UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Climate Control Mechanical Services, Inc.              Case 3:15-bk-02248-JAF
                                                       (Jointly Administered With)
Base 3, LLC                                            Case 3:15-bk-02249-JAF
The Alexander Group, LLC                               Case 3:15-bk-02250-JAF
Facility Performance, LLC                              Case 3:15-bk-05021-JAF
                                                       Chapter 11

          Debtors.
_____/

Skanska USA Building, Inc.                             Adv. Pro. 3:16-ap-00100-JAF

          Plaintiff,

-vs-

Climate Control Mechanical Services, Inc.

          Defendant.
_____/

## COUNTERCLAIM AND CROSSCLAIM

Defendant, Climate Control Mechanical Services, Inc. ("CCMS") countersues

Plaintiff, Skanska Usa Building, Inc. ("SKANSKA"), and files cross-claims and sues

Defendants, Zurich American Insurance Company ("ZURICH"), and Fidelity and Deposit

Company of Maryland ("FDCM"), Liberty Mutual Insurance Company ("LIBERTY"),

Federal Insurance Company ("FEDERAL") and the Continental Insurance Company

("CONTINENTAL"), (collectively, ZURICH, FDCM, LIBERTY, FEDERAL and

CONTINENTAL are referred to as "the SURETY") and alleges as follows:

## JURISDICTION

1. CCMS filed a voluntary petition under chapter 11 on May 18, 2015. Plaintiff files this amended complaint as a debtor in possession for the benefit of the estate. A plan has not been confirmed.

2. For purposes of complying with Rule 7008(a)[1] CCMS states:

a. This adversary proceeding relates to case 3:15-bk-02248-JAF filed by CCMS in the U.S. Bankruptcy Court for the Middle District of Florida, Jacksonville Division under chapter 11 of Bankruptcy Code (the "Chapter 11 case");

b.  This counterclaim and crossclaim is filed in response to a complaint filed in this adversary proceeding by SKANSKA which seeks a determination of certain contractual obligations of the parties.

c. The Court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b)(2)(B) and (C);

c. This adversary proceeding involves both core and non-core matters; and

d. CCMS consents to entry of final orders or judgments by the bankruptcy judge.

3. This complaint seeks relief of a kind specified in Rule 7001 and, therefore, is filed as an adversary proceeding pursuant to Rule 3007(b).

4. CCMS has authority to recover money and property for the benefit of the estate pursuant to § 550 as a debtor in possession.

---

[1]All references in this pleading to chapters, statutory sections, and rules, are references, chapters and statutory sections of the Bankruptcy Code and rules of the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.

5.   This is an action for: (1) breach of contract, (2) action on payment bond, and (3) action for breach of the SURETY's implied common law duty of good faith and fair dealing.

6.   CCMS, is a corporation organized and operating under the laws of the State of Florida, with its principal place of business in Marion County, Florida. At all times material hereto, with respect to the events complained of herein, CCMS was doing business in Alachua County, Florida.

7.   SKANSKA, is a Delaware corporation registered to conduct business in the State of Florida and having its principal place of place of business in Florida in Hillsborough County, Florida.  At all times material hereto, with respect to the events complained of herein, SKANSKA was doing business in Alachua County, Florida.

8.   ZURICH is a New York corporation registered to conduct business in the State of Florida, which regularly conducts business in the State of Florida. At all times material hereto, with respect to the events complained of herein, ZURICH was doing business in Alachua County, Florida.

9.   FDCM is a Maryland corporation registered to conduct business in the State of Florida, which regularly conducts business in the State of Florida. At all times material hereto, with respect to the events complained of herein, FDCM was doing business in Alachua County, Florida.

10.   LIBERTY is a Massachusetts corporation registered to conduct business in the State of Florida, which regularly conducts business in the State of Florida. At all times material hereto, with respect to the events complained of herein, LIBERTY was doing business in Alachua County, Florida.

11. FEDERAL is an Indiana corporation registered to conduct business in the State of Florida, which regularly conducts business in the State of Florida. At all times material hereto, with respect to the events complained of herein, FEDERAL was doing business in Alachua County, Florida.

12. CONTINENTAL is a Pennsylvania corporation registered to conduct business in the State of Florida, which regularly conducts business in the State of Florida. At all times material hereto, with respect to the events complained of herein, CONTINENTAL was doing business in Alachua County, Florida.

13. This dispute arises out of a written construction subcontract agreement under which CCMS was to furnish and install heating, ventilation and air conditioning ("HVAC") systems to be incorporated in the construction of the "UF323A Chemistry/Chemical Biology Building" for the University of Florida located in Alachua County, Florida in the City of Gainesville (hereafter referred to as the "Project"), for which Project SKANSKA was the Prime Contractor, and for which Project ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL, collectively as the SURETY provided both payment and performance bonds.

## GENERAL ALLEGATIONS

14. On or about August 14, 2014, SKANSKA entered into a contract (the "Prime Contract") with The University of Florida Board of Trustees ("UF", the "Project Owner") to perform the construction and related work and services at the construction project commonly referred to as UF 323A Chemistry/Chemical Biology Building (the "Project"). CCMS does not possess a copy of the Prime Contract for the Project. Upon information and belief, a copy of the Prime Contract is believed to be in the possession and control

of SKANSKA.

15.  On or about April 29, 2015, SKANSKA entered into a subcontract with CCMS to perform the HVAC scope of work for the Project. Specifically, CCMS was to "provide … the complete engineering, coordination, furnishing and installation of … all HVAC Systems as required, shown, described and specified … and all related scope and services" pursuant to the subcontract. A copy of the subcontract agreement between SKANSKA and CCMS is attached hereto as Exhibit "A."

16.  On or about August 4, 2014, in connection with the SKANSKA-UF prime contract for the Project, SKANSKA as Principal, and the various entities comprising the SURETY, as Surety, executed and delivered to UF both a Performance Bond and a Payment Bond, each in the amount of One Hundred Seventy-Five Thousand Three Hundred and Seven and 00/100 Dollars ($175,307.00) for the Project. As the Project was built in phases, the amount of the Performance and Payment bonds was increased accordingly through a series of Bond Riders as the Project construction proceeded, ultimately to reflect the Penal Sum of $51,500,000.00 as a result of the third Bond Rider.  (Payment and Performance Bonds and Bond Riders attached as Composite Exhibit "B"). The Payment Bond furnished by the SURETY extends to and covers claims by all claimants defined in Section 255.05(1), Florida Statutes, who furnish labor, services, or materials for the prosecution of the work provided for in the contract, which includes subcontractors such as CCMS.

17.  The original value of the SKANSKA-CCMS subcontract was $6,410,705.00. Change orders on the Project ultimately reduced the contract value to $4,051,011.75.

18.  When CCMS submitted a bid for the work on the UF 323A

Chemistry/Chemical Biology Building Project, SKANSKA's bonding company, ZURICH and the other individual sureties comprising the SURETY, sent forensic accountants to CCMS's offices to review and assess CCMS' financial condition and ability to meet the proposed HVAC subcontract obligations.  During the period immediately prior to the commencement of the Project, CCMS sustained substantial losses on other, unrelated construction projects, and was forced to seek protection under Chapter 11 of the United States Bankruptcy Code.  The SURETY's forensic accountants maintained a presence in CCMS' offices from March 2015 through and including at least June 2015, reviewing CCMS' financial records and assessing CCMS' financial capacity and ability to complete the UF 323A Chemistry/Chemical Biology Building Project.

19.  From the commencement of the Project, it consistently ran behind schedule. The original project schedule, dated March 2, 2015, was never adhered to by SKANSKA and was missing critical elements vital to the completion of CCMS' scope of work. Because the Project had to achieve substantial completion in time for Fall 2016 classes at the University of Florida, by the time the HVAC scope of work could be performed by CCMS on the Project the project was already weeks behind schedule and SKANSKA was under pressure from UF to make up for SKANSKA's scheduling inefficiencies and delays caused by other trades in preliminary, and earlier stages of construction.

20.  Consequently, when CCMS submitted Requests For Information (RFIs) to SKANSKA as to why activities that had to be completed before CCMS could began its work had not been completed and, in some cases had not started, SKANSKA delayed responding or provided vague or ambiguous responses designed create the

appearance that CCMS was either fully or partially responsible for the delay, even as CCMS was working diligently to complete its contract activities on the project in accord with SKANSKA's constantly revised scheduling and in spite of the chaos on the project created by SKANSKA's lack of coordination of trades.

21.   When CCMS submitted RFIs, responses from SKANSKA were delayed, vague or unresponsive. Throughout the project, SKANSKA was consistently unresponsive when queried by CCMS as to which activities were on the critical path in revised project schedules, why various activities on the original schedule had been delayed, and which activities were impacting the scheduled completion. SKANSKA's lack of responsiveness as to the scheduling of critical path activities on the project impacted CCMS' ability to start work, maintain scheduled work operations, and complete its originally scheduled scope of work under the subcontract, and forced CCMS to add substantial additional labor as well as incorporate additional materials to the project in an effort to make up for the delays caused by SKANSKA.

22.   Consequently, CCMS' work was severely impacted by numerous delays to the Project schedule not of CCMS' making.

23.   Because of the additional labor and materials added to the Project by CCMS, at SKANSKA's request, to make up for the delays caused by SKANSKA, CCMS incurred substantial additional costs over and above the contract price, including change orders, that was negotiated to be paid to CCMS.

24.   CCMS' work on the project was delayed, interfered with and damaged due to the impacts to its work on the PROJECT caused by SKANSKA, including but not limited to:

a.   General delay in getting contractors for all trades on the project site from the commencement of the project schedule. The delay in portions of the Project construction requisite for the installation of CCMS' HVAC piping and ductwork resulted in a significant delay of submittals, Computer Aided Design ("CAD") drafting and planning by CCMS as to its scope of work on the Project;

b.   Delay in structural steel and fireproofing shafts: All ductwork & piping in the Project building, including HVAC ductwork and piping, runs into or out of shafts running from the floor of the building to the penthouse, called "chases." Delay in design and construction of these structures by SKANSKA delayed CCMS' ability to install materials for the HVAC system supported by the structure in these shafts.  The delay in the installation of the chase steel by SKANSKA impacted CCMS' work and directly led to lost labor productivity because it led to congestion of the job site, interference with CCMS' job activities once CCMS was able to commence its work, and stacking of CCMS' project activities.

c.   Delay in Shaft wall construction: The original project schedule failed to include for the construction of the shaft walls, and the impact was not anticipated by SKANSKA in scheduling for the Project. SKANSKA ultimately advised its subcontractors, including CCMS, that construction of shaft walls was part of the scope of work of the trades installing work in the shaft. Construction of shaft walls was therefore delayed by SKANSKA's failure to plan for the shaft wall construction, and did not start until October 2015. Because other work was proceeding at that time, the shaft walls had to be constructed during and while other work was progressing in the same areas, resulting in congestion and stacking of trades, and a 1500% increase in CCMS' labor due to the

inspection and construction process being employed by SKANSKA for the shaft walls. SKANSKA also did not allow any work going through shaft wall to be completed until the process of building and inspecting the shaft walls was completed, meaning that completion of CCMS' duct and pipe installation work in shafts could not be completed until the shaft walls were finished.

d.  Delay in dry-in of the building: Duct work and insulation work by CCMS was delayed approximately ninety (90) days due to SKANSKA's failure to complete the dry-in of the building as originally scheduled, and the impacts from the delays were incurred from the time CCMS began its work until the date it was terminated from the Project by SKANSKA. SKANSKA's failure to dry-in the building as scheduled led to water intrusion in CCMS' work area which affected CCMS' ability to install its materials and the efficiency with which it was able to do so.

e.  Delay in providing sizing for piping headers for the 5th floor penthouse: When Skanska revised the original Project schedule, it failed to provide direction for what size piping headers would lead to the Air Handling Units ("AHUs") used on the Project, and how the stacked coils should be piped. CCMS's RFI on this issue took 35 work days to answer by SKANSKA, and the delay was critical to supplying water and air conditioning for the building.

f.  Delay in providing permanent power: The original schedule provided for completion of permanent power to the building on December 8, 2015. Actual permanent power was not completed until March 7, 2016. The delay in providing permanent power impacted CCMS' ability to flush piping and provide conditioned air to the building.

g.  Delay in completing Building Information Modeling (BIM) for the project:

SKANSKA was five (5) months late in completing BIM modeling for the Project; this prevented other trades whose work was requisite for the HVAC work CCMS was to perform from being able to install or construct their work, which in turn prevented CCMS from being able to install its own work until the BIM modeling and foundational work by other trades was completed.

h.  Delay in providing water on site: CCMS was unable to fill water systems for the HVAC system due to insufficient water being provided on the building site by SKANSKA.

i.  CCMS experienced loss of labor productivity by having to increase manpower on the job, at SKANSKA's direction, past the point of maximum efficiency in order to recover the project schedule which had been significantly delayed by other contractors and by design inefficiencies outside of CCMS' control.

25.  The impacts described in paragraphs 19 through 24, above, led directly to the additional labor and material costs incurred by CCMS on the Project, due to lost productivity caused by the Project inefficiencies created by SKANSKA.

26.  CCMS committed significant resources to the Project to meet the demands of SKANSKA to accelerate the Project schedule, and met with SKANSKA on February 15, 2016 to outline the cost and payment requirements which would be necessary to meet the newly imposed obligations.

27.  On February 17, 2016, SKANSKA confirmed to CCMS that the financial obligations required to accelerate the HVAC work by CCMS would be met, and that the Project Owner, UF, was in agreement that the increased Project costs would be paid.

28.  SKANSKA's response, once it became apparent that the HVAC scope of

work had been significantly impacted by the delays to the project attributable from its own scheduling and project planning failures and from delays caused by other trades and scopes of work, was to lay the blame for the delays and the failure to meet scheduled deadlines to achieve substantial completion on CCMS. Despite the numerous delays to the schedule caused by SKANSKA and subcontractors other than CCMS performing precedent scopes of work, SKANSKA issued a 48-Hour Default Notice, dated March 10, 2016, stating that CCMS "failed to comply with the original Project Schedule from March 2, 2015." (Exhibit "C.")

29.  On or about March 9, 2016, CCMS was notified by one of its subcontractors, Sullivan Welding, that SKANSKA had entered into a subcontract with another HVAC contractor, Gulf Mechanical, to replace CCMS and complete the HVAC scope of work on the project.

30.  On March 10, 2016, SKANSKA sent CCMS a Notice of Payment Withholding "all future payments" to CCMS pursuant to Section 4.7 of the parties' subcontract. Exhibit "D".

31.  CCMS replied in full in writing to each allegation raised by SKANSKA in the 48-Hour Default Notice. Exhibit "E".

32.  SKANSKA issued a written Notice of Termination on March 14, 2016, claiming that CCMS "failed to cure" within 48 hours. Exhibit "F". SKANSKA falsely claimed in the Notice of Termination that CCMS "informed SKANSKA" on the morning of March 14, 2016 that CCMS was demobilizing from the jobsite in light of its pending termination.

33.  CCMS replied to the Notice of Termination on March 15, 2016 as follows:

a.  Noting that the 48-hour Cure notice issued by SKANSA was delivered to CCMS' shop foreman on a Saturday and that CCMS had fully responded to each allegation raised by SKANSKA in the Notice to Cure within 48 hours; and

b.  That CCMS' project manager had erroneously stated that CCMS would be demobilizing, since what had been delivered to CCMS's shop foreman was a 48 hour cure notice, and not a termination notice.

c.  CCMS's Project Manager further advised SKANSKA that CCMS would continue manning the project, which statement had been acknowledged by SKANSKA. Exhibit "G".

34.  SKANSKA's representation that CCMS had demobilized from or had informed SKANSKA that it was demobilizing from the project was false.

35.  SKANSKA developed or devised a plan to induce CCMS to remain on the job with promises of payment for the significant expenditures of increased costs for labor and materials as a result of its (i.e., SKANSKA's) decision to accelerate the Project schedule while never truly intending to fulfill that commitment.  Subsequently, SKANSKA contacted another mechanical contractor about completing the HVAC scope of work on the Project, which contractor, Gulf Mechanical, began contacting CCMS' vendors and subcontractors about work on the Project while they were still performing work for CCMS.  This resulting interference with CCMS' work only served to obfuscate the true nature of the facts surrounding CCMS' termination from the Project by SKANSKA.

36.  SKANSKA's articulated bases for terminating CCMS from the Project are without merit, as the original project schedule did not merely "re-sequence" work

affecting or impacting CCMS. The original schedule was missing or incomplete with respect to work squarely impacting CCMS' ability to start, pursue and complete its work on the project, and thus substantially impaired CCMS' productivity on the Project.

37.   Throughout the Project, SKANSKA essentially used CCMS as an excuse for its own failures to maintain the schedule, coordinate the work of various trades and ensure that precedent work had been performed to ensure that CCMS could commence, perform and complete its own work as scheduled, until SKANSKA received payment for the work performed by CCMS and it was convenient for SKANSKA to terminate CCMS and hire a replacement subcontractor. Through no fault of its own, CCMS incurred substantial damages in labor, material and equipment costs on the project due to the loss of productivity incurred because of SKANSKA's failures.

38.   CCMS was not the cause of the loss of productivity on the SKANSKA-CCMS subcontract for the "HVAC – Mechanical" scope of work on the Project. Rather, the actions of the prime contractor SKANSKA were directly responsible for the loss of productivity suffered by CCMS.

39.   The lost productivity costs sustained by CCMS, described in paragraphs 20-25, 36 and 37, above, are substantial expenditures for labor and materials which were not part of the SKANSKA-CCMS subcontract or related change orders, were not reasonably anticipated or foreseeable Project construction costs at the time of the making of the parties' contract, and are costs for which CCMS seeks recovery under the payment bond furnished by the SURETY.

40.   Additionally, SKANSKA has failed to pay CCMS the contract balance owed to CCMS for work performed on the Project. Upon information and belief, SKANSKA

was paid by UF for the work performed by CCMS on March 1, 2016, but SKANSKA has not released the contract balance to CCMS. The last payment received by CCMS from Skanska was on March 2, 2016. SKANSKA has paid CCMS a total of $2,361,787.24 of the $4,051,011.75 total revised contract value to date.

41.  The last date on which CCMS performed labor or delivered materials or supplies to the Project was in March 2016, which is within one year of the filing of this action.

42.  On June 14, 2016 CCMS sent a letter to SKANSKA advising that CCMS had incurred $2,848,710.88 in damages in regard to its work on the Project, calculated based on the construction industry standard Mechanical Contractors Association of America ("MCAA") factors for productivity on construction projects, and that SKANSKA was in breach of contract with respect to its obligation to pay CCMS within fourteen (14) days of receipt of payment from UF, the Project owner, CCMS last having received payment for "Project Timeline Acceleration" cost (additional staffing) in the amount of $261,267.80 on March 2, 2016. In the letter, CCMS requested that SKANSKA schedule a meeting to resolve CCMS' claim by June 30, 2016. The SURETY was copied on the letter from CCMS to SKANSKA. Exhibit "H".

43.  Through execution of power of attorney included with the Project bonds, ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL represented that they are authorized to transact and conduct surety business in all States within the United States, including the State of Florida, and are therefore jointly and severally liable for obligations owing on to claimants on the Project bonds.

44.  No meeting was scheduled to resolve CCMS' claim for unpaid contract

funds and additional costs incurred due to lost productivity on the Project. By letter

dated July 19, 2916, ZURICH, on behalf of the SURETY, acknowledged receipt of

CCMS' Notice of Claim against the Project payment bond and requested that CCMS

provide additional documentation in support of its claim in order that the SURETY could

sufficiently investigate and evaluate CCMS' claim. Exhibit "I".

45.   CCMS complied with the SURETY's request and supplied the information

and documentation requested by the surety in support of its claim.

46.   On or about October 20, 2016, ZURICH sent CCMS a letter denying CCMS'

claim summarily and in its entirety, on behalf of the SURETY. ZURICH's denial stated,

in relevant part:

> Skanska advises that due to numerous deficiencies in the work performed by
> CCMS, Skanska terminated the CCMS contract. The claim submitted by CCMS
> consists of backcharges assessed by Skanska, as well as unsubstantiated and
> unapproved change order requests, and no amount is due CCMS. Therefore, we
> must deny coverage for this claim.

Exhibit "J."

47.   All conditions precedent to maintenance of this action have occurred, have

been met, or have been waived.

48.   CCMS has retained the undersigned attorneys to represent it in this action

and has agreed and obligated itself to pay a reasonable fee for its services.

## COUNT I – BREACH OF CONTRACT

49.   This is an action for breach of contract seeking damages in the amount of

$2,848,710.88, exclusive of interest, costs, and attorney's fees.

50.   The allegations contained in paragraphs 1 through 48 above are hereby

realleged and incorporated by reference as if fully stated herein.

51.  CCMS has performed all conditions precedent to be performed by it under the contract or the conditions have occurred or have been waived.

52.  SKANSKA has breached the contract in that it terminated CCMS from the Project without basis and failed and refused to pay CCMS in full for the work performed by CCMS on the Project, despite repeated demand.

53.  Upon information and belief, SKANSKA has been paid in full by the Project Owner for the work performed by CCMS, but has failed and refused to pay CCMS for the same.

54.  SKANSKA was given written notice and the opportunity to resolve the failure to pay the contract balance to CCMS but has refused to do so.

55.  Due to SKANSKA's breach CCMS has been damaged. Specifically, due to the failure to pay the contract balance owed to CCMS as well as the substantial amounts of labor and materials which CCMS had to pay to meet SKANSKA's demands to accelerate the Project work schedule, CCMS has lacked to resources needed to man other projects. This in turn has resulted in financial harm to the company.

56.  As a direct and proximate result of SKANSKA's breach of contract in failing to pay the contract balance owed to CCMS, CCMS has been damaged in the amount of $2,848,710.88.

**WHEREFORE**, CCMS, demands judgment against SKANSKA for damages, costs of this action, including a reasonable attorney's fee and such other and further relief as this Court deems just and proper.

## COUNT II – QUANTUM MERUIT

57.  This is an action for quantum meruit seeking damages in the amount of $2,848,710.88, exclusive of interest, costs, and attorney's fees, and is plead in the alternative to Count I.

58.  The allegations contained in paragraphs 1 through 48 above are hereby realleged and incorporated by reference as if fully stated herein.

59.  CCMS performed services and supplied labor and materials in the furtherance of the Project for which SKANSKA was the Prime Contractor.

60.  SKANKSA acquiesced to CCMS' actions and accepted the benefits of CCMS' services and the labor and materials provided by CCMS but has failed and refused to pay CCMS in full for the reasonable value of its services rendered or its labor, materials, and supplies provided to SKANSKA, and for costs incurred in connection with those services, the reasonable value of which remains unpaid the amount of $2,848,710.88.

**WHEREFORE**, CCMS, demands judgment against SKANSKA  for damages, costs of this action, and such other and further relief as this Court deems just and proper.

## COUNT III – UNJUST ENRICHMENT

61.  This is an action for unjust enrichment seeking damages in the amount of $2,848,710.88, exclusive of interest, costs, and attorney's fees, and is plead in the alternative to Count I.

62.   The allegations contained in paragraphs 1 through 48 above are hereby realleged and incorporated by reference as if fully stated herein.

63. CCMS provided services, labor and materials necessary for the completion of the construction Project for which SKANSKA was the Prime Contractor.

64. The services, labor and materials referred to above were all incorporated into the Project at SKANSKA's direction or as a result of SKANSKA's actions and constitute a benefit to SKANSKA.

65. SKANSKA has accepted and retained the benefits conferred upon it by CCMS.

66. SKANSKA has failed and refused to pay CCMS the value of the services, labor, materials, and supplies provided by CCMS despite repeated demand therefore.

67. SKANSKA will be unjustly enriched if it is permitted to retain the benefit of CCMS' work without paying CCMS for the same.

**WHEREFORE**, CCMS demands judgment against Defendant for damages, costs of this action, and such other and further relief as this Court deems just and proper.

## COUNT IV – ACTION ON PAYMENT BOND

68. This is an action on a payment bond against ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL  (collectively referred to as "the SURETY") to recover for contract sums owed to and additional costs incurred by CCMS on the "UF323A Chemistry/Chemical Biology Building" Project.

69. The allegations contained in paragraphs 1 through 48 above are hereby realleged and incorporated by reference as if fully stated herein.

70. CCMS is owed the sum of $2,848,710.88 by SKANSKA, inclusive of both the subcontract balance owed to CCMS by SKANSKA in regard to the

SKANSKA-CCMS subcontract for the HVAC scope of work on the Project, as well as increased labor and materials costs due to productivity loss incurred by CCMS in regard to the work it performed on the Project.

71.  CCMS furnished a notice of non-payment to SKANSKA on June 14, 2016. (Exhibit "H").

72.  ZURICH, FDCM, LIBERTY, FEDERAL, and CONTINENTAL, together pledging assets to secure the bond on the Project, and each through duly executed power of attorney, collectively are the surety on the Project payment bond. ZURICH, acting on behalf of the SURETY, acknowledged receipt of CCMS' claim on or about July 19, 2016.

73.  SKANSKA is the principal on the Project payment bond furnished by ZURICH.

74.  CCMS as a subcontractor on the Project is entitled to the protection of the bond.

75.  CCMS has filed a claim for payment under the bond, but the SURETY refuses to pay the claim.

76.  The SURETY is liable to pay the claim on the bond.

**WHEREFORE**, CCMS demands judgment against ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL jointly and severally, on the bond in the amount of $2,848,710.88, plus prejudgment interest and costs and such other relief this Court deems just and proper.

## COUNT V – BREACH OF DUTY OF GOOD
## FAITH, FAIR DEALING AND REASONABLENESS

77.   This is an action against Defendants ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL for breach of its duty of good faith, fair dealing and reasonableness.

78.   The allegations contained in paragraphs 1 through 48 above are hereby realleged and incorporated by reference as if fully stated herein.

79.   On or about June 14, 2016, CCMS served the SURETY notice of its claim under the payment bond for unpaid work under its subcontract with SKANSKA and for additional unpaid work performed on the project at the behest of or attributable to the actions of SKANSKA. CCMS' notice of claim is attached hereto as Exhibit "H". On July 19, 2916, ZURICH, on behalf of the SURETY, acknowledged receipt of CCMS' claim (Exhibit "I", attached hereto).

80.   To date, the SURETY has failed and refused to pay any portion of CCMS' claim. Further, the SURETY has failed and refused to provide CCMS with any reason(s) why the claim has not been paid or any evidence that an objective and impartial investigation into the merits of CCMS' claim was actually made.

81.   The SURETY, as a surety issuing a payment bond on a construction project in Florida, has a duty to make a good faith investigation of any claim for payment made under the bond by either the bond obligee or any of the principal's subcontractors, suppliers, materialmen or laborers who have performed work on the project. The SURETY also has a duty of fair dealing and reasonableness in regard to the investigation, assessment and determination of such claims.

82.   In response to CCMS' notice of claim under the payment bond, the SURETY

merely sent CCMS a copy of SKANSKA's denial that any payment was due to CCMS. CCMS never received any indication that the SURETY performed any sort of investigation into the merits of CCMS' claim.

83.   The SURETY breached its duties of good faith, fair dealing and reasonableness in rejecting the claim of CCMS under the payment bond insofar as it failed to properly investigate, assess and resolve a claim it should have known was properly payable and owing under the bond.

84.   As a direct and proximate result of the acts and omissions of the SURETY, CCMS has incurred damages.

**WHEREFORE**, Plaintiff, CCMS, demands judgment against ZURICH, FDCM, LIBERTY, FEDERAL and CONTINENTAL, jointly and severally, for damages, and such other and further relief as this Court deems just and proper.

| | |
|---|---|
| **WIDERMAN MALEK, PL**<br>Attorneys at Law | **RICHARD A. PERRY, P.A.**<br>Law Practice |
| /s/ Edward J. Kinberg<br>**EDWARD J. KINBERG**<br>Florida Bar No. 996742<br>1990 W New Haven Ave Ste 201<br>Melbourne, FL 32904-3923<br>(355) 255-2332<br>ejk@uslegalteam.com | /s/ Richard A. Perry<br>**RICHARD A. PERRY**<br>Florida Bar No. 394520<br>820 East Fort King Street<br>Ocala, FL 34471-2320<br>(352)732-2299<br>richard @ rapocala.com |
| Attorney for Defendant Climate<br>Control Mechanical Services, Inc. | Attorney for Defendant Climate<br>Control Mechanical Services, Inc. |

# EXHIBIT "A"

# SUBCONTRACT AGREEMENT



# SKANSKA

# Subcontract Agreement

**THIS SUBCONTRACT** (the "Subcontract") is made as of this **29**<sup>th</sup> day of **April, 2015** ("Effective Date") by and between the Contractor and Subcontractor as identified below.  Capitalized terms used in this document entitled Subcontract Agreement and not defined herein shall have the meanings assigned to them in Exhibit E.

| PROJECT NAME:    UF-323A, CHEMISTRY / CHEMICAL BIOLOGY BUILDING | PROJECT NUMBER: | 239012 |
|---|---|---|
| PROJECT ADDRESS:<br>UNIVERSITY OF FLORIDA BUILDING 0275<br>GAINESVILLE, FL 32611 | SUBCONTRACT NO.: | 239012-201-017 |
| | VENDOR NO.: | 2772155 |
| | COST CODE REFERENCE: | 201.15700000.5020 |

| CONTRACTOR:<br>    Skanska USA Building Inc. | SUBCONTRACTOR:<br>    Climate Control Mechanical Services, Inc. |
|---|---|
| HOME OFFICE ADDRESS:<br>    4030 W. Boy Scout Blvd.<br>    Suite 200<br>    Tampa, Florida 33607 | ADDRESS:<br>    2695 NW 4th Street<br>    Ocala, FL  34475 |
| CONTACT:<br>    DAVE ANDERSON | CONTACT:<br>    ROB BOYER / LOUIE WISE III<br>    EMAIL: RBOYER@CLIMATECONTROLFLORIDA.COM<br>    SIGNOR: LW3@CLIMATECONTROLFLORIDA.COM |
| TELEPHONE:<br>    813-480-6387 | TELEPHONE:<br>    352-291-0185 |
| FACSIMILE:<br>    866-392-7737 | FACSIMILE:<br>    352-351-0219 |
| CONTRACTOR'S LICENSE NUMBER (IF REQUIRED): | SUBCONTRACTOR'S LICENSE NUMBER (IF REQUIRED): |

**WHEREAS**, Contractor has entered into a contract with **The University of Florida Board of Trustees**  (the "Owner") dated as of **August 14, 2014** (the "Owner Contract") to perform the construction and related work and services at the project commonly referred to as **UF 323A Chemistry/Chemical Biology Building** (the "Project"):

| OWNER:<br>    UNIVERSITY OF FLORIDA BOARD OF TRUSTEES | ARCHITECT:<br>    STANTEC |
|---|---|
| ADDRESS:<br>    P.O. BOX 115050<br>    GAINESVILLE, FL 32611-0050 | ADDRESS:<br>    400 EAST MORGAN CENTER<br>    101 EAST DIAMOND STREET<br>    BUTLER, PA  16001 |
| | TELEPHONE:<br>    727-431-1388 |
| | FACSIMILE:<br>    N/A |

**WHEREAS**, Subcontractor desires to perform, and Contractor has agreed to enter into this Subcontract with Subcontractor for the performance of, a portion of the work required to complete the Project.

**NOW THEREFORE**, for and in consideration of the covenants and agreements of the parties contained herein, Contractor and Subcontractor agree as follows:

1.    Subcontractor agrees to perform and complete the work required by this Subcontract, which generally consists of the **HVAC Systems - Mechanical** (the "Work").

2.    As full consideration for complete performance of the Work, and except for increases or decreases by Change Order as provided for in Exhibit E, Subcontractor shall be paid the lump sum of **Six Million, Four Hundred Ten Thousand, Seven Hundred Five Dollars and Zero Cents ($6,410,705.00)** (the "Subcontract Amount").

Page 1 of 3

3. Subcontractor ☐ is ☒ is not *(Mark the appropriate box with an "X")* required to provide performance and payment bonds securing the performance of the Work and the payment of Sub-subcontractors.  Subcontractor ☒ is ☐ is not *(Mark the appropriate box with an "X")* required to enroll in Contractor's Subguard performance insurance program.

4. Subcontractor shall perform the Work in accordance with and comply with all requirements contained in the following Exhibits, each of which is included as an integral part of the Subcontract:

| MANDATORY SUBCONTRACT EXHIBITS | | | | | |
|---|---|---|---|---|---|
| ☒ | Exhibit A: | Scope of Work/Supply and Clarifications/Qualifications | ☒ | Exhibit G: | Skanska Standard Insurance Requirements |
| ☒ | Exhibit B: | Drawings and Sketches, Specifications, Addenda and Other Documents | ☒ | Exhibit H: | Skanska Standard Interim Estimate for Payment, Waiver and Release |
| ☒ | Exhibit C: | Alternates, Unit Prices and Labor Rates | ☐ | Exhibit I: | Skanska Standard Final Estimate for Payment, Unconditional Waiver and Release – *Not used in Florida* |
| ☒ | Exhibit D: | Project Schedule/Milestones | ☒ | Exhibit J: | Skanska Standard Subcontractor Environmental Health and Safety Requirements |
| ☒ | Exhibit E: | Skanska Standard Subcontract Terms and Conditions | ☒ | Exhibit K: | Skanska Standard Change Order |
| ☒ | Exhibit F: | Skanska Code of Conduct | ☒ | Exhibit N: | Supplemental Terms and Conditions for use in the State of Florida |

5. Subcontractor shall also perform the Work in accordance with and comply with all requirements contained in the Exhibits marked in the following list, each of which marked Exhibit is included as an integral part of the Subcontract *(Indicate which Exhibits apply by inserting an "X" in the box next to the Exhibit)*:

| OPTIONAL SUBCONTRACT EXHIBITS | | | | | |
|---|---|---|---|---|---|
| ☐ | Exhibit L: | Supplemental Terms and Conditions for Federal Government Projects | ☒ | Exhibit U: | Sub-subcontractor Identification |
| ☒ | Exhibit M: | Project Specific Requirements | ☐ | Exhibit V: | Guarantee to Owner |
| ☐ | Exhibit O: | Payment and Performance Bonds | ☐ | Exhibit W: | Owner Confidentiality and Non-Disclosure Requirements |
| | Exhibit P: | Reserved | ☒ | Exhibit X: | Site Logistics Plan |
| ☐ | Exhibit Q: | Skanska Standard Environmental Insurance Requirements | ☐ | Exhibit Y: | Supplemental Terms and Conditions for Subcontractors with Design Responsibility |
| ☒ | Exhibit R: | Project Specific Quality Management Program | | Exhibit Z: | Not Used |
| ☒ | Exhibit S: | Authorized Signatories | ☒ | Exhibit PS1: | Safety & Health Management Program |
| ☒ | Exhibit T: | LEED Requirements | ☒ | Exhibit PS2: | Subcontractor Start-up Checklist |

**IN WITNESS WHEREOF**, Contractor and Subcontractor have executed this Subcontract to be effective as of the Effective Date.

| **Contractor: SKANSKA USA BUILDING INC.** | **Subcontractor:  CLIMATE CONTROL MECHANICAL SERVICES, INC.** |
|---|---|
| By: *Matt Gilbert*    5/19/2015 | By: *Louie Wise III*    5/19/2015 |
| (Signature)                (Date) | (Signature)                (Date) |
| Matt Gilbert | Louie Wise III |
| (Printed Name) | (Printed Name) |
| Sr. Vice President | President |
| (Title) | (Title) |

Subcontract Agreement
(06/2006 ed. Rev. 1)

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68E48D0DEDD6

# EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SCOPE OF WORK/SUPPLY AND CLARIFICATIONS/QUALIFICATIONS

### 1.  Scope of Work/Supply

The Scope of Work/Supply is identified in the following Specification Section(s) and further described below:

| Specification Section | Description |
|---|---|
| 01000 | UF Design and Construction Standards: Miscellaneous General Requirements: June 2010 |
| All Sections | UF Design and Construction Standards: General Design Guidelines: August 2011 |
| All Sections | UF Construction Standards: March 2013 |
| Division 1 | General Requirements (as they relate to this scope) |
| Division 22 | Plumbing (as it relates to this scope of work) |
| Division 23 | Heating, Ventilating, and Air Conditioning (in its Entirety) |
| Division 26 | Electrical (as they relate to this scope) |
| 262923 | Variable-Frequency Motor Controllers |
| Division 05 | Metals (as they relate to this scope) |
| 055000 | Metal Fabrications |
| Division 07 | Thermal and Moisture Protection (as they relate to this scope) |
| 078413 | Penetration Firestopping |
| Division 08 | Openings (as they relate to this scope) |
| 083113 | Access Doors and Frames |
| Division 09 | Finishes (as they relate to this scope) |
| 099123 | Painting (as it relates to this scope) |

**Scope Specific Requirements**

It is the intent of this Subcontract Agreement to provide for the complete engineering, coordination, furnishing and installation of the all **HVAC Systems** as required, shown, described and specified under this agreement, and all related scope and services, required in order to provide for a complete Project. This Subcontractor shall be responsible to perform all work not expressly specified or indicated by the Contract Documents but as required for a thorough and complete execution of the work of this Subcontract in every respect.  Note that the word "provide" if, and when used herein shall mean Provide completely, including all costs for labor, materials, and equipment.  It is further understood that the Project Drawings, Specifications and other Documents listed in Exhibit B, may not be fully developed, and that the Total Subcontract Agreement Price will include a complete and functional installation to the satisfaction of the Owner and the Contractor.

In addition to the foregoing, it is further understood and agreed that this Subcontractor also includes the furnishing and installation of the below listed items regardless of whether or not they are in the above Specification sections, or any other Specification section, or shown on the plans.  Drawing and detail references are provided for reference only and are not to be considered as all inclusive of the Contract Documents for the particular items referenced.

# EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

2.    **General Items**

2.1.    Reference all contract exhibits for the full scope of work.

2.2.    All premium time, overtime, weekend work, etc. to meet the project schedule is included in this subcontract.

2.3.    All mobilizations necessary for this scope are included in this subcontract.

3.    **General Scope Specific Items**

3.1.    This subcontractor shall provide **ALL HVAC Systems as** contained in the contract documents for this building, unless specifically noted to be by another subcontractor.

3.2.    The scope of work shall include, but is not limited to all coordination, purchasing, manufacturing, fabrication, mobilization, demobilization, main office overhead, on-site supports, supervisions, labor, material, tools, equipment, scaffolding, rigging, hoisting, testing (assistance), and any other items required to complete the scope of work outlines herein.

3.3.    Provide all sleeves, core drilling, saw cutting, miscellaneous expansion and chemical anchors, bolts, nuts, washers, fillers, shop paint, field paint, galvanizing, miscellaneous metal straps, anchor bolts, etc., required for completion of this scope of work.

3.4.    In the event that the contract documents conflict with UF standards or building codes, this subcontractor will contain the more stringent or the more costly of the requirements.

3.5.    This subcontractor includes the basis of design for materials, equipment, systems, etc. as shown in the contract documents or materials, equipment, systems, etc., from one of the listed, approved manufactures or suppliers identified in the project specifications. Should this subcontractor propose a deviation from these as an alternate or provide substitutions, and if these are accepted, any and all cost associated with changes directly related to the deviation shall be by this subcontractor.

3.6.    **Provide all the work of Division 23 in its entirety.** This includes a **COMPLETE** system, as shown on the contract drawings, specifications, and required by code and/or UF Standards.

3.7.    Provide the work of Specification Section 078413 Penetration Firestopping as it relates to this scope.

3.8.    Provide the work of Specification Section 083113 as it relates to this scope of work.

3.9.    This subcontractor shall coordinate with the BAS provider in every aspect related to this scope for work.

3.10.    This Subcontractor shall provide firestopping and/or caulking at all penetrations of rated assemblies, as it relates to this scope of work. Wall patching required because of untimely wall penetrations will be performed at the expense of Subcontractor.

**Page 2 of 8**

**Scope of Work/Supply and Clarifications/Qualifications**
**(06/2006 ed. Rev. 0)**

## EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.11.   Provide equipment vibration isolation, and sound attenuation where required as indicated in the contract documents and as pertains to this subcontractor's scope of work

3.12.   Subcontractor shall layout all equipment pads and supply all anchors related to this scope. Coordinate with concrete contractor prior to installation.

3.13.   Subcontractor shall provide layout and installation of all sleeves within all elements of the structure for the installation of its work items.  Install sleeves and blockouts prior to concrete pour. A representative shall be available during the concrete pours oversee sleeve locations. In the event that the subcontract is not awarded prior to concrete placement, this subcontractor shall core drill all required penetrations in that area.

3.14.   The drywall subcontractor will provide all access panels as shown on the architectural drawings. Any and all other access panels required for this scope of work shall be bought/provided by this subcontractor and installed by the drywall subcontractor. Coordinate with other subcontractors to provide uniform access panels throughout the building.

3.15.   The site will be given to this subcontractor at the appropriate grade for the SOG. Should this subcontractor install any underground pipe, hangers, sleeves, etc., this subcontractor will bring the site to within 1/10" of the original elevation.

3.16.   Provide all piping, hangers, bridging, support, bracing and any other material needed for the installation of this scope of work.

3.17.   Provide all drip pans, hoods, screens, etc. under work provided by this Subcontractor, where items of this scope of work passes over electrical components, and where electrical code require these components to be shielded from water damage or other life safety concerns.

3.18.   Provide all HVAC connections and rough-in to and in lab equipment and lab casework. Coordinate with the contract documents and lab equipment/casework supplier(s). Provide protection of lab equipment and casework while working in and around equipment and casework. All identifiable damage related to the scope will be charged to this subcontractor.

3.19.   Provide all Counter-flashing. This also includes flashing/covers at the top of any roof curbs furnished by this subcontractor.

3.20.   Installation of all smoke detectors and sampling tubing in ductwork. The smoke detectors shall be provided by the Fire Alarm subcontractor. The differential testing of the detectors shall be provided by the Fire Alarm subcontractor. The HVAC subcontractor shall assist the Fire Alarm subcontractor in locating the smoke detectors. The HVAC subcontractor shall provide an access door at each smoke detector, and also coordinate the upstream/downstream requirements of the smoke detector location to ensure that adequate straight run of duct is provided per manufacturer's requirements. The HVAC subcontractor shall also coordinate the as-installed access to the smoke detector location.

3.21.   The HVAC subcontractor shall coordinate & verify that all Flow meters/devices have adequate upstream & downstream straight runs of piping/duct as required by the manufacturers.

# EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.22.   Provide all drain pans, float switches/associated wiring for equipment furnished or installed by this subcontractor. Fume hood float switches and wiring by fume hood manufacture.

3.23.   All Sheetmetal Systems & supports provided/installed in accordance with SMACNA (or contract documents if more stringent).

3.24.   Testing, chemical treatment and flushing of ALL HVAC Piping Systems. This also includes all specified chemical treatment & required equipment. Provide off-site waste disposal of flushing, testing, and treatment fluids.

3.25.   Furnish/installation of all starters, breakers, disconnects for VFD's/VFC's for Equipment that is furnished by this subcontractor. This includes all interconnect wiring to the equipment, etc. so that the Electrical subcontractor has single point connection at the VFD/VFC. This also includes any interlock or connections between the VFD/VFC and the bypass for the VFD/VFC if the furnished unit does not include factory wiring. The VFD/VFC manufacturer must be common for the entire project, and confirmation of required vendor shall be confirmed with Skanska prior to award.

3.26.   This subcontractor shall be required to start-up & operate all equipment & systems required for Temporary Air & services to be provided to achieve climate control to support installation of finishes The equipment shall be started up at the beginning of September 1st, 2015, and the systems must be operational for use for temporary climate control by December 1st, 2015 (Dates may vary). This includes any required flushing, testing, chemical treatment, manufacturer's start-up, insulation, pump laser alignment, manufacturer's start-up, vibration isolation, permanent supports, etc. Include in the temporary air work and filtration, during AHU operation, the cost for installation & change out every week of the MERV 8 filter media at each operating AHU.

3.27.   The Subcontractor includes all labor and material cost for installation and change-out of filters and/or filter media, the following change-outs of filters for all AHU's installed under this scope of work. (This in addition to any requirements of the IAQ program requirements (Indoor Air Quality Program Requirements)).

   a.   Original installation of temporary filters.

   b.   Seven change-outs of temporary filters during the Temporary Air operation.

   c.   Change-out of temporary filters and replace with permanent filters prior to Test and Balancing process.

   d.   Change-out of permanent filters after T & B and prior to owner turnover.

   e.   Deliver remaining set of permanent filters to owner's maintenance department.

3.28.   All motor starters, switches, and accessories shown or required by equipment manufacturers.

3.29.   Furnish/install all outlet boxes and components.

## EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.30.    Furnish/install all HVAC RGD's (Registers, Grilles, & Diffusers) and all Linear Diffusers, as well as all associated components.

3.31.    This subcontractor shall furnish & deliver to the Electrical Subcontractor, at the project site, all submittals for materials and equipment that requires coordination and all loose ship starters, motor control devices, etc. considered a part of the scope of this subcontract but requiring wiring or installation by the Electrical Subcontractor. The HVAC Subcontractor has all intermediate wiring of equipment except wiring that reports directly to the BAS, wiring of end switches on dampers, wiring of devices that report directly to the Fire Alarm System, and other electrical wiring shown on the electrical drawings as provided by the electrical subcontractor.

3.32.    This subcontractor shall be responsible for all damages caused by testing of the HVAC Systems.

3.33.    This subcontractor is required to assist the Commissioning Agent (Moses and Associates) per the division 1 commissioning plan and UF standards.

3.34.    This subcontractor shall provide all required Testing & Balancing for the project.

3.35.    Testing of each zone for each floor & each riser separate from the entire system so that ceilings & shaft walls can be installed at each area independent of the other areas.

3.36.    Provide all blocking and grout as required for this scope of work.

3.37.    All piping, ductwork, equipment, and all associated components shall be brought to the site in a clean state, installed clean, with all open ends sealed when not being worked on and at the end of each day for items that are being worked on.

3.38.    Provide cleaning of all systems & duct as noted and required per design specifications.

3.39.    Provide rigging, hoisting and handling of all material.

3.40.    Subcontractor includes all pipe 2" diameter and less as copper in lieu of steel.

3.41.    Provide all work associated with and in support of the execution of the BIM modelling and coordination program according to exhibit M.

3.42.    Provide wall penetration drawings with locations/dimensions from column centerline for all duct penetrations, large pipe penetrations, grouped pipe opening, etc. prior to wall installation. The drywall subcontractor shall use these drawings to coordinate the necessary penetration layout. This subcontractor shall cut their own holes for single pipes penetrating a wall.

3.43.    This subcontractor shall provide final connections to all systems, installed by this subcontractor or others.

3.44.    Furnish, install, and maintain temporary humidity sensors for duration of six months. Provide humidity reports to the contractor when requested.

**Page 5 of 8**

Scope of Work/Supply and Clarifications/Qualifications
(06/2006 ed. Rev. 0)

# EXHIBIT "A"

**Attachment to Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.45.   Install all Control Valves, VAV's, Control Dampers, Instrument Wells, Flow Meters, and Air Flow Measurement Stations, etc. supplied by the BAS subcontractor.

3.46.   Furnish/installation of all VFD's/VFC's. This includes all interconnect wiring to the equipment, etc. so that the Electrical subcontractor and the BAS Controls subcontractor has single point connection at the VFD/VFC.
   a.   This also includes any interlock or connections between the VFD/VFC and the bypass for the VFD/VFC if not a furnished unit with factory wiring. The VFD/VFC manufacturer must be common for the entire project, and confirmation of required vendor shall be confirmed with Skanska prior to award so that any required price adjustments (credit/add) can be made to the contract price.

3.47.   Equipment starters and disconnects shown on the electrical drawings will be furnished and installed by the division 26 subcontractor. All other required starters and disconnects, for equipment furnished as part of this scope, shall be furnished by this Subcontractor.

3.48.   This subcontractor shall furnish and install all dampers not integral to the BAS/Lab Controls (fire, smoke, combination fire/smoke, etc.).

3.49.   This subcontractor shall install all control dampers, integral to the BAS, supplied by the BAS subcontractor.

3.50.   Subcontractor will provide Air Flow Monitoring Stations on M902 integral to the AHU's. Control subcontractor will provide Air Flow Monitoring Stations that are external to the AHU's, (one at AHU-R-N and one at AHU-R-S)

3.51.   Paint interior surfaces of ducts with a flat, non-specular black paint per specification section 099123.

3.52.   Subcontractor includes all Duct Stack Supports (S508) where necessary.

3.53.   Subcontractor includes all duct supports in trenches.

3.54.   Subcontractor includes all mechanical and motorized dampers, subcontractor excludes all architectural louvers as indicated on A700.1, A701.1, A702.1 and A703.1.

3.55.   Subcontractor includes all piping associated with FCU's, AHU's, etc.

3.56.   Subcontractor includes all condensate drain piping.

3.57.   Subcontractor includes $25,000.00 for hoist that will be deducted if subcontractor can make use of Contractors tower crane to hoist 5th floor equipment.

3.58.   Subcontractor includes all Overtime work and Weekend work for this scope of work for the additional amount of $272,000.00.

3.59.   Subcontractor includes all cost associated with off-site storage of materials and equipment as/if needed.

# EXHIBIT "A"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.60.   Subcontractor includes composite clean up.

3.61.   Subcontractor includes all stainless steel ductwork and welded stainless steel ductwork, dampers and accessories.

3.62.   Subcontractor includes work related to Mock-ups, including first floor service trench mockup.

3.63.   This Subcontractor shall be responsible for providing all rated penetrations of assemblies being penetrated by the Work of this subcontractor. These penetrations to be detailed according to UL System Numbered details, these details and numbers to be provided to the contractor for each penetration. UL Number labels to be provided and attached to assemblies at penetrations.

  a.   Subcontractor includes furnishing and installing all sleeves, firestopping, easypath sleeves or equivalents, caulking, etc. at these penetrations.
  b.   Subcontractor to ensuring annular spacing between the sleeve/opening and the penetrating item is uniform so as to meet the requirements of the UL detail being used.
  c.   Should the assemblies being penetrated not be built at the time the Work of this subcontract, subcontractor shall be responsible for installing the sleeves and supporting and centering the sleeve so to achieve the uniform annular space required for UL detail.
  d.   Wall patching/repair required because of untimely wall penetrations or out of place penetrations will be for this Subcontractors account.
  e.   Subcontractor includes all bent plate/sheet metal angles, frames and mineral wool at locations where ductwork penetrates or passes thru drywall assemblies

3.64.   Subcontractor shall provide all layout for this scope of work, including but not limited to layout and installation of all sleeves, block-outs, fasteners and embedded items within all elements of the structure required for this Work. Sleeves and block-outs shall be installed prior to concrete pours. A representative shall be present/available during the concrete pours oversee sleeve locations and ensure they do not move. Subcontractor shall be responsible for costs associated with remedial work where sleeves and penetrations are missed, or move.

3.65.   All sleeves and penetrations thru horizontal slabs shall be provided and detailed as rated assemblies/systems with UL System Numbering, these shall be detailed to prevent water egress between floors, this will include use of lipped sleeves and silicone based, waterproof, W-rated fire stopping, Hilti CFS-SIL or equivalent. This to eliminate water egress between floors during and after construction.

3.66.   Subcontractor includes installing duct smoke detectors provided by others.

3.67.   Subcontractor includes the following:
  a. 5 Additional Fire Dampers- $6,250.00 (5@$1,250.00)
  b. Overtime & Weekend Work - $272,388.00
  c. Hoisting- $25,000.00

3.68.   Subcontractor understands and includes that the contractor is relying on the HVAC system to provide conditioned air for installation of finishes, including drywall, and the subcontractor has included costs associated with achieving this early, temporary conditioned air with the buildings

# EXHIBIT "A"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

HVAC equipment, this would include overtime and other costs to expedite system installation to move air and dehumidify the interior of the building.

3.69.    Subcontractor includes solenoid valves, wired by others.

3.70.    Subcontractor hereby acknowledges, agrees and understands that this Subcontractor understands that the Contractor will contract/subcontract directly with a Building Automation Systems and Laboratory Controls Subcontractor (Siemens) to provide for the Building Automation Systems and Laboratory Controls portion/scope of the Work related to this project. This Subcontractor agrees and acknowledges that, between this Subcontract Agreement and the Contractor's subcontract agreement with the Building Automation Systems and Laboratory Controls Subcontractor (Siemens) a complete HVAC and Building Automation Systems and Laboratory Controls Scope of Work is included. This Subcontractor and the Building Automation Systems and Laboratory Controls Subcontractor (Siemens) have met and coordinated Scopes of Work between each other, prior to award and entering into this Agreement, so ensuring no scope gaps occur between these two trades, and that any and all costs associated with providing a complete and functioning system are included between these two Agreements, and, that there will be no further or additional costs related to providing for these complete and operational HVAC Systems, Building Automation Systems and Laboratory Control Systems. Subcontractor acknowledges and confirms that they have met/coordinated/corresponded and/or discussed Scopes with the Building Automation Systems and Laboratory Controls Subcontractor (Siemens) prior to entering into this Agreement.

3.71.    For accounting purposes only this subcontract amount is made up follows:

| | | |
|---|---|---|
| All Sheet Metal, Ductwork and Air Distribution Systems | $ | 1,948,000.00 |
| All Insulation Work | $ | 769,500.00 |
| All Piping and Associated Work | $ | 1,080,000.00 |
| All Grilles, Registers, Diffusers, Dampers, Louvers and Associated Work | $ | 463,000.00 |
| All HVAC Equipment, Fans and Associated Work | $ | 1,240,000.00 |
| All Testing and Balancing | $ | 86,207.00 |
| All other misc Labor , Equipment, Materials, Items | $ | 324,800.00 |
| All Site Requirements | $ | 99,700.00 |
| | | |
| Duct Stack Supports S508 | $ | 2,520.00 |
| Cost to Use Hilti Products | $ | 6,275.00 |
| IAQ Program During Construction | $ | 133,605.00 |
| IAQ Program: Deduct Testing not required, by commission agent | $ | (44,137.00) |
| Reduced Office admin: IAQ Program Testing not required | $ | (4,055.00) |
| Copper piping in lieu of steel | $ | 36,643.00 |
| Solenoid Valves | $ | 17,500.00 |
| Conformance Set of Documents Inclusion | $ | (52,491.00) |
| | | |
| Additional Dampers for those not shown on drawings | $ | 6,250.00 |
| Overtime and weekend work | $ | 272,388.00 |
| Hoisting (if Tower Crane not available) | $ | 25,000.00 |
| | | |
| Commissioning & Commissioning Support | Included | |
| All Flushing and Chemical Treatment of Systems | Included | |
| Flex/Quick Connect connections at Lab Casework | Included | |
| Condensate Drains | Included | |
| Lab Bench/Casework Rough-in | Included | |
| Temp Humidity Sensors | Included | |
| Air Flow Monitoring Stations- AHU | Included | |
| Insulation at Hood Exhaust, Note 9 on M201 | Included | |
| HVAC/Control Coordination, no scope gaps (CCMS & Siemens) | Included | |
| Stainless Steel Bubble Tight Dampers. | Included | |
| Mechanical dampers/motorized dampers | Included | |
| All other items not specifically listed/itemized including equipment, materials, labor etc to provide a complete HVAC scope | Included | |
| | | |
| Non Working Safety Officer for 30+ Employees onsite | Included | |
| Composite Cleanup | Included | |
| **Total Subcontract Amount** | **$** | **6,410,705.00** |

Scope of Work/Supply and Clarifications/Qualifications
(06/2006 ed. Rev. 0)

# EXHIBIT "B"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## DRAWINGS & SKETCHES, SPECIFICATIONS, ADDENDA and OTHER DOCUMENTS

The Contract Documents include the following documents as attached:

**Drawings, Sketches, Specifications,  Addenda, and Other Documents**
**(06/2006 ed. Rev. 0)**



# Construction Document Log

by Issue, Document Type, Number

## Project:  UF Chemistry Chemical Biology Building (239012)

**UF Specifications and Standards**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|--------|----------|------|--------------|------------|---------------|
| 02200 | 00 | EARTHWORK | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02280 | 00 | SOIL TREATMENT | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02500 | 00 | PAVING AND SURFACING | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02600 | 00 | UTILITY PIPING MATERIALS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02660 | 00 | WATER DISTRIBUTION | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02680 | 00 | FUEL AND STEAM DISTRIBUTION | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02700 | 00 | SEWERAGE AND DRAINAGE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02810 | 00 | IRRIGATION | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02840 | 00 | WALK, ROAD AND WALKING APURTENANCES | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 02900 | 00 | LANDSCAPING | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 03000 | 00 | CONCRETE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 04000 | 00 | MASONRY | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 05000 | 00 | METALS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 06000 | 00 | WOOD AND PLASTICS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 07000 | 00 | THERMAL AND MOISTURE PROTECTION | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 07500 | 00 | ROOFING AND SYSTEMS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 08100 | 00 | DOORS AND FRAMES | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 08500 | 00 | WINDOWS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 08700 | 00 | HARDWARE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 09000 | 00 | FINISHES | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10150 | 00 | TOILET ROOMS AND COMPARTMENTS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10260 | 00 | WALLS AND CORNER GUARDS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10430 | 00 | EXTERIOR SIGNAGE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10430A | 00 | EXTERIOR SIGNAGE A | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |

| 10430B | 00 | EXTERIOR SIGNAGE B | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
|--------|----|--------------------|--------------------------|------------|-------------------|
| 10430C | 00 | EXTERIOR SIGNAGE C | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440 | 00 | INTERIOR SIGNAGE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440A | 00 | INTERIOR SIGNAGE A | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440B | 00 | INTERIOR SIGNAGE B | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440C | 00 | NTERIOR SIGNAGE C | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440D | 00 | INTERIOR SIGNAGE D | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10440E | 00 | INTERIOR SIGNAGE E | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10520 | 00 | FIRE PROTECTION SPECIALTIES | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 10800 | 00 | TOILET ACCESSORIES | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 11130 | 00 | AUDIO VISUAL EQUIPMENT | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 11170 | 00 | WASTE HANDLING EQUIPMENT AND RECYCLING | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 11600 | 00 | LABORATORY EQUIPMENT | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 12350 | 00 | LABORATORY CASEWORK | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 12500 | 00 | WINDOW TREATMENTS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 12700 | 00 | MULTIPLE SEATING | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 13038 | 00 | COLD STORAGE ROOMS AND BUILDINGS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 13320 | 00 | WASTEWATER TREATMENT AND DISPOSAL | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 13700 | 00 | SECURITY ACCESS AND SURVEILLANCE | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 14200 | 00 | ELEVATOR AND WHEELCHAIR LIFTS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15050 | 00 | BASIC MECHANICAL MATERIALS AND METHODS | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15190 - MECHANICAL IDENTIFICATION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15250 - MECHANICAL INSULATION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15300 - FIRE PROTECTION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15400 - PLUMBING | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15500 - HVAC | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15550 - HEAT GENERATION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15680 - CHILLED WATER PLANS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15750 - HEAT TRANSFER | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |

| 15850 - AIR HANDLING AND DISTRIBUTION EQUIPMENT | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15950 - CONTROLS AND METERING | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 15990 - TESTING, ADJUSTING AND BALANCING | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16050 - BASIC MATERIALS AND METHODS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16195 - ELECTRICAL IDENTIFICATION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16300 - POWER TRANSMISSION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16400 - SERVICE AND DISTRIBUTION | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16480 - ELECTRIC MOTORS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16500 - LIGHTING | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16600 - SPECIAL SYSTEMS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16723 - FIRE ALARM SYSTEMS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16740 - TELECOMMUNICATION STANDARDS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16752 - ASSISTIVE LISTENING SYSTEMS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| 16950 - ELECTRICAL TESTING | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| GENERAL DESIGN GUIDLINES | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |
| MISCELLANEOUS GENERAL REQUIREMENTS | 00 | | Issued For Construction | 10/13/2014 | SYS_ITEMTYPE_SPEC |

## Phase 2 Conformance Set

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
| --- | --- | --- | --- | --- | --- |

| CS-01 | 01 | Design Phase 1 Cover Sheet and Sheet Index | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
|-------|----|--------------------------------------------|-------------------------|------------|----------------------|
| S100 | 01 | GENERAL NOTES | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S101 | 01 | GENERAL NOTES CONTINUED | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S200 | 01 | BASEMENT FOUNDATION PLAN AND STRUCTURAL CEILING FRAMING PLAN | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S201 | 01 | FIRST FLOOR FRAMING AND FOUNDATION PLAN | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S202 | 01 | SECOND FLOOR FRAMING PLAN | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S300 | 01 | FOUNDATION DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S301 | 01 | FOUNDATION DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S302 | 01 | FOUNDATION DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S303 | 01 | FOUNDATION DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S304 | 01 | ENLARGED PILE CAP PLANS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S305 | 01 | DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S306 | 00 |  | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S400 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S401 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S402 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S403 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S404 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S405 | 01 | FLOOR FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S500 | 01 | ROOF FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S501 | 01 | STEEL DETAILS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S502 | 01 | ROOF SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S503 | 01 | ROOF FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S504 | 01 | ROOF FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S505 | 01 | ROOF FRAMING DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S507 | 00 |  | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S508 | 01 | CANOPY DETAILS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S520 | 01 | ROOF ISOMETRICS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S600 | 01 | COLUMN SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S601 | 01 | COLUMN DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S602 | 01 | GIRDER BEAM JOIST DETAILS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S603 | 01 | GIRDER SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S604 | 01 | GIRDER SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S605 | 01 | GIRDER  BEAM SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |

| S606 | 01 | BEAM SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S607 | 01 | BEAM SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S608 | 01 | BEAM JOIST SCHEDULE | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S700 | 01 | CMU DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S701 | 01 | CMU DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S800 | 01 | CONCRETE WALL DETAILS AND SECTIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S801 | 01 | CONCRETE WALL ELEVATIONS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S802 | 01 | ENLARGED ELEVATOR CORE REINFORCING PLANS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |
| S803 | 01 | CONCRETE DETAILS | Issued For Construction | 10/22/2014 | SYS_ITEMTYPE_DRAWING |

**Updated Drawings without Overlay**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
| --- | --- | --- | --- | --- | --- |
| S203 | 02 | THIRD FLOOR FRAMING PLAN | Issued For Construction | 10/27/2014 | SYS_ITEMTYPE_DRAWING |
| S204 | 02 | FOURTH FLOOR FRAMING PLAN | Issued For Construction | 10/27/2014 | SYS_ITEMTYPE_DRAWING |
| S205 | 02 | FIFTH FLOOR FRAMING PLAN | Issued For Construction | 10/27/2014 | SYS_ITEMTYPE_DRAWING |
| S206 | 02 | ROOF FRAMING PLAN | Issued For Construction | 10/27/2014 | SYS_ITEMTYPE_DRAWING |
| S207 | 02 | HIGH ROOF FRAMING PLAN | Issued For Construction | 10/27/2014 | SYS_ITEMTYPE_DRAWING |

**Phase 3 Drawings**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
| --- | --- | --- | --- | --- | --- |
| A001 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A002 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A200 | 02 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A201 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A202 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A203 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A204 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A205 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A206 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A210 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A230 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A231 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A232 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A235 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68F48D0DEDD6

| A300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A301 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A302 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A303 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A304 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A320 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A400-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A401-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A402-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A403-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A404-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A405-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A410 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A420 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A421 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A430 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A431 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A432 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A433 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A434 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A435 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A436 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A437 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A438 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A439 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A440 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A441 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A501 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A502 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A503 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A504 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A505 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A506 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A507 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| A508 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
|---|---|---|---|
| A509 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-2 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-3 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-4 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-5 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-6 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A511-7 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A512-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A512-2 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A512-3 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A512-4 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A513-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A513-2 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A513-3 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A513-4 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A514-1 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A514-2 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A514-3 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A514-4 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A550 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A551 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A560 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A561 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A562 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A563 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A565 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A566 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A580 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A581 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A582 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A583 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A701 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| A702 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
|------|--|-------------------------|------------|----------------------|
| A703 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A710 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A711 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A712 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A713 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A714 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A715 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A720 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A721 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A722 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A723 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A724 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A725 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A726 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A727 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A728 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A729 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A731 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A732 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A733 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A734 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A735 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A736 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A738 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A739 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A750 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A751 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A752 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A753 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A754 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A755 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A760 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A800 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| A801 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| A900 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
|------|------------------------|------------|----------------------|
| A901 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| CS02 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E201 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E202 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E203 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E204 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E205 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E301 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E302 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E303 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E304 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E305 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E401 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E402 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E403 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E404 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E405 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E501 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E502 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E600 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E602 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E701 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E702 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E703 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E704 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E705 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E706 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E707 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E708 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68F48D0DEDD6

| E709 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
|------|-------------------------|------------|----------------------|
| E710 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E711 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| E712 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F001 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F002 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F201 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F202 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F203 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F204 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F205 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F206 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| F400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| L200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| L300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| L400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS101 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS102 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS103 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS104 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS105 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| LS106 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M001 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M201 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M202 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M203 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M204 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M205 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M206 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M301 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| M302 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
|------|--|-------------------------|------------|----------------------|
| M303 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M304 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M305 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M500 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M501 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M502 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M503 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M504 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M505 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M600 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M700 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M701 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M702 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M703 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M704 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M800 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M801 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M802 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M803 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M900 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M901 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M902 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M903 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M904 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M905 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M906 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M907 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| M908 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P001 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P200 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P201 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P202 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P203 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P204 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| | | | |
|---|---|---|---|
| P205 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P206 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P301 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P302 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P303 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P304 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P305 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P401 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P402 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P403 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P404 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P600 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P601 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P602 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P603 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P604 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P605 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P606 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P607 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P608 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P609 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P610 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P611 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P612 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P613 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P614 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P615 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P616 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P617 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P618 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P701 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P702 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

| P703 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| P800 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T001 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T002 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T200 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T201 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T202 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T203 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T204 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T205 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T500 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T600 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T700 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T701 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |
| T702 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_DRAWING |

**Phase 3 Specifications**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
| --- | --- | --- | --- | --- | --- |
| 012200 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 012300 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 023610 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 042000 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 044300 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 054000 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 055000 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 055100 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 057300 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 061053 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 061600 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 064023 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 071700 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 072600 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 072726 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 073213 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 074113 | | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

| 074150 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 075216 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 076200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 077200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 078100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 078125 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 078413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 078446 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 079200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 081113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 081416 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 081700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 083113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 083300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 083323 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 084113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 084123 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 084413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 087100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 088000 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 089000 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 092116.23 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 092216 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 092400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 092900 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 093000 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 095113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 095133 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 095429 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 096340 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 096513 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 096519 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 096723 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 096813 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 097710 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

| 097723 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 099123 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 101423 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 102113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 102600 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 102800 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 104413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 105613 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 109900 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 109901 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 110140 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 111250 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 114001 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 115213 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 115310 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 115311 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 115312 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 115320 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 116202 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 122113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 122413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123550 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123551 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123552 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123553 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123554 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123560 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 123561 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 124816 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 124930 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 126100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 126200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 132100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 142100 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 210500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

| | | | |
|---|---|---|---|
| 210513 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 211200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 211313 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 213113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 213400 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 213900 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220513 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220519 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220523 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220529 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220553 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 220700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221116 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221119 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221123.13 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221223 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221316 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221319 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221329 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221423 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 221429 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 223300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 223500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 224000 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 224500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 224700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226119 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226213 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226219 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226313 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 226700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230001 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

| | | | |
|---|---|---|---|
| 230500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230513 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230516 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230517 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230518 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230529 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230548 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230553 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230593 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230713 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230716 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230800 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230900 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 230910 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 232123 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 232223 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 232500 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 233113 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 233300 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 233416 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 233600 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 233713 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 235700 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 238219 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 238413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260519 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260526 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260529 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260800 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260923 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 260943 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 261200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262200 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262413 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262416 | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

| | | | | |
|---|---|---|---|---|
| 262713 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262726 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262813 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262816 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262913 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 262923 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 263213 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 263600 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 264113 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 264313 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 265100 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 265600 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 270500 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 271100 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 271300 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 272000 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 280500 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 281300 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 282300 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |
| 283111 | | Issued For Construction | 11/17/2014 | SYS_ITEMTYPE_SPEC |

**Missed Phase 3 Secification**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| 237313 | 00 | AIR-HANDLING UNITS | Issued For Construction | 11/21/2014 | SYS_ITEMTYPE_SPEC |

**Updated Specifications**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| 230523 | 01 | General Duty Valves for HVAC Piping | Issued For Construction | 12/10/2014 | SYS_ITEMTYPE_SPEC |
| 232113 | 01 | Hydronic Piping | Issued For Construction | 12/10/2014 | SYS_ITEMTYPE_SPEC |
| 232213 | 01 | Steam and Condensate Heating Piping | Issued For Construction | 12/10/2014 | SYS_ITEMTYPE_SPEC |

**Phase 3 Drawings Revision**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| E001 | 02 | ELECTRICAL SYMBOL LEGEND | Issued For Construction | 12/11/2014 | SYS_ITEMTYPE_DRAWING |

| | | | | | |
|---|---|---|---|---|---|
| E002 | 02 | ELECTRICAL SITE PLAN | Issued For Construction | 12/11/2014 | SYS_ITEMTYPE_DRAWING |
| E601 | 02 | ELECTRICAL DETAILS | Issued For Construction | 12/11/2014 | SYS_ITEMTYPE_DRAWING |

## Specifications Table of Contents

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| 002 | 00 | Table of Contents | Issued For Construction | 12/8/2014 | SYS_ITEMTYPE_SPEC |

## Phase 1 Conformance Set

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| C120 | 01 | Civil Legends Abbreviations and Notes | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| C220 | 01 | Demolition Plan | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| C320 | 01 | DimensionPlan | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| C420 | 01 | Paving Grading and Drainage Plan | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| C520 | 01 | Utility Plan | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| C620 | 01 | Details and Notes | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| L100 | 01 | TREE MITIGATION PLAN | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| M001S | 01 | MECHANICAL SYMBOL LEGEND | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| M002S | 01 | MECHANICAL SITE PLAN | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| M003S | 01 | MECHANICAL SITE DETAILS | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |
| M004S | 01 | MECHANICAL SITE DETAILS | Issued For Construction | 9/10/2014 | SYS_ITEMTYPE_DRAWING |

## 100 Percent Construction Documents

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|---|---|---|---|---|---|
| 013100 | 00 | Project Management and Coordination | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 013300 | 00 | Submittal Procedures | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 013300A | 00 | Submittal Review Form | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 013300B | 00 | Electronic Document Agreement | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 019113 | 00 | General Commissioning Requirements | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 230001 | 00 | Basic Mechanical Requirements | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 230519 | 00 | Gages for HVAC Piping | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 260100 | 00 | Basic Electrical Requirements | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 260510 | 00 | Tests and Performance Verification | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 260513 | 00 | Medium Voltage Cables | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 260533 | 00 | Raceways and Boxes for Electrical Systems | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |

| 260543 | 00 | Underground Ducts and Raceways for Electrical Systems | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 260553 | 00 | Electrical Identification | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 311000 | 00 | Site Clearing | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 312000 | 00 | Earth Moving | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 321313 | 00 | Concrete Paving | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 331000 | 00 | Water Utilities | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |
| 333000 | 00 | Sanitary Sewage Utilities | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |

**100 Percent Construction Documents- Phase 1 Remaining Documents**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|--------|----------|------|--------------|------------|---------------|
| 334000 | 00 | Storm Drainage Utilities | Issued For Construction | 9/2/2014 | SYS_ITEMTYPE_SPEC |

**Phase 2 Drawings**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|--------|----------|------|--------------|------------|---------------|
| 001 | 00 | Spec Cover Sheet Phase II | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 004 | 00 | Directory and Table of Contents | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 011000 | 01 | Summary | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 014030 | 00 | Threshold Building Inspection Services | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 033000 | 00 | Cast-In Place Concrete | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 033300 | 00 | Architectural Concrete | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 051200 | 00 | Structural Steel Framing | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 051213 | 00 | Architecturally Exposed Structural Steel | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 053100 | 00 | Steel Decking | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 072100 | 00 | Thermal Insulation | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |
| 316316 | 00 | Auger Cast Piles | Issued For Construction | 9/22/2014 | SYS_ITEMTYPE_SPEC |

**Missed Specification**

| Item # | Revision | Name | Issue Status | Issue Date | Document Type |
|--------|----------|------|--------------|------------|---------------|
| 071413 | 00 | Waterproofing | Issued For Construction | 9/26/2014 | SYS_ITEMTYPE_SPEC |

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68F48D0DEDD6



**Request for Information**

Summary Log

**UF Chemistry/Chemical Biology Building**  
Corner of University Avenue & Buckman Drive,  
UF Campus,  
Gainesville FL

**Project #  239012-UF-323a**  
Tel:    Fax:

**Skanska USA Building Inc.**

| RFI # | Subject | Author Company | Answer Company | Date Created | Date Req'd | Date Resp | Cost Impact | Amt | Sched Impact | Days | Dwg Impact |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | SF6 Gas Switch | Skanska MAPP | Stantec Consulting | 9/4/2014 | 9/7/2014 | 9/7/2014 | No | 0 | No | | Not Sure |
| 002 | Misc. Civil Clarifications | Skanska MAPP | Stantec Consulting | 9/4/2014 | 9/7/2014 | 9/11/2014 | No | 0 | No | | Not Sure |
| 003 | Manhole Requirements | Skanska USA Building Inc. | Stantec Consulting | 9/4/2014 | 9/11/2014 | 9/11/2014 | No | 0 | No | | Not Sure |
| 004 | Backflow Preventer | Skanska USA Building Inc. | Stantec Consulting | 9/29/2014 | 10/2/2014 | 9/30/2014 | Yes | 0 | No | | Not Sure |
| 005 | Details for PC-62 | Skanska USA Building Inc. | Stantec Consulting | 9/29/2014 | 10/2/2014 | 9/30/2014 | No | 0 | No | | Not Sure |
| UF323 A 006 | PC-42 Confirmation | Skanska USA Building Inc. | Stantec Consulting | 9/30/2014 | 10/3/2014 | 10/1/2014 | No | 0 | No | | Not Sure |
| UF323 A 007 | Updated Soils Report | Skanska USA Building Inc. | Stantec Consulting | 10/2/2014 | 10/5/2014 | 10/2/2014 | No | 0 | No | | Not Sure |
| UF323 A 008 | Auger Cast-In-Place Piles | Skanska USA Building Inc. | Stantec Consulting | 10/2/2014 | 10/5/2014 | 10/3/2014 | No | 0 | No | | Not Sure |
| UF323 A 009 | Typ. Pile Detail | Skanska USA Building Inc. | Stantec Consulting | 10/3/2014 | 10/6/2014 | 10/3/2014 | No | 0 | No | | Not Sure |
| UF323 A 010 | Auger Pile Tolerances and Lengths | Skanska USA Building Inc. | Stantec Consulting | 10/3/2014 | 10/6/2014 | 10/3/2014 | No | 0 | No | | Not Sure |
| UF323 A 011 | Chilled Water and Steam Pipe Guides | Skanska USA Building Inc. | Stantec Consulting | 10/3/2014 | 10/6/2014 | 10/13/2014 | No | 0 | No | | No |
| UF323 A 012 | Soil Removal-Geotechnical  Report | Skanska USA Building Inc. | Stantec Consulting | 10/7/2014 | 10/10/2014 | 11/5/2014 | No | 0 | No | | No |
| UF323 A 013 | Waterproofing | Skanska USA Building Inc. | Stantec Consulting | 10/8/2014 | 10/11/2014 | 10/17/2014 | No | 0 | No | | No |
| UF323 A 014 | CMU Walls | Skanska USA Building Inc. | Stantec Consulting | 10/8/2014 | 10/11/2014 | 10/17/2014 | No | 0 | No | | No |
| UF323 A 015 | Testing Requirements | Skanska USA Building Inc. | Stantec Consulting | 10/9/2014 | 10/12/2014 | 11/12/2014 | Not Sure | 0 | Not Sure | | Not Sure |
| UF323 A 016 | Light Poles | Skanska USA Building Inc. | Stantec Consulting | 10/10/2014 | 10/13/2014 | 10/15/2014 | Yes | 0 | No | | Yes |

**SKANSKA**

**Request for Information**
Summary Log

| RFI # | Subject | Author Company | Answer Company | Date Created | Date Req'd | Date Resp | Cost Impact | Amt | Sched Impact | Days | Dwg Impact |
|-------|---------|----------------|----------------|--------------|------------|-----------|-------------|-----|--------------|------|-----------|
| UF323 A 017 | S-2 Floor Drain | Skanska USA Building Inc. | Stantec Consulting | 10/13/2014 | 10/16/2014 | 10/17/2014 | No | 0 | No | | No |
| UF323 A 018 | Drawing Overlays | Skanska USA Building Inc. | Stantec Consulting | 10/24/2014 | 10/27/2014 | 10/27/2014 | No | 0 | No | | Yes |
| UF323 A 019 | Structural Confirmations | Skanska USA Building Inc. | Stantec Consulting | 10/27/2014 | 10/30/2014 | 10/28/2014 | No | 0 | No | | Yes |
| UF323 A 020 | Generator Conduit Stub-Up Location | Skanska USA Building Inc. | Stantec Consulting | 10/30/2014 | 11/2/2014 | 11/20/2014 | Not Sure | 0 | Not Sure | | Not Sure |
| UF323 A 021 | Chilled Water Tie-In | Skanska USA Building Inc. | Stantec Consulting | 10/30/2014 | 11/2/2014 | 11/7/2014 | Yes | 0 | No | | Yes |
| UF323 A 022 | Excessive Bends in Primary Power Conduits | Skanska USA Building Inc. | Stantec Consulting | 10/31/2014 | 11/3/2014 | 11/5/2014 | Yes | 0 | Not Sure | | No |
| UF323 A 023 | Gas Main Conflict | Skanska USA Building Inc. | Stantec Consulting | 10/31/2014 | 11/3/2014 | 11/4/2014 | No | 0 | No | | No |
| UF323 A 024 | FDC | Skanska USA Building Inc. | Stantec Consulting | 11/5/2014 | 11/8/2014 | 11/7/2014 | No | 0 | No | | No |
| UF323 A 025 | Reuse Water Line Conflict | Skanska USA Building Inc. | Stantec Consulting | 10/31/2014 | 11/3/2014 | 11/20/2014 | Yes | 0 | No | | Not Sure |
| UF323 A 026 | Existing Water Main | Skanska USA Building Inc. | Stantec Consulting | 10/31/2014 | 11/3/2014 | 11/20/2014 | Not Sure | 0 | Not Sure | | Not Sure |
| UF323 A 027 | SW Sanitary Sewer Tie In-Survey Elevations | Skanska USA Building Inc. | Stantec Consulting | 10/31/2014 | 11/3/2014 | 11/4/2014 | No | 0 | No | | No |
| UF323 A 028 | Storm Line at ST 1801 | Skanska USA Building Inc. | Stantec Consulting | 11/3/2014 | 11/6/2014 | 11/11/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 029 | Flint Auditorium Storm | Skanska USA Building Inc. | Stantec Consulting | 11/6/2014 | 11/9/2014 | 11/11/2014 | Not Sure | 0 | Not Sure | | Not Sure |
| UF323 A 030 | Re-route FDC Chem-Bio | Skanska USA Building Inc. | Stantec Consulting | 11/10/2014 | 11/13/2014 | 11/11/2014 | Not Sure | 0 | Not Sure | | Not Sure |
| UF323 A 031 | Trash Compactor and Generator Pad Auger Piles | Skanska USA Building Inc. | Stantec Consulting | 11/11/2014 | 11/14/2014 | 11/13/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 032 | 24" Storm Connection | Skanska USA Building Inc. | Stantec Consulting | 11/13/2014 | 11/16/2014 | 11/20/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 033 | Doors, Frames & Hardware | Skanska USA Building Inc. | Stantec Consulting | 11/25/2014 | 11/28/2014 | 11/26/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 034 | Rail Details | Skanska USA Building Inc. | Stantec Consulting | 11/25/2014 | 11/28/2014 | 11/26/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 035 | MEP Questions | Skanska USA Building Inc. | Stantec Consulting | 11/26/2014 | 12/3/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |

**SKANSKA**

| RFI # | Subject | Author Company | Answer Company | Date Created | Date Req'd | Date Resp | Cost Impact | Amt | Sched Impact | Days | Dwg Impact |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UF323 A 036 | Systems Furniture Electrical Outlets, Data Outlets, and Undercabinet Light Fixtures | Skanska USA Building Inc. | Stantec Consulting | 12/1/2014 | 12/4/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 037 | Specification 237313 - AHU | Skanska USA Building Inc. | Stantec Consulting | 12/2/2014 | 12/5/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 038 | General Phase 3 Confirming RFI's | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 039 | Doors and Walls Confirming RFI | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 040 | Embed Schedule | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | | Not Sure | | Not Sure | | Not Sure |
| UF323 A 041 | Canopy Framing | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | 12/15/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 042 | Drawing A750 | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 043 | Vertical Strip on A430 | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 044 | A201 Room 102 Stainless Sill/Countertop | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | 12/15/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 045 | Specification 126100 Fixed Audience Seating | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | 12/15/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 046 | UF Specification 12700 Multiple Seating | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | 12/15/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 047 | A231 Spray Applied Fireproofing | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 048 | Waterproofing for the Cold Room units | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 049 | Missing Wall Tags | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/8/2014 | 12/5/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 050 | Textured Wall Panels | Skanska USA Building Inc. | Stantec Consulting | 12/5/2014 | 12/10/2014 | 12/15/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 051 | Auger Cast-In-Place Pile Length | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/10/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 052 | Laboratory Water Piping and Laboratory Natural Gas Specifications | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/17/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 053 | Cylinder Storage Cabinets | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | | Not Sure | | Not Sure | | Not Sure |



**Request for Information**
Summary Log

| RFI # | Subject | Author Company | Answer Company | Date Created | Date Req'd | Date Resp | Cost Impact | Amt | Sched Impact | Days | Dwg Impact |
|-------|---------|----------------|----------------|--------------|-----------|-----------|-------------|-----|--------------|------|------------|
| UF323 A 054 | East Elevation Brick Veneer | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/11/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 055 | Misc. Wall Types | Skanska MAPP | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/11/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 056 | Vestibule Ceiling Height | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/11/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 057 | Documents Referenced but Not Included in Phase 3 Drawings | Skanska USA Building Inc. | Stantec Consulting | 12/9/2014 | 12/12/2014 | 12/11/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 058 | Stack Duct Support Details | Skanska USA Building Inc. | Stantec Consulting | 12/10/2014 | 12/13/2014 | 12/10/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 059 | Vault Elevations | Skanska USA Building Inc. | Stantec Consulting | 12/12/2014 | 12/17/2014 | | Not Sure | | Not Sure | | Not Sure |
| UF323 A 060 | PC-5 Depth | Skanska USA Building Inc. | Stantec Consulting | 12/22/2014 | 12/25/2014 | 12/23/2014 | Not Sure | | Not Sure | | Not Sure |
| UF323 A 061 | Crane Pile Caps | Skanska USA Building Inc. | Stantec Consulting | 12/22/2014 | 12/25/2014 | | Not Sure | | Not Sure | | Not Sure |
| UF323 A 062 | Basement Wall Backfill | Skanska USA Building Inc. | Stantec Consulting | 12/22/2014 | 12/25/2014 | | Not Sure | | Not Sure | | Not Sure |
| UF323 A 063 | Fume Hoods- Latticework, ADA Requirements, and Accessory Locations | Skanska MAPP | Stantec Consulting | 12/29/2014 | 1/1/2015 | | Not Sure | | Not Sure | | Not Sure |
| UF323 A 064 | South Elevation- Course Jack Arch | Skanska USA Building Inc. | Stantec Consulting | 1/2/2015 | 1/5/2015 | | Not Sure | | Not Sure | | Not Sure |

**Total Number of RFIs for this project: 64**                     **Final Totals for this project:**          **0**

# EXHIBIT "C"

**Attachment** to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## ALTERNATES, UNIT PRICES, AND LABOR RATES

Note: For the purposes of this Exhibit C, the term "Scope" shall mean the scope of Work to be provided by Subcontractor under the Subcontract or the Goods and Services to be supplied and performed by Seller under the Purchase Order, as applicable.

**I.    ALTERNATES**

Contractor/Buyer may at any time elect to have Subcontractor/Seller provide as part of its Scope one or more of the alternates identified in this Section I. The "ADD" or "DELETE" price identified in connection with an alternate is inclusive of all of Subcontractor's/Seller's costs and expenses to provide the alternate in accordance with all requirements of the Subcontract/Purchase Order.

1.   Insert the amount to be added to the Subcontract Amount/Purchase Order Amount if the Subcontractor/Seller is directed to provide payment and performance bond.

ADD <u>$1.5% of subcontract amount</u>

2.   Insert the amount to be deleted from the subcontract amount should the lab casework and equipment be furnished as fixed and not require quick connect/disconnect for flexible locations.

DELETE (<u>$6,400.00</u>)

3.   Insert the amount to be deleted from the subcontract amount should the Contractors Tower Crane be available for hoisting of Equipment.

DELETE (<u>$25,000.00</u>)

4.   Insert the amount to be deleted from the subcontract amount should the 5 additional fire dampers not be required.

DELETE (<u>$6,250.00</u>)

5.   Insert the amount to be deleted from the subcontract amount should the solenoid valves not be required or if they are provided by others.

DELETE (<u>$17,500.00</u>)

**II.    UNIT PRICES**

If Contractor/Buyer elects to change the quantities of one or more of the following items to be provided by Subcontractor/Seller as part of its Scope, or a change otherwise occurs in the quantity of any such item and Subcontractor/Seller is entitled to a Subcontract/Purchase Order adjustment in connection with that change, Contractor/Buyer may in its sole discretion utilize the following "ADD" or "DEDUCT" Unit Prices as the basis for adjusting the Subcontract Amount/Purchase Order Amount. Each Unit Price is inclusive of all of Subcontractor's/Seller's costs and expenses to provide the specified quantity of the item in accordance with all requirements of the Subcontract/Purchase Order. Changed quantities (e.g. lbs, LF, SF, pieces, etc.) will be numerically netted (plus or minus) prior to the application of the appropriate dollar unit rate for each listed Unit Price.

Alternates, Unit Prices, and Labor Rates
(05/2009 ed. Rev. 1)

# EXHIBIT "C"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

| Item | Unit Price ADD | Unit Price DEDUCT |
|------|----------------|-------------------|
| 1.  N/A | $N/A | $          / |

If requested, Subcontractor/Seller shall submit Unit Prices for additional items that may be utilized by Contractor/Buyer.

## III.  ALLOWABLE MARKUPS

Subcontractor/Seller shall apply the following overhead and profit markups for changes in the Scope:

|  |  | % Markup |
|--|--|----------|
| **A.** | **Labor** | **10** |
|  | The markup on labor shall be reflected in the labor rates stated in Section V and shown in the Labor Rate Breakdown. | |
| **B.** | **Material** | **10** |
|  | The markup on material shall be applied after all applicable discounts and rebates due Subcontractor/Seller are considered. | |
| **C.** | **Third Party Rentals** | **5** |
|  | The markup on third party rentals shall be applied to the direct invoiced cost.  Equipment owned by the Subcontractor/Seller is not eligible for markup, and is subject to the rates shown in Section IV. | |
| **D.** | **Sub-subcontractor/Subsupplier Work/Supply** | **5** |
|  | The markup on Sub-subcontractor/Subsupplier work/supply in connection with a change in Scope shall be applied to the direct invoiced cost from the Sub-subcontractor/Subsupplier. Sub-subcontractor's/Subsupplier's markup for its own direct cost shall not exceed the percentages listed above for labor, material, and third party rentals. | |
| **E.** | **Additional Bond Premium (if required)** | **n/a** |
|  | The additional bond premium (if required) on a change in Scope shall be applied to the direct cost of the change. | |

Overhead and profit shall be inclusive of the following: home office costs, management supervision, training, vehicles and pickups, travel, reproduction, temporary facilities, computers, office equipment, small tools, and other incidentals. Small tools are defined as tools that do not have a new unit cost in excess of $750.00.

## IV.  EQUIPMENT RATES

Contractor/Buyer may elect to have Subcontractor/Seller provide any of the following equipment in connection with its Scope at the applicable "Hourly", "Daily", "Weekly", or "Monthly" rate specified. Each specified rate is inclusive of all of Subcontractor's/Seller's costs and expenses to furnish the equipment (not including operator) in accordance with all requirements of the Subcontract/Purchase Order, including but not limited to the following: transportation, delivery, pickup, fuel, energy costs, consumables, connections, maintenance, wear and tear, repair, depreciation, storage, tax, overhead, and profit.  If an hourly rate is used, equipment shall be charged based upon actual usage within ½ hour.

# EXHIBIT "C"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

| Equipment Description | Rate | | | |
|---|---|---|---|---|
| | Hourly | Daily | Weekly | Monthly |
| N/A | | | | |
| | | | | |

Rental costs of Subcontractor/Seller-owned equipment not shown on the list above shall be charged as follows:

- 80% of the rates shown in the latest edition of "AED Green Book" prepared by EquipmentWatch, San Jose, CA ("AED"); or if not shown in AED,
- 80% of the rates shown in the latest edition of "Tool and Equipment Rental Guide" prepared by Mechanical Contractors Association of America ("MCA"); or if not shown in MCA,
- 60% of the rates shown in the latest edition of "Rental Rate Blue Book for Construction Equipment" published by EquipmentWatch, San Jose, CA ("Blue Book"); or if not shown in the Blue Book,
- 60% of the rates shown in the latest edition of "Tool and Equipment Rental Schedule" published by National Electrical Contractors Association, Bethesda, MD ("NECA").

Subcontractor/Seller shall not be reimbursed for the cost of leasing/renting an individual tool or piece of equipment in excess of its fair market value as determined above.


V.    **LABOR RATES**

Contractor/Buyer may elect to have Subcontractor/Seller provide labor (or additional labor) in connection with its Scope.  All additional labor shall be billed at the applicable rate as required by law.  Each specified rate is inclusive of all of Subcontractor's/Seller's costs and expenses to furnish the additional labor in accordance with all requirements of the Subcontract/Purchase Order.

Subcontractor/Seller shall provide Contractor/Buyer a breakdown for each rate specified.

| Trade | Rate Straight Time | Rate Premium Time | Rate Double Time |
|---|---|---|---|
| 1.   N/A | $  N/A      /hr | $  N/A        /hr | $  N/A      /hr |


**VI. LABOR RATES:**
The following are hourly labor rates for all field labor classifications which may be used in pricing any changes in the Work that may be required.  Rates are total hourly billing rates **exclusive of overhead and profit**. Rates are actual wages, taxes, fringes and applicable insurance.  Overhead and profit will be applied in accordance with the terms of the General Conditions. Hourly rates indicated by the Subcontractor are those which are in effect at the time of the award of the Contract. As new labor agreements take effect, wages and fringes will be adjusted accordingly to reflect the actual change in cost.

Alternates, Unit Prices, and Labor Rates
(05/2009 ed. Rev. 1)

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68E48D0DEDD6

# EXHIBIT "C"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

| LABOR RATE BREAKDOWN | |
|---|---|
| **PROJECT:** | |
| **WORK CLASSIFICATION:** | |
| **SUBCONTRACTOR:** | |
| **DATE:** | |
| **EFFECTIVE DATES:** | |

| | FOREMAN | | | JOURNEYMAN | | | APPRENTICE | | |
|---|---|---|---|---|---|---|---|---|---|
| | Straight | Premium 1½ | Premium 2 | Straight | Premium 1½ | Premium 2 | Straight | Premium 1½ | Premium 2 |
| **BASE RATE** $_____ | | | | | | | | | |
| **BENEFITS** $_____ | | | | | | | | | |
| | | | | | | | | | |
| (EMPLOYER PAID) Health & Welfare | | | | | | | | | |
| Pension | | | | | | | | | |
| Apprentice | | | | | | | | | |
| Annuity | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **PAYROLL TAXES @ $____** | | | | | | | | | |
| FICA ____% | | | | | | | | | |
| FUTA ____% | | | | | | | | | |
| SUTA ____% | | | | | | | | | |
| | | | | | | | | | |
| **INSURANCES @ $_____** | | | | | | | | | |
| Workers' Comp. ____% | | | | | | | | | |
| General Liability____% | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **SUBTOTAL** | | | | | | | | | |

**Alternates, Unit Prices, and Labor Rates**
**(05/2009 ed. Rev. 1)**

# EXHIBIT "D"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## PROJECT SCHEDULE/MILESTONES

### 1. PROJECT SCHEDULE

See attached Schedule with a Data Date of 03/02/2015 and a 03/03/2015 Run Date.

### 2. SCHEDULE MILESTONES

The following is a list of schedule milestones for the project:

| Activity | Milestone Date |
|---|---|
| Sub Mobilization | April 1, 2015 |
| Sub Completion | April 17, 2016 |
| | |

"Substantial Completion" shall be defined as follows:

Substantial Completion is when the Architect certifies that the Work or designation portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use. (AIA A201 General Conditions 1997 ed.)

### 3. ANTICIPATED DURATIONS FOR KEY SUBCONTRACTOR ACTIVITIES

| Activity | Workdays | Craft Hours |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

### 4. ANTICIPATED CRAFT LOADING

| Average Crew Size | | Peak Crew Size | |
|---|---|---|---|
| | | | |

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date = Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| **UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE** | | 477 | 330 | Jul-07-2014 A | Jun-15-2016 |
| **PROJECT MILESTONES** | | 396 | 330 | Sep-16-2014 A | Jun-15-2016 |
| 1000 | Notice To Proceed | 0 | 0 | Sep-16-2014 A | |
| 1010 | Mobilize/ Implement Site Logistics | 5 | 0 | Sep-16-2014 A | Oct-06-2014 A |
| SHELL-TIME | Overall Summary Duration for Shell - Start of Vertical to Top-Out | 93 | 84 | Feb-23-2015 A | Jun-26-2015 |
| TOP-OUT | Structural Top-Out | 0 | 0 | | Jun-26-2015 |
| DRY-IN | Complete Building Dry-In - Horizontal & Vertical | 0 | 0 | | Oct-14-2015 |
| POWER | Permanent Power | 0 | 0 | | Nov-30-2015 |
| AIR | Conditioned-Air | 0 | 0 | | Dec-30-2015 |
| EL-USE | Construction Use Elevator - Operational | 0 | 0 | | Jan-13-2016 |
| 9099 | Subcontractor Completion (Target Date) | 0 | 0 | | Apr-19-2016 |
| PUNCH | Final Work-Off Punch | 8 | 8 | Apr-20-2016 | Apr-29-2016 |
| S/C | Substantial Completion | 0 | 0 | | Apr-29-2016* |
| F/C | Final Completion | 0 | 0 | | |
| **PHASE I - SITEWORK / SITE UTILITIES** | | 254 | 107 | Jul-07-2014 A | Jul-30-2015 |
| **Design & GMP** | | 59 | 0 | Jul-07-2014 A | Oct-16-2014 A |
| PRE1080 | Phase 1 - Sitework 100% CD's | 29 | 0 | Jul-07-2014 A | Aug-15-2014 A |
| PRE1140 | Phase 1 - Sitework 100% CD's Skanska/ UF Review | 5 | 0 | Aug-18-2014 A | Aug-22-2014 A |
| PRE1090 | Prepare / Submit Phase 1 GMP | 5 | 0 | Aug-18-2014 A | Sep-10-2014 A |
| PRE1160 | Issue Phase 1 Conformance Set To biders | 5 | 0 | Sep-05-2014 A | Sep-12-2014 A |
| PRE1150 | Phase 1- Sitework Conformance Set | 9 | 0 | Sep-05-2014 A | Sep-17-2014 A |
| PRE1100 | Approve Phase 1 GMP | 1 | 0 | Sep-16-2014 A | Sep-16-2014 A |
| PRE1180 | NTP For Phase 1 | 0 | 0 | | Sep-16-2014 A |
| PRE1170 | Bid Opening Phase 1 | 0 | 0 | | Sep-16-2014 A |
| **Subcontractor Awards** | | 5 | 0 | Sep-15-2014 A | Nov-07-2014 A |
| P1-AWD1020 | Release & Award Electrical Utility Systems Subcontractor | 5 | 0 | Sep-15-2014 A | Oct-16-2014 A |
| P1-AWD1010 | Release & Award Mechanical Utility Systems Subcontractor | 5 | 0 | Oct-01-2014 A | Oct-24-2014 A |
| P1-AWD1000 | Release & Award Civil Utility Systems Subcontractor | 5 | 0 | Oct-02-2014 A | Nov-07-2014 A |
| **Procurement & Construction** | | 209 | 107 | Sep-15-2014 A | Jul-30-2015 |
| **Stormwater Systems** | | 125 | 15 | Oct-03-2014 A | Apr-20-2015 |
| P1-SW1000 | Sub Prepare Shop Drawing Submittals - Storm | 10 | 0 | Oct-03-2014 A | Oct-09-2014 A |
| P1-SW1020 | Sub Procure Stormwater Piping | 10 | 0 | Oct-10-2014 A | Oct-23-2014 A |
| P1-SW1010 | A/E Approve Shop Drawing Submittals - Storm | 10 | 0 | Oct-10-2014 A | Nov-04-2014 A |
| P1-SW1040 | Install Deep Storm & Structure # S-2 | 10 | 0 | Oct-27-2014 A | Nov-07-2014 A |
| P1-SW1080 | Install North Storm | 5 | 0 | Nov-10-2014 A | Nov-24-2014 A |
| P1-SW1050 | Install SE Storm | 10 | 0 | Dec-15-2014 A | Dec-31-2014 A |
| P1-SW1060 | Tie-In Branch Storm Systems to Main | 10 | 10 | Mar-31-2015 | Apr-13-2015 |
| P1-SW1070 | Test New Storm System | 5 | 5 | Apr-14-2015 | Apr-20-2015 |
| **Sanitary Sewer Systems** | | 148 | 10 | Oct-03-2014 A | May-04-2015 |
| P1-SS1000 | Sub Prepare Shop Drawing Submittals - Sanitary | 10 | 0 | Oct-03-2014 A | Oct-09-2014 A |
| P1-SS1010 | A/E Approve Shop Drawing Submittals - Sanitary | 10 | 0 | Oct-10-2014 A | Oct-10-2014 A |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

**SKANSKA**

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| P1-SS1020 | Sub Procure Sanitary Sewer Piping | 3 | 0 | Oct-13-2014 A | Oct-13-2014 A |
| P1-SS1040 | Install Sanitary Piping | 5 | 5 | Apr-21-2015 | Apr-27-2015 |
| P1-SS1070 | Test New Sanitary System | 5 | 5 | Apr-28-2015 | May-04-2015 |
| **Potable Water Systems** | | **113** | **11** | **Oct-03-2014 A** | **Mar-16-2015** |
| P1-PW1000 | Sub Prepare Shop Drawing Submittals - Potable Water | 10 | 0 | Oct-03-2014 A | Oct-09-2014 A |
| P1-PW1010 | A/E Approve Shop Drawing Submittals - Potable Water | 10 | 0 | Oct-10-2014 A | Oct-16-2014 A |
| P1-PW1020 | Sub Procure Potable Water Piping | 5 | 0 | Oct-17-2014 A | Oct-24-2014 A |
| P1-PW1110 | Install Fire Line | 10 | 0 | Oct-27-2014 A | Dec-19-2014 A |
| P1-PW1030 | Install Potable Water Line | 10 | 5 | Oct-27-2014 A | Mar-06-2015 |
| P1-PW1025 | GRU Permit & Tap - Potable Water | 10 | 0 | Nov-10-2014 A | Nov-14-2014 A |
| P1-PW1040 | Install Keene Hall FDC | 5 | 0 | Nov-17-2014 A | Dec-19-2014 A |
| P1-PW1070 | Meter & Backflow Assembly | 5 | 0 | Dec-01-2014 A | Dec-12-2014 A |
| P1-PW1050 | Keene Hall FDC Test & Inspect | 5 | 0 | Dec-19-2014 A | Dec-19-2014 A |
| P1-PW1060 | Keene Hall FDC Tie-In & Activate | 5 | 0 | Dec-22-2014 A | Dec-24-2014 A |
| P1-PW1080 | Test & Inspect Potable Water System | 5 | 5 | Mar-02-2015 | Mar-06-2015 |
| P1-PW1090 | Activate Potable Water | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| P1-PW1100 | Relocate Fire Hydrant | 1 | 1 | Mar-16-2015 | Mar-16-2015 |
| **Chilled Water Systems** | | **64** | **0** | **Oct-09-2014 A** | **Nov-26-2014 A** |
| P1-CW1000 | Sub Prepare Shop Drawing Submittals - Chilled Water | 10 | 0 | Oct-09-2014 A | Oct-09-2014 A |
| P1-CW1010 | A/E Approve Shop Drawing Submittals - Chilled Water | 10 | 0 | Oct-10-2014 A | Oct-10-2014 A |
| P1-CW1020 | Sub Procure Chilled Water Piping | 10 | 0 | Oct-13-2014 A | Oct-31-2014 A |
| P1-CW1030 | Install Chilled Water Piping | 5 | 0 | Nov-03-2014 A | Nov-15-2014 A |
| P1-CW1050 | Test & Inspect New Chilled Water System | 5 | 0 | Nov-10-2014 A | Nov-15-2014 A |
| P1-CW1060 | Clean & Flush CW Piping System | 5 | 0 | Nov-10-2014 A | Nov-15-2014 A |
| P1-CW1070 | Demo Old Chilled Water Piping | 5 | 0 | Nov-17-2014 A | Nov-26-2014 A |
| **Steam Piping Systems** | | **196** | **40** | **Oct-09-2014 A** | **Jul-30-2015** |
| P1-SP1000 | Sub Prepare Shop Drawing Submittals - Steam Piping | 10 | 0 | Oct-09-2014 A | Jan-19-2015 A |
| P1-SP1010 | A/E Approve Shop Drawing Submittals - Steam Piping | 10 | 0 | Oct-10-2014 A | Jan-21-2015 A |
| P1-SP1020 | Sub Procure Steam Piping | 10 | 0 | Oct-13-2014 A | Jan-21-2015 A |
| **Temporary System** | | **175** | **5** | **Oct-27-2014 A** | **Jul-30-2015** |
| P1-SP1030 | Install Temporary Steam Pipe | 5 | 0 | Oct-27-2014 A | Nov-09-2014 A |
| P1-SP1040 | Test & Inspect Temporary Steam Pipe | 5 | 0 | Nov-03-2014 A | Nov-09-2014 A |
| P1-SP1050 | Clean & Flush Temporary Steam Pipe | 5 | 0 | Nov-03-2014 A | Nov-09-2014 A |
| P1-SP1060 | Tie In Temporary Steam Pipe | 1 | 0 | Nov-09-2014 A | Nov-09-2014 A |
| P1-SP1170 | Remove Temporary Steam Pipe | 5 | 5 | Jul-24-2015 | Jul-30-2015 |
| **Permanent System** | | **132** | **35** | **Nov-17-2014 A** | **Jul-23-2015** |
| **Phase Ia (Pre-Basement Structure)** | | **20** | **0** | **Jan-22-2015 A** | **Feb-06-2015 A** |
| P1-SP1080 | Install Permanent Steam Pipe & Structures | 20 | 0 | Jan-22-2015 A | Feb-06-2015 A |
| **Phase Ib (After Basement Structure)** | | **20** | **20** | **Jun-04-2015** | **Jul-01-2015** |
| P1-SP1090 | Install Permanent Steam - Pipe @ Basement | 20 | 20 | Jun-04-2015 | Jul-01-2015 |
| **Complete Permanent Steam System** | | **132** | **15** | **Nov-17-2014 A** | **Jul-23-2015** |
| P1-SP1055 | Abate Existing Steam System | 5 | 0 | Nov-17-2014 A | Nov-28-2014 A |
| P1-SP1066 | Demo Existing System | 5 | 0 | Dec-01-2014 A | Dec-05-2014 A |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| P1-SP1133 | Test & Inspect Permanent Steam Pipe | 5 | 5 | Jul-02-2015 | Jul-09-2015 |
| P1-SP1134 | Clean & Flush Permanent Steam Pipe | 5 | 5 | Jul-10-2015 | Jul-16-2015 |
| P1-SP1144 | Tie In Permanent Steam | 5 | 5 | Jul-17-2015 | Jul-23-2015 |
| **Electrical Systems** | | **106** | **0** | **Sep-15-2014 A** | **Jan-10-2015 A** |
| P1-SP1180 | Sub Prepare Shop Drawing Submittals - Site Electrical | 10 | 0 | Sep-15-2014 A | Sep-26-2014 A |
| P1-SP1190 | A/E Approve Shop Drawing Submittals - Site Electrical | 10 | 0 | Sep-29-2014 A | Oct-10-2014 A |
| P1-SP1200 | Sub Procure Site Electrical | 10 | 0 | Sep-29-2014 A | Oct-10-2014 A |
| P1-EE1040 | Install New Conduit to South Tie-In | 5 | 0 | Oct-17-2014 A | Dec-19-2014 A |
| P1-EE1090 | Install Conduit East to TX | 10 | 0 | Dec-08-2014 A | Dec-19-2014 A |
| P1-EE1050 | Pull New Wire | 5 | 0 | Dec-22-2014 A | Jan-05-2015 A |
| P1-EE1070 | Tie in New Electrical @ South Location | 3 | 0 | Jan-02-2015 A | Jan-05-2015 A |
| P1-EE1080 | Demo Exiting Duct Bank | 5 | 0 | Jan-07-2015 A | Jan-10-2015 A |
| **RFI # 022 Construction** | | **65** | **0** | **Nov-03-2014 A** | **Dec-16-2014 A** |
| P1-EE-RFI-022-00 | RFI # 022: Utility Procurement | 15 | 0 | Nov-03-2014 A | Dec-09-2014 A |
| P1-EE-RFI-022-10 | RFI #022: Relocate Water Mains | 10 | 0 | Nov-25-2014 A | Dec-09-2014 A |
| P1-EE-RFI-022-20 | RFI #022: Install New Electrical Manhole | 5 | 0 | Dec-10-2014 A | Dec-16-2014 A |
| **PRECONSTRUCTION** | | **280** | **150** | **Jul-07-2014 A** | **Sep-30-2015** |
| **Design & GMP** | | **115** | **0** | **Jul-07-2014 A** | **Feb-09-2015 A** |
| **PHASE II - FOUNDATIONS / STRUCTURE** | | **84** | **0** | **Jul-07-2014 A** | **Oct-24-2014 A** |
| PRE1210 | Phase 2 - Foundations 100% CD's | 55 | 0 | Jul-07-2014 A | Sep-18-2014 A |
| PRE1420 | Phase 2 - Foundation 100% CD UF/ Skanska Review | 5 | 0 | Sep-19-2014 A | Sep-24-2014 A |
| PRE1260 | Prepare / Submit Phase 2 GMP | 20 | 0 | Sep-19-2014 A | Oct-16-2014 A |
| PRE1220 | Phase 2- Foundations Conformance Set | 14 | 0 | Sep-25-2014 A | Oct-14-2014 A |
| PRE1270 | Approve Phase 2 GMP | 5 | 0 | Oct-17-2014 A | Oct-23-2014 A |
| PRE1250 | Bid Opening Phase 2 | 0 | 0 | | Oct-23-2014 A |
| PRE1280 | NTP For Phase 2 | 0 | 0 | | Oct-23-2014 A |
| PRE1230 | Issue Phase 2 Conformance Set To biders | 5 | 0 | Oct-24-2014 A | Oct-24-2014 A |
| **PHASE III - EXTERIOR & INTERIOR FINISHES** | | **115** | **0** | **Jul-07-2014 A** | **Feb-09-2015 A** |
| PRE1310 | Phase 3 - Building 100% CD's | 95 | 0 | Jul-07-2014 A | Nov-14-2014 A |
| PRE1350 | Phase 3 - Building 100 % CD's UF/ Skanska Review | 5 | 0 | Nov-17-2014 A | Jan-02-2015 A |
| PRE1360 | Prepare / Submit Phase 3 GMP | 20 | 0 | Nov-17-2014 A | Jan-23-2015 A |
| PRE1380 | Phase 3 - Building Conformance Set | 18 | 0 | Nov-24-2014 A | Jan-09-2015 A |
| PRE1400 | Issue Phase 3 Conformance Set to Bidders | 5 | 0 | Jan-12-2015 A | Jan-14-2015 A |
| PRE1430 | Approve Phase 3 GMP | 5 | 0 | Jan-26-2015 A | Feb-05-2015 A |
| PRE1410 | Bid Opening Phase 3 | 0 | 0 | | Feb-09-2015 A |
| PRE1440 | NTP For Phase 3 | 0 | 0 | | Feb-09-2015 A |
| **Procurement** | | **221** | **150** | **Oct-24-2014 A** | **Sep-30-2015** |
| **Phase 3 GMP - Priority # 1** | | **70** | **0** | **Oct-24-2014 A** | **Feb-05-2015 A** |
| **Superstructure** | | **70** | **0** | **Oct-24-2014 A** | **Jan-19-2015 A** |
| 1450 | Issue Subcontracts - Superstructure | 5 | 0 | Oct-24-2014 A | Dec-03-2014 A |
| 1470 | Prepare/ Submit Initial Superstructure Submittals | 10 | 0 | Oct-24-2014 A | Dec-16-2014 A |
| 1480 | Review/ Approve Initial Superstructure Submittals | 10 | 0 | Dec-17-2014 A | Dec-23-2014 A |

Legend:
- ▬ Remaining Level of Effort
- ▬ Actual Level of Effort
- ▭ Actual Work
- ▭ Remaining Work
- ▬ Critical Remaining Work
- ◆ Milestone

**SKANSKA**

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | Classic WBS Layout - For Issuance | Data Date = Mar-02-2015 |
| | | | Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 1490 | Procure Initial Superstructure Rebar | 10 | 0 | Dec-24-2014 A | Jan-19-2015 A |
| **Deep Foundations** | | 70 | 0 | Oct-24-2014 A | Dec-08-2014 A |
| 1390 | Issue Subcontracts - Deep Foundations | 5 | 0 | Oct-24-2014 A | Nov-07-2014 A |
| 1430 | Prepare Foundation/ Basement Submittals | 15 | 0 | Oct-24-2014 A | Nov-11-2014 A |
| 1440 | Review/ Approve Foundation/ Basement Submittals | 10 | 0 | Nov-12-2014 A | Nov-19-2014 A |
| 1460 | Procure Foundation Rebar | 10 | 0 | Nov-24-2014 A | Dec-08-2014 A |
| **07A Foundation Waterproofing** | | 31 | 0 | Oct-24-2014 A | Feb-05-2015 A |
| 7310 | 07A - Bid Day | 5 | 0 | Oct-24-2014 A | Oct-24-2014 A |
| 7320 | 07A - Review Bids/Descope | 10 | 0 | Oct-26-2014 A | Nov-06-2014 A |
| 7330 | 07A - Award Bid Package | 0 | 0 | | Nov-11-2014 A |
| 7350 | 07A - Prepare and Submit Submittals | 15 | 0 | Dec-01-2014 A | Jan-19-2015 A |
| 7340 | 07A - Prepare and Sign Contract | 5 | 0 | Dec-01-2014 A | Jan-21-2015 A |
| 7370 | 07A - Submittal Review - Design Team | 10 | 0 | Jan-20-2015 A | |
| 7380 | 07A - Final Submittal Approval | 0 | 0 | | Feb-02-2015 A |
| 7390 | 07A - Material Procurement | 2 | 0 | Feb-03-2015 A | Feb-04-2015 A |
| 7400 | 07A - Mobilization | 1 | 0 | Feb-05-2015 A | Feb-05-2015 A |
| **Phase 3 GMP - Priority # 2** | | 145 | 125 | Feb-09-2015 A | Aug-25-2015 |
| **04E Unit Masonry** | | 90 | 70 | Feb-09-2015 A | Jun-08-2015 A |
| 7010 | 04E- Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7020 | 04E-Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 7030 | 04E-Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 7040 | 04E-Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| 7050 | 04E-Prepare and Submit Submittals | 20 | 20 | Mar-16-2015 | Apr-10-2015 |
| 7070 | 04E-Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 7080 | 04E-Final Submittal Approval | 0 | 0 | | Apr-24-2015 |
| 7090 | 04E-Material Procurement | 20 | 20 | Apr-27-2015 | May-22-2015 |
| 7100 | 04E-Mobilization | 10 | 10 | May-26-2015 | Jun-08-2015 |
| **05A Structural Steel** | | 115 | 95 | Feb-09-2015 A | Jul-14-2015 |
| 7210 | 05A - Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7220 | 05A - Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 7230 | 05A - Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 7240 | 05A - Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| 7250 | 05A - Prepare and Submit Submittals | 20 | 20 | Mar-09-2015 | Apr-03-2015 |
| 7270 | 05A - Submittal Review - Design Team | 10 | 10 | Apr-06-2015 | Apr-17-2015 |
| 7280 | 05A - Final Submittal Approval | 0 | 0 | | Apr-17-2015 |
| 7290 | 05A - Material Procurement | 50 | 50 | Apr-20-2015 | Jun-29-2015 |
| 7300 | 05A - Mobilization | 10 | 10 | Jun-30-2015 | Jul-14-2015 |
| **05B Arch. & Misc. Metals** | | 105 | 85 | Feb-09-2015 A | Jun-29-2015 |
| 7110 | 05B - Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7120 | 05B - Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 7130 | 05B - Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 7140 | 05B - Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |

Legend: Remaining Level of Effort | Actual Work | Critical Remaining Work | Actual Level of Effort | Remaining Work | Milestone

SKANSKA

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 7150 | 05B - Prepare and Submit Submittals | 30 | 30 | Mar-16-2015 | Apr-24-2015 |
| 7170 | 05B - Submittal Review - Design Team | 10 | 10 | Apr-27-2015 | May-08-2015 |
| 7180 | 05B - Final Submittal Approval | 0 | 0 | | May-08-2015 |
| 7190 | 05B - Material Procurement | 25 | 25 | May-11-2015 | Jun-15-2015 |
| 7200 | 05B - Mobilization | 10 | 10 | Jun-16-2015 | Jun-29-2015 |
| **07D Applied Fireproofing & Fire Resistive Coating** | | **100** | **80** | **Feb-09-2015 A** | **Jun-22-2015** |
| 7710 | 07D - Bid Day | 5 | 5 | Feb-09-2015 A | Feb-09-2015 A |
| 7720 | 07D - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 7730 | 07D - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 7740 | 07D - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 7750 | 07D - Prepare and Submit Submittals | 15 | 15 | Mar-23-2015 | Apr-10-2015 |
| 7770 | 07D - Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 7780 | 07D - Final Submittal Approval | 0 | 0 | | Apr-24-2015 |
| 7790 | 07D - Material Procurement | 30 | 30 | Apr-27-2015 | Jun-08-2015 |
| 7800 | 07D - Mobilization | 10 | 10 | Jun-09-2015 | Jun-22-2015 |
| **14A Elevators** | | **145** | **125** | **Feb-09-2015 A** | **Aug-25-2015** |
| 8310 | 14A - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8320 | 14A - Review Bids/Descope | 10 | 10 | Feb-10-2015 A | Mar-13-2015 |
| 8330 | 14A - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8340 | 14A - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8350 | 14A - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8370 | 14A - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8380 | 14A - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8390 | 14A - Material Procurement | 80 | 80 | May-04-2015 | Aug-25-2015 |
| 8400 | 14A - Mobilization | 10 | 10 | Aug-12-2015 | Aug-25-2015 |
| **15C Fire Suppresion** | | **125** | **105** | **Feb-09-2015 A** | **Jul-28-2015** |
| 9310 | 15C - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 9320 | 15C - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 9330 | 15C - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 9340 | 15C - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 9400 | 15C - Mobilization | 10 | 10 | Mar-23-2015 | Apr-03-2015 |
| 9350 | 15C - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 9370 | 15C - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 9380 | 15C - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 9390 | 15C - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| **15B HVAC** | | **122** | **102** | **Feb-09-2015 A** | **Jul-23-2015** |
| 8610 | 15B - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8620 | 15B - Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 8630 | 15B - Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 8640 | 15B - Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| 8700 | 15B - Mobilization | 10 | 10 | Mar-16-2015 | Mar-27-2015 |
| 8650 | 15B - Prepare and Submit Submittals | 20 | 20 | Mar-16-2015 | Apr-10-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 8670 | 15B - Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 8680 | 15B - Final Submittal Approval | 0 | 0 | | Apr-24-2015 |
| 8690 | 15B - Material Procurement | 60 | 60 | Apr-29-2015 | Jul-23-2015 |
| **15D BAS** | | **130** | **110** | **Feb-09-2015 A** | **Aug-04-2015** |
| 9410 | 15D - Bid Day | 5 | 5 | Feb-09-2015 A | Feb-09-2015 A |
| 9420 | 15D -Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 9430 | 15D -Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 9440 | 15D -Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| 9450 | 15D -Prepare and Submit Submittals | 20 | 20 | Mar-16-2015 | Apr-10-2015 |
| 9470 | 15D -Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 9480 | 15D -Final Submittal Approval | 0 | 0 | | Apr-24-2015 |
| 9490 | 15D -Material Procurement | 60 | 60 | Apr-27-2015 | Jul-21-2015 |
| 9500 | 15D -Mobilization | 10 | 10 | Jul-22-2015 | Aug-04-2015 |
| **15E Plumbing** | | **105** | **85** | **Feb-09-2015 A** | **Jun-29-2015** |
| 9510 | 15E- Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 9520 | 15E- Review Bids/Descope | 10 | 10 | Feb-10-2015 A | Mar-13-2015 |
| 9530 | 15E- Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 9540 | 15E- Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 9600 | 15E- Mobilization | 10 | 10 | Mar-23-2015 | Apr-03-2015 |
| 9550 | 15E- Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 9570 | 15E- Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 9580 | 15E- Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 9590 | 15E- Material Procurement | 40 | 40 | May-04-2015 | Jun-29-2015 |
| **16B Electrical Fit & Distribution** | | **140** | **120** | **Feb-09-2015 A** | **Aug-18-2015** |
| 9710 | 16B -Bid Day | 5 | 5 | Feb-09-2015 A | Feb-09-2015 A |
| 9720 | 16B -Review Bids/Descope | 10 | 5 | Feb-10-2015 A | Mar-06-2015 |
| 9730 | 16B -Award Bid Package | 0 | 0 | | Mar-06-2015 |
| 9740 | 16B -Prepare and Sign Contract | 5 | 5 | Mar-09-2015 | Mar-13-2015 |
| 9750 | 16B -Prepare and Submit Submittals | 20 | 20 | Mar-16-2015 | Apr-10-2015 |
| 9770 | 16B -Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 9780 | 16B -Final Submittal Approval | 0 | 0 | | Apr-24-2015 |
| 9790 | 16B -Material Procurement | 80 | 80 | Apr-27-2015 | Aug-18-2015 |
| 9800 | 16B -Mobilization | 10 | 10 | Aug-05-2015 | Aug-18-2015 |
| **Phase 3 GMP - Priority # 3** | | **170** | **150** | **Feb-09-2015 A** | **Sep-30-2015** |
| **07B Roofing** | | **100** | **80** | **Feb-09-2015 A** | **Jun-22-2015** |
| 7810 | 07B - Bid Day | 5 | 5 | Feb-09-2015 A | Feb-09-2015 A |
| 7820 | 07B - Review Bids/Descope | 10 | 10 | Feb-10-2015 A | Mar-13-2015 |
| 7830 | 07B - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 7840 | 07B - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 7850 | 07B - Prepare and Submit Submittals | 15 | 15 | Mar-23-2015 | Apr-10-2015 |
| 7870 | 07B - Submittal Review - Design Team | 10 | 10 | Apr-13-2015 | Apr-24-2015 |
| 7880 | 07B - Final Submittal Approval | 0 | 0 | | Apr-24-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

**SKANSKA**

| | | | | | | |
|---|---|---|---|---|---|---|
| UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 | |
| | | | | | Run Date =Mar-03-2015 14:35 | |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 7890 | 07B - Material Procurement | 30 | 30 | Apr-27-2015 | Jun-08-2015 |
| 7900 | 07B - Mobilization | 10 | 10 | Jun-09-2015 | Jun-22-2015 |
| **08A Glass & Glazing** | | **140** | **120** | **Feb-09-2015 A** | **Aug-18-2015** |
| 8010 | 08A - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-27-2015 A |
| 8020 | 08A -Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8030 | 08A -Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8040 | 08A -Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8100 | 08A -Mobilization | 10 | 10 | Mar-23-2015 | Apr-03-2015 |
| 8050 | 08A -Prepare and Submit Submittals | 25 | 25 | Mar-23-2015 | Apr-24-2015 |
| 8070 | 08A -Submittal Review - Design Team | 10 | 10 | Apr-27-2015 | May-08-2015 |
| 8080 | 08A -Final Submittal Approval | 0 | 0 | | May-08-2015 |
| 8090 | 08A -Material Procurement | 70 | 70 | May-11-2015 | Aug-18-2015 |
| **06B, 09D Interior Arch Woodwork & Wall Panel System** | | **135** | **135** | **Mar-02-2015** | **Sep-09-2015** |
| 7410 | 06B - Bid Day | 5 | 5 | Mar-02-2015 | Mar-06-2015 |
| 7420 | 06B - Review Bids/Descope | 10 | 10 | Mar-09-2015 | Mar-20-2015 |
| 7430 | 06B - Award Bid Package | 0 | 0 | | Mar-20-2015 |
| 7440 | 06B - Prepare and Sign Contract | 5 | 5 | Mar-23-2015 | Mar-27-2015 |
| 7450 | 06B - Prepare and Submit Submittals | 35 | 35 | Mar-30-2015 | May-15-2015 |
| 7470 | 06B - Submittal Review - Design Team | 10 | 10 | May-18-2015 | Jun-01-2015 |
| 7480 | 06B - Final Submittal Approval | 0 | 0 | | Jun-01-2015 |
| 7490 | 06B - Material Procurement | 60 | 60 | Jun-02-2015 | Aug-25-2015 |
| 7500 | 06B - Mobilization | 10 | 10 | Aug-26-2015 | Sep-09-2015 |
| **08C Doors Frames & Hardware** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 7610 | 08C - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7620 | 08C - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 7630 | 08C - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 7640 | 08C - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 7650 | 08C - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 7670 | 08C - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 7680 | 08C - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 7690 | 08C - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 7700 | 08C - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **08D OCD & Fire Doors** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 7510 | 08D - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7520 | 08D - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 7530 | 08D - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 7540 | 08D - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 7550 | 08D - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 7570 | 08D - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 7580 | 08D - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 7590 | 08D - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 7600 | 08D - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | **10A, 11A, 12A, Lab Casework, Fume Hoods & Accessories** | 170 | 150 | Feb-09-2015 A | Sep-30-2015 |
| 9010 | 10A, 11A, 12A,  - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 9020 | 10A, 11A, 12A,  -Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 9030 | 10A, 11A, 12A,  -Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 9040 | 10A, 11A, 12A,  -Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 9050 | 10A, 11A, 12A,  -Prepare and Submit Submittals | 35 | 35 | Mar-23-2015 | May-08-2015 |
| 9070 | 10A, 11A, 12A,  -Submittal Review - Design Team | 10 | 10 | May-11-2015 | May-22-2015 |
| 9080 | 10A, 11A, 12A,  -Final Submittal Approval | 0 | 0 | | May-22-2015 |
| 9090 | 10A, 11A, 12A,  -Material Procurement | 80 | 80 | May-26-2015 | Sep-16-2015 |
| 9100 | 10A, 11A, 12A,  -Mobilization | 10 | 10 | Sep-17-2015 | Sep-30-2015 |
| | **Phase 3 GMP - Priority # 4** | 136 | 116 | Feb-09-2015 A | Aug-12-2015 |
| | **09B Tilling** | 105 | 85 | Feb-09-2015 A | Jun-29-2015 |
| 8510 | 09B - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8520 | 09B - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8530 | 09B - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8540 | 09B - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8550 | 09B - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8570 | 09B - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8580 | 09B - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8590 | 09B - Material Procurement | 30 | 30 | May-04-2015 | Jun-15-2015 |
| 8600 | 09B - Mobilization | 10 | 10 | Jun-16-2015 | Jun-29-2015 |
| | **09C Carpet, Resilientt Base, Flooring & Moisture Mitigation** | 135 | 115 | Feb-09-2015 A | Aug-11-2015 |
| 9210 | 09C - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 9220 | 09C - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 9230 | 09C - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 9240 | 09C - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 9250 | 09C - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 9270 | 09C - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 9280 | 09C - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 9290 | 09C - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 9300 | 09C - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| | **09D Resinous Flooring** | 105 | 85 | Feb-09-2015 A | Jun-29-2015 |
| 9110 | 09D - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 9120 | 09D - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 9130 | 09D - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 9140 | 09D - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 9150 | 09D - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 9170 | 09D - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 9180 | 09D - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 9190 | 09D - Material Procurement | 30 | 30 | May-04-2015 | Jun-15-2015 |
| 9200 | 09D - Mobilization | 10 | 10 | Jun-16-2015 | Jun-29-2015 |
| | **09E Painting** | 105 | 85 | Feb-09-2015 A | Jun-29-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 8910 | 09E - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8920 | 09E - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8930 | 09E - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8940 | 09E - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8950 | 09E - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8970 | 09E - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8980 | 09E - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8990 | 09E - Material Procurement | 30 | 30 | May-04-2015 | Jun-15-2015 |
| 9000 | 09E - Mobilization | 10 | 10 | Jun-16-2015 | Jun-29-2015 |
| **10B Accessories** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 8810 | 10B - Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8820 | 10B - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8830 | 10B - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8840 | 10B - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8850 | 10B - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8870 | 10B - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8880 | 10B - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8890 | 10B - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 8900 | 10B - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **10C, Misc. Specialties** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 8710 | 10C - Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8720 | 10C - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8730 | 10C - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8740 | 10C - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8750 | 10C - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8770 | 10C - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8780 | 10C - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8790 | 10C - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 8800 | 10C - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **12B Blinds & Shades** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 7910 | 12B - Bid Day | 1 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 7920 | 12B -Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 7930 | 12B -Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 7940 | 12B -Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 7950 | 12B -Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 7970 | 12B -Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 7980 | 12B -Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 7990 | 12B -Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 8000 | 12B -Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **12C Fixed Audience Seating** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 8110 | 12C - Bid Day | 5 | 0 | Feb-09-2015 A | Feb-09-2015 A |
| 8120 | 12C - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |

Remaining Level of Effort
Actual Level of Effort
Actual Work
Remaining Work
Critical Remaining Work
Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 8130 | 12C - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8140 | 12C - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8150 | 12C - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8170 | 12C - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8180 | 12C - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8190 | 12C - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 8200 | 12C - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **12D Systems Furniture** | | **135** | **115** | **Feb-09-2015 A** | **Aug-11-2015** |
| 8210 | 12D - Bid Day | 5 | 5 | Feb-09-2015 A | Feb-09-2015 A |
| 8220 | 12D - Review Bids/Descope | 10 | 10 | Mar-02-2015 | Mar-13-2015 |
| 8230 | 12D - Award Bid Package | 0 | 0 | | Mar-13-2015 |
| 8240 | 12D - Prepare and Sign Contract | 5 | 5 | Mar-16-2015 | Mar-20-2015 |
| 8250 | 12D - Prepare and Submit Submittals | 20 | 20 | Mar-23-2015 | Apr-17-2015 |
| 8270 | 12D - Submittal Review - Design Team | 10 | 10 | Apr-20-2015 | May-01-2015 |
| 8280 | 12D - Final Submittal Approval | 0 | 0 | | May-01-2015 |
| 8290 | 12D - Material Procurement | 60 | 60 | May-04-2015 | Jul-28-2015 |
| 8300 | 12D - Mobilization | 10 | 10 | Jul-29-2015 | Aug-11-2015 |
| **02E Landscaping** | | **116** | **116** | **Mar-02-2015** | **Aug-12-2015** |
| 1400 | 02E - Bid Day | 1 | 1 | Mar-02-2015 | Mar-02-2015 |
| 1435 | 02E - Review Bids/Descope | 10 | 10 | Mar-03-2015 | Mar-16-2015 |
| 1445 | 02E - Award Bid Package | 0 | 0 | | Mar-16-2015 |
| 1455 | 02E - Prepare and Sign Contract | 5 | 5 | Mar-17-2015 | Mar-23-2015 |
| 1465 | 02E - Prepare and Submit Submittals | 20 | 20 | Mar-24-2015 | Apr-20-2015 |
| 1485 | 02E - Submittal Review - Design Team | 10 | 10 | Apr-21-2015 | May-04-2015 |
| 1495 | 02E - Final Submittal Approval | 0 | 0 | | May-04-2015 |
| 1505 | 02E - Material Procurement | 60 | 60 | May-05-2015 | Jul-29-2015 |
| 1515 | 02E - Mobilization | 10 | 10 | Jul-30-2015 | Aug-12-2015 |
| **BIM Coordination** | | **22** | **22** | **Mar-30-2015** | **Apr-28-2015** |
| BIM-000 | Start Implementation of BIM Strategy | 22 | 22 | Mar-30-2015 | Apr-28-2015 |
| **CONSTRUCTION** | | **361** | **290** | **Nov-10-2014 A** | **Apr-19-2016** |
| **FOUNDATIONS** | | **109** | **38** | **Nov-10-2014 A** | **Apr-22-2015** |
| **Basement to Finished Floor EL 0'-0"** | | **109** | **38** | **Nov-10-2014 A** | **Apr-22-2015** |
| SB0-0110 | Test Piles | 8 | 0 | Nov-10-2014 A | Nov-24-2014 A |
| SB0-0400 | Install Basement Shoring System | 20 | 0 | Nov-17-2014 A | Feb-26-2015 A |
| SB0-0000 | Excavate 2' Pre-cut | 5 | 0 | Dec-01-2014 A | Dec-05-2014 A |
| SB0-0100 | Install Auger Cast Piles @ Basement Level & North Area | 10 | 0 | Dec-08-2014 A | Dec-23-2014 A |
| SB0-0300 | Excavate Basement  Piles to -10ft & Cut | 5 | 0 | Dec-29-2014 A | Dec-31-2014 A |
| SB0-0310 | Install Whaler/Header Pipe Systems | 5 | 0 | Jan-05-2015 A | Jan-19-2015 A |
| SB0-0200 | Dewater Basement - Initial Set-up | 5 | 0 | Jan-11-2015 A | Jan-19-2015 A |
| SB0-0320 | Excavate Basement  Piles from -10ft to -25ft & Cut | 9 | 0 | Jan-20-2015 A | Feb-05-2015 A |
| SB0-1000 | Excavate to Bottom of PC's | 3 | 5 | Feb-23-2015 A | Mar-06-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

**SKANSKA**

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | Classic WBS Layout - For Issuance | | | | | Data Date = Mar-02-2015 / Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| SB0-1020 | FRP Basement Pile Caps | 7 | 8 | Feb-24-2015 A | Mar-11-2015 |
| SB0-1030 | FRP Elevator Pit Walls to Basement Slab EL -14'-0" | 3 | 3 | Mar-12-2015 | Mar-16-2015 |
| SB0-1040 | Waterproof Elevator Pit Walls | 2 | 2 | Mar-17-2015 | Mar-18-2015 |
| SB0-1050 | Pour Mud Slab | 1 | 1 | Mar-19-2015 | Mar-19-2015 |
| SB0-1060 | Waterproof B/Basement Slab EL. -14'-0" | 4 | 4 | Mar-20-2015 | Mar-25-2015 |
| SB0-1070 | FRP 24" Thick Basement Slab EL. -14'-0" | 4 | 4 | Mar-26-2015 | Mar-31-2015 |
| SB0-1080 | FRP Basement Walls/Columns to Finished Floor | 8 | 8 | Apr-01-2015 | Apr-10-2015 |
| S01-1000 | FRP Slab-On-Grade/ Basement Roof | 8 | 8 | Apr-13-2015 | Apr-22-2015 |
| **Level 01** | | **66** | **36** | **Dec-01-2014 A** | **Apr-20-2015** |
| 1065 | Mass Excavation | 5 | 0 | Dec-01-2014 A | Dec-19-2014 A |
| 1055 | Install Auger Cast Piles @ SOG | 15 | 0 | Dec-08-2014 A | Jan-23-2015 A |
| 1075 | Dewater & Shore @ SOG | 5 | 0 | Dec-22-2014 A | Jan-30-2015 A |
| 1085 | Excavate for Pile Caps | 36 | 8 | Jan-22-2015 A | Mar-11-2015 |
| S01-1010 | FRP Pile Caps- South | 21 | 0 | Jan-26-2015 A | Feb-18-2015 A |
| S01-1020 | FRP Pile Caps- North | 21 | 21 | Feb-19-2015 A | Mar-30-2015 |
| **Trenches - South** | | **15** | **15** | **Mar-02-2015** | **Mar-20-2015** |
| SG-S-102 | Excavate/Prep Trenches | 3 | 3 | Mar-02-2015 | Mar-04-2015 |
| SG-S-105 | Waterproof Trenches | 5 | 5 | Mar-05-2015 | Mar-11-2015 |
| SG-S-110 | Install Trenches - South | 7 | 7 | Mar-12-2015 | Mar-20-2015 |
| **Trenches - North** | | **15** | **15** | **Mar-31-2015** | **Apr-20-2015** |
| S01-1090 | Excavate/Prep Trenches | 3 | 3 | Mar-31-2015 | Apr-02-2015 |
| S01-1100 | Waterproof Trenches | 5 | 5 | Apr-03-2015 | Apr-09-2015 |
| SG-N-120 | Install Trenches - North | 7 | 7 | Apr-10-2015 | Apr-20-2015 |
| **SUPERSTRUCTURE** | | **93** | **84** | **Feb-23-2015 A** | **Jun-26-2015** |
| **Level 02** | | **59** | **50** | **Feb-23-2015 A** | **May-08-2015** |
| S12-1000 | FRP Columns/Walls to 2nd Floor- South | 19 | 10 | Feb-23-2015 A | Mar-13-2015 |
| S12-1010 | FRP 2nd Floor Elevated Slab- SOUTH | 13 | 13 | Mar-16-2015 | Apr-01-2015 |
| S12-1020 | FRP Columns/Walls to 2nd Floor- North | 20 | 20 | Apr-01-2015 | Apr-28-2015 |
| S12-1030 | FRP 2nd Floor Elevated Slab- NORTH | 8 | 8 | Apr-29-2015 | May-08-2015 |
| **Level 03** | | **39** | **39** | **Apr-02-2015** | **May-27-2015** |
| S23-1000 | FRP Columns/Walls to 3rd Floor- South | 4 | 4 | Apr-02-2015 | Apr-07-2015 |
| S23-1010 | FRP 3rd Floor Elevated Slab- SOUTH | 9 | 9 | Apr-08-2015 | Apr-20-2015 |
| S23-1020 | FRP Columns/Walls to 3rd Floor- North | 4 | 4 | May-11-2015 | May-14-2015 |
| S23-1030 | FRP 3rd Floor Elevated Slab- NORTH | 8 | 8 | May-15-2015 | May-27-2015 |
| **Level 04** | | **37** | **37** | **Apr-21-2015** | **Jun-11-2015** |
| S34-1000 | FRP Columns/Walls to 4th Floor- South | 4 | 4 | Apr-21-2015 | Apr-24-2015 |
| S34-1010 | FRP 4th Floor Elevated Slab- SOUTH | 9 | 9 | Apr-27-2015 | May-07-2015 |
| S34-1020 | FRP Columns/Walls to 4th Floor- North | 4 | 4 | May-28-2015 | Jun-02-2015 |
| S34-1030 | FRP 4th Floor Elevated Slab- NORTH | 7 | 7 | Jun-03-2015 | Jun-11-2015 |
| **Level 05** | | **35** | **35** | **May-08-2015** | **Jun-26-2015** |
| S45-1000 | FRP Columns/Walls to 5th Floor- South | 4 | 4 | May-08-2015 | May-13-2015 |
| S45-1010 | FRP 5th Floor Elevated Slab- SOUTH | 9 | 9 | May-14-2015 | May-27-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| S45-1020 | FRP Columns/Wall to 5th Floor- North | 4 | 4 | Jun-12-2015 | Jun-17-2015 |
| S45-1030 | FRP 5th Floor Elevated Slab- NORTH | 7 | 7 | Jun-18-2015 | Jun-26-2015 |
| **SOG** | | **101** | **101** | **Mar-12-2015** | **Aug-03-2015** |
| **First Floor - South** | | **76** | **76** | **Mar-12-2015** | **Jun-26-2015** |
| SG-S-120 | Demobilize Concrete - South | 5 | 5 | Mar-12-2015 | Mar-18-2015 |
| SG-S-100 | Remove Re-Shores - South | 5 | 5 | May-20-2015 | May-27-2015 |
| SG-S-130 | UnderSlab MEPF - South | 12 | 12 | May-28-2015 | Jun-12-2015 |
| SG-S-140 | F/R/P SOG - South | 10 | 10 | Jun-15-2015 | Jun-26-2015 |
| **First Floor - North** | | **29** | **29** | **Jun-23-2015** | **Aug-03-2015** |
| SG-N-100 | Remove Re-Shores - North | 5 | 5 | Jun-23-2015 | Jun-29-2015 |
| SG-N-110 | Demobilize Concrete - North | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| SG-N-130 | UnderSlab MEPF - North | 10 | 10 | Jul-07-2015 | Jul-20-2015 |
| SG-N-140 | F/R/P SOG - North | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| **EXTERIOR** | | **139** | **139** | **May-19-2015** | **Dec-04-2015** |
| EX-1290 | Survey Control Layout Exterior - South to North | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| EX-1205 | Concrete Demobilization - Roof Level | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| EX-1300 | Below Grade Waterproofing | 5 | 5 | Jul-07-2015 | Jul-13-2015 |
| EX-1310 | Stem Wall CMU | 5 | 5 | Jul-14-2015 | Jul-20-2015 |
| EX-1320 | Stem Wall Concrete | 5 | 5 | Jul-21-2015 | Jul-27-2015 |
| EX-1500 | Flash / Insulate / Net | 30 | 30 | Aug-04-2015 | Sep-15-2015 |
| 1520 | Punch-Out Building Envelope | 15 | 15 | Nov-12-2015 | Dec-04-2015 |
| **Roof Top Activity** | | **85** | **85** | **May-19-2015** | **Sep-17-2015** |
| EX-1035 | Elevator Concrete Walls | 10 | 10 | May-19-2015 | Jun-02-2015 |
| EX-1040 | Elevator CMU Wall | 10 | 10 | Jun-09-2015 | Jun-22-2015 |
| EX-1050 | Elevator Concrete Roof Cap | 5 | 5 | Jun-23-2015 | Jun-29-2015 |
| EX-1160 | Dormer Wall Systems | 10 | 10 | Aug-18-2015 | Aug-31-2015 |
| EX-1170 | Dormer Louver Systems | 10 | 10 | Sep-01-2015 | Sep-15-2015 |
| EX-1140 | Steel Framing - Porch | 5 | 5 | Sep-03-2015 | Sep-10-2015 |
| EX-1150 | Steel Deck - Porch | 5 | 5 | Sep-11-2015 | Sep-17-2015 |
| **South** | | **16** | **16** | **Jul-07-2015** | **Jul-28-2015** |
| EX-1020 | Gables / Parapet CMU - South | 10 | 10 | Jul-07-2015 | Jul-20-2015 |
| EX-1030 | Gables / Parapet Tie Beams - South | 6 | 6 | Jul-21-2015 | Jul-28-2015 |
| **North** | | **16** | **16** | **Jul-21-2015** | **Aug-11-2015** |
| EX-1060 | Gables / Parapet CMU - North | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| EX-1070 | Gables / Parapet Tie Beams - North | 6 | 6 | Aug-04-2015 | Aug-11-2015 |
| **Roofing** | | **66** | **66** | **Jul-31-2015** | **Nov-02-2015** |
| EX-1180 | Roof Top Curbs - Center | 5 | 5 | Jul-31-2015 | Aug-06-2015 |
| EX-1190 | Prep for Roofing (All) - Center, South & North | 15 | 15 | Aug-07-2015 | Aug-27-2015 |
| EX-1230 | Roof Eqpt / Vents / Hatches / Doors | 10 | 10 | Oct-07-2015 | Oct-20-2015 |
| EX-1280 | Roofing Lightning Protection | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| **Center** | | **37** | **37** | **Aug-28-2015** | **Oct-20-2015** |
| EX-1200 | Roofing Dry-In - Center | 10 | 10 | Aug-28-2015 | Sep-11-2015 |

Legend:
- ▬ Remaining Level of Effort (green)
- ▬ Actual Work (blue)
- ▬ Critical Remaining Work (red)
- ▬ Actual Level of Effort (dark blue)
- ▭ Remaining Work (light green)
- ◆ Milestone

SKANSKA

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| **UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15** | Classic WBS Layout - For Issuance | | | Data Date = Mar-02-2015 | Run Date =Mar-03-2015 14:35 |
| EX-1250 | Roofing Finish - Center | 10 | 10 | Oct-07-2015 | Oct-20-2015 |
| **South** | | 27 | 27 | Sep-14-2015 | Oct-20-2015 |
| EX-1210 | Roofing Dry-In - South | 11 | 11 | Sep-14-2015 | Sep-28-2015 |
| EX-1260 | Roofing Finish - South | 10 | 10 | Oct-07-2015 | Oct-20-2015 |
| **North** | | 20 | 20 | Sep-29-2015 | Oct-26-2015 |
| EX-1220 | Roofing Dry-In - North | 10 | 10 | Sep-29-2015 | Oct-12-2015 |
| EX-1270 | Roofing Finish - North | 10 | 10 | Oct-13-2015 | Oct-26-2015 |
| **Porch** | | 20 | 20 | Sep-18-2015 | Oct-15-2015 |
| EX-2200 | Roofing Dry-In - Porch | 10 | 10 | Sep-18-2015 | Oct-01-2015 |
| EX-2210 | Roofing Finish - Porch | 10 | 10 | Oct-02-2015 | Oct-15-2015 |
| **Exterior Enclosures** | | 91 | 91 | Jul-07-2015 | Nov-11-2015 |
| EX-1520 | Exterior Doors | 10 | 10 | Oct-15-2015 | Oct-28-2015 |
| EX-1510 | Metal Panel Systems (Bay Windows) | 10 | 10 | Oct-15-2015 | Oct-28-2015 |
| EX-1530 | Low Voltage Systemes to Exterior Doors | 10 | 10 | Oct-29-2015 | Nov-11-2015 |
| **South** | | 91 | 91 | Jul-07-2015 | Nov-11-2015 |
| EX-1330 | Cold Form Framing - South | 20 | 20 | Jul-07-2015 | Aug-03-2015 |
| EX-1340 | Framing MEP Rough-Ins - South | 20 | 20 | Jul-14-2015 | Aug-10-2015 |
| EX-1350 | Exterior Sheathing - South | 20 | 20 | Jul-21-2015 | Aug-17-2015 |
| EX-1360 | Vapor Barrier - South | 20 | 20 | Jul-28-2015 | Aug-24-2015 |
| EX-1370 | Brick / Stone Systems - South | 30 | 30 | Aug-04-2015 | Sep-15-2015 |
| EX-1390 | Curtain Wall Systems - South | 20 | 20 | Aug-19-2015 | Sep-16-2015 |
| EX-1380 | Brick / Stone Cleaning - South | 5 | 5 | Sep-16-2015 | Sep-22-2015 |
| EX-1400 | Curtain Wall Sealants - South | 20 | 20 | Oct-15-2015 | Nov-11-2015 |
| **North** | | 71 | 71 | Aug-04-2015 | Nov-11-2015 |
| EX-1335 | Cold Form Framing - North | 20 | 20 | Aug-04-2015 | Aug-31-2015 |
| EX-1345 | Framing MEP Rough-Ins - North | 20 | 20 | Aug-11-2015 | Sep-08-2015 |
| EX-1355 | Exterior Sheathing - North | 20 | 20 | Aug-18-2015 | Sep-15-2015 |
| EX-1365 | Vapor Barrier - North | 20 | 20 | Aug-25-2015 | Sep-22-2015 |
| EX-1375 | Brick / Stone Systems - North | 30 | 30 | Sep-01-2015 | Oct-13-2015 |
| EX-1395 | Curtain Wall Systems - North | 20 | 20 | Sep-17-2015 | Oct-14-2015 |
| EX-1385 | Brick / Stone Cleaning - North | 5 | 5 | Oct-14-2015 | Oct-20-2015 |
| EX-1405 | Curtain Wall Sealants - North | 20 | 20 | Oct-15-2015 | Nov-11-2015 |
| **Canopies** | | 105 | 105 | Jul-07-2015 | Dec-03-2015 |
| EX-1420 | Canopy Steel | 10 | 10 | Jul-07-2015 | Jul-20-2015 |
| EX-1430 | Canopy Framing | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| EX-1440 | Canopy MEP R/I's | 5 | 5 | Oct-21-2015 | Oct-27-2015 |
| EX-1450 | Canopy Roofing | 5 | 5 | Oct-28-2015 | Nov-03-2015 |
| EX-1460 | Canopy Cement Plaster | 5 | 5 | Nov-04-2015 | Nov-10-2015 |
| EX-1470 | Canopy Painting | 5 | 5 | Nov-25-2015 | Dec-03-2015 |
| **STAIRS** | | 262 | 262 | Mar-16-2015 | Mar-24-2016 |
| **South Stairs - "B"** | | 187 | 187 | Mar-16-2015 | Dec-08-2015 |
| STAIR-B10 | STAIR-B STRINGERS (WITH STRUCTURE) - SOUTH | 74 | 74 | Mar-16-2015 | Jun-26-2015 |
| STAIR-B20 | STAIR-B STRINGERS BUILD-OUT - SOUTH | 105 | 105 | Jul-10-2015 | Dec-08-2015 |

Remaining Level of Effort — Actual Work — Critical Remaining Work
Actual Level of Effort — Remaining Work — Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | North Stairs - "A" | 230 | 230 | Apr-29-2015 | Mar-24-2016 |
| STAIR-A10 | STAIR-A STRINGERS (WITH STRUCTURE) - NORTH | 42 | 42 | Apr-29-2015 | Jun-26-2015 |
| STAIR-A20 | STAIR-B STRINGERS BUILD-OUT - NORTH | 105 | 105 | Oct-26-2015 | Mar-24-2016 |
| | MEPF AREAS / SYSTEMS | 213 | 213 | Apr-23-2015 | Feb-24-2016 |
| | Basement | 170 | 170 | Apr-23-2015 | Dec-23-2015 |
| | Secondary Electrical Room | 38 | 38 | May-07-2015 | Jun-30-2015 |
| 00-6500 | F/R/P Housekeeping Pads Bsmnt EER | 2 | 2 | May-07-2015 | May-08-2015 |
| 00-6550 | Prime / 1st Pass Paint Bsmnt EER | 2 | 2 | May-21-2015 | May-22-2015 |
| 00-6750 | Final Paint Bsmnt EER | 1 | 1 | May-22-2015 | May-22-2015 |
| 00-6600 | Install Electrical Cans/Eqpt Bsmnt EER | 10 | 10 | May-26-2015 | Jun-08-2015 |
| 00-6650 | Run Elec Feeders/Terminate Bsmnt EER | 5 | 5 | Jun-09-2015 | Jun-15-2015 |
| 00-6700 | Hang & Hardware Door Bsmnt EER | 1 | 1 | Jun-16-2015 | Jun-16-2015 |
| 00-6710 | Energize Bsmnt EER | 5 | 5 | Jun-17-2015 | Jun-23-2015 |
| 00-6699 | Punch Bsmnt EER for S/C | 5 | 5 | Jun-24-2015 | Jun-30-2015 |
| | Communication Room | 68 | 68 | May-21-2015 | Aug-26-2015 |
| 00-8550 | Prime / 1st Pass Paint - Bsmnt COMM | 2 | 2 | May-21-2015 | May-22-2015 |
| 00-8500 | Install Plywood Backboard - Bsmnt COMM | 1 | 1 | May-26-2015 | May-26-2015 |
| 00-8520 | Install Finish Flooring - Bsmnt COMM | 2 | 2 | May-27-2015 | May-28-2015 |
| 00-8510 | Build-Out Comm Eqpt. - Bsmnt COMM | 60 | 60 | May-29-2015 | Aug-21-2015 |
| 00-8750 | Final Paint - Bsmnt COMM | 1 | 1 | Aug-24-2015 | Aug-24-2015 |
| 00-8700 | Hang & Hardware Door - Bsmnt COMM | 1 | 1 | Aug-25-2015 | Aug-25-2015 |
| 00-8710 | Activate Phone Lines - Bsmnt COMM | 1 | 1 | Aug-26-2015 | Aug-26-2015 |
| | Mechanical Room | 170 | 170 | Apr-23-2015 | Dec-23-2015 |
| 00-7050 | Build Walls for Basement Mech Room | 20 | 20 | Apr-23-2015 | May-20-2015 |
| 00-7500 | F/R/P Housekeeping Pads Bsmnt MECH | 5 | 5 | May-21-2015 | May-28-2015 |
| 00-7550 | Prime / 1st Pass Paint - Bsmnt MECH | 5 | 5 | Jun-30-2015 | Jul-07-2015 |
| 00-7600 | Set Mech Epqt Bsmnt MECH | 15 | 15 | Jul-24-2015 | Aug-13-2015 |
| 00-7610 | Set Fire Pump & Activate | 15 | 15 | Jul-29-2015 | Aug-18-2015 |
| 00-7650 | Mech Piping/Eqpt Insulation Bsmnt MECH | 15 | 15 | Aug-14-2015 | Sep-03-2015 |
| 00-7700 | Hang & Hardware Door Bsmnt MECH | 2 | 2 | Sep-04-2015 | Sep-08-2015 |
| 00-7560 | Install Finish Flooring | 5 | 5 | Sep-09-2015 | Sep-15-2015 |
| 00-7680 | Power to Mech. Eqpt. Bsmnt MECH | 5 | 5 | Dec-01-2015 | Dec-07-2015 |
| 00-7750 | Final Paint Bsmnt MECH | 2 | 2 | Dec-08-2015 | Dec-09-2015 |
| 00-7999 | Punch Bsmnt MECH Room for S/C | 10 | 10 | Dec-10-2015 | Dec-23-2015 |
| | 1st Floor | 78 | 78 | Sep-30-2015 | Jan-21-2016 |
| | Electrical Rooms | 47 | 47 | Sep-30-2015 | Dec-07-2015 |
| 01-6500 | F/R/P Housekeeping Pads 1st Floor EER | 2 | 2 | Sep-30-2015 | Oct-01-2015 |
| 01-6550 | Prime / 1st Pass Paint 1st Floor EER | 2 | 2 | Oct-02-2015 | Oct-05-2015 |
| 01-6750 | Final Paint 1st Floor EER | 1 | 1 | Oct-05-2015 | Oct-05-2015 |
| 01-6600 | Install Electrical Cans/Eqpt 1st Floor EER | 20 | 20 | Oct-06-2015 | Nov-02-2015 |
| 01-6650 | Run Elec Feeders/Terminate 1st Floor EER | 10 | 10 | Nov-03-2015 | Nov-16-2015 |
| 01-6700 | Hang & Hardware Door 1st Floor EER | 3 | 3 | Nov-17-2015 | Nov-19-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

Page 14 of 34

SKANSKA

| UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 01-6710 | Energize 1st Floor EER | 5 | 5 | Nov-20-2015 | Nov-30-2015 |
| 01-6699 | Punch 1st Floor EER for S/C | 5 | 5 | Dec-01-2015 | Dec-07-2015 |
| **Communication Rooms** | | 73 | 73 | Sep-30-2015 | Jan-14-2016 |
| 01-8550 | Prime / 1st Pass Paint - 1st Floor COMM | 4 | 4 | Sep-30-2015 | Oct-05-2015 |
| 01-8500 | Install Plywood Backboard - 1st Floor COMM | 2 | 2 | Oct-06-2015 | Oct-07-2015 |
| 01-8520 | Install Finish Flooring - 1st Floor COMM | 2 | 2 | Oct-08-2015 | Oct-09-2015 |
| 01-8510 | Build-Out Comm Eqpt. - 1st Floor COMM | 60 | 60 | Oct-12-2015 | Jan-07-2016 |
| 01-8750 | Final Paint - 1st Floor COMM | 2 | 2 | Jan-08-2016 | Jan-11-2016 |
| 01-8700 | Hang & Hardware Door - 1st Floor COMM | 2 | 2 | Jan-12-2016 | Jan-13-2016 |
| 01-8710 | Activate Phone Lines - 1st Floor COMM | 1 | 1 | Jan-14-2016 | Jan-14-2016 |
| **Large Restrooms** | | 78 | 78 | Sep-30-2015 | Jan-21-2016 |
| 01-5000 | Prime / 1st Pass Paint 1st Floor  RESTROOMS | 2 | 2 | Sep-30-2015 | Oct-01-2015 |
| 01-5050 | Install Ceiling Grid 1st Floor  RESTROOMS | 2 | 2 | Oct-02-2015 | Oct-05-2015 |
| 01-5250 | Porcelain Tile Walls & Floors 1st Floor RESTROOMS | 10 | 10 | Oct-02-2015 | Oct-15-2015 |
| 01-5100 | Mech Trim in Ceiling Grid 1st Floor RESTROOMS | 4 | 4 | Oct-06-2015 | Oct-09-2015 |
| 01-5150 | Elec Trim in Ceiling Grid 1st Floor RESTROOMS | 4 | 4 | Oct-06-2015 | Oct-09-2015 |
| 01-5200 | Fire Sprinker in Ceiling Grid 1st Floor  RESTROOMS | 4 | 4 | Oct-07-2015 | Oct-12-2015 |
| 01-5090 | Lay Ceiling Tile 1st Floor RESTROOMS | 1 | 1 | Oct-12-2015 | Oct-12-2015 |
| 01-5300 | Bathroom Millwork 1st Floor RESTROOMS | 2 | 2 | Oct-16-2015 | Oct-19-2015 |
| 01-5350 | Plumbing Fixtures 1st Floor RESTROOMS | 5 | 5 | Oct-20-2015 | Oct-26-2015 |
| 01-5400 | Div 10 / Toilet Room Specialties 1st Floor RESTROOM | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| 01-5450 | Elec Wall Trim 1st Floor RESTROOM | 2 | 2 | Oct-30-2015 | Nov-02-2015 |
| 01-5500 | Hang & Hardware Doors 1st Floor RESTROOM | 1 | 1 | Nov-03-2015 | Nov-03-2015 |
| 01-5550 | CM Punch 1st Floor RESTROOM | 1 | 1 | Jan-15-2016 | Jan-15-2016 |
| 01-5600 | Work-Off Punch / Final Clean 1st Floor RESTROOM | 3 | 3 | Jan-18-2016 | Jan-20-2016 |
| 01-5650 | Final Painting 1st Floor RESTROOMS | 1 | 1 | Jan-21-2016 | Jan-21-2016 |
| **2nd Floor** | | 96 | 96 | Jul-24-2015 | Dec-09-2015 |
| **Main Electrical Room (Rm # 220)** | | 80 | 80 | Jul-24-2015 | Nov-13-2015 |
| 02-4000 | Build Walls for Main Elec. Room | 15 | 15 | Jul-24-2015 | Aug-13-2015 |
| 02-4015 | F/R/P Housekeeping Pads - Main Elec. Room | 2 | 2 | Aug-14-2015 | Aug-17-2015 |
| 02-4010 | Set Panels - Main Elec. Room | 10 | 10 | Aug-14-2015 | Aug-27-2015 |
| 02-4020 | Set Gear / Elec. Eqpt. - Main Elec. Room | 20 | 20 | Aug-19-2015 | Sep-16-2015 |
| 02-4030 | Run Feeders - Main Elec. Room | 5 | 5 | Sep-17-2015 | Sep-23-2015 |
| 02-4040 | Run Distribution Cabling  - Main Elec. Room | 15 | 15 | Sep-17-2015 | Oct-07-2015 |
| 02-4080 | Hang Doors & Hardware for Main Elec. Room | 2 | 2 | Oct-08-2015 | Oct-09-2015 |
| 02-4050 | Energize Transformer - Main Elec. Room | 5 | 5 | Oct-12-2015 | Oct-16-2015 |
| 02-4060 | Energize Main Electrical Room | 5 | 5 | Oct-19-2015 | Oct-23-2015 |
| 02-4070 | Energize Emergency Generator | 5 | 5 | Oct-26-2015 | Oct-30-2015 |
| 02-4999 | Punch 2nd Floor Main Elec. Room for S/C | 10 | 10 | Nov-02-2015 | Nov-13-2015 |
| **Secondary Electrical Room** | | 28 | 28 | Aug-26-2015 | Oct-05-2015 |
| 02-6500 | F/R/P Housekeeping Pads 2nd Floor EER | 2 | 2 | Aug-26-2015 | Aug-27-2015 |
| 02-6550 | Prime / 1st Pass Paint 2nd Floor EER | 2 | 2 | Aug-26-2015 | Aug-27-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | | Classic WBS Layout - For Issuance | | | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |
|---|---|---|---|---|---|---|---|---|

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 02-6750 | Final Paint 2nd Floor EER | 1 | 1 | Aug-27-2015 | Aug-27-2015 |
| 02-6600 | Install Electrical Cans/Eqpt 2nd Floor EER | 10 | 10 | Aug-28-2015 | Sep-11-2015 |
| 02-6650 | Run Elec Feeders/Terminate 2nd Floor EER | 5 | 5 | Sep-14-2015 | Sep-18-2015 |
| 02-6700 | Hang & Hardware Door 2nd Floor EER | 1 | 1 | Sep-21-2015 | Sep-21-2015 |
| 02-6710 | Energize 2nd Floor EER | 5 | 5 | Sep-22-2015 | Sep-28-2015 |
| 02-6699 | Punch 2nd Floor EER for S/C | 5 | 5 | Sep-29-2015 | Oct-05-2015 |
| **Communication Room** | | **68** | **68** | **Aug-26-2015** | **Dec-02-2015** |
| 02-8550 | Prime / 1st Pass Paint - 2nd Floor COMM | 2 | 2 | Aug-26-2015 | Aug-27-2015 |
| 02-8500 | Install Plywood Backboard - 2nd Floor COMM | 1 | 1 | Aug-28-2015 | Aug-28-2015 |
| 02-8520 | Install Finish Flooring - 2nd Floor COMM | 2 | 2 | Aug-31-2015 | Sep-01-2015 |
| 02-8510 | Build-Out Comm Eqpt. - 2nd Floor COMM | 60 | 60 | Sep-02-2015 | Nov-25-2015 |
| 02-8750 | Final Paint - 2nd Floor COMM | 1 | 1 | Nov-30-2015 | Nov-30-2015 |
| 02-8700 | Hang & Hardware Door - 2nd Floor COMM | 1 | 1 | Dec-01-2015 | Dec-01-2015 |
| 02-8710 | Activate Phone Lines - 2nd Floor COMM | 1 | 1 | Dec-02-2015 | Dec-02-2015 |
| **Large Restroom** | | **73** | **73** | **Aug-26-2015** | **Dec-09-2015** |
| 02-5000 | Prime / 1st Pass Paint 2nd Floor RESTROOMS | 2 | 2 | Aug-26-2015 | Aug-27-2015 |
| 02-5050 | Install Ceiling Grid 2nd Floor RESTROOMS | 2 | 2 | Aug-28-2015 | Aug-31-2015 |
| 02-5250 | Porcelain Tile Walls & Floors 2nd Floor RESTROOMS | 10 | 10 | Aug-28-2015 | Sep-11-2015 |
| 02-5100 | Mech Trim in Ceiling Grid 2nd Floor RESTROOMS | 4 | 4 | Sep-01-2015 | Sep-04-2015 |
| 02-5150 | Elec Trim in Ceiling Grid 2nd Floor RESTROOMS | 4 | 4 | Sep-01-2015 | Sep-04-2015 |
| 02-5200 | Fire Sprinker in Ceiling Grid 2nd Floor RESTROOMS | 4 | 4 | Sep-02-2015 | Sep-08-2015 |
| 02-5090 | Lay Ceiling Tile 2nd Floor RESTROOMS | 1 | 1 | Sep-08-2015 | Sep-08-2015 |
| 02-5300 | Bathroom Millwork 2nd Floor RESTROOMS | 1 | 1 | Sep-14-2015 | Sep-14-2015 |
| 02-5350 | Plumbing Fixtures 2nd Floor RESTROOMS | 3 | 3 | Sep-15-2015 | Sep-17-2015 |
| 02-5400 | Div 10 / Toilet Room Specialties 2nd Floor RESTROOM | 3 | 3 | Sep-18-2015 | Sep-22-2015 |
| 02-5450 | Elec Wall Trim 2nd Floor RESTROOM | 2 | 2 | Sep-21-2015 | Sep-22-2015 |
| 02-5500 | Hang & Hardware Doors 2nd Floor RESTROOM | 1 | 1 | Sep-23-2015 | Sep-23-2015 |
| 02-5550 | CM Punch 2nd Floor RESTROOM | 1 | 1 | Dec-03-2015 | Dec-03-2015 |
| 02-5600 | Work-Off Punch / Final Clean 2nd Floor RESTROOM | 3 | 3 | Dec-04-2015 | Dec-08-2015 |
| 02-5650 | Final Painting 2nd Floor RESTROOMS | 1 | 1 | Dec-09-2015 | Dec-09-2015 |
| **3rd Floor** | | **73** | **73** | **Sep-04-2015** | **Dec-18-2015** |
| **Secondary Electrical Room** | | **28** | **28** | **Sep-04-2015** | **Oct-14-2015** |
| 03-6500 | F/R/P Housekeeping Pads 3rd Floor EER | 2 | 2 | Sep-04-2015 | Sep-08-2015 |
| 03-6550 | Prime / 1st Pass Paint 3rd Floor EER | 2 | 2 | Sep-04-2015 | Sep-08-2015 |
| 03-6750 | Final Paint 3rd Floor EER | 1 | 1 | Sep-08-2015 | Sep-08-2015 |
| 03-6600 | Install Electrical Cans/Eqpt 3rd Floor EER | 10 | 10 | Sep-09-2015 | Sep-22-2015 |
| 03-6650 | Run Elec Feeders/Terminate 3rd Floor EER | 5 | 5 | Sep-23-2015 | Sep-29-2015 |
| 03-6700 | Hang & Hardware Door 3rd Floor EER | 1 | 1 | Sep-30-2015 | Sep-30-2015 |
| 03-6710 | Energize 3rd Floor EER | 5 | 5 | Oct-01-2015 | Oct-07-2015 |
| 03-6699 | Punch 3rd Floor EER for S/C | 5 | 5 | Oct-08-2015 | Oct-14-2015 |
| **Communication Room** | | **68** | **68** | **Sep-04-2015** | **Dec-11-2015** |
| 03-8550 | Prime / 1st Pass Paint - 3rd Floor COMM | 2 | 2 | Sep-04-2015 | Sep-08-2015 |

Legend:
— Remaining Level of Effort    ▬ Actual Work    ▬ Critical Remaining Work
— Actual Level of Effort    ▭ Remaining Work    ◆ Milestone

SKANSKA

| | | | | | | |
|---|---|---|---|---|---|---|
| **UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15** | | | | | Classic WBS Layout - For Issuance | Data Date = Mar-02-2015 / Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish | Gantt |
|---|---|---|---|---|---|---|
| 03-8500 | Install Plywood Backboard - 3rd Floor COMM | 1 | 1 | Sep-09-2015 | Sep-09-2015 | Sep-09-2015 I Sep-09-2015 |
| 03-8520 | Install Finish Flooring - 3rd Floor COMM | 2 | 2 | Sep-10-2015 | Sep-11-2015 | Sep-10-2015 I Sep-11-2015 |
| 03-8510 | Build-Out Comm Eqpt. - 3rd Floor COMM | 60 | 60 | Sep-14-2015 | Dec-08-2015 | Sep-14-2015 ▭ Dec-08-2015 |
| 03-8750 | Final Paint - 3rd Floor COMM | 1 | 1 | Dec-09-2015 | Dec-09-2015 | Dec-09-2015 I Dec-09-2015 |
| 03-8700 | Hang & Hardware Door - 3rd Floor COMM | 1 | 1 | Dec-10-2015 | Dec-10-2015 | Dec-10-2015 I Dec-10-2015 |
| 03-8710 | Activate Phone Lines - 3rd Floor COMM | 1 | 1 | Dec-11-2015 | Dec-11-2015 | Dec-11-2015 I Dec-11-2015 |
| **Large Restroom** | | 73 | 73 | Sep-04-2015 | Dec-18-2015 | Sep-04-2015 ▬▬▬▼ Dec-18-2015, Large Restroom |
| 03-5000 | Prime / 1st Pass Paint 3rd Floor RESTROOMS | 2 | 2 | Sep-04-2015 | Sep-08-2015 | Sep-04-2015 ▯ Sep-08-2015 |
| 03-5050 | Install Ceiling Grid 3rd Floor RESTROOMS | 2 | 2 | Sep-09-2015 | Sep-10-2015 | Sep-09-2015 I Sep-10-2015 |
| 03-5250 | Porcelain Tile Walls & Floors 3rd Floor RESTROOMS | 10 | 10 | Sep-09-2015 | Sep-22-2015 | Sep-09-2015 ▭ Sep-22-2015 |
| 03-5100 | Mech Trim in Ceiling Grid 3rd Floor RESTROOMS | 4 | 4 | Sep-11-2015 | Sep-16-2015 | Sep-11-2015 ▯ Sep-16-2015 |
| 03-5150 | Elec Trim in Ceiling Grid 3rd Floor RESTROOMS | 4 | 4 | Sep-11-2015 | Sep-16-2015 | Sep-11-2015 ▯ Sep-16-2015 |
| 03-5200 | Fire Sprinker in Ceiling Grid 3rd Floor RESTROOMS | 4 | 4 | Sep-14-2015 | Sep-17-2015 | Sep-14-2015 ▯ Sep-17-2015 |
| 03-5090 | Lay Ceiling Tile 3rd Floor RESTROOMS | 1 | 1 | Sep-17-2015 | Sep-17-2015 | Sep-17-2015 I Sep-17-2015 |
| 03-5300 | Bathroom Millwork 3rd Floor RESTROOMS | 1 | 1 | Sep-23-2015 | Sep-23-2015 | Sep-23-2015 I Sep-23-2015 |
| 03-5350 | Plumbing Fixtures 3rd Floor RESTROOMS | 3 | 3 | Sep-24-2015 | Sep-28-2015 | Sep-24-2015 ▯ Sep-28-2015 |
| 03-5400 | Div 10 / Toilet Room Specialties 3rd Floor RESTROOM | 3 | 3 | Sep-29-2015 | Oct-01-2015 | Sep-29-2015 ▯ Oct-01-2015 |
| 03-5450 | Elec Wall Trim 3rd Floor RESTROOM | 2 | 2 | Sep-30-2015 | Oct-01-2015 | Sep-30-2015 I Oct-01-2015 |
| 03-5500 | Hang & Hardware Doors 3rd Floor RESTROOM | 1 | 1 | Oct-02-2015 | Oct-02-2015 | Oct-02-2015 I Oct-02-2015 |
| 03-5550 | CM Punch 3rd Floor RESTROOM | 1 | 1 | Dec-14-2015 | Dec-14-2015 | Dec-14-2015 I Dec-14-2015 |
| 03-5600 | Work-Off Punch / Final Clean 3rd Floor RESTROOM | 3 | 3 | Dec-15-2015 | Dec-17-2015 | Dec-15-2015 I Dec-17-2015 |
| 03-5650 | Final Painting 3rd Floor RESTROOMS | 1 | 1 | Dec-18-2015 | Dec-18-2015 | Dec-18-2015 I Dec-18-2015 |
| **4th Floor** | | 73 | 73 | Sep-16-2015 | Dec-30-2015 | Sep-16-2015 ▬▬▬▼ Dec-30-2015, 4th Floor |
| **Secondary Electrical Room** | | 28 | 28 | Sep-16-2015 | Oct-23-2015 | Sep-16-2015 ▬▽ Oct-23-2015, Secondary Electrical Room |
| 04-6500 | F/R/P Housekeeping Pads 4th Floor EER | 2 | 2 | Sep-16-2015 | Sep-17-2015 | Sep-16-2015 I Sep-17-2015 |
| 04-6550 | Prime / 1st Pass Paint 4th Floor EER | 2 | 2 | Sep-16-2015 | Sep-17-2015 | Sep-16-2015 I Sep-17-2015 |
| 04-6750 | Final Paint 4th Floor EER | 1 | 1 | Sep-17-2015 | Sep-17-2015 | Sep-17-2015 I Sep-17-2015 |
| 04-6600 | Install Electrical Cans/Eqpt 4th Floor EER | 10 | 10 | Sep-18-2015 | Oct-01-2015 | Sep-18-2015 ▭ Oct-01-2015 |
| 04-6650 | Run Elec Feeders/Terminate 4th Floor EER | 5 | 5 | Oct-02-2015 | Oct-08-2015 | Oct-02-2015 ▯ Oct-08-2015 |
| 04-6700 | Hang & Hardware Door 4th Floor EER | 1 | 1 | Oct-09-2015 | Oct-09-2015 | Oct-09-2015 I Oct-09-2015 |
| 04-6710 | Energize 4th Floor EER | 5 | 5 | Oct-12-2015 | Oct-16-2015 | Oct-12-2015 ▯ Oct-16-2015 |
| 04-6699 | Punch 4th Floor EER for S/C | 5 | 5 | Oct-19-2015 | Oct-23-2015 | Oct-19-2015 ▯ Oct-23-2015 |
| **Communication Room** | | 68 | 68 | Sep-16-2015 | Dec-22-2015 | Sep-16-2015 ▬▬▬▼ Dec-22-2015, Communication Room |
| 04-8550 | Prime / 1st Pass Paint - 4th Floor COMM | 2 | 2 | Sep-16-2015 | Sep-17-2015 | Sep-16-2015 I Sep-17-2015 |
| 04-8500 | Install Plywood Backboard - 4th Floor COMM | 1 | 1 | Sep-18-2015 | Sep-18-2015 | Sep-18-2015 I Sep-18-2015 |
| 04-8520 | Install Finish Flooring - 4th Floor COMM | 2 | 2 | Sep-21-2015 | Sep-22-2015 | Sep-21-2015 I Sep-22-2015 |
| 04-8510 | Build-Out Comm Eqpt. - 4th Floor COMM | 60 | 60 | Sep-23-2015 | Dec-17-2015 | Sep-23-2015 ▭ Dec-17-2015 |
| 04-8750 | Final Paint - 4th Floor COMM | 1 | 1 | Dec-18-2015 | Dec-18-2015 | Dec-18-2015 I Dec-18-2015 |
| 04-8700 | Hang & Hardware Door - 4th Floor COMM | 1 | 1 | Dec-21-2015 | Dec-21-2015 | Dec-21-2015 I Dec-21-2015 |
| 04-8710 | Activate Phone Lines - 4th Floor COMM | 1 | 1 | Dec-22-2015 | Dec-22-2015 | Dec-22-2015 I Dec-22-2015 |
| **Large Restroom** | | 73 | 73 | Sep-16-2015 | Dec-30-2015 | Sep-16-2015 ▬▬▬▼ Dec-30-2015, Large Restroom |
| 04-5000 | Prime / 1st Pass Paint 4th Floor RESTROOMS | 2 | 2 | Sep-16-2015 | Sep-17-2015 | Sep-16-2015 I Sep-17-2015 |

Legend: ▬ Remaining Level of Effort | ▬ Actual Level of Effort | ▬ Actual Work | ▭ Remaining Work | ▬ Critical Remaining Work | ◆ Milestone

SKANSKA

UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | Classic WBS Layout - For Issuance | Data Date = Mar-02-2015  Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 04-5050 | Install Ceiling Grid 4th Floor RESTROOMS | 2 | 2 | Sep-18-2015 | Sep-21-2015 |
| 04-5250 | Porcelain Tile Walls & Floors 4th Floor RESTROOMS | 10 | 10 | Sep-18-2015 | Oct-01-2015 |
| 04-5100 | Mech Trim in Ceiling Grid 4th Floor RESTROOMS | 4 | 4 | Sep-22-2015 | Sep-25-2015 |
| 04-5150 | Elec Trim in Ceiling Grid 4th Floor RESTROOMS | 4 | 4 | Sep-22-2015 | Sep-25-2015 |
| 04-5200 | Fire Sprinker in Ceiling Grid 4th Floor  RESTROOMS | 4 | 4 | Sep-23-2015 | Sep-28-2015 |
| 04-5090 | Lay Ceiling Tile 4th Floor RESTROOMS | 1 | 1 | Sep-28-2015 | Sep-28-2015 |
| 04-5300 | Bathroom Millwork 4th Floor RESTROOMS | 1 | 1 | Oct-02-2015 | Oct-02-2015 |
| 04-5350 | Plumbing Fixtures 4th Floor RESTROOMS | 3 | 3 | Oct-05-2015 | Oct-07-2015 |
| 04-5400 | Div 10 / Toilet Room Specialties 4th Floor RESTROOM | 3 | 3 | Oct-08-2015 | Oct-12-2015 |
| 04-5450 | Elec Wall Trim 4th Floor RESTROOM | 2 | 2 | Oct-09-2015 | Oct-12-2015 |
| 04-5500 | Hang & Hardware Doors 4th Floor RESTROOM | 1 | 1 | Oct-13-2015 | Oct-13-2015 |
| 04-5550 | CM Punch 4th Floor RESTROOM | 1 | 1 | Dec-23-2015 | Dec-23-2015 |
| 04-5600 | Work-Off Punch / Final Clean 4th Floor RESTROOM | 3 | 3 | Dec-24-2015 | Dec-29-2015 |
| 04-5650 | Final Painting 4th Floor RESTROOMS | 1 | 1 | Dec-30-2015 | Dec-30-2015 |
| **5th Floor Mechanical Area** | | **153** | **153** | **Jun-29-2015** | **Feb-04-2016** |
| Pre-Structural | | 10 | 10 | Jun-29-2015 | Jul-13-2015 |
| 05-1000 | F/R/P Eqpt Pads | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| 05-1005 | Set Mechanical Room Equipment | 5 | 5 | Jul-07-2015 | Jul-13-2015 |
| Structure | | 36 | 36 | Jul-15-2015 | Sep-02-2015 |
| 05-1010 | Steel Framing - Center | 7 | 7 | Jul-15-2015 | Jul-23-2015 |
| 05-1020 | Steel Deck - Center | 5 | 5 | Jul-24-2015 | Jul-30-2015 |
| 05-1030 | Steel Framing - South | 7 | 7 | Jul-31-2015 | Aug-10-2015 |
| 05-1080 | Mechanical Support Steel | 10 | 10 | Jul-31-2015 | Aug-13-2015 |
| 05-1040 | Steel Deck - South | 5 | 5 | Aug-11-2015 | Aug-17-2015 |
| 05-1050 | Steel Framing - North | 7 | 7 | Aug-18-2015 | Aug-26-2015 |
| 05-1060 | Steel Deck - North | 5 | 5 | Aug-27-2015 | Sep-02-2015 |
| Exterior Enclosure / Temp Dry-in | | 70 | 70 | Jun-29-2015 | Oct-06-2015 |
| 05-1120 | Temp Storm Control | 50 | 50 | Jun-29-2015 | Sep-08-2015 |
| 05-1130 | Temp Roof Penetration Control | 20 | 20 | Aug-11-2015 | Sep-08-2015 |
| 05-1100 | Fume Exhaust Stacks | 15 | 15 | Aug-14-2015 | Sep-03-2015 |
| 05-1110 | All Eqpt Roof Stacks | 15 | 15 | Aug-14-2015 | Sep-03-2015 |
| 05-1150 | Exterior Doors | 10 | 10 | Sep-09-2015 | Sep-22-2015 |
| 05-1140 | Ships Ladder | 10 | 10 | Sep-09-2015 | Sep-22-2015 |
| 05-1115 | Temp Roof / Mechanical Floor | 10 | 10 | Sep-23-2015 | Oct-06-2015 |
| Mechanical Room Interior Build-Out | | 130 | 130 | Jul-31-2015 | Feb-04-2016 |
| 05-1170 | Mechanical Piping / Ductwork | 60 | 60 | Jul-31-2015 | Oct-23-2015 |
| 05-1220 | Electrical Distribution | 50 | 50 | Sep-21-2015 | Dec-01-2015 |
| 05-1230 | HVAC Controls & Distribution | 50 | 50 | Sep-21-2015 | Dec-01-2015 |
| 05-1270 | Frame Walls | 10 | 10 | Sep-23-2015 | Oct-06-2015 |
| 05-1280 | In-Wall MEP R/I | 10 | 10 | Oct-07-2015 | Oct-20-2015 |
| 05-1290 | Hang & Finish Walls | 10 | 10 | Oct-21-2015 | Nov-03-2015 |
| 05-1180 | Mechanical Pressure Test | 10 | 10 | Oct-26-2015 | Nov-06-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

| UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | Classic WBS Layout - For Issuance | | | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |
|---|---|---|---|---|---|---|

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 05-1210 | Mechanical Piping / Ductwork Insulation | 25 | 25 | Oct-26-2015 | Dec-01-2015 |
| 05-1300 | Paint Walls | 10 | 10 | Nov-04-2015 | Nov-17-2015 |
| 05-1190 | Mechanical Pipe Test & Flush | 10 | 10 | Nov-09-2015 | Nov-20-2015 |
| 05-1200 | Mechanical Pipe Chemical Treatment | 10 | 10 | Nov-16-2015 | Dec-01-2015 |
| 05-1240 | Energize Power / HVAC Start-Up | 5 | 5 | Dec-02-2015 | Dec-08-2015 |
| 05-1250 | Commission All Eqpt | 30 | 30 | Dec-09-2015 | Jan-21-2016 |
| 05-1260 | HVAC Controls Operational | 0 | 0 | | Dec-30-2015 |
| 05-1310 | 5th Floor Mechanical Area Punch for S/C | 10 | 10 | Jan-22-2016 | Feb-04-2016 |
| **Elevators** | | **60** | **60** | **Dec-01-2015** | **Feb-24-2016** |
| EL-PUNCH | Punch Elevators for S/C | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| **Construction Use / Service (Floors 1-5)** | | **30** | **30** | **Dec-01-2015** | **Jan-13-2016** |
| EL-2050 | Install Rails & Brackets - Service Elev. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| EL-2100 | Install Machine Room Eqpt. - Service Elev. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| EL-2150 | Build-Out Cabs - Service Elev. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| EL-2160 | Cab Finishes - Service Elev. | 5 | 5 | Dec-30-2015 | Jan-06-2016 |
| EL-2200 | Test Cabs - Service Elev. | 5 | 5 | Jan-07-2016 | Jan-13-2016 |
| **Passenger (Floors Bsmnt-4)** | | **30** | **30** | **Dec-30-2015** | **Feb-10-2016** |
| EL-1050 | Install Rails & Brackets - Passenger Elev. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| EL-1100 | Install Machine Room Eqpt. - Passenger Elev. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| EL-1150 | Build-Out Cab - Passenger Elev. | 10 | 10 | Jan-14-2016 | Jan-27-2016 |
| EL-1160 | Cab Finishes - Passenger Elev. | 5 | 5 | Jan-28-2016 | Feb-03-2016 |
| EL-1200 | Test Cab - Passenger Elev. | 5 | 5 | Feb-04-2016 | Feb-10-2016 |
| **INTERIOR BUILDOUT** | | **205** | **205** | **Jun-30-2015** | **Apr-19-2016** |
| **First Floor** | | **181** | **181** | **Aug-04-2015** | **Apr-19-2016** |
| **Layout & Priority Wall Framing** | | **17** | **17** | **Aug-04-2015** | **Aug-26-2015** |
| 01-1000 | Survey Layout - 1st Fl. | 7 | 7 | Aug-04-2015 | Aug-12-2015 |
| 01-1010 | Perimeter Wall Framing - 1st Fl. | 10 | 10 | Aug-13-2015 | Aug-26-2015 |
| 01-1020 | Priority Wall Framing / H&F High Rock - 1st Fl. | 10 | 10 | Aug-13-2015 | Aug-26-2015 |
| 01-1030 | Above Ceiling Support Systems - 1st Fl. | 10 | 10 | Aug-13-2015 | Aug-26-2015 |
| 01-1040 | Snorkle Support Systems - 1st Fl. | 10 | 10 | Aug-13-2015 | Aug-26-2015 |
| **Trench Activities** | | **34** | **34** | **Sep-16-2015** | **Nov-02-2015** |
| 01-5010 | Bolt Steel Angles - 1st Fl. | 5 | 5 | Sep-16-2015 | Sep-22-2015 |
| 01-5020 | Install Ductwork - 1st Fl. | 10 | 10 | Sep-23-2015 | Oct-06-2015 |
| 01-5030 | Install Electrical - 1st Fl. | 9 | 9 | Oct-07-2015 | Oct-19-2015 |
| 01-5040 | Install Plumbing - 1st Fl. | 9 | 9 | Oct-07-2015 | Oct-19-2015 |
| 01-5055 | QC & Inspect Trench - 1st Fl. | 5 | 5 | Oct-20-2015 | Oct-26-2015 |
| 01-5065 | Steel Floor Cover - 1st Fl. | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| 01-5075 | F/R/P Trench Covers- 1st Fl. | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| 01-5085 | Trench Access Covers - 1st Fl. | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| **O/H Rough-In** | | **69** | **69** | **Aug-13-2015** | **Nov-18-2015** |
| **O/H Mechanical Ductwork** | | **41** | **41** | **Aug-20-2015** | **Oct-16-2015** |
| 01-1100 | O/H MEPF Mains - Ductwork - 1st Fl. | 18 | 18 | Aug-20-2015 | Sep-15-2015 |
| 01-1105 | O/H MEPF Branch - Ductwork - 1st Fl. | 18 | 18 | Sep-16-2015 | Oct-09-2015 |

Legend:
- ▬▬ Remaining Level of Effort
- ▬▬ Actual Level of Effort
- ▬▬ Actual Work
- ▬▬ Remaining Work
- ▬▬ Critical Remaining Work
- ◆ Milestone

SKANSKA

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| **UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15** | | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 / Run Date =Mar-03-2015 14:35 |
| 01-1110 | O/H MEPF Equipment - Ductwork - 1st Fl. | 10 | 10 | Sep-28-2015 | Oct-09-2015 |
| 01-1115 | O/H MEPF Pressure Tests - Ductwork - 1st Fl. | 5 | 5 | Oct-12-2015 | Oct-16-2015 |
| **O/H Mechanical Piping** | | 51 | 51 | Aug-13-2015 | Oct-23-2015 |
| 01-1200 | O/H MEPF Mains - Mechanical Piping - 1st Fl. | 18 | 18 | Aug-13-2015 | Sep-08-2015 |
| 01-1205 | O/H MEPF Branch - Mechanical Piping - 1st Fl. | 18 | 18 | Sep-09-2015 | Oct-02-2015 |
| 01-1210 | O/H MEPF Equipment - Mechanical Piping - 1st Fl. | 10 | 10 | Oct-05-2015 | Oct-16-2015 |
| 01-1215 | O/H MEPF Pressure Tests - Mechanical Piping - 1st Fl. | 5 | 5 | Oct-19-2015 | Oct-23-2015 |
| **O/H Plumbing** | | 51 | 51 | Aug-13-2015 | Oct-23-2015 |
| 01-1300 | O/H MEPF Mains - Plumbing - 1st Fl. | 18 | 18 | Aug-13-2015 | Sep-08-2015 |
| 01-1305 | O/H MEPF Branch - Plumbing - 1st Fl. | 18 | 18 | Sep-09-2015 | Oct-02-2015 |
| 01-1310 | O/H MEPF Equipment - Plumbing - 1st Fl. | 10 | 10 | Oct-05-2015 | Oct-16-2015 |
| 01-1315 | O/H MEPF Pressure Tests - Plumbing - 1st Fl. | 5 | 5 | Oct-19-2015 | Oct-23-2015 |
| **O/H Electrical** | | 46 | 46 | Aug-13-2015 | Oct-16-2015 |
| 01-1400 | O/H MEPF Mains - Electrical - 1st Fl. | 18 | 18 | Aug-13-2015 | Sep-08-2015 |
| 01-1405 | O/H MEPF Branch - Electrical - 1st Fl. | 18 | 18 | Sep-09-2015 | Oct-02-2015 |
| 01-1410 | O/H MEPF Equipment - Electrical - 1st Fl. | 10 | 10 | Oct-05-2015 | Oct-16-2015 |
| **O/H Fire Protection** | | 51 | 51 | Aug-13-2015 | Oct-23-2015 |
| 01-1500 | O/H MEPF Mains - Fire Protection Piping - 1st Fl. | 18 | 18 | Aug-13-2015 | Sep-08-2015 |
| 01-1505 | O/H MEPF Branch - Fire Protection Piping - 1st Fl. | 18 | 18 | Sep-09-2015 | Oct-02-2015 |
| 01-1510 | O/H MEPF Equipment - Fire Protection Piping - 1st Fl. | 10 | 10 | Oct-05-2015 | Oct-16-2015 |
| 01-1515 | O/H MEPF Pressure Tests - Fire Protection Piping - 1st Fl. | 5 | 5 | Oct-19-2015 | Oct-23-2015 |
| **O/H Low Voltage** | | 18 | 18 | Oct-26-2015 | Nov-18-2015 |
| 01-1600 | O/H Low Voltage R/I - 1st Fl. | 18 | 18 | Oct-26-2015 | Nov-18-2015 |
| **Interior Wall Framing & Rough-In's** | | 51 | 51 | Sep-09-2015 | Nov-18-2015 |
| 01-2010 | In-Wall Plumbing R/I - Carriages & Assemblies - 1st Fl. | 10 | 10 | Sep-09-2015 | Sep-22-2015 |
| 01-2000 | Interior Wall Framing - 1st Fl. | 10 | 10 | Sep-16-2015 | Sep-29-2015 |
| 01-2020 | In-Wall Electrical R/I - 1st Fl. | 20 | 20 | Sep-30-2015 | Oct-27-2015 |
| 01-2030 | In-Wall Plumbing R/I - Piping - 1st Fl. | 20 | 20 | Sep-30-2015 | Oct-27-2015 |
| 01-2040 | In-Wall Low Voltage R/I - 1st Fl. | 18 | 18 | Oct-26-2015 | Nov-18-2015 |
| **In-Wall Rough-In Inspections** | | 21 | 21 | Oct-28-2015 | Nov-25-2015 |
| 01-IW-PLUM | QC / In-Wall Plumbing Inspection - Start Production Drywall - 1st Fl. | 5 | 5 | Oct-28-2015 | Nov-03-2015 |
| 01-IW-ELEC | QC / In-Wall Electrical Inspection - Start Production Drywall - 1st Fl. | 5 | 5 | Oct-28-2015 | Nov-03-2015 |
| 01-IW-LOWV | QC / In-Wall Other Inspection - Start Production Drywall - 1st Fl. | 5 | 5 | Nov-19-2015 | Nov-25-2015 |
| **Ceiling Framing** | | 43 | 43 | Sep-30-2015 | Dec-01-2015 |
| 01-3010 | Hard Ceiling Framing - 1st Fl. | 5 | 5 | Sep-30-2015 | Oct-06-2015 |
| 01-3020 | MEPF Ceiling R/I - 1st Fl. | 10 | 10 | Oct-07-2015 | Oct-20-2015 |
| 01-3000 | Above Ceiling Drywall - H&F - 1st Fl. | 10 | 10 | Nov-09-2015 | Nov-20-2015 |
| 01-3030 | MEPF Ceiling R/I QC & Inspections - 1st Fl. | 5 | 5 | Nov-23-2015 | Dec-01-2015 |
| **Finishes** | | 164 | 164 | Aug-27-2015 | Apr-19-2016 |
| **Labs** | | 164 | 164 | Aug-27-2015 | Apr-19-2016 |
| **Above Ceiling** | | 86 | 86 | Aug-27-2015 | Dec-30-2015 |
| 01-6090 | Final Above Ceiling Eqpt & Supports - 1st Fl. | 10 | 10 | Aug-27-2015 | Sep-10-2015 |
| 01-6020 | Install Snorkles - 1st Fl. | 10 | 10 | Oct-12-2015 | Oct-23-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

| UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 01-6000 | O/H MEP Eqpt & Pipe Insulation - 1st Fl. | 10 | 10 | Oct-26-2015 | Nov-06-2015 |
| 01-6070 | Wall Penetration Treatment / Label - 1st Fl. | 10 | 10 | Nov-23-2015 | Dec-08-2015 |
| 01-6080 | Projection Screens - 1st Fl. | 10 | 10 | Nov-23-2015 | Dec-08-2015 |
| 01-6010 | Low Voltage Wiring - 1st Fl. | 10 | 10 | Dec-02-2015 | Dec-15-2015 |
| 01-6100 | Above Ceiling QC - 1st Fl. | 5 | 5 | Dec-09-2015 | Dec-15-2015 |
| 01-6130 | Fume Hood Branch Connections - 1st Fl. | 10 | 10 | Dec-14-2015 | Dec-28-2015 |
| 01-6110 | Fire Wall Inspections - 1st Fl. | 5 | 5 | Dec-16-2015 | Dec-22-2015 |
| 01-6120 | Above Ceiling Pre-Grid Inpections - 1st Fl. | 5 | 5 | Dec-23-2015 | Dec-30-2015 |
| **Below Ceiling** | | 100 | 100 | Nov-30-2015 | Apr-19-2016 |
| 01-7000 | Wall Insulation - 1st Fl | 5 | 5 | Nov-30-2015 | Dec-04-2015 |
| 01-7030 | Install Fume Hoods w/Bases - 1st Fl. | 10 | 10 | Nov-30-2015 | Dec-11-2015 |
| 01-7010 | Hang & Finish Walls - 1st Fl. | 15 | 15 | Nov-30-2015 | Dec-18-2015 |
| 01-7020 | Hang & Finish Lids / Soffits - 1st Fl. | 15 | 15 | Dec-07-2015 | Dec-28-2015 |
| 01-7060 | Prime Paint - 1st Fl. | 10 | 10 | Dec-21-2015 | Jan-05-2016 |
| 01-7080 | Band Paint - 1st Fl. | 10 | 10 | Dec-21-2015 | Jan-05-2016 |
| 01-7100 | Trench Covers - 1st Fl. | 10 | 10 | Dec-21-2015 | Jan-05-2016 |
| 01-7040 | Install Snorkles - 1st Fl. | 10 | 10 | Dec-29-2015 | Jan-12-2016 |
| 01-7070 | Point-up Drywall - 1st Fl. | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| 01-7110 | Ceiling Grid - 1st Fl. | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| 01-7230 | Storefronts & Glazing - 1st Fl. | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| 01-7120 | Specialty Ceiling Grid - 1st Fl. | 5 | 5 | Jan-20-2016 | Jan-26-2016 |
| 01-7090 | First Pass Finish Paint - 1st Fl. | 10 | 10 | Jan-20-2016 | Feb-02-2016 |
| 01-7130 | Ceiling Grid MEP Trim - 1st Fl. | 10 | 10 | Jan-20-2016 | Feb-02-2016 |
| 01-7150 | VCT Flooring - Labs - 1st Fl. | 10 | 10 | Feb-03-2016 | Feb-16-2016 |
| 01-7260 | Final Above Ceiling Inspections - 1st Fl. | 10 | 10 | Feb-03-2016 | Feb-16-2016 |
| 01-7160 | Lab Casework - Base Cabs - 1st Fl. | 10 | 10 | Feb-17-2016 | Mar-01-2016 |
| 01-7240 | Misc. Specialties & Accessories - 1st Fl. | 10 | 10 | Feb-17-2016 | Mar-01-2016 |
| 01-7250 | Wall Devices & Trim - 1st Fl. | 10 | 10 | Feb-17-2016 | Mar-01-2016 |
| 01-7270 | Lay Ceiling Tile / Specialty Clng Panels - 1st Fl. | 10 | 10 | Feb-17-2016 | Mar-01-2016 |
| 01-7140 | Test & Balance Prelim - 1st Fl. | 30 | 30 | Feb-17-2016 | Mar-29-2016 |
| 01-7170 | Lab Casework - Eqpt & Showers - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7180 | Lab Casework - Shelving & Storage Cabs - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7190 | Lab Casework - MEPF R/I to Casework - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7200 | Lab Casework - Epoxy Tops - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7280 | Doors & Hardware - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7290 | Roller Shades - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7330 | Signage - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7335 | Install Tech Eqpt. - 1st Fl. | 10 | 10 | Mar-02-2016 | Mar-15-2016 |
| 01-7210 | Lab Casework - MEPF Fixtures @ Casework - 1st Fl. | 10 | 10 | Mar-16-2016 | Mar-29-2016 |
| 01-7220 | Lab Casework - Wire Mold - 1st Fl. | 10 | 10 | Mar-16-2016 | Mar-29-2016 |
| 01-7300 | Rough Clean - 1st Fl. | 10 | 10 | Mar-16-2016 | Mar-29-2016 |

| | |
|---|---|
| ▬▬ Remaining Level of Effort | ▬▬ Actual Work     ▬▬ Critical Remaining Work |
| ▬▬ Actual Level of Effort | ▭ Remaining Work   ◆ Milestone |

**SKANSKA**

| | | | | | | |
|---|---|---|---|---|---|---|

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 01-7310 | Sub Self-Punch - 1st Fl. | 10 | 10 | Mar-16-2016 | Mar-29-2016 |
| 01-7340 | Ready for Inspections - 1st Fl. | 0 | 0 | | Mar-29-2016 |
| 01-7320 | Commissioning - 1st Fl. | 5 | 5 | Mar-30-2016 | Apr-05-2016 |
| 01-7350 | Final Paint - 1st Fl. | 5 | 5 | Mar-30-2016 | Apr-05-2016 |
| 01-7999 | Punch Labs for S/C -1st Fl. | 5 | 5 | Apr-06-2016 | Apr-12-2016 |
| 01-7360 | Final Cleaning - 1st Fl. | 5 | 5 | Apr-13-2016 | Apr-19-2016 |
| 01-7370 | Floor / Area Complete - 1st Fl. | 0 | 0 | | Apr-19-2016 |
| **Non-Labs** | | **123** | **123** | **Oct-26-2015** | **Apr-19-2016** |
| **Above Ceiling** | | **45** | **45** | **Oct-26-2015** | **Dec-30-2015** |
| 01-8000 | O/H MEP Eqpt & Pipe Insulation - 1st Fl. | 10 | 10 | Oct-26-2015 | Nov-06-2015 |
| 01-8070 | Wall Penetration Treatment / Label - 1st Fl. | 10 | 10 | Nov-23-2015 | Dec-08-2015 |
| 01-8010 | Low Voltage Wiring - 1st Fl. | 10 | 10 | Dec-02-2015 | Dec-15-2015 |
| 01-8100 | Above Ceiling QC - 1st Fl. | 5 | 5 | Dec-09-2015 | Dec-15-2015 |
| 01-8110 | Fire Wall Inspections - 1st Fl. | 5 | 5 | Dec-16-2015 | Dec-22-2015 |
| 01-8120 | Above Ceiling Pre-Grid Inpections - 1st Fl. | 5 | 5 | Dec-23-2015 | Dec-30-2015 |
| **Below Ceiling** | | **100** | **100** | **Nov-30-2015** | **Apr-19-2016** |
| 01-9500 | Wall Insulation - 1st Fl | 5 | 5 | Nov-30-2015 | Dec-04-2015 |
| 01-9510 | Hang & Finish Walls - 1st Fl. | 15 | 15 | Nov-30-2015 | Dec-18-2015 |
| 01-9520 | Hang & Finish Lids / Soffits - 1st Fl. | 15 | 15 | Dec-07-2015 | Dec-28-2015 |
| 01-9530 | Prime Paint - 1st Fl. | 10 | 10 | Dec-21-2015 | Jan-05-2016 |
| 01-9550 | Band Paint - 1st Fl. | 10 | 10 | Dec-21-2015 | Jan-05-2016 |
| 01-9570 | Ceiling Grid - 1st Fl. | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| 01-9540 | Point-up Drywall - 1st Fl. | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| 01-9580 | Specialty Ceiling Grid - 1st Fl. | 10 | 10 | Jan-13-2016 | Jan-26-2016 |
| 01-9590 | Ceiling Grid MEP Trim - 1st Fl. | 10 | 10 | Jan-13-2016 | Jan-26-2016 |
| 01-9610 | Storefronts & Glazing - 1st Fl. | 10 | 10 | Jan-13-2016 | Jan-26-2016 |
| 01-9560 | First Pass Finish Paint - 1st Fl. | 10 | 10 | Jan-20-2016 | Feb-02-2016 |
| 01-9700 | Final Above Ceiling Inspections - 1st Fl. | 10 | 10 | Jan-27-2016 | Feb-09-2016 |
| 01-9630 | Guard/Handrail Systems - 1st Fl. | 10 | 10 | Jan-27-2016 | Feb-09-2016 |
| 01-9650 | Misc. Casework / Millwork - 1st Fl. | 10 | 10 | Jan-27-2016 | Feb-09-2016 |
| 01-9620 | Misc. Specialties & Accessories - 1st Fl. | 10 | 10 | Jan-27-2016 | Feb-09-2016 |
| 01-9640 | Wall Devices & Trim - 1st Fl. | 10 | 10 | Jan-27-2016 | Feb-09-2016 |
| 01-9710 | Lay Ceiling Tile / Specialty Clng Panels - 1st Fl. | 10 | 10 | Feb-10-2016 | Feb-23-2016 |
| 01-9660 | Doors & Hardware - 1st Fl. | 10 | 10 | Feb-10-2016 | Feb-23-2016 |
| 01-9680 | Rough Clean - 1st Fl. | 10 | 10 | Feb-10-2016 | Feb-23-2016 |
| 01-9600 | Test & Balance Prelim - 1st Fl. | 40 | 40 | Feb-10-2016 | Apr-05-2016 |
| 01-9670 | Window Treatments - 1st Fl. | 10 | 10 | Feb-24-2016 | Mar-08-2016 |
| 01-9690 | Sub Self-Punch - 1st Fl. | 10 | 10 | Feb-24-2016 | Mar-08-2016 |
| 01-9740 | Signage - 1st Fl. | 10 | 10 | Feb-24-2016 | Mar-08-2016 |
| 01-9720 | Resilient Flooring - Rooms - 1st Fl. | 10 | 10 | Mar-09-2016 | Mar-22-2016 |
| 01-9730 | Resilient  Flooring - Corridors - 1st Fl. | 10 | 10 | Mar-16-2016 | Mar-29-2016 |
| 01-9760 | Ready for Inspections - 1st Fl. | 0 | 0 | | Mar-29-2016 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

**SKANSKA**

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | Classic WBS Layout - For Issuance | | | | | Data Date = Mar-02-2015 / Run Date =Mar-03-2015 14:35 |
|---|---|---|---|---|---|---|---|

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 01-9750 | Commissioning - 1st Fl. | 5 | 5 | Mar-30-2016 | Apr-05-2016 |
| 01-9770 | Final Paint - 1st Fl. | 5 | 5 | Mar-30-2016 | Apr-05-2016 |
| 01-9999 | Punch Non-Labs for S/C - 1st Fl. | 5 | 5 | Apr-06-2016 | Apr-12-2016 |
| 01-9780 | Final Cleaning - 1st Fl. | 5 | 5 | Apr-13-2016 | Apr-19-2016 |
| 01-9790 | Floor / Area Complete - 1st Fl. | 0 | 0 | | Apr-19-2016 |
| **Second Floor** | | 192 | 192 | Jun-30-2015 | Mar-31-2016 |
| **Layout & Priority Wall Framing** | | 17 | 17 | Jun-30-2015 | Jul-23-2015 |
| 02-1000 | Survey Layout - 2nd Fl. | 7 | 7 | Jun-30-2015 | Jul-09-2015 |
| 02-1010 | Perimeter Wall Framing - 2nd Fl | 10 | 10 | Jul-10-2015 | Jul-23-2015 |
| 02-1020 | Priority Wall Framing / H&F High Rock - 2nd Fl. | 10 | 10 | Jul-10-2015 | Jul-23-2015 |
| 02-1030 | Above Ceiling Support Systems - 2nd Fl. | 10 | 10 | Jul-10-2015 | Jul-23-2015 |
| 02-1040 | Snorkle Support Systems - 2nd Fl. | 10 | 10 | Jul-10-2015 | Jul-23-2015 |
| **O/H Rough-In** | | 69 | 69 | Jul-10-2015 | Oct-15-2015 |
| **O/H Mechanical Ductwork** | | 41 | 41 | Jul-17-2015 | Sep-14-2015 |
| 02-1100 | O/H MEPF Mains - Ductwork - 2nd Fl. | 18 | 18 | Jul-17-2015 | Aug-11-2015 |
| 02-1105 | O/H MEPF Branch - Ductwork - 2nd Fl. | 18 | 18 | Aug-12-2015 | Sep-04-2015 |
| 02-1110 | O/H MEPF Equipment - Ductwork - 2nd Fl. | 10 | 10 | Aug-24-2015 | Sep-04-2015 |
| 02-1115 | O/H MEPF Pressure Tests - Ductwork - 2nd Fl. | 5 | 5 | Sep-08-2015 | Sep-14-2015 |
| **O/H Mechanical Piping** | | 51 | 51 | Jul-10-2015 | Sep-21-2015 |
| 02-1200 | O/H MEPF Mains - Mechanical Piping - 2nd Fl. | 18 | 18 | Jul-10-2015 | Aug-04-2015 |
| 02-1205 | O/H MEPF Branch - Mechanical Piping - 2nd Fl. | 18 | 18 | Aug-05-2015 | Aug-28-2015 |
| 02-1210 | O/H MEPF Equipment - Mechanical Piping - 2nd Fl. | 10 | 10 | Aug-31-2015 | Sep-14-2015 |
| 02-1215 | O/H MEPF Pressure Tests - Mechanical Piping - 2nd Fl. | 5 | 5 | Sep-15-2015 | Sep-21-2015 |
| **O/H Plumbing** | | 51 | 51 | Jul-10-2015 | Sep-21-2015 |
| 02-1300 | O/H MEPF Mains - Plumbing - 2nd Fl. | 18 | 18 | Jul-10-2015 | Aug-04-2015 |
| 02-1305 | O/H MEPF Branch - Plumbing - 2nd Fl. | 18 | 18 | Aug-05-2015 | Aug-28-2015 |
| 02-1310 | O/H MEPF Equipment - Plumbing - 2nd Fl. | 10 | 10 | Aug-31-2015 | Sep-14-2015 |
| 02-1315 | O/H MEPF Pressure Tests - Plumbing - 2nd Fl. | 5 | 5 | Sep-15-2015 | Sep-21-2015 |
| **O/H Electrical** | | 46 | 46 | Jul-10-2015 | Sep-14-2015 |
| 02-1400 | O/H MEPF Mains - Electrical - 2nd Fl. | 18 | 18 | Jul-10-2015 | Aug-04-2015 |
| 02-1405 | O/H MEPF Branch - Electrical - 2nd Fl. | 18 | 18 | Aug-05-2015 | Aug-28-2015 |
| 02-1410 | O/H MEPF Equipment - Electrical - 2nd Fl. | 10 | 10 | Aug-31-2015 | Sep-14-2015 |
| **O/H Fire Protection** | | 51 | 51 | Jul-10-2015 | Sep-21-2015 |
| 02-1500 | O/H MEPF Mains - Fire Protection Piping - 2nd Fl. | 18 | 18 | Jul-10-2015 | Aug-04-2015 |
| 02-1505 | O/H MEPF Branch - Fire Protection Piping - 2nd Fl. | 18 | 18 | Aug-05-2015 | Aug-28-2015 |
| 02-1510 | O/H MEPF Equipment - Fire Protection Piping - 2nd Fl. | 10 | 10 | Aug-31-2015 | Sep-14-2015 |
| 02-1515 | O/H MEPF Pressure Tests - Fire Protection Piping - 2nd Fl. | 5 | 5 | Sep-15-2015 | Sep-21-2015 |
| **O/H Low Voltage** | | 18 | 18 | Sep-22-2015 | Oct-15-2015 |
| 02-1600 | O/H Low Voltage R/I - 2nd Fl. | 18 | 18 | Sep-22-2015 | Oct-15-2015 |
| **Interior Wall Framing & Rough-In's** | | 51 | 51 | Aug-05-2015 | Oct-15-2015 |
| 02-2010 | In-Wall Plumbing R/I - Carriages & Assemblies - 2nd Fl. | 10 | 10 | Aug-05-2015 | Aug-18-2015 |
| 02-2000 | Interior Wall Framing - 2nd Fl | 10 | 10 | Aug-12-2015 | Aug-25-2015 |
| 02-2020 | In-Wall Electrical R/I - 2nd Fl. | 20 | 20 | Aug-26-2015 | Sep-23-2015 |

Legend:
━━ Remaining Level of Effort    ▬ Actual Work    ━━ Critical Remaining Work
━━ Actual Level of Effort    ▭ Remaining Work    ◆ Milestone

SKANSKA

UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 02-2030 | In-Wall Plumbing R/I - Piping - 2nd Fl. | 20 | 20 | Aug-26-2015 | Sep-23-2015 |
| 02-2040 | In-Wall Low Voltage R/I - 2nd Fl. | 18 | 18 | Sep-22-2015 | Oct-15-2015 |
| **In-Wall Rough-In Inspections** | | 21 | 21 | Sep-24-2015 | Oct-22-2015 |
| 02-IW-PLUM | QC / In-Wall Plumbing Inspection - Start Production Drywall - 2nd Fl. | 5 | 5 | Sep-24-2015 | Sep-30-2015 |
| 02-IW-ELEC | QC / In-Wall Electrical Inspection - Start Production Drywall - 2nd Fl. | 5 | 5 | Sep-24-2015 | Sep-30-2015 |
| 02-IW-LOWV | QC / In-Wall Other Inspection - Start Production Drywall - 2nd Fl. | 5 | 5 | Oct-16-2015 | Oct-22-2015 |
| **Ceiling Framing** | | 43 | 43 | Aug-26-2015 | Oct-26-2015 |
| 02-3010 | Hard Ceiling Framing - 2nd Fl. | 5 | 5 | Aug-26-2015 | Sep-01-2015 |
| 02-3020 | MEPF Ceiling R/I - 2nd Fl. | 10 | 10 | Sep-02-2015 | Sep-16-2015 |
| 02-3000 | Above Ceiling Drywall - H&F - 2nd Fl. | 10 | 10 | Oct-06-2015 | Oct-19-2015 |
| 02-3030 | MEPF Ceiling R/I QC & Inspections - 2nd Fl. | 5 | 5 | Oct-20-2015 | Oct-26-2015 |
| **Finishes** | | 175 | 175 | Jul-24-2015 | Mar-31-2016 |
| **Labs** | | 165 | 165 | Jul-24-2015 | Mar-17-2016 |
| **Above Ceiling** | | 86 | 86 | Jul-24-2015 | Nov-23-2015 |
| 02-6090 | Final Above Ceiling Eqpt & Supports - 2nd Fl. | 10 | 10 | Jul-24-2015 | Aug-06-2015 |
| 02-6020 | Install Snorkles - 2nd Fl. | 10 | 10 | Sep-08-2015 | Sep-21-2015 |
| 02-6000 | O/H MEP Eqpt & Pipe Insulation - 2nd Fl. | 10 | 10 | Sep-22-2015 | Oct-05-2015 |
| 02-6070 | Wall Penetration Treatment / Label - 2nd Fl. | 10 | 10 | Oct-20-2015 | Nov-02-2015 |
| 02-6080 | Projection Screens - 2nd Fl. | 10 | 10 | Oct-20-2015 | Nov-02-2015 |
| 02-6010 | Low Voltage Wiring - 2nd Fl. | 10 | 10 | Oct-27-2015 | Nov-09-2015 |
| 02-6100 | Above Ceiling QC - 2nd Fl. | 5 | 5 | Nov-03-2015 | Nov-09-2015 |
| 02-6130 | Fume Hood Branch Connections - 2nd Fl. | 10 | 10 | Nov-06-2015 | Nov-19-2015 |
| 02-6110 | Fire Wall Inspections - 2nd Fl. | 5 | 5 | Nov-10-2015 | Nov-16-2015 |
| 02-6120 | Above Ceiling Pre-Grid Inspections - 2nd Fl. | 5 | 5 | Nov-17-2015 | Nov-23-2015 |
| **Below Ceiling** | | 101 | 101 | Oct-23-2015 | Mar-17-2016 |
| 02-7000 | Wall Insulation - 2nd Fl. | 5 | 5 | Oct-23-2015 | Oct-29-2015 |
| 02-7030 | Install Fume Hoods w/Bases - 2nd Fl. | 10 | 10 | Oct-23-2015 | Nov-05-2015 |
| 02-7010 | Hang & Finish Walls - 2nd Fl. | 15 | 15 | Oct-23-2015 | Nov-12-2015 |
| 02-7020 | Hang & Finish Lids / Soffits - 2nd Fl. | 15 | 15 | Oct-30-2015 | Nov-19-2015 |
| 02-7060 | Prime Paint - 2nd Fl. | 10 | 10 | Nov-13-2015 | Nov-30-2015 |
| 02-7080 | Band Paint - 2nd Fl. | 10 | 10 | Nov-13-2015 | Nov-30-2015 |
| 02-7100 | Trench Covers - 2nd Fl. | 10 | 10 | Nov-13-2015 | Nov-30-2015 |
| 02-7040 | Install Snorkles - 2nd Fl. | 10 | 10 | Nov-20-2015 | Dec-07-2015 |
| 02-7070 | Point-up Drywall - 2nd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 02-7110 | Celing Grid - 2nd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 02-7230 | Storefronts & Glazing - 2nd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 02-7120 | Specialty Ceiling Grid - 2nd Fl. | 5 | 5 | Dec-15-2015 | Dec-21-2015 |
| 02-7090 | First Pass Finish Paint - 2nd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 02-7130 | Ceiling Grid MEP Trim - 2nd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 02-7260 | Final Above Ceiling Inspections - 2nd Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 02-7150 | VCT Flooring - Labs - 2nd Fl. | 10 | 10 | Dec-31-2015 | Jan-14-2016 |
| 02-7270 | Lay Ceiling Tile / Specialty Clng Panels - 2nd Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 02-7160 | Lab Casework - Base Cabs - 2nd Fl. | 10 | 10 | Jan-15-2016 | Jan-28-2016 |
| 02-7240 | Misc. Specialties & Accessories - 2nd Fl. | 10 | 10 | Jan-15-2016 | Jan-28-2016 |
| 02-7250 | Wall Devices & Trim - 2nd Fl. | 10 | 10 | Jan-15-2016 | Jan-28-2016 |
| 02-7140 | Test & Balance Prelim - 2nd Fl. | 40 | 40 | Jan-15-2016 | Mar-10-2016 |
| 02-7330 | Signage - 2nd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 02-7335 | Install Tech Eqpt. - 2nd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 02-7170 | Lab Casework - Eqpt & Showers - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7180 | Lab Casework - Shelving & Storage Cabs - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7190 | Lab Casework - MEPF R/I to Casework - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7200 | Lab Casework - Epoxy Tops - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7280 | Doors & Hardware - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7290 | Roller Shades - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-7210 | Lab Casework - MEPF Fixtures @ Casework - 2nd Fl. | 10 | 10 | Feb-12-2016 | Feb-25-2016 |
| 02-7220 | Lab Casework - Wire Mold - 2nd Fl. | 10 | 10 | Feb-12-2016 | Feb-25-2016 |
| 02-7300 | Rough Clean - 2nd Fl. | 10 | 10 | Feb-12-2016 | Feb-25-2016 |
| 02-7310 | Sub Self-Punch - 2nd Fl. | 10 | 10 | Feb-12-2016 | Feb-25-2016 |
| 02-7340 | Ready for Inspections - 2nd Fl. | 0 | 0 | | Feb-25-2016 |
| 02-7350 | Final Paint - 2nd Fl. | 5 | 5 | Feb-26-2016 | Mar-03-2016 |
| 02-7320 | Commissioning - 2nd Fl. | 5 | 5 | Mar-04-2016 | Mar-10-2016 |
| 02-7999 | Punch Labs for S/C - 2nd Fl. | 5 | 5 | Mar-04-2016 | Mar-10-2016 |
| 02-7360 | Final Cleaning - 2nd Fl. | 5 | 5 | Mar-11-2016 | Mar-17-2016 |
| 02-7370 | Floor / Area Complete - 2nd Fl. | 0 | 0 | | Mar-17-2016 |
| **Non-Labs** | | 134 | 134 | Sep-22-2015 | Mar-31-2016 |
| **Above Ceiling** | | 45 | 45 | Sep-22-2015 | Nov-23-2015 |
| 02-8000 | O/H MEP Eqpt & Pipe Insulation - 2nd Fl. | 10 | 10 | Sep-22-2015 | Oct-05-2015 |
| 02-8070 | Wall Penetration Treatment / Label - 2nd Fl. | 10 | 10 | Oct-20-2015 | Nov-02-2015 |
| 02-8010 | Low Voltage Wiring - 2nd Fl. | 10 | 10 | Oct-27-2015 | Nov-09-2015 |
| 02-8100 | Above Ceiing QC - 2nd Fl. | 5 | 5 | Nov-03-2015 | Nov-09-2015 |
| 02-8110 | Fire Wall Inspections - 2nd Fl. | 5 | 5 | Nov-10-2015 | Nov-16-2015 |
| 02-8120 | Above Ceiling Pre-Grid Inpections - 2nd Fl. | 5 | 5 | Nov-17-2015 | Nov-23-2015 |
| **Below Ceiling** | | 111 | 111 | Oct-23-2015 | Mar-31-2016 |
| 02-9500 | Wall Insulation - 2nd Fl | 5 | 5 | Oct-23-2015 | Oct-29-2015 |
| 02-9510 | Hang & Finish Walls - 2nd Fl. | 15 | 15 | Oct-23-2015 | Nov-12-2015 |
| 02-9520 | Hang & Finish Lids / Soffits - 2nd Fl. | 15 | 15 | Oct-30-2015 | Nov-19-2015 |
| 02-9530 | Prime Paint - 2nd Fl. | 10 | 10 | Nov-13-2015 | Nov-30-2015 |
| 02-9550 | Band Paint - 2nd Fl. | 10 | 10 | Nov-13-2015 | Nov-30-2015 |
| 02-9800 | Construct Lecture Hall Seating Platforms - 2nd Fl. | 15 | 15 | Nov-13-2015 | Dec-07-2015 |
| 02-9570 | Ceiling Grid - 2nd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 02-9540 | Point-up Drywall - 2nd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 02-9580 | Specialty Ceiling Grid - 2nd Fl. | 10 | 10 | Dec-08-2015 | Dec-21-2015 |
| 02-9590 | Ceiling Grid MEP Trim - 2nd Fl. | 10 | 10 | Dec-08-2015 | Dec-21-2015 |
| 02-9610 | Storefronts & Glazing - 2nd Fl. | 10 | 10 | Dec-08-2015 | Dec-21-2015 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work ◆
- Critical Remaining Work
- Milestone ◆

SKANSKA

| UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | Classic WBS Layout - For Issuance | | | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 02-9560 | First Pass Finish Paint - 2nd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 02-9700 | Final Above Ceiling Inspections - 2nd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 02-9630 | Guard/Handrail Systems - 2nd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 02-9620 | Misc. Specialties & Accessories - 2nd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 02-9640 | Wall Devices & Trim - 2nd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 02-9650 | Misc. Casework / Millwork - 2nd Fl. | 10 | 10 | Dec-31-2015 | Jan-14-2016 |
| 02-9710 | Lay Ceiling Tile / Specialty Clng Panels - 2nd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 02-9660 | Doors & Hardware - 2nd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 02-9600 | Test & Balance Prelim - 2nd Fl. | 40 | 40 | Jan-07-2016 | Mar-02-2016 |
| 02-9680 | Rough Clean - 2nd Fl. | 10 | 10 | Jan-15-2016 | Jan-28-2016 |
| 02-9670 | Window Treatments - 2nd Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 02-9740 | Signage - 2nd Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 02-9690 | Sub Self-Punch - 2nd Fl. | 10 | 10 | Jan-29-2016 | Feb-11-2016 |
| 02-9720 | Resilient Flooring - Rooms - 2nd Fl. | 10 | 10 | Feb-12-2016 | Feb-25-2016 |
| 02-9730 | Resilient  Flooring - Corridors - 2nd Fl. | 10 | 10 | Feb-19-2016 | Mar-03-2016 |
| 02-9750 | Commissioning - 2nd Fl. | 5 | 5 | Feb-25-2016 | Mar-02-2016 |
| 02-9810 | Lecture Hall Seating - 2nd Fl. | 10 | 10 | Feb-26-2016 | Mar-10-2016 |
| 02-9760 | Ready for Inspections - 2nd Fl. | 0 | 0 | | Mar-03-2016 |
| 02-9770 | Final Paint - 2nd Fl. | 10 | 10 | Mar-04-2016 | Mar-17-2016 |
| 02-9999 | Punch Non-Labs for S/C - 2nd Fl. | 5 | 5 | Mar-18-2016 | Mar-24-2016 |
| 02-9780 | Final Cleaning - 2nd Fl. | 5 | 5 | Mar-25-2016 | Mar-31-2016 |
| 02-9790 | Floor / Area Complete - 2nd Fl. | 0 | 0 | | Mar-31-2016 |
| **Third Floor** | | **184** | **184** | **Jul-10-2015** | **Mar-30-2016** |
| | Layout & Priority Wall Framing | 17 | 17 | Jul-10-2015 | Aug-03-2015 |
| 03-1000 | Survey Layout - 3rd Fl. | 7 | 7 | Jul-10-2015 | Jul-20-2015 |
| 03-1010 | Perimeter Wall Framing - 3rd Fl. | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| 03-1020 | Priority Wall Framing / H&F High Rock - 3rd Fl. | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| 03-1030 | Above Ceiling Support Systems - 3rd Fl. | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| 03-1040 | Snorkle Support Systems - 3rd Fl. | 10 | 10 | Jul-21-2015 | Aug-03-2015 |
| | O/H Rough-In | 69 | 69 | Jul-21-2015 | Oct-26-2015 |
| | O/H Mechanical Ductwork | 41 | 41 | Jul-28-2015 | Sep-23-2015 |
| 03-1100 | O/H MEPF Mains - Ductwork - 3rd Fl. | 18 | 18 | Jul-28-2015 | Aug-20-2015 |
| 03-1105 | O/H MEPF Branch - Ductwork - 3rd Fl. | 18 | 18 | Aug-21-2015 | Sep-16-2015 |
| 03-1110 | O/H MEPF Equipment - Ductwork - 3rd Fl. | 10 | 10 | Sep-02-2015 | Sep-16-2015 |
| 03-1115 | O/H MEPF Pressure Tests - Ductwork - 3rd Fl. | 5 | 5 | Sep-17-2015 | Sep-23-2015 |
| | O/H Mechanical Piping | 51 | 51 | Jul-21-2015 | Sep-30-2015 |
| 03-1200 | O/H MEPF Mains - Mechanical Piping - 3rd Fl. | 18 | 18 | Jul-21-2015 | Aug-13-2015 |
| 03-1205 | O/H MEPF Branch - Mechanical Piping - 3rd Fl. | 18 | 18 | Aug-14-2015 | Sep-09-2015 |
| 03-1210 | O/H MEPF Equipment - Mechanical Piping - 3rd Fl. | 10 | 10 | Sep-10-2015 | Sep-23-2015 |
| 03-1215 | O/H MEPF Pressure Tests - Mechanical Piping - 3rd Fl. | 5 | 5 | Sep-24-2015 | Sep-30-2015 |
| | O/H Plumbing | 51 | 51 | Jul-21-2015 | Sep-30-2015 |
| 03-1300 | O/H MEPF Mains - Plumbing - 3rd Fl. | 18 | 18 | Jul-21-2015 | Aug-13-2015 |

Remaining Level of Effort    Actual Work    Critical Remaining Work
Actual Level of Effort    Remaining Work    Milestone

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 03-1305 | O/H MEPF Branch - Plumbing - 3rd Fl. | 18 | 18 | Aug-14-2015 | Sep-09-2015 |
| 03-1310 | O/H MEPF Equipment - Plumbing - 3rd Fl. | 10 | 10 | Sep-10-2015 | Sep-23-2015 |
| 03-1315 | O/H MEPF Pressure Tests - Plumbing - 3rd Fl. | 5 | 5 | Sep-24-2015 | Sep-30-2015 |
| **O/H Electrical** | | 46 | 46 | Jul-21-2015 | Sep-23-2015 |
| 03-1400 | O/H MEPF Mains - Electrical - 3rd Fl. | 18 | 18 | Jul-21-2015 | Aug-13-2015 |
| 03-1405 | O/H MEPF Branch - Electrical - 3rd Fl. | 18 | 18 | Aug-14-2015 | Sep-09-2015 |
| 03-1410 | O/H MEPF Equipment - Electrical - 3rd Fl. | 10 | 10 | Sep-10-2015 | Sep-23-2015 |
| **O/H Fire Protection** | | 51 | 51 | Jul-21-2015 | Sep-30-2015 |
| 03-1500 | O/H MEPF Mains - Fire Protection Piping - 3rd Fl. | 18 | 18 | Jul-21-2015 | Aug-13-2015 |
| 03-1505 | O/H MEPF Branch - Fire Protection Piping - 3rd Fl. | 18 | 18 | Aug-14-2015 | Sep-09-2015 |
| 03-1510 | O/H MEPF Equipment - Fire Protection Piping - 3rd Fl. | 10 | 10 | Sep-10-2015 | Sep-23-2015 |
| 03-1515 | O/H MEPF Pressure Tests - Fire Protection Piping - 3rd Fl. | 5 | 5 | Sep-24-2015 | Sep-30-2015 |
| **O/H Low Voltage** | | 18 | 18 | Oct-01-2015 | Oct-26-2015 |
| 03-1600 | O/H Low Voltage R/I - 3rd Fl. | 18 | 18 | Oct-01-2015 | Oct-26-2015 |
| **Interior Wall Framing & Rough-In's** | | 51 | 51 | Aug-14-2015 | Oct-26-2015 |
| 03-2010 | In-Wall Plumbing R/I - Carriages & Assemblies - 3rd Fl. | 10 | 10 | Aug-14-2015 | Aug-27-2015 |
| 03-2000 | Interior Wall Framing - 3rd Fl. | 10 | 10 | Aug-21-2015 | Sep-03-2015 |
| 03-2020 | In-Wall Electrical R/I - 3rd Fl. | 20 | 20 | Sep-04-2015 | Oct-02-2015 |
| 03-2030 | In-Wall Plumbing R/I - Piping - 3rd Fl. | 20 | 20 | Sep-04-2015 | Oct-02-2015 |
| 03-2040 | In-Wall Low Voltage R/I - 3rd Fl. | 18 | 18 | Oct-01-2015 | Oct-26-2015 |
| **In-Wall Rough-In Inspections** | | 21 | 21 | Oct-05-2015 | Nov-02-2015 |
| 03-IW-PLUM | QC / In-Wall Plumbing Inspection - Start Production Drywall - 3rd Fl. | 5 | 5 | Oct-05-2015 | Oct-09-2015 |
| 03-IW-ELEC | QC / In-Wall Electrical Inspection - Start Production Drywall - 3rd Fl. | 5 | 5 | Oct-05-2015 | Oct-09-2015 |
| 03-IW-LOWV | QC / In-Wall Other Inspection - Start Production Drywall - 3rd Fl. | 5 | 5 | Oct-27-2015 | Nov-02-2015 |
| **Ceiling Framing** | | 43 | 43 | Sep-04-2015 | Nov-04-2015 |
| 03-3010 | Hard Ceiling Framing - 3rd Fl. | 5 | 5 | Sep-04-2015 | Sep-11-2015 |
| 03-3020 | MEPF Ceiling R/I - 3rd Fl. | 10 | 10 | Sep-14-2015 | Sep-25-2015 |
| 03-3000 | Above Ceiling Drywall - H&F - 3rd Fl. | 10 | 10 | Oct-15-2015 | Oct-28-2015 |
| 03-3030 | MEPF Ceiling R/I QC & Inspections - 3rd Fl. | 10 | 10 | Oct-29-2015 | Nov-04-2015 |
| **Finishes** | | 167 | 167 | Aug-04-2015 | Mar-30-2016 |
| **Labs** | | 167 | 167 | Aug-04-2015 | Mar-30-2016 |
| **Above Ceiling** | | 87 | 87 | Aug-04-2015 | Dec-07-2015 |
| 03-6090 | Final Above Ceiling Eqpt & Supports - 3rd Fl. | 10 | 10 | Aug-04-2015 | Aug-17-2015 |
| 03-6020 | Install Snorkles - 3rd Fl. | 10 | 10 | Sep-17-2015 | Sep-30-2015 |
| 03-6000 | O/H MEP Eqpt & Pipe Insulation - 3rd Fl. | 10 | 10 | Oct-01-2015 | Oct-14-2015 |
| 03-6070 | Wall Penetration Treatment / Label - 3rd Fl. | 10 | 10 | Oct-29-2015 | Nov-11-2015 |
| 03-6080 | Projection Screens - 3rd Fl. | 10 | 10 | Oct-29-2015 | Nov-11-2015 |
| 03-6010 | Low Voltage Wiring - 3rd Fl. | 10 | 10 | Nov-05-2015 | Nov-18-2015 |
| 03-6100 | Above Ceiing QC - 3rd Fl. | 5 | 5 | Nov-12-2015 | Nov-18-2015 |
| 03-6110 | Fire Wall Inspections - 3rd Fl. | 5 | 5 | Nov-19-2015 | Nov-25-2015 |
| 03-6130 | Fume Hood Branch Connections - 3rd Fl. | 10 | 10 | Nov-20-2015 | Dec-07-2015 |
| 03-6120 | Above Ceiling Pre-Grid Inpections - 3rd Fl. | 5 | 5 | Nov-30-2015 | Dec-04-2015 |
| **Below Ceiling** | | 103 | 103 | Nov-03-2015 | Mar-30-2016 |

Remaining Level of Effort — Actual Work — Critical Remaining Work
Actual Level of Effort — Remaining Work — Milestone

SKANSKA

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 03-7000 | Wall Insulation - 3rd Fl. | 5 | 5 | Nov-03-2015 | Nov-09-2015 |
| 03-7030 | Install Fume Hoods w/Bases - 3rd Fl. | 10 | 10 | Nov-06-2015 | Nov-19-2015 |
| 03-7010 | Hang & Finish Walls - 3rd Fl | 15 | 15 | Nov-06-2015 | Nov-30-2015 |
| 03-7020 | Hang & Finish Lids / Soffits - 3rd Fl. | 15 | 15 | Nov-13-2015 | Dec-07-2015 |
| 03-7060 | Prime Paint - 3rd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 03-7080 | Band Paint - 3rd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 03-7100 | Trench Covers - 3rd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 03-7040 | Install Snorkles - 3rd Fl. | 10 | 10 | Dec-08-2015 | Dec-21-2015 |
| 03-7070 | Point-up Drywall - 3rd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 03-7110 | Ceiling Grid - 3rd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 03-7230 | Storefronts & Glazing - 3rd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 03-7120 | Specialty Ceiling Grid - 3rd Fl. | 5 | 5 | Dec-30-2015 | Jan-06-2016 |
| 03-7090 | First Pass Finish Paint - 3rd Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 03-7130 | Ceiling Grid MEP Trim - 3rd Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 03-7150 | VCT Flooring - Labs - 3rd Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 |
| 03-7260 | Final Above Ceiling Inspections - 3rd Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 |
| 03-7160 | Lab Casework - Base Cabs - 3rd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 03-7240 | Misc. Specialties & Accessories - 3rd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 03-7250 | Wall Devices & Trim - 3rd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 03-7270 | Lay Ceiling Tile / Specialty Clng Panels - 3rd Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 |
| 03-7140 | Test & Balance Prelim - 3rd Fl. | 30 | 30 | Jan-28-2016 | Mar-09-2016 |
| 03-7170 | Lab Casework - Eqpt & Showers - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7180 | Lab Casework - Shelving & Storage Cabs - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7190 | Lab Casework - MEPF R/I to Casework - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7200 | Lab Casework - Epoxy Tops - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7280 | Doors & Hardware - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7290 | Roller Shades - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7330 | Signage - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7335 | Install Tech Eqpt. - 3rd Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 |
| 03-7210 | Lab Casework - MEPF Fixtures @ Casework - 3rd Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 03-7220 | Lab Casework - Wire Mold - 3rd Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 03-7300 | Rough Clean - 3rd Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 03-7310 | Sub Self-Punch - 3rd Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 03-7340 | Ready for Inspections - 3rd Fl. | 0 | 0 | | Mar-09-2016 |
| 03-7320 | Commissioning - 3rd Fl. | 5 | 5 | Mar-10-2016 | Mar-16-2016 |
| 03-7350 | Final Paint - 3rd Fl. | 5 | 5 | Mar-10-2016 | Mar-16-2016 |
| 03-7999 | Punch Labs for S/C - 3rd Fl. | 5 | 5 | Mar-17-2016 | Mar-23-2016 |
| 03-7360 | Final Cleaning - 3rd Fl. | 5 | 5 | Mar-24-2016 | Mar-30-2016 |
| 03-7370 | Floor / Area Complete - 3rd Fl. | 0 | 0 | | Mar-30-2016 |
| **Non-Labs** | | **126** | **126** | **Oct-01-2015** | **Mar-30-2016** |
| **Above Ceiling** | | **45** | **45** | **Oct-01-2015** | **Dec-04-2015** |

| Remaining Level of Effort | Actual Work | Critical Remaining Work |
| Actual Level of Effort | Remaining Work | Milestone |

Page 28 of 34

SKANSKA

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| | **UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15** | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 / Run Date =Mar-03-2015 14:35 |
| 03-8000 | O/H MEP Eqpt & Pipe Insulation - 3rd Fl. | 10 | 10 | Oct-01-2015 | Oct-14-2015 |
| 03-8070 | Wall Penetration Treatment / Label - 3rd Fl. | 10 | 10 | Oct-29-2015 | Nov-11-2015 |
| 03-8010 | Low Voltage Wiring - 3rd Fl. | 10 | 10 | Nov-05-2015 | Nov-18-2015 |
| 03-8100 | Above Celing QC - 3rd Fl. | 5 | 5 | Nov-12-2015 | Nov-18-2015 |
| 03-8110 | Fire Wall Inspections - 3rd Fl. | 5 | 5 | Nov-19-2015 | Nov-25-2015 |
| 03-8120 | Above Ceiling Pre-Grid Inpections - 3rd Fl. | 5 | 5 | Nov-30-2015 | Dec-04-2015 |
| **Below Celing** | | 103 | 103 | Nov-03-2015 | Mar-30-2016 |
| 03-9500 | Wall Insulation - 3rd Fl. | 5 | 5 | Nov-03-2015 | Nov-09-2015 |
| 03-9510 | Hang & Finish Walls - 3rd Fl. | 15 | 15 | Nov-06-2015 | Nov-30-2015 |
| 03-9520 | Hang & Finish Lids / Soffits - 3rd Fl. | 15 | 15 | Nov-13-2015 | Dec-07-2015 |
| 03-9530 | Prime Paint - 3rd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 03-9550 | Band Paint - 3rd Fl. | 10 | 10 | Dec-01-2015 | Dec-14-2015 |
| 03-9570 | Celing Grid - 3rd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 03-9540 | Point-up Drywall - 3rd Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 03-9580 | Specialty Ceiling Grid - 3rd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 03-9590 | Ceiling Grid MEP Trim - 3rd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 03-9610 | Storefronts & Glazing - 3rd Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 |
| 03-9560 | First Pass Finish Paint - 3rd Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 03-9700 | Final Above Ceiling Inspections - 3rd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 03-9630 | Guard/Handrail Systems - 3rd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 03-9650 | Misc. Casework / Millwork - 3rd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 03-9620 | Misc. Specialties & Accessories - 3rd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 03-9640 | Wall Devices & Trim - 3rd Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 03-9710 | Lay Ceiling Tile / Specialty Clng Panels - 3rd Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 03-9660 | Doors & Hardware - 3rd Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 03-9680 | Rough Clean - 3rd Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 03-9600 | Test & Balance Prelim - 3rd Fl. | 30 | 30 | Jan-21-2016 | Mar-02-2016 |
| 03-9670 | Window Treatments - 3rd Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 03-9690 | Sub Self-Punch - 3rd Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 03-9740 | Signage - 3rd Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 03-9720 | Resilient Flooring - Rooms - 3rd Fl. | 10 | 10 | Feb-18-2016 | Mar-02-2016 |
| 03-9750 | Commissioning - 3rd Fl. | 5 | 5 | Feb-25-2016 | Mar-02-2016 |
| 03-9730 | Resilient  Flooring - Corridors - 3rd Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 03-9760 | Ready for Inspections - 3rd Fl. | 0 | 0 | | Mar-09-2016 |
| 03-9770 | Final Paint - 3rd Fl. | 5 | 5 | Mar-10-2016 | Mar-16-2016 |
| 03-9999 | Punch Non-Labs for S/C - 3rd Fl. | 5 | 5 | Mar-17-2016 | Mar-23-2016 |
| 03-9780 | Final Cleaning - 3rd Fl. | 5 | 5 | Mar-24-2016 | Mar-30-2016 |
| 03-9790 | Floor / Area Complete - 3rd Fl. | 0 | 0 | | Mar-30-2016 |
| **Fourth Floor** | | 187 | 187 | Jul-21-2015 | Apr-13-2016 |
| **Layout & Priority Wall Framing** | | 17 | 17 | Jul-21-2015 | Aug-12-2015 |
| 04-1000 | Survey Layout - 4th Fl. | 7 | 7 | Jul-21-2015 | Jul-29-2015 |
| 04-1010 | Perimeter Wall Framing - 4th Fl. | 10 | 10 | Jul-30-2015 | Aug-12-2015 |

Remaining Level of Effort — Actual Work — Critical Remaining Work
Actual Level of Effort — Remaining Work — Milestone

**SKANSKA**

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | Classic WBS Layout - For Issuance | | | Data Date = Mar-02-2015 |
|---|---|---|---|---|---|---|
| | | | | | | Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 04-1020 | Priority Wall Framing / H&F High Rock - 4th Fl. | 10 | 10 | Jul-30-2015 | Aug-12-2015 |
| 04-1030 | Above Ceiling Support Systems - 4th Fl. | 10 | 10 | Jul-30-2015 | Aug-12-2015 |
| 04-1040 | Snorkle Support Systems - 4th Fl. | 10 | 10 | Jul-30-2015 | Aug-12-2015 |
| O/H Rough-In | | 69 | 69 | Jul-30-2015 | Nov-04-2015 |
| O/H Mechanical Ductwork | | 41 | 41 | Aug-06-2015 | Oct-02-2015 |
| 04-1100 | O/H MEPF Mains - Ductwork - 4th Fl. | 18 | 18 | Aug-06-2015 | Aug-31-2015 |
| 04-1105 | O/H MEPF Branch - Ductwork - 4th Fl. | 18 | 18 | Sep-01-2015 | Sep-25-2015 |
| 04-1110 | O/H MEPF Equipment - Ductwork - 4th Fl. | 10 | 10 | Sep-14-2015 | Sep-25-2015 |
| 04-1115 | O/H MEPF Pressure Tests - Ductwork - 4th Fl. | 5 | 5 | Sep-28-2015 | Oct-02-2015 |
| O/H Mechanical Piping | | 51 | 51 | Jul-30-2015 | Oct-09-2015 |
| 04-1200 | O/H MEPF Mains - Mechanical Piping - 4th Fl. | 18 | 18 | Jul-30-2015 | Aug-24-2015 |
| 04-1205 | O/H MEPF Branch - Mechanical Piping - 4th Fl. | 18 | 18 | Aug-25-2015 | Sep-18-2015 |
| 04-1210 | O/H MEPF Equipment - Mechanical Piping - 4th Fl. | 10 | 10 | Sep-21-2015 | Oct-02-2015 |
| 04-1215 | O/H MEPF Pressure Tests - Mechanical Piping - 4th Fl. | 5 | 5 | Oct-05-2015 | Oct-09-2015 |
| O/H Plumbing | | 51 | 51 | Jul-30-2015 | Oct-09-2015 |
| 04-1300 | O/H MEPF Mains - Plumbing - 4th Fl. | 18 | 18 | Jul-30-2015 | Aug-24-2015 |
| 04-1305 | O/H MEPF Branch - Plumbing - 4th Fl. | 18 | 18 | Aug-25-2015 | Sep-18-2015 |
| 04-1310 | O/H MEPF Equipment - Plumbing - 4th Fl. | 10 | 10 | Sep-21-2015 | Oct-02-2015 |
| 04-1315 | O/H MEPF Pressure Tests - Plumbing - 4th Fl. | 5 | 5 | Oct-05-2015 | Oct-09-2015 |
| O/H Electrical | | 46 | 46 | Jul-30-2015 | Oct-02-2015 |
| 04-1400 | O/H MEPF Mains - Electrical - 4th Fl. | 18 | 18 | Jul-30-2015 | Aug-24-2015 |
| 04-1405 | O/H MEPF Branch - Electrical - 4th Fl. | 18 | 18 | Aug-25-2015 | Sep-18-2015 |
| 04-1410 | O/H MEPF Equipment - Electrical - 4th Fl. | 10 | 10 | Sep-21-2015 | Oct-02-2015 |
| O/H Fire Protection | | 51 | 51 | Jul-30-2015 | Oct-09-2015 |
| 04-1500 | O/H MEPF Mains - Fire Protection Piping - 4th Fl. | 18 | 18 | Jul-30-2015 | Aug-24-2015 |
| 04-1505 | O/H MEPF Branch - Fire Protection Piping - 4th Fl. | 18 | 18 | Aug-25-2015 | Sep-18-2015 |
| 04-1510 | O/H MEPF Equipment - Fire Protection Piping - 4th Fl. | 10 | 10 | Sep-21-2015 | Oct-02-2015 |
| 04-1515 | O/H MEPF Pressure Tests - Fire Protection Piping - 4th Fl. | 5 | 5 | Oct-05-2015 | Oct-09-2015 |
| O/H Low Voltage | | 18 | 18 | Oct-12-2015 | Nov-04-2015 |
| 04-1600 | O/H Low Voltage R/I - 4th Fl. | 18 | 18 | Oct-12-2015 | Nov-04-2015 |
| Interior Wall Framing & Rough-In's | | 51 | 51 | Aug-25-2015 | Nov-04-2015 |
| 04-2010 | In-Wall Plumbing R/I - Carriages & Assemblies - 4th Fl. | 10 | 10 | Aug-25-2015 | Sep-08-2015 |
| 04-2000 | Interior Wall Framing - 4th Fl. | 10 | 10 | Sep-01-2015 | Sep-15-2015 |
| 04-2020 | In-Wall Electrical R/I - 4th Fl. | 20 | 20 | Sep-16-2015 | Oct-13-2015 |
| 04-2030 | In-Wall Plumbing R/I - Piping - 4th Fl. | 20 | 20 | Sep-16-2015 | Oct-13-2015 |
| 04-2040 | In-Wall Low Voltage R/I - 4th Fl. | 18 | 18 | Oct-12-2015 | Nov-04-2015 |
| In-Wall Rough-In Inspections | | 21 | 21 | Oct-14-2015 | Nov-11-2015 |
| 04-IW-PLUM | QC / In-Wall Plumbing Inspection - Start Production Drywall - 4th Fl. | 5 | 5 | Oct-14-2015 | Oct-20-2015 |
| 04-IW-ELEC | QC / In-Wall Electrical Inspection - Start Production Drywall - 4th Fl. | 5 | 5 | Oct-14-2015 | Oct-20-2015 |
| 04-IW-LOWV | QC / In-Wall Other Inspection - Start Production Drywall - 4th Fl. | 5 | 5 | Nov-05-2015 | Nov-11-2015 |
| Ceiling Framing | | 43 | 43 | Sep-16-2015 | Nov-13-2015 |
| 04-3010 | Hard Ceiling Framing - 4th Fl. | 5 | 5 | Sep-16-2015 | Sep-22-2015 |
| 04-3020 | MEPF Ceiling R/I - 4th Fl. | 10 | 10 | Sep-23-2015 | Oct-06-2015 |

Legend:
- ── Remaining Level of Effort
- ── Actual Level of Effort
- ▬ Actual Work
- ▭ Remaining Work
- ── Critical Remaining Work
- ◆ Milestone

SKANSKA

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | | | | Classic WBS Layout - For Issuance | | Data Date = Mar-02-2015 | Run Date =Mar-03-2015 14:35 |
|---|---|---|---|---|---|---|---|---|

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| 04-3000 | Above Ceiling Drywall - H&F - 4th Fl. | 10 | 10 | Oct-26-2015 | Nov-06-2015 | | Oct-26-2015 ▣ Nov-06-2015 | |
| 04-3030 | MEPF Ceiling R/I QC & Inspections - 4th Fl. | 5 | 5 | Nov-09-2015 | Nov-13-2015 | | Nov-09-2015 ▣ Nov-13-2015 | |
| **Finishes** | | 170 | 170 | Aug-13-2015 | Apr-13-2016 | | Aug-13-2015 ▬▬▬▬▬ ▼ Apr-13-2016, Finishe | |
| **Labs** | | 170 | 170 | Aug-13-2015 | Apr-13-2016 | | Aug-13-2015 ▬▬▬▬▬ ▼ Apr-13-2016, Labs | |
| **Above Ceiling** | | 90 | 90 | Aug-13-2015 | Dec-21-2015 | | Aug-13-2015 ▬▬▬▬ Dec-21-2015, Above Ceiling | |
| 04-6090 | Final Above Ceiling Eqpt & Supports - 4th Fl. | 10 | 10 | Aug-13-2015 | Aug-26-2015 | | Aug-13-2015 ▣ Aug-26-2015 | |
| 04-6020 | Install Snorkles - 4th Fl. | 10 | 10 | Sep-28-2015 | Oct-09-2015 | | Sep-28-2015 ▣ Oct-09-2015 | |
| 04-6000 | O/H MEP Eqpt & Pipe Insulation - 4th Fl. | 10 | 10 | Oct-12-2015 | Oct-23-2015 | | Oct-12-2015 ▣ Oct-23-2015 | |
| 04-6070 | Wall Penetration Treatment / Label - 4th Fl. | 10 | 10 | Nov-09-2015 | Nov-20-2015 | | Nov-09-2015 ▣ Nov-20-2015 | |
| 04-6080 | Projection Screens - 4th Fl. | 10 | 10 | Nov-09-2015 | Nov-20-2015 | | Nov-09-2015 ▣ Nov-20-2015 | |
| 04-6010 | Low Voltage Wiring - 4th Fl. | 10 | 10 | Nov-16-2015 | Dec-01-2015 | | Nov-16-2015 ▣ Dec-01-2015 | |
| 04-6100 | Above Ceiing QC - 4th Fl. | 5 | 5 | Nov-23-2015 | Dec-01-2015 | | Nov-23-2015 ▣ Dec-01-2015 | |
| 04-6110 | Fire Wall Inspections - 4th Fl. | 5 | 5 | Dec-02-2015 | Dec-08-2015 | | Dec-02-2015 ▣ Dec-08-2015 | |
| 04-6130 | Fume Hood Branch Connections - 4th Fl. | 10 | 10 | Dec-08-2015 | Dec-21-2015 | | Dec-08-2015 ▣ Dec-21-2015 | |
| 04-6120 | Above Ceiling Pre-Grid Inpections - 4th Fl. | 5 | 5 | Dec-09-2015 | Dec-15-2015 | | Dec-09-2015 ▣ Dec-15-2015 | |
| **Below Ceiling** | | 106 | 106 | Nov-12-2015 | Apr-13-2016 | | Nov-12-2015 ▬▬▬▬▬ ▼ Apr-13-2016, Below C | |
| 04-7000 | Wall Insulation - 4th Fl | 5 | 5 | Nov-12-2015 | Nov-18-2015 | | Nov-12-2015 ▣ Nov-18-2015 | |
| 04-7030 | Install Fume Hoods w/Bases - 4th Fl. | 10 | 10 | Nov-20-2015 | Dec-07-2015 | | Nov-20-2015 ▣ Dec-07-2015 | |
| 04-7010 | Hang & Finish Walls - 4th Fl. | 15 | 15 | Nov-20-2015 | Dec-14-2015 | | Nov-20-2015 ▣ Dec-14-2015 | |
| 04-7020 | Hang & Finish Lids / Soffits - 4th Fl. | 15 | 15 | Dec-01-2015 | Dec-21-2015 | | Dec-01-2015 ▣ Dec-21-2015 | |
| 04-7060 | Prime Paint - 4th Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 | | Dec-15-2015 ▣ Dec-29-2015 | |
| 04-7080 | Band Paint - 4th Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 | | Dec-15-2015 ▣ Dec-29-2015 | |
| 04-7100 | Trench Covers - 4th Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 | | Dec-15-2015 ▣ Dec-29-2015 | |
| 04-7040 | Install Snorkles - 4th Fl. | 10 | 10 | Dec-22-2015 | Jan-06-2016 | | Dec-22-2015 ▣ Jan-06-2016 | |
| 04-7070 | Point-up Drywall - 4th Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 | | Dec-30-2015 ▣ Jan-13-2016 | |
| 04-7110 | Ceiling Grid - 4th Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 | | Dec-30-2015 ▣ Jan-13-2016 | |
| 04-7230 | Storefronts & Glazing - 4th Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 | | Dec-30-2015 ▣ Jan-13-2016 | |
| 04-7120 | Specialty Ceiling Grid - 4th Fl. | 5 | 5 | Jan-14-2016 | Jan-20-2016 | | Jan-14-2016 ▣ Jan-20-2016 | |
| 04-7090 | First Pass Finish Paint - 4th Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 | | Jan-14-2016 ▣ Jan-27-2016 | |
| 04-7130 | Ceiling Grid MEP Trim - 4th Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 | | Jan-14-2016 ▣ Jan-27-2016 | |
| 04-7150 | VCT Flooring - Labs - 4th Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 | | Jan-28-2016 ▣ Feb-10-2016 | |
| 04-7260 | Final Above Ceiling Inspections - 4th Fl. | 10 | 10 | Jan-28-2016 | Feb-10-2016 | | Jan-28-2016 ▣ Feb-10-2016 | |
| 04-7160 | Lab Casework - Base Cabs - 4th Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 | | Feb-11-2016 ▣ Feb-24-2016 | |
| 04-7240 | Misc. Specialties & Accessories - 4th Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 | | Feb-11-2016 ▣ Feb-24-2016 | |
| 04-7250 | Wall Devices & Trim - 4th Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 | | Feb-11-2016 ▣ Feb-24-2016 | |
| 04-7270 | Lay Ceiling Tile / Specialty Clng Panels - 4th Fl. | 10 | 10 | Feb-11-2016 | Feb-24-2016 | | Feb-11-2016 ▣ Feb-24-2016 | |
| 04-7140 | Test & Balance Prelim - 4th Fl. | 30 | 30 | Feb-11-2016 | Mar-23-2016 | | Feb-11-2016 ▬▬▬ Mar-23-2016 | |
| 04-7170 | Lab Casework - Eqpt & Showers - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 | | Feb-25-2016 ▣ Mar-09-2016 | |
| 04-7180 | Lab Casework - Shelving & Storage Cabs - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 | | Feb-25-2016 ▣ Mar-09-2016 | |
| 04-7190 | Lab Casework - MEPF R/I to Casework - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 | | Feb-25-2016 ▣ Mar-09-2016 | |
| 04-7200 | Lab Casework - Epoxy Tops - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 | | Feb-25-2016 ▣ Mar-09-2016 | |
| 04-7280 | Doors & Hardware - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 | | Feb-25-2016 ▣ Mar-09-2016 | |

| Legend | | | |
|---|---|---|---|
| ▬ Remaining Level of Effort | ▬ Actual Work | ▬ Critical Remaining Work | |
| ▬ Actual Level of Effort | ▭ Remaining Work | ◆ Milestone | |

**SKANSKA**

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 04-7290 | Roller Shades - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 04-7330 | Signage - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 04-7335 | Install Tech Eqpt. - 4th Fl. | 10 | 10 | Feb-25-2016 | Mar-09-2016 |
| 04-7210 | Lab Casework - MEPF Fixtures @ Casework - 4th Fl. | 10 | 10 | Mar-10-2016 | Mar-23-2016 |
| 04-7220 | Lab Casework - Wire Mold - 4th Fl. | 10 | 10 | Mar-10-2016 | Mar-23-2016 |
| 04-7300 | Rough Clean - 4th Fl. | 10 | 10 | Mar-10-2016 | Mar-23-2016 |
| 04-7310 | Sub Self-Punch - 4th Fl. | 10 | 10 | Mar-10-2016 | Mar-23-2016 |
| 04-7340 | Ready for Inspections - 4th Fl. | 0 | 0 | | Mar-23-2016 |
| 04-7320 | Commissioning - 4th Fl. | 5 | 5 | Mar-24-2016 | Mar-30-2016 |
| 04-7350 | Final Paint - 4th Fl. | 5 | 5 | Mar-24-2016 | Mar-30-2016 |
| 04-7999 | Punch Labs for S/C - 4th Fl. | 5 | 5 | Mar-31-2016 | Apr-06-2016 |
| 04-7360 | Final Cleaning - 4th Fl. | 5 | 5 | Apr-07-2016 | Apr-13-2016 |
| 04-7370 | Floor / Area Complete - 4th Fl. | 0 | 0 | | Apr-13-2016 |
| **Non-Labs** | | 129 | 129 | Oct-12-2015 | Apr-13-2016 |
| **Above Ceiling** | | 45 | 45 | Oct-12-2015 | Dec-15-2015 |
| 04-8000 | O/H MEP Eqpt & Pipe Insulation - 4th Fl. | 10 | 10 | Oct-12-2015 | Oct-23-2015 |
| 04-8070 | Wall Penetration Treatment / Label - 4th Fl. | 10 | 10 | Nov-09-2015 | Nov-20-2015 |
| 04-8010 | Low Voltage Wiring - 4th Fl. | 10 | 10 | Nov-16-2015 | Dec-01-2015 |
| 04-8100 | Above Ceiling QC - 4th Fl. | 5 | 5 | Nov-23-2015 | Dec-01-2015 |
| 04-8110 | Fire Wall Inspections - 4th Fl. | 5 | 5 | Dec-02-2015 | Dec-08-2015 |
| 04-8120 | Above Ceiling Pre-Grid Inspections - 4th Fl. | 5 | 5 | Dec-09-2015 | Dec-15-2015 |
| **Below Ceiling** | | 106 | 106 | Nov-12-2015 | Apr-13-2016 |
| 04-9500 | Wall Insulation - 4th Fl | 5 | 5 | Nov-12-2015 | Nov-18-2015 |
| 04-9510 | Hang & Finish Walls - 4th Fl. | 15 | 15 | Nov-20-2015 | Dec-14-2015 |
| 04-9520 | Hang & Finish Lids / Soffits - 4th Fl. | 15 | 15 | Dec-01-2015 | Dec-21-2015 |
| 04-9530 | Prime Paint - 4th Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 04-9550 | Band Paint - 4th Fl. | 10 | 10 | Dec-15-2015 | Dec-29-2015 |
| 04-9570 | Ceiling Grid - 4th Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 04-9540 | Point-up Drywall - 4th Fl. | 10 | 10 | Dec-30-2015 | Jan-13-2016 |
| 04-9580 | Specialty Ceiling Grid - 4th Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 04-9590 | Ceiling Grid MEP Trim - 4th Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 04-9610 | Storefronts & Glazing - 4th Fl. | 10 | 10 | Jan-07-2016 | Jan-20-2016 |
| 04-9560 | First Pass Finish Paint - 4th Fl. | 10 | 10 | Jan-14-2016 | Jan-27-2016 |
| 04-9700 | Final Above Ceiling Inspections - 4th Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 04-9630 | Guard/Handrail Systems - 4th Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 04-9650 | Misc. Casework / Millwork - 4th Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 04-9620 | Misc. Specialties & Accessories - 4th Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 04-9640 | Wall Devices & Trim - 4th Fl. | 10 | 10 | Jan-21-2016 | Feb-03-2016 |
| 04-9710 | Lay Ceiling Tile / Specialty Clng Panels - 4th Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 04-9660 | Doors & Hardware - 4th Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 04-9680 | Rough Clean - 4th Fl. | 10 | 10 | Feb-04-2016 | Feb-17-2016 |
| 04-9600 | Test & Balance Prelim - 4th Fl. | 30 | 30 | Feb-04-2016 | Mar-16-2016 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work ◆
- Critical Remaining Work
- Milestone ◆

SKANSKA

**UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15**

Classic WBS Layout - For Issuance

Data Date = Mar-02-2015
Run Date =Mar-03-2015 14:35

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| 04-9670 | Window Treatments - 4th Fl. | 10 | 10 | Feb-18-2016 | Mar-02-2016 |
| 04-9690 | Sub Self-Punch - 4th Fl. | 10 | 10 | Feb-18-2016 | Mar-02-2016 |
| 04-9740 | Signage - 4th Fl. | 10 | 10 | Feb-18-2016 | Mar-02-2016 |
| 04-9720 | Resilient Flooring - Rooms - 4th Fl. | 10 | 10 | Mar-03-2016 | Mar-16-2016 |
| 04-9750 | Commissioning - 4th Fl. | 5 | 5 | Mar-10-2016 | Mar-16-2016 |
| 04-9730 | Resilient  Flooring - Corridors - 4th Fl. | 10 | 10 | Mar-10-2016 | Mar-23-2016 |
| 04-9760 | Ready for Inspections - 4th Fl. | 0 | 0 | | Mar-23-2016 |
| 04-9770 | Final Paint - 4th Fl. | 5 | 5 | Mar-24-2016 | Mar-30-2016 |
| 04-9999 | Punch Non-Labs for S/C - 4th Fl. | 5 | 5 | Mar-31-2016 | Apr-06-2016 |
| 04-9780 | Final Cleaning - 4th Fl. | 5 | 5 | Apr-07-2016 | Apr-13-2016 |
| 04-9790 | Floor / Area Complete - 4th Fl. | 0 | 0 | | Apr-13-2016 |
| **ATRIUM** | | **205** | **205** | **Jun-29-2015** | **Apr-18-2016** |
| AT-1000 | Atrium Balcony Steel | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| AT-1010 | Atrium Balcony Metal Decking | 5 | 5 | Jul-07-2015 | Jul-13-2015 |
| AT-1020 | Atrium Balcony Metal Decking - MEP R/I & Inspect | 5 | 5 | Jul-14-2015 | Jul-20-2015 |
| AT-1030 | F/R/P Atrium Deck | 5 | 5 | Jul-21-2015 | Jul-27-2015 |
| AT-1040 | Atrium Grid / Steel Supports | 5 | 5 | Jul-28-2015 | Aug-03-2015 |
| AT-1050 | Exterior Wall Framing @ Atrium | 10 | 10 | Aug-04-2015 | Aug-17-2015 |
| AT-1060 | Curtain Wall @ Atrium | 15 | 15 | Aug-18-2015 | Sep-08-2015 |
| AT-1070 | Interior Brick & Stone @ Atrium | 20 | 20 | Sep-09-2015 | Oct-06-2015 |
| AT-1080 | Interior Brick & Stone Cleaning @ Atrium | 5 | 5 | Oct-07-2015 | Oct-13-2015 |
| AT-1090 | F/R/P Atrium Stair "C" | 20 | 20 | Oct-14-2015 | Nov-10-2015 |
| AT-1100 | F/R/P Atrium Stair "D" | 20 | 20 | Nov-11-2015 | Dec-10-2015 |
| AT-1110 | Atrium Build-Out (From MEP O/H - Punch) | 90 | 90 | Dec-11-2015 | Apr-18-2016 |
| **SITE IMPROVEMENTS** | | **207** | **207** | **Jun-12-2015** | **Apr-05-2016** |
| SI-1100 | Build-Out Generator Yard | 30 | 30 | Jun-12-2015 | Jul-24-2015 |
| SI-1000 | Demobilize Crane # 2 | 5 | 5 | Jun-29-2015 | Jul-06-2015 |
| SI-1110 | Build-Out Loading Area Yard | 30 | 30 | Jun-29-2015 | Aug-10-2015 |
| SI-1010 | Demolish Crane # 2 Bases | 5 | 5 | Jul-07-2015 | Jul-13-2015 |
| SI-1020 | Demolish Site Staging / Scaffold & Eqpt. | 5 | 5 | Jul-14-2015 | Jul-20-2015 |
| SI-1120 | Build-Out North Landscape Wall | 15 | 15 | Aug-11-2015 | Aug-31-2015 |
| SI-1030 | Exterior Bollards & Pedestals | 5 | 5 | Aug-13-2015 | Aug-19-2015 |
| SI-1005 | Demobilize Crane # 1 | 5 | 5 | Dec-07-2015 | Dec-11-2015 |
| SI-1040 | Curbs & Walks | 20 | 20 | Dec-07-2015 | Jan-05-2016 |
| SI-1090 | Demolish Crane # 1 Bases | 5 | 5 | Dec-14-2015 | Dec-18-2015 |
| SI-1050 | Architectural Site Furnishings | 10 | 10 | Jan-06-2016 | Jan-19-2016 |
| SI-1060 | Site Pavers | 20 | 20 | Jan-20-2016 | Feb-16-2016 |
| SI-1070 | Remove Construction Fence | 15 | 15 | Feb-17-2016 | Mar-08-2016 |
| SI-1080 | Irrigation & Landscaping | 20 | 20 | Mar-09-2016 | Apr-05-2016 |
| **COMMISSIONING & COMPLETION ACTIVITIES** | | **40** | **40** | **Feb-24-2016** | **Apr-19-2016** |
| 7000 | Final Commissioning | 40 | 40 | Feb-24-2016 | Apr-19-2016 |

| | |
|---|---|
| ▬ Remaining Level of Effort | ▬ Actual Work |
| ▬ Actual Level of Effort | ▬ Remaining Work |
| ▬ Critical Remaining Work | ◆ Milestone |

**SKANSKA**

| | UF CHEMISTRY / CHEMICAL BIOLOGY BUILDING - BASELINE SCHEDULE - DATA DATE = 02-MAR-15 | Classic WBS Layout - For Issuance | Data Date = Mar-02-2015 Run Date =Mar-03-2015 14:35 |

| Activity ID | Activity Name | Original Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| EL-FINAL | Final State Elevator Inspections | 5 | 5 | Feb-25-2016 | Mar-02-2016 |

Gantt timeline: Feb-25-2016 — Mar-02-2016

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

Page 34 of 34

SKANSKA

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SKANSKA STANDARD SUBCONTRACT TERMS AND CONDITIONS

### TABLE OF CONTENTS

Article 1 - DEFINITIONS, CONTRACT DOCUMENTS AND RELATED MATTERS PERTAINING TO SUBCONTRACTOR'S WORK .................................................................... 3
1.1     Definitions. ................................................. 3
1.2     Safety. ......................................................... 3
1.3     Contract Documents. ................................. 3
1.4     Contract Documents are Complementary. ............ 4
1.5     Obligation to Study the Contract Documents. ...... 4
1.6     Rights and Remedies under the Owner Contract. .. 4
1.7     The Architect. ............................................. 4

Article 2 - SCOPE OF SUBCONTRACTOR'S WORK .............. 4
2.1     All Items Required to Perform the Work are Included. ...................................................... 4
2.2     Project Investigation. ................................. 4
2.3     Existing Conditions. ................................... 4
2.4     Duty to Coordinate. ................................... 4
2.5     Protection of Work. ................................... 5
2.6     Quality and Protection of Equipment, Materials and Supplies. ............................................... 5
2.7     Protection of On Site Property. ................... 5
2.8     Protection of Other Property. ..................... 5
2.9     Housekeeping. ............................................ 5
2.10    Clean-Up Crews. ....................................... 5
2.11    Temporary Structures and Facilities. .......... 6
2.12    Layout and Field Measurements. ................ 6
2.13    Cutting, Fitting and Patching. ..................... 6
2.14    Use of Contractor's Equipment. ................. 6
2.15    Meetings. .................................................. 6
2.16    Daily Reports. ........................................... 6
2.17    Testing. ..................................................... 6
2.18    Equipment, Material and Supply Deliveries. ...... 6
2.19    Parking and Storage. ................................. 6
2.20    Royalties and License Fees. ....................... 6
2.21    Sub-Contractors. ....................................... 6
2.22    Monthly Status Reports. ............................ 6
2.23    Prohibition on Certain Work and Dealings. ....... 7

Article 3 - TIME FOR PERFORMANCE OF THE WORK ........ 7
3.1     Time for Performance. ............................... 7
3.2     The Project Schedule. ................................ 7
3.3     Work Plan. ................................................ 7

Article 4 - PROGRESS PAYMENTS ................................... 7
4.1     Schedule of Values. ................................... 7
4.2     Progress Payments. ................................... 7
4.2.1   Estimates for Payment. ............................. 7
4.2.2   Basis for Calculating Payment. .................. 7
4.2.3   Payment for Stored Materials. ................... 7
4.3     Joint Checks. ............................................ 8

4.4     Subcontractor's Use of Payments. ............. 8
4.5     Estimates For Payment and Partial Waivers and Release of Liens and Claims Required. ............. 8
4.6     Payment is not a Release by the Contractor. ...... 8
4.7     Payment Withholding. ............................... 8

Article 5 - FINAL PAYMENT ........................................... 8
5.1     Final Payment. ......................................... 8
5.2     Effect of Final Payment. ............................ 8

Article 6 - SUBMITTALS AND SUBSTITUTIONS ................. 9
6.1     Submittal Requirements. ........................... 9
6.2     Submittal Progress Reports. ...................... 9
6.3     Work Progress Documents and As-Builts. ......... 9
6.4     Revisions to Submittals. ............................ 9
6.5     Professional Certifications. ....................... 9
6.6     Coordination Drawings. ............................ 9
6.7     Contractor's Review of Submittals. ............ 9
6.8     Substitutions. ............................................ 9
6.9     Ownership and Use of Documents ............. 9

Article 7 - LABOR AND SUPERINTENDENCE ..................... 9
7.1     Labor. ...................................................... 9
7.2     Supervision. ............................................. 10
7.3     Technical Services. ................................... 10
7.4     Compliance with Owner Requirements for Supervision. .............................................. 10
7.5     Subcontractor Labor Relations. ................. 10
7.6     Removal of Workmen. ............................... 10

Article 8 - DETERMINATION AND INSPECTION OF THE WORK ... 10
8.1     Determinations of Compliance with Contract Documents. .............................................. 10
8.2     Access for Inspection. ............................... 10
8.3     Rejection of Work. ................................... 10
8.4     Compliance with Additional Architectural Instructions. .............................................. 10
8.5     Failure of Sources of Supply. ..................... 10

Article 9 - PROGRESS AND COMPLETION ......................... 10
9.1     Commencement of Work. ........................... 10
9.2     Compliance with Owner's Scheduling Requirements. ............................................ 10
9.3     Recovery Plan. .......................................... 11
9.4     Substantial and Final Completion of Work. ...... 11
9.5     Punchlist. .................................................. 11
9.6     Use and Acceptance of Portions of Work Prior to Final Completion of Work. ......................... 11

Article 10 - CHANGES AND IMPACTS ............................... 11
10.1    Changes in the Work. ................................ 11

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

10.2     Change Order Requests. ....................................11
10.3     Requirements for Pricing Changes. ....................11
10.4      Change Order Directive. ..................................12
10.5     Impacts to the Work. ........................................12
10.6     Requirements for all Impact Claims. ................12
10.7     Contractor's Receipt of Claims Does Not Create a Presumption of Validity. ....................................12
10.8     Allowable Mark-Ups. ........................................12
10.9     Required Documentation in Support of Change Orders or Claims. ..........................................12

Article 11 - DELAYS ..............................................12
11.1     Liability for Delays. ..........................................12
11.2     Liquidated Damages. ........................................12
11.3     Work Delays and Interferences. .........................13
11.4     Force Majeure. ..................................................13

Article 12 - TERMINATION ....................................13
12.1     Termination for Default. ...................................13
12.2     Execution of Remedy Under Subcontractor's Surety Performance Bond or Guarantee. ...........13
12.3     Cessation of Payments Upon Termination. ........13
12.4     Termination for Convenience. ...........................13

Article 13 - DISPUTES ..........................................14
13.1     Contractor to Make Initial Decision on Disputes. 14
13.2     Continued Performance Required. ....................14
13.3     Appeals Under the Contract Documents. ..........14
13.4     Method of Dispute Resolution. .........................14
13.5     Governing Law, Jurisdiction and Venue. ...........14
13.6     Joinder in Related Proceedings. .......................14

Article 14 - REGULATORY COMPLIANCE .............14
14.1     Compliance with Applicable Law Generally. .....14
14.2     Safety Compliance. ...........................................14
14.3     Environmental Compliance. ..............................15
14.4     Tax Compliance. ...............................................15
14.5     Affirmative Action and Non-Discrimination. ......15
14.6     Harassment and Offensive Behavior. .................15
14.7     Skanska Code of Conduct. ................................15

Article 15 - BONDING AND SUBCONTRACT PERFORMANCE INSURANCE ..............................15
15.1     Payment and Performance Bonds. .....................15
15.2     Subcontract Performance Insurance. ................15
15.3     Pre-Qualification for Subguard Required. ........15
15.4     Failure to Meet Subguard Requirements. ..........15
15.5     Work Not to Commence Until Bonds Issued or Subguard Enrollment Completed. .....................15

Article 16 - ENCUMBRANCES ...............................16
16.1     No Liens or Encumbrances. ..............................16
16.2     Subcontractor and Sub-subcontractor Information. .......................................................16
16.3     Assignment and Delegation Not Permitted Without Prior Written Consent. .........................16

Article 17 - WARRANTIES AND GUARANTEES ........16

17.1     Work Warranties and Guarantees and Correction of Defects or Deficiencies. ...............................16
17.2     No Period of Limitation Established. .................16
17.3     Sub-subcontractor Warranties and Guarantees. 16
17.4     Backcharges. ....................................................16
17.5     Costs and Damages Resulting From Defects or Deficiencies in the Work. ................................17

Article 18 - INDEMNITY AND INSURANCE ..............17
18.1     Indemnity. .........................................................17
18.2     Insurance. .........................................................17
18.3     Environmental Insurance. .................................17

Article 19 - MISCELLANEOUS REQUIREMENTS AND SPECIAL PROVISIONS ....................................17
19.1     Headings for Convenience Only. .......................17
19.2     Calculation of Time Periods. ............................17
19.3     Audit and Record Retention. .............................17
19.4     Confidentiality. .................................................17
19.5     Contractor's Remedies Are Not Exclusive. .........18
19.6     Damages Limitation. .........................................18
19.7     Title to the Work. ..............................................18
19.8     Reformation of Unenforceable Provisions. ........18
19.9     Survival. ............................................................18
19.10    Notices. .............................................................18
19.11    Subcontract Document. ....................................18
19.12    Additional Documents to Subcontract. ..............18
19.13    Frivolous Claims. ..............................................18

Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

### SUBCONTRACT TERMS AND CONDITIONS

#### Article 1 - DEFINITIONS, CONTRACT DOCUMENTS AND RELATED MATTERS PERTAINING TO SUBCONTRACTOR'S WORK

*1.1*   *Definitions.*
The following definitions apply internally to these terms and conditions and the Subcontract Agreement:

(a)   "Applicable Law" all laws, treaties, ordinances, judgments, decrees, injunctions, writs and orders of any court or governmental agency or authority, and rules, regulations, codes, orders, interpretations of any federal, state, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, or court having jurisdiction over the Project or any activity conducted at or in connection with the Project or in connection with the Subcontract.

(b)   "Architect" means the architect employed by the Owner in connection with the Project as identified in the Subcontract Agreement.

(c)   "Certificate of Final Completion" means the certificate indicating that the Work other than potential warranty obligations has been completed as required by the Owner Contract.

(d)   "Certificate of Substantial Completion" means the certificate indicating that the Work has been substantially completed as required by the Owner Contract.

(e)   "Change" means an addition, reduction, acceleration, suspension or other modification in the scope or time for the performance of Subcontractor's Work.

(f)   "Change Order" has the meaning set forth in Section 10.1.

(g)   "Contract Documents" has the meaning set forth in Section 1.3.

(h)   "Contractor" means the entity identified as such in the Subcontract Agreement. It is understood that Skanska USA Building Inc. may also be referred to in the Owner Contract as the "Construction Manager", "Design-Builder", etc. In all such instances, the term "Contractor" shall be deemed interchangeable with the terminology used in the Owner Contract to refer to Skanska USA Building Inc.

(i)   "Damages" means, individually and collectively, as applicable, any and all losses, costs, expenses, damages, injuries, claims, demands, obligations, liabilities, judgments, fines, penalties, interest and causes of action, including without limitation administrative and legal costs and reasonable attorney's fees.

(j)   "Delay Events" has the meaning set forth in Section 11.3.

(k)   "Design Professional" as used herein, means an architect, professional engineer, or other professional engaged by the Owner to provide design services to the Project.

(l)   "Effective Date" shall mean the date defined as such in the heading portion of the Subcontract Agreement.

(m)   "Indemnified Parties" means the Owner, Contractor, and their respective directors, officers, employees, parents and subsidiaries of any tier, representatives, agents, successors and assigns, and any and all representatives, agents, directors, officers, employees of any of the foregoing.

(n)   "Owner" means Contractor's customer in connection with the Project as identified in the Subcontract Agreement.

(o)   "Owner Contract" means the contract between Contractor and the Owner for the Project identified in the Subcontract Agreement, and all written amendments, change orders, modifications and supplements thereto.

(p)   "Project" means the project in connection with the parties have entered into this Subcontract as identified in the Subcontract Agreement.

(q)   "Schedule" has the meaning set forth in Section 3.2.

(r)   "Subcontract" means the agreement between Contractor and Subcontractor for the Project and is comprised of the Contract Documents.

(s)   "Subcontract Agreement" means the document entitled Subcontract Agreement and executed by Contractor and Subcontractor.

(t)   "Subcontract Amount" means the amount to be paid by Contractor to Subcontractor for Subcontractor's performance of the Work as identified in the Subcontract Agreement. The Subcontract Amount includes all federal, state, county and municipal taxes imposed by Applicable Law upon labor, services, equipment, materials, supplies or other items acquired, performed, furnished or used in connection with or arising out of the Subcontractor's Work, including, but not limited to, transportation, sales, use, gross receipts, excise, unemployment, and personal property taxes, whether payable by or levied or assessed against Contractor, Owner or Subcontractor. If Applicable Law requires any such taxes to be stated and charged separately, Subcontractor shall include a separate line item on any applications for payment or invoices indicating the amount of such taxes. The total price of all items included in Subcontractor's Work plus the amount of all taxes applicable thereto, shall not exceed the Subcontract Amount.

(u)   "Subcontract Exhibits" means the Exhibits marked in the Subcontract Agreement as applicable to the Agreement.

(v)   "Subguard" has the meaning set forth in Section 15.2.

(w)   "Subcontractor" means each vendor, supplier, materialmen, consultant, contractor or other person or entity performing a portion of the Work and/or providing equipment or services directly or indirectly in connection with the Work as defined in the Contract Documents as set forth in Section 1.3 hereunder.

(x)   "Sub-subcontractor" means each lower tier vendor, supplier, materialmen, consultant, contractor, subcontractor or other person or entity performing a portion of the Work for Subcontractor hereunder and/or providing equipment or services directly or indirectly in connection with the Work or Subcontract.

(y)   "Work" means the work to be performed by Subcontractor under the Subcontract as generally described in Section 1 of the Subcontract Agreement and more specifically set forth in Exhibit A. Subcontractor shall perform all technical, professional or other services and provide all supervision, labor, equipment, material, supplies, permits, insurance, hoisting, scaffolding, systems, tools, apparatus, transportation, shop drawings, samples and submittals, and all other items necessary to perform and complete the work required by this Subcontract.

*1.2*   *Safety.*
Subcontractor acknowledges that the safety of persons and property on and off the Project site in connection with performance of the Work is of prime importance to Contractor and Owner, and Subcontractor shall cooperate with Contractor and Owner in efforts to prevent injuries to persons and property and to comply with all applicable safety rules and regulations, including as set forth in Section 14.2, to create and maintain an injury free environment.

*1.3*   *Contract Documents.*
The Subcontract is comprised of the following "Contract Documents": the Subcontract Agreement; the Subcontract Exhibits;

**Page 3 of 18**

**Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

and, the Owner Contract, but only with respect to those obligations that are applicable (directly or indirectly) to the Work to be performed by Subcontractor under the Subcontract and Owner's rights, redress and remedies as provided in Section 1.6. Subcontractor assumes toward the Contractor and the Owner all the obligations that the Contractor assumes toward the Owner in the Owner Contract with respect to the Work to be performed by Subcontractor under the Subcontract. Notwithstanding the foregoing, the payment and dispute resolution provisions contained in the Owner Contract are specifically excluded from the Contract Documents.

### 1.4 *Contract Documents are Complementary.*

The Contract Documents are intended to be read as a whole, and any Work required by one part and not mentioned in another (e.g., item shown in drawing and not mentioned in the specifications, or mentioned in the specifications and not shown in drawing), shall be executed to the same extent as though required by all. The addition, omission or incorrect placement of a word or character in one part of the Subcontract shall not change the intent of the Subcontract as a whole, and shall not constitute the basis for a claim by the Subcontractor for an increase in the Subcontract Amount or an extension of time within which to perform and complete the Work. In the event of a conflict between one or more provisions of the Contract Documents, the provision imposing the more demanding term, condition, duty or standard of performance, or the greater limitation on the nature and type of relief or damages allowed to Subcontractor, shall control. A conflict exists in the Contract Documents when the same subject matter is addressed by two or more provisions of the Contract Documents in a manner that cannot be reconciled to give effect to all provisions. In the various parts of the Contract Documents where reference is made to applicable codes and standards, the Work shall, except as otherwise specified, conform to the latest issue of the referenced code or standard available at the time the Work is performed.

### 1.5 *Obligation to Study the Contract Documents.*

Subcontractor shall carefully study and compare the Contract Documents and notify Contractor in writing of any error, inconsistency, omission or ambiguity prior to executing any affected Work. Contractor's determination of the Subcontract requirements in view of the error, inconsistency, omission or ambiguity shall be final and Subcontractor shall perform the Work consistent with that determination, subject to dispute resolution under Section 13.4. Subcontractor shall be liable for any added costs or damage resulting from its performance of any Work involving an error, inconsistency, omission or ambiguity in the Contract Documents that has not been reported to Contractor, including any re-performance and related costs of correction and any additional costs incurred by the Contractor.

### 1.6 *Rights and Remedies under the Owner Contract.*

Contractor shall have the benefit of all rights, redress and remedies against Subcontractor that Owner has against Contractor under the Owner Contract.

### 1.7 *The Architect.*

If Owner does not engage an Architect on the Project, the parties' rights and obligations under the Subcontract shall be determined without regard to any certificates, determinations or other functions the Contract Documents anticipate the Architect will issue, make or perform. The Owner may at any time substitute the Architect employed by it in connection with the Project.

### Article 2 - SCOPE OF SUBCONTRACTOR'S WORK

### 2.1 *All Items Required to Perform the Work are Included.*

Subcontractor and its Sub-subcontractors shall strictly comply with all requirements of the Subcontract in the performance of the Work and other activities in connection with the Subcontract. Subcontractor acknowledges and agrees that it can perform and complete the Work in strict compliance with the Subcontract requirements, including Subcontract Amount and Project Schedule, and acknowledges and agrees that it can do so even though certain drawings, specifications, addenda and bulletins, may not be fully developed at the time of contracting. Subcontractor further acknowledges and agrees that the Work includes the provision of all equipment, components, systems, materials, documentation and other services and items required to perform the Work and make it complete, functional and/or operational, notwithstanding the fact that each such service or item may not be expressly mentioned in the Contract Documents.

### 2.2 *Project Investigation.*

Subcontractor represents that it has, or has had full opportunity to, examine the Project site and Contract Documents; that it has satisfied itself as to the requirements of the Work and all conditions which may affect the Work, including but not limited to the availability and costs of labor, services, equipment, materials, supplies and other items required for the Work, the observable condition of the Project site and access thereto to perform the Work and actual and anticipated local weather conditions; that the Subcontract Amount and Schedule have been determined with due regard for all such requirements and conditions which do or may affect the Work; and, that its entry into the Subcontract has not been induced either wholly or in part by any promises, representations or statements by or on behalf of Contractor, Owner and/or the Architect, other than those set forth in the Subcontract. Subcontractor acknowledges and accepts the risk of mistake or error with respect to all matters within the scope of its Project investigation, and agrees that it shall not be entitled to, and shall make no claim for, any additional compensation or damages of any kind or character or an extension of time for performance should any requirements or conditions applicable to the Work be different from or in addition to those identified by Subcontractor through such reasonable investigation.

### 2.3 *Existing Conditions.*

Subcontractor shall inspect the work provided by others onto which the Work is to be placed or to which the Work is to be applied or attached and shall notify Contractor in writing of any observable defect or other detrimental condition in any such work prior to the performance of the affected Work. If Subcontractor fails to so notify Contractor, Subcontractor shall be deemed to have accepted the condition of such work as suitable for its Work. Subcontractor shall be liable for any added costs or damage resulting from its performance of any Work involving any unsuitable work provided by others of which Subcontractor has not notified Contractor as required, including any re-performance and related costs of correction and any additional costs incurred by the Contractor, Owner or their other contractors.

### 2.4 *Duty to Coordinate.*

Subcontractor agrees that Owner and Contractor shall have the right to perform or have performed other work in or about the Project site during the time when Subcontractor is performing its Work. Subcontractor shall: coordinate its Work activities at the Project site with those of Contractor, Owner, and their other contractors; afford a reasonable opportunity for the introduction and storage of materials and the execution of such work; and make every reasonable effort to enable both its Work and such other work to be completed without hindrance or interference. Subcontractor shall notify Contractor in writing of any potential conflicts between its Work and such other work and if requested by Contractor shall participate in the preparation of coordinated drawings in areas of congestion. In

Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

situations where a conflict arises between the Subcontractor's Work and the work of others, Contractor will determine in its discretion which work has the highest priority and direct the performance of the Work accordingly. Subcontractor shall not be entitled to an adjustment of the Subcontract Amount or an extension of time for its field coordination activities as the Subcontractor shall anticipate and provide for such activities in the Subcontract Amount and agreed time for performance.

**2.5    *Protection of Work.***
Subcontractor shall protect the Work at all times prior to its acceptance by Owner. Subcontractor shall bear the risk of loss or any damage to the Work or a portion thereof prior to Owner's acceptance (regardless of the holder of title thereto), and Subcontractor shall promptly replace, repair, restore or rebuild any such damaged Work so that it conforms to the requirements of the Subcontract. If the damage is recognized by the insurer to be covered by a first party property insurance policy maintained by Owner or Contractor for the Project, Contractor will reimburse Subcontractor its direct costs to replace, repair, restore or rebuild damaged Work to the extent of insurance proceeds Contractor actually receives for that work, less Contractor's cost to prepare and adjust the claim. Subcontractor shall cooperate with Contractor and Owner in connection with the preparation and adjustment of any insurance claim for damage to the Work. Under no circumstances will Contractor or Owner be required to take any legal action to pursue coverage for damage to the Work in the event the insurer fails or refuses to recognize the existence or applicability of coverage for such damage. If requested by Subcontractor, Contractor shall assign and shall request that the Owner assign to Subcontractor its rights in connection with any such coverage issues, but only to the extent thereof.

**2.6    *Quality and Protection of Equipment, Materials and Supplies.***
Unless otherwise expressly agreed, all equipment, material, supplies and other items furnished by Subcontractor and incorporated into the Work shall be new, unused, of first rate quality, suitable for use in the Work and in strict conformity with the requirements of the Subcontract. Subcontractor shall at all times cover and protect from damage and theft all equipment, materials, supplies and other items that are to be used in the performance of, or incorporated into, the Work at the Project. Subcontractor is solely responsible for and shall bear the risk of loss for all equipment, materials, supplies and other items stored by it at the Project site (regardless of the holder of title thereto), and Subcontractor shall replace any shortages thereof at its expense. If any damage or theft is recognized by the insurer to be covered by a first party property insurance policy maintained by Owner or Contractor for the Project, Contractor will reimburse Subcontractor its direct costs to replace damaged or stolen equipment, materials, supplies or other items to the extent of insurance proceeds Contractor actually receives for that replacement, less Contractor's cost to prepare and adjust the claim. Subcontractor shall cooperate with Contractor and Owner in connection with the preparation and adjustment of any insurance claim for any damage or theft. Under no circumstances will Contractor or Owner be required to take any legal action to pursue coverage for any damaged or stolen equipment, materials, supplies or other items in the event the insurer fails or refuses to recognize the existence or applicability of coverage for the damage or loss in question. If requested by Subcontractor, Contractor shall assign and shall request that the Owner assign to Subcontractor its rights in connection with any such coverage issues, but only to the extent thereof.

**2.7    *Protection of On Site Property.***
Subcontractor shall at all times protect the Project, Project site and the work and property of Owner, Contractor and their other contractors on the Project site from any damage arising out of its operations. Subcontractor shall be responsible for any such damage and Contractor shall be entitled to backcharge Subcontractor the amount of any deductible payable under any first party property insurance maintained by Contractor or Owner for the Project in connection with such damage. Subcontractor shall at its expense promptly replace, repair, restore or rebuild any damage to the Project, Project site and the work and property of Owner, Contractor and their other contractors on the Project site arising out of its operations if so directed by Contractor. If the damage is recognized by the insurer to be covered by a first party property insurance policy maintained by Owner or Contractor for the Project, Contractor will reimburse Subcontractor its direct costs to replace, repair, restore or rebuild to the extent of insurance proceeds Contractor actually receives for that work, less Contractor's cost to prepare and adjust the claim. Subcontractor shall cooperate with Contractor and Owner in connection with the preparation and adjustment of any insurance claim for damage to the Work. Under no circumstances will Contractor or Owner be required to take any legal action to pursue coverage for damage to the Project, Project site and the work and property of Owner, Contractor and the other contractors on the Project site in the event the insurer fails or refuses to recognize the existence or applicability of coverage for such damage. If requested by Subcontractor, Contractor shall assign and shall request that the Owner assign to Subcontractor its rights in connection with any such coverage issues, but only to the extent thereof.

**2.8    *Protection of Other Property.***
Subcontractor shall at all times take all necessary precautions to protect all third party property not covered by Sections 2.5, 2.6 and 2.7 from any damage arising out of its operations, including the property of adjacent landowners, utilities, roads, bridges, waterways and railroads. If any such third party property is damaged as a result of Subcontractor's operations, Subcontractor shall promptly replace, repair, restore or rebuild it at its expense.

**2.9    *Housekeeping.***
Proper housekeeping is an essential component of creating and maintaining an injury free environment. Subcontractor shall observe proper housekeeping controls for construction debris, waste materials and rubbish arising from its operations and shall cleanup and remove all such items from the Project site on a daily basis (or shorter interval if required for safety or if directed by Contractor). If Contractor permits Subcontractor temporarily to store debris, waste materials or rubbish at a designated location on or near the Project site, Subcontractor shall ensure that the items are at all times stored safely and shall remove them from the designated location immediately following Contractor's direction that it do so. Fire exits, corridors, ladder ways, doorways and exit paths in general shall be clear and open to pedestrian and handicapped access traffic at all times, specifically including nights and weekends. As part of the completion of its Work and as a condition precedent to final payment, Subcontractor shall perform a final cleaning to remove all stains, splatter and dirt from its Work and to remove any remaining construction debris, waste materials and rubbish arising from its operations from the Project site. If Subcontractor fails to observe proper housekeeping within twenty-four (24) hours of Contractor's written notice (or shorter time if necessary) to properly correct a deficiency which compromises the maintenance of an injury free environment, Contractor may properly clean up and remove any such construction debris, waste materials or rubbish by the most expeditious means available and charge Subcontractor for the costs incurred.

**2.10    *Clean-Up Crews.***
Contractor reserves the right, upon twenty-four (24) hours written notice to all responsible subcontractors, to clean-up one or more areas of the Project site and remove unidentifiable construction

# EXHIBIT "E"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

debris, waste materials and rubbish from the area. Contractor shall backcharge the costs incurred for this work on a pro-rata basis to each subcontractor working in the affected area.

**2.11    Temporary Structures and Facilities.**
Subcontractor shall provide all temporary offices, structures, sheds, storage facilities and other temporary structures or facilities required for the Work, complete with all required utility hookups and services, including gas, telephone and water. Subcontractor shall maintain temporary structures and facilities in a safe and orderly condition and in accordance with any applicable federal, state or local requirements.

**2.12    Layout and Field Measurements.**
Subcontractor shall provide any layouts, field measurements and verifications required for the performance of its Work and shall be responsible for their accuracy.

**2.13    Cutting, Fitting and Patching.**
Subcontractor shall perform all cutting, fitting, patching, sleeving, grouting, and sealing of its Work that may be required to fit it to, or to receive, the work of others.

**2.14    Use of Contractor's Equipment.**
Unless Contractor has expressly agreed in the Contract Documents to allow Subcontractor to use Contractor's equipment without charge, Subcontractor shall pay Contractor its rental cost for such equipment or, if the equipment is owned by Contractor, Contractor's charge out rate for that equipment. Subcontractor acknowledges that Contractor has no obligation to allow Subcontractor to use any of Contractor's equipment on the Project and that Subcontractor is solely responsible for supplying all equipment required to perform and complete the Work.

**2.15    Meetings.**
At weekly safety and other subcontractor meetings held by Contractor, Subcontractor shall be represented by personnel who are authorized to make binding decisions on Subcontractor's behalf in connection with the performance of the Work and its other obligations under the Subcontract, including committing to safe work practices, staffing levels, equipment, material and supply deliveries, and coordination of the Work. Subcontractor may be required by Contractor to attend, and Subcontractor agrees to actively participate in, any such meetings prior to commencement date of the Work, including meetings and safety orientations for the maintenance of an injury free environment.

**2.16    Daily Reports.**
If required by Contractor, Subcontractor shall submit a daily report to the Contractor, which shall, at a minimum, include: a description of the Subcontractor's Work activities for the day; a work force count by trade for Subcontractor and its Sub-subcontractors; a listing of any major deliveries; and, a description of any Delay Event or other matter that has or may adversely impact Subcontractor's ability to perform the Work in accordance with the Subcontract and its actual or anticipated impact on the Work. Subcontractor's daily report is due by noon the following day. In addition to any other applicable requirements in the Subcontract, Subcontractor's right to submit a claim for any Delay Event or other matter that adversely impacts the Work is conditioned on Subcontractor's submission of its daily report describing the matter, and Subcontractor waives any claim in connection with a matter that is not adequately described in Subcontractor's daily reports. Subcontractor's daily reports shall not serve as a substitute for, or relieve Subcontractor of its obligation to provide, formal written notice to Contractor as required elsewhere in the Contract Documents of any Delay Event or other matter that has or may adversely impact Subcontractor's ability to perform the Work

in accordance with the Subcontract, and the Subcontractor waives any claim that does not comply with such requirements and agrees that Contractor's actual or constructive notice of the claim will have no effect on the claim or Subcontractor's waiver of the claim.

**2.17    Testing.**
Where testing agency standards are referenced in the Contract Documents, all materials to be incorporated into the Work shall be tested and certified by an approved, independent testing firm acceptable to the Contractor. Subcontractor is responsible for the cost of all required testing.

**2.18    Equipment, Material and Supply Deliveries.**
Subcontractor shall be responsible for offloading, storing and protecting any equipment, materials, supplies and other items for the Work at the Project site and shall make the appropriate provisions to receive, unload and safely store all such items. Subcontractor shall coordinate deliveries of equipment, materials, supplies and other items with Contractor in advance and shall only schedule such deliveries during hours designated for that purpose by Contractor. Equipment, material, supplies and other items stored on the Project site shall be in the care and custody of the Subcontractor and shall not be removed from the site without the written consent of the Contractor. Subcontractor agrees to keep Contractor fully informed regarding its delivery schedule for any equipment, materials, supplies or other items and shall immediately advise Contractor in writing of any delay or anticipated delay that may affect the progress of the Work or the work of Contractor, Owner, or their other contractors.

**2.19    Parking and Storage.**
The locations for employee and equipment parking, material and supply storage and temporary trailers shall be designated and approved by Contractor if on the project site or on another site arranged by the Contractor. Contractor reserves the right to change any designated or approved location and Subcontractor shall promptly advise its employees of the change and relocate any materials, supplies and temporary trailers to the newly designated location at no cost to Contractor.

**2.20    Royalties and License Fees.**
Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees required as a result of its Work. Subcontractor shall defend, indemnify and hold harmless the Indemnified Parties as provided in Section 18.1 in connection with any suits or claims for infringement of any patent or other intellectual property rights.

**2.21    Sub-Subcontractors.**
Subject to the written approval of the Contractor, Subcontractor shall select Sub-subcontractors with a demonstrable commitment to safe work practices supportive of an injury free environment as is required of Subcontractor and shall bind all Sub-subcontractors to the provisions of the Subcontract applicable to the subcontracted Work. Neither the Subcontract nor any subcontract with a Sub-subcontractor shall create any contractual relationship between any Sub-subcontractor and either Owner or Contractor, nor any payment or other obligation on the part of either Owner or Contractor to any Sub-subcontractor. Notwithstanding the existence of any subcontract, Subcontractor shall be fully responsible for ensuring the safe performance of the Work as if no such subcontract exists. Each subcontract, purchase order or other agreement entered into by Subcontractor in connection with the Work shall be assignable and shall be assigned to Contractor on written request.

**2.22    Monthly Status Reports.**
If required by Contractor, Subcontractor's monthly estimates for payment shall be accompanied by a status report from Subcontractor,

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

which shall include the following: (i) a submittal progress report as required by Section 6.2; (ii) information on the status of materials and equipment that may be in the course of preparation or manufacture (if requested by Contractor, a complete up-to-date procurement schedule shall be submitted on forms acceptable to the Contractor); and (iii) an updated schedule and a narrative progress update on Subcontractor's Work, including a description of any Delay Event or other matter that has or may adversely impact Subcontractor's ability to perform the Work in accordance with the Subcontract and its actual or anticipated impact on the Work.

**2.23**    _Prohibition on Certain Work and Dealings._
Until final completion of Contractor's work under the Owner Contract, Subcontractor shall not perform any work in connection with the Project directly for the Owner or any of Owner's tenants (if applicable), or deal directly with the Owner's representatives or its other contractors in connection with the Project unless permitted to do so in writing by Contractor.

**Article 3 - TIME FOR PERFORMANCE OF THE WORK**

**3.1**    _Time for Performance._
Subcontractor acknowledges that the dates required in the Schedule for the performance and completion of the Work are essential conditions of the Subcontract and agrees that Subcontractor's failure to perform and complete the Work consistent with such dates shall constitute a material violation of the Subcontract. Subcontractor represents that it has taken into consideration and made allowances for all hindrances and delays incident to its Work as provided in Sections 2.2 and 2.4.

**3.2**    _The Project Schedule._
If not prepared and attached to the Subcontract as an Exhibit, Contractor will develop a Project schedule that will schedule and coordinate the times required for each area of work on the Project, including the Work (the "Schedule"). Subcontractor shall participate and cooperate with Contractor in scheduling the times and sequences required to perform Subcontractor's Work, and Subcontractor agrees to perform its Work in accordance with the Schedule, as it may be revised and amended from time to time by Contractor, including as provided in Section 9.2. The terms "Schedule", "Project Schedule", "Contractor's Schedule", "CPM Schedule" and like terms are used interchangeably in the Contract Documents and each shall refer to the "Schedule" pursuant to this Section 3.2.

**3.3**    _Work Plan._
In support of the Project Schedule, Subcontractor shall, as a condition precedent to Contractor's obligation to process Subcontractor's first estimate for payment, furnish Contractor with an itemized breakdown of Subcontractor's Work, which shall include the anticipated sequence of the Work and durations in terms of days and man-hours for the work activities necessary to complete the Work in the time required to support the Project Schedule. Subcontractor represents that it shall: (i) prepare documents that are feasible and realistic for the planning, scheduling and coordination of the Work, and (ii) prepare schedules, updates, revisions and reports that accurately reflect Subcontractor's reasonable expectations as to the sequence of activities, duration of activities, productivity or efficiency, projected and actual completion of any Work item or activity, and delays or problems expected or encountered and specified float time, including as necessary, accounting for any direction provided by Contractor under Section 9.2.

**Article 4 - PROGRESS PAYMENTS**

**4.1**    _Schedule of Values._
Within fifteen (15) days after the Effective Date, Subcontractor shall submit for Contractor's approval Subcontractor's itemized schedule of values that allocates the Subcontract Amount to the various portions of the Work. The schedule of values shall be in the form and supported by data to substantiate its accuracy as required by the Contract Documents, or as Contractor may reasonably require. Upon acceptance by Contractor, Subcontractor will use the schedule of values as the basis for its periodic estimates for payment. If it is later determined that the schedule of values is unbalanced, the Subcontractor shall revise the schedule as necessary and submit a revised schedule of values for Contractor's approval. Subcontractor's submission of the required schedule of values is a condition precedent to Contractor's obligation to make payments to the Subcontractor.

**4.2**    _Progress Payments._
Contractor shall pay Subcontractor the Subcontract Amount on a monthly basis as follows:

**4.2.1**    _Estimates for Payment._
Unless otherwise stipulated by Contractor, on or before the earlier of: (i) the 25th day of each month; or (ii) no later than five (5) days prior to the date, if any, in the Owner Contract for the submission of estimates for payment, Subcontractor shall submit a written estimate for payment to Contractor in the form annexed as **Exhibit H** along with all substantiating data and information required by the Contract Documents or as reasonably requested by Contractor**.** The amount due Subcontractor on each estimate shall be calculated as provided in Section 4.2.2. If approved by Owner and Contractor, Contractor shall pay the net amount due to Subcontractor within fourteen (14) days after Owner pays the corresponding amount to Contractor under the Owner Contract. Subcontractor acknowledges and agrees that Owner's payment to Contractor under the Owner Contract of amounts due Subcontractor under the Subcontract is a condition precedent to Contractor's obligation to pay such amounts to Subcontractor. Subcontractor further acknowledges that it is relying on the credit and ability of the Owner to pay for Work performed and not Contractor and accepts the risk that it will not be paid by Contractor for Work performed in the event Contractor is not paid by Owner for such Work.

**4.2.2**    _Basis for Calculating Payment._
The amount due Subcontractor on each estimate for payment shall be calculated based on the percentage of the Work completed by Subcontractor to the date of the estimate as approved by the Contractor, Owner and/or Architect. The amount of the payment shall be the sum of: (a) the proportionate value of completed Work based on Subcontractor's approved schedule of values; less (b) the following amounts: (1) retainage of 10%; (2) all previous payments; (3) all charges for materials and services furnished by Contractor to Subcontractor; and (4) any other charges and deductions as provided for in the Subcontract.

**4.2.3**    _Payment for Stored Materials._
Payments made on account of materials not incorporated in the Work but delivered to and accepted by Contractor and suitably stored (on or off the Project site), shall be made, if at all, in accordance with the Contract Documents. Sub-subcontractor invoices itemizing respective quantities and unit costs of such stored material shall accompany all requests for payments for stored materials. At its option, Contractor may make payment for stored material by joint check to Subcontractor and the applicable Sub-subcontractor and require as a condition precedent to payment for stored materials that a bill of sale, any necessary Uniform Commercial Code documentation and/or proof of proper insurance be furnished from Subcontractor and the applicable Sub-subcontractor. Materials

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

accepted by Contractor and stored off site must be at a bonded warehouse, unless stored at the Subcontractor's premises with Contractor's approval, and all stored materials shall be: (i) fully insured; (ii) segregated from other material; and (iii) clearly marked "Property of Skanska USA Building Inc.".

### 4.3 *Joint Checks.*
Prior to submitting its first estimate for payment, Subcontractor shall provide Contractor with a statement identifying the name, address and telephone number of each known Sub-subcontractor. Subcontractor shall update its statement with each monthly estimate for payment as required to identify any new Sub-subcontractors and any name, address or telephone number changes for existing Sub-subcontractors. Contractor may, in its sole discretion make payment for any portion of Subcontractor's Work by joint check to Subcontractor and the applicable Sub-subcontractor or benefit fund to which Subcontractor has an outstanding obligation. Any payments made by Contractor by joint check as provided in this Section 4.3 shall be deemed to have been made directly to Subcontractor.

### 4.4 *Subcontractor's Use of Payments.*
Subcontractor shall promptly pay for all labor, services, equipment, materials, supplies and other items acquired, performed, furnished or used in connection with the performance of the Work covered by payments received from Contractor, and shall furnish evidence satisfactory to verify compliance with this requirement when requested by Contractor. All funds paid to Subcontractor in connection with the Project constitute funds held in trust by Subcontractor. Subcontractor agrees to apply first to the payment of: (i) taxes owed by Subcontractor based on labor, services, equipment, materials supplies and other items acquired, performed, furnished or used in connection with the performance of the Work; (ii) Subcontractor bond and insurance premiums; and (iii) Sub-subcontractors and any applicable Sub-subcontractor benefit funds.

### 4.5 *Estimates For Payment and Partial Waivers and Release of Liens and Claims Required.*
As condition precedent to receipt of any progress payments, Subcontractor shall provide Contractor with its duly executed "Skanska Standard Interim Estimate for Payment, Waiver and Release" in the form annexed as **Exhibit H.**

### 4.6 *Payment is not a Release by the Contractor.*
No progress payment made by Contractor shall be deemed conclusive evidence that Subcontractor has satisfied its obligations in connection with all or part of the Work covered by such payment, and Contractor shall not by virtue of having made any such payment be deemed to have accepted any Work not meeting the requirements of the Subcontract or to have waived any claims against Subcontractor in connection therewith. All payments are provisional and any overpayment by Contractor to Subcontractor shall be deemed to be a mistake of fact and shall be promptly repaid to Contractor upon demand. The acceptance by Subcontractor of each progress payment from Contractor shall constitute a waiver and release by Subcontractor of all claims of any kind against the Contractor for payment for Work performed up to the date of Subcontractor's estimate for payment against which payment was made and accepted, excluding only Subcontractor's entitlement to retainage withheld in connection with such payment and any disputed amount withheld from payment by Contractor.

### 4.7 *Payment Withholding.*
Contractor may withhold the whole or any part of any payment to Subcontractor to such extent as Contractor reasonably deems necessary to protect it from loss as a result of: (a) incomplete, defective or damaged Work not remedied; (b) Contractor backcharges; (c) claims filed or reasonable evidence indicating

probable filing of claims, including lien claims, involving or arising out of Subcontractor's Work; (d) damage to Contractor's, Owner's or their respective other contractors' work; (e) failure of Subcontractor to make payments when due to Sub-subcontractors; (f) reasonable insecurity regarding Subcontractor's intention or ability to continue with the proper and timely performance of the Work; (g) failure of the Subcontractor to perform or comply with any of its obligations under the Contract Documents; or (h) expenses arising from frivolous claims against Contractor. Contractor may also at any time on written notice to Subcontractor offset against any payment due to Subcontractor under the Subcontract any amount due from Subcontractor to Contractor under any other agreement between the parties.

### Article 5 - FINAL PAYMENT

### 5.1 *Final Payment.*
Subcontractor shall submit its final estimate for payment to Contractor when it has completed the Work, including punch list items, in accordance with all requirements of the Subcontract as approved by the Contractor and Owner and/or Architect. Subcontractor's final estimate for payment shall be in the form annexed as **Exhibit I**, and shall include all substantiating data and information required by the Contract Documents or as reasonably requested by Contractor. Subcontractor's final estimate for payment shall show the Work as one hundred percent (100%) complete and shall be calculated in the same manner as Subcontractor's periodic progress payments under Section 4.2, provided that retention shall not be deducted to arrive at the net amount due. If approved by Owner and Contractor, Contractor shall pay the net amount due to Subcontractor within ten (10) days after Owner pays the corresponding amount to Contractor under the Owner Contract, provided all conditions precedent to final payment under the Contract Documents, including the following, have been met: (i) any conditions precedent in the Owner Contract to Subcontractor's entitlement to final payment have been satisfied; (ii) Subcontractor's surety, if any, has consented in writing to the making of final payment; (iii) Subcontractor has provided Contractor with a statement that it has: (a) paid all federal, state, county and municipal taxes, duties and other amounts imposed by Applicable Law upon any labor, services, equipment, materials, supplies or other items acquired, performed, furnished or used in connection with Subcontractor's performance of the Work, including, but not limited to, sales, use, gross receipts, excise, unemployment, and personal property taxes; and (b) completed the Work and performed all other obligations as required under the Subcontract through the date of its final estimate for payment; (iv) Subcontractor has provided Contractor all: as-built drawings, certifications, maintenance manuals, operating instructions, statement of estimates, reports and other final submittals; software; written guarantees and warranties; and bonds required to be provided by Subcontractor under the Subcontract; and (v) Subcontractor has provided a duly executed "Skanska Standard Final Estimate for Payment, Unconditional Waiver and Release" in the form annexed as **Exhibit I**. Contractor may require a final waiver and release of liens and claims from Sub-subcontractors. Subcontractor acknowledges and agrees that Owner's payment to Contractor under the Owner Contract of the final payment due Subcontractor under the Subcontract is a condition precedent to Contractor's obligation to pay such amount to Subcontractor. Subcontractor further acknowledges that it is relying on the credit and ability of the Owner to pay for Work performed and not Contractor and accepts the risk that it will not be paid by Contractor for Work performed in the event Contractor is not paid by Owner for such Work.

**Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

**5.2** *Effect of Final Payment.*
As provided in Exhibit I, Subcontractor's acceptance of final payment from Contractor shall constitute a final waiver and release of all liens and claims by Subcontractor against the Contractor and Owner arising out of or relating to the Subcontract.

### Article 6 - SUBMITTALS AND SUBSTITUTIONS

**6.1** *Submittal Requirements.*
Subcontractor shall furnish all required shop drawings, cut sheets, samples, material lists, as-builts, data or other submittals for approval with the required number of copies prior to fabricating or ordering any equipment, material, supply or other item requiring an approved submittal. Submittal data shall be complete, submitted promptly and in such sequence as to ensure scheduled delivery of the applicable equipment, material, supply or other item and to cause no delay in the Work or in the activities of Contractor or its other contractors. All submittals, data, reports and other documents shall be in the English language.

**6.2** *Submittal Progress Reports.*
Within ten (10) days after the Effective Date, Subcontractor shall submit to Contractor a complete list of all submittals required to be furnished by Subcontractor under the Subcontract and their anticipated submittal date. Thereafter, Subcontractor shall furnish Contractor on a monthly basis (or more frequently if requested by Contractor), a progress report on the status of the submittals, including any delay or anticipated delay in their issuance, revision or completion as the case may be.

**6.3** *Work Progress Documents and As-Builts.*
Subcontractor shall maintain construction drawings and other data and documents at the Project site and update them each workday as required to accurately reflect the progress of the Work. Subcontractor shall make such drawings, data and documents available for the Contractor's review at the Project site upon request, and at least on a monthly basis in connection with the Subcontractor's estimates for payment. Subcontractor shall furnish final as-built drawings to Contractor as part of its completion of the Work. Subcontractor's compliance with this Section 6.3 is a condition precedent to the Contractor's obligation to make interim progress payments and final payment to Subcontractor.

**6.4** *Revisions to Submittals.*
Subcontractor shall specifically advise Contractor in writing when transmitting a revised shop drawing or other submittal of any revisions that are in addition to, or differ from, those requested by the Contractor or the Architect on prior versions of the submittal. If Subcontractor does not provide written notice of such additional or different revisions to Contractor, Contractor's and/or Architect's approval of the submittal shall not include such additional or different revisions. Notwithstanding the foregoing, Subcontractor acknowledges that the Project Schedule does not allow for the resubmission of shop drawings and other submittals and that Subcontractor is required to ensure its initial submittals meet the requirements of the Contract Documents. Subcontractor shall be liable for any added costs or damage resulting from its failure to furnish submittals when and as required by the Subcontract, including any re-performance and related costs of correction and any additional costs incurred by the Contractor, Owner or their other contractors.

**6.5** *Professional Certifications.*
When professional certification of performance or design criteria of equipment, materials, systems or other items is required to be furnished by Subcontractor under the Subcontract, Contractor shall

be entitled to rely upon such certification and shall not be expected or required to make any independent examination with respect thereto.

**6.6** *Coordination Drawings.*
If applicable to Subcontractor's Work, Subcontractor shall prepare coordination drawings showing exact alignment, physical location and other required details for those portions of its Work that must be coordinated with the work of Contractor, Owner or their other contractors, and shall participate in any related coordination efforts by Contractor.

**6.7** *Contractor's Review of Submittals.*
Contractor's or Architect's review or approval of any Subcontractor submittals shall not relieve Subcontractor of any of its obligations under the Subcontract.

**6.8** *Substitutions.*
Subcontractor shall not substitute any equipment, materials, supplies, specified by the Contract Documents, or any procedures or methods specified by the Contract Documents for performing the Work unless it first submits a written proposal to Contractor for substitution that complies with all applicable Subcontract requirements and Contractor thereafter approves the substitution in writing. Subcontractor acknowledges that unless expressly permitted by the Contract Documents, Subcontractor shall not be entitled to substitute any equipment, materials, supplies, procedures or methods specified by the Contract Documents.

**6.9** *Ownership and Use of Documents*
To the extent not inconsistent with the Owner Contract, all submittals and other documents furnished by Subcontractor under the Subcontract, including any designs, drawings, specifications, calculations, sketches, models, reports, computer programs, computer discs, diskettes or tapes, charts, photographs and other documents, are instruments of Subcontractor's service and all intellectual property rights in such documents shall belong to Subcontractor; provided, however, Subcontractor hereby grants to Contractor and Owner a transferable, irrevocable and perpetual royalty-free license to retain and use all such documents for any purpose in connection with the Project. Subcontractor warrants and represents that any submittal or other document furnished by Subcontractor or any of its Sub-subcontractors do not infringe any patent, copyright, trademark or other intellectual property rights of any person or entity.

### Article 7 - LABOR AND SUPERINTENDENCE

**7.1** *Labor.*
Subcontractor shall engage a sufficient number of skilled workers to perform the Work promptly, diligently, and in accordance with the requirements of the Subcontract. If requested by Contractor, Subcontractor shall provide Contractor with copies of its policies regarding the furnishing of labor including copies of all wage agreements, working rules, and regulations, if applicable, affecting the Work. Subcontractor warrants that it is now, and will continue to be, in full compliance with the Immigration Reform and Control Act of 1986 (IRAC), specifically including all of its I-9 employer verification provisions. Subcontractor warrants that it will continue to properly train its staff regarding the execution and retention of these I-9 employment verification forms. Subcontractor warrants that it has an I-9 verification policy which it implements throughout the company. Further, Subcontractor agrees to indemnify Contractor and Owner for any legal fees, public relations costs, work stoppages, and any damages resulting from Subcontractor's employment of any unauthorized workers.

**Page 9 of 18**

**Skanska Standard Subcontract Terms and Conditions**
**(06/2006 ed. Rev. 3)**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

7.2   **_Supervision._**
Subcontractor shall engage a sufficient number of competent supervisory personnel as are necessary to perform the Work in accordance with the requirements of the Subcontract. Subcontractor shall further have a competent superintendent continuously on the Project site during work hours and readily available on call. The superintendent shall be fully acquainted with the Work and shall have the authority to administer the Subcontract on Subcontractor's behalf and shall not be changed except with the consent of Contractor.

7.3   **_Technical Services._**
Subcontractor shall provide all technical personnel required to start-up, test, commission and operate any equipment and to test and use any material, supplies or other items used or supplied by Subcontract in connection with the Work and to instruct Contractor's and Owner's personnel in the operation and maintenance of any such equipment, materials, supplies or other items.

7.4   **_Compliance with Owner Requirements for Supervision._**
Subcontractor shall comply with any superintendence or project management obligations imposed upon Contractor under the Owner Contract to the extent necessary to ensure Contractor's compliance with such obligations to Owner.

7.5   **_Subcontractor Labor Relations._**
Subcontractor shall be responsible for all labor relations matters relating to its performance of the Work and shall at all times maintain harmony among the personnel employed by it and its Sub-subcontractors in connection with the Project with those of Contractor, Owner and their other contractors. Subcontractor shall at all times use all reasonable efforts and judgment as a skilled and experienced contractor to adopt and implement policies and practices designed to avoid work stoppages, slowdowns, disputes and strikes. Subcontractor shall notify Contractor as promptly as possible of any actual or potential labor dispute that may affect the Work. If a labor condition threatens the timely completion of any portion of the Work and Subcontractor fails to give satisfactory assurance of its ability to complete the Work in a timely manner, or Subcontractor fails to employ labor that is compatible and in harmony with other labor employed on the Project, or Subcontractor fails to continue to perform the Work without interruption or delay during a strike, picket, walkout, or other work stoppage or slowdown caused by a labor dispute, Contractor may, at its option, terminate Subcontractor's right to proceed with Work for default in accordance with Section 12.1 or employ workmen to perform the affected Work and backcharge Subcontractor the cost thereof.

7.6   **_Removal of Workmen._**
If Contractor notifies Subcontractor in writing that any employee or agent of Subcontractor or one of its Sub-subcontractors is incompetent, disorderly, or otherwise unsatisfactory, such person shall immediately be removed, at Subcontractor's cost, from the Work and shall not thereafter be employed in the performance of the Work.

**Article 8 - DETERMINATION AND INSPECTION OF THE WORK**

8.1   **_Determinations of Compliance with Contract Documents._**
Contractor, along with the Owner and Architect, shall determine the requirements of the Contract Documents in connection with the Work and whether the Work has been performed and completed in accordance with those requirements. These determinations shall be final and Subcontractor shall perform the Work consistent with them, subject to dispute resolution under Section 13.4.

8.2   **_Access for Inspection._**
Subcontractor shall at all times provide Contractor, Owner, the Architect and their authorized representatives safe and sufficient facilities and access to review or inspect the Work on the Project site and, upon request, at Subcontractor's and its Sub-subcontractor's off-site facilities where any Work is being performed. Contractor shall have no obligation to review or inspect Subcontractor's Work, and any such review or inspection shall not relieve Subcontractor of its obligations under this Subcontract.

8.3   **_Rejection of Work._**
Contractor, Owner or the Architect may reject any Work performed or equipment, materials, supplies or other items furnished by Subcontractor that are determined not to comply with the requirements of the Contract Documents. Within twenty-four (24) hours after receiving Contractor's written notice rejecting any Work performed or equipment, materials, supplies or other items furnished, Subcontractor shall take down the rejected Work and remove the rejected equipment, materials, supplies or other items from the Project site. Subcontractor shall promptly re-perform any rejected Work and replace any rejected equipment, materials, supplies or other items as necessary to comply with the requirements of the Contract Documents. If requested by Contractor, Subcontractor shall also correct any work of Contractor, Owner or their other contractors as required in connection with any rejected Work. All costs associated with re-performing rejected Work and replacing rejected equipment, materials, supplies or other items shall be borne by the Subcontractor without any increase in the Subcontract Amount or time for performance of the Work.

8.4   **_Compliance with Additional Architectural Instructions._**
Subcontractor shall conform to and abide by any additional specifications, drawings, or explanations furnished by the Architect to illustrate the Work to be done, subject to the provisions of Article 10.

8.5   **_Failure of Sources of Supply._**
In the event of a partial failure of the Subcontractor's sources of supply of the equipment, materials, supplies or other items to be furnished under the Contract Documents, whether due to allocation or otherwise, the Subcontractor shall make all reasonable efforts to fully meet its obligations under this Subcontract prior to making any allocations among the Subcontractor's other customers.

**Article 9 - PROGRESS AND COMPLETION**

9.1   **_Commencement of Work._**
Except as otherwise provided elsewhere in the Contract Documents, Subcontractor shall commence the Work in accordance with the Schedule immediately upon receipt of verbal or written notice to proceed from Contractor. Subcontractor shall diligently and continuously prosecute its Work or any portion thereof in an efficient fashion and at a rate so as not to cause delay in the progress of the work of Contractor, Owner, or their other contractors. If requested by Contractor, Subcontractor shall maintain and update on a monthly basis (or more frequently if requested) a cost and resource loaded critical path method schedule for the Subcontractor's Work, which depicts Subcontractor's Work activities with logic ties for preceding/restraining work, duration, cost and/or crew size.

9.2   **_Compliance with Owner's Scheduling Requirements._**
Contractor shall be entitled to decide the time, order and priority for performance of the various portions of Subcontractor's Work to the extent necessary, in Contractor's judgment, to assure Contractor's compliance with the scheduling requirements imposed on Contractor under the Owner Contract, and to direct the performance of the Work accordingly. Subcontractor shall not be entitled to an adjustment of

**Page 10 of 18**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

the Subcontract Amount or an extension of time in connection with any such direction by Contractor as the Subcontractor shall anticipate and provide for such activities in the Subcontract Amount and agreed time for performance.

**9.3    Recovery Plan.**
If Contractor determines that Subcontractor has fallen behind in the progress of the Work or is in danger of falling behind at its then current rate of progress, or is responsible for any Project Schedule delays, Contractor may direct Subcontractor on written notice to take the steps Contractor deems necessary to improve the rate of progress of the Work, including requiring Subcontractor to increase its labor force, number of shifts and/or overtime operations, days of work, or to provide additional equipment or materials. Within forty-eight (48) hours of such written notice from Contractor, Subcontractor shall submit for Contractor's approval a recovery plan composed of a schedule and a safety assessment to demonstrate the manner by which Subcontractor will implement the required steps to attain the required rate of progress while maintaining an injury free environment. Subcontractor will implement the recovery plan immediately upon Contractor's approval. If Contractor determines that Subcontractor's plan will not attain the required rate of progress, Subcontractor will take the steps Contractor directs in that regard and perform the Work accordingly, all without additional cost to the Contractor. If Subcontractor fails to submit or follow a recovery plan as required or perform the Work in accordance with Contractor's directives in the event Subcontractor's recovery plan is not approved, Contractor may, following twenty-four (24) hour notice to Subcontractor, perform the Work as Contractor deems necessary to attain the required rate of progress. Contractor may deduct from any payment due Subcontractor or collect directly from Subcontractor on demand all Damages incurred or suffered by Contractor in connection with Subcontractor's delay in the progress of the Work or to the Project Schedule, including any Damages assessed against Contractor under the Owner Contract.

**9.4    Substantial and Final Completion of Work.**
The Work will be deemed substantially and finally complete as of the dates indicated in the Certificate of Substantial Completion and Certificate of Final Completion, respectively, or earlier date agreed by Contractor in a written notice to Subcontractor.

**9.5    Punchlist.**
When Subcontractor deems its Work substantially complete, Subcontractor shall give written notice thereof to Contractor along with a punch list of remaining items to be performed to achieve final completion. Subcontractor shall revise its punch list to include any items Contractor advises Subcontractor should be included on that list and shall perform the punch list Work as directed by Contractor.

**9.6    Use and Acceptance of Portions of Work Prior to Final Completion of Work.**
At any time prior to final completion of all the Work, Contractor may temporarily take possession of and use any part of the Work. Contractor may return any such Work to Subcontractor for completion. The Contractor may at any time request in writing that Subcontractor permit Contractor to accept any part of the Work and Subcontractor shall make that part of the Work available for Contractor's inspection as soon as reasonably possible, and in no event later than five (5) days following the request. If Contractor agrees, following the inspection by the Owner and/or Architect, that the part of the Work in question can be accepted, Contractor shall issue a Certificate of Completion for such portion of the Work. The use or acceptance of part of the Work by Contractor as provided in this Section 9.6 shall not relieve Subcontractor of any of its responsibilities under the Subcontract. Subcontractor shall not use any portion of the Work other than as approved in writing by

Contractor. In the case Subcontractor uses any of the Work; Subcontractor shall recondition such portion of the Work to meet the requirements of the Subcontract.

**Article 10 - CHANGES AND IMPACTS**

**10.1    Changes in the Work.**
Contractor shall have the right in its discretion at any time prior to final completion of the Work on written notice to Subcontractor (and without notice to Subcontractor's sureties), to direct a "Change". In the event of a Change, the Subcontract Amount and/or Subcontractor's time for performance shall be adjusted, if at all, by way of a written amendment or "Change Order" to the Subcontract as set forth in Sections 10.2 and 10.3. Unless directed by Contractor to proceed immediately with a Change, Subcontractor shall submit a written request to Contractor for a Subcontract adjustment as provided in Section 10.2 prior to proceeding with a Change.

**10.2    Change Order Requests.**

(a) Contractor Initiated Change: For any Contractor initiated Change, Subcontractor shall submit its written request for a Change Order within ten (10) days of receipt of Contractor's Change notice. Subcontractor's request shall include documentation sufficient to enable the Contractor to determine the factors necessitating the adjustment(s) being requested. If Contractor decides to proceed (or Subcontractor has already proceeded with the written direction of Contractor) with the Change and a Subcontract adjustment is warranted, Contractor shall issue a written Change Order to Subcontractor adjusting the Subcontract either: (i) as requested by Subcontractor; or, (ii) in the event the Contractor disagrees with Subcontractor's statement as to the effect of the Change, Contractor shall issue a Change Order to Subcontractor: (a) on terms Contractor reasonably deems appropriate. Subcontractor shall thereafter perform the Work in accordance with the Change Order, subject to dispute resolution under Section 13.4. Subcontractor shall have no right to suspend or delay the performance of its obligations under the Subcontract while the Contractor is reviewing Subcontractor's adjustment request or if Subcontractor disagrees with the Change Order issued by Contractor.

(b) Owner Initiated Change: For any Change initiated by the Owner or Architect, Subcontractor shall submit its written request for a Change Order no later than two (2) days prior to the expiration of the time period specified in the Owner's Contract for the submission of such a request and shall include all information required under the Owner Contract. Contractor shall process Subcontractor's Change Order request in accordance with the change order process in the Owner Contract. Subcontractor's entitlement to additional compensation or a time extension in connection with a Change initiated by the Owner or Architect shall be limited to the cost and schedule adjustments approved by Owner for Subcontractor's Work in Owner's change order to Contractor under the Owner Contract.

(c) Contractor may at any time in its discretion decide not to proceed with a Change without obligation to Subcontractor.

**10.3    Requirements for Pricing Changes.**
Unless the Owner Contract requires different pricing, the amount of additional compensation paid to Subcontractor shall be determined by one of the following methods at the sole discretion of the Contractor:

10.3.1    Lump sum price in an amount proposed by Subcontractor (properly itemized and supported by sufficient substantiating data to permit evaluation) and accepted by Contractor;

# EXHIBIT "E"

**Attachment to Subcontract/Purchase Order,** by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

10.3.2   Unit Prices or Alternates as set forth in **Exhibit C** (if applicable); or

10.3.3   Time and material basis.

If a Change is performed by Subcontractor on other than a lump sum basis, Subcontractor shall furnish each day to Contractor certified copies of all time sheets, receiving and inspection reports and shall provide Contractor with such purchase orders, invoices, Subsubcontractor quotes and other documents and records as may enable Contractor to verify, to its reasonable satisfaction, the costs or savings reasonably incurred by Subcontractor in effecting the Change. All labor, services, equipment, materials, supplies and other items provided by Subcontractor on other than a lump sum basis shall be purchased at competitive market prices and reflect Subcontractor's actual cost after rebates and discounts. Subcontractor acknowledges and agrees that any request for an adjustment will be totally inclusive of all additional costs and time extensions related to the Change, whether resulting from delays, inefficiencies, interferences or any other impact to Subcontractor's performance of the Work. Subcontractor's failure to request a cost or time adjustment in connection with a Change shall constitute a representation by Subcontractor that no such adjustment is required and shall constitute a waiver by Subcontractor of its right to any such adjustment. Subcontractor's failure to timely submit a proposed credit for deleted Work shall render Contractor's and/or Owner's or Architect's determination of the proper credit final and binding.

**10.4   Change Order Directive.**
If Contractor and Subcontractor do not agree as to the appropriate adjustment to the Subcontract Amount and/or Subcontractor's time for performance in connection with a Change, Contractor may issue a "directive" that directs Subcontractor to proceed with the Change and leaves the adjustment to the Subcontractor Amount and/or Subcontractor's time for performance open. Subcontractor shall proceed with the Change and provide Contractor the information and documents required under Section 10.3 in connection with Changes performed on other than a lump sum basis to support its additional costs and information and documents to support its request for a time extension. When the Change has been completed, Contractor shall determine the appropriate adjustment, or for claims resulting from the Owner or Architect, shall refer the matter to the Architect or Owner's representative to determine the appropriate adjustment to the Subcontract Amount and/or Subcontractor's time for performance. Their decision shall be binding on Subcontractor unless Subcontractor notifies the Contractor in writing that it disputes the decision within the shorter of: (i) twenty-four (24) hours before the expiration of the time allowed, if any, under the Owner Contract to contest the decision; or (ii) forty-eight (48) hours after Subcontractor's receipt of the decision. If Subcontractor properly disputes the decision, the matter shall be subject to dispute resolution under Section 13.4.

**10.5   Impacts to the Work.**
Subcontractor shall make all claims for additional compensation, and extensions of time due to acceleration, disruption or inefficiency or other adverse impacts to the Work or otherwise to Subcontractor's performance under the Subcontract within two (2) business days following the occurrence of the event giving rise to the claim and in such manner so as to permit the Contractor to satisfy the requirements of the Owner Contract for the submission of such claim. All such claims shall be supported by appropriate documentation and, in the case of requests for extensions of time, sufficient detail to demonstrate that the impact is to work activities on the critical path. If the Subcontractor fails to submit a claim to the Contractor as required and as a consequence Contractor is prejudiced in its ability to present such claim under the Owner Contract, then Subcontractor's

entitlement to a Subcontract adjustment relating to such claim shall be equally prejudiced. Contractor's liability to the Subcontractor for any adverse impact to the Work or otherwise to Subcontractor's performance under the Subcontract attributable to the Owner, Architect or their separate contractors is limited to the cost, schedule or other relief, if any, actually granted by the Owner. Contractor's liability to the Subcontractor for any adverse impact to the Work or otherwise to Subcontractor's performance under the Subcontract attributable to Contractor's other subcontractors or suppliers for the Project is limited to the amount, if any, actually recovered from such other subcontractors or suppliers.

**10.6   Requirements for all Impact Claims.**
Subcontractor's timely compliance with the notice requirements in Section 10.5 shall be a condition precedent to Subcontractor's entitlement to a Subcontract adjustment and Subcontractor waives and releases any claim for additional compensation or an extension of time in the event that Subcontractor does not so comply.

**10.7   Contractor's Receipt of Claims Does Not Create a Presumption of Validity.**
Nothing done or not done by Contractor or Owner shall be construed as an acknowledgment or acceptance of the accuracy or validity of any Subcontract adjustment requested by Subcontractor until a signed Change Order is issued to Subcontractor by Contractor.

**10.8   Allowable Mark-Ups.**
Subcontractor's overhead and profit mark-up percentages on additional costs incurred in connection with Changes and impacts to the Work for which Subcontractor is entitled to a Subcontract adjustment shall in no event exceed the mark-ups allowed to Contractor for changes under the Owner Contract. Subcontractor shall not apply a mark-up to any costs the Owner Contract provides are not subject to mark-up.

**10.9   Required Documentation in Support of Change Orders or Claims.**
Subcontractor shall allow Contractor to review any data Contractor may reasonably request to assist the Contractor, Owner and/or Architect to determine the validity of a Subcontract adjustment requested by Subcontractor. Data that may be reviewed includes, but is not limited to: (i) Subcontractor's payroll records for each employee working on the Project (which shall contain the employee's name, address, social security number, hourly wage, daily and weekly number of hours worked, gross wages earned, deductions made and actual wages paid); (ii) Subcontractor's Project estimate(s) and supporting calculations; (iii) Subcontractor work schedules and related documents; and (iv) Sub-subcontractor related documents (which Contractor may obtain from Subcontractor or directly from the Sub-subcontractor).

## Article 11 - DELAYS

**11.1   Liability for Delays.**
Subcontractor shall be liable to Contractor for any and all loss or damage Contractor sustains as a result of Subcontractor's delay in the safe performance of the Work or delay to the Project attributable to Subcontractor, including any amounts due from Contractor to Owner under the Owner Contract. Permitting the Subcontractor to continue to perform its Work after the agreed time for performance has expired shall not be construed as or constitute a waiver by Contractor of any claims for loss or damage it may have against Subcontractor as a result of such delay.

**11.2   Liquidated Damages.**
Subcontractor shall be liable for any specific liquidated damages negotiated and agreed to by Contractor and Subcontractor in the Subcontract and that portion of any liquidated damages payable by

**Page 12 of 18**

**Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Contractor under the Owner Contract attributable to Subcontractor's failure to discharge one or more of its obligations when and as required under the Subcontract. Subcontractor acknowledges that any liquidated damages payable by it are reasonable and appropriate in light of the probable increased costs and other anticipated damage to Contractor in the event of the performance failure by Subcontractor in connection with which such damages become payable. Subcontractor agrees to and does hereby waive any defense as to the validity or enforceability of any liquidated damages payable by it under the Subcontract on the grounds that such damages are void as penalties or are not reasonably related to actual damages, whether the damages were specifically established by Contractor and Subcontractor under the Subcontract or were established by Contractor and Owner under the Owner Contract. Subcontractor further agrees that Contractor shall be entitled to recover from Subcontractor any Damages Contractor incurs as a result of Subcontractor's failure to discharge a Subcontract obligation that exceeds any liquidated damages paid by Subcontractor in connection with that failure.

**11.3    _Work Delays and Interferences._**
Except as provided under Article 10.5, the full and complete compensation to, and sole and exclusive remedy of, Subcontractor in the event of any delay, interference or other adverse impact to the Work shall be an extension of time for performance of the Work. Subcontractor acknowledges that in agreeing to the Subcontract Amount it has assessed the potential impact of the limitations in this Section 11.3 on its ability to recover additional compensation in connection with a Work delay or interference and agrees that these limitations will apply regardless of the accuracy of Subcontractor's assessment or actual costs incurred by Subcontractor.

**11.4    _Force Majeure._**
Subcontractor shall not be liable for a delay in the performance of one or more of its obligations under the Subcontract due to events of force majeure, but only to the extent and upon the conditions that: (i) Subcontractor's written notice to Contractor of the event for which its seeks relief: (a) conspicuously indicates in the notice's subject heading, "CLAIM FOR FORCE MAJEURE RELIEF"; (b) meets the force majeure notice requirements under the Owner Contract; and (c) is provided to Contractor no later than two (2) business days prior to the date Contractor is required to submit such notice to Owner under the Owner Contract. If the Owner Contract does not contain a force majeure provision, Subcontractor shall provide its written notice to Contractor no later than three (3) days after the occurrence of the event with a description of the particulars of the event, the estimated duration of the event or the effect thereof and the probable impact on Subcontractor's performance. Subcontractor shall so far as possible avoid and/or remedy the effects of any event of force majeure on its performance with all reasonable dispatch, and shall use its best efforts to eliminate and mitigate the consequences thereof. Subcontractor's relief for a force majeure event shall be limited to the force majeure relief Contractor actually receives from the Owner under the Owner Contract in connection Subcontractor's Work.

**Article 12 - TERMINATION**

**12.1    _Termination for Default._**
Subcontractor shall be in default under this Subcontract if Subcontractor: (a)(i) becomes insolvent or is unable to meet its debts as they mature; (ii) admits its inability to pay its debts generally; or (iii) institutes or has instituted against it under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, a proceeding which seeks the adjustment, protection or composition of Subcontractor or its debts or an order providing for the appointment of a receiver, trustee, or other similar official for Subcontractor or a substantial part of its property; or (b)(i) fails to supply enough properly skilled workmen or proper materials or equipment or to

make sufficient progress, in each case so as to endanger the timely or proper performance of the Work; (ii) abandons the Work; (iii) repeatedly or persistently disregards Applicable Law or Contractor's instructions; or (iv) otherwise breaches any provision of the Subcontract. Subject to Subcontractor's right to notice and an opportunity to cure for certain defaults as provided below, Contractor may on written notice to Subcontractor at any time after it is in default: terminate Subcontractor's right to proceed with all or part of the remaining Work, take possession of the terminated Work and any and all of Subcontractor's materials, tools, appliances, equipment and other items at the Project site and finish the terminated Work by whatever method Contractor may deem expedient. Contractor shall deduct all Damages incurred by Contractor as a result of Subcontractor's default from the Subcontract balance. In the event the Subcontract balance is insufficient to cover the Damages, Subcontractor shall pay the difference to the Contractor within ten (10) days of Contractor's demand for payment of same. If the Subcontract balance exceeds the Damages, the difference shall be paid to Subcontractor, subject to Owner's acceptance of the Work as provided in Section 12.3. Any default termination by Contractor of Subcontractor for default that is subsequently determined to have been erroneous shall be deemed to have been termination for Contractor's convenience under Section 12.4 and the party's rights and obligations shall be adjusted accordingly. Prior to terminating Subcontractor's right to proceed with Work due to Subcontractor's default under clauses (b)(i), (ii), (iii) or (iv) of this Section 12.1, Contractor will provide Subcontractor written notice of the default. ==Contractor may terminate Subcontractor's right to proceed with Work if Subcontractor fails to fully and completely cure the default and provide reasonable evidence of such cure to Contractor within forty-eight (48) hours of receipt of Contractor's written notice.==

**12.2    _Execution of Remedy Under Subcontractor's Surety Performance Bond or Guarantee._**
In the event Subcontractor's performance under the Subcontract is secured by a surety performance bond or other guarantee of performance, Contractor may, in the event of a Subcontractor default, demand that Subcontractor's surety or guarantor complete performance of the Work In the event the surety or guarantor fails to perform and complete Subcontractor's Work and other obligations in accordance with the Subcontract and bond or guarantee (as applicable), Contractor may proceed to remedy Subcontractor's default in accordance with Section 12.1. To the extent Contractor's damages exceed the Subcontract balance at time the Subcontract is terminated, Contractor shall be entitled to pursue its remedies against Subcontractor's surety or guarantor for breach of its bond or guarantee obligations.

**12.3    _Cessation of Payments Upon Termination._**
If the Contractor terminates Subcontractor's right to proceed with all or part of the remaining Work, Subcontractor shall not be entitled to further payment, if any, until Subcontractor's Work has been finally completed and accepted by Owner.

**12.4    _Termination for Convenience._**
Contractor may upon written notice to Subcontractor, without cause and without prejudice to any other right or remedy, elect to terminate the remaining Work for Contractor's convenience. The termination shall be effective in the manner specified in Contractor's notice. Unless Contractor's notice directs otherwise, Subcontractor shall immediately discontinue performance of the Work and the placing of orders for equipment, materials, supplies and other items and demobilize from the Project. Subcontractor shall take the steps necessary to preserve and protect Work in progress and shall use its best efforts to mitigate its costs in connection with the termination. Contractor shall pay Subcontractor a termination payment as Subcontractor's sole and exclusive remedy in connection with

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Contractor's convenience termination. The termination payment shall be comprised of: (i) amounts invoiced and due for Work performed but not yet paid; (ii) payment for Work satisfactorily completed but not yet invoiced by Subcontractor prior to the termination; (iii) retainage held by Contractor at the date of termination; and, (iv) all reasonable, actual termination costs incurred by Subcontractor in terminating the Work (but excluding any and all costs and expenses incurred by Subcontractor from and after the date of termination for those of its employees who are not directly performing required termination activities); provided, that if the termination was effected by Contractor due to the elimination or termination of work by Owner under the Owner Contract or other Owner action, or, as a result of the order of a court or public authority, then Subcontractor's termination payment shall be limited to the amount paid by Owner to Contractor for the terminated Work under the Owner Contract, less Contractor's costs to obtain that amount from Owner. In no event shall Subcontractor be entitled to recover any profit or overhead on terminated Work. Subcontractor's termination payment under this Section 12.4 will constitute its final payment for the Work and will be processed and become due to Subcontractor in accordance with Section 5.1.

## Article 13 - DISPUTES

**13.1    Contractor to Make Initial Decision on Disputes.**
Except as otherwise provided in the Subcontract, Contractor shall initially decide all disputes arising out of the Subcontract. Contractor shall reduce its decision to writing and furnish a copy thereof to Subcontractor. Contractor's decision shall be final and conclusive unless Subcontractor advises Contractor in writing within forty-eight (48) hours of receiving the decision of the bases for its disagreement with the decision. Subcontractor agrees that if it does not contest the Contractor's decision within the time and in the manner required under this Section 13.1, Contractor's decision shall be final and conclusive and the Subcontractor shall be deemed to have waived any right to contest the decision. Contractor decisions properly contested by Subcontractor shall be resolved in accordance with Section 13.4.

**13.2    Continued Performance Required.**
Subcontractor acknowledges the importance of performing and completing the Work and its other obligations under the Subcontract in a timely manner. Subcontractor agrees that its rights in connection with any claim or dispute with Contractor in connection with the Subcontract shall be determined as provided in this Article 13 or elsewhere in the Subcontract, and that it shall not be entitled to suspend or otherwise delay its performance and completion of the Work or the performance of its other obligations under the Subcontract based on any alleged breach by Contractor or claim or dispute between the parties, regardless of whether such breach, claim or dispute is the subject of dispute resolution between Contractor and Subcontractor.

**13.3    Appeals Under the Contract Documents.**
If Subcontractor wishes to appeal a decision rendered under the Contract Documents by the Architect, Owner or another Owner representative that adversely affects Subcontractor's interests, Subcontractor may do so, provided Contractor's interests are unaffected, Subcontractor bears all costs associated with the appeal and assumes sole responsibility for its prosecution.

**13.4    Method of Dispute Resolution.**
Claims and disputes between Contractor and Subcontractor arising out of or in connection with the Subcontract or the Work shall be resolved by litigation unless Contractor, at its sole option, advises Subcontractor in writing prior to the institution of litigation with respect to a claim or dispute, or within thirty (30) days after either party has instituted litigation with respect to the claim or dispute that

Contractor elects to have the claim or dispute resolved by arbitration. In such event, Subcontractor shall be bound by Contractor's election and any litigation filed shall be stayed by stipulation of the parties pending the conclusion of the arbitration proceedings. The arbitration proceedings shall be conducted pursuant to the Construction Industry Arbitration Rules issued by the American Arbitration Association then in effect. The parties shall afford each other informal discovery consistent with the discovery provisions of the Federal Rules of Civil Procedure, including the production of all documents related to the claim or dispute at issue and the deposition of witnesses having knowledge of facts pertaining to the claim or dispute at issue.

**13.5    Governing Law, Jurisdiction and Venue.**
This Subcontract shall be governed by and construed in accordance with the laws of the state in which Contractor's home office from which the Project being performed is located, excluding the conflicts of laws principles thereof; provided, however, that in the event the Contractor and Owner have elected to have the laws of another state govern the Owner Contract, then this Subcontract shall be governed by and construed in accordance with the laws of such state, excluding the conflicts of laws principles thereof. Subject to Section 13.6, for any action or proceeding involving claims and disputes between Contractor and Subcontractor arising out of or in connection with the Subcontract or the Work, Contractor and Subcontractor expressly and unconditionally: (a) agree that the presiding federal or state court in the district or state in which Contractor's home office from which the Project is being performed is located shall have exclusive jurisdiction over the action or proceeding; and (b) waive the right to a trial by jury in the action or proceeding. If Contractor elects to resolve a claim or dispute by arbitration, the arbitration shall be venued in the state and county court in which Contractor's home office from which the Project being performed is located.

**13.6    Joinder in Related Proceedings.**
In the event Contractor is involved in a separate arbitration, litigation, mediation or other legal proceeding in which any aspect of the Subcontractor's Work or entitlement to payment is at issue, or questions of law or fact common to the Subcontractor's performance under the Subcontract are involved; or, if complete relief cannot be afforded in such proceeding without the Subcontractor's participation therein, Subcontractor hereby consents, upon written demand by Contractor, to its consolidation or joinder in that proceeding to the applicability of any rules or procedures applicable to such proceeding; and hereby waives any objections to the location or forum in which the proceeding is pending. In the event Subcontractor has initiated litigation against Contractor at the time Contractor's demand for consolidation or joinder is received, and that proceeding cannot be consolidated with the proceeding in which the Contractor is involved, Subcontractor agrees to dismiss or, in the event dismissal would prejudice Subcontractor's rights, stay the litigation.

## Article 14 - REGULATORY COMPLIANCE

**14.1    Compliance with Applicable Law Generally.**
Subcontractor, its Sub-subcontractors, and all Work provided under the Subcontract shall strictly comply with Applicable Law. Subcontractor shall, to the fullest extent permitted by law, indemnify, defend, and hold harmless the Indemnified Parties against and from any and all Damages resulting from or arising out of or in connection with any actual or alleged violation of Applicable Law by Subcontractor or its Sub-subcontractors concerning the Work. Subcontractor's compliance with Applicable Law shall include but not be limited to the specific compliance required under this Article 14.

**14.2    Safety Compliance.**
Subcontractor shall support and participate in the creation and maintenance of an injury free environment and shall be responsible

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

for safety precautions and training programs and shall take all actions necessary to provide for the safety of persons and property on or off the project site in connection with the performance of the Work. Subcontractor shall comply with all Subcontract requirements relating to safety, including as set forth in **Exhibit J** and the Owner Contract, and all requirements under Applicable Law relating to safety, including the Williams-Steiger Occupational Safety and Health Act of 1970. Subcontractor shall immediately report in writing to Contractor any injury to any Subcontractor or Sub-subcontractor employee, or any property damage at the Project site in connection with Subcontractor's or one of its Sub-subcontractor's activities.

**14.3** *Environmental Compliance.*
Subcontractor shall comply with Contractor's environmental requirements as set forth in **Exhibit J** and Applicable Law relating to the protection or preservation of the environment from hazardous material or waste, toxic substance, pollution or contamination or the discharge or release of, or exposure to, materials (including energy, odors, noise, soil, dust, etc.) into the environment. Subcontractor shall not under any circumstance apply to or enter into negotiations with any governmental authority or agency for acceptance of variations from or revisions to air, water or noise pollution or similar environmental laws or regulations relating to the Subcontract or the performance thereof, without Contractor's prior written approval.

**14.4** *Tax Compliance.*
Subcontractor agrees to pay all taxes, fees and contributions on or measured by the income, gross receipts or assets of Subcontractor or any of its Sub-subcontractors and all taxes, fees and contributions on or measured by employees or other labor costs of Subcontractor or any of its Sub-subcontractors, including without limitation all payroll or employment compensation tax, social security tax or similar taxes for Subcontractor's or any of its Sub-subcontractor's employees. Subcontractor further agrees to pay all sales and use taxes, and all import, export and other customs duties, charges, levies and fees imposed or incurred in connection with the shipping and delivery of any equipment, materials, supplies or other items required for the Work to the Project site. In the event that Contractor should pay or be required to pay any of the foregoing items or any portion thereof, Contractor may deduct the amount from the Subcontract balance or invoice Subcontractor therefor. Subcontractor shall pay any such Contractor invoice in full within five (5) days of receipt.

**14.5** *Affirmative Action and Non-Discrimination.*
Subcontractor shall comply with Contractor's affirmative action programs and any affirmative action obligations imposed upon Contractor under the Owner Contract. Subcontractor shall comply with all equal opportunity employment requirements, and shall not, under any circumstances, discriminate against any person because of race, creed, color, age, sex, national origin, marital status, sexual orientation, status with regard to public assistance, or the presence of a physical, sensory or mental disability.

**14.6** *Harassment and Offensive Behavior.*
Contractor is committed to maintaining a work environment that is free of harassment and offensive behavior, and such behavior is strictly prohibited by Contractor. Harassment and offensive behavior prohibited by this policy includes but is not limited to requests to engage in illegal, immoral, or unethical conduct, or negative comments or actions based on any person's race, creed, color, age, sex, national origin, marital status, sexual orientation, status with regard to public assistance, or the presence of a physical, sensory or mental disability. Neither Subcontractor nor any of its Sub-subcontractor's shall engage in any harassment or offensive behavior in connection with the Subcontract or the Project. Subcontractor shall immediately address any claim of harassment or offensive behavior involving it or its Sub-subcontractors, properly discipline any person

determined to have engaged in such conduct, including dismissal or removal from the Project where appropriate, and use its best efforts to ensure that such conduct shall not reoccur.

**14.7** *Skanska Code of Conduct.*
Subcontractor agrees that it shall operate and its employees shall conduct themselves in a manner consistent with the principles contained in the Skanska Code of Conduct attached as **Exhibit F**, as relevant to the Work.

**Article 15 - BONDING AND SUBCONTRACT PERFORMANCE INSURANCE**

**15.1** *Payment and Performance Bonds.*
If bonds are required by the Subcontract, Subcontractor shall furnish separate performance and payment bonds to secure its obligations under the Subcontract, each with a penal amount equal to one hundred percent (100%) of the Subcontract Amount. The bonds shall be written on the forms attached as **Exhibit O**. Subcontractor shall pay the premium for the bonds and the cost thereof is included in the Subcontract Amount. Unless more stringent requirements are imposed by the Owner Contract, all bonds issued by Subcontractor shall be issued by a surety acceptable to Contractor that is listed in the most current Federal Register listing of approved surety companies (Federal Register, Vol. 55, Department of Treasury Circular 570) with an A.M. Best Rating of "A-" or better, and is authorized to issue the bonds in the state where the Project is located.

**15.2** *Subcontract Performance Insurance.*
In lieu of requiring Subcontractor to provide payment and performance bonds, Contractor, at its sole option, may secure Subcontractor's obligations under the Subcontract by obtaining subcontract performance insurance (also known as "Subguard"), to insure Contractor against a Subcontractor default. Subguard shall be for the exclusive benefit of Contractor and the existence of Subguard insurance coverage shall not in any way limit or restrict any of Contractor's rights or remedies in the event of a Subcontractor default, nor shall it in any manner inure to the benefit of, or provide any rights or remedies to, Subcontractor or any of its Sub-subcontractors or any of their respective employees or agents.

**15.3** *Pre-Qualification for Subguard Required.*
If Contractor elects to secure Subcontractor's obligations under the Subcontract through Subguard, Subcontractor shall comply with Contractor's Subguard qualification procedures, including providing documentation and information required by the Subguard insurer involving financial, technical, management and other matters relating to Subcontractor and its operations.

**15.4** *Failure to Meet Subguard Requirements.*
If Subcontractor fails to qualify for Subguard coverage, Contractor may elect to require Subcontractor to furnish performance and payment bonds to secure Subcontractor's obligations under the Subcontract, and Subcontractor shall provide those bonds in the manner and time specified by Contractor and otherwise in accordance with Section 15.1.

**15.5** *Work Not to Commence Until Bonds Issued or Subguard Enrollment Completed.*
If bonds or Subguard coverage are required for Subcontractor, Subcontractor shall not commence performance of the Work before it has furnished the required performance and payment bonds or qualified for and been enrolled in the Subguard program, as applicable. If Subcontractor commences performance of the Work in violation of this Section 15.5, Subcontractor shall be deemed to have done so at its own risk and shall not be entitled to payment until the bonds are furnished to Contractor or Subcontractor is qualified for

**Page 15 of 18**

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

and enrolled in the Subguard program, it being understood and agreed that Subcontractor's compliance with the applicable bond or Subguard requirements is a condition precedent to Contractor's obligation to pay Subcontractor for Work performed.

## Article 16 - ENCUMBRANCES

16.1    **_No Liens or Encumbrances._**
Subcontractor warrants and guarantees free and clear title to the Work and all equipment, materials, supplies and others items supplied by Subcontractor for incorporation into the Work shall pass to Contractor and Owner, and that the Work, the Project site and the Project and any and all interests and estates therein and any and all improvements and materials placed on the Project site by Subcontractor or its Sub-subcontractors shall be free and clear of, all liens, claims, security interests and other encumbrances made by, through or under Subcontractor or any of its Sub-subcontractors. In the event of any nonconformity with the requirements of this Section 16.1, Subcontractor shall promptly: (i) defend Contractor's and Owner's title to the Work, the Project site and Project and such interests, estates, improvements and materials, as the case may be; and (ii) remove and discharge any such lien, claim, security interest or other encumbrance by paying the claimant, by posting a bond or other instrument as required by Applicable Law, or by providing Contractor collateral that is satisfactory in form and substance to it Contractor and Owner to fully indemnify and hold harmless Contractor and Owner from and against any Damages resulting from such encumbrance. Contractor may withhold from any amount due or to become due to Subcontractor an amount sufficient to remove and discharge such encumbrance until Subcontractor has removed and discharged such encumbrance as required by Section 16.1. If Subcontractor has not removed and discharged a lien, claim, security interest or other encumbrance covered by this Section 16.1 within ten (10) days after it has been made or filed, Contractor may cause the encumbrance to be removed and discharged with the moneys withheld, or by posting a bond, whereupon for purposes of this Subcontract such moneys or bonding costs (along with other costs incurred by Contractor in connection with the encumbrance), shall be deemed to have been paid to Subcontractor hereunder.

16.2    **_Subcontractor and Sub-subcontractor Information._**
In addition to the requirements of Section 4.5, Subcontractor shall, as often as requested by Contractor, furnish a statement identifying each party that has furnished or is furnishing any services, labor, equipment, materials supplies or other items to Subcontractor in connection with the Project, along with other pertinent information including such party's address, the value of and the party's contract, the amount paid to date and the amount due or to become due thereunder. Contractor may also request Subcontractor from time to time to obtain similar information from one or more of its Sub-subcontractors and Subcontractor shall do so and provide it to Contractor within five (5) days of Contractor's written request. Contractor may alternatively request such information directly from one or more Sub-subcontractor and Subcontractor expressly consents to Contractor contacting its Sub-subcontractors for this purpose. Subcontractor shall furnish Contractor within five (5) days of Contractor's written request evidence that Subcontractor has paid all amounts incurred by the Subcontractor for services, labor, equipment, materials supplies and other items used or furnished by Subcontractor in connection with the Project, or other liability incurred by Subcontractor for the purpose of performing the Work.

16.3    **_Assignment and Delegation Not Permitted Without Prior Written Consent._**
Subcontractor acknowledges and agrees that none of its rights or obligations under the Subcontract may be assigned or delegated without the prior written consent of the Contractor. Any assignment

or delegation by Subcontractor of a right or obligation hereunder without Contractor's prior written consent shall be null and void and of no force or effect. Contractor shall have the right on written notice to Subcontractor to assign this Subcontract in whole or in part to the Owner or its designee (including Owner's lender) if Owner terminates Contractor's performance under the Owner Contract for any reason or other circumstances exist under the Owner Contract requiring such assignment. Subcontractor will cooperate with Contractor as required to effect any such assignment.

## Article 17 - WARRANTIES AND GUARANTEES

17.1    **_Work Warranties and Guarantees and Correction of Defects or Deficiencies._**
Subcontractor warrants and guarantees that all Work (i) shall be free of defects in design, workmanship and material, (ii) shall be performed in accordance with the generally accepted industry codes and standards applicable to the Work, (iii) shall be performed in a good and workmanlike manner; and (iv) shall strictly conform to the requirements of the Subcontract (including any warranties required of the Contractor under the Owner Contract to the extent applicable to the Work). Upon receipt of written notice of a defect or deficiency in the Work, Subcontractor shall at Contractor's sole option and at no cost to Contractor, promptly repair, replace, or re-perform such defective or deficient Work so that it conforms to the requirements of the Subcontract. Subcontractor's obligation to repair, replace, or re-perform defective or deficient Work under this Section 17.1 shall extend: (i) for the warranty or guarantee period(s) specifically established in the Subcontract; or, (ii) if no such warranty or guarantee period(s) has been established, for the warranty period established for Contractor's work under the Owner Contract. If Contractor deems it inexpedient for Subcontractor to repair, replace, or re-perform defective or deficient Work, Contractor may make a deduction from the Subcontract Amount in lieu of such repair, replacement and re-performance, as determined by Contractor. Subcontractor shall provide information and execute documents as requested or required by Contractor to assign any Subcontractor warranty or guarantee to Owner or another party.

17.2    **_No Period of Limitation Established._**
Nothing contained in Section 17.1, and no warranty or guarantee period(s) specifically established in the Subcontract shall be construed to establish a period of limitation on any of Subcontractor's obligations under the Subcontract, other than Subcontractor's obligation to repair, replace, or re-perform defective or deficient Work during the period in question as provided in Section 17.1.

17.3    **_Sub-subcontractor Warranties and Guarantees._**
Subcontractor shall require warranties and guarantees from its Sub-subcontractors similar to those provided by Subcontractor under this Section 17.1. Subcontractor's Sub-subcontractor's warranties and guarantees shall be expressly stated to be for the benefit of and be enforceable by Contractor and Owner and assignable to Contractor and Owner on Contractor's demand therefor.

17.4    **_Backcharges._**
If Contractor notifies Subcontractor in writing at any time during the performance of the Work to correct defective or deficient Work, and Subcontractor states, or by its actions, indicates that it is unable or unwilling to proceed with corrective action in a reasonable time, Contractor may upon written notice to Subcontractor accomplish the required corrective action by the most expeditious means available and backcharge Subcontractor for the costs incurred.

# EXHIBIT "E"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

**17.5** **_Costs and Damages Resulting From Defects or Deficiencies in the Work._**
Subcontractor shall be liable for all Damages incurred by Contractor and its other contractors as a result of defects or deficiencies in the Work. This liability is in addition to Subcontractor's repair, replacement and re-performance obligations under Section 17.1.

### Article 18 - INDEMNITY AND INSURANCE

**18.1** **_Indemnity._**
In addition to any other defense, indemnity or hold harmless obligation imposed on Subcontractor by the Subcontract or Applicable Law, Subcontractor shall, to the fullest extent permitted by law, indemnify, defend and hold harmless the Indemnified Parties from and against any Damages involving the following:

(a)    Any actual or alleged infringements of any patent, trademark, copyright or other intellectual property or proprietary right by Subcontractor, its Sub-subcontractor or the Work furnished by Subcontractor;

(b)    Injury or death to any person, or damage to or destruction of any property (including loss of use thereof), or any other damage or loss by whomsoever suffered resulting from or arising out of or in connection with the Work, whether or not any such damage or loss is due to the negligence of any kind or character or other fault of any one or more of the Indemnified Parties or breach of any statutory duty, contractual obligation or other obligation by one or more of the Indemnified Parties.

(c)    Any failure of the Subcontractor or the Work to comply with the requirements of the Subcontract;

(d)    Any lien, claim, security interest or other encumbrance made or filed against: (i) the Work, Project site and the Project; any and all interests and estates therein and any and all improvements and materials placed on the Project site by Subcontractor or its Sub-subcontractors; or, (ii) any payment, performance, lien prevention, or lien discharge bond posted by any of the Indemnified Parties; and,

(e)    Any hazardous material or waste, toxic substance, pollution or contamination brought to or generated on the Project site by Subcontractor or its Sub-subcontractor, or used, handled, transported, stored, removed, remediated, disturbed or disposed of by Subcontractor or its Sub-subcontractor.

The foregoing obligations of Subcontractor shall not be affected or limited in any way by any insurance required of or provided to Subcontractor under the Subcontract. If a temporary restraining order or preliminary injunction is granted in any proceeding involving a claim, demand or cause of action covered by clause (a) above, Subcontractor shall make every reasonable effort at its expense to secure the suspension of the restraining order or injunction by giving a satisfactory bond or otherwise. If any portion of the Work is held in such proceeding to constitute an infringement and the use thereof is permanently enjoined, Subcontractor shall at its expense promptly secure a license authorizing Contractor's and Owner's continued use of such Work or, if Subcontractor is unable to secure such license, replace the affected Work or modify it so that it is non-infringing. Subcontractor shall not be required to defend, indemnify and hold harmless any Indemnified Party for Damages resulting, or to result from that Indemnified Party's sole negligence or intentional misconduct.

**18.2** **_Insurance._**
Subcontractor shall strictly comply with all of Contractor's standard insurance requirements set forth in **Exhibit G** to the Subcontract.

**18.3** **_Environmental Insurance._**
If Subcontractor's Work involves the remediation, removal or disposal of any hazardous material or waste, toxic substance, pollution or contamination, Subcontractor shall also strictly comply with all of the environmental insurance requirements set forth in **Exhibit Q** to the Subcontractor.

### Article 19 - MISCELLANEOUS REQUIREMENTS AND SPECIAL PROVISIONS

**19.1** **_Headings for Convenience Only._**
The Article and Section headings in these terms and conditions have been inserted for convenience or reference only and shall not in any manner affect the construction, meaning or effect of anything contained herein nor govern the rights and liabilities of the parties.

**19.2** **_Calculation of Time Periods._**
Unless specifically stated otherwise, all references in the Subcontract to days, or requirements that action be taken or notice be provided within a certain number of days, are to calendar days.

**19.3** **_Audit and Record Retention._**
Subcontractor's records related to the Project and the Subcontract shall be subject to audit and shall be made available to Contractor for that purpose upon five (5) days prior written notice. To the extent the foregoing audit provisions are different than, or inconsistent with, any audit provisions found in the Owner Contract, the more stringent requirement shall control. Unless the Contract Documents or Applicable Law requires a longer period, Subcontractor shall maintain its entire Project and Subcontract related records, financial and otherwise, for a period of three (3) years after the Contractor achieves final completion of its work at the Project.

**19.4** **_Confidentiality._**
Subcontractor acknowledges and agrees that it will execute any confidentiality or nondisclosure agreements required by the Owner Contract, which will be attached as **Exhibit W**. Subcontractor further acknowledges and agrees that Contractor may disclose certain information to Subcontractor for purposes of the Work that Contractor and/or Owner considers to be confidential or proprietary or to constitute trade or business secrets (collectively "Confidential Information"). In the absence of more stringent requirements contained in the Owner Contract, when Contractor and/or Owner discloses any information designated as Confidential Information to Subcontractor, Subcontractor agrees that:

19.4.1    the Confidential Information shall be used solely for the purpose of performance under the Subcontract and disclosed only to those of Subcontractor's employees who have a need to know the information for that purpose;

19.4.2    it shall not disclose Confidential Information to any third party without Contractor's prior written consent;

19.4.3    it will take precautions to prevent the disclosure of the Confidential Information that are no less stringent than those employed to preserve the secrecy of its own confidential business information or trade secrets, and in no event less than reasonable precautions; and,

19.4.4    upon completion of the Work it will return all documents containing Confidential Information to the Contractor and/or Owner without retaining any copies thereof.

Unless a longer period is established by the Contract Documents, the provisions of this Section 19.4 shall remain in force for a period of five (5) years after Contractor's final completion of its work at the

# EXHIBIT "E"

**Attachment to Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Project. Subcontractor agrees that in the event of its breach or threatened breach of its obligations under this Section 19.4, Contractor shall be entitled to equitable relief in order to restrain any continued or threatened breach.

**19.5**    _Contractor's Remedies Are Not Exclusive._
The remedies provided to Contractor in the Subcontract are cumulative and not exclusive and additional to any other remedies available to Contractor under Applicable Law.

**19.6**    _Damages Limitation._
In no event shall any of the Indemnified Parties be liable to Subcontractor or any of its Sub-subcontractors, whether based on delay, contract, tort, negligence, warranty, indemnity, strict liability, error or omission or otherwise, for any consequential, special, incidental, indirect, exemplary, multiple or punitive damages or damages arising from or in connection with loss of use or loss of revenue or profit, actual or anticipated or otherwise, and Subcontractor hereby releases each of the Indemnified Parties from any such liability. Subcontractor shall obtain similar releases from each of its Sub-subcontractors.

**19.7**    _Title to the Work._
Title to the Work, or portions thereof, shall pass to Contractor upon the occurrence of the earliest of the following events, as applicable: a) when such Work or portion is delivered to the Contractor or the Project Site pursuant to the Subcontract; b) when Subcontractor has been paid any sum to which it may become entitled in respect to such Work or portion; c) when such Work or portion is identifiable to the Subcontract; or d) when the Certificate of Final Completion for all Work is issued by Contractor on behalf of the Owner and/or Architect. All equipment, materials, supplies and other items to which Contractor has title shall not be removed from the Project site without Contractor's prior written consent.

**19.8**    _Reformation of Unenforceable Provisions._
Subcontractor acknowledges that Contractor conducts business on a nationwide basis and that it is Contractor's intent that the requirements of the Subcontract comply with and are fully enforceable under the laws of all jurisdictions where it conducts business. The parties agree that if any provision of the Subcontract is determined by a court to be unenforceable in whole or in part under Applicable Law, that determination shall not affect the validity and enforceability of the remainder of the Subcontract and that only the provision (or part thereof) in question shall be deemed unenforceable. Accordingly, in the event that any one or more of the provisions of the Subcontract shall be found to be contrary to public policy and unenforceable, the remaining provisions of this Subcontract shall remain in full force and effect, and such term or provision shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with Applicable Law.

**19.9**    _Survival._
The applicable provisions of Articles 12, 13, 14, 15, 16, 17, 18 and 19 and any other provision of the Subcontract that either: (1) provides for limitation of or protection against liabilities between Contractor and Subcontractor; or (2) expressly or by implication comes into or continues in force and effect after Subcontractor's completion of the Work, shall survive termination of the Subcontract and Subcontractor's completion of the Work.

**19.10**    _Notices._
All notices required or permitted pursuant to this Subcontract shall be in writing and sent to the parties at the addresses set forth on the Subcontract Agreement. Notice shall be deemed delivered only upon receipt. Notice may be sent via facsimile, so long as the party sending the facsimile uses a machine that produces a printed

confirmation of delivery, and retains the printed confirmation evidencing that the transmission was successfully completed as proof of delivery.

**19.11**    _Subcontract Document._
The Subcontract shall be construed without regard to any presumption or other rule requiring construction or interpretation against the party who caused it to have been drafted. The Subcontract may be executed in counterparts, each of which will be considered an original.

**19.12**    _Additional Documents to Subcontract._
The Subcontract represents the entire integrated agreement between the parties with respect to the Project and supersedes all prior negotiations, proposals, correspondence, representations or agreements, whether written or oral, express or implied. This Subcontract may only be amended or modified in a Change Order or other writing signed by both Contractor and Subcontractor. The failure of Contractor to enforce at any time or for any period of time any one or more of the provisions of the Subcontract shall not be construed as a waiver of any such provision or provisions.

**19.13**    _Frivolous Claims._
In the event the Subcontractor asserts any frivolous claim against Contractor (or submits a Subcontractor adjustment request that has no substantial merit or that is based in whole or in part upon materially inaccurate assertions), Contractor shall be entitled to collect from Subcontractor by offset or otherwise any and all costs and expenses (including but not limited to reasonable attorney's fees) incurred by Contractor in investigating, responding to, defending against and resolving such claim or request.

**Skanska Standard Subcontract Terms and Conditions
(06/2006 ed. Rev. 3)**

**EXHIBIT "F"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

# SKANSKA CODE OF CONDUCT

**General Principles**

It is our key responsibility to develop and maintain an economically sound and prosperous business. Skanska assumes its responsibilities where we have effective control. These include our responsibilities towards the communities and environments in which we operate, towards our employees, business partners and society in general.

Therefore we have defined some key foundations for our performance:

- We are committed to do business with a high degree of integrity and ethics.
- We comply with legal requirements that apply in the countries where we do business.
- We respect the United Nations Universal Declaration of Human Rights and recognize our responsibility to observe those rights that apply to our performance toward our employees and the communities in which we operate. This commitment includes activities that relate to the rights and entitlements of Indigenous Peoples.
- We are open-minded in dialogue with those who are affected by our operations. We respond to inquiries from external parties and communicate with affected parties in a timely and effective manner.

Within our sphere of influence we endeavor to ensure that in our projects, our suppliers, subcontractors, agents, joint ventures and other partners abide by the principles set out in our Code of Conduct.

**Employee Relations**

A strong and consistent relationship with all employees, built on mutual respect and dignity, is of vital importance to Skanska. Employment conditions offered to employees will at least meet minimum requirements of national legislation and relevant ILO conventions.

- We provide a safe and healthy working environment and are committed to continual improvement.
- We provide equal opportunities to people without regard to race, color, gender, nationality, religion, ethnic affiliation or other distinguishing characteristics. We do not allow discrimination or harassment.
- We provide means for employees and other persons involved with Skanska to report legitimate concerns and grievances in a manner that ensures proper review and action, without retaliation.
- We recognize employees' rights to form or join trade unions in accordance with applicable national laws and principles.
- We provide training and education opportunities for employees that support their current and future work plans.
- We do not employ any person below the age of 15 or applicable higher legal minimum age.
- We do not use forced labor, slave labor or other forms of involuntary labor at our work sites.
- We do not allow any practice that would restrict free movement of employees.

# EXHIBIT "F"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

---

**Behavior in Our Marketplace**

Corruption, bribery and unfair anti-competitive actions distort markets and hamper economic, social and democratic development. Skanska does not tolerate such activities.

- We shall not act contrary to applicable competition laws.
- We shall not, directly or indirectly, offer or give any undue payment or other consideration to any person or entity for the purpose of inducing such person or entity to act contrary to prescribed duties in order to obtain, retain or direct business or to secure any other improper advantage in the conduct of Skanska's business.
- We shall not, directly or indirectly, solicit or accept any undue payment or other consideration that is given for the purpose of inducing us to act contrary to prescribed duties.
- We record the correct nature of all financial transactions by recording them in accordance with locally Accepted Accounting Principles and in all Group reporting follow International Financial Reporting Standards (IFRS) and applicable Skanska Policies and Rules.
- We have controls in place in our IT procedures to ensure adequate levels of data protection for our clients.

**Environment**

Based on the strong belief that project development and construction related services can make a major contribution to a more sustainable world, Skanska is committed to proactive environmental management at all levels.

- We maintain organizational structures, management systems, procedures and training plans that as a minimum ensure compliance with all relevant laws, regulations and standards.
- Our Environmental Management System is certified to ISO 14001. Since line management is responsible for our environmental performance, it is integrated into core business processes and plans.
- In a spirit of continual improvement, we involve our workforce in the process of environmental management including sub-contractors, partners and other interested parties.
- Our ambition is to continually improve the environmental credentials of our projects, products and services by actively looking for ways to reduce negative environmental impacts during their entire life cycle.

# EXHIBIT "G"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

## SKANSKA STANDARD INSURANCE REQUIREMENTS

### SECTION I:     DEFINITIONS

As used in this Exhibit G:

(a)  "Project" means the project that is the subject of the Subcontract/Purchase Order.

(b)  "Scope" means the scope of Work to be provided by Subcontractor under the Subcontract or the Goods and Services to be supplied and performed by Seller under the Purchase Order, as applicable.

(c)  "State" means a state of the United States or the District of Columbia or the Commonwealth of Puerto Rico, as applicable.

Capitalized terms used in this Exhibit G and not defined in the Subcontract/Purchase Order shall have the meanings generally ascribed to such terms in the commercial insurance industry in the United States.

### SECTION II:     STANDARD INSURANCE COVERAGES

Subcontractor/Seller shall comply with the following:

1.  <u>Standard Insurance Coverages</u>: Unless higher limits or additional coverages are required by the Subcontract/Purchase Order or Owner Contract, Subcontractor/Seller shall secure and maintain from the earlier of commencement of work or the effective date of the Subcontract/Purchase Order the minimum insurance coverages and limits required by this Exhibit G.  Failure of the Contractor/Buyer to identify deficiencies in any insurance provided by Subcontractor/Seller shall not relieve Subcontractor/Seller from any insurance obligations.  Required coverages are as follows:

    1.1    <u>Workers Compensation and Employer's Liability</u>:

    Worker's Compensation Insurance and Employer's Liability Insurance (including occupational disease) to cover statutory benefits and limits under the Worker's Compensation laws of any applicable jurisdiction in which the Scope is to be performed, and Employers' Liability Insurance with minimum limits of five hundred thousand dollars ($500,000) each accident, five hundred thousand dollars ($500,000) for disease, each employee and five hundred thousand dollars ($500,000) disease, policy limit.

    Policy coverage terms and conditions to include:
    - USL&H – where applicable.
    - Jones Act – where applicable.
    - All states endorsement – where applicable.
    - Employers Liability/Stop Gap Liability if work is performed in the State of Washington, Wyoming, Ohio, North Dakota or the Commonwealth of Puerto Rico.
    - For the attainment of Workers Compensation in monopolistic states and Puerto Rico, coverage must be secured through the state fund of that state.
    - Certificate must clearly identify that coverage applies in the State in which the Project is located.

    1.2    <u>Commercial General Liability Insurance</u>:

    Commercial General Liability Insurance ("CGL") written on ISO form CG 00 01 Edition date 10/01 or prior ISO edition occurrence form or equivalent for hazards of: (a) Construction Operation, (b) Subcontractors and Independent Contractors, (c) Products and Completed Operations applicable to the Additional Insured (with Completed Operations coverage to remain in force from the date of final completion of the Scope until the expiration of the statute of repose of the State in which the Project is located).  The insurance shall include: (1)

**Page 1 of 11**

Skanska Standard Insurance Requirements
(09.2012 ed. Rev. 1)

# EXHIBIT "G"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

Contractual Liability coverage sufficient to meet the requirements of the Subcontract/Purchase Order (including defense costs and attorney's fees assumed under contract, which shall be payable in addition to the limit of liability); (2) Personal Injury Liability (with the standard contractual and employee exclusions deleted); (3) Notice and Knowledge of Occurrence; and (4) no subsidence exclusion.

If marked as required, Subcontractor's/Seller's CGL insurance is required to provide the following coverages:

|  | Required |  |
|---|:---:|:---:|
|  | Yes | No |
| • Mold | ☐ | ☒ |
| • EIFS | ☐ | ☒ |
| • Operations (performed within) 50' of railroad property | ☐ | ☒ |
| • Residential operations | ☐ | ☒ |
| • Pollution Coverage (Exhibit Q Required) | ☐ | ☒ |

If the Subcontractor's/Seller's CGL insurance excludes any of the required coverages, a separate policy acceptable to Contractor/Buyer must be obtained.

For each insurance category checked 'Yes' above, Subcontractor/Seller's CGL insurer and/or broker will evidence, through Policy endorsement, or provide written confirmation, that such coverage is intact, even if each respective insurance certificate lists that type of coverage and describes its liability limits.

The insurance shall have the following minimum limits of liability, which shall be available to the Project:

| EACH OCCURRENCE | $ | 1,000,000 |
|---|---|---|
| PRODUCTS-COMP/OP AGG. | $ | 2,000,000 |
| PERSONAL & ADV INJURY | $ | 1,000,000 |
| GENERAL AGGREGATE | $ | 2,000,000 |

The general aggregate coverage limits shall be per project general aggregate and shall be evidenced on Subcontractor's/Seller's Certificate of Insurance.

1.3    Commercial Auto Liability Insurance:

Commercial Automobile Liability insurance covering all owned, leased and non-owned vehicles used in connection with the Scope with limits of: $1,000,000 combined single limit per accident for bodily injury and property damage. The policy must include coverage for bodily injury, death and property damage arising out of ownership, maintenance or use of any motorized vehicle on or off the site of the Project, and Contractual Liability coverage. If hauling of hazardous waste is part of the Scope, Automobile Liability Insurance with a $1,000,000 combined single limit per occurrence for bodily injury and property damage applicable to all hazardous waste hauling vehicles, and include MCS 90 endorsement and the ISO Form CA 9948 (Pollution Liability Broadened Coverage for Business Automobile).

If CGL 12/04 or later edition is provided, the CA0051 1204: Mobile Equipment Subject to Motor Vehicles Laws shall also be provided. This additional endorsement is not required if the 2006 ISO Auto form is provided.

# EXHIBIT "G"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

1.4    <u>Commercial Umbrella Liability Insurance</u>:

    Commercial Umbrella Liability Insurance for bodily injury and property damage liability over Subcontractor/Seller's primary Employer's Liability, Commercial General Liability and Commercial Automobile Liability with limits available to the Project in the amount of $5,000,000 each occurrence and aggregate. All coverages and terms required under the Commercial General Liability, Automobile Liability and Employers Liability (sections 1.1, 1.2, and 1.3 above) must be included on the Umbrella Liability policy.

    Higher limits may be required by Contractor/Buyer or Owner on a project by project basis.

    Subcontractor/Seller's Umbrella Liability Policy shall evidence, through a policy endorsement, that it will provide liability coverage in excess of all available underlying coverage before any primary or excess coverage held by any Additional Insured or Indemnified Party is utilized.

1.5    <u>Leased Employee Liability</u>:

    If Subcontractor/Seller leases one or more employees through the use of a payroll, employee management or other company, Subcontractor/Seller must directly procure workers compensation/employer's liability insurance. The insurance shall be written on a "Minimum Premium" or "If Any" policy form. In addition, the workers compensation/employer's liability coverage provided **to and for the leased employees** by the payroll, employee management or other company must be evidenced and include an Alternate Employer/Leased Employee Endorsement, naming Subcontractor/Seller as the alternate employer. The employer's liability must be scheduled under a $5,000,000 umbrella (except in states where employer's liability is unlimited).

1.6    <u>Property Insurance</u>:

    Property Insurance coverage for tools and equipment owned, leased or used by the Subcontractor/Seller in the performance of the Scope. The Property Insurance shall extend to equipment, materials and supplies stored off the Project site or in transit to the Project site to be furnished as part of the Scope and incorporated into the Project.

1.7    <u>Professional Liability Insurance</u>:

<u>Required</u>

Yes    No
☐    ☒

    If marked as required, the Scope involves professional services and Professional Liability Insurance is required covering liability for claims that arise from the errors, omissions or acts of the Subcontractor/Seller or any entity for which the Subcontractor/Seller is legally responsible, in the provision of professional services. The policy shall be primary and non-contributory, with the insuring agreement to read: "to pay on behalf of" and shall be effective (retroactively, if applicable) from the date of commencement of all professional activities in connection with the Scope. The coverage shall be maintained for a period of 3 years following final acceptance of the Project. Minimum limits are: (1) Prime Subcontractor Design Professional: $2,000,000 per claim/annual aggregate; (2) Lower-Tier Subcontractor-Design Professional: $1,000,000 per claim/annual aggregate. A copy of the policy shall be provided to the Contractor/Buyer upon request.

    Coverages shall **<u>not</u>** include any exclusions or other limitations related to:

- scope of the services.
- delays in project completion and cost overruns.
- who can notify the carrier of a claim or potential claim.
- mold, fungus, asbestos, pollutants or other hazardous substances.

# EXHIBIT "G"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

For the purposes of Professional Liability Insurance, the term "Prime Design Professional" means the architect/engineer providing architectural, engineering and/or other professional services under a contract directly with Contractor/Buyer, and the term "Sub-Design Professional" means any architect/engineer providing architectural, engineering and/or other professional services directly or indirectly to a Prime Design Professional in connection with the Project. A Prime Design Professional is also a Subcontractor/Supplier and a Sub-Design Professional is also a Sub-subcontractor/Sub-supplier.

1.8   Riggers Liability Required:                                             Required
                                                                             Yes      No
                                                                             ☒        ☐

If marked as required, the Scope involves the rigging, hoisting, lowering, raising or moving of property or equipment belonging to others and Riggers Liability Insurance is required to insure against physical loss or damage to the property or equipment.

1.9   Aircraft/Watercraft:                                                   Required
                                                                             Yes      No
                                                                             ☐        ☒

If marked as required, the Scope involves the use of any owned, leased, chartered or hired aircraft or watercraft of any type and Aircraft Liability Insurance or Watercraft Liability Insurance, as applicable, is required in an amount of not less than $10,000,000 per occurrence, including Passenger Liability for bodily injury and property damage.

2.   Insurer Requirements:  Each insurer providing insurance coverage as required in this Exhibit G shall be a licensed admitted insurer authorized to issue such coverages in each State in which any part of the Scope is performed.  The insurer shall be acceptable to Contractor/Buyer and shall have an AM Best rating of "A-VI" or better.

3.   Certificate of Insurance: Prior to commencing its performance and throughout the warranty period under the Subcontract/Purchase Order, Subcontractor/Seller shall provide Contractor/Buyer a current certificate of insurance evidencing the coverages required by this Exhibit G (a sample Certificate of Insurance is attached for reference purposes).

4.   Sub-subcontractor/Sub-supplier: Before permitting any Sub-subcontractor/Sub-supplier to perform Scope under the Subcontract/Purchase Order, the Subcontractor/Seller shall require the Sub-subcontractor/Sub-supplier to maintain insurance in like form and amounts to that required herein.  Subcontractor/Seller shall be responsible to ensure that Sub-subcontractor/Sub-supplier maintains insurance in like form and amounts and shall provide evidence of same to Contractor/Buyer if requested.

5.   Notice of Cancellation: All insurance coverages required by this Exhibit G shall contain a provision that the coverage afforded hereunder cannot be cancelled, non-renewed, allowed to lapse, or have any restricted modifications added unless at least thirty (30) days prior written notice has been given to the Contractor/Buyer.

6.   Additional Insureds: All insurance required by this Exhibit G (excluding only Workers Compensation Insurance and Professional Liability Insurance) shall name Indemnified Parties as Additional Insureds and any other parties as required by the Owner Contract, and shall be primary and non-contributory to any insurance maintained by Indemnified Parties and Additional Insureds and any other parties as required by Owner Contract, all of which shall be stated on the Certificate of Insurance provided by the Subcontractor.  The General Liability Additional Insured Endorsement shall be on Form CG 2010 11/85, or CG 20 10 10/01 plus CG 20 37 10/01, or equivalent and shall include ongoing and completed operations.  **Evidence, by endorsement or policy language, of Additional Insured and Primary and Non-Contributory coverage must be provided with the certificate of insurance for General Liability.**

# EXHIBIT "G"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

7.  Deductibles/Denial of Claims: Subcontractor/Seller shall be responsible, at no additional cost to Contractor/Buyer, for the payment of any deductibles or self-insured retention in connection with the insurance coverages required by this Exhibit G both for itself and all Additional Insureds. Any self-insured retention or deductible in excess of $25,000 must be declared at the time Subcontractor/Seller submits its bid and must be specifically approved by Contractor/Buyer prior to execution of the Subcontract/Purchase Order. Subcontractor/Seller shall be responsible for any loss arising out of coverage denial by its insurance carrier.

8.  Dilution of Limits: For those policies containing an aggregate, as soon as incurred loss activity (paid plus reserve) depletes the aggregate by 50% or more, written notice must be sent to the Contractor/Buyer by certified mail return receipt requested.

9.  OCIP/CCIP Program: Subcontractor/Seller may be required by Contractor/Buyer to enroll in an Owner Controlled Insurance Program ("OCIP") or Contractor Controlled Insurance Program ("CCIP"). Subcontractor/Seller shall strictly comply with all requirements of the program in which it is required to enroll and the Subcontract Amount/Purchase Order Amount shall be reduced by a deduct change order by the amount included therein by Subcontractor/Seller for insurance coverage replaced by the OCIP or CCIP.

10. Waiver of Subrogation: All insurance coverages maintained by Subcontractor/Seller shall include a waiver of any right of subrogation of the insurers thereunder against Indemnified Parties and Additional Insureds and all of their respective assigns, subsidiaries, affiliates, employees, insurers and underwriters, and of any right of the insurers to any set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of any person insured under any such policy (Workers Compensation – where permitted). Subcontractor/Seller further waives all claims and all rights of subrogation against Indemnified Parties' and Additional Insureds' other contractors and all of their respective assigns, subsidiaries, affiliates, employees, insurers and underwriters for loss of, or damage to, Subcontractor's/Seller's Scope, tools, machinery, equipment, material, supplies, or any other losses within the scope of any insurance maintained by Subcontractor/Seller. If any of the Indemnified Parties and Additional Insureds is partially or wholly self-insured, then the waiver of subrogation shall apply as if they were in fact covered by their own insurance.

11. No Limitation: The insurance coverages maintained by Subcontractor/Seller shall not limit any of Subcontractor's/Seller's indemnity obligations or other liabilities under the Subcontract/Purchase Order. Insurance coverages maintained by Subcontractor/Seller that exceed the minimum requirements in this Exhibit G shall be applicable to the Subcontract/Purchase Order.

12. Severability of Interests (Cross Liability): All insurance required by this Exhibit G (excluding only Workers Compensation Insurance and Professional Liability Insurance) shall be endorsed to provide that, in asmuchas the policy is written to cover more than one insured, all terms, conditions, insuring agreements and endorsements, with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured. No cross liability exclusion will be accepted. Nor shall there be any restrictions in any policies that limit coverage for a claim brought by an Additional Insured against a named insured.

13. Insurance Policy Review/Exclusions/Copies: Contractor/Buyer has the right to receive copies of all insurance policies upon request. Policies shall not contain any exclusions that are not acceptable to Contractor/Buyer and Owner. If requested by Contractor/Buyer or Owner, all policies must be certified by the insurance carrier as being true and complete. Policies shall not contain any exclusions that are not acceptable to Contractor/Buyer and Owner, in their sole discretion. Contractor/Buyer's right to review and approve all insurance policies will not constitute a waiver of any rights created by or provisions contained in this Exhibit G should they differ from these contained in such policies.

14. Claims-Made Policies: Except for Professional Liability Insurance, claims-made policies are not acceptable.

15. Effect of Specified Coverages: In specifying minimum requirements herein, neither Contactor nor Owner assert or recommend this insurance as adequate to Subcontractor's/Seller's requirements. Subcontractor/Seller is solely

**Page 5 of 11**

**Skanska Standard Insurance Requirements
(09.2012 ed. Rev. 1)**

# EXHIBIT "G"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

responsible to inform itself of types of insurance it may need beyond these minimum requirements to protect itself from loss, damage or liability.

16. <u>Breach of Insurance Requirements</u>:  Subcontractor's/Seller's failure to obtain and maintain insurance coverages as required by this Exhibit G or any other Exhibit or attachment shall constitute a material breach of the Subcontract/Purchase Order.  In such event, in addition to any and all other rights and remedies contained in the Subcontract/Purchase Order, (i) Contractor/Buyer may, at its option, terminate the Subcontractor/Seller for default; (ii) Contractor/Buyer may, at its option, purchase such coverage and backcharge the premium and associated costs to Subcontractor/Seller; and/or (iii) any of the Indemnified Parties or Additional Insureds can require, that Subcontractor and/or its subcontractors to pay for all attorney's fees, expenses and liability as a result of any claim or lawsuit for which coverage would have been provided to the Indemnified Parties or Additional Insureds under Subcontractor's/Seller's insurance program but for a breach by Subcontractor/Seller or any of its subcontractors. Furthermore, to the extent of their respective interests, the Insurers of those entities that were to be included as Additional Insureds are deemed to be third-party beneficiaries of the insurance procurement obligation and as such have the same rights against the breaching party as the Indemnified Parties or Additional Insureds.

**Skanska Standard Insurance Requirements
(09.2012 ed. Rev. 1)**

## EXHIBIT "G"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

---

## CERTIFICATE OF LIABILITY INSURANCE

Issue Date (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESETATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | | |
|---|---|---|---|---|
| | | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | | E-MAIL ADDRESS: | | |
| | | PRODUCER CUSTOMER ID #: | | |
| | | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| INSURED | | INSURER A: | | |
| | | INSURER B: | | |
| | | INSURER C: | | |
| | | INSURER D: | | |
| | | INSURER E: | | |
| | | INSURER F | | |

COVERAGES                    CERTIFICATE:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFFECTIVE (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY | | X | X | POLICY NUMBER PER PROJECT AGGREGATE ENDORSEMENT 50' RAILROAD EXCLUSION ELIMINATED (10/01 & PRIOR OR EQUIVALENT) | | | EACH OCCURRENCE | $1,000,000 |
| CLAIMS MADE X OCCUR. | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | | | | | | | MED EXP (Any one person) | $5,000 |
| X ISO FORM CG0001 | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| X CONTRACT'L LIAB. | | | | | | | GENERAL AGGREGATE | $2,000,000 |
| GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PROJECT X LOC | | | | | | | PRODUCTS – COMP/OP AGG | $2,000,000 |
| **AUTOMOBILE LIABILITY** X ANY AUTO | | X | X | POLICY NUMBER | | | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| ALL OWNED AUTOS | | | | | | | BODILY INJURY (Per person) | $ |
| SCHEDULED AUTOS | | | | | | | | |
| X HIRED AUTOS | | | | | | | BODILY INJURY (Per accident) | $ |
| X NON-OWNED AUTOS | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| **UMBRELLA LIAB** X OCCUR | | X | X | POLICY NUMBER | | | | [] |
| **EXCESS LIAB** CLAIMS-MADE | | | | | | | | |
| DEDUCTIBLE | | | | | | | EACH OCCURRENCE | $5,000,000 |
| RETENTION $ | | | | | | | AGGREGATE | $5,000,000 |
| **WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED **(Mandatory in NH)** If yes, describe under special provisions below | N/A | X | POLICY NUMBER COVERAGE APPLIES IN STATE OF JOBSITE OPERATION UNDER THIS SUBCONTRACT USL&H COVERAGE IS INCLUDED WHERE NEEDED | | | WC STATUTORY LIMITS X   OTHER | | |
| Y/N | | | | | | | E.L. EACH ACCIDENT | *$500,000 |
| | | | | | | | E.L. DISEASE-EA EMPLOYEE | *$500,000 |
| OTHER **The coverages provided shall be pursuant to insurance requirements contained in the Subcontract..** | | | | | | | E.L. DISEASE-POLICY LIMIT | *$500,000 *EXCEPT WHERE UNLIMITED |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

All operations performed under **UF-323A, Chemistry/Chemical Biology Building, University of Florida Building 0275, Gainesville, FL 32611.** Skanska USA Building Inc. Project Number **239012**. All insurance (excluding only Workers Compensation Insurance and Professional Liability Insurance) include Owner, Skanska USA Building Inc., Skanska USA Inc., Indemnified Parties, any other parties as required by the Owner Contract, [list any others as identified by the contract documents] and their respective directors, officers, employees and affiliates as Additional Insureds, and shall be primary and non-contributory to any insurance maintained by Additional Insureds. The General Liability Additional Insured Endorsement shall be on Form CG 2010 11/85, or CG 20 10 10/01 plus CG 20 37 10/01, or equivalent and shall include ongoing and completed operations. Waiver of Subrogation applies to all policies for all additional insureds. Umbrella policy applies excess of General Liability, Automobile Liability, and Employers Liability.   **Evidence by endorsement, or policy language, of Additional Insured and Primary & Non-Contributory coverage on General Liability and waivers of subrogation on General Liability and Worker's Compensation must be provided with the certificate of insurance.**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Skanska USA Building Inc. 4030 W. Boy Scout Blvd., Suite 200 Tampa, Florida | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

Skanska Standard Insurance Requirements
**(09.2012 ed. Rev. 1)**

POLICY NUMBER:                                    COMMERCIAL GENERAL LIABILITY
                                                              CG 2010 11/85

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**


ADDITIONAL INSURED - - OWNERS, LESSEES OR
CONTRACTORS (FORM B)


This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART


SCHEDULE


Name of Person or Organization:


(If no entry appears above, information required to complete this endorsement will be shown in the
Declarations as applicable to this endorsement)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization
shown in the Schedule, but only with respect to liability arising out of **"your work"** for that insured by
**or for you.**

CG 2010 11/85            Copyright, Insurance Services Office, Inc., 1984

Skanska Standard Insurance Requirements
(09.2012 ed. Rev. 1)

ISO | Commercial General Liability Forms | 10/01/01

POLICY NUMBER:                                           COMMERCIAL GENERAL LIABILITY
                                                              CG 2010 10/01

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person or Organization: |
| --- |
| |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A.   Section II - Who Is An Insured is amended to include as an additional insured the person or organization shown in the Schedule, but only with respect to liability arising out of  your ongoing operations performed for that insured.

B.   With respect to the insurance afforded to these additional insureds, the following exclusion is added:

2.   **Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1)  All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

(2)  That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 2010 10/01                          © ISO Properties, Inc., 2000

Skanska Standard Insurance Requirements
(09.2012 ed. Rev. 1)

Page 9 of 11

POLICY NUMBER:                                          COMMERCIAL GENERAL LIABILITY
                                                               CG 2037 10/01

THIS ENDORSEMENT CHANGES THE POLCY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED -OWNERS, LESSEES OR
## CONTRACTORS - COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **Name of Person or Organization:** |
| **Location And Description of Completed Operations:** |
| **Additional Premium:** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

**Section II - Who is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

CG 2037 10/01

COMMERCIAL GENERAL LIABILITY
CG 20 01 04 13

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PRIMARY AND NONCONTRIBUTORY - OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the Other Insurance Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

1)  The additional insured is a Named Insured under such other insurance; and

2)  You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

CG 20 01 04 13                        © Insurance Services Office, Inc., 2012

# EXHIBIT "H"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

## SKANSKA STANDARD INTERIM ESTIMATE FOR PAYMENT, WAIVER AND RELEASE

TO:           **SKANSKA USA BUILDING INC. ("Skanska")**

FROM:                                                  Vendor #: _____

                ("Subcontractor/Seller")

Address: _____                                Project No.: _____

Project Name: _____                          Requisition #: _____

Project Site Address: _____ ("Property")

Subcontract or Purchase Order No.: _____     Cost Code #: _____

Period From: _____ To: _____

**STATEMENT OF SUBCONTRACT AMOUNT/PURCHASE ORDER AMOUNT:**

| | | | |
|---|---|---|---|
| 1. | **ORIGINAL CONTRACT SUM** | $ | _____ |
| 2. | Net change by Change Order | $ | _____ |
| 3. | **CONTRACT SUM TO DATE** (Line 1 ± 2) | $ | _____ |
| 4. | TOTAL COMPLETED & STORED TO DATE | $ | _____ |
| 5. | RETAINAGE | $ | _____ |
| 6. | **TOTAL EARNED LESS RETAINAGE** (Line 4 less Line 5 Total) | $ | _____ |
| 7. | LESS PREVIOUS CERTIFICATES for PAYMENT (line 6 from prior estimate for payment) | $ | _____ |
| 8. | CURRENT PAYMENT DUE | $ | _____ |
| 9. | **BALANCE TO FINISH, INCLUDING RETAINAGE** (Line 3 less Line 6) | $ | _____ |
| 10. | GROSS THIS PERIOD | $ | _____ |
| 11. | RETAINAGE THIS PERIOD | $ | _____ |

SKANSKA PROJECT MANAGEMENT APPROVAL _____ DATE: _____

**CERTIFICATION OF SUBCONTRACTOR/SELLER:**  I, the Undersigned, on behalf of the Subcontractor/Seller, hereby certify that: (1) the "Total Completed & Stored to Date" as shown above represents the actual amount due to Subcontractor/Seller under the terms of the Subcontract/Purchase Order for all Work performed or Goods and Services (as such initially capitalized terms are applicable and defined in the Subcontract/Purchase Order) supplied and performed, as applicable (including all authorized changes thereto), up through and including the period covered by this Estimate for Payment; (2) Subcontractor/Seller has paid all amounts due to its Sub-subcontractors/Subsuppliers (as applicable and as defined in the Subcontract/Purchase Order respectively) for the periods covered by previous payments received from Skanska; and (3) Subcontractor/Seller has complied with all Federal, State and Local laws, including without limitation, income, sales and use tax laws, Social Security laws, Unemployment Compensation laws, and Workers' Compensation laws insofar as applicable to Subcontractor/Seller's performance under the Subcontract/Purchase Order.

**WAIVER and RELEASE BY SUBCONTRACTOR/SELLER:**  Conditioned only upon payment of the amount of this request, or such other amount that is approved and paid by Skanska and/or Owner, and in order to induce such payment, I, the Undersigned, on behalf of the Subcontractor/Seller, do hereby release and waive the following rights and claims with respect to all Work, Goods and Services that have been performed or provided by, or on behalf of, Subcontractor/Seller in connection with the Project and/or the Property up through and including the period covered by this Estimate for Payment:  (a) all rights and claims that Subcontractor/Seller has under the mechanic's lien, materialmen's lien and other similar lien statutes of the State in which the Project is located; (b) all rights and claims that Subcontractor/Seller has against any labor, material, payment, performance or lien discharge bond pertaining to the Project, and all rights and claims that Subcontractor/Seller has under the Miller Act (40 U.S.C. §§ 3131-3133) or any similar State statute that requires a material and/or payment bond for the Project; and (c) all other claims for additional compensation of any kind, including delay, disruption, interference, impact, and acceleration, except for those unresolved claims for which Subcontractor/Seller has complied with the notice requirements of the Subcontract/Purchase Order.

**ACKNOWLEDGED BY AND AGREED TO** by the Subcontractor/Seller, through its authorized Undersigned representative, as of the _____ day of _____, 20____ .

Signed, sworn to and subscribed before the undersigned witness and notary public:

_____                                        _____
**SUBCONTRACTOR/SELLER**                                 Signature of Notary Public

_____                                        _____
Name and Title                                          Printed Name/Notary Seal
                                                        My Commission Expires: _____
_____
Name and Title Printed

Skanska Standard Interim Estimate for Payment, Waiver and Release
(08/2009 ed., Rev. 1)

# EXHIBIT "J"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

Note: If this Exhibit J is annexed to a Purchase Order, the term "Subcontract" means the Purchase Order, the term "Contractor" means Buyer, the term "Subcontractor" means Seller, the term "Sub-subcontractors" means Subsuppliers and the term "Work" means the Goods and Services, each as defined in the Purchase Order terms and conditions.

## SKANSKA STANDARD SUBCONTRACTOR ENVIRONMENTAL HEALTH and SAFETY REQUIREMENTS

Skanska USA Building Inc. ("Contractor") is dedicated to providing an Injury Free Environment®. Contractor expects Subcontractor management, supervision and workers to embrace environmental health and safety as a core value. Contractor's environmental, health and safety requirements are contained in this **Exhibit J** as well as in Contractor's Safety & Health Management Program ("SHMP") and in Contractor's Environmental Management System ("EMS") for the Project, which is hereby incorporated into this Subcontract. Subcontractor understands its responsibility to maintain a safe and healthy working environment and Subcontractor and its Sub-subcontractors shall abide by the requirements contained in the SHMP and EMS. The SHMP and EMS are available to Subcontractor upon Subcontractor's request. In addition, Subcontractor and its Sub-subcontractors shall, at no additional cost to Contractor, comply with the following requirements:

**Regulatory Compliance:**
Subcontractor agrees that the prevention of accidents to workmen engaged upon or in the vicinity of the project is its responsibility. Subcontractor agrees to comply with all federal, state, county and municipal laws, ordinances, rules, regulations, codes, standards, orders and requirements concerning environmental, health and safety that are applicable to the Work, including, among others, the Federal Occupational Safety and Health Act of 1970 ("OSHA") and the policies and guidelines set forth by the Environmental Protection Agency ("EPA") , as amended, and all standards, rules, regulations and orders which have been and shall be adopted or issued there under, and with environmental, health and safety standards established by Contractor and the Owner. The most stringent of the aforementioned laws, ordinances, rules, regulations, codes, standards, orders and requirements shall prevail.

**Subcontractor Safety Representative:**
Prior to mobilization, Subcontractor shall designate in writing to Contractor a competent person that shall serve as the Subcontractor's Project environmental, health and safety representative. This individual will be responsible and have the authority to ensure the Subcontractor's implementation, compliance with and enforcement of the SHMP and EMS. Qualifications for the Subcontractor's Project environmental, health and safety representative are provided in the SHMP and EMS. Contractor reserves the right to require Subcontractor to replace its Project environmental, health and safety representative if Contractor in its discretion determines the individual is not qualified, is ineffective or is not fulfilling all applicable environmental, health and safety responsibilities. If Subcontractor will have thirty (30) or more workers on the Project site at any time, including Sub-subcontractors, Subcontractor will provide a full time, on site environmental, health and safety professional prior to mobilization. Subcontractor will submit to Contractor, in writing, the proposed environmental, health and safety professional's qualifications and experience. Contractor reserves the right in its discretion to reject Subcontractor's proposed environmental, health and safety professional.

**Subcontractor Monthly Incident Summary Report:**
Each month Subcontractor shall submit a completed Subcontractor Monthly Incident Summary Report to Contractor. This report will be attached to Subcontractor's monthly payment request. Monthly payment requests that are submitted without a completed Monthly Incident Summary Report will be returned to Subcontractor. The reporting form is provided in the SHMP.

**Subcontractor Injuries and Incidents:**
Subcontractor shall notify Contractor of any incident or injury involving an employee of Subcontractor or one of its Sub-subcontractors on the day of the injury or incident. Subcontractor shall complete the Incident Notification and Investigation form provided in the SHMP and submit the completed form to Contractor within twenty-four (24) hours of the incident or

# EXHIBIT "J"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

injury. Subcontractor agrees that all injuries and incidents will be investigated to determine root cause, corrective action and preventative action to ensure similar injuries or incidents do not occur.

**Minimum Working Apparel:**
Subcontractor agrees that the minimum working apparel includes hardhat meeting the current version of ANSI Standard Z89.1, safety glasses and side shields meeting the current version of ANSI Standard Z87.1, high visibility attire at all times (ANSI reflectivity requirements must be met when working in traffic and/or at night), shirt with three inch or longer sleeves, long pants and durable work boots. Refer to the SHMP Personal Protection Equipment Section for more specific requirements.

**Environmental, Health and Safety Orientation, Training and Programs:**
Subcontractor agrees that none of its or its Sub-subcontractors' management personnel, supervisory personnel or workers will begin work on the Project without receiving a Project specific environmental, health and safety orientation provided by or authorized by Contractor. Subcontractor shall provide training as required by all federal, state, county and municipal laws, ordinances, rules, regulations, codes, standards, orders and requirements concerning environmental, health and safety that are applicable to the Work, including but not limited to, the Federal Occupational Safety and Health Act of 1970 ("OSHA") and the policies and guidelines set forth by the Environmental Protection Agency (EPA), as amended, and all standards, rules, regulations and orders which have been and shall be adopted or issued there under, and with environmental, health and safety standards established by Contractor and the Owner, including Contractor's Injury Free Environment® (IFE) program and Stretch and Flex Program. The most stringent of the aforementioned laws, ordinances, rules, regulations, codes, standards, orders and requirements shall prevail.

**Housekeeping and Orderliness:**
Subcontractor agrees that all equipment, tools, materials and other apparatuses will be stored, stacked, placed, temporarily spotted or setup in such a manner as to maintain safe egress and a clean and orderly workplace. Subcontractor agrees to remove all debris and trash daily. Should Contractor deem the Subcontractor in nonconformance with these requirements, Contractor will direct to Subcontractor to take corrective action immediately. Should the Subcontractor neglect to take such corrective measures, Contractor may do so at the expense of Subcontractor and may deduct the cost thereof from any payments due or to become due to Subcontractor.

**Fall Prevention and Protection Policy:**
Subcontractor shall comply with the Contractor Fall Prevention and Protection Policy, which requires that no worker exposed to a fall hazard of six (6) feet or greater will work without one hundred percent (100%) fall protection. Subcontractor will take all practical measures to eliminate, prevent and control fall hazards of six (6) feet or more before resorting to a personal fall arrest system. When personal fall arrest is required, Subcontractor shall provide such proper equipment for this purpose and all necessary instruction and training in the care and use of the equipment, including refresher training. All training shall be documented and made available to Contractor upon request.

**Disciplinary Action:**
Contractor may issue a written notice to individuals who are observed violating the laws, ordinances, rules, regulations, codes, standards, orders and requirements noted under Regulatory Compliance above. Any Subcontractor or Sub-subcontractor personnel who receive three (3) written violation notices within a one (1) year period may be removed from the Project. Individuals may be removed from the Project after one (1) written notice if Contractor determines in its discretion that the violation observed warrants such removal.

**Environmental, Health and Safety Nonconformance:**
When ordered by Contractor, Subcontractor shall stop any part of the Work that Contractor in its discretion deems unsafe, unhealthy and/or may have an adverse environmental impact until corrective measures satisfactory to Contractor have been taken. Subcontractor agrees that it shall not have or make any claim for damages growing out of such stoppages. Should Subcontractor neglect to take such corrective measures, Contractor may do so at the expense of the Subcontractor and deduct the cost thereof from any payments due or to become due to Subcontractor. Failure on the part of Contractor to stop unsafe or unhealthy practices shall in no way relieve Subcontractor of its responsibility therefor. Within twenty-four (24) hours of being ordered by Contractor to stop the <u>Work</u>, Subcontractor will develop and submit to Contractor a written Corrective

# EXHIBIT "J"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

Action Plan and Preventative Action Plan for any unsafe, unhealthy and/or environmentally adverse practice(s) that are the subject of Contractor's notice.

**Environmental, Health and Safety Planning:**
Prior to mobilization Subcontractor will provide Contractor with a written Project Environmental, Health and Safety Implementation Plan outlining the activities, hazards and controls Subcontractor will employ to mitigate hazards and potential environmental impacts associated with Subcontractor's Work. Subcontractor and its Sub-subcontractors will also prepare Daily Pre-Task Safety Plans outlining the activities, hazards and controls associated with the Work and related activities that will be performed that day. Subcontractor and its Sub-subcontractors will review Daily Pre-Task Safety Plans with their employees at the start of each shift and as required throughout the shift.

**Hazard Communication:**
Prior to mobilizing, Subcontractor will provide Contractor with Project specific hazardous material inventory list and Material Safety Data Sheets (MSDS) for each hazardous material Subcontractor or one of its Sub-subcontractors will bring onto the Project site.

**Regulatory Inspections:**
If Contractor is fined by any regulatory inspection by a Federal, State, County or Municipal agency or body as a result of any act or omission of Subcontractor or one of its Sub-subcontractors, Contractor will deduct the amount thereof and associated costs from any payments due or to become due to Subcontractor.

**Prohibitive Articles:**
In order that a safe and productive work environment can be provided, Subcontractor and Sub-subcontractors will prohibit the use, possession, control, sale, purchase, transportation, and distribution of the following on Contractor projects:

- Illegal and illicit drugs including but not limited to marijuana, mood and mind altering substances, "look-alike" substances, designer and synthetic drugs, and certain inhalants and over-the-counter drugs
- Prescription drugs not prescribed by a physician
- Drug paraphernalia, equipment, and literature related to illegal drugs and substance use
- Alcohol products and beverages
- Weapons, firearms, ammunition, explosives, and fireworks
- Radios, DVD/CD players, tape/cassette players, MP3 players and iPods.

**Illegal Acts:**
The theft, conversion, misappropriation, unauthorized removal, possession, or use of property or equipment belonging to Contractor, Owner, Subcontractor, or other worker including but not limited to, materials, tools documents, and propriety information is prohibited.

**Searches:**
Subcontractor and Sub-subcontractors understand that Contractor may conduct reasonable unannounced searches of the Work and/or Project area and personal searches of workers and others on the Project, including but not limited to, personal effects, vehicles, lockers, gang boxes, tool boxes, clothing, meal containers, and baggage. Searches will be performed by authorized personnel and may include the use of scent-trained dogs.

**Post Incident Drug and Alcohol Screening:**
Subcontractor and Sub-subcontractors agree all workers involved in any incident where damage to property or an injury treated by a physician occurred, will be subject to post-incident drug and alcohol testing. Subcontractor will transport the workers involved to a collection facility designated by Contractor.

**Penalties:**
Subcontractor and Sub-subcontractors agree that anyone found using, possessing, selling, distributing, transporting any prohibitive article; has any traces of a prohibited drug, substance, or alcohol in his/her system; engaged in an illegal act; refuses to submit to a search of property or person; or refused, delayed, or altered a urine and/or blood analysis; or was

# EXHIBIT "J"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

---

uncooperative with testing personnel will be immediately removed from the Project and prohibited from working on another Contractor project.

**Environmental Management System:**

Contractor is attuned to the potential environmental impact of its operation and activities. In an effort to address their impact, Contractor is a registered ISO 14001 certified company and has implemented an EMS to address potential impacts. The EMS is designed to identify and reduce the environmental impacts on all Contractor projects. It requires the allocation of appropriate resources and appropriate training to ensure the attainment of environmental objectives and targets. In order to achieve the objectives and targets, the Subcontractor and Sub-subcontractors agree at no additional cost to Contractor, to comply with the following requirements:

- **Regulatory Compliance:** Subcontractor and Sub-subcontractors will identify, evaluate, and comply with all applicable federal, state, and local environmental laws and regulations that are applicable to its work on the Project.
- **Prevention of Pollution:** Subcontractor and Sub-subcontractors will seek to avoid creation of pollution and waste as a result of its work. Subcontractor and Sub-subcontractors will manage waste created from its work through safe and responsible methods.
- **Conservation:** Subcontractor and Sub-subcontractors will strive to diminish its consumption of natural resources, with a focus on re-use of materials, and the diversion of materials from landfill. Subcontractor and Sub-subcontractors will also strive to conserve energy and water throughout construction.
- **Emissions and Effluents:** Subcontractor and Sub-subcontractors will work to diminish emissions and effluents generated by their Work by employing cost effective controls and by implementing corrective actions as required and preventive actions where possible.
- **Ecology and Habitat:** Subcontractor and Sub-subcontractors will protect habitats, such as wetlands, and other sensitive ecological resources in accordance with applicable regulations and local ordinances.
- **Hazardous and Toxic Substances:** Subcontractor and Sub-subcontractors will not bring on to a the Project any hazardous substance or material, or any other substances or materials requiring special handling, until MSDS sheets have been transmitted to Contractor prior to bringing the material or substance on to the Project. Subcontractor and Sub-subcontractor will at all times remain responsible for the proper storage, use, clean-up, removal, and disposal of any such materials or substances.
- **Communications:** Subcontractor and Sub-subcontractors will communicate the Skanska Environmental Policy and requirements of the EMS to all of its employees. Subcontractor and Sub-subcontractor will alert Contractor, potentially effected individuals or organizations, and the proper authorities of any environmental incident in a timely and effective manner.
- **Training:** Subcontractor and Sub-subcontractors will ensure all of its employees involved in the Project have attended Environmental Awareness Training provided by Contractor prior to commencing the Work on the Project. Subcontractor and Sub-subcontractor employees are also required to be trained in necessary competency training as outlined by applicable environmental regulations or as required in the Skanska EMS.

**Skanska Environmental Policy:**

The Skanska USA Building Inc. Environmental Policy can be viewed at **www.skanskausa.com**

EXHIBIT "K"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

# SKANSKA STANDARD CHANGE ORDER

To: _____    Date: _____

Address: _____    Project No.: _____

_____    Project Name: _____

_____

Subcontract/Purchase
Order No.: _____

Change Order No.: _____    Cost Code: _____

1.  **CHANGE IDENTIFICATION:** The following changes are hereby made to the above-referenced Subcontract/Purchase Order:

*[Describe changes made]*

2.  **ADJUSTMENT TO SUBCONTRACT/PURCHASE ORDER AMOUNT**:  As consideration for the change(s) identified in Section 1, the Subcontract/Purchase Order Amount is increased / decreased by:

_____ **DOLLARS** ($_____)

Original Subcontract/Purchase Order Amount:         $ _____
Net of Previous Change Orders
        No. 1 through No.        :        $ _____
Subcontract/Purchase Order Amount before this
        Change Order:        $ _____

The Amount of this Change Order:        $ _____

Revised Subcontract/Purchase Order Amount:        $ _____

**IF NO ADJUSTMENT IS MADE, THE SUBCONTRACT/PURCHASE ORDER AMOUNT REMAINS UNCHANGED.**

3.  **ADJUSTMENT TO TIME FOR PERFORMANCE**: In connection with the change(s) noted in Section 1, Subcontractor/Seller agrees that its time for performance under the Subcontract/Purchase Order will be adjusted as follows:

*[If the Change Order extends the schedule, identify the number of days of the extension; if there is a new Substantial Completion date, identify the date; if there is any change to any parts of the work (e.g. submittals, equipment delivery dates, etc., identify the new dates.]*

**IF NO ADJUSTMENT IS MADE, SUBCONTRACTOR'S/SELLER'S TIME FOR PERFORMANCE REMAINS UNCHANGED.**

By executing this Change Order, Subcontractor/Seller attests that the Subcontract/Purchase Order adjustment provided herein is adequate and constitutes compensation in full for all costs, claims, markup, and expenses, direct or indirect, attributable to this or any other prior Change Orders.  Subcontractor/Seller further attests that the Subcontract/Purchase Order adjustment provided herein constitutes compensation in full for any delays, acceleration, or loss of efficiency encountered by Subcontractor in the performance of the Work through the date of this Change Order, and for the performance of this and any prior Change Orders by or before the date of Substantial Completion.

**EXCEPT AS EXPRESSLY MODIFIED HEREIN, THE TERMS AND CONDITIONS OF THE SUBCONTRACT/PURCHASE ORDER REMAIN UNCHANGED.**

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

**EXHIBIT "K"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611, Project #239012.**

| **Contractor/Buyer:** | **Subcontractor/Seller:** |
|---|---|
| **SKANSKA USA BUILDING INC.** | |
| By: _____ | By: _____ |
| (Signature)           (Date) | (Signature)           (Date) |
| _____ | _____ |
| (Printed Name)          (Title) | (Printed Name)          (Title) |
| | *IF NOT SIGNED AND RETURNED WITHIN TEN (10) DAYS, THIS DOCUMENT IS SUBJECT TO CANCELLATION.* |

# EXHIBIT "M"

**Attachment** to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SUPPLEMENTAL CONDITIONS TO SUBCONTRACT AGREEMENT

### PROJECT SPECIFIC REQUIREMENTS

LABOR REQUIREMENTS ................................................................................................................3
    1.1.    Labor Jurisdiction    3
LAYOUT, TESTING, AND INSPECTION ......................................................................................3
    2.1.    Layout    3
    2.2.    Testing    3
    2.3.    Inspection    3
START-UP AND COMMISSIONING ...............................................................................................4
    3.1.    Subcontractor Responsibilities    4
DOCUMENTATION AND COMMUNICATION ..............................................................................4
    4.1.    Contract Documents    4
    4.2.    Printing    4
    4.3.    Submittals    4
    4.4.    Closeout Documents    4
    4.5.    Software    5
    4.6.    E-mail    5
    4.7.    Mail Delivery    5
    4.8    Shipping    5
    4.9    Daily Reports    5
CONTRACT DOCUMENTS ...............................................................................................................5
    5.1.    Interpretations of Drawings and Specifications    5
    5.2.    Reference Standards    6
PRICE AND PAYMENTS ..................................................................................................................6
    6.1.    Late Receipt of Estimate for Payment    6
CHANGES IN THE WORK ...............................................................................................................6
    7.1.    Change Order Pricing Methods    6
    7.2.    Time & Material (T&M) Costs    6
    7.3.    Proposal Requests    7
    7.4.    Overhead Costs    7
SCHEDULE ........................................................................................................................................7
    8.1.    Schedule Requirements    8
    8.2.    Subcontractor Schedule Submission    8
    8.3.    Three-Week Look Ahead Schedules    8
    8.4    Inclement Weather    8
    8.5    Schedule Maintenance and Review    8
    8.6    Sub-Subcontractor and Supplier Information    8
    8.7    Phasing of the Project    9
EQUIPMENT RATES ........................................................................................................................9
    9.1.    Subcontractor Owned Vehicles    9
    9.2.    Equipment Rates    9
    9.3.    Subcontractor Owned Equipment Rental Costs    9
LABOR AND PERSONNEL ..............................................................................................................9
    10.1.    Jurisdiction    9
    10.2.    Continuous Labor    10
    10.3.    Key Personnel    10
    10.4    MBE/WBE    10
    10.5    Notifications to Owner    10
    10.6    Job-Specific Apparel    10

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

CLEANING AND PROTECTION.................................................................................... 10
    11.1.    Final Cleaning    10
    11.2.    Daily Cleaning    10
    11.3.    Composite Cleanup Crew    11
    11.4.    Touchup    11
    11.5    Jobsite Delivery Schedules    11
    11.6    Truck Wash    11
    11.7    Property Lines    11
SUBMITTALS ..............................................................................................................11
    12.1.    Submittal Delivery    12
    12.2.    Questions or Deviations from Contract Documents    13
    12.3.    Submittals for Related Elements    13
    12.4.    Submittal Revisions    13
    12.5.    Informational Submittals    13
    12.6.    Sample Matching    13
SUBSTITUTIONS .........................................................................................................13
    13.1.    Substitution Requirements    13
    13.2.    Substitution Considerations    13
    13.3.    Coordination with Intent of Design    14
MATERIALS & EQUIPMENT .......................................................................................14
    14.1.    Subcontractor Responsibilities    14
    14.2.    Owner Furnished Equipment and Materials    14
    14.3.    Owner Review of Equipment Pricing    14
    14.4    Equipment Purchasing    14
QUALITY CONTROL....................................................................................................14
    15.1.    Inspection Attendance    14
    15.2.    Inspection Notice and Witness    14
    15.3.    Manufacture/Fabrication Inspection    15
CLOSEOUT PROCEDURES ..........................................................................................15
    16.1.    Project Closeout Requirements    15
    16.2.    As-Built Drawings    15
    16.3    Punchlists    15
    16.4    Demobilization    16
DEVIATION TICKET SYSTEM ....................................................................................16
    17.1.    Deviation Ticket System    16
    17.2.    Deviation Ticket Items    16
    17.3.    Employee Removal    16
    17.4.    Deviation Ticket Cost    16
TEMPORARY FACILITIES AND EQUIPMENT...........................................................16
    18.1.    Hoisting Requirements    16
    18.2    Temporary Office    17
    18.3    Parking    17
    18.4    Storage    17
SALES TAX RECOVERY PROGRAM............................................................................17
    19.1.    Subcontractor Participation/Requirements    17
LEED........................................................................................................................18
    20.1.    Definition    18
    20.2.    Subcontractor Participation/Requiements    18
COORDINATION WITH OTHER TRADES AND DRAWINGS.....................................19
BUILDING INFORMATION MODELING (BIM) ........................................................20
3D COORDINATION SPECIFICATION.......................................................................26

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SUPPLEMENTAL CONDITIONS TO SUBCONTRACT AGREEMENT

### PROJECT SPECIFIC CONDITIONS

## 1.  LABOR REQUIREMENTS

### 1.1  Labor Jurisdiction

Subcontractor is aware that both Union and Non-union tradesmen will be working together to furnish and execute a finished product.  Subcontractor shall provide manpower that offers a homogeneous work environment without affecting other trades on the project.

## 2.  LAYOUT, TESTING, AND INSPECTION

### 2.1.  Layout

Subcontractor shall include all layout required for its work. Skanska, (herein referred to as the Construction Manager or CM) will have a registered land surveyor accurately establish all corners of the building, one site benchmark and the finished floor elevation at grade level.  Additional control points and benchmarks shall be provided by the Structural Subcontractor as directed by Skanska.  Each Subcontractor shall layout his own work from the points given.  Each Subcontractor shall make provisions to preserve all control points, such as monuments, stakes, benchmarks, or other datum points and shall replace at his cost any of these which might be lost or destroyed through his actions.

Each Subcontractor shall be responsible for the correct location, dimensions, and elevations of his work.  As the work progresses, the Subcontractor shall lay out the exact locations of work under his contact.  Subcontractors shall coordinate the locations and layout of their work with other Subcontractors.

All work shall be neatly and carefully laid out to provide the most useful space utilization and the most orderly appearance. Before proceeding with any work where exposed to view or where conflict might occur, Subcontractor shall carefully plan the layout and review any questionable installations with Construction Manager.

Limits of Construction are generally delineated in the Contract Documents.  These limits shall not be construed as preventing the Subcontractor from performing work outside the Limits should the work require such performance.

This Subcontractor is responsible for taking field measurements and verification as required to properly complete their Work.

### 2.2  Testing

Unless stated otherwise in the Contract Documents, the Owner will retain an independent Agent to perform all onsite testing and inspection, unless otherwise indicated in this Subcontractor's scope.  Subcontractor shall assist the testing laboratory/Agent in obtaining samples and gathering data as needed relative to its work. The cost of the re-testing to confirm the acceptability of failed test shall be charged to the Subcontractor whose work failed any prior test. All other testing required by the Contract Documents shall be borne by the Subcontractor required to install work associated with that testing requirement.

Any/all required testing shall be performed in manner that supports and maintains the CM's schedule. Testing frequency, sequences, means, methods, and durations will be performed in a manner acceptable to the CM

### 2.3  Inspection

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Subcontractor is responsible for all coordination and scheduling/calling in of all local, state, and federal building inspections. Contractor must be notified of all scheduled inspections at least 24-48 hours in advance, depending on the inspection entity. The advance notice depends on the type of inspection. This Subcontractor also shall submit to Contractor all inspection reports. This Subcontractor shall be responsible for all costs for re-inspection or re-testing due to deficiencies of this scope of work.

This Subcontractor shall coordinate all manufacturers inspections prior to installation or concealment for this Subcontractor's scope of work. A written report/acceptance shall be provided on manufacturers letterhead within 72 hours of inspection.

3. **START-UP AND COMMISSIONING**
   1.
   **3.1. Subcontractor Responsibilities**
   2. Subcontractor will provide on-site start-up and commissioning services, supervision and training of Owner's personnel for all the work specified and as required including all labor, materials, transportation, lodging, per diems, taxes, insurance, overhead, profit, burden, and expenses. The start-up and commissioning program shall inspect, test, and demonstrate compliance with the Contract Documents, operational functionality of the systems and equipment, and capacity and performance characteristics, and shall be coordinated with the Contractor's duly authorized representative(s). Subcontractor shall assist in the demonstration of the equipment function and in providing instruction to the Owner's personnel as required.

4. **DOCUMENTATION AND COMMUNICATION**

   **4.1 Contract Documents**
   Subcontractor shall be responsible for all printing costs associated with the Construction Documents. Only electronic copies of the Construction Documents will be provided via the Skanska Cloud.

   **4.2 Printing**
   Subcontractor is responsible for all printing costs necessary to complete the work and to comply with all documentation requirements of the contract documents, including but not limited to shop drawings, as-builts, and additional sets of plans and specifications.

   **4.3 Submittals**
   Electronic Submittals will be a requirement for this project. All submittals will be uploaded to the project's teamsite in a legible format. Once uploaded, formal notification must be sent to the project team for review.

   **4.4 Closeout Documents**
   Closeout documents shall be provided per Specifications. See Division 1 as well as related Specification Sections.

   Attic stock will be delivered per a mutually agreed schedule before substantial completion. The materials will be appropriately placed on pallet(s) and properly labelled and wrapped. Once the quantity has been confirmed, the subcontractor will be responsible for placing the attic stock in locations directed by the Owner. SKANSKA USA BUILDING, INC. will not accept any materials, which do not meet the above and/or specified requirement. Any materials left behind by the subcontractor that are not properly turned over and are either lost, misplaced, and /or thrown away as a result, will be replaced at the subcontractor's expense.

   This Subcontractor will furnish to the CM "Operation and Maintenance" (O & M) Manuals upon this Subcontractor having billed the CM for 50% of the total Contract Sum and/or a minimum of 6 months before the Project Substantial Completion Date, which ever is earlier.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

This subcontractor will furnish to the CM "Training" Manuals six (6) months prior to completion of the Work. Training sessions shall be scheduled over a four (4) month period with completion of all training one (1) month prior to completion of the Work.

All Owner Training sessions for this Subcontractors scope of work will be videotaped by this Subcontractor and the DVD turned over to the Owner as part of the Closeout process.  Agenda's of the training and 3 proposed dates of training will be submitted for review.

As built drawings must be maintained on-site at all times. Periodic inspections of on going as-built documentation will be performed by the CM's personnel. Failure to maintain as-built drawings is cause for withholding of progress payment(s) until the condition is resolved.   As-builts must be updated each day in the CM's jobsite office.

### 4.5  Software
Subcontractor will implement and prepare all documents using the project standard software as listed in the 3D Coordination Specification provided in the Specifications and Appendix.

### 4.6  E-mail
A project website has been setup for the duration of the project.  Each Subcontractor is required to provide the resources necessary to communicate electronically with the CM and other members of the project.  This includes but is not limited to maintaining an e-mail address, providing the software and hardware necessary for such communications and providing personnel familiar with telecommunication operations to maintain such communications.  The types of electronic documents that are required for use on the project include Submittals, RFI's, RFP's, Meeting Minutes, Letters, Notices, Bulletins, Requisitions, Pay Applications, etc.

This Subcontractor shall pay for and maintain throughout the life of the Contract, software and hardware connections to allow for the transfer of information between the CM and Subcontractor. Specific software shall include Microsoft Outlook, Word, and Excel. Information transfer may be in the form of Submittals, RFI's, Meeting Minutes, Schedules, etc.

### 4.7  Mail Delivery
All mail for subcontractors shall be sent to the subcontractor's local office, and not Skanska's onsite trailer. Skanska will not be responsible for subcontractor's mail.

### 4.8  Shipping
All documentation that requires shipping shall be at this Subcontractor's expense.

### 4.9  Daily Reports
Each subcontractor shall submit a daily report, containing details of that day's activities as it pertains to that particular subcontractor, through Skanska's Dayfacts program.  This will be complete on a DAILY basis.  Any time spent by Skanska personnel chasing down these daily reports will be reimbursed by this subcontractor at $100.00/hour.

## 5   CONTRACT DOCUMENTS

### 5.1  Interpretations of Drawings and Specifications
Interpretations requested by the Subcontractor for the proper execution or progress of the Work, in the form of drawings or otherwise, will be requested by the Subcontractor in writing, using the Contractor Request for Information Forms, and Contractor will issue the response in writing.  Such interpretations which are consistent with the intent of and/or reasonably inferable from the Contract Documents shall not serve as a basis for a claim

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

of a change in the Schedule or the Price by the Subcontractor. The Subcontractor shall not make any changes, additions, and/or deletions in the Work except upon written order of Contractor.

5.1.1    The Contract documents are meant to be complementary and what is required by one is required by all. Whenever possible, the Contract Documents shall be interpreted as consistent with one another and cumulative. However, if a conflict arises between the Contract Documents, the most stringent requirement shall prevail: provided, however, that the following priorities shall apply to the interpretation of the Drawings and Specifications:

- Among and between Drawings, detail Drawings shall govern over general Drawings, and larger scale Drawings shall govern over smaller scale drawings. Figured dimensions shall govern over scaled dimensions, and work not dimensioned shall be performed as directed by the Architect. In the event of a conflict, inconsistency or discrepancy within or among the Specifications or Drawings as to the quantity or quality of work or materials or quality of construction methods, the higher quality or greater quantity shall be furnished or performed unless otherwise specifically directed in writing by the Architect. Any matters contained in the Specifications that have been omitted from the Drawing or vice versa shall be constructed as though contained in both

**5.2  Reference Standards**
Where codes, standards, requirements, and publications of public and private bodies are referred to in the Contract Documents, references shall be understood to be the latest revision.

## 6    PRICE AND PAYMENTS

**6.1  Late Receipt of Estimate for Payment**
Subcontractor shall submit an Application for Payment by the 20th of each month, to be projected for work in place through the 25th of the month. If the Subcontractor's Application for Payment is received by Contractor after the 20th of the month, it will not be included in the Contractor's invoice to the Owner and therefore, will not be recognized as being received until the 20th of the following month.

## 7    CHANGES IN THE WORK

**7.1  Change Order Pricing Methods**
The amount to be paid to the Subcontractor on account of any extra, changed, added, or omitted work shall be:

7.1.1    A lump sum price which shall be supported by an estimate provided by the Subcontractor, in which it specifies its estimated costs for labor (hrs. at $/hr.) and materials (units with $/unit and/or applicable quote with backup), with a mark-up, no greater than percentages shown in Exhibit C;
7.1.2    Alternates or Unit Prices as specified in Exhibit C; or at the sole option of the Contractor,
7.1.3    A time and material (T&M) basis.

**7.2  Time and Material (T&M) Costs**
Time and Material (T&M) costs are to be computed as follows:

7.2.1    Actual cost of direct hourly labor per the wage rates identified in Exhibit C. This wage rate schedule shall include base hourly wages including all labor burden covering payroll taxes, worker's compensation, insurance, employee benefits, small tools, consumables and expendables, overhead, and profit. There shall be NO additional mark-up provided for the premium portion of labor.

## EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

7.2.2   Time and Material Tickets are deemed invalid unless a CE is assigned, is shown on the ticket, and signed by Skanska personnel.

7.2.3   Actual substantiated invoice cost of underlined materials (excluding small tools) incorporated into the Work, including applicable discounts and rebates due Subcontractor, plus a mark-up per Exhibit C. Tax shall not be included as part of cost of materials, and shall be applied to the cost after mark-up.

7.2.4   Third party rental costs of construction equipment (excluding small tools) inclusive of fuel, sales taxes, maintenance, and transportation to and from the Project Site shall have an overhead mark-ups shall be limited to schedule as described in Exhibit C.

7.2.5   Equipment owned by the Subcontractor shall be reimbursed at the rates specified in Exhibit C.

7.2.6   The sub-subcontractor shall be allowed overhead and profit which amount in total shall not exceed the schedule as described in Exhibit C of such cost, which shall be itemized separately.

7.2.7   Cost of premiums for all bonds and insurance, permits, and fees directly related to the changes in the Work shall be reimbursed at cost.

7.2.8   The change request must be returned to the Contractor within the time frame indicated in the Contractor's directive or within (5) five working days if no time frame is indicated otherwise, or a price will be determined on behalf of the Subcontractor.

7.2.9   For time and material (T&M) contracts or change orders ONLY, the following items shall be reimbursed at the net cost to Subcontractor:

- Building permits and other permits and licenses
- Reproduction costs
- Minor jobsite expenses, such as expenses for telephone service
- Net costs for freight, cartage, etc. for miscellaneous items used at jobsite
- Costs of inspection and testing fees
- Cost of power, water, light, heat, and sewage disposal services used at the jobsite
- Fuel for off-road equipment

### 7.3  Proposal Requests

Subcontractor agrees to respond to all Proposal Requests (PR), Architectural Supplemental Instructions (ASI), or Requests for Information (RFI) that have been forwarded or answered by the Architect/Engineer/Landscape Architect/Civil Engineer with three (3) calendar days, upon receipt of PR, ASI or RFI. Subcontractor also agrees to provide a cost proposal, as outlined in this contract, within five (5) days of notice of impact. If no cost proposal is received, a price will be determined on behalf of the subcontractor.

### 7.4 Overhead Costs

The overhead cost shall be in lieu of the following:

-   Salary costs and other compensation of officers and/or partners
-   Home office-based professional staff and associated labor burden
-   Salary costs and other compensation of employees doing general administrative work
-   Computer cost
-   Home office rent or depreciation; utilities; equipment depreciation, maintenance, and operating cost; property and other business taxes; and other office expenses
-   Travel costs for non-reimbursable individuals
-   Small tools, defined as tools which do not have a new unit cost in excess of $750.00.

## 8    SCHEDULE

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## 8.1  Schedule Requirements

Subcontractor shall complete his work within the specified time for completion, including, but not limited to furnishing additional manpower and supervision, expediting materials, working overtime and/or working such shifts as necessary to complete the Project within the scheduled construction time at no additional cost to Contractor and/or Owner, and according to the Contractor's directed work sequence which may be modified from time to time by the Contractor as the progress of the work dictates.  Saturdays and Sundays are considered make-up days in the event that a subcontractor is behind schedule, inclement weather and/or holidays.

## 8.2  Subcontractor Schedule Submission

Within seven (7) calendar days after Subcontract award, Subcontractor will be required to submit a man and cost loaded bar chart schedule indicating the work execution plan within the guidelines and dates set forth by the Contractor.  The schedule shall show Work commencing at Subcontract award and, as a minimum, shall include activities for submittal preparation, review and approval, significant procurement items, and all construction activities for each of the several and distinct portions of the Work.  The time frames and activity durations shall include all related work necessary to complete this scope.  All known construction constraints must be indicated on the Subcontractor Schedule.  Examples of constraints would be equipment deliveries by Contractor or Owner, or material deliveries by Subcontractor, plant shutdowns required, work performed by others, and constraints between activities.

## 8.3  Three-Week Look Ahead Schedules

Subcontractor shall prepare a three (3) week look-ahead schedule each week and submit it prior to the job coordination meeting.  The estimated percent complete for activities in progress during the current week are to be included.  For activities that extend beyond the three (3) week window, a forecast current finish date is to be estimated.  Forms shall be provided by the Contractor.

## 8.4  Inclement Weather

In the event of inclement weather prior to departing from home, the Contractor Superintendent can be contacted to determine whether the site is open as usual, having a delayed opening, or closed.  During the workday, Contractor will inform Subcontractor to have site personnel depart the site early in cases of heavy wind, rain, lightning, snow and/or ice.  Any work onsite required in preparation of inclement weather, including hurricanes, tornado's, high wind events, etc. are specifically included in this Subcontract.

## 8.5  Schedule Maintenance and Review

Subcontractor shall dedicate time and appropriate personnel to aid in developing, maintaining, and monitoring the project schedule.  In addition, Subcontractor will be required to assign man-hours per work activity as outlined in the manpower loading worksheet provided by Skanska.  This worksheet must be returned with the executed Subcontract Agreement.

## 8.6  Sub-Subcontractor and Supplier Information

    8.6.1    Any Sub-Subcontract awards will be subject to the approval of the Contractor.  The Subcontractor shall provide the names, addresses and phone numbers of all major Sub-subcontractors and/or material suppliers and equipment manufacturers within 45 days of award of the Subcontract and shall update this list on a monthly basis and submit same with their Application for Payment.  Any and all sub-subcontractors and/or vendors shall be highlighted and brought to the Contractor's attention for information and per the requirement of the Owner.

    8.6.2    Subcontractor acknowledges that the Contractor reserves the right to contact any and all of Subcontractor's suppliers, vendors, and sub-subcontractors to inquire and to assist with the status and delivery of any material to be used on the project.  Contractor reserves the right to assist and to expedite materials directly with the manufacturer or supplier.  Contractor also reserves the right to inquire about Subcontractor's payment to the suppliers or sub-subcontractors.  In no way shall

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

rights reserved by the Contractor hereunder relieve the Subcontractor from its sole responsibility of procuring materials in a timely fashion and performing the work in accordance with the project schedule or any of its other duties, obligations or responsibilities under this Subcontract.

8.6.3    Subcontractor shall provide appropriate facilities at all reasonable times for inspection by the Contractor or Owner of the work and materials provided under this Subcontract, whether at the project site or at any place where such work or materials may be in preparation, manufacture, storage, or installation.

**8.7  Phasing of the Project**
Due to the nature of this Project, a phase-like approach to the work will be required.  It is understood that Subcontractor's work may not flow in a continuous manner and that multiple move-ins and remobilizations will be required at no additional cost to the Contractor.

# 9    EQUIPMENT RATES

**9.1  Subcontractor Owned Vehicles**
Subcontractor owned automobiles and pickup trucks are to be furnished as part of the Subcontractor's overhead and profit markup, and shall not be reimbursed as a rental expense.

**9.2  Equipment Rates**
Base equipment rental rates for equipment utilized on this Project shall be priced on an hourly, daily, weekly, and monthly cost.  Rates shall include transportation, delivery, pickup, fuel, energy costs, consumables, connections, maintenance, wear and tear, repair, depreciation, storage, tax, overhead, profit, and all other costs required for an all-inclusive rate.  Equipment shall be charged based upon actual usage within ½ hour, using an hourly rate.

**9.3  Subcontractor Owned Equipment Rental Costs**
Rental costs of Subcontractor-owned equipment not shown on the list below shall be invoiced as follows:

▪ 80% of the rates which are shown in the latest edition of "Nationally Averaged Rental Rate and Model Reference Data for Construction Equipment" prepared by Associated Equipment Distributors, Chicago, Illinois ("AED"); or if not shown in AED,
▪ 80% of the rates which are shown in the latest edition of "Tool and Equipment Rental Guide" prepared by Mechanical Contractors Association of America, Inc., Washington, D.C. ("MCA"); or if not shown in MCA,
▪ 60% of the rates which are shown in the latest edition of "Rental Rate Blue Book for Construction Equipment" published by Equipment Guidebook Company, Palo Alto, CA ("Blue Book"); or if not shown in the Blue Book,
▪ 60% of the rates which are shown in the latest edition of "Tool and Equipment Rental Schedule" published by National Electrical Contractors Associates, Bethesda, MD ("NECA").

Subcontractor shall not be reimbursed for the cost of leasing/renting an individual tool or piece of equipment in excess of its fair market value as determined above.

# 10   LABOR AND PERSONNEL

**10.1  Jurisdiction**
The Subcontractor and all its lower-tier subcontractors engaged in on-site construction work shall insofar as permitted by law employ crafts properly having proper jurisdiction.

**Project Specific Requirements**
**Project Revised 3/25/15**

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

### 10.2  Continuous Labor

Unless specifically scheduled by Contractor, this Subcontractor agrees to provide continuous field labor under all circumstances until completion of its work.  Accordingly, in the event the Union Agreements (if a Union Subcontractor) covering its employees expire during the course of the Project, this Subcontractor shall execute interim Union Agreement(s) or Project Union Agreement(s) so as not to disrupt its operation or that of other subcontractors.  Failure to effect the above within three (3) working days after notice from Contractor will result in termination of this Subcontractor.

### 10.3  Key Personnel

Subcontractor shall not replace any Manager, Supervision, or Key Personnel during the duration of the work without prior Contractor approval, which shall not be unreasonably withheld.  Prior to commencement of the Work, Subcontractor shall furnish to Contractor the names of all Subcontractor Key Personnel.

### 10.4  WBE/MBE /SBE

Minority participation is a requirement of this project and is this projects goal to seek diversity in its work force and the work force of its Subcontractors.  Minority owned and small businesses need to be identified and enterprises with the potential to provide needed services and commodities will be encouraged.

### 10.5  Notifications to Owner

Per the Owner requirements, no violent crime offenders are allowed onsite. All those part of a work release program must provide their names to the Owner. Subcontractors must provide name and date of birth of all employees (from Supervisors to day laborers) to Owner via fax (352-392-0539).

### 10.6  Job-Specific Apparel

Subcontractor personnel shall wear project specific T-shirt when onsite, which are available for purchase from Contractor for $10/ea.

## 11  CLEANING, PROTECTION AND DELIVERIES

### 11.1  Final Cleaning

Subcontractor shall remove grease, dust, dirt, stains, labels, fingerprints, and other foreign materials from interior and exterior surfaces of fixtures, hardware, finished surfaces, and equipment furnished or installed as a part of its Subcontract.

### 11.2  Daily Cleaning

Each Subcontractor shall be responsible for the daily cleanup and removal, to the CM's centrally located dumpsters, debris and waste resulting from their work.  Dumpsters will be provided by the CM, except as identified in Subcontractors scope of work with the CM.  Each Subcontractor shall agree to comply with the Project Policy and Procedure for Weekly Job Clean-Up.

This is a LEED project.  All recyclable materials are to be collected, deposited and tracked accordingly.  Dumpsters and hauling as required to meet LEED requirements by various Subcontractors will be the responsibility of that Subcontractor. Refer to Subcontractors scope to verify whether dumpsters are required to be provided for their work. If Subcontractor provides dumpsters, they must also provide all proper documentation for LEED.

In the event that construction debris and dissimilar recyclables are discarded in the incorrect location, the subcontractor will be responsible for all fees associated with offsite/onsite sorting of material. In the event that no specific subcontractor is identified, the fee will be distributed between all appropriate parties.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

Specific types and classifications of construction debris are not allowed to be deposited in the jobsite dumpsters and therefore are the Subcontractors responsibility to remove from the jobsite and dispose of legally. These items include but are not limited to:

- Materials Unsuitable for Disposal by Standard Commercial Procedures
- Materials Classified as Environmentally Hazardous or Environmental Contaminants
- Highly Volatile or Explosive Substances
- Residential Garbage
- Any material traditionally not accepted by landfills in the metropolitan area or any other material identified as unsuitable by CM and

## 11.3  Composite Cleanup Crew

In addition to its responsibility for specific cleanup of its debris, each Subcontractor, while on-site, is required to participate in a composite Project cleanup crew, supervised by CM personnel, for the purpose of general clean up and removal of "unidentifiable debris". Each Subcontractor agrees to provide capable laborer(s), equipped with a broom, shovel, and a 1 cubic yard capacity trash buggy to participate full time eight (8) hours a week or as required. Each Subcontractor shall contribute labor to the composite crew at the ratio of one (1) individual for every ten (10) of its on-site employees. For example, 1-10 employees require 1 composite crew laborer; 11-20 on-site employees require 2 composite crew laborers, and so on. Trash and debris from the composite cleaning operation will be deposited in the specified jobsite dumpster provided by the CM depending upon the recyclable nature of said trash and debris.

The composite clean up crew will meet each morning during the course of the project at a time and place as determined by the CM's Project Superintendent or his designated representative.

If any Subcontractor fails to maintain a satisfactory cleanup program, the CM will give a twenty-four (24) hour written notice to perform the necessary clean up. If the **Subcontractor then fails to perform the clean up, CM will have the option to perform the clean up on the project and back charge the responsible Subcontractors(s) for the cost at a rate of $35.00 per hour plus Supervision.**

## 11.4  Touch-up

In the event that any of the subcontract materials are to receive primed or finished painting, this Subcontractor shall be required to provide all labor and material to properly touch-up any scratches and/or abrasions to these materials, that occurred as a result of this Subcontractor's delivering, handling, hoisting, welding and installation of said materials.

## 11.5  Jobsite Delivery Schedules

All deliveries shall be scheduled for times approved by Skanska personnel and the University of Florida. Skanska requires delivery schedules to be incorporated into the subcontractors three week look ahead, submitted on a weekly basis.

## 11.6  Truck Wash

All trucks/vehicles shall be thoroughly cleaned before reentering a road from the jobsite. The subcontractor is responsible to utilize the provided truck wash and maintain a clean road per UF/City standards.

## 11.7  Property Lines

Subcontractor will take necessary "special" measures to keep all materials, equipment and operations within the property lines. Any damages resulting from "out of property line" work, whether intended or accidental, will be repaired at the expense of the Subcontractor.

## 12  SUBMITTALS

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

### 12.1 Submittal Delivery

Submittals shall be provided by Subcontractor using a Submittal Cover Sheet. All submittals will be uploaded electronically to Skanska's job specific team site. Paper hard copies of submittals will not be accepted. Sample submittals, and or hard copies required by the specifications must be mailed or hand delivered to the jobsite trailer.

The subcontractor will provide the required number of samples of each type required and/or requested per specifications. All submittals for approval will be transported via courier if necessary.

Subcontractor shall expedite and follow-up on all submittals and re-submittals to ensure earliest possible approval. The Subcontractor shall issue physical and electronic versions of Field use drawings immediately after the return of approved documents.

The Subcontractor shall submit a complete submittal schedule addressing individually each scope item. The Submittal schedule will be submitted in a form, and to a level of detail satisfactory to the CM. This schedule shall include at a minimum, the area or items each submittal is for, the anticipated number of drawings included for each package to be submitted, the date each submittal will be issued to the CM and the date the submittal must be approval by in order to fabricate in time for delivery to meet the project schedule. The Subcontractor shall bear responsibility for delays resulting from the failure of the Subcontractor to provide this information. Quantities of submittal documentation and other submittal requirements as described in the Project Specifications.

All Submissions shall include the Manufacturer's latest product literature including installation details and procedures.

Subcontractor shall provide all revisions to and copies of shop drawings, samples, product data, etc. that are required to gain approval by the Architect/Owner. Subcontractor acknowledges that numerous submissions may be required and shall provide these revision/copies at no additional cost to the Construction Manager and/or Owner.

Where structural calculations and/or shop drawings are required to be signed and sealed by a Structural Engineer, said Engineer will be registered in State of Florida.

The Subcontractor shall provide all available colors/finishes, not just standard colors, for particular products that are required to have color/finish selected by the Architect.

Unless otherwise noted in the Contract Documents, the below listed items will be submitted within the timeframe indicated (all items not specifically addressed below will be submitted no later than fourteen (14) days after award to the Subcontractor.):

- Submittals Schedule        Within ten (10) calendar days after award
- Shop Drawings/Calculations        Commence within thirty (30) calendar days after award
- Embed Layout Drawings        Within thirty (30) calendar days after award
- Misc. Data, Design Mixes, etc.        Within thirty (30) calendar days after award
- Samples        Within fourteen (14) calendar days after award
- Sample Panels/Mock-ups        Within fourteen (14) calendar days after approval
- Sample Warranties        Within forty-five (45) calendar days after award
- All Submittals        Complete within ninety (90) calendar days after award

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Each Subcontractor is required to submit an attic stock tracking spreadsheet during the submittal process, which is to include the specification section, attic stock quantity (back-up supporting the quantity), special storing instructions, and product life

**12.2  Questions or Deviations from Contract Documents**
Subcontractor shall highlight, encircle, or otherwise indicate questions or deviations from the Contract Documents.

**12.3  Submittals for Related Elements**
Coordinate transmittal of different submittals involving related elements so processing will not be delayed by need to postpone review of submittals until related submittals are received.  Contractor reserves the right to withhold action of submittals requiring coordination with other submittals until related submittals are received.

All approved submittals will be uploaded to the project teamsite. It is the subcontractor's responsibility to become familiar and coordinate with all approved submittals.

**12.4  Submittal Revisions**
Submittals shall be corrected and resubmitted as often as necessary to obtain approval.  The Owner, Engineer, or Contractor shall have the right to require Subcontractor to make any changes to the submittals that may be necessary, in their opinion, to make the Work conform to the intent of the Contract Documents.  Extension of contract time will not be authorized because of failure to transmit submittals to Contractor sufficiently in advance of Work to permit processing.

**12.5  Informational Submittals**
Submittals made by the Subcontractor which are not required by the Contract Documents may be returned without action.  Informational submittals upon which Contractor or the Architect is not expected to take responsive action may be so identified in the Contract Documents.

**12.6  Sample Matching**
Where visual matching to an established physical sample is required, the Owner, Architect, and Contractor's decision will be final.

# 13  SUBSTITUTIONS

**13.1 Substitution Requirements**
In order for Contractor to consider a substitution, Subcontractor shall complete a Request for Substitution form and provide supporting documentation as required to allow for a full and complete review of the request.

**13.2 Substitution Considerations**
Contractor will consider proposed substitutions when specified as "or equal" or "or approved equal" provisions are stated in the Contract Documents.  Contractor will also consider substitutions if:
- Specified product is not obtainable
- Delivery date of specified product is such that the scheduled date of Substantial Completion of Work will be delayed.
- At any time during construction, and after an order has been placed, circumstances beyond control of Subcontractor affecting manufacture or delivery of product may cause delay.
- For any other reason Subcontractor believes a substitution may be in the best interest of Contractor.

Contractor will NOT consider proposed substitutions if:

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

- Contract Documents do not allow for substitutions.
- Substitution will not provide the same or better warranty.
- Substitutions are indicated or implied on the submittals without having been formally requested.
- Substitution implementation requires major revision in Work in order to use proposed substitution.
- Substitution materially alters design concept including color, size, or function originally intended by specified product.

The decision to accept or reject a Subcontractor request for a substitution, other than a substitution of an "or equal" or an "or approved equal" as provided in the Contract Documents, will be made by Contractor in its sole discretion.

### 13.3 Coordination with Intent of Design

Subcontractor shall coordinate installation of any accepted substitution to conform with intent of the design.

## 14   MATERIALS & EQUIPMENT

### 14.1 Subcontractor Responsibilities

Subcontractor shall be responsible for proper removal, disposal, scheduling, delivery, receiving, unloading, inspecting, inventorying, storing, handling, protecting, relocating, hoisting, distributing, laying out, installing, cleaning, and protection for items to be furnished and/or installed by this Subcontractor.

### 14.2 Owner Furnished Equipment and Materials

The Owner reserves the right to procure, under its name and on its forms, equipment and materials. Such equipment and material will be provided to the Subcontractor for installation in a timely manner to support construction.

B. ............................................................................................................................................................

C. ......................................................................................................................................................... 1

### 4.3 Owner Review of Equipment Pricing

Prior to purchasing major pieces of equipment, Contractor reserves the right to require Subcontractor to reveal pricing from all specified vendors, in order to allow the Owner the option of selecting a preferred vendor.

### 14.4 Equipment Purchasing

Subcontractor shall service and maintain equipment and components installed under its Subcontract, between the period commencing with the start-up of said equipment and components, and the date of Project Completion. Contractor will not accept responsibility for the care, custody, and control of material between the time of installation by Subcontractor and acceptance by the Owner. On, or just prior to the date of the Project completion, this Subcontractor shall refurbish and return the respective equipment to "Like New" condition. Upon completion of the above, the equipment shall be turned over to the Owner, and the specified warranty periods shall begin.

## 15   QUALITY CONTROL

### 15.1 Inspection Attendance

Subcontractor shall attend inspections applicable to this scope of work. Subcontractor shall provide the required materials, supervision, and personnel to facilitate these inspections and fully demonstrate the operation of systems installed.

### 15.2 Inspection Notice and Witness

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

The Subcontractor shall give Contractor timely notice of when and where inspection and/or testing will be performed by the Subcontractor or by its independent testing agency, so that the Contractor, Architect, and/or Owner may observe same. Contractor will witness and sign off on any successful test; any test not witnessed by a Contractor representative will have to be repeated. The Subcontractor shall comply with all valid directives of any testing and inspection agency, engineers, etc. Any such observation by the Contractor, Architect, and/or the Owner shall not diminish, in any way, the Subcontractor's responsibility to perform the Work in accordance with the Contract Documents.

### 15.3 Manufacture/Fabrication Inspection
The Owner, it's Agent, and/or Contractor shall have the right to visit the premises of the Subcontractor, or its manufacturer or subcontractors, to inspect all material or equipment in process of manufacture or fabrication with regard to material, design, and quality of workmanship and progress of the work. The Subcontractor shall supply the inspecting agent with all assistance practicable, including drawings and other documents, as well as a guide who is familiar with the work in progress. The above is subject only to pre-notification of the Owner or their Agent, and/or Contractor.

## 16  CLOSEOUT PROCEDURES

### 16.1 Project Closeout Requirements
Project closeout procedures shall consist of the following:
- Complete construction and provide start-up testing of equipment and systems
- Conduct a final walk-through inspection to ensure completion of punchlist items
- Provide on-site instruction and training (videotaped) as required
- Remove all temporary facilities and utilities
- Repair or replace property damaged by construction activities or temporary facilities
- Complete final cleaning activities
- Submit as-built drawings and other record documents in required quantity
- Store spare parts and products and submit list of items stored
- Provide sets in the required quantity of O&M data, spare parts lists, warranties, guarantees, instruction manuals, users manuals, etc. for equipment provided and as required by the Contract Documents
- Submit a final billing with final release of lien paperwork for processing
- Submit a list that includes name, address, and telephone number of each entity installing product or equipment. Include local representatives and service organizations most convenient to the Project site.

### 16.2 As-Built Drawings
The following shall define the requirements when completing as-built drawings:
- All as-built changes shall be recorded as they occur and before Work is concealed.
- The initials of the person making the entry and the date change shall be recorded for the each revision.
- All construction changes authorized by Change Order and not incorporated into the Contract Documents shall be recorded.
- Dimensions of buried or concealed Work not originally shown on the Drawings shall be indicated.
- No extra compensation will be paid for doing any as-built drawings.

**D.** ............................................................................................................................................................
### 16.3 Punchlists
Subcontractor agrees to maintain skilled and professional labor and on-site supervision until punchlist items are completed and accepted by Owner and the Contractor. The responsible Subcontractor will complete all punchlist items within fifteen (15) days of notification of receipt of the punchlist. If Subcontractor does not

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

commence and diligently pursue the completion of all punchlist items within seven (7) days, Contractor may, upon the issuance of forty-eight (48) hours advance written notice of same to Subcontractor, complete items and deduct the actual cost plus 10% of completing any items from the Subcontract sum.

E............................................................................................................................................................ 1
**6.4  Demobilization**
Upon Substantial Completion of the Contract by Subcontractor, Subcontractor shall remove from the Project Site temporary systems, tools, equipment, machinery and surplus materials not required for the continued performance of his work under this Subcontract, unless otherwise directed by the Contractor.

## 17  DEVIATION TICKET SYSTEM

### 17.1 Deviation Ticket System
This Subcontractor understands and accepts the possible consequences of the Deviation Ticket Procedure.  This Subcontractor's Monthly Requests for Payment will be reduced by a fair financial sum that will be indicated on the Deviation Ticket until such time as the deviation is rectified by this Subcontractor to the satisfaction of Contractor.

### 17.2 Deviation Ticket Items
This Subcontractor recognizes the importance of discipline on the productivity of all tradesmen and the Project. As such, if there are violations of the Safety Plan and Site Logistics Plan, a Deviation Ticket will be issued by Contractor and a **$250 fine per occurrence** assessed to the Subcontractor:
- Employee not wearing a hard hat
- Employee not wearing eye and/or safety protection
- Employee using any tobacco products on-campus
- Employee non-compliance with site policies and procedures
- Failure to attend Stretch and Flex at 6:50am, and participate in a pre-task plan directly following.
- Failure to provide proper representation at required meetings
- Failure to submit daily reports on or before 12 p.m. for the work performed the previous day

### 17.3 Employee Removal
Subcontractor agrees to remove any employee and/or sub-subcontractor from the Project who is the cause of more than two (2) occurrences of violation.

### 17.4 Deviation Ticket Cost
Subcontractor agrees that each reduction to the Price and fine required to be paid by the Subcontractor for its failure, or the failure of any person acting on its behalf, to perform as required hereunder, is a realistic estimate of the administrative costs to Contractor for such failure to perform.  The Subcontractor's obligations with respect to such amounts shall be in addition to, and not lieu of, any other costs or damages resulting from any failure to perform hereunder.

## 18  TEMPORARY FACILITIES, STORAGE, AND EQUIPMENT

### 18.1  Hoisting Requirements
Unless specifically stated otherwise, each subcontractor is responsible to provide it's own hoisting of men and materials.

Subcontractor must submit, for CM's approval, a plan indicating its proposed equipment locations, including swing arcs, heights, staging areas, etc. and the proposed duration for use of the equipment.  No such equipment

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

may be structurally tied to the building without prior approval. All such equipment will be operated and maintained in accordance with applicable safety regulations including OSHA, FAA, and CM. Any required access roads for hoisting equipment are to be provided and maintained by Subcontractor. Electrical requirements for hoisting equipment, beyond those identified herein, are to be provided by Subcontractor.

Subcontractors are responsible for all hoisting, rigging, erection, distribution, lifts, and scaffolding required to perform their work. Certifications for all riggers, licenses for crane operators and certificates for flagmen must be provided to Contractor.

Subcontractors will be required to furnish protection of adjacent structures and streets.

Subcontractors will be required to provide CM with critical lift plans and provide any mats required for such picks. The following criteria qualify any pick as a critical pick:

- Tandem picks
- Net weight of load exceeds 25 tons
- Value of load exceeds $50,000
- Replacement time for damaged load exceeds two (2) months
- Gross load weight exceeds 85% of cranes rated capacity

**18.2 Temporary Office**
There will be no room for temporary offices onsite. All Subcontractors are required to provide offsite office space.

**18.3 Parking**
There will be no room for parking onsite. All Subcontractors are required to coordinate offsite parking.

**18.4 Storage**
There will be no storage available on site. Plan accordingly.

## 19    SALES TAX RECOVERY PROGRAM

University of Florida may elect to purchase materials directly from your vendors in order to achieve a savings on the sales tax. All purchases with a value greater than $10,000 will be subject to this program. Subcontractor agrees to act in good faith to identify all opportunities to help achieve maximum savings.

Subcontractor shall identify potential purchases and seek Construction Manager's approval to be included in this program within 10 days of contract award. Subcontractor shall provide CM with a list of proposed Direct Purchase Vendors indicating the materials being purchased, the estimated direct purchase order amount for each vendor and the estimated sales tax savings for each vendor. Materials subject to inclusion in this program shall be itemized with the Subcontractor's Schedule of Values.

Subcontractors shall prepare a purchase order requisition form(s) and attachments to allow University of Florida to purchase materials directly from suppliers. Attachments must include at a minimum the following:

    i.       Copy of Vendors written quote (includes specific materials to be purchased and their pre-tax price)

Subcontractor shall submit draft Purchase Orders with the appropriate attachments to CM well in advance to allow for a timely delivery of materials without impacting the Project Schedule. Subcontractor will be responsible for any delays associated with the untimely delivery of materials purchased under this program.

A deductive Change Order will be issued to Subcontractor's once University of Florida formally issues a Purchase Order to the appropriate vendor(s). This deductive amount will include the amount of the Purchase

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Order plus the amount of tax savings.

University of Florida will be responsible for payment directly to vendors. Subcontractor will be responsible for coordinating the purchase, delivery, and unloading of materials purchased under this program. Subcontractor will be responsible for verifying all materials ordered have been approved through the submittal process and are in compliance with the contract document.

Subcontract shall be responsible for providing all warranties as required by the Contract Documents for all materials supplied under this program

Vendor invoices will be issued to Subcontractor for their approval and verification that materials arrived in good condition and in the quantities stated. Subcontractor will be responsible for recommending payment and/or the withholding of payment(s) to appropriate vendors within five (5) business days of receipt of invoice. Subcontractor shall enclose an updated ODP log with each set of invoices.

Subcontractor will be responsible for attaching signed copies of original delivery receipts to invoices and returning them to the CM within five (5) business days of receipt of payment.

## 20   LEED

### 20.1   Definition
LEED is an initiative by the United States Green Building Council (USGBC), which helps to create a sustainable environment and sustainable building practices. You will be required, as part of your subcontract to assist Skanska and the Owner in ensuring that materials are properly separated when they are put into the trash or recycling if separate dumpsters are provided, i.e. wood will go into one dumpster, cardboard into another, steel and concrete will be divided as well. Normal construction waste will be placed in a separate dumpster. Dumpsters will be labeled and laid out on the site. This project is LEED registered and, as such, recycling of all possible materials will not only be encouraged, but enforced.

### 20.2   Subcontractor Participation/Requirements
This is a LEED-Registered project. To that end, subcontractors are encouraged to follow the sustainable practices listed below and to provide pricing information if additional or alternate products/systems are available that meet these practices:
    a. Use materials fabricated and/or extracted from within 500 miles of the project site.
    b. Use materials with recycled content.
    c. Use concrete with a high fly-ash content whenever possible
    d. Use rapidly renewable materials such as bamboo, linoleum, strawboard, wheat board
    e. Use materials containing certified wood.
    f. More energy efficient lighting or systems
    g. More water efficient fixtures, irrigation, gutter systems, etc.
    h. Any other sustainable or "green" products or practices

Subcontractors are required to do the following:
    a. No smoking
    b. Use adhesives, sealants, paints, coatings, caulks, etc. with the lowest VOC levels available and provide documentation of VOC levels to CM.
    c. Separate construction waste into receptacles/locations/piles for recycling as directed by the CM.
    d. Keep all open ends and vents of ductwork covered from fabrication through installation until all work is complete.
    e. Perform all dust, pollutant and chemical releasing sawing, cutting, grinding, etc. operations outside of the building footprint.
    f. Keep jobsite clean and orderly, including keeping as much dirt and dust out of the building as possible

## EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

Subcontractors and suppliers are required to submit documents certifying all information outlining the following:

    a. Itemized materials breakdown

    b. Fabrication site of any and all materials, installations, etc.

        i. Extraction site of all primary components of materials (e.g. steel, aggregate; wood; gypsum, etc.)

    c. Recycled content of all materials, products, installations, etc.

        i. Broken down by post-consumer & post-industrial

    d. Volatile Organic Compound (VOC) levels in all of the following:

        i. Paints & coatings

        ii. Adhesives & sealants

        iii. Carpet systems

        iv. Composite wood (flooring, doors, paneling, millwork, etc.)

    e. Mix designs of any concrete with flyash content

    f. Any other environmentally sound practices, products or information available.

## 21. COORDINATION WITH OTHER TRADES AND COORDINATION DRAWINGS

Reference Specification Section 01 3110 Project Management and Coordination, and 01 3150 Coordination Drawings

### a) Coordination of Work with Other Trades

- Each Subcontractor shall recognize the complex nature of the Project, such as the Bid Package, Bid Category(ies), the sequential nature of contracts and the concurrent operations of other Subcontractors and the Separate Contractors with the work under this Subcontract. All Subcontractors are required to review, discuss and coordinate their work with the work of other Subcontractors as well as through the Contractor with regard to sequence, timing, built-in work and equipment, layout, location, compatibility of materials and sizes and required clearances prior to beginning the work to avoid construction delays which impact the Owner's occupancy of the facility. All contractors are urged to cooperate with each other to assure smooth progress of the project.

- The completion of the Project within the prescribed time is dependent upon the close and active cooperation and open discussions of all those involved, therefore, it is expressly understood and agreed that each Subcontractor shall layout and install his work at such time and in such manner as not to delay or interfere with the carrying forward of the work of other Subcontractors and Separate Contractors. Each Subcontractor shall coordinate their work with the work of other Subcontractors. Subcontractors shall be familiar with and coordinate the scope of work in other work categories, which must be installed in conjunction with the work of this subcontract, for proper coordination and interface. Observation of the work by others does not relieve a Subcontractor from his responsibility for coordination, superintendence, or scheduling and direction of the Work.

### b) Coordination Drawings

Coordination drawing plans (minimum 1/4" scale) and sections (minimum 1/2" scale) shall show all horizontal and vertical dimensions of the Work for building room layouts, structural elements, sprayed fireproofing, pipe with insulation and/or conduit over 1-1/2", racks of more than three (3) pipes or conduit and all ductwork including insulation thickness, regardless of size. Include one electronic copy.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

c) **Building Information Modeling**

Contractors that are identified in their scope of work as part of the BIM coordination process are to create their coordination drawings in 3D CAD or other 3D software that is compatible with NavisWorks Manager 2010. Other details for these coordination drawings are outlines in Exhibit A and its Attachments 1 & 2 of the specific discipline's contract package.

d) **Drawing Backgrounds**

Electronic copies of selected CAD (Computer Aided Design) drawing files with architectural backgrounds will be given to Subcontractor upon request if provided by A/E. Neither Construction Manager nor A/E are obligated to provide electronic files. Subcontractor will be responsible for any cost to convert electronic CAD files furnished by Contractor.

e) **Failure to Produce Drawings**

If Subcontractor fails to produce all of its initial coordination drawings within the time allocated and in the manner required, Contractor may produce the drawings and all costs incurred by Contractor to do so will be backcharged to Subcontractor.

f) **Acceptance of Coordination Drawings**

If Subcontractor participates in the production of coordination drawings, Subcontractor will be required to sign off on the final coordination drawings to indicate its acceptance thereof prior to the commencement of its Work or any other contractor's work in any given area. All costs attributable to failure of a Subcontractor to provide its timely approval of the coordination drawings or failure to cooperate in the production or assembly of input for said drawings shall be borne by the Subcontractor.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

g) **Definitions**

- Coordination Model: electronic 3D geometric representation combining all trades involved in the coordination process.
- 3D Trade Contractor Model: electronic 3D geometric representation of the trade specific building elements to be installed for a specific contractor's scope of work.
- Shop Drawing: submittal drawing to be used for approval by the Owner, Construction Manager and design team. Shop drawings will be generated from the 3D Trade Contractor Model. These drawings shall be a 2D representation of the installation intent. These drawings shall be submitted per the contract documents prior to completion of the coordination process for each designated work breakdown area. Regardless of contract requirements, shop drawings will be submitted to the Construction Manager for each work breakdown area. Shop drawings will be dimensioned in accordance with VDC Coordinator instructions.
- VDC Manager: Construction Manager appointed personnel responsible for working with the model and for guiding the 3D coordination process.
- Trade Contractor Model Manager: trade contractor personnel responsible for working with the model and for interpreting the information provided within the model.
- Clash Detection Software: AutoDESK Navisworks Manage 2014.
- Coordination Team: Skanska, Designers, Trade Contractors, Coordination subcontractor
- VDC = Virtual Design and Construction.
- BIM = Building Information Modeling.
- Project Implementation Plan (PIP) - Defines applications or "uses" for BIM related to specific project requirements issued by Skanska.
- Construction Manager = Skanska
- Each awarded trade contractor must designate a lead trade's person that will need to be present during the coordination meetings so that the issues can be resolved and the proper direction will be relayed back to each respective design team. This designated person must be fluent in 2D and 3D Computer Aided Design/Drafting.
- Coordination Team: Skanska, Designers, Trade Contractors, Coordination Subcontractor

h) **Coordination**

- **8.2.1 Use of CAD and BIM files provided by Skanska**
  Subcontractor shall defend and indemnify Construction Manager, Skanska, Owner and Architect from any and all claims, losses, damages and arising out of or in connection with the use of the electronic CAD files and any BIM files provided to Subcontractor by the Architect through Construction Manager and from Construction Manager directly, to the same extent that Construction Manager is required to indemnify the Architect and/or Owner within Exhibit 18 to the contract between Construction Manager and the Owner.

i) **Failure to produce coordination or modeling**

- If Subcontractor fails to produce all of its coordination drawings or level 400 model within the time allocated and in the manner required, Construction Manager may produce the drawings and model, and all costs incurred by Construction Manager to do so will be back charged to Subcontractor.

j) **Acceptance of coordination and modeling**

- Subcontractor shall be required to participate in the production of coordination drawings and models. Subcontractor will be required to sign off on the final products to indicate its acceptance thereof prior to the commencement of its Work or any other contractor's work in any given area. All costs attributable to failure of a Subcontractor to provide its timely

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

approval of the coordination drawings or model, or failure to cooperate in the production or assembly of input for said products shall be borne by the Subcontractor.

k) **Summary**

- The coordination team will use models prepared by each individual trade for the 3D Coordination process with respect to the 0, 0, 0 base point. Awarded trade contractors must submit 3D modeling information per scheduled matrix of area breakdown provided by Construction Manager. All 3D models submitted must be compatible with the NavisWorks Manage 2014 software and each trade contractor is responsible for submitting an ".nwd" file for each accompanying native CAD file (.DWG). All relevant models will be incorporated into one area review file for use during coordination meetings by a clash detection software to expedite the drawing review process and resolution. The VDC Manager/ Coordinator or party as designated by the Construction Manager will collect and combine all detailing files posted by trades into a master Base Model and run a clash report through the NavisWorks Manage 2014 software per the BIM Coordination schedule for all systems to be reviewed at the coordination meetings in an effort to resolve all conflicts and achieve a clash-free coordination set. Upon completion of all areas, the Construction Manager will publish an .NWD file. The NavisWorks Manage 2014 software and license is required by all trades involved in the 3D Coordination process.

l) **Submittals**

- Coordination Model will be reconciled by each contractor to find the best collective solution to the coordination of all items.
- Each trade contractor will supply a 3D Trade Contractor Model for their own scope of work separated by areas as directed by Skanska.
- Each trade contractor will supply the 3D Trade Contractor Models with all clashes resolved and representing what was installed in the field for their own scope of work at the end of the coordination process. Trade Contractor models will be provided as follows:
  - One complete model representing the project as a whole.
  - One model per floor and per zone (or as designated by Skanska).
- Each trade contractor will be responsible for working in harmony with the other trade contractors to resolve coordination issues. If there is not a resolution agreed upon by all then the Construction Manager will make the decision for them.
- A lead trade contractor may be appointed to control the process.
- Trade contractor models will be color coded to provide delineation between systems.
- Trade subcontractor to create annotated 2D coordination drawings in all areas.

m) **Models**

- 3D Trade Contractor Model – computer generated 3D drawings used for coordination, conflict resolution, fabrication, and as-built in (.dwg) compatible software.

- Each trade contractor will be responsible for producing a model(s) to represent the work of the contractor in accordance with the work breakdown structure to be provided by Skanska.
- If the trade contractor does not have the in-house capability to produce the required model(s), the contractor may utilize the service of an outside entity to provide this service. The in-house coordinator and/or outside entity must be approved Skanska.
- In the event that the trade contractor wishes to exclude the preparation of the model(s) from their scope of work, they must do so at bid time and must receive approval from Skanska. The trade contractor must still provide electronic shop drawings files as directed by Skanska to support the coordination process in (.dwg) file format. Skanska will engage a third party on

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

behalf of the trade contractor in order to convert the information into (a) 3D model(s) for coordination purposes. Any and all costs associated with this work on behalf of the trade contractor will become the responsibility of the trade contractor. This does not excuse or exclude the trade contractor from any of the coordination process as described in this specification.

- All elements must be drawn to scale using imperial units and shall be a true representation of what is to be installed in the field in all three dimensions.
- All 3D models submitted must be compatible with the Navisworks Manage 2014 software. If object enablers are required that are not readily accessible free of charge, the subcontractor is responsible for providing them to Skanska.
- All modeling shall take place at the appropriate X, Y, and Z coordinates with respect to the architecture reference file.
- The base architectural/structural model(s) distributed to all participants is for use as a background to detail their trade work around. The origin point must not change as it will affect the collation of the files into the Base Composite Model.
- Skanska will hold the 3D architectural/structural .rvt models and will distribute to the sub-contractors as needed.
- File layering convention shall follow the AIA layering standards.
- The file naming convention for all electronic files shall be designated by Skanska; reference the BIM Project and Implementation Plan.
- The project will be issued a Project Implementation Plan for file management and file set-up, all information in the PIP is to be followed.
- Model coordination files will be saved to the project intranet site for access by all trades, Skanska and the owner's representative. The folder structure will be provided during the coordination kickoff meeting and must be maintained throughout the project. It will be the trade contractor's responsibility to maintain the latest models in the correct file format at all times. It is also the trade contractor's responsibility to remove old files and move them to the appropriate "Archive" folder. All trade subcontractors responsible for downloading other trade, vendor and designer models, etc for coordination.
- With each revision to the model(s) the trade contractor shall issue a notification via email to each of the other coordination team members notifying them when new information is available.
- Utilize solid object formats, (specific geometry) in order to minimize file size.
- Working (imperial) units, unless otherwise specified, shall be in inches.
- All trades must use a separate layer, object style and color.
- Each trade contractor will maintain their own model design files as sole author. Trade contractors are responsible for providing the team with Naviswork's model files (.nwd,) as well as a .DWG for each area required which will be used for coordination.
- In the event the design changes are issued by bulletin which will result in changes in the model(s), it is the responsibility of the trade contractor to make any and all changes required for coordination and compliance with the design. The trade contractor can and will include the cost of modeling and coordination if warranted into their request for change authorization.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

n) **Model Coordination Process**
- Coordination Process shall take place in accordance with the "Skanska 3D MEP/FP Coordination Schedule" – At a minimum 15,000 Square Feet of area shall be coordinate per week. Any additional manpower (coordinators, premium time, etc.) to achieve the schedule is included in this subcontract. The coordination schedule will be developed by the overall team to meet the overall construction project schedule.
- Coordination Meetings
  - A mandatory Kick-Off Meeting will be set up to discuss and determine;
  - Introduce the trade coordination team.
  - Update of what information is already available from the A/E and structural designers and subcontractors.
  - Distribution of the "base model" and access to the File Sharing application site.
  - General review of the available above ceiling space.
  - Establishment of "zones" for space allocation per trade as guideline.
  - Required attendance of coordination meetings.
  - Meeting schedule and breakdown of floors into manageable areas.
  - Drawing posting deadlines.
  - Sign off schedule and signature lock on sign-off reports / drawings.
  - Review BIM Project Implementation Plan; project orientation, directory file structure, file naming conventions, etc
  - Material fabrication and delivery times after sign-off for each area.
  - Use of adherence to trade signed-off base model during installation.
  - Review of model input from subcontractor of owner required system nomenclature.
  - Each trade contractor is required to take part in regular coordination review meetings. The time and place for these meetings will be established by Skanska.
  - The purpose of the coordination meeting is to identify and resolve probable interferences between building systems.
  - Trade contractor shall supply a Trade Contractor Modeling Manager or person authorized act on behalf of their organization to solve coordination issues which may arise between trades
  - If conflicts are identified and a resolution is agreed upon it is the trade contractor's responsibility to have the necessary changes made in their model and republish said model to the File Sharing site in time for the next meeting. It will be established in the kick-off meeting the required timeframe that these models will need to be resolved and re-submitted for the next coordination meeting.
  - Each trade will upload electronic drawings (which must be compatible with .dwg 2014 and Navisworks Manage 2014 software) to the File Sharing site with their pre-determined color-coded drawings for use at the trade coordination meetings. This will occur by 5:00 PM on Fridays prior to the meetings. Each trade shall review the clash report and coordinate the corrections and work together to resolve the clashes. The coordination meeting shall focus on clashes that cannot be resolved by one trade alone.
  - Above ceiling space allocation (zones) for each trade will be established by the group and adjusted to meet actual installation and coordination requirements. These zones are to be used as guidelines for routing prior to the trade coordination meetings.
  - All trades will attend the scheduled coordination meetings, bringing any shop drawings or other materials required to solve potential conflicts. Skanska will facilitate these meetings. If a dialog is required concerning architectural,

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

engineering or structural matters, Skanska will request attendance by the appropriate discipline. Notice shall be given to Skanska at least 48 hours in advance of the coordination meeting if a trade knows of a conflict that will require the participation of the lead architectural/mechanical/electrical designer or others that do not normally attend the coordination meetings.

- At the meeting, the published clash report will be reviewed to identify the areas of concern, discuss possible solutions for conflicts, and decide on the solution that is the least impact to all trades. If any outstanding conflicts cannot be resolved at the meeting, the drawing sign-off can be delayed until the next coordination meeting. However, it is expected that the coordination schedule will be maintained despite the delay in the sign-off. The sign-off represents each trade's confirmation and assurance their work is coordinated and the field installation of their work will not be in conflict with any other trade.

- During the installation of each trade's work, Skanska will refer to the signed-off report and the 3D model to resolve any conflicts. Each installing firm agrees to install all work per the signed-off drawings, without deviation. If a deviant installation takes place without prior approval from all detailing parties, it will be the responsibility of the installing contractor to remove the work and install it as shown on the signed off drawings. If a conflict does arise during installation that was not foreseen or solved during the coordination effort, each of the detailing firms will work together to find a solution that is the least impact to all trades. The cost of this work will be evaluated as the problems arise, however, the party responsible for the conflict will be responsible for the cost of the fix, including the additional detailing time of all parties involved.

- If the electronic drawings of an individual firm are not posted to the File Sharing site as scheduled, they will be responsible for any additional meeting time and/or the cost of delaying the process if sign-off dates are not met due to the delinquent posting.

- RFI responses required to be incorporated into the coordinated drawing for the upcoming meeting shall be clouded within each trade's detail model to denote that the area is incomplete. All RFI that will potentially impact the trade coordination will be distributed to all the parties involved.

- Trades not attending any coordination meeting, or failing to post their electronic drawing files on the provided File Sharing site by the designated date and time, will relinquish the right to make changes to other trades' routing in an effort to coordinate their own work, and will execute their discipline without impact to the work coordinated at the meeting.

- A representative of the A/E may be attending the coordination meeting and will be authorized to assist in the resolution of clashes from a design perspective to expedite the process. If changes to the building design are requested, the RFI process must be followed. When submitted, the RFI must clearly state the problem, possible solutions and benefits to the project.

- **Record Information**
  - Upon completion of coordination activities for a floor or area as deemed appropriate by Skanska, the VDC Manager/BIM Coordinator will zip all associated files together and upload to the file sharing site. The zip will include a copy of the coordinated clash free report of an area provided by the coordination sub-contractor; all trade specific system files in (3D) .dwg and .nwd and (2D) .pdf with annotation provided by subcontractor.

## EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Subcontractors are responsible to sign-off on all coordinated areas and these will become the record coordination document(s).

- **Change Conditions**
  - In the event that design changes are issued by bulletin the trade contractor will make the changes required in their model(s) to support the coordination process without delay.
  - Change Order Requests must include costs for any associated coordination.

o) **3D Modeling**

- **Order of Modeling**
  - The Sheet- metal contractor should publish a base model with the major trunk lines which will serve as the basis for the other trades to begin their individual models.

- **System Models and Level of Detail**
  - The level of detail required for all modeling on this project will be minimum LOD 400.
  - For purposes of this project LOD 400 will be defined as: Model Elements are modeled as specific assemblies that are accurate in terms of size, shape, location, quantity, and orientation with complete fabrication, assembly, and detailing information with all interference, clash and coordination issues resolved.
  - The level of detail defined in each section below (Modeling Standards) is intended to provide additional clarification or information. If the information in the following sections conflicts with the LOD 400 requirement, the direction that results in the highest detail shall be followed.
  - Pre-purchased equipment shall be the responsibility of the contractor assigned to receive, install and coordinate the equipment. This subcontractor shall be fully responsible for layout, 3D drawings (modeling) and coordination of the pre-purchased equipment.
  - Each trade contractor is responsible for protecting access zones within their models. Access zones should be modeled on a dedicated layer as solids at less than 100% shading as not to obscure the main fixture or element being protected. Solid shall extend from equipment to farthest point of access, i.e., from VAV to ceiling.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

p) **Modeling Standards**
- **HVAC Sheetmetal Standards**
  - All ducts, related accessories (including but not limited to standard dampers, fire dampers, VAV boxes, diffusers, turning vanes, etc.) and HVAC equipment will be modeled.
  - If item appears on a schedule and has a scheduled name (AHU-1, VAV3-1, etc.), the corresponding model element shall have the same name in the model element data.
  - Ducts will be modeled to the outside face dimension.
  - Models will include insulation where required.
  - Models will include hangers where required.
  - All structural supports including strongback angles and unistrut supports must be modeled at full scale.
  - Access zones shall be modeled for all elements requiring access including but not limited to equipment, fixtures, standard dampers, fire dampers, VAV boxes, diffusers, turning vanes, fan coil units etc.
  - All equipment shall be modeled to its overall height, width and depth.
  - All access panels shall be modeled, including access zones above and below.
  - In the event that seismic bracing for suspended elements is required by code, such bracing shall be included in the model.

- **HVAC Piping Standards**
  - All piping, related accessories (valves, valve chains, air vents, drain valves, flow meters, etc.) and HVAC equipment will be modeled.
  - If item appears on a schedule and has a scheduled name (AHU-1, VAV3-1, etc.), the corresponding model element shall have the same name in the model element data.
  - Pipes will be modeled to the outside diameter of the pipe or pipe insulation. Hangers must be modeled where necessary. All spring hangers must be modeled including anchoring devices.
  - Equipment will be modeled to its overall height, width and depth.
  - Models will include insulation where required.
  - Access zones shall be modeled for all elements requiring access including but not limited to equipment, fixtures and valves.
  - All access panels shall be modeled, including access zones above and below.
  - In the event that seismic bracing for suspended elements is required by code, such bracing shall be included in the model.
  - Trays for the protection of electrical equipment, if allowed by code, must be modeled.

- **Plumbing and Specialty Piping Standards**
  - All plumbing, specialty piping, related accessories (valves, air vents, drain valves, flow meters etc.) and equipment will be modeled.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

- If item appears on a schedule and has a scheduled name (AHU-1, VAV3-1, etc.), the corresponding model element shall have the same name in the model element data.
- Pipes will be modeled to the outside diameter of the pipe or the pipe insulation. Pipe slope will be incorporated in the model.
- Equipment will be modeled to its overall height, width and depth.
- Models will include insulation where required.
- Models will include hangers where required.
- Access zones shall be modeled for all elements requiring access including but not limited to equipment, fixtures, valves and cleanouts.
- All access panels shall be modeled, including access zones above and below.
- In the event that seismic bracing for suspended elements is required by code, such bracing shall be included in the model.
- Trays for the protection of electrical equipment, if allowed by code, must be modeled

- **Electrical Standards**
  - All conduit/MC cabling (2" and larger and banks 4" and larger), power feeds to equipment, switch gear, panels, junction box and pull station locations will be modeled.
  - If item appears on a schedule and has a scheduled name (AHU-1, VAV3-1, etc.), the corresponding model element shall have the same name in the model element data.
  - Light fixture locations and space requirements to be included in the model and coordinated with reflected ceiling plan. All access zones or clearances to maintain light fixtures will also be modeled.
  - Equipment and cable tray with access zones to be included in the model. Equipment will be modeled to its overall height, width and depth.
  - Equipment and junction box access zones per specification and code (whichever is greater) shall be modeled.
  - All access panels shall be modeled, including access zones above and below.
  - In the event that seismic bracing for suspended elements is required by code, such bracing shall be included in the model.
  - All structural supports and racks utilizing unistrut, angle iron, etc must be modeled.
  - Hangers will be modeled.

- Fire Protection (Sprinkler, Fire Alarm)
  - All components of the fire protection system will be modeled.
  - If item appears on a schedule and has a scheduled name (AHU-1, VAV3-1, etc.), the corresponding model element shall have the same name in the model element data.
  - Access zones shall be modeled for all elements requiring access including but not limited to equipment, fixtures, valves and controllers.
  - Locate all piping, valves, fire pump, and sprinkler heads.
  - All access panels shall be modeled, including access zones above and below.
  - In the event that seismic bracing for suspended elements is required by code, such bracing shall be included in the model.
  - Models will include hangers where required.

# EXHIBIT "M"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

- Building Management Systems
  - All controllers, actuators, valves, fixtures, conduits equipment and components must be modeled.
  - All access zones required for the maintenance of the BMS system must be included.
  - Hangers will be modeled.

**q) Installation**
- All work shall be installed in accordance with the final coordinated 3D model.
- It is the responsibility of each subcontractor to provide up to date information to their field personnel to ensure that installation is proceeding in accordance with coordinated files.
- Upon request, subcontractor shall provide dimensioned files (PDF) to Skanska staff in order to verify installed systems.
- It is the responsibility of the subcontractor to track and update their coordination model with any deviations in the field.

**r) Final Deliverable**
- At substantial completion of this subcontractor's scope of work, the subcontractor will provide the following models and files as a part of their standard closeout.
- LOD 400 model of all systems coordinated and/or installed by this subcontractor.
- Native model (model shall be in a 3D .DWG compatible format) and spatially correct with the coordinates (x,y,z) in the Revit Architecture model.
- Subcontractor shall provide one .DWG file per system per floor (or area) or as agreed upon in writing by Skanska VDC Manager.
- Model shall be accurate in terms of scale and dimension.
- Model shall incorporate all contract changes and accurately represent the as-built conditions.
- Owner project number shall be printed on all 2D sheets
- Owner nomenclature to be followed

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SUPPLEMENTAL TERMS AND CONDITIONS TO SUBCONTRACT
## FOR USE IN THE STATE OF FLORIDA

Subcontract No. 239012-201-017 between Skanska USA Building Inc. and Climate Control Mechanical Services, Inc., dated the 29th day of April, 2015, is hereby modified as follows:

Exhibit "E" to the Subcontract, entitled "SKANSKA STANDARD SUBCONTRACT TERMS AND CONDITIONS," is modified as follows:

## Section 1.1(m) is amended as follows:

(m) "Indemnified Parties" means the Owner, Contractor, Contractor's sureties and their respective directors, officers, employees, parents and subsidiaries of any tier, representatives, agents, successors and assigns, and any and all representatives, agents, directors, officers, employees of any of the foregoing.

## Section 4.2.1 is amended as follows:

*4.2.1* **Estimates for Payment.**
Unless otherwise stipulated by Contractor, on or before the earlier of: (i) the 25th day of each month; or (ii) no later than five (5) days prior to the date, if any, in the Owner Contract for the submission of estimates for payment, Subcontractor shall submit a written estimate for payment to Contractor in the form annexed as **Exhibit H** along with all substantiating data and information required by the Contract Documents or as reasonably requested by Contractor**.** The amount due Subcontractor on each estimate shall be calculated as provided in Section 4.2.2. If approved by Owner and Contractor, Contractor shall pay the net amount due to Subcontractor within fourteen (14) days after Owner pays the corresponding amount to Contractor under the Owner Contract. Subcontractor acknowledges and agrees that Owner's payment to Contractor under the Owner Contract of amounts due Subcontractor under the Subcontract is a condition precedent to Contractor's obligation to pay such amounts to Subcontractor. Subcontractor further acknowledges that it is relying on the credit and ability of the Owner to pay for Work performed and not Contractor and accepts the risk that it will not be paid by Contractor for Work performed in the event Contractor is not paid by Owner for such Work. Subcontractor further acknowledges that if Contractor has provided payment or performance bonds or a combination payment and performance bond for the Project, the obligation of Contractor and its surety to make any progress payment to Subcontractor under any such bond is subject to the express condition precedent of Contractor's prior receipt of payment from the Owner of the progress payment for the Subcontractor. This provision is incorporated by reference into any such bond.

## Section 4.5 is deleted in its entirety and replaced with the following:

*4.5* **Estimates for Payment and Partial Waivers and Release of Liens and Claims Required**
As a further consideration for the granting of this sub-contract/purchase order to Subcontractor by Contractor, Subcontractor agrees that as a condition precedent to receiving each progress payment from Contractor for work performed or material furnished pursuant to this contract, Subcontractor shall execute and deliver to Contractor with its Request for Progress Payment in the form annexed as Exhibit "H" (1) a Waiver and Release of Lien upon progress payment and Waiver of Right to Claim Against Bond (progress payment) in a form attached hereto as exhibit "N1" and (2) a Full and Complete Release of all Claims and causes of action Subcontractor may have or claim to have against Contractor to the date of the execution of said release, save and except for those claims which Subcontractor shall specifically list on said release and describe in a matter sufficient for Contractor to identify such claim or claims with certainty in the form attached as part of exhibit "N3". Subcontractor further agrees that as a condition precedent to receiving each progress payment from Contractor, it shall provide Contractor with a Waiver and Release of Lien upon progress payment and Waiver of Right to Claim Against Bond (progress payment) for any Sub-subcontractor that either served Contractor or Owner with a Notice to Owner, Notice to Contractor, or is a laborer as defined in Florida Statute §713.01. Notwithstanding anything to the contrary appearing herein or in the prime contract between owner and Contractor, Subcontractor should not be entitled to receive any progress payment or final payment prior to Contractor's actual receipt of that payment from owner. Subcontractor agrees that Contractor's actual receipt of full payment from owner shall be a condition precedent to the bringing of any action by Subcontractor hereof against Contractor or its surety, if any, relating to Contractors

Exhibit N
Supplemental Terms and Conditions to Subcontract
State of Florida (09/2009 ed. Rev. 0)

# EXHIBIT "N"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

failure to make payment. Subcontractor further agrees that its full performance of this agreement shall not constitute an exception to the provision of this paragraph.

## Section 5.1 is amended as follows:

5.1  **Final Payment.**

Subcontractor shall submit its final estimate for payment to Contractor when it has completed the Work, including punch list items, in accordance with all requirements of the Subcontract as approved by the Contractor and Owner and/or Architect. Subcontractor's final estimate for payment shall be in the form annexed as **Exhibit H1**, and shall include all substantiating data and information required by the Contract Documents or as reasonably requested by Contractor. Subcontractor's final estimate for payment shall show the Work as one hundred percent (100%) complete and shall be calculated in the same manner as Subcontractor's periodic progress payments under Section 4.2, provided that retention shall not be deducted to arrive at the net amount due. If approved by Owner and Contractor, Contractor shall pay the net amount due to Subcontractor within ten (10) days after Owner pays the corresponding amount to Contractor under the Owner Contract, provided all conditions precedent to final payment under the Contract Documents, including the following, have been met: (i) any conditions precedent in the Owner Contract to Subcontractor's entitlement to final payment have been satisfied; (ii) Subcontractor's surety, if any, has consented in writing to the making of final payment; (iii) Subcontractor has provided Contractor with a statement that it has: (a) paid all federal, state, county and municipal taxes, duties and other amounts imposed by Applicable Law upon any labor, services, equipment, materials, supplies or other items acquired, performed, furnished or used in connection with Subcontractor's performance of the Work, including, but not limited to, sales, use, gross receipts, excise, unemployment, and personal property taxes; and (b) completed the Work and performed all other obligations as required under the Subcontract through the date of its final estimate for payment; (iv) Subcontractor has provided Contractor all: as-built drawings, certifications, maintenance manuals, operating instructions, statement of estimates, reports and other final submittals; software; written guarantees and warranties; and bonds required to be provided by Subcontractor under the Subcontract; and (v) Subcontractor has provided a duly executed "Waiver and Release of Lien Upon Final Payment and Waiver of Right to Claim Against Payment Bond "final payment" in the form annexed as exhibit "N2" and a Final Release of Claims in the form annexed hereto as exhibit "N4." Subcontractor further agrees that as a condition precedent to receiving final payment from Contractor, it shall provide Contractor with a Waiver and Release of Lien upon Final Payment and Waiver of Right to Claim Against Payment Bond "final payment" for any Sub-subcontractor that either served Owner or Contractor with a Notice to Owner, Notice to Contractor, or is a laborer as defined in Florida Statute §713.01 a duly executed "Skanska Standard Final Estimate for Payment, Unconditional Waiver and Release" in the form annexed as **Exhibit I.** Contractor may require a final waiver and release of liens and claims from Sub-subcontractors. Subcontractor acknowledges and agrees that Owner's payment to Contractor under the Owner Contract of the final payment due Subcontractor under the Subcontract is a condition precedent to Contractor's obligation to pay such amount to Subcontractor. Subcontractor further acknowledges that it is relying on the credit and ability of the Owner to pay for Work performed and not Contractor and accepts the risk that it will not be paid by Contractor for Work performed in the event Contractor is not paid by Owner for such Work.

## Section 5.2 is amended as follows:

5.2  *Effect of Final Payment.*

As provided in Exhibit N1, Subcontractor's acceptance of final payment from Contractor shall constitute a final waiver and release of all liens and claims by Subcontractor against the Contractor and Owner arising out of or relating to the Subcontract.

## Section 13.4 is amended as follows:

13.4  *Method of Dispute Resolution.*

Claims and disputes between Contractor and Subcontractor arising out of or in connection with the Subcontract or the Work shall be resolved by litigation unless Contractor, at its sole option, advises Subcontractor in writing prior to the institution of litigation with respect to a claim or dispute, or within thirty (30) days after either party has instituted litigation with respect to the claim or dispute that Contractor elects to have the claim or dispute resolved by arbitration. In such event, Subcontractor shall be bound by Contractor's election and any litigation filed shall be stayed by stipulation of the parties pending the conclusion of the arbitration proceedings. In the event Contractor elects arbitration, any arbitration shall be conducted pursuant to the Construction Industry Arbitration Rules promulgated by the American Arbitration Association, then obtaining, as well as Chapter 682, Florida Statutes, or the Federal Arbitration Act, 9 U.S.C. § 1 et seq., whichever may apply. The parties further stipulate and agree that the arbitrator(s) shall be required to furnish a reasoned award and to follow the substantive law of Florida in making decisions or

**Exhibit N**
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

rendering awards in resolution of the dispute. ~~The arbitration proceedings shall be conducted pursuant to the Construction Industry Arbitration Rules issued by the American Arbitration Association then in effect.~~ The parties shall afford each other informal discovery consistent with the discovery provisions of the Federal Rules of Civil Procedure, including the production of all documents related to the claim or dispute at issue and the deposition of witnesses having knowledge of facts pertaining to the claim or dispute at issue.

## Section 13.5 is amended as follows:

13.5    *Governing Law, Jurisdiction and Venue.*
This Subcontract shall be governed by and construed in accordance with the laws of the state in which Contractor's home office from which the Project being performed is located, excluding the conflicts of laws principles thereof; provided, however, that in the event the Contractor and Owner have elected to have the laws of another state govern the Owner Contract, then this Subcontract shall be governed by and construed in accordance with the laws of such state, excluding the conflicts of laws principles thereof. Subject to Section 13.6, for any action or proceeding involving claims and disputes between Contractor and Subcontractor arising out of or in connection with the Subcontract or the Work, Contractor and Subcontractor expressly and unconditionally: (a) agree that the presiding federal or state court in the district or state in which Contractor's home office from which the Project is being performed is located shall have exclusive jurisdiction over the action or proceeding; and (b) waive the right to a trial by jury in the action or proceeding. If Contractor elects to resolve a claim or dispute by arbitration, the arbitration shall be venued in the state and county court in which Contractor's home office from which the Project being performed is located. Subcontractor for itself and its surety expressly agrees that Contractor's surety or sureties has full power and authority to enforce the choice of law, venue, and waiver of jury trial provisions in this Section 13.5 in the event Subcontractor or its surety initiate litigation or arbitration against Contractor's surety or sureties.

## Section 16.1 is amended as follows:

16.1    *No Liens or Encumbrances.*
Subcontractor warrants and guarantees free and clear title to the Work and all equipment, materials, supplies and others items supplied by Subcontractor for incorporation into the Work shall pass to Contractor and Owner, and that the Work, the Project site and the Project and any and all interests and estates therein and any and all improvements and materials placed on the Project site by Subcontractor or its Sub-subcontractors shall be free and clear of, all liens, claims, security interests and other encumbrances made by, through or under Subcontractor or any of its Sub-subcontractors. In the event of any nonconformity with the requirements of this Section 16.1, Subcontractor shall promptly: (i) defend Contractor's and Owner's title to the Work, the Project site and Project and such interests, estates, improvements and materials, as the case may be; and (ii) remove and discharge any such lien, claim, security interest or other encumbrance by paying the claimant, by posting a bond or other instrument as required by Applicable Law, or by providing Contractor collateral that is satisfactory in form and substance to it Contractor and Owner to fully indemnify and hold harmless Contractor and Owner from and against any Damages resulting from such encumbrance. Contractor may withhold from any amount due or to become due Subcontractor an amount sufficient to remove and discharge such encumbrance until Subcontractor has removed and discharged such encumbrance as required by Section 16.1. If Subcontractor has not removed and discharged a lien, claim, security interest or other encumbrance covered by this Section 16.1 within ten (10) days after it has been made or filed, Contractor may cause the encumbrance to be removed and discharged with the moneys withheld, or by posting a bond, whereupon for purposes of this Subcontract such moneys or bonding costs (along with other costs incurred by Contractor in connection with the encumbrance), shall be deemed to have been paid to Subcontractor hereunder. Subcontractor further warrants and guarantees that if it has recorded a claim of lien on the Project, then it shall provide Contractor as a condition precedent to final payment with a signed and notarized Satisfaction of Lien (discharging its lien pursuant to Florida Statute §713.21) to be recorded in the official records of the County in which the lien was recorded in addition to the waiver and releases annexed as Exhibits "N2" and "N4".

Additionally, Subcontractor warrants and guarantees that if any Sub-subcontractor has recorded a lien on the Project, then Subcontractor shall provide Contractor as a condition precedent to final payment with either a signed and notarized Satisfaction of Lien (discharging the lien pursuant to Florida Statute §713.21) from that Sub-subcontractor recorded in the official records of the County in which the lien was recorded, or a copy of the Subcontractor's lien transfer bond (filed pursuant to Florida Statute §713.24) transferring that lien to the bond with the certificate of transfer from the clerk of court where the bond was filed. However, (a) if Contractor has already transferred that Sub-subcontractor's lien to a lien transfer bond as the result of Subcontractor's failure to do so within the time required by Section 16.1, then Subcontractor must provide Contractor as a condition precedent to final payment with a signed and notarized Satisfaction of Lien (discharging the lien pursuant to Florida Statute §713.21) from that Sub-subcontractor recorded in the County in which the lien was recorded with any moneys expended

Exhibit N
Supplemental Terms and Conditions to Subcontract
State of Florida (09/2009 ed. Rev. 0)

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

and costs Contractor incurred in connection with the encumbrance being deducted from the final payment (unless previously deducted through a progress payment); or (b) if Contractor has already discharged the Sub-subcontractor's lien through payment as the result of Subcontractor's failure to do so within the time required by Section 16.1, then any moneys expended and costs Contractor incurred in connection with the encumbrance shall be deducted from the final payment (unless previously deducted through a progress payment).

## Section 18.1 is deleted in its entirety and replaced with the following:

*18.1  Indemnification.*
Notwithstanding any provisions of the Subcontract to the contrary, the following indemnity provisions control: To the fullest extent permitted by Florida law, Subcontractor shall defend, indemnify and hold harmless the Indemnified Parties from and against: (a) any and all intentional torts perpetrated by Subcontractor or any person or entity performing any portion of Subcontractor's scope of Work; (b) any and all negligence perpetrated by Subcontractor or any person or entity performing Subcontractor's scope of work, including but not limited to negligence resulting in destruction of property or personal injury; (c) any and all negligence perpetrated by Contractor or any person or entity employed by Contractor, including but not limited to negligence resulting in destruction of property or personal injury; (d) any and all violations perpetrated by Subcontractor or any person or entity performing Subcontractor's scope of Work of federal, state, or local laws as construed by the authorities having jurisdiction, including but not limited to any and all violations of Chapter 440, Florida Statutes; (e) any and all liens, payment bond claims, or other claims made by any person performing Subcontractor's scope of Work; (f) any actual or alleged infringements of any patent, trademark, copyright or other intellectual property or proprietary right by Subcontractor, its Sub-subcontractor or the Work furnished by Subcontractor; (g) any failure of the Subcontractor or the Work to comply with the requirements of the Subcontract; (h) any hazardous material or waste, toxic substance, pollution or contamination brought to or generated on the Project site by Subcontractor or its Sub-subcontractor, or used, handled, transported, stored, removed, remediated, disturbed or disposed of by Subcontractor or its Sub-subcontractor. Subcontractor's defense, indemnity and hold harmless obligations to the Indemnified Parties shall include all costs, reasonable attorneys' fees, expenses and liabilities incurred related to Subcontractor's obligations under this section. If requested by Contractor, Subcontractor shall use counsel satisfactory to Contractor to defend an Indemnified Party as provided in this section.

With respect to Section 18.1 (c) above, in compliance with section 725.06, Florida Statutes the indemnity obligation described herein is limited to $2,000,000.00 (TWO MILLION DOLLARS), which amount the parties agree bears a reasonable commercial relationship to the Subcontract and the risks associated with the performance of the Work. The indemnity obligations described herein are intended to be consistent with the scope of section 725.06, Florida Statutes, and if any portion of the indemnity obligations described herein is deemed inconsistent with section 725.06 by a court of competent jurisdiction, the provisions of section 725.06 shall control, it being the intent of the parties that Subcontractor indemnify the Indemnified Parties to fullest extent permitted by Florida law.  To comply with the technical requirements of section 725.06, the parties agree that these indemnity provisions shall be deemed to be incorporated into the project specifications or bid documents for the project, as necessary to make the indemnity provisions fully enforceable.

If Subcontractor is, or as part of the Work provides the services of, a design professional as defined by section 725.08(4), Florida Statutes, Subcontractor shall, to the fullest extent required by the Owner Contract and permitted by section 725.08, Florida Statutes, indemnify and hold harmless the Owner, and its officers and employees, from liabilities, damages, losses, and costs, including, but not limited to, reasonable attorneys' fees, to the extent caused by the negligence, recklessness, or intentionally wrongful conduct of the Subcontractor and other persons employed or utilized by the Subcontractor in the performance of the Subcontract.

Subcontractor shall not be required to provide indemnification to the Indemnified Parties for claims resulting from the gross negligence, or willful, wanton or intentional misconduct of the Indemnified Parties or their respective officers, directors, agents or employees, or for statutory violations or punitive damages except and to the extent the statutory violation or punitive damages are caused by or result from the acts or omissions of the Subcontractor or any of the Subcontractor's Sub-subcontractors or agents or their respective employees.

If this Subcontract is for the performance of work on a public project for the State of Florida, Subcontractor's indemnification obligations are further limited by sections 725.06 (2) & (3), Florida Statutes (2004).

If any claim is made against the Indemnified Parties for any matter enumerated herein, any payment due, or which thereafter becomes due, to Subcontractor, may be held by Contractor to cover such claims. In the event any amounts held by the Contractor are insufficient to cover the claim, the Subcontractor shall pay the difference to the Contractor within ten (10) days of

Page 4 of 10

Exhibit N
Supplemental Terms and Conditions to Subcontract
State of Florida (09/2009 ed. Rev. 0)

# EXHIBIT "N"

**Attachment to Subcontract/Purchase Order, by and between Subcontractor/Seller and Skanska USA Building Inc. for UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Contractor's demand for payment. This indemnity and defense obligation shall survive the termination or expiration of the Subcontract.

Nothing contained herein is intended to, or shall be construed to, limit the Subcontractor's defense, indemnity and hold harmless obligation to claims covered by insurance.

If a temporary restraining order or preliminary injunction is granted in any proceeding involving a claim, demand or cause of action covered by any indemnity obligation of the Subcontractor, Subcontractor shall at its expense secure the suspension and/or satisfaction of the restraining order or injunction by giving a satisfactory bond or other instrument. If any portion of the Subcontractor's Work is held in any proceeding to constitute an infringement of patent, trademark, copyright or other intellectual property or proprietary rights and the use thereof is permanently enjoined, Subcontractor shall at its expense promptly secure a license authorizing Contractor's and Owner's continued use of such Work or, if Subcontractor is unable to secure such license, replace the affected Work or modify it so that it is non-infringing.

## Insert the following new section:

**19.14** *Attorneys' Fees.*
Except for the provisions of Section 18.1, notwithstanding any other terms and conditions of the Subcontract each party shall bear its own attorneys' fees and costs in any arbitration, litigation, or other form of dispute resolution between Contractor and Subcontractor arising out of this Subcontract.

**19.15** *School Site.*
If the project for which the Subcontractor is performing the Work is conducted on a school site where students will be present, the Jessica Lunsford Act shall apply. Therefore, the Subcontractor and employees of Subcontractor will complete an application for background checks. Fingerprinting will be conducted as applicable under the rules of the school district for whom the Project is being performed. Payment of any fees for the clearance check will be made in accordance with the school district for whom the Project is being performed. After the background check, those workers receiving clearance to work on school sites will be issued a badge or other appropriate documentation, but the Contractor or the appropriate school district officials. Badges and other documentation will only be issued upon presentation of at least one form of Picture ID acceptable to the Contractor and the District. Badges issued to Subcontractor and Subcontractor's subcontractors will expire thirty (30) days after final completion of the Project. Contractor will notify Subcontractor when an employee or vendor receives clearance and is approved to be issued a badge or other documentation.

## Exhibit "H" is modified as follows:

The following language shall be deleted:

**"WAIVER and RELEASE BY SUBCONTRACTOR/SELLER**: Conditioned only upon payment of the amount of this request, or such other amount that is approved and paid by Skanska and/or Owner, and in order to induce such payment, I, the Undersigned, on behalf of the Subcontractor/Seller, do hereby release and waive the following rights and claims with respect to all Work, Goods and Services that have been performed or provided by, or on behalf of, Subcontractor/Seller in connection with the Project and/or the Property up through and including the period covered by this Estimate for Payment: (a) all rights and claims that Subcontractor/Seller has under the mechanic's lien, materialmen's lien and other similar lien statutes of the State in which the Project is located; (b) all rights and claims that Subcontractor/Seller has against any labor, material, payment, performance or lien discharge bond pertaining to the Project, and all rights and claims that Subcontractor/Seller has under the Miller Act (40 U.S.C. §§ 3131-3133) or any similar State statute that requires a material and/or payment bond for the Project; and (c) all other claims for additional compensation of any kind, including delay, disruption, interference, impact, and acceleration, except for those unresolved claims for which Subcontractor/Seller has complied with the notice requirements of the Subcontract/Purchase Order."

Subcontractor/Supplier acknowledges, agrees to, and understands that this language in Exhibit "H" is being deleted because Subcontractor/Supplier in accordance with Paragraphs 3 and 4 in this Exhibit "N" is required to: (a) submit the waivers and releases annexed as Exhibits "N1" and "N3" as an express condition precedent to being paid progress payments and (b) submit the waivers and releases annexed as Exhibits "N2" and "N4" as an express condition precedent to being paid final payment.

Exhibit N
Supplemental Terms and Conditions to Subcontract
State of Florida (09/2009 ed. Rev. 0)

## EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

**END OF DOCUMENT**
**(EXHIBITS "N1", "N2", "N3" AND "N4" ATTACHED)**

**Page 6 of 10**

**Exhibit N**
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

# EXHIBIT "N"

**Attachment to Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

## EXHIBIT "N1"

### WAIVER AND RELEASE OF LIEN UPON PROGRESS PAYMENT AND WAIVER OF RIGHT TO CLAIM AGAINST PAYMENT BOND (PROGRESS PAYMENT)

Except as specifically identified below, the undersigned lienor and/or claimant on payment bond, in consideration of the sum of $_____, hereby waives and releases its lien and right to claim against the payment bond for labor, services, or materials furnished through _____ ("Release Date") to Skanska USA Building Inc. and the Owner, on the job of _____.

(description of property)

(The Undersigned Lienor/Claimant understands that the term "payment bond" as used herein shall refer to any payment bond that is furnished by or on behalf of Skanska USA Building, Inc. for the above-referenced job including, without limitation, any bond that is furnished under the federal Miller Act (40 U.S.C. §§3131-3134), any payment bond that is furnished under Florida's Construction Lien Law (Fla. Stat. Ch. 713, Part I), any payment bond that is furnished for a Florida public project including a payment bond issued under Florida Statute §255.05, or any payment bond that is deemed a common law bond.)

This waiver does not cover any retention or any labor, services, or materials furnished after the Release Date.

DATED ON _____, _____.

(Name of Lienor/Claimant)

By: _____

Exceptions:

This waiver and release does not cover the following:

**[Identify any specific claims asserted by Lienor/Claimant for changes or impacts prior to the Release Date not covered by this waiver and release either in this waiver and release or an attached Exhibit A. Lienor/Claimant acknowledges, agrees to, and understands that identifying any claims and exceptions does not relieve Seller from complying with the notice requirements in the Purchase Order.]**

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by ____ _____ as _____of _____ on behalf of _____.

_____
Notary Public, State of Florida at Large

Exhibit N
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

## EXHIBIT "N2"

### WAIVER AND RELEASE OF LIEN UPON FINAL PAYMENT AND
### WAIVER OF RIGHT TO CLAIM AGAINST PAYMENT BOND
### (FINAL PAYMENT)

      The undersigned lienor and/or claimant on payment bond, in consideration of the final payment in the amount of $     , hereby waives and releases its lien and right to claim a lien and further releases its right to claim against the payment bond for labor, services, or materials furnished to Skanska USA Building Inc. and the Owner, on the job of   .

(description of property)

(The Undersigned Lienor/Claimant understands that the term "payment bond" as used herein shall refer to any payment bond that is furnished by or on behalf of Skanska USA Building, Inc. for the above-referenced job including, without limitation, any bond that is furnished under the federal Miller Act (40 U.S.C. §§3131-3134), any payment bond that is furnished under Florida's Construction Lien Law (Fla. Stat. Ch. 713, Part I), any payment bond that is furnished for a Florida public project including a payment bond issued under Florida Statute §255.05, or any payment bond that is deemed a common law bond.)

DATED ON     ,    .

                         (Name of Lienor/Claimant)

                        By: _____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ _____, as _____ of _____ on behalf of _____.

                      _____
                      Notary Public, State of Florida at Large

**Exhibit N**
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## EXHBIT "N3"

## PARTIAL RELEASE OF CLAIMS

KNOW ALL MEN BY THESE PRESENTS:  That the undersigned , for and in consideration of the payment of the $ _____ paid by or on behalf of Skanska USA Building, Inc. (hereinafter referred to as "Contractor"), the receipt and sufficiency of which is hereby acknowledged and confessed, hereby releases and waives all defenses to claims and releases, remises and quitclaims unto said Contractor, its parent companies, affiliated companies, Sureties, and their agents, servants and employees, successors and assigns of and from any and all claims whether known or unknown, suits, damages, demands of every kind or character, causes of action, including any claims for extra work, extended or additional job cost and overhead, lost profits, impact costs and the like, including claims and demands arising from any claimed or unclaimed delays, disruptions, interferences, inefficiencies, lost productivity, acceleration, or changes to the work that arise out of or relate to this project, the Subcontract, or the Work (all collectively referred to as Defenses and Claims), which the Undersigned has or could have as of _____ ("Release Date") against Contractor or Owner or Contractor's parent companies, affiliates, sureties or any person, firm or corporation that may in any way be liable or responsible for the acts or omission of Contractor in connection with this project, save and except as noted in Exhibit A, which must be attached hereto. If there is an Exhibit A, place an asterisk ("*") by your signature, otherwise no claims (or Exhibit A) will be deemed to exist as of the Release Date. The undersigned acknowledges, agrees to, and understands that identifying any claims and exceptions in an Exhibit A does not relieve Subcontractor from complying with the notice requirements in the Subcontract

This Partial Release of Defenses and Claims does not release retainage through the above date and is given pursuant to the terms of the Subcontract or Purchase Order, as applicable, by and between Contractor and the Undersigned on _____ _____.

The undersigned represents that it has not sold, assigned, or otherwise transferred or conveyed to any third party the Defenses and Claims including any claims relating to the undersigned's lien or bond rights for this project.  The undersigned further represents that it has authority to execute this Partial Release of Defenses and Claims and has knowledge of this project, the Subcontract, and the Work.

IN WITNESS WHEREOF, the Undersigned has signed this RELEASE OF CLAIMS on this _____ day of _,    20 _____.


By: _____


Title: _____


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ _____, as _____ of _____ on behalf of _____.


_____
Notary Public, State of Florida at Large

Exhibit N
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

# EXHIBIT "N"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

## EXHIBIT "N4"

## FULL RELEASE OF CLAIMS

KNOW ALL MEN BY THESE PRESENTS:  That the undersigned, for and in consideration of the payment of $ _____ paid by or on behalf of Skanska USA Building, Inc. (hereinafter referred to as "Contractor"), the receipt and sufficiency of which is hereby acknowledged and confessed, hereby releases and waives all defenses to claims and releases, remises and quitclaims unto said Contractor, its parent companies, affiliated companies, Sureties and their agents, servants and employees, successors and assigns of and from any and all claims whether known or unknown, suits, damages, demands of every kind or character, causes of action, including any claims for extra work, extended or additional job cost and overhead, lost profits, impact costs and the like, including claims and demands arising from any claimed or unclaimed delays, disruptions, interferences, inefficiencies, lost productivity, acceleration, or changes to the work that arise out of or relate to this project, the Subcontract, or the Work (all collectively referred to as Defenses and Claims), which the Undersigned has or could have against Contractor or Owner or Contractor's parent companies, affiliates, sureties or any person, firm or corporation that may in any way be liable or responsible for the acts or omission of Contractor in connection with this project.

This Full Release of Defenses and Claims is given pursuant to the terms of the Subcontract or Purchase Order, as applicable, by and between Contractor and the Undersigned on _____.

The undersigned represents that it has not sold, assigned, or otherwise transferred or conveyed to any third party the Defenses and Claims including any claims related to the undersigned's lien or bond rights for this project.  The undersigned further represents that it has authority to execute this Partial Release of Defenses and Claims and has knowledge of this project, the Subcontract, and the Work.

IN WITNESS WHEREOF, the Undersigned has signed this RELEASE OF CLAIMS on this _____ day of _ _____, 20____.

By: _____

Title: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ _____, as _____ of _____ on behalf _____.

_____
Notary Public, State of Florida at Large

**Page 10 of 10**

**Exhibit N**
**Supplemental Terms and Conditions to Subcontract**
**State of Florida (09/2009 ed. Rev. 0)**

## EXHIBIT "PS-2"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SUBCONTRACTOR START-UP CHECKLIST

This Exhibit is provided as a pre work checklist that complements the contract documents and various other aspects of working on site. Please have your PM and Superintendent review with each other and initial prior to the first day on site. While this is intended to serve as a guide, it is no means meant to be a comprehensive list of the contract requirements or scope of work. It is REQUIRED that this checklist, and Skanska Subcontract be reviewed with a Skanska superintendent prior to starting ANY work.

1) Jobsite location
2) Skanska staff
3) Parking
4) UF requirements
5) Deliveries
6) Insurance
7) Day one orientation
8) Job hours
9) Skanska Safety and Environmental  Programs/SHMP
10) Stretch and Flex, Pre Task Plans
11) Subcontractor site specific safety plan/ MSDS
12) Emergency plans/ local facilities
13) Permits
14) Site/material staging, utilization
15) Manpower and material movement
16) Certifications
17) Schedule
18) Preconstruction Meetings
19) QC program/ Mock-up, first work
20) Boxes
21) Current documents/ planroom
22) Daily reports/ Dayfacts
23) Weekly coordination meetings
24) Survey/ layout/ alignments
25) Open door for assistance from Skanska USA Inc.


1. Jobsite Location
   a. 1645 W University Ave Gainesville, Florida 32611
2. Skanska Staff
   a. Marc Manning- Sr. Superintendent
      i. Marc.Manning@skanska.com
      ii. Mobil- 813 784-5288
   b. Joe Ettershank- Sr. Project Manager
      i. Joe.Ettershank@skanska.com
      ii. Mobil- 813 416-8274
   c. John Easterwood- Assistant Project Manager
      i. John.Easterwood@skanska.com

      ii.  Mobil- 813- 446-8873
- d. Tory Blume- Assistant Superintendent
  - i. Tory.Blume@skanska.com
  - ii. 813 440-9208
- e. Nader Sinno- Project Engineer
  - i. Nader.Sinno@skanska.com
  - ii. Mobil- 352 226-7242
- f. Norberto Rodriguez- EHS Manager
  - i. Norberto.Rodriguez@skansk.com
  - ii. Mobil- 954 448-9235
- g. Pamela Ysidron- Accounting
  - i. Pamela.Ysidron@skanska.com
  - ii. Mobil- 813 917-0118
- h. Stephanie Catalina- VDC Manager
  - i. Stephanie.Catalina@skanska.com
  - ii. Mobil- 813 299-1574
- i. Dave Anderson- Project Executive
  - i. David.Anderson@skanska.com
  - ii. Mobil- 813 480-6387

3. Parking
   a. Per Exhibit M, there is no employee parking onsite. All Employees/Employers are responsible for parking. A lot is available behind the Hilton on SW 34th Street. Contact a Skanska Rep for the exact location and a pass.
4. UF Requirements
   a. The University of Florida Specifications are included in the contract documents. Where there are deviations from the A/E specifications and drawings, the most stringent shall apply.
5. Deliveries
   a. Per UF Requirements, deliveries that require partial lane closures will not be allowed between 7:30am-9:00am and 3:30pm-5:00pm. Each subcontractor shall be required for the maintenance of traffic during deliveries.
   b. All Trucks must be washed prior to leaving the site. Skanska has provided a wheel wash and hose at the N gate.
6. Insurance
   a. This is not an OCIP or CCIP project. Each subcontractor is responsible for their own insurance, according to Exhibit G. Insurance must be approved prior to Subcontractor working onsite or receiving payment.
7. Day One Orientation
   a. Foreman/Superintendents
      i. Must have orientation with Marc Manning Prior to beginning work.
   b. Crew
      i. Orientations are Tuesday and Thursday, @ 7:15am. ALL Employees are required to attend before starting work. Employees must bring ID's to the orientation (Drivers licenses, State issued ID).
8. Job Hours
   a. The official Job Hours are from 7:00pm-5:30pm. Any additional hours must be approved by a Skanska Superintendent.
9. Skanska safety and Enviromental Programs/SHMP
   a. The SHMP is located in your contract, and WILL be adopted by each subcontractor.
10. Stretch and Flex/Pretask Plans
    a. Stretch and Flex Begins at 7:00am. ALL EMPLOYEES ARE REQUIRED TO ATTEND AND PARTICIPATE.

    b. Pre-task plans, provided by Skanska, are to be completed daily after Stretch and Flex. They will be turned in to Skanska every afternoon.

11. Subcontractor Site Specific Safety Plan/ MSDS

    a. Prior to contract, Skanska must receive and approve a site specific safety plan, submitted by each subcontractor.

    b. All MSDS sheets will be provided with the site specific safety plan.

12. Emergency Plan/ Local Facilities

    a. In the case of an emergency, first call 911 then notify Skanska Personnel. ALL ACCIDENTS AND INJURYS MUST BE REPORTED IMMEDIATELY.

    b. The gather point, in case of an emergency, is to the north of the Skanska trailer. ALL subcontractors must gather here in case of an emergency.

13. Permits

    a. Hot Work- All Subcontractors must have a signed permit prior to beginning work.

    b. Digging- All Subcontractors must have a signed permit prior to digging. Each subcontractor is responsible for inquiring about the location of underground utilities.

14. Site/Material Staging, Utilization

    a. In General, there will no material storage onsite. Each subcontractor shall prepare for in time deliveries. Coordinate with the Skanska Superintendents.

15. Manpower and Material Movement

    a.

16. Certifications

    a. Welding

    b. Flagging

    c. Rigging

    d. Equipment

17. Schedule

    a. The baseline schedule will be updated on a monthly basis. ALL Subcontractors are required to submit a three week look-ahead to Skanska, once a week. This will be used for coordination with deliveries, work-flow, and other subcontractors.

18. Preconstruction Meetings

    a. There will be a preconstruction meeting prior to your firm working onsite.

19. QC Program/ Mock-up/ First Work

20. Boxes

    a. Each subcontractor will have a box in the Skanska trailer. Each day, all pretask plans must be delivered to the box.

    b. Also located in Skanska's trailer are boxes with all necessary permits, pretask plans, and other forms necessary for everyday work.

21. Current Documents/Planroom

    a. All Subcontractors are required to maintain current documents, making changes due to RFI's, submittals, field orders, etc. Skanska maintains the most current documents on docupro (Skanska cloud).

22. Daily Reports/Dayfacts

    a. All subcontractors are required to submit daily reports, via dayfacts.

23. Weekly Coordination Meetings

    a. There will be a coordination meeting every Friday at 10:00am.

24. Survey/Layout/Alignments

    a. Skanska Survey will include control lines on each floor. Each subcontractor is responsible for surveying/layout from the gridlines.

25. Open Door- Skanska

    a. Skanska has an open door policy for all subcontractors.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68F48D0DEDD6

# EXHIBIT R

# QUALITY MANAGEMENT PROGRAM

## Skanska USA Building Inc.

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

## TABLE OF CONTENTS

1.0.     SCOPE

2.0      THE QUALITY CONTROL TEAM
2.1      Organizational Structure
2.2      The Responsibility and Authority of the Team
2.3      The Quality Control Manager
2.4      The Document Control Manager
2.5      The Superintendents, Project Managers, Contract Managers, and Project Engineers

3.0      THE QUALITY CONTROL PROCEDURES
3.1      Design QC Procedures
3.2      Procurement QC Procedures
3.3      Construction QC Procedures

4.0      THE SUBMITTAL PROCESS
4.1      Submittal Review and Approval Process
4.2      Submittal Log
4.3      Submittal Review Guidelines
4.4      Substitution Requests

5.0      PRE-INSTALLATION PROCEDURES
5.1      Pre-Installation Reviews
5.2      Pre-Installation Meetings
5.3      Samples
5.4      Mock-ups

6.0      TESTING AND INSPECTION PROCEDURES
6.1      Product and Material Testing
6.2      Field Progress Inspections
6.3      The Architect's and his Consultant's Inspections
6.4      Inspections by Governing Authorities

7.0      THE PROCESS OF CORRECTING NON-CONFORMING WORK
7.1      Non-Conformance Reports
7.2      Non-Conformance Report Log

8.0      QUALITY CONTROL DOCUMENTATION
8.1      Contract Document Log(s)
8.2      Testing and Inspection Plan Log
8.3      Quality Control Daily and Weekly Reports
8.4      Structural Inspector's Reports
8.5      Other Independent Testing and Inspection Reports
8.6      Architect's/Consultant's Inspection Reports
8.7      Monthly QC Report

**Quality Management Program
(06/2006 ed. Rev. 1)**

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

---

**LIST OF REPORT**

The following is a list of reports to be used as part of the Quality Control Plan:

1)   Inspection Report (Document #001)
2)   Non-Conformance Report (Document #002)
3)   Receipt of Materials and Equipment Inspection Report (Document #003)
4)   Utility Inspection Checklist (Document #004)
5)   Concrete Placement Checklist (Document #005)
6)   Equipment/Start-up Inspection Report (Document #006)
7)   Quality Control Daily Report (Document #007)
8)   Quality Control Weekly Report (Document #008)

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

<u>EXHIBIT "R"</u>

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

## 1.0    SCOPE

The Purpose of the Quality Control Plan is to assure everyone with an interest in the project that the materials and workmanship that become part of the **MPM MPH Master Site Plan Tower** corresponds to the level of quality expected and which meets all requirements of the contract documents.   The Quality Control Plan provides specific guidelines for implementing Skanska quality control philosophy on the Owner's project and to do so in strict accordance with the requirements of the Contract Documents.

To this end, it is necessary to establish a plan that includes a number of processes that when correctly established and administered, are effective toward achieving the expected level of quality. Such a plan must include procedures that adequately address all project activities including those of design development, construction documents, procurement, material selection and approval, fabrication, delivery, installation, and project closeout.

These efforts begin by establishing processes to assure that designs are developed thoughtfully and thoroughly and that construction documents are generated that appropriately address all established program requirements.

These efforts continue by incorporating established procedures to ensure that qualified suppliers and subcontractors are secured to supply and perform the Work.

We then implement a time tested submittal processes to assure that we select and receive the quality of materials and equipment that will provide the level of capacity, reliability, and service that are required by the contract documents.

After completing the submittal process, we implement a "pre-installation process" to re-confirm that the materials and equipment that will actually be incorporated into the Work will be the same as the materials and equipment that have been approved for that purpose, that those materials have been delivered to the jobsite or are otherwise readily available for immediate delivery as required, that all preceding work has been properly installed and finished, and that the subject element of work is properly prepared to proceed.

Just as soon as the work has started and a sufficient quantity of the material has been put in place to make an accurate assessment of the quality of workmanship being achieved, we implement what we call the "initial field inspection" process. Once we have assured ourselves through the initial field inspections that the established standards of quality of material finish and workmanship are being met the installation is allowed to continue.

After the initial installation of the work is approved, we implement a series of periodic inspections called "production inspections". These inspections are designed to ensure that the remaining work matches the level of quality achieved at the initial filed inspection. These periodic production inspections continue as appropriate until the work is completed.

While the emphasis of the Quality Control Program is to prevent the use of inferior materials and substandard workmanship, we understand that occasionally defective materials are installed or faulty workmanship occurs. To ensure that we become aware of such events as they occur and to ensure that they are corrected in an expeditious manner we have established the "non-conformance" process. This procedure is used to identify, track, and correct work that is found to be non-conforming.

An important quality control activity (and mind set) is to start to finish the project as soon as it begins.  We begin this activity by implementing a number of procedures designed to properly finalize and turnover the facility. These procedures include those to assemble, maintain, and distribute complete and accurate record documents. These documents include the as-built drawings; warranties and guarantees; and operation and maintenance manuals among others.   We also determine the appropriate procedure to train the Owner's operating personnel. Finally, we begin to develop formal punch list process to ensure the timely and complete performance of the Work.

What follows is how we describe, establish, implement, and administer these processes and procedures.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

## 2.0    THE QUALITY CONTROL TEAM

### 2.1    Organizational Structure

The successful implementation of the Quality Control Plan requires a structured Quality Control Team (all staff of Skanska USA Building Inc.) with each team member having well defined responsibilities, lines of communication, and an appropriate level authority. Each Team member must have clearly defined relationships with the other members of the Project Team.

### 2.2    The Responsibility and Authority of the Team

The Quality Control Team's responsibilities and authorities include the following;

- ❑ Work together with all members of the Project Team to support all established quality control programs and policies; faithfully implement and administer the processes and procedures described in the Quality Control Plan; demonstrate a proactive approach to problem identification and resolution; and most importantly, deliver a new facility to the Owner which reflects the level of quality of materials, equipment, and workmanship expected and which we all can be proud of.

- ❑ Support and coordinate all project quality control activities including those of the subcontractors and suppliers, the Design Team, and the independent testing and inspection agencies.

- ❑ Implement and properly administer all processes and procedures described in the Quality Control Plan including: the submittal review and approval process; the non-conformance identification and resolution process, and the testing and inspection plan.

- ❑ Identify any discrepancies in the contract documents in a timely manner.  Recommend appropriate solutions within the scope of the contract.

- ❑ Create and distribute all necessary quality control reports, forms, logs, agendas, meeting minutes, and other documents necessary to appropriately communicate and record the activities of the Quality Control Team.

- ❑ Ensure that all quality control activities are undertaken in a manner consistent with the requirements of the Safety Plan, the Environmental Plan, and all other appropriate project requirements.

- ❑ Conduct and participate in all established quality control meetings.

### 2.3    Quality Control Manager

The Quality Control (QC) Manager is responsible for the proper establishment, implementation, and administration of all elements of the QC Plan. The QC Manager confers directly with the Sr. Project Manager and interfaces directly with Owner's Project Management representatives on all Quality Control matters.

The QC Manager reviews, revises the QC Plan, as he deems appropriate and submits the final plan to the Sr. Project Manager and the Owner's representative for approval. Once approved the plan is distributed to all members of the Project Team and ensures that all members of the QC Team understand that all quality control activities are to be performed in accordance with the Project Safety Plan and other project requirements.

The QC Manager supervises the activities of all QC Team personnel. The QC Manager supervises the QC Teams review of all contract documents to ensure they conform to the required level of quality expected for each building system and finish element.

The QC Manager ensures that particular requirements of the approved Quality Control Plan are included in all subcontractors and purchase orders. The QC Manager supervises the proper administration of the submittal review and approval process including the timely receipt, review, approval, distribution, and maintenance of accurate files for all submittals.  Submittal

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

files include those for shop drawings, product data, test reports, and other submittal documents. The QC Manager supervises the accurate and timely maintenance of the Submittal Log.

The QC Manager supervises the implementation and administration of all the pre-installation processes including pre-installation reviews and pre-installation meetings; the appropriate on-site presentation and maintenance of the approved material and finish samples; and the construction, approval, and maintenance of all required mock-up assemblies.

The QC Manager supervises the preparation and administration of the testing and inspection plans including all factory and field tests, the field progress inspection processes, the structural inspection plan, all independent testing and inspection agencies, the Architect's and his consultant's inspections, the Building Department, the Fire Marshall's Office, and any other authority having jurisdiction.

The QC Manager supervises the proper administration of all Correction Actions including the proper reporting, tracking, and appropriate resolution of all non-conforming materials and/or workmanship. The QC Manager reviews all Non-Conformance Reports, all recommended actions to resolve the deficiency, and directs the removal and replacement of non-conforming work as necessary and appropriate

The QC Manager supervises all QC communication and documentation procedures such as meetings, agendas, minutes, logs, plans, schedules, and other reporting processes including issue of Weekly Quality Control Reports.

The QC Manager supervises the administration of all established closeout procedures as they relate to quality control matters including the proper administration and implementation of the punch list process; the receipt, review, assembly, and distribution of all operation and maintenance manuals; the establishment and implementation of the procedures associated with the receipt, review, assembly, and distribution of all warranties and guarantees; the implementation and coordination of the processes associated with the training the Owner's operating personnel; the receipt, review, assembly, and distribution of the Operation and Maintenance Manuals; the implementation and coordination of the procedures and other required record documents including the as-built drawings.

## 2.4    The Document Control Manager

The Document Control Manager is responsible for assisting the Quality Control Team in the processing and maintenance of files for submittals. The Document Control Manager will provide monthly reports identifying submittal status and highlighting any critical submittals.

The Document Control Manager assists the QC Team with the submittal process with special responsibility for establishing and maintaining an accurate Submittal Log; maintains well organized files for shop drawings, catalog data, and other submittals; and designs, prepares, and maintains the appropriate presentations of samples.

The Document Control Manager provides monthly submittal status reports noting the status of submittals and highlighting those not approved that have exceeded the late start date of the contract schedule.

## 2.5    Superintendents, Project Managers, Assistant Project Managers and Project Engineers

All Superintendents, Project Managers, Assistant Project Managers and Project Engineers are members of the Quality Control Team. Each such superintendent, manager, and engineer is responsible to, and has the authority to, implement and administer all quality control procedures and processes established for their designated areas of responsibility.

All Superintendents, Project Managers, Assistant Project Managers and Project Engineers will receive, read, understand all elements of the Quality Control Plan established for the Project; review and understand all project procedures; become intimately familiar with all construction documents associated with their designated areas of responsibility.

All Superintendents, Project Managers, Assistant Project Managers and Project Engineers will attend all appropriate QC meetings and provide special expertise in resolving any questions on contract requirements, submittals, or required preliminary work.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

All Superintendents, Project Managers, Assistant Project Managers and Project Engineers will receive, review, and understand the Contract Document Log produced and distributed by the Document Control Manager.

Each Project Managers, Assistant Project Managers and Project Engineers will work with the procurement personnel to ensure that bidding firms and successful subcontractors and suppliers are aware of the subcontract requirements and all project processes and procedures that have been established to ensure the required standards of quality are met.

Each Project Managers, Assistant Project Managers and Project Engineers will implement and administer the submittal review process to the extent of their designated areas of responsibility. This includes all associated activities including the receipt, review, logging, forwarding of submittals including shop drawings, product data, etc. It also includes the review, approval, and management of submittals within their area of designated responsibility in accordance with the procedures outlined in the specifications.

All Superintendents, Project Managers, Assistant Project Managers and Project Engineers will oversee the construction of mock-ups required by their designated areas of the technical specifications to ensure that the appropriate level of quality workmanship is achieved in the project. Each Superintendent, Project Manager, Assistant Manager, and Project Engineer will implement and participate in all Pre-installation Meetings established for their designed portions of work.

Each Superintendents, Project Managers, Assistant Project Managers and Project Engineers will assist in the performance of all tests and inspections required of those portions of the Work they have designated responsibility. Each Superintendent, Project Manager, Assistant Manager, and Project Engineer is responsible to conduct field inspections. Project Managers, Assistant Managers, and Project Engineers are responsible to coordinate the testing and inspection activities of the independent testing and inspection agencies. They are also responsible to work with the Superintendents to ensure that all necessary testing and inspections are properly and consistently performed.

Each Superintendents, Project Managers, Assistant Project Managers and Project Engineers will check for omissions and dimensional errors on the construction drawings. They conduct or participate in the off-site field inspections and tests that are associated with their designated elements of the Work as deemed appropriate by the QC Manager. They also perform follow-up inspections and examinations as necessary to ensure continued compliance with the requirements of the contract documents.

Each Superintendents, Project Managers, Assistant Project Managers and Project Engineers will identify, document, track, and ensure the repair or replacement of all non-conforming work in their designated areas of responsibility. They will know, understand, and properly administer the Non-Conformance System, the Non-Conformance Log, and ensure that and deficiencies in the work are repaired, replaced, or otherwise resolved.

Each Superintendents, Project Managers, Assistant Project Managers and Project Engineers will implement and properly administer all close-out procedures for their designated areas of responsibility including those associated with the punch list process, the assembly of Operating and Maintenance Manuals, the training of Owner's operating personnel, and the assembly and proper distribution of record documents, warranties and guarantees and coordinate issue of same to the Owner through the Quality Control Manager.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

## 3.0    THE QUALITY CONTROL PROCEDURES

### 3.1    Quality Control of Design

The Quality of the Design ultimately developed for the project is the responsibility of the Project Team. This responsibility is first addresses by the Design Team implementing their established, in-house quality control programs and policies. Such programs and policies are provided as an attachment to this plan.   In addition to the in-house design quality control efforts, the Project Team as a group conducts other efforts to assure the quality of the design product. These efforts include the holding of periodic design review meetings where the quality, completeness, and the "constructability" of the designs and the design documents are reviewed. As a result, the Design Team becomes aware of any designs and/or documents that need to be further developed or revised. In addition, the designs and designs documents are revised as necessary as a result of the design and document reviews conducted by other members of the Project Team, the Owner's peer reviewers, governing authorities.

### 3.2    Quality Control of Procurement

The overall responsibility and authority for these efforts rests with the Sr. Project Manager. Bid packages are developed and organized with the idea of making the work accessible to all qualified firms. Further, certain companies both local and national are known by members of this team to be capable of, and have a reputation for, consistently doing a great job of performing most of the work elements required for this facility. These firms are specifically invited to participate in the bid process for this project. The ability of any potential firms to perform according to the established quality standards for the project is determined in a variety of ways. If in our final analysis, a firm is judged not to have a solid record of providing quality workmanship, they are removed as candidates for participating on this project.

During the procurement process, Skanska will initiate the use of the Owner's "Standardization of Materials" document to insure that products, materials and equipment purchased for this Project meet the standards set out in this document and the requirements of the project.

### 3.3    Quality Control of Construction

The quality control procedures established for the construction process provide the ultimate means to ensure the quality of the materials, equipment, and workmanship incorporated into the project. These processes and procedures can be characterized as grouped into the following categories: the submittal review and approval processes; the pre-installation inspection and communication process; the testing and inspection processes; the process of identifying, tracking, and correcting any non-conforming work; the process of documenting the quality control activities performed on the project; and the processes associated with the closeout of construction activities and the turnover of the completed facility to the Owner. These processes are described in detail in the following pages.

## 4.0    SUBMITTAL PROCESS

### 4.1    Submittal Review and Approval

The purpose of the submittal review and approval process is to assure that the materials, equipment, and building systems to be incorporated into the project correspond to the expectations of the Project Team.   The timely and careful review of submittals is also a key factor in avoiding delays or the necessity of re-work.

The Quality Control Manager establishes and supervises the operation of each element of the submittal review and approval process for Project. The Project Managers, Assistant Managers, Project Engineers, and the Document Control Manager are responsible to implement and administer this process on a day-to-day basis.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**4.2    Submittal Log**

The Submittal Log is the document used by the Project Team to list, schedule, and track the receipt, approval, and status of all submittals. The submittal review and approval process is established to ensure that the proper materials and equipment are incorporated into the work.

The Submittal Log lists each item to be submitted as well as the specification section or other contract document that requires the submittal. The Submittal Register also lists the date when each submittal needs to be received and the date the submittal needs to be returned approved. These dates are determined in concert with the Project Schedule. The date when each submittal is actually received and the date when it is forwarded to the Design Team and/or Owner for review and approval is also recorded on the Log.

As the procurement process continues and the Project Schedule logic becomes further developed, members of the Project Team continue to determine the most appropriate submittal sequences and dates and the Submittal Log is updated accordingly.

The Submittal Log is maintained on data base software to permit information sorting in a variety of different ways. In this manner the Register is able to serve as a Submittal Schedule, a Submittal Status Report, an Open Submittal Report, a Submittal By Trade Report, etc. Further, a listing of all submittals either currently in review or previously approved is available to members of the Project Team 24 hours a day, 7 days a week by accessing the project's Internet based project management system.

The Document Control Manager, and each Project Manager, Assistant Manager, or Project Engineer is responsible for the accurate and timely maintenance of the Submittal Log.

**4.3    Submittal Review Guidelines**

The Document Control Manager receives the submittal, makes the appropriate entry in the Submittal Log, and forwards the submittal to the appropriate Assistant Project Manager, Contract Manager, or Project Engineer for further action. The appropriate Assistant Project Manager, Contract Manager, or Project Engineer reviews the submittal for conformance to the project requirements using the following guidelines:

❑    Review each submittal in conjunction with the requirements of the appropriate Specification Section(s). Verify the submittal complies with referenced codes and standards as well as the other specified requirements set forth in the Specification Section.

❑    Review each submittal in the context of the provider's contracted scope of work. Checklists are available from the Procurement Team on request and are very useful in such an effort. Check for exclusions in the scope of work or submittal. Review all exclusions and clouded notes on the shop drawings. Watch for phrases like: "by others" or "not by this contractor", etc. Confirm exactly what subcontractor or supplier is meant as "others". If the scope of work excludes an element required by that particular specification, verify that "others" are, indeed, meeting the requirement. If not, notify the Quality Control Manager.

❑    Compare each submittal to the requirements of the current construction drawings. Review the contract drawings and become familiar with the applicable details. Check the submittal for compliance with the contract drawings by comparing details, sections, dimensions, and cross-referenced drawings, or Detail Sheets for other associated components of the work. Read all General Notes on the drawings to check if applicable to the submittal. Generally, sealed professional engineer's calculations must be provided to support any structural detailing.

❑    Compare each submittal to the requirements of other project documents as may be appropriate. Examples of such other project documents include the Contract Documents, the Project Procedures Manual, the Safety & Health Management Plan, Request For Information responses, approved or pending Change Orders, Architect's Supplemental Instructions, etc.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

- ❑ Review and coordinate submittals with the requirements of associated or other trades. Review the submittal for any rough-in requirements of other trades including such items as: embedments, additional or concealed supports, anchoring devices, wood blocking, sleeves and block-outs, flashing, waterproofing, etc. If any of the above (or similar) requirements are applicable, consider forwarding the appropriate information to the other subcontractor(s) for his review, comment, or other appropriate action. When appropriate, review the submittal with other members of the Project Team

- ❑ The submittal will be reviewed by the Construction Team and if it generally conforms to the requirements of the intended construction it will be marked to indicate the same and will be transmitted to the Design Team for review and approval as required. However, if the submittal does not appear to conform to the requirements of the intended construction it will be returned to the subcontractor or supplier for revision and/or completion.

### 4.4    Substitution Requests

Changes in products, materials, equipment, or methods of constructional required by the Contract Documents proposed by a subcontractor or supplier after the award of a subcontract or Purchase Order are considered substitutions. Requests for substitutions WILL NOT be accepted for this project. Were possible, there will be ample options allowed in the specifications set out by the Design Team, i.e. at least (3) products/equipment will be included for selection, to facilitate competitive bidding and procurement.

### 5.0    PRE-INSTALLATION PROCEDURES

### 5.1    Pre-Installation Reviews

Project Managers, Assistant Managers, Project Engineers, and Superintendents are responsible to conduct pre-installations reviews on those elements of the Work they are responsible to manage. The nature of these preparatory reviews is such that they are to be conducted <u>after</u> all related materials, equipment, and other submittals have been approved <u>but before</u> the first installation of the work begins.

This effort includes a review of all contract requirements related to the work; a confirmation that all required submittals have been received, properly reviewed and approved; that any material and equipment tests have been performed and approved; that arrangements have been completed for any production testing that may be required; that any preceding work has been completed to the extent appropriate for the work to begin; that the materials and or equipment is on-site or otherwise immediately available for the work to begin; that the material and/or equipment to be installed matches that of the approved submittals; and the results of these preparatory reviews are reported and documented in the minutes of Pre-Installation Meetings.

### 5.2    Pre-Installation Meetings

Pre-installation meetings are conducted for certain work activities after the pre-installation has been performed. The purpose of these meetings is to ensure that everyone involved understands what standards of quality and performance are required relative to the Work. These meetings are chaired by the Quality Control Manager and attended by other members of the Project Team including the Design Team and the subcontractor's personnel responsible for the performance of their work. The Owner's representatives are welcome to attend and participate in these meetings.

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

Pre-installation meetings will be conducted for the majority of the work elements. These meetings will address issues such as: the quality standards required for the project; how the subcontractor plans to achieve those standards; the materials that have been previously approved for the project; installation details reflected in the construction documents; the intended or required install sequence; the testing and inspection plan associated with the installation of the work; responsibilities for protection of the work of other trades as well as work in-place; acceptance procedures, etc.

**5.3    Samples**

Samples are physical examples which illustrate products, materials, colors, finishes, coatings, textures, patterns, workmanship, or other criteria of interest to the members of the Project Team that are used to establish standards by which the Work will be judged. Samples that are required to be submitted, approved, maintained, and displayed at the jobsite are identified in the various sections of the technical specifications or in other contract documents. All required samples are identified on the Submittal Log along with the current status of each sample. Samples are submitted to the Architect for review and approval as required by the designated specification or by an established project procedure. Once the approved samples are returned to the jobsite they will be appropriately displayed in a designated location determined by the Project Team. In this manner samples are preserved for review and comparison throughout the duration of construction.

**5.4    Mock-Ups**

Mock-up installations are required to physically exhibit the standards of materials, finishes, and/or workmanship that are required. Mock-ups are generally left in place until all the corresponding production work is complete and accepted. Mock-ups may be constructed as part of the permanent work if practical and appropriate

**6.0    TESTING AND INSPECTION PROCEDURES**

**6.1    Products and Material Testing**

Many of the products and materials that will be incorporated into the project must be tested prior to being installed to be certain that they meet all appropriate quality standards. The testing is required by the contract documents, including the technical specifications, or by the authorities having jurisdiction. Some tests are performed at the manufacturing or fabricating facility and are generally referred to as "factory" tests. Members of the Quality Control team are available to witness factory tests as necessary and appropriate as determined by the QC Manager. The Owner is informed of these tests by reviewing the Testing and Inspection Plan and is welcome to witness these tests as desired.

Some tests will be performed on the jobsite. Such tests are generally referred to as "field" tests. These tests are to be performed by, and the results certified by, the Owner's testing agencies.

Many times product manufacturer's or fabricator's have a number of their products pre-tested and are then able to offer "manufacturer's certified test results" to assure their products meet appropriate criteria and "manufacturer's certified installers" to assure installations are performed properly.

**6.2    Field Progress Inspections**

Project Managers, Assistant Managers, Project Engineers, and Superintendents are required to make thorough initial inspections of the work elements they are responsible to manage when those work elements first start. In addition, these same team members are required to make regular, periodic inspections of these work elements as they progress toward completion. Reporting the results of these inspections will occur in the QC Section of the <u>Daily Report</u>.

When the work has been presented as complete, the Project Managers, Assistant Managers, Project Engineers, and Superintendents will make thorough, final inspections of the work to determine if, in fact, the work is complete, correct, and meets all other requirements of the project. If the work is complete in all aspects, they will advise the Quality Control Manager, in writing, that they believe the work is ready for the Owner and Design Team member Inspection. If it is not, they will develop and distribute a punch list of work that needs further effort and will then oversee the completion and correction of the work. Once they are satisfied that the work is complete and correct they will advise the Owner and Design Team that

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

the work is ready for their inspection. These individuals also accompany the Owner and Design Team member on his inspections.

Periodic field tests are conducted routinely. An example of such field tests would be pressure testing of piping systems as particular portions are completed. The results of such tests are reported in the QC Section of the <u>Daily Report</u> as they occur. The Quality Control Team maintains record files of these test results by specification number and system. The records of these test results are available to all members of the Project Team. A failed test is usually documented in the form of a Non-Conformance Report.

**6.3     Architect's and their Consultant's Inspections**

The Architect and their designated consultants also monitor construction activities and make detailed observations of the quality of construction. The Architect will keep the Quality Control Manager informed of the quality of the work and will further notify the Quality Control Manager in writing of any work that they observe which does not meet the project requirements.

**6.4     Inspections by Governing Authorities**

The Owner or their designated representatives may make periodic inspections of various elements of the work to ensure that the work complies with the requirements of all applicable codes and permit requirements. These inspections are normally recorded on the Permit Inspection Card that is prominently displayed on-site at all times.

**7.0     CORRECTION PROCEDURES**

**7.1     Non-Conformance Reports (NCRs)**

Any materials, equipment, and/or installations that are determined by members of the Project Team to be not in compliance with the quality standards set forth for the project are defined to be "non-conforming". All materials, equipment, and/or installations that are found to be non-conforming and which are not appropriately repaired, reworked, or replaced in a reasonable timeframe (3 days) will be documented as such in the form of a Non-Conformance Report. A sample of a <u>Non-Conformance Report (NCR)</u> form is provided as an attachment to this plan. All Project Team members are authorized to request the issuance of a NCR should they determine that any materials, equipment, and/or installations are non-conforming. All Project Team members are responsible for delivering NCRs directly to the Quality Control Manager.

**7.2     Non-Conformance Report Log**

All NCRs received by the Quality Control Manager will be recorded in the NCR Log. The responsible subcontractor, the Construction Manager, the General Superintendent and other designated members of the Project Team will receive a copy of the NCR along with other relevant information or direction. The status of all NCRs will be shown as "open" on the NCR Log, and will remain so until the non-conforming work has been completed, repaired, reworked, or replaced to the satisfaction of the Project Manager and/or the Quality Control Manager. All "open" NCRs will be included on the agenda for, and discussed at the Weekly Subcontractors Meeting. No payment is to be approved for non-conforming work. A sample page from the Non-Conformance Report Log is provided as an attachment to this plan.

**Quality Management Program
(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

## 8.0    QUALITY CONTROL DOCUMENTATION

### 8.1    The Contract Document Log

The Document Control Manager produces a list of all Contract Documents that are associated with the project. This list is identified as the Contract Document Log. This log lists all the drawings and specifications that have been issued for the project. From this log, a listing of the most current drawings and specifications that have been issued for construction can be generated.  This listing is generated to ensure that all parties associated with the project are working from the most current set of documents.  The Contract Document Log is prepared and maintained by the Document Control Manager and is available to all members of the Project Team. It is the responsibility of the Document Control Manager to maintain an accurate Contract Document Log at all times.

### 8.2    The Testing and Inspection Plan and Log

As technical specifications and drawings are issued for construction the Quality Control Team first creates and then continues to develop the Testing and Inspection Plan and Log. This document lists and indicates the reference for all tests and inspections expected to be performed including those required by all applicable laws, statues, codes, standards, contract requirements, the technical specifications, this plan, or any other established project procedure. Since this listing also indicates when the tests and inspections are expected to occur, it also serves as a testing and inspection schedule. All tests and inspections will be scheduled so as not to delay the progress of the Work. Also listed are the individuals or firms responsible for the test or inspection as well as the current status of the test or inspection.  In any case, The Quality Control Manager retains appropriate authority over the testing and inspection processes to the extent necessary and appropriate for this project.

### 8.3    Quality Control Daily and Weekly Reports

A section of the Daily Report is dedicated to describing any unusual or significant quality control activities and/or issues of the day. A report will be issue for each day of the project. A weekly report will be generated to compile daily reports and log all outstanding non-conforming quality issues.

### 8.4    Structural Engineer's Report

The Structural Inspector's reporting responsibilities are defined by the Structural Engineer of Record. The SER reports to the Building Official and any other authority having jurisdiction as requested. The SER reports to the Architect and to the Quality Control Manager once each month.

### 8.5    Independent Testing & Inspection Agency Reports

These reports are submitted to the Quality Control Manager and are included in the <u>Quality Control Report, which</u> will be included in the monthly Project Report.

### 8.6    Architect's and Architect's Consultant's Inspection Reports

These reports are submitted to the Quality Control Manager and are included in the <u>Quality Control Report</u>.

### 8.7    Quality Control Report

This report is prepared according to project procedures and is issued once a month throughout the duration of construction. Each report notes any non-conforming work and the current status of its repair or replacement.

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**


## QUALITY CONTROL INSPECTION REPORT


Area _____     Prepared By: _____

Subcontractor _____     Date: _____

_____     Location: _____

Specification/Drawing: _____     _____


PART ID: _____

CODE, SPECIFICATION NO: _____

JOB DESCRIPTION: _____
_____
_____
_____

REFERENCED SKETCHES/DRAWINGS: _____
_____

EMBEDDED/HIDDEN ITEMS:_____
_____
_____

ACCEPTABLE FOR CLOSURE:          Yes_____          No _____

INSPECTION RESULTS: _____
_____
_____
_____
_____

Q.C. INSPECTOR: _____     DATE: _____

SUBCONTRACTOR: _____     DATE: _____

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**

**QUALITY CONTROL
NON-CONFORMANCE REPORT**

Area _____    Prepared By: _____

Subcontractor _____    Date: _____

_____    Location: _____

Specification/Drawing: _____    _____

NON-CONFORMITY: _____

_____

_____

_____

_____

_____

_____

_____

Q.C. Rep.: _____    Project Manager: _____

**CORRECTION ACTION:** _____

_____

_____

_____

_____

_____

CM QC Manager: _____

Subcontractor: _____

Correction Action Completed:        Yes _____

CM QC Manager: _____

**Quality Management Program
(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**

**QUALITY CONTROL**
**RECEIPT OF MATERIALS AND EQUIPMENT INSPECTION**

Area _____    Prepared By: _____

Subcontractor _____    Date: _____

_____    Location: _____

Specification/Drawing: _____    _____

| QTY | DESCRIPTION | SATISFACTORY | UNSATIFACTORY | NON CONFORMANCE | COMMENTS |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Q.C. INSPECTOR: _____    DATE: _____

SUBCONTRACTOR: _____    DATE: _____

REMARKS: _____
_____
_____
_____
_____

Quality Management Program
(06/2006 ed. Rev. 1)

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**

**QUALITY CONTROL
UTILITY INSPECTION CHECKLIST**

Area _____    Prepared By: _____

Subcontractor _____    Date: _____

_____    Location: _____

Specification/Drawing: _____    _____

Specification:
Drawing:

**Specialty Items Listed**

Materials:

Pipe:

Valves:

Fittings:

Thrust Block(s):

Elevation:

Depth:

Location:

Pressure Test:

Backfill Material:

Compaction:

Subcontractor: _____    Date: _____

Construction Manager: _____    Date: _____

**Quality Management Program
(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**

**QUALITY CONTROL**
**CONCRETE PLACEMENT CHECKLIST**

*Note:  Concrete placement may not proceed without Contractor/Sub-Contractor signatures.*

Concrete Placement Number: _____     Actual Pour Date: _____

Structure: _____     Location: _____

Cubic Yards:    Theoretical: _____     Time:   Start: _____
Actual: _____     Finish: _____
Waste: _____

Concrete Mix Design Number: _____
Temperature at site _____     Air Content: _____     Slump: _____

| ITEM | IRONWORKER (Init/Date) | CARPENTER (Init/Date) | M&E (Init/Date) | ENG (Init/Date) | QC (Init/Date |
|---|---|---|---|---|---|
| **EXCAVATION** | | | | | |
| Excavation Location (SURVEY CHECK) | | | | | |
| Subgrade Location (SURVEY CHECK) | | | | | |
| Screed Rail Elev. Set (SURVEY CHECK) | | | | | |
| **SURFACE PREPARATION** | | | | | |
| Foundation Preparation | | | | | |
| Expansion Joint Material | | | | | |
| **FORMWORK** | | | | | |
| Alignment and Grade (SURVEY CHECK) | | | | | |
| Adequate Ties and Bracing | | | | | |
| Forms Surfaces | | | | | |
| Chamfer Strips | | | | | |
| She-bolt and Tie Protection | | | | | |
| Blockouts Installed | | | | | |
| Embeds for Electricity | | | | | |
| Embeds for Mechanical | | | | | |
| Re-bar | | | | | |
| Survey Line and Grade | | | | | |
| Waterproof/Pre-Placement | | | | | |

REMARKS: _____
_____
_____

QC REP: _____ Date: _____ Superintendent: _____ Date: _____

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

**EXHIBIT "R"**

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

### MPM MPH Master Site Plan Tower

**QUALITY CONTROL**
**EQUIPMENT/SYSTEMS START UP INSPECTION REPORT**

Area _____    Prepared By: _____

Subcontractor _____    Date: _____

_____    Location: _____

Specification/Drawing: _____    _____

Description of Equipment/System: _____

_____

_____

_____

Equipment/Systems components conform to Contract
Documents and approved submittals:    Yes _____    No _____

Power Requirements complete:    Yes _____    No _____

All connecting piping/valves/ductwork complete:    Yes _____    No _____    N/A_____

All controls and connections to control system complete:    Yes _____    No _____    N/A_____

System balancing complete:    Yes _____    No _____    N/A_____

Manufacturer's inspection/approval complete:    Yes _____    No _____    N/A_____

## EXHIBIT "R"

**Attachment to Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

**MPM MPH Master Site Plan Tower**

### _QUALITY CONTROL DAILY REPORT_

Date: _____

**GENERAL CONDITIONS**        **(e.g. TIME, WIND DIRECTION, SPEED AND HUMIDITY)**

Weather A.M.: _____    Temperature: _____
Weather Mid-Day: _____        Temperature: _____
Weather P.M.: _____    Temperature: _____

Inspections: _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Meetings: _____
_____
_____
_____

Visitors: _____
_____
_____
_____

QC Manager: _____    Date: _____

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

## EXHIBIT "R"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** at **MPM MPH Master Site Plan Tower, Clearwater, Florida #2312001.**

---

### MPM MPH Master Site Plan Tower

### QUALITY CONTROL WEEKLY REPORT

Date: _____

**GENERAL CONDITIONS**          (e.g. **TIME, WIND DIRECTION, SPEED AND HUMIDITY**)

Weather A.M.: _____    Temperature: _____
Weather Mid-Day: _____    Temperature: _____
Weather P.M.: _____    Temperature: _____

Inspections: _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Meetings: _____
_____
_____
_____

Visitors: _____
_____
_____

QC Manager: _____    Date: _____

**Page 21 of 21**

**Quality Management Program**
**(06/2006 ed. Rev. 1)**

# EXHIBIT "S"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## AUTHORIZED SIGNATORIES

Subcontractor/Seller represents and warrants that those officers or employees of Subcontractor/Seller listed below are duly authorized to execute documents on behalf of Subcontractor/Seller, thereby legally binding Subcontractor/Seller to the all terms, conditions and requirements of any documents so executed. Contractor/Buyer shall be entitled to rely upon the representation and warranty made herein until written notice from the Subcontractor/Seller modifying this list is received by the Contractor/Buyer.

| Name | Title | Limits |
|------|-------|--------|
| Kevin Barry | Director of Operations | $25,000 |
| | | |
| | | |
| | | |
| | | |
| | | |

Authorized by: _Louie Wise III_ (signature)

Title: President

Date: 5/19/2015

# EXHIBIT "T"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

### GREEN BUILDING LEED REQUIREMENTS

The UF-357 Clinical Translational Research Building project is seeking LEED Platinum Certification. The LEED process is a collaborative effort involving all members of the project team. Subcontractor is responsible for understanding the LEED process and the documentation requirements to achieve LEED certification. The Subcontractor has reviewed the attached LEED checklist information for this project and agrees to assist Skanska, the Architect and Owner with meeting all the LEED requirements required by the credits being sought. Specific Subcontractor performance will be required in the items marked CM/GC. Additional documentation efforts may be needed regarding credits assigned to other team members listed.

Version - This project has been registered under LEED 2009 for New Construction & Major Renovations, Version 3

The Subcontractor confirms the bid price submitted at time of contract includes the Subcontractors efforts to document and perform the LEED requirements being sought on the accompanying checklist. No additional compensation will be considered unless the project team deviates from the credits identified herein.

Skanska USA Building Inc. ("Skanska") one of the nation's leading builders, is acutely aware of our client's desire to design and construct award winning buildings which take advantage of leading edge technology, are environmentally friendly and reduce energy consumption. When project owners engage designers to create a building, they consider the economic, environmental and social aspects of the project in their decision-making process. The building will convey an identity to the observer and to the occupants. While designers hold the key to creating sustainable environments within the building as well as energy efficient equipment, envelopes and materials, the construction manager is involved on a daily basis with its construction. The professionals at Skanska endeavor to build in a manner that is most beneficial to the client and embrace green building principles. So that the Owner may obtain credits toward LEED certification from the construction process, Skanska will actively emphasize and monitor the following areas throughout the construction process:

**A. SUSTAINABLE SITES – 26 Credits**

1. Construction Activity Pollution Prevention (Prerequisite)
2. Site selection (1 Credit)
3. Development Density and Community Connectivity (5 credits)
4. Alternative Transportation: Public Transportation Access (6 credits)
5. Alternative Transportation: Bicycle Storage and Changing Rooms (1 Credit)
6. Alternative Transportation: Low-emitting and Fuel-Efficient Vehicles (3 Credits)
7. Alternative Transportation: Parking capacity (2 Credits)
8. Site Development: Protect or Restore Habitat (1 Credit)
9. Site Development: Maximize Open Space (1 Credit)
10. Stormwater Design: Quantity Control (1 Credit)
11. Stormwater Design: Quality Control (1 Credit)
12. Heat Island Effect: Non-Roof (1 Credit)
13. Heat Island Effect: Roof (1 Credit)
14. Light Pollution Reduction (1 Credit)

**B. WATER EFFICIENCY – 10 Credits**

1. Water Use Reductions: 20% Reduction (Prerequisite)
2. Water Efficient Landscaping: No Potable Water Use or Irrigation (4 Credits)
3. Innovative Wastewater Technologies (2 Credits)
4. Water Use Reduction:
   a. 30% Reduction (2 Credits)
   b. 35% Reduction (1 Credit)
   c. 40% Reduction (1 Credit)

# EXHIBIT "T"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

**B.   ENERGY AND ATMOSPHERE – 25 Credits**

1. Fundamental Commissioning of Building Energy Systems (Prerequisite)
2. Minimum Energy Performance (Prerequisite)
3. Fundamental Refrigerant Management (Prerequisite)
5. Optimize Energy Performance (14 Credits)
6. On-Site Renewable Energy (2 Credits)
7. Enhanced Commissioning (2 Credits)
8. Enhance Refrigerant Management (2 Credits)
9. Measurement and Verification (3 Credits)
10. Green Power (2 Points)

**C.   MATERIAL AND RESOURCES – 7 Credits**

1. Storage and Collection of Recyclables (Prerequisite)
2. Construction Waste Management: 50% Recycled or Salvaged (1 Credit)
3. Construction Waste Management: 75% Recycled or Salvaged (1 Credit)
4. Recycled Content: post-consumer + ½ pre-consumer = 20% total material costs (2 Credits)
5. Regional Materials: 20% Extracted, Processed & Mfr. Regionally (2 Credits)
6. Certified Wood (1 Credit)

**D.   INDOOR ENVIRONMENTAL QUALITY – 14 Credits**

1. Minimum Indoor Air Quality Performance (Prerequisite)
2. Environmental Tobacco Smoke (ETS) Control (Prerequisite)
3. Outdoor Air Delivery Monitoring (1 Credit)
4. Construction IAQ Management Plan: During Construction (1 Credit)
5. Construction IAQ Management Plan: Before Occupancy (1 Credit)
6. Low-Emitting Materials: Adhesives & Sealants (1 Credit)
7. Low Emitting Materials: Paints & Coatings (1 Credit)
8. Low Emitting Materials: Flooring Systems (1 Credit)
9. Low Emitting Materials: Composite Wood & Agrifiber Products (1 Credit)
10. Indoor Chemical and Pollutant Source Control (1 Credit)
11. Controllability of Systems: Lighting (1 Credit)
12. Controllability of Systems: Thermal Comfort (1 Credit)
13. Thermal Comfort: Design (1 Credit)
14. Thermal Comfort: Verification (1 Credit)
15. Daylight and Views: Daylight (1 Credit)
16. Daylight and Views: Views (1 Credit)

**E.   REGIONAL PRIORITY – 4 Credits**

1. Regional Priority: SSc5.2 – Site Development – Maximize Open Space (1 Credit)
2. Regional Priority: WEc2 – Innovative Wastewater Technologies (1 Credit)
3. Regional Priority: EAc1 – Optimize Energy Performance (1 Credit)
4. Regional Priority: MRc5 – Regional Materials – 20% (1 Credit)

**F.   INNOVATION IN DESIGN – 6 Credits**

1. Innovation in Design: Recycle Content: 30% (1 Credit)
2. Innovation in Design: Regional Materials: 30% (1 Credit)

Green Building LEED Requirements

# EXHIBIT "T"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

3.  Innovation in Design: Education (1 Credit)
4.  Innovation in Design: Green Cleaning (1 Credit)
5.  Innovation in Design: ISO 14001 Certified Contractor (1 Credit)
6.  LEED Accredited Professional (1 Credit)

Subcontractor agrees that it shall cooperate with Skanska in developing the above-referenced plans and in creating and maintaining the documentation required to establish the credits required for LEED certification.

## LEED® "PLATINUM" CERTIFICATION

This Project is designed to address the Owner's needs related to safety, and quality.  The Project incorporates sustainable design concepts which will reduce the long term operational costs associated with running a facility of this size, improve the human and environmental benefits, and help reduce certain pollutants around the facility.

## LEED REQUIREMENTS

To accomplish these goals, the UF CTRB building will be seeking a LEED® (Leadership in Energy and Environmental Design) Platinum building certification.  The U.S. Green Building Council created LEED® as a rating system to define and quantify the various aspects necessary to building a "green" building.  These aspects include, but are not limited to,

·   Choosing sustainable sites
·   Making efficient use of water
·   Using alternative energy sources for energy efficiency
·   Utilizing recycled and local resources for material usage
·   Indoor Environmental Quality for comfort

## RELATED DOCUMENTS

Drawings and general provisions of the Contract, including General and Supplementary Conditions and other Division 1 Specification Sections, apply to this Section.

## SUMMARY

This Section includes general requirements and procedures for compliance with certain U.S. Green Building Council's (USGBC) LEED prerequisites and credits needed for the Project to obtain LEED Platinum Certification utilizing USGBC's "LEED 2009 for New Construction & Major Renovations."

Other LEED prerequisites and credits needed to obtain LEED certification are dependent on material selections and may not be specifically identified as LEED requirements.  Compliance with requirements needed to obtain LEED prerequisites and credits may be used as one criterion to evaluate substitution requests.

Additional LEED prerequisites and credits needed to obtain the indicated LEED certification are dependent on the Architect's design.

Refer to the LEED Checklist at the end of this section for the LEED prerequisites and credits that are applicable to this project.

Related Sections include the following:

# EXHIBIT "T"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

A. Documents affecting the work of this Section include other elements of the Contract for Construction, including the Owner/Builder Agreement or Owner/Design-Builder Agreement, the General Terms & Conditions, other sections of the Division 0 and Division 1 non-technical specifications, and the technical plans and specifications.

B. Divisions 02 through 33 Sections for LEED requirements specific to the work of each of these Sections. Requirements may or may not include reference to LEED.

**DEFINITIONS**

A. Chain-of-Custody Certificates: Certificates signed by manufacturers certifying that wood used to make products was obtained from forests certified by an FSC-accredited certification body to comply with FSC STD-01-001, "FSC Principles and Criteria for Forest Stewardship." Certificates shall include evidence that manufacturer is certified for chain of custody by an FSC accredited certification body.

B. Forest Stewardship Council (FSC – www.fscus.org): Non-profit organization devoted to encouraging the responsible management of the world's forests.

C. LEED: Leadership in Energy & Environmental Design. www.usgbc.org

D. Rapidly Renewable Materials: Materials made from plants that are typically harvested within a 10-year or shorter cycle. Rapidly renewable materials include products made from bamboo, cotton, flax, jute, straw, sunflower seed hulls, vegetable oils, or wool.

E. Salvaged materials or reused materials: Materials recovered from existing buildings or construction sites and reused. Common salvaged materials include structural beams and posts, flooring, doors, cabinetry, brick, and decorative items.

F. Regional Materials: Materials that have been extracted, harvested, or recovered, as well as manufactured, within 500 miles (800 km) of Project site. If only a fraction of a product or material is extracted/harvested/recovered and manufactured locally, then only that percentage (by weight) shall contribute to the regional value. Mechanical, electrical, plumbing, and specialty items shall be excluded from this calculation.

G. Regionally Manufactured Materials: Materials that are manufactured within a radius of 500 miles (800 km) from Project site. Manufacturing refers to the final assembly of components into the building product that is installed at Project site.

H. Regionally Extracted and Manufactured Materials: Regionally manufactured materials made from raw materials that are extracted, harvested, or recovered within a radius of 500 miles (800 km) from Project site.

I. Recycled Content: The percentage by weight of constituents that have been recovered or otherwise diverted from the solid waste stream, either during the manufacturing process (pre-consumer), or after consumer use (postconsumer).

   1. "Post-consumer" material is defined as waste material generated by households or by commercial, industrial, and institutional facilities in their role as end users of the product, which can no longer be used for its intended purpose.

   2. "Pre-consumer" material is defined as material diverted from the waste stream during the manufacturing process. Specifically, discarded materials from one manufacturing process that are used as constituents in another manufacturing process. Excluded is reutilization of materials such as rework, regrind, or scrap generated in a process and capable of being reclaimed within the same process that generated it.

   3. Spills and scraps from the original manufacturing process that are combined with other constituents after a minimal amount of reprocessing for use in further production of the same product are not recycled materials.

Green Building LEED Requirements

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# EXHIBIT "T"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

4.  Recycled content value is determined by multiplying the recycled fraction of the assembly (by weight) by the cost of assembly.

5.  Mechanical, electrical, plumbing, and specialty items shall be excluded from this calculation.

## SUBMITTALS

A.  General:  Submit additional LEED submittal requirements included in other sections of the Specifications.

B.  LEED submittals are in addition to other submittals.  If submitted item is identical to that submitted to comply with other requirements, submit duplicate copies as a separate submittal to verify compliance with indicated LEED requirements.

C.  Please reference Specification Section 01 35 20 for all "Action Submittals" and "Informational Submittals" required along with the LEED requirements under these submittals.

Green Building LEED Requirements

# EXHIBIT "U"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SUB-SUBCONTRACTOR IDENTIFICATION

1.

Name:    Facility Peformance

Address:    PO Box 3038 Ocala FL 34478

4.

Name: _____

Address: _____

2.

Name: _____

Address: _____

5.

Name: _____

Address: _____

3.

Name: _____

Address: _____

6.

Name: _____

Address: _____

Note:    Attach additional sheets if necessary.

Sub-subcontractor Identification
(06/2006 ed. Rev. 1)

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

## SITE REQUIREMENTS AND LOGISTICS

Note: If this Exhibit X is annexed to a Purchase Order, the term "Subcontract" means the Purchase Order, the term "Subcontractor" means Seller, the term "Sub-subcontractors" means Subsuppliers, the term "Work" means the Goods and Services and the term "Contractor" means Buyer, each as defined in the Purchase Order terms and conditions.

## 1.   TEMPORARY MEASURES

### 1.1.   Temporary Trailers
There will be no temporary trailers allowed onsite. Subcontractors are required to provide offsite offices.

### 1.2.   Temporary Water
Temporary water for the work will be provided by the Contractor or a designated Subcontractor.  Temporary water may be well water supply.  Any requirement for filtering and/or treatment necessary will be the responsibility of each subcontractor for their particular scope of work.  Hoses and extension cords required to obtain the services from the locations provided by the Contractor to the Subcontractor's work area will be each Subcontractor's responsibility.

### 1.3.   Drinking Water
Subcontractor shall provide its own drinking water, ice, and cups.

### 1.4.   Temporary Sanitary Facilities
Temporary toilets shall be provided by Contractor for use by all site contractors except as noted otherwise.

### 1.5.   Temporary Electric and Lighting
Subcontractor shall provide its own temporary electrical power and lighting as required until the electrical contractor completes the initial temporary service and wiring installation for the project.  Once initial service installation is completed, temporary power, wiring, lighting and distribution will be provided in accordance with then current OSHA requirements.  Any requirements in excess of these shall be at the expense of the Subcontractor.  Subcontractor shall bear the cost of hook-up of its tools and equipment to the power distribution system. Any electrical service in excess of single phase, 120V power shall be the responsibility of Subcontractor.

Temporary power may only be available in the form of subcontractor provided portable generators until such time as temporary permanent power can be run to the job site areas.  The Subcontractor is to plan accordingly and supply their own power generator until temporary power is available.  No electric welders will be allowed on site unless power is provided through generators supplied by the Subcontractor using the welder.  Subcontractor is responsible to provide GFI protection on all electrical equipment utilized by Subcontractor's forces.

### 1.6.   Temporary Heat
Subcontractor shall provide temporary heat necessary to maintain minimum temperature and humidity conditions required for the Work. All temporary heating methods and ventilation requirements shall be approved by Contractor.

### 1.7.   Telephone
Public pay telephones have not been installed on site.  Subcontractor must provide its own telephone service and other communication needs.  Use of Contractor field office phones will not be permitted.

### 1.8   Installation, Maintenance, Protection and Removal
The Subcontractor providing temporary service(s) shall install, maintain, protect, and remove the service(s) in accordance with any directives issued by Contractor in connection therewith.

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

---

**1.9    Permits and Fees.**

The Subcontractor providing temporary service(s) shall obtain and maintain all necessary permits for such service(s) and pay all fees required for same.

## 2.    DESIGNATED AREAS

**2.1.    Trailer Laydown & Storage**

Subcontractor understands that on-site space is limited. Subcontractors shall plan on having little to no laydown or storage area onsite. If it is determined feasible, the CM shall determine placement and scheduled duration. Each Subcontractor is responsible to provide offsite storage arrangements as required.

**2.2.    Break and Eating Areas**

Eating will be allowed only in areas so designated by Contractor. Designated break areas must be cleaned daily by all Subcontractors. No eating will be allowed in any buildings at any stage of construction.

**2.3.    Access**

Construction traffic shall enter and exit the site per the attached site utilization plan ONLY. All on-site speed signs and speed limits must be obeyed. All vehicles driven on site must have a current license, registration, and valid inspection sticker. All drivers entering the facility must have a valid driver's license and an escort.

**2.4.    Deliveries**

Subcontractor's material deliveries and supplies will be assigned access through a designated gate by Contractor only during the times as directed by the CM. Deliveries should be scheduled with the Contractor who will designate the area for unloading and storage of the material. Contractor reserves the right not to allow trailers onto the Project site if the material delivery is improperly scheduled. All delivery personnel will be required to conform to the SHMP and PPE if leaving the delivery vehicle.

Under no circumstances are deliveries to be scheduled between 7:30am-8:30am and 3:30pm-4:30pm, unless otherwise directed by Skanska.

**2.5.    Parking**

Subcontractor understands that there is no onsite parking. Vehicles parked within the project limits, without authorization will be towed. It is the responsibility of each Subcontractor to arrange for and coordinate parking for their employees. Offsite parking, is the responsibility of the subcontractor.

**2.6.    Traffic Control**

Subcontractor shall be responsible for any and all traffic control measures to safeguard construction activities from pedestrian and vehicular traffic.

**2.7.    Owner's Facilities**

Access to the existing facilities (such as cafeterias, restrooms, lobbies) is prohibited to Subcontractor and its Sub-subcontractor's personnel except as required for the performance of the Work.

## 3.    SITE POLICIES

**3.1.    Drug Screening and Orientation**

Every Subcontractor and Sub-subcontractor employee on the Project site will be required to attend a jobsite specific safety orientation program. Upon completion of this class each employee will be required to sign the "Acknowledgment" page stating that this employee understands all the rules, regulations, and procedures as a

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

condition of their employment on the project and will receive a jobsite sticker. Classes will be held on a regular basis so as not to impede construction progress.

Skanska is committed to providing a safe, drug-free work place for all employees. This policy applies to all Skanska, subcontractor at any tier, vendor and other third party employees, including management working on or visiting this project.

Drug and alcohol abuse on and off the job can contribute both to incidents and to greater risk for all individuals employed on this project, as well as the general public. All work tasks on Skanska projects will be considered safety-sensitive.

The following are prohibited on Skanska projects:
- Being under the influence of any amount of alcohol or illegal drugs
- The use, sale, offer to sell, purchase, transfer, distribution or possession of illegal drugs, drug paraphernalia or alcohol products

Each subcontractor will promote a Drug Free Workplace with their employees and will communicate what constitutes prohibited activities during the safety orientation.

Any worker who suffers or contributes to a work-related injury or illness which requires treatment by a physician or other medical facility or is involved in an incident where damage to property occurs will be tested for drugs and alcohol within three (3) hours of the incident.

Subcontractors will ensure all workers involved in an incident have a post incident drug/alcohol test and will report the results to Skanska. At a minimum, the drug test will follow current National Institute on Drug Abuse (SAMHSA) five panel guidelines and the alcohol test will follow Department of Transportation (DOT) guidelines. Workers that refuse to test, stall to be tested, are uncooperative with collectors, or attempt to alter a urine specimen will be considered positive and immediately removed from the project.

## 3.2.    Jobsite stickers
Jobsite stickers must be worn at all times, on the hardhat and in full view. This indicates who has and who has not been through the job specific orientation. Anyone onsite without a sticker will be removed immediately.

## 3.3.    Smoking/Tobacco Products
Smoking and the use of tobacco products is prohibited onsite. Subcontractor shall police its and its Sub-subcontractor's employees to ensure compliance with this policy.

## 3.4.    Security
The CM or Owner will not provide the services of a security officer or watchman.

Neither CM nor Owner assumes any responsibility for loss, theft, or damage to the Subcontractor's materials or for damage to the in-place work before the completion and Owner's acceptance of the construction. In the instance of any such loss, theft or damage, the Subcontractor shall be responsible to renew, restore or remedy the work, tools, equipment, and construction in accordance with requirements of the Contract Documents without additional cost to the CM or Owner.

Neither CM nor Owner assumes responsibility for damage, liability, theft, casualty or other hazard to the automobiles or other vehicles, nor to injury including death to occupants of automobiles or other vehicles on or in transit to the project site.

Subcontractors shall advise CM of any theft or damage, which might delay the execution of the work and furnish CM and the Owner with a copy of any theft report filed with local, county, or state agencies.

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

All site-parked equipment, operable machinery and hazardous parts of the new construction subject to mischief and accidental operation shall be made inaccessible, locked or otherwise made inoperable when left unattended, and shall be left in a safe manner as approved by the CM's Project Superintendent.

CM may establish additional security policies and procedures. All subcontractors shall be responsible to adhere to the security requirements as established by the CM or Owner.

### 3.5.   Visitors

No visitors shall be admitted to the jobsite by the Subcontractor, except as necessary to perform the Work, without first obtaining the approval of the Contractor. All visitors must check in at the job trailer upon arrival.

### 3.6.   Confidentiality

Subcontractor shall abide by the Owner's policy, which prohibits both the possession of a camera and the taking of photographs on the Owner's property without written permission from the Owner through the Contractor. Neither Subcontractor nor its Sub-subcontractor shall publish, advertise, or otherwise divulge information with respect to the Work without prior written approval from the Contractor or Owner.

### 3.7.   Searches

Subcontractor and its Sub-subcontractors shall abide by Owner's site security regulations and procedures. Designated Skanska personnel or the authorities are authorized to search vehicles, lunch pails, toolboxes, and persons without prior notification.

### 3.8.   Harassment

In the event any Subcontractor or Sub-subcontractor employee is accused of harassment, Subcontractor shall remove the employee from the Project site. Retaliating in any way against employees who report harassment is strictly prohibited.

### 3.9.   Dumpsters

Dumpsters made available by the Contractor for all trades refer to trade specific scopes for deviations on dumpster usage.

### 3.10.   Cleanup

Each Subcontractor shall be responsible for the daily cleanup and removal, to the CM's centrally located dumpsters, debris and waste resulting from their work. Dumpsters will be provided by the CM, except as identified in Subcontractors scope of work with the CM. Each Subcontractor shall agree to comply with the Project Policy and Procedure for Weekly Job Clean-Up.

This is a LEED project. All recyclable materials are to be collected, deposited and tracked accordingly. Dumpsters and hauling as required to meet LEED requirements by various Subcontractors will be the responsibility of that Subcontractor.

Specific types and classifications of construction debris are not allowed to be deposited in the jobsite dumpsters and therefore are the Subcontractors responsibility to remove from the jobsite and dispose of legally. These items include but are not limited to:

- Materials Unsuitable for Disposal by Standard Commercial Procedures
- Materials Classified as Environmentally Hazardous or Environmental Contaminants
- Highly Volatile or Explosive Substances
- Residential Garbage
- Any material traditionally not accepted by landfills in the metropolitan area or any other material identified as unsuitable by CM and

Site Requirements and Logistics
(06/2006 ed. Rev. 0)

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

### 3.11.    Noise and Dust

Contractor reserves the right to stop any operation on the Project site causing excessive noise, dust, etc. at sensitive times or areas.  If a justified compliant is received from the Owner or site neighbor, Subcontractor shall immediately take whatever steps are necessary to correct the situation.  Subcontractor agrees that it will not submit any claim for extra compensation resulting from excessive noise, dust, or other similar scope related stoppage.

### 3.12.    Radios

No radios or walkmans will be permitted on the jobsite.  Subcontractors will provide their own superintendent(s) with a Sprint/Nextel two-way radio compatible with the Contractor's Sprint/Nextel equipment and a cell phone number.

## 4.    HOURS OF WORK

### 4.1.    Start Time

At 6:50 a.m. all Subcontractor and Sub-subcontractor employees are required to be present for Stretch and Flex. After Stretch and Flex, all Subcontractors and Sub-Subcontractors are required to participate in a Pre-Task plan.

### 4.2.    Lunch Time

All Subcontractor and Sub-subcontractor employees shall leave their workstations for lunch break, to an area designated by the Contractor, at 12:00 p.m.  Lunch break shall finish at 12:30 p.m. and all employees shall proceed immediately to their workstation ready to start work.

### 4.3.    Finish Time

No Subcontractor or Sub-subcontractor employee shall stop work and leave their workstation prior to 3:30 p.m. to secure tools and/or clean up.

### 4.4.    Loitering

No Subcontractor or Sub-subcontractor employee shall be permitted to enter the Project site sooner than thirty (30) minutes before beginning work, nor permitted to stay longer than thirty (30) minutes after completing work.

### 4.5.    Overtime Requests

Any work outside of these hours, including weekend work, must be submitted in writing 48 hours in advance to Skanska.  Overtime work will need to be requested 2 hours in advance of the close of business on that day.    The notice shall be given, in writing, to the Contractor and shall include the type, location, and timing of the work to be performed, including any heavy equipment to be used.

### 4.6.    Standby Trades

Subcontractor shall be responsible for all costs of standby trades should Subcontractor work other than normal working hours.

### 4.7.    Off hours

Some work may be required off hours to accommodate the local conditions, project requirements and sequencing of work.  This may require early morning, evening or night time work.  This should be included in this Subcontract Agreement and will be at no cost to Skanska.

## 5.    SITE SAFETY INFORMATION

### 5.1.    Emergency Contact Numbers

From Contractor Field Office: Dial 9-1-1

### 5.2.    First Aid

Site Requirements and Logistics
(06/2006 ed. Rev. 0)

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

First aid supplies are available at the Contractor field trailer.

### 5.3.    Inclement Weather

In the event of inclement weather prior to departing from home, the site telephone weather hotline can be contacted at 813- 446-8873 (John Easterwood) to determine whether the site is open as usual, having a delayed opening, or closed.  The initial message will be made at 6:00 a.m. with updates, if warranted at 7:00 a.m. and 8:00 a.m. on inclement weather days.  During the workday, Contractor will inform Subcontractor to have site personnel depart the site early in cases of heavy snow and/or ice, rain and/or wind.

## 6.    HOISTING AND TRANSPORTATION

### 6.1.    Hoisting

Contractor will NOT be providing a hoist, crane, or lifts for general use by Subcontractor.  Subcontractor shall provide all means and methods for hoisting material, equipment, etc., as required to perform its Work.

### 6.2.    Elevator Usage

The building elevator(s) will be available for use by Subcontractors during the interior build-out on a limited basis as determined by the Construction Manager.

## 7.    COMMUNICATIONS

### 7.1.    Equipment Removal

Subcontractor shall notify the Contractor at least two (2) working days prior to any day it proposes to move heavy equipment into or away from the Project site.  Subcontractor shall not proceed until receipt of written approval from the Contractor.

### 7.2.    Excavation

Subcontractor shall notify Contractor at least two (2) working days prior to date proposed to commence any excavation and shall not commence any such excavation until receipt of written approval from Contractor.  When excavation work endangers the stability of known existing facilities, Subcontractor shall provide adequate shoring, bracing, and temporary guying to protect the facilities until backfilling is completed.  This protection shall be at Subcontractor's expense.  Any excavation (other than pavement or concrete removal) within five (5) feet of existing underground services shall be by hand tools and in strict accordance with any excavation permit that may be issued.  Prior to commencement of backfill operations, Subcontractor shall notify Contractor.

### 7.3.    Tie-Ins

When a mechanical, electrical, or instrumentation tie-in is required in existing systems, Subcontractor shall notify Contractor at least two (2) working days prior to the desired tie-in date.  The purpose of such notification is to provide time for review of safety considerations, to establish conditions for the Work, and to arrange for permits, orders, and clearances.

### 7.4.    Existing Services

All work relating to the disruption of existing services shall be performed at such times as scheduled by the Owner and Contractor.  Subcontractor shall accomplish modifications, relocations, and tie-ins of equipment and piping with minimum downtime of existing operations.  Subcontractor shall schedule all such tie-ins with Contractor in advance and obtain approval in writing as required.  Subcontractor shall work continuously until tie-ins to existing systems are complete, unless otherwise approved by Contractor.

## 8.    SITE LOGISTICS PLAN (Exhibit X-1)

Site Requirements and Logistics
(06/2006 ed. Rev. 0)

# EXHIBIT "X"

Attachment to **Subcontract/Purchase Order**, by and between **Subcontractor/Seller** and **Skanska USA Building Inc.** for **UF-323A, Chemistry/Chemical Biology Building, Gainesville, FL 32611 Project #239012.**

Exhibit X-1 shows the Site Logistics Plan for the project. Subcontractor agrees that the designated areas for laydown, storage, break areas, trash removal, parking, access, and delivery are satisfactory and sufficient for its needs in prosecution of its scope. Any change in such areas shall not be permitted without prior approval by Contractor.

As progress continues, the site logistics plan will change accordingly as directed by the Contractor.

**Site Requirements and Logistics**
**(06/2006 ed. Rev. 0)**



Case 3:16-ap-00100-JAF   Doc 26   Filed 03/03/17   Page 213 of 427

**Skanska Trailers**

**Staging/Dumpsters**

**Tower Crane**

**UF Chemistry/Chemical Biology Building Footprint**
GROUND FLOOR FF = 169.00

SERVICE TOWER

FLINT AUDITORIUM & LABORATORIES

CHEMISTRY LAB - UF BLDG 28

WEST UNIVERSITY AVENUE A.K.A. STATE ROAD NO. 26

**Gate #1**

**Tower Crane**

**Gate #2**

**Temporary Truck Staging ONLY**

BUCKMAN DRIVE

## Stantec

400 Morgan Center
101 East Diamond St.
Butler, PA 16001

tel: 724.285.4761
fax: 724.285.6815

www.Stantec.com

George F. Young, Inc.

ISSUED FOR CONSTRUCTION

Chemistry / Chemical Biology Building
(UF-323A)

Building 0275

University of Florida
Gainesville, FL 32611

Drawing Name
UTILITY PLAN

Drawing Number
C520



**Jobsite**

**Truck Must Be accompanied by a Flagman through Campus**

**Sub Parking Through UF**

**SKANSKA**

**Revision: 9**

**Date:**
July 16[h], 2014

**Revised by:**
David Espy

# Safety and Health Management Program



UF - 323A, Chemistry/Chemical Biology Building
Gainesville, Florida

FL SHMP REV: 27/Mar/2014

# SKANSKA

## Table of Contents

**Safety and Health Policy** ...................................................................... 5

Injury Free Environment ....................................................................... 6
Responsibility and Accountability ........................................................ 6
Project Safety Leadership Team .......................................................... 8
Safety Regulations ............................................................................... 8
Notification of Unsafe or Hazardous Conditions ................................. 8
Disciplinary Program ........................................................................... 8
Incident and Near Miss Reporting and Investigation ........................... 8
Post Incident Review Meeting .............................................................. 9
Daily Work Site Safety Inspection ....................................................... 9
Substance Abuse Policy ...................................................................... 9

**Safety Planning** .................................................................................. 10

Skanska Project Execution Plan ........................................................ 10
Subcontractor Project Specific Safety Plan ...................................... 10
Crew Daily Pre/Post-Task Planning ................................................... 11
Orientation, Training and Meetings .................................................... 11

**Project Specific Safety Work Requirements** ..................................... 14

Asbestos Containing Material (ACM) ................................................. 14
Blasting .............................................................................................. 14
Caissons ............................................................................................ 15
Concrete Construction ....................................................................... 15
Confined Spaces ................................................................................ 16
Cranes and Cribbing .......................................................................... 18
Demolition .......................................................................................... 28
Electrical ............................................................................................ 28
Equipment and Vehicles ..................................................................... 30
Excavation and Trenching .................................................................. 31
Fall Prevention/Protection .................................................................. 31
Fire Protection/Prevention .................................................................. 32
Hot Work ............................................................................................. 34
Housekeeping ..................................................................................... 34
Infection Control ................................................................................. 35
Ladders and Stairways ....................................................................... 37
Lasers ................................................................................................. 38
Lead .................................................................................................... 39
Lockout/Tagout ................................................................................... 40
Masonry Construction ........................................................................ 42
Mold Control ....................................................................................... 43
Personal Protective Equipment (PPE) ............................................... 43
Pile Driving ......................................................................................... 45
Precast Concrete ................................................................................ 46

**SKANSKA**

Rigging ..................................................................................... 46
Scaffolding ............................................................................... 46
Silica ......................................................................................... 48
Steel Erection ........................................................................... 49
Temporary Barricades ............................................................... 49
Tools, Hand and Power ............................................................. 50
Traffic Maintenance and Protection .......................................... 51
Welding and Cutting ................................................................. 51

## Quality of Life Requirements ...................................... 53

Smoking Policy ......................................................................... 53
Warm up and Stretching Exercises .......................................... 53
Sanitation ................................................................................. 53
Emergency Procedures ............................................................ 53
Building Evacuation .................................................................. 53
Medical Emergency .................................................................. 54
Emergency Medical Map ........................................................... 55
Fire ........................................................................................... 56
Severe Weather ........................................................................ 56
Emergency Action Planning ...................................................... 56
Emergency Action Plan ............................................................. 57
Hurricane Preparedness Plan ................................................... 58

## Project Hazard Communication Program ................... 60

## Hazard Communication Program ............................... 62

## Subcontractor Requirements ..................................... 63

Designated Subcontractor Safety Representative ..................... 63
Subcontractor Safety Orientation ............................................. 63
Monthly Man-hour Report ......................................................... 63
Subcontractor Safety Submittals .............................................. 64

## Forms Appendix ........................................................ 66

Appendix A: Subcontractor Monthly Incident Summary Report ........ 68
Appendix B: General Safety Work Practices Poster .................. 69
Appendix C: Incident Notification Form ..................................... 70
Appendix D: Safety Training Roster .......................................... 72
Appendix E: Guard Rail Removal Permit ................................... 73
Appendix F: Daily Pre/Post Task Planning ............................... 74
Appendix G: Master Chemical and Substance Inventory List ........ 76
Appendix H: Hot Work Permit .................................................... 77
Appendix I: Confined Space Entry Permit ................................. 78
Appendix J: Excavation Permit .................................................. 79
Appendix K: Notice to Commence Steel Erection ..................... 80
Appendix L: Daily Scaffold Safety Inspection Report ................ 81
Appendix M: Work Site Safety Inspection Form ........................ 82

# SKANSKA

Appendix N: Voluntary Use of a Disposable Respirator ..................................................... 83
Appendix O: Lockout/Tagout Checklist ............................................................................... 84
Appendix P: Annual Inspection Forms – Lattice & Telescoping Boom ............................. 86
Appendix Q: Monthly Inspection Forms – Lattice & Telescoping Boom .......................... 94
Appendix R: Daily Inspection Forms – Lattice & Telescoping Boom ............................. 100
Appendix S: Crane Maintenance Checklist ...................................................................... 102
Appendix T: Critical Lift Checklist .................................................................................... 103
Appendix U: Tower Crane Checklist ................................................................................. 104
Appendix V: Lift Plan Example .......................................................................................... 106
Appendix W: Soil Bearing Chart ....................................................................................... 110
Appendix X: Pre-Demolition Survey .................................................................................. 111
Appendix Y: Safety Deviation Ticket ................................................................................ 113
Appendix Z: Daily Forklift Inspection ............................................................................... 114
Appendix AA: Daily Stilt Permit ........................................................................................ 115
Appendix BB: Ladder Authorization Permit ...................................................................... 117
Appendix CC: Ladder Authorization Log .......................................................................... 118

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

## Safety and Health Policy

The safety and well being of all persons associated with Skanska projects are paramount. Skanska is committed to implementing and fostering an Injury Free Environment (IFE) throughout our entire organization. IFE is a mindset where no injury is acceptable and working safely is not optional. At Skanska, safety is personal to each of us and is a way of life and we value and respect every worker. We maintain organizational structures, safety and health management systems, procedures, and training plans that support an injury free environment and ensure compliance with all relevant laws, regulations and standards.

All injuries are preventable when safety becomes an everyday personal value. Committing to an Injury Free Environment is not just the right choice; it's the only choice. We believe that with this approach we can positively influence everyone associated with Skanska projects.

Skanska is committed to the following:

- We will conduct all of our activities in a manner that accounts for the impact to the safety and health of our workforce and communities

- We are committed to the prevention of injuries and illnesses and to the continual improvement of our safety and health management and performance

- We will evaluate and comply will all applicable federal, state and local laws and regulations as well as other pertinent requirements at each location where we conduct business.

- We will communicate this policy to all employees, make it available to the public and establish procedures to receive and respond to inquiries from external interested parties.

- We will alert potentially affected individuals and authorities of any safety and health incidents in a timely and effective manner. Thorough investigations will be conducted and corrective and preventative actions shall be implemented and monitored.

- Senior Management shall maintain and periodically review the implementation of the safety and health policy.

Skanska believes that how we care for people today affects both current and future generations. We accept our responsibility for maintaining awareness and minimizing adverse safety and health impacts from our operations.

Bill Flemming,
President & CEO

OHSAS Policy Statement
March 2010

**FL SHMP REV: 16/July/2014**

# SKANSKA

## Safety Health and Management Program

The purpose of Skanska's Safety and Health Management Program (SHMP) is to assist project management, supervision, subcontractors and workers in understanding Skanska's Injury Free Environment philosophy and the health and safety expectations and requirements for its projects.

The Skanska Project Team is responsible for the implementation and execution of this Safety and Health Management Program.

## Injury Free Environment

Skanska is committed to an Injury Free Environment. IFE is the shared corporate and individual belief that safety is a value, not compromised by cost or schedule. Everyone has the right to go home safely at the end of the day.

Injury Free Environment holds three basic premises:

- All incidents and injuries are preventable; no level of incident or injury is acceptable or tolerated.

- Injury Free operations are possible in construction; a prevailing mindset and conviction exists to do the right thing and what is necessary to achieve that state.

- Elevate safety awareness daily; a journey of continuous improvement to advance safety and achieve a heightened state of awareness where workers choose to be responsible and accountable for their own safety and the safety of their co-workers.

- Each subcontractor foreman/field superintendent/project manager shall be required to attend up to twelve hours of IFE training conducted by Skanska. Any employee who has received this orientation or Supervisor Skills Training or a combination of the two within the past four years shall be exempt. Subcontractors shall include any associated costs in the Proposal.

## Responsibility and Accountability

Everyone associated with this project must understand their responsibilities with regards to health and safety on this project. With the responsibilities defined, project management, supervision, subcontractors and workers will be held accountable for their health and safety performance.

- **Project Management** includes Project Executive, Project Director, Project Manager, Project Engineer, and EHS Director. ** **First-line Supervision** includes General Superintendents, Superintendents, Field Engineers, General Foremen and Foremen.

| Subject | Project Management | First-Line Supervision | Worker | Project EHS Representative |
|---------|-------------------|------------------------|--------|----------------------------|
| | Will Ensure That: | Will Ensure That: | Will: | Will: |
| **Safety & Health Management Program:** | The SHMP is understood, implemented, and strictly complied with and that Skanska, Subcontractors, vendors, or third party individuals working or having business at this project are in conformance to the SHMP. | The SHMP is fully understood, implemented in work planning and communicated to workers.<br><br>The project is compliant with the SHMP. | Understand the contents of the SHMP and follow the established rules and procedures. | Understand the contents of the SHMP and follow the established rules and procedures. |

**SKANSKA**

| Subject | Project Management | First-Line Supervision | Worker | Project EHS Representative |
|---|---|---|---|---|
| | Will Ensure That: | Will Ensure That: | Will: | Will: |
| **Work Practices:** | First-line supervision is communicating safe work practices to workers. | All work tasks are properly communicated to workers and complied with. | Follow all safe work practices as communicated to them by their supervisor. | Ensure project is compliant with safe work practices and federal, state, local, and company regulations, rules and procedures. |
| **Site-Specific Safety Rules:** | The site-specific safety rules and procedures are implemented and enforced. | The site-specific safety rules and procedures are understood and implemented. | Understand and follow the site-specific safety rules and procedures. | Assess project conformance to site-specific safety rules and procedures. |
| **Orientation:** | Resources are available to conduct a proper orientation<br><br>They participate in orientation process | They participate in orientation process and provide trainees with site tour before reporting to work assignment | Attend orientation prior to beginning work.<br><br>Understand and follow the site-specific safety rules and procedures. | Support project management and first line supervision in the development and administration of the orientation |
| **Training:** | Resources are available to implement safety and health training.<br><br>Training programs are developed and implemented. | They receive a project-specific supervisor safety orientation prior to start of work.<br><br>All workers under their direction are properly trained in hazard recognition and safe work practices. | Attend required project safety and health training.<br><br>Understand and follow the work practices and guidelines discussed during the training. | Ensure that project management, first-line supervision and workers have received proper health and safety training.<br><br>Assist project supervision in training workers on hazard recognition and safe work practices. |
| **Safety Planning:** | National pre-qualification system is being properly utilized for contractor selection.<br><br>All first-line supervision identifies, evaluates, and controls the work site hazards, and provides resources to implement controls. | All hazards are identified, evaluated and controlled and addressed in Daily Pre-Post Task Plans.<br><br>Institute a daily assessment program to identify, evaluate and correct work site hazards. | Understand the hazards of the work and follow the safe work practices and controls developed for those hazards. | Assist in evaluating hazards and determining methods of eliminating or reducing the hazard. |
| **Incidents:** | All incidents are investigated properly and thoroughly. | They conduct a thorough and proper incident investigation and develop solutions to prevent similar occurrences. | Cooperate and participate in the incident investigation and contribute ideas and solutions. | Assist first-line supervision in investigating incidents.<br><br>Maintain monthly incident statistics. |

# SKANSKA

## Project Safety Leadership Team

Skanska shall establish a Project Safety Leadership Team (PSLT) at the onset of each project.

The PSLT shall be made up of project management, field supervision, craft labor and EHS representatives from Skanska and all major subcontractors.  The PSLT will meet regularly to discuss project safety concerns, incident trends, compliance issues, and upcoming project work or activities that may require additional environmental, health & safety planning and/or coordination.  At a minimum, these meetings will be held monthly.  Skanska project management will prepare meeting minutes.

## Safety Regulations

Skanska and subcontractors shall comply with all applicable government regulations, specific client rules and regulations, and this Safety and Health Management Program.  If any of these standards, requirements, rules or procedures conflict, the most stringent one will prevail.

## Notification of Unsafe or Hazardous Conditions

Each worker on this project has the right and responsibility to notify project management or supervision of any unsafe or hazardous condition that may be present without fear of retribution.

Project management or supervision will take immediate action to correct or remove any hazard brought to their attention.

Skanska incorporates a Deviation Ticket System (Appendix Y), which institutes monetary penalties to subcontractors for those at-risk behaviors that are deemed unsafe.  The decision to impose a monetary penalty fine rests solely on the Skanska person who believes that the particular at-risk behavior observed deserves a fine attached to it.  The amount of the deviation ticket depends on the severity or potential severity of the at-risk behavior not only to the subcontractor's own workers but to all individuals that may be put at risk by the at-risk behavior due to the offending subcontractor's non-compliance.  All monetary deviations that are not satisfactorily rectified as described in the remediation section of the deviation ticket will result in a back charge to the offending subcontractor and will come out of their next month's requisition.

## Disciplinary Program

At-risk behavior on this project that could contribute to an incident or injury will not be tolerated.  Each worker has an individual responsibility to work safely, and each first-line supervisor is responsible to correct at-risk behavior of workers under their direction.

At-risk behaviors considered immediately dangerous to life or health that may result in immediate termination from the project, include, but are not limited to:

- Failure to follow the Fall Protection Policy
- Failure to follow the Substance Abuse Policy
- Possession of firearms, explosives or dangerous weapons
- Theft and other criminal activity
- Entering or allowing to enter an unprotected trench or excavation

- Fighting, horseplay, or practical joking
- Unsafe and/or reckless operation of motorized vehicles or equipment
- Entering or allowing to enter a confined space without following procedures
- Failure to follow lockout/tagout procedures

For those acts or practices not considered immediately dangerous to life or health the following will apply:

- First occurrence: Verbal, written warning, and/or re-training
- Second occurrence: Written warning, re-training, suspension, or termination from the project
- Third occurrence: Termination from the project

## Incident and Near Miss Reporting and Investigation

Every incident and near miss will be reported immediately to Skanska and documented using the Incident Notification & Investigation Form (Appendix C).  The Skanska Project Team will contact their EHS representative immediately and use the online reporting system to initiate the formal notification process before the end of the day.  The Skanska Project Team will notify the Skanska Environmental Health and Safety

# SKANSKA

Department of any incident or near miss and will thoroughly investigate to determine the probable root cause(s) Corrective actions and preventive action will be required to eliminate future occurrences.

**An __incident__** is defined as any unplanned or undesired event that results in or has the potential to result in a work-related injury/illness, property damage, or disruption of business where the cause was from human errors of omission or commission.

**A __near miss__** is any situation that has the potential to result in a work-related injury/illness, property damage, serious environmental impact, or disruption of business under slightly different circumstances.

Skanska and/or subcontractor first-line supervision will be involved in the investigation of incidents and near misses. The Incident Notification and Investigation form must be completed and submitted to the Skanska Environmental Health and Safety Department within 24 hours of the occurrence. Injured workers shall be accompanied to the medical facility by a supervisor.

## Post Incident Review Meeting

Upon completion of the incident investigation or observation of a major nonconformance Skanska may require a post incident review meeting. At this meeting, the Skanska project team and Skanska senior project management, supervision, and involved subcontractor(s) will discuss the nonconformance, root causes, preventive actions and corrective action plans.

## Daily Work Site Safety Inspection

Skanska and subcontractors will perform daily work site safety inspections of their work and the work of subcontractors under their direction. Inspections can be documented on the Work Site Safety Inspection Form (Appendix M) or an acceptable equivalent. Inspection documentation is to be maintained on the project and be available for review.

## Substance Abuse Policy

Skanska is committed to providing a safe, drug-free work place for all employees. The substance abuse policy includes pre-employment drug testing, post accident/incident drug testing, random drug testing and reasonable suspicion testing. This policy applies to all Skanska, subcontractor at any tier, vendor and other third party employees, including management working on or visiting this project.

Drug and alcohol abuse on and off the job can contribute both to incidents and to greater risk for all individuals employed on this project, as well as the general public. All work tasks on Skanska projects will be considered safety-sensitive.

The following are prohibited on Skanska projects:

- Being under the influence of any amount of alcohol or illegal drugs

- The use, sale, offer to sell, purchase, transfer, distribution or possession of illegal drugs, drug paraphernalia or alcohol products

Any worker who suffers or contributes to a work-related injury or illness which requires treatment by a physician or other medical facility or is involved in an incident where damage to property occurs will be tested for drugs and alcohol within three (3) hours of the incident.

Subcontractors will ensure all workers involved in an incident have a post incident drug/alcohol test and will report the results to Skanska. At a minimum, the drug test will follow current Substance Abuse and Mental Health Services Administration (SAMHSA) five panel guidelines and the alcohol test will follow Department of Transportation (DOT) guidelines.

Workers that refuse to test, stall to be tested, are uncooperative with collectors, or attempt to alter a urine specimen will be considered positive and immediately removed from the project.

# SKANSKA

## Safety Planning

### Skanska Project Execution Plan

The project's Account Manager, Project Manager, Superintendent and Area EHS Director shall meet following project award to discuss the development of the Skanska Project Execution Plan (PEP) and shall ensure the following is included:

1. IFE Plan (including IFE Orientation and Supervisors Skills training)
2. Development of Site Specific SHMP
3. Employee and Foreman EHS Orientation Plans
4. EHS Staffing
5. Administration of Safety Deviation Ticket program (Appendix Y)
6. Management of online man hour and incident reporting system
7. Environmental Management System (EMS) Aspect Identification identify a spill contractor and Storm water Pollution Prevention Plan (SWPPP)
8. Identification and management of Hazardous Materials such as lead and asbestos
9. Crisis Management (communication plan coordinated with client)
10. Emergency Action Plan (medical treatment provider, confined space/fall rescue needs, etc)
11. EHS Training needs (OSHA 10/30, HAZWOPER, 1st Aid/CPR/AED, task specific or specialty training, etc)
12. Recognition program such as the STAR Program
13. Security/site control
14. Sanitation provisions
15. Unique logistics that will impact EHS
16. Subcontractor and tiered subcontractor prequalification
17. Employee screening –drug and alcohol testing
18. OCIP/CCIP management and injury management
19. Maintenance of Traffic Provisions
20. Identify a plan to audit Pre-Post Task Planning
21. Crane Management including CCO operator and third party inspection
22. Use scaffold stairs instead of gang ladders.
23. Identify fall protection anchorage points/systems to include in subcontractor scopes. **A monitor system is not an acceptable form of fall protection on any Skanska project.**

### Subcontractor Project Specific Safety Plan

<u>Prior to mobilization</u>, each subcontractor's project management and first-line supervision will develop and submit a written detailed project specific safety plan utilizing Skanska Project Specific Safety Plan (PSSP) form or equivalent that will describe how they and their sub-tier subcontractors intend to implement and conform to the project SHMP (to obtain this form please contact EHS Department)  The safety plan will:

- Identify each component of the work that the subcontractor is responsible for completing.

- Identify hazards associated with the work and the proper equipment and tools to perform the work.

- Plan adequate and sufficient controls to protect their work crews.

- All applicable training documentation utilizing Skanska Competent Person log or equivalent.

The Skanska project team will review the subcontractor project specific safety plans.  Each subcontractor will be required to attend an environmental, health and safety preconstruction meeting prior to commencing work to review the submitted plans.

# SKANSKA

If the project specific safety plan needs revision due to scope of work changes, unanticipated or new hazards, other condition changes, etc., then all work pertaining to that work component will stop until a new project specific safety plan is completed.

## Crew Daily Pre/Post-Task Planning

A Daily Pre/Post-Task Safety Plan will be completed daily by each crew performing work on this project. (Appendix F)

Each first-line supervisor will lead the crew's discussion of each task(s) to be performed and identify the work sequences, hazards (including those from other trades), training, controls and emergency action plans necessary to protect workers from the identified hazards.

- The work will be broken down into individual steps (i.e. all the steps the work crew will have to take in order to complete that task); the known hazards associated with the work; and the hazard controls (tools, safety equipment, safety rules, safe work practices, etc.). A successful plan requires time for workers to provide input into the pre/post-task plan(s).

- First-line supervisors will review the plan with their respective work crew so that each worker is aware of what work activities will occur during the shift, what hazards to be aware of and how to properly control or eliminate those hazards. Each worker will sign the plan stating that they understand the work activities, hazards and controls. This is also an acknowledgement that each worker agrees to work according to the plan.

- The completed pre/post-task plan shall be posted in a conspicuous location near the work activity.

- Before the end of the shift, the crew will review the days plan(s), ensure each crew member is accounted for, and determine if any injuries, incidents or near misses occurred and if any material/tools are needed for the next day.

Those tasks with similar work can use prior pre/post-task plans, but the plan must still be dated and reviewed with crewmembers at the beginning of the shift. If the scope of work changes or a new hazard appears during the work, the first-line supervisor will stop their crewmembers and revise the pre/post-task plan.

## Orientation, Training and Meetings

To promote and ensure an Injury Free Environment, health and safety training is a requirement for all Skanska and subcontractor workers assigned to this project.

### Foreman Orientation

All foremen are recommended to mobilize to the site prior to their crew so they can receive specific training and review the permits, forms, and procedures required by the SHMP as well as project specific information necessary to adequately coordinate their work and prepare their crews.

### Employee New Hire Orientation

Prior to the start of work, every worker shall attend an environmental, health, and safety orientation conducted by Skanska, which will provide general environmental, health and safety information and project specific work rules and procedures. Subcontractors will only be permitted to bring on new employees the day of a scheduled project orientation session.

### Daily and Weekly Safety Meetings

All workers assigned to this project will participate in safety meetings conducted by Skanska or their employer. Skanska reserves the right to remove subcontractor management/supervision personnel who do not regularly attend and/or conduct weekly safety meetings on the project.

Safety meetings should communicate any incidents that occur on the project, safety concerns, new work activities, and new and continuing potential hazards.

### Health and Safety Training

In addition to the site specific environmental, health and safety orientation, OSHA requires that workers receive specific task training. To help comply with OSHA minimum worker training requirements and assist in achieving an Injury Free workplace, a training matrix has been included in this Safety & Health Management Program to

# SKANSKA

---

assist in the identification of applicable training requirements.  This is for reference only and shall not be considered all inclusive.

Skanska may evaluate orientations and training periodically to verify they are being properly conducted and that the contents adequately cover the standards, policies, rules, and procedures contained in the Safety & Health Management Program or OSHA standards.

Project management or supervision will communicate the environmental, health and safety policies, rules, and procedures to all vendors and third party individuals having business on this project.

Appendix D or equivalent shall be used to document safety training on this project

| Topic | Who Needs Training | What Training is Needed |
|---|---|---|
| Project Specific Environmental, Health & Safety Orientation | All project management, supervision, and workers entering the project | Safety rules and procedures contained in the Safety & Health Management Program (SHMP), site-specific emergency action plan, each worker's responsibilities, disciplinary program, environmental aspects and warm up and stretching exercises |
| Hazard Communication | All workers entering the project | Hazard Communication Basic Training (Refer to Hazard Communication Program in this SHMP) |
| Hazardous Chemical or Substance | Workers exposed to a hazardous chemical or substance | Specific Hazard Communication Training (Refer to Hazard Communication Program in this SHMP) |
| Respiratory Protection | Workers required to wear respiratory protection, including common dust masks | OSHA 29 CFR 1910.134 & 139 or 1926.103 |
| Fall Protection | Any worker who might be exposed to a fall hazard | • The nature of fall hazards<br>• Procedures for erecting, disassembling, maintaining and inspecting fall protection systems<br>• Use and operation of: guardrail systems, personal fall arrest systems, safety net systems, warning line systems, controlled access zones and other fall protection<br>• Procedures for handling equipment and erection of overhead protection<br>• Fall protection standards<br>• Rescue Plan |
| PPE | Workers using PPE | Refer to section on PPE or regulatory standards |
| Forklifts | Operators of powered industrial trucks | • Types of trucks operated<br>• Hazards of the workplace<br>• Hands-on performance evaluation |
| Confined Spaces | Any worker attending to, supervising, entering or working within a confined space | • Hazards of the space<br>• Duties of entrants, attendants, supervisors<br>• Air monitoring<br>• Rescue Plan |
| Permit-Required Confined Spaces | Any worker attending to, supervising, entering or working within a permit-required confined space | • Hazards of the space<br>• Duties of entrants, attendants, supervisors<br>• Measures used to eliminate or control hazards<br>• Air monitoring requirements<br>• Emergency procedures/rescue equipment<br>• Communications<br>• Permitting procedure<br>• PPE<br>• Rescue Plan |

FL SHMP REV: 16/July/2014

# SKANSKA

| Topic | Who Needs Training | What Training is Needed |
|---|---|---|
| OSHA 30 Hour | All project superintendents and foreman | • OSHA 30 Hour Construction |
| Excavations/Trenches | Workers entering or working within an excavation/trench | • Hazards of the space (slides, cave-ins, water accumulation, etc.)<br>• Safe means of access/egress<br>• Proper support system procedures (erection, maintenance, disassembly and inspection) |
| Lockout/Tagout | Workers affected by hazardous energy sources | • Nature of known hazardous energy sources<br>• Project-specific Lockout/Tagout procedures |
| Gas Welding & Cutting | Workers conducting gas welding and/or cutting | • The safe use of fuel gas<br>• How to use a fire extinguisher |
| Arc Welding & Cutting | Workers conducting arc welding and/or cutting | • What to do with unattended machines and electrode holders<br>• Operations around water<br>• Shielding arc welding<br>• How to use a fire extinguisher |
| Hot Work | Workers conducting hot work activities | • Hazards of the area<br>• Permits<br>• Duties of Fire Watch<br>• How to use a fire extinguisher |
| Scaffolding | Workers working from scaffolding | • The nature of any known hazards<br>• Proper erection, maintenance and disassembly of fall protection systems<br>• Falling object protection<br>• Material/equipment handling from scaffold<br>• Maximum load-carrying capacity<br>• Scaffold tagging system<br>• Access and egress |
| Crane Baskets | Workers working from crane baskets | • Safe work rules<br>• 100% fall protection<br>• Lift plans contents<br>• Critical Lift Planning<br>• Emergency procedures |

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

## Project Specific Safety Work Requirements

The project specific safe work requirements are the minimum requirements for this project. The purpose of these requirements is to ensure an Injury Free Environment and compliance with standards and regulations. Skanska believes by concentrating on four main areas—personal protective equipment, housekeeping, fall prevention/protection and ladders—incidents and near misses can be reduced.

## Asbestos Containing Material (ACM)

Before beginning any renovation or demolition work, an asbestos survey must be completed for the work area. The survey must be performed by an accredited building inspector and the report must be shared with all personnel on site, including subcontractors.  A copy of the report must remain on site for reference.

All asbestos must be identified prior to the disturbance of any materials.  Materials not sampled shall be assumed to be asbestos-containing until proven otherwise.  If additional suspect materials are identified during the project, all work must stop immediately and the materials must be sampled for asbestos.

Only a licensed contractor will remove, repair, or clean up asbestos-containing materials.

Precautions must be taken to avoid the disturbance of asbestos-containing materials.  However, if known or suspect ACM is disturbed during the performance of work, the following procedure will be followed:

- Work in area shall immediately stop
- Warn other workers nearby of the disturbed or damaged material
- Contact your immediate supervisor
- Barricade the immediate area around the disturbed or damaged material
- Do not enter the barricaded area until proper bulk and/or air sampling has been completed and the area is deemed safe by Skanska or subcontractor

Asbestos awareness training is required depending on the level of potential exposure.

## Blasting

The transporting, handling, storing, and use of explosives, blasting agents and blasting equipment shall be directed and supervised by a licensed contractor.  The licensed contractor shall designate a person knowledgeable and with proven experience and ability in blasting operations as their on-site blaster.

All personnel who participate in blasting operations shall receive initial training in basic explosives safety. Individuals shall receive additional training in explosives safety commensurate with their assigned responsibilities.

- Prior to the use, storage or handling of explosives, a job-specific blasting plan shall be prepared by a licensed contractor and submitted to Skanska for approval.
- The job-specific Blasting Plan shall be site-specific and shall at minimum address the following:
- Designation of a qualified individual as the Blaster who has authority over all actions and operations related to blasting.  List the names, qualifications, and detailed responsibilities for all personnel involved with the blasting or who will otherwise be responsible for transporting, handling or storing the explosives.  List all incidental personnel and other personnel authorized to be within the danger zone during blasting operations
- Dates and location of blasting
- Type and quantity of explosives and detonating or initiating devices to be used at the site An inventory of explosives and blasting agents stored at the site shall be maintained
- Means of transporting explosives and provisions for storing and securing explosives on site
- Obtaining all applicable permits and licenses
- Minimum acceptable weather and static conditions and considerations for stray radio frequency energy and electrical currents where electrical initiation will be used
- Standard procedures for handling, setting, wiring, and firing explosive charges

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

**SKANSKA**

- List of required PPE
- Minimum standoff distances/means for clearing/controlling access to blast danger areas
- Procedures for handling misfires and other unusual occurrences
- Means of annunciation and timing for pre-blast notification and "all clear" after blast

In addition to the Blasting Plan, the licensed contractor will develop an Emergency Action Plan, which shall include:

- Phone numbers of local emergency response organizations (rescue, ambulance, fire department, police)
- Location and phone number of nearest medical services facility
- Actions to be taken when a person is injured
- A copy of a material safety data sheet (SDS. ) for each explosive or other hazardous material expected to be used

Personnel not listed on the blasting plan shall not be allowed on site without approval of the blast officer.  All personnel shall receive a safety briefing prior to entering the blast area.  A roster shall be maintained of all personnel within the blast area

A copy of the blasting plan shall be maintained at the blasting site(s) and office locations

## Caissons

When a worker(s) must enter a caisson, a qualified person will develop a detailed work plan.  The plan will include but not be limited to:

- Type of shield to be used
- Means of access for the worker(s)
- Method of atmosphere monitoring to be used
- Training to be provided to worker(s)

When workers are required to enter a caisson four (4) feet in depth or greater, the workspace will be considered a "permit-required" confined space.  All requirements of the confined space section of this SHMP and OSHA 29 CFR 1910.146 will be strictly followed.

All workers required to enter a caisson will receive confined space entry training and understand the contents of the written work plan.

Guardrails must be erected around the caisson opening(s) when the sleeve does not extend 42-inches above ground level.

## Concrete Construction

All vertical and horizontal rebar, form stakes, metal and/or plastic conduit, and/or small pipe stub-ups will be protected with approved caps or other industry accepted alternatives to protect against impalement and injury.

Workers that operate vibrators, pump nozzles and concrete buckets will wear appropriate eye and foot protection.  It is highly recommended that long sleeve shirts be worn to protect against exposure of concrete to the bare skin and the possibility of concrete burn and contact dermatitis.

Workers engaged in vertical rebar assembly shall comply with the project six-foot fall protection rules.  Positioning devices alone are not approved fall protection but can be used in conjunction with personal fall protection equipment.

Pre-fabricated forms and form making material will be stacked neatly at all times.  When stripping concrete forms, all material will be immediately removed and stacked in an orderly manner.  Forming material or debris will not block walkways and aisles.  Subcontractor will remove rebar, tie-wire and other debris from the work area daily.

No employee is permitted to ride a concrete bucket.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

Ensure that reinforcing steel and forms for walls, piers, columns, stairs and similar vertical structures are adequately supported to prevent overturning and collapse and are designed and installed under the supervision of a qualified person.

Ensure that coiled wire mesh is adequately secured to prevent uncoiling.

Equip buckets with a discharge device that an employee can operate without being exposed to the load.  Equip buckets with safety devices to prevent premature or accidental dumping, and ensure that the release is self-closing.

Follow safe rigging practices when handling concrete buckets.

When using bull floats, inspect the area to ensure there is no energized equipment or power lines nearby that the handles could touch.

Concrete buggy handles must not extend beyond the wheels on either side of the buggy.

Rotating-type, powered concrete trowels shall be equipped with dead-man controls that automatically shut down the equipment when the operator's hands are removed from the controls.

Finishers shall wear kneepads and impervious gloves when hand-finishing concrete.

## Concrete Shoring

All employees will be properly trained and a Competent Person shall be present during all shoring operations.

Shoring will be removed in columns.  Once there are two (2) columns remaining, the shoring will be removed vertically in alternating pattern.  Additional bracing is required to be fastened in the middle of the second scaffold frame from the ground.

Shoring with a height to base width ratio of more than 4:1 shall be restrained from tipping by guy wires, bracing, or equivalent means.

Lower the shoring with a minimum of ½" rope.  Do not throw shoring or forming equipment or other material to the ground.  Shoring and related material should be stored/stacked in an orderly manner as soon as it is dismantled.
The work area shall be barricade.

## Confined Spaces

Before any work can begin in a confined space a detailed Confined Space Entry Permit (Appendix I or equivalent) and written entry plan must be prepared and submitted to Skanska.  This process will help determine whether the space is a "Non Permit Required" confined space or a "Permit Required" confined space.  All confined spaces shall be considered "Permit Required" unless the contractor can prove otherwise.  Refer to OSHA 29 CFR 1910.146 for further direction.

A confined space is any space large enough and so configured that a person can bodily enter and perform work; has limited openings for entry and exit; and was not designed for continuous human occupancy.  This may also be referred to as a "Non Permit Required" Confined Space.

A "Permit Required" space meets the above criteria *and* has a potentially uncontrollable hazard.

"Permit Required" confined spaces may include, but are not limited to:

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

- Storage tanks
- Excavations and trenches
- Ventilation and exhaust ducts
- Sewers
- Manholes

- Underground vaults and utility tunnels
- Pipelines
- Pits and tubs
- Open top spaces more than four feet in depth

If possible, all confined spaces should be identified and evaluated at the beginning of the project.

Before working in any confined space, a competent person will determine what hazards exist. Any operating system or equipment will be locked out and tagged to prevent accidental operation. Contact the operating facility representative prior to any confined space entry work.

Prior to workers entering a "Permit Required" confined space, the atmosphere must be tested and a permit completed and authorized. The atmosphere will be tested for oxygen deficiency, toxic gases or vapors, and combustible or flammable gases or vapors according to the hazard analysis and/or information provided by the client.

Prior to any worker entering a confined space, he/she will be trained in the following and records submitted to Skanska prior to commencement of the work:

- Contents of the Confined Space Entry Plan
- Known hazards in the confined space
- Emergency procedures in case of an emergency and a rescue plan
- Correct use of personal protective equipment when required
- Hot Work Permit, if required
- Atmosphere testing requirements
- Lockout/Tagout procedures
- Fall protection if required

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

## Cranes and Cribbing

Table of Contents

**Section 100**          **Scope of Applicable Equipment**

**Section 200**          **Definitions**

**Section 300**          **Pre Erection Requirements**
1. Geotechnical Requirements
2. Foundation Considerations
3. FAA and other agency notifications
4. Overhead and Underground Utility Considerations
5. Inspection and oversight requirements
6. Required checklists

**Section 400**          **Post Erection Procedures and Requirements**
1. Inspection requirements (annual, monthly, daily)
2. Operator, rigger, and signal person qualifications
3. Critical and major lift planning
4. Jumping Cranes
5. Lift and pre/post-task planning
6. Safety Plan and Job Hazard Analysis (JHA)
7. Barge mounted cranes
8. Emergency planning (severe weather or manmade emergency)

**Section 500**          **Management Systems**
1. Documentation Control

**Appendix P**          **Annual Inspection Form**

**Appendix Q**          **Monthly Inspection Form**

**Appendix R**          **Daily Inspection Form**

**Appendix S**          **Crane Maintenance Checklist**

**Appendix T**          **Critical Lift Checklist**

**Appendix U**          **Tower Crane Checklist**

**Appendix V**          **Lift Plan Example**

**Appendix W**          **Soil Bearing Chart**

FL SHMP REV: 16/July/2014

**SKANSKA**

## Section 100 – Scope of Applicable Equipment

This standard applies to power-operated equipment used on Skanska USA projects that can hoist, lower, and horizontally move a suspended load.  The list below is intended to offer a framework of the variety of cranes seen on projects across the United States and to provide guidance of the applied scope of this standard.

**Telescopic Crane** – This crane has a boom that consists of number of different fitted tubes that reside inside each other.  A hydraulic mechanism is what extends or retracts the tubes to increase or decrease the length of the main boom.

**Tower Crane** – This crane is fixed to the ground and gives a great combination of height and lifting capacity. It's commonly used in construction to build sky scrapers and other tall buildings.  To save space and to provide stability the vertical part of the crane is typically braced directly onto the completed building which is normally the concrete lift shaft located in the center.

**Truck Mounted Crane** – A crane that is mounted on a rubber tire truck that drives around for maximum portability.  When in operation Outriggers extend horizontally then vertically to both level and stabilize the crane for hoisting operations.

**Rough Terrain Crane** – A crane that is mounted on an undercarriage contains four rubber tires and is designed for pick-up and carry operations.  Outriggers extend first horizontally and then vertically to both level and stabilize the crane for hoisting operations.

**Lattice Boom Crane** – A crane that can be mounted on an undercarriage with tires or tracks.  The lattice boom section consists of the boom butt and boom tip.  The length of which is increased by adding boom extensions. Boom sections are made of lightweight, thin wall, high strength alloy tubular or angle steel and are designed to take compression loads.  Lattice boom manufacturers have set a zero tolerance on rust, bent lacing or cords, cracked welds, and other problems.

**Pile Driver Crane** – A crane used in combination with a machine for delivering repeated blows to the top of a pile for driving it into the ground; consists of a frame called "leads", which supports and guides a hammer weight, together with a mechanism for raising and dropping the hammer or for driving the hammer by air for steam.

**Barge Crane/ Floating Crane** – A specialized crane which can be permanently attached to a ship, or driven up and secured on a floating barge.  It's used to lift heavy loads in marine type environments.

**Crawler Crane** – An undercarriage mounted crane that also has a set of tracks that provide extra stability and mobility.

**Aerial Crane** – A specially designed and fitted lifting helicopter which can lift large loads.

**Loader Crane** – A loader crane is fitted to a trailer or flat body truck chassis and used to unload/load goods onto the trailer/truck or onto a jobsite.  It contains many different jointed sections that can be folded into a smaller space when the crane is not being used

# SKANSKA

## Section 200 – Definitions

| Term | Definition |
|------|------------|
| **NCCCO** | National Commission for the Certification of Crane Operations |
| **Qualified Operator** | An operator certified as qualified by a nationally recognized certification authority, or having verified and demonstrated knowledge gained through practical experience. |
| **Certified Crane Operator** | A crane operator certified by a nationally accredited certification authority such as NCCCO, or equivalent. |
| **Qualified Rigger** | A qualified rigger is one who through possession of a recognized degree, certificate, or professional standing; or by extensive knowledge, training, and experience, has successfully demonstrated the ability to solve/resolve problems related to rigging work and related activities. |
| **Qualified Signal Person** | A "qualified" signal person is one that his/her employer must ensure that the signal person is qualified through a knowledge test and documented practical test.  This qualification must be done by a qualified evaluator, which may be a third party or an employee of the signal person's employer.  The evaluator must demonstrate that he or she is competent in accurately assessing whether an individual meets the qualification requirements specified by this final rule for signal persons. |
| **Skanska Crane Inspector** | A full time Skanska employee having completed a recognized inspector certification, and demonstrated all the requisite knowledge to certify a crane is ready to operate. |
| **Third Party Inspector** | A crane inspector as certified by a nationally recognized certification authority and having a resume of demonstrated skills.  This inspector cannot have any affiliation with the owner of the crane, sub-contractors, Skanska, or other parties or organization working on the project. |
| **Pre Installation Inspection** | A documented inventory and visual integrity inspection of all crane parts prior to a crane being assembled on a project site. |
| **Post Installation Inspection** | A documented annual and/or monthly inspection of all installed crane parts after crane is assembled or delivered to the job site. (refer to Appendices P, Q, or daily) |
| **Rigging Plan** | A documented plan detailing types of rigging to be used (slings, chains, links, hooks, spreader bars etc.) and their methods of use to wit; vertical, basket, or choker |
| **PIC** | Person in charge |
| **Helper or Assist Crane** | A crane used to erect another crane |
| **Competent Person** | A competent person as defined by OSHA [29CFR 1926.32 (f)] means one who is capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminated them. |
| **Sequence of Lifts** | A documented prescribed sequence of crane movements and lifts specific to the erection sequence of the project. |
| **Crane Prepped Roadway** | An adequate access road providing ingress and egress to the project site for the safe delivery and movements of derricks, cranes, trucks, and other necessary equipment to be erected.  The ingress/egress must provide a means and method to provide safe vehicular and pedestrian access. The roadway must be stable, properly graded, and provide adequate drainage. |
| **Critical Lift** | A lift that (1) exceeds 75 percent of the rated capacity of the crane or derrick, or (2) requires the use of more than one crane or derrick. (see critical lift risk topic attached) |
| **Major Lift** | Any lift that is unique and would significantly affect job schedule or budge is a major lift. (A lift may be both critical and major) |
| **Crane Pad** | A prepared area that is level, graded and properly drained  area for a crane to operate on, (which can be concrete, stable soil, crushed rock or a combination thereof), which will support the crane and it's intended load with a safety factor of 5 to 1 built in. |

                                                              FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

## Section 300 – Pre Erection Requirements

### 1. Geotechnical Requirements

Soil conditions must be fully assessed prior to any crane arriving at the site.  Items to consider include travel, slope, and soil loading ability.  Prior to the erection of any tower crane a geo-technical evaluation shall be accomplished and incorporated into the foundation design of the engineered system.

### 2. Foundation Considerations

For mobile cranes, outrigger size and location and soil condition must be considered when planning.  Soil bearing capacity is to be determined by a professional engineer and outrigger sizing established prior to the crane arriving on site.  Refer to Appendix H for guidelines in determining outrigger configuration.

Tower crane foundations must be a designed system, certified by a professional engineer, taking all loads and soil conditions into consideration.

### 3. FAA and Other Agency Notifications

The Federal Aviation Administration (FAA) requires a permit on construction cranes any time they will exceed 200 feet in height, OR when they are placed within 20,000 feet (3.79 miles) of an airport regardless of height. The FAA requires FAA Form 7460-1 to be submitted at least 30 days before the following:

The date the proposed construction is proposed to begin

The date the application for a construction permit is to be filed

The FAA requires that 4 copies of the FAA Form 7460-1 be sent to the local/regional FAA Director.  In addition to the FAA, other local statutes may require additional notification.

### 4. Overhead and Underground Utility Considerations

Prior to the assembly/erection of any crane it must be determined if any part of the crane, load line, or load (including rigging and lifting accessories) could get in the direction or area of assembly within proximity of a power line.  Minimum clearance distances are on the table on the next page. In the event this clearance must be encroached the line will be de-energized prior to the planned encroachment.

**Minimum Clearance Distances**

| Voltage (nominal kV, alternating current) | Minimum clearance distance (feet) |
|---|---|
| Up to 50 | 10 |
| Over 50 to 200 | 15 |
| Over 200 to 350 | 20 |
| Over 350 to 500 | 25 |
| Over 500 to 750 | 35 |
| Over 750 to 1000 | 45 |
| Over 1000 | (as established by the power line owner/operator or registered professional engineer who is a qualified person with respect to electrical power transmission and distribution) |

### 5.  Inspection and Oversight Requirements

No crane will be brought onto the project without a current annual inspection by a qualified third party, manufacturers operating manual and applicable load charts immediately before put into service.  A copy of the current annual inspection will be copied to Skanska and remain in the crane at all times.

Prior to any crane arriving on a Skanska project the previous monthly and annual inspection shall be reviewed by Skanska site management.  Verification that all noted defects have been corrected shall be included with the inspection form if applicable.  Inspection forms must be compatible with the applicable forms in Appendices P, Q, and R of this standard.

In addition, erection of tower cranes shall be directed by a third party inspector.  Upon completion of erection a new annual inspection shall be accomplished by the third party inspector and all defects corrected and

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

documented prior to any lift.  The Tower Crane Protocol Checklist is included in Appendix U of this standard to serve as a guidance checklist.

## Section 400 – Post Erection Procedures and Requirements

### 1. Inspection Requirements (annual, monthly, daily)

On-going comprehensive inspections are a critical component that ensures the on-going safe operation of all cranes.

- Daily Inspections will be accomplished for all cranes on Skanska projects. It is highly recommended that the checklists in Appendix R of this standard are used to document that this requirement has been met. However, the only documentation required by this standard are any deficiencies identified during the daily inspection.  Daily inspections may be accomplished by a Qualified Operator as defined in Section 200 of this standard.

- Monthly Inspections will be accomplished for all cranes on Skanska projects that reside on the project for greater than 30 calendar days, regardless of operating days during that period.  The monthly inspection forms (or equivalent) in Appendix Q of this standard are required to be completed and maintained in the cab of the equipment.  Monthly forms will be retained for a minimum of 3 months, as some local agencies may require them to be retained longer.  Monthly inspections may be accomplished by a 1) Qualified Operator, 2) Skanska Crane Inspector, or 3) Third Party Inspector as defined in Section 200 of this standard.

  Annual Inspections will be accomplished for all cranes on Skanska projects that reside on that project for greater than 365 calendar days, regardless of operating days during that period.  The annual inspection forms shall be maintained in the cab of the equipment.  Annual inspections must be accomplished by Third Party Inspector as defined in Section 200.

*Modified equipment.*

- Equipment that has had modifications or additions which affect the safe operation of the equipment (such as modifications or additions involving a safety device or operator aid, critical part of a control system, power plant, braking system, load-sustaining structural components, load hook, or in-use operating mechanism) or capacity shall be inspected by a qualified person after such modifications/additions have been completed, prior to initial use.  The inspection shall meet the following requirements:
    - (i) The inspection shall assure that the modifications or additions have been done in accordance with the approval obtained pursuant to § 1926.1434 (Equipment modifications).
    - (ii) The inspection shall include functional testing.
  - (2) Equipment shall not be used until an inspection under this paragraph demonstrates that the requirements of paragraph (a)(1)(i) of this section have been met.

*Repaired/adjusted equipment.*

  - (1) Equipment that has had a repair or adjustment that relates to safe operation (such as: a repair or adjustment to a safety device or operator aid, or to a critical part of a control system, power plant, braking system, load-sustaining structural components, load hook, or in-use operating mechanism), shall be inspected by a qualified person after such a repair or adjustment has been completed, prior to initial use.  The inspection shall meet the following requirements:
    - (i) The qualified person shall determine if the repair/adjustment meets manufacturer equipment criteria (where applicable and available).
    - (ii) Where manufacturer equipment criteria are unavailable or inapplicable, the qualified person shall:
        - (A) Determine if a registered professional engineer (RPE) is needed to develop criteria for the repair/adjustment.  If an RPE is not needed, the employer shall

22

# SKANSKA

ensure that the criteria are developed by the qualified person.  If an RPE is needed, the employer shall ensure that they are developed by an RPE.

- (B) Determine if the repair/adjustment meets the criteria developed in accordance with paragraph (b)(1)(ii)(A) of this section.
  - (iii) The inspection shall include functional testing.
- o (4) Equipment shall not be used until an inspection under this paragraph demonstrates that the repair/adjustment meets the requirements of paragraph (b)(1)(i) of this section (or, where applicable, (b)(1)(ii) of this section).

*Severe service.*

- Where the severity of use/conditions is such that there is a reasonable probability of damage or excessive wear (such as loading that may have exceeded rated capacity, shock loading that may have exceeded rated capacity, prolonged exposure to a corrosive atmosphere), the employer shall stop using the equipment and a qualified person shall:
  - o Inspect the equipment for structural damage.
  - o In light of the use/conditions determine whether any items/conditions need to be inspected; if so, the qualified person shall inspect those items/conditions.
  - o If a deficiency is found, the employer shall follow the requirements in CFR 1926.1412.

*Equipment not in regular use.*

Equipment that has been idle for 3 months or more shall be inspected by a qualified person in accordance with the requirements of the (Monthly) inspection, before initial use.

- Any part of a manufacturer's procedures regarding inspections that relate to safe operation (such as to a safety device or operator aid, critical part of a control system, power plant, braking system, load-sustaining structural components, load hook, or in-use operating mechanism) that is more comprehensive or has a more frequent schedule than the requirements of this section shall be followed. Additional documentation requirements by the manufacturer are not required.

## 2. Operator, Rigger, and Signalman Qualifications

Crane operators on this project will be certified by one of the following accredited entities unless prior approval from Skanska's Environmental Health and Safety Department has been obtained:

- *National Commission for the Certification of Crane Operators (NCCCO).*
- *Crane Institute Certification (CIC)*
- *National Center for Construction Education and Research (NCCER)*

Prior to any lifts, the following shall occur.

1. Review and inspect Operator's Certification Card for types of cranes the operator is certified to operate.

2. Verify on the Application for Employment or by sub-contractor certification that the applicant has operated cranes in the classification for which they are being hired.

3. Skanska site staff will verify that the operator is competent to operate the applicable crane.

4. Upon determining that the potential operator is qualified, personal training will be given to the operator that may include the following:

   a. Site specific requirements

   b. Review of specific sections of the Company Safety Manual such as safe material handling practices

   c. Equipment maintenance and periodic equipment check requirements

These guidelines do not overrule any local, state or federal requirements. In the event of conflict the more stringent standard shall prevail.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

## 3. Critical and Major Lift Planning

<u>Critical Lift Determination</u>

The decision to designate a lift as a critical lift is a management decision, incorporating both critical and major lifts (see definition of critical and major lifts in Section 200). Guidelines provided here are intended to aid in making that decision. The manager who has the responsibility for the item being lifted has the authority to require that it be handled as a critical lift. In addition, the manager at the facility where the lift will be performed also has the authority to require that it be handled as a critical lift. The manager who designated the lift as a critical lift shall ensure that a person-in-charge (PIC) is assigned. (The PIC need not be in the Skanska organization).

<u>Critical Lift Procedures</u>

The PIC shall ensure that a step-by-step procedure is prepared for critical lifts. Although individual procedures are prepared for the one-time critical lifts, general procedures may be employed to accomplish routine recurrent crucial lifts. For example, a general procedure may be used to lift an item or series of similar items that are frequently lifted or repeatedly handled in the same manner.

- Any non-routine or critical equipment lift (as determined by the Project Manager, Superintendent or Safety Supervisor). Critical equipment may include equipment that meets one of the following criteria:

  o The load item, if damaged or upset, would result in a release into the environment of radioactive or hazardous material exceeding the established permissible environmental limits.

  o The load item is unique and, if damaged, would be irreplaceable or not repairable and is vital to a system, facility or project operation.

  o The cost to replace or repair the load item, or the delay in operations of having the load damaged, would have a negative impact on the facility, organization, or budget to the extent that it would affect program commitments.

  o A lift not meeting the above criteria shall also be designated critical if mishandling or dropping of the load would cause any of the above noted consequences to nearby installations or facilities.

  o Further site-specific criteria may be developed to supplement those cited above and may include loads which require exceptional care in handling because of size, weight, close-tolerance installation or high susceptibility to damage as well as lifts using multiple pieces of lifting equipment.

An example of a critical lift procedure and checklist is included in Appendix T of this standard.

<u>Approval of Critical Lifts</u>

The critical lift procedures should be reviewed at a pre-lift meeting by the responsible contractor, the crane operator(s), the PIC, Skanska Site Management, author of the Lift Plan, Manager of the lift operation, and Skanska EH&S Department.

<u>Revisions of Critical Lift Procedures</u>

Any revisions to the procedure shall be reviewed and approved though the same cycle as the original procedure.

<u>Pre-Lift Meeting</u>

Before the critical lift is performed, a pre-lift meeting with all participating personnel shall be held. During the meeting, the critical lift procedures shall be reviewed and questions shall be resolved. The pre-lift meeting shall be documented.

**Note**: Practice lifts are recommended. (If used, requirements for the practice lift should be documented in the procedure.)

**SKANSKA**

---

## 4. Jumping Cranes

Jumping of cranes must follow similar protocols as a critical or a major lift and requires a comprehensive written plan to address the following:

1. Number of sections to be added/removed
2. Work sequence
3. Rigging to be used
4. Inspection of all rigging equipment including shackles, hooks, etc.
5. Review of all equipment such as collars, ties, and bolts, including capacities and a record of visual inspection by a competent person.
6. Relevant weather warnings and emergency procedures
7. Full compliance with manufacturer's recommendations
8. Have a registered professional engineer verify that the host structure is strong enough to sustain the forces imposed through the braces, brace anchorages and supporting floors.
9. *Signs.* The size and location of signs installed on tower cranes must be in accordance with manufacturer specifications. Where these are unavailable, a registered professional engineer familiar with the type of equipment involved must approve in writing the size and location of any signs.
10. The rigging work is done by a qualified rigger.
11. Synthetic slings are protected from abrasive, sharp or acute angles and configurations that could cause a reduction of the sling's rated capacity, such as distortion or localized compression.

## 5. Lift and Pre/Post-Task Planning

Prior to any lifts a lift plan (*see Definitions Section 200*) should be in place. The final lift plan should fully incorporate the current site conditions, including utility locations and any possible intersections with public access areas.

A daily pre/post-task plan must be accomplished prior to any lift for that particular day to ensure that no deviations from the lift plan exist.

An example of a lift plan is included in Appendix V for reference.

## 6. Safety Plan and Job Hazard Analysis

All incidents involving crane operations (*i.e., unsafe observation, near miss, etc.*) must be reported immediately to Skanska site staff, including the project EHS manager. Skanska will collaborate with other contractors if appropriate and develop a corrective action in response to the cause of the incident prior to resuming crane operations.

Accessible areas within the swing radius or the rotating superstructure must be barricaded to prevent serious injury or death to workers. Crane supported personnel platforms (crane baskets) are not permitted without the prior approval of site management and Skanska EHS personnel.

In addition, the following guidelines for mobile cranes should be adhered to:

1. Ensure the crane is level $360^o$ and maintained during operation.

2. Extend outriggers fully or set per the manufacturer's recommendation for a particular lift configuration. Weight must be off the tires.

3. Cribbing or mats under outrigger pads should be of sufficient size and properly placed to ensure adequate soil bearing as required by the manufacturer.

4. Before a lift, determine the load weight, radius, and load capacity. Crane capacity charts are the ideal gross capacity of the crane at certain boom lengths, boom angles, and load radius from the crane center pin.

   a. Deductions to the net capacity should be made per manufacturer's load chart or operating manual for attachments such as jibs (stowed or attached), headache balls, wind, less than ideal setups, etc. to determine the load that can be safely lifted.

# SKANSKA

    b.  Additional deductions to the net capacity are the weight of the crane's load block, rigging and amount of load line required to make the lift.  Some manufacturers include the load line in their load charts but others, like Manitowoc, do not.

5.  A designated, qualified person will determine the load weight.  Note: OEM drawings listing the equipment or machinery assemblies are not always accurate.  Refer to the shipping weight or have the equipment or machinery assembly weighed.  Calculate all structural loads and determine the center of gravity.

6.  Determine the radius from the center pin of the crane to the center of gravity of the load using a tape measure.

7.  Determine the boom length, counterweight, and crane configuration to determine the correct load chart required.

8.  Position the hook over the "Center of Gravity" of the load before starting the lift.

The following guidelines for tower cranes should be adhered to:

1.  No employee will work or travel on any part of the crane boom without proper fall arrest equipment.  No worker will be allowed to climb the tower or get on the boom when the crane is in operation

2.  Hoisting ropes must be shortened by the removal of ten feet at the dead end after every three months of use unless otherwise specified by the manufacturer.

3.  No load will be swung over any public street that is occupied by the general public unless authorized by local authorities.

4.  Prior to a load being swung over other workers, the first-line supervisor using the crane will provide a lookout that shall sound an alarm as the load is moved across the work area.  The lookout shall wear a fluorescent orange vest or other similar high-visibility garment.

5.  A written crane dismantling plan is required for dismantling of any crane.

In addition to the above safety requirements, the requirements of OSHA standards 29 CFR 1926.1400 shall **also** be complied with.

## 7. Barge Mounted Cranes

When a mobile crane is to be placed on a barge to work, a Crane on Barge Stability Chart must be prepared which will:

1.  Require a survey of the barge for structural capacity for the operating crane.
2.  Determine the stability parameters of the particular barge and crane combination.
3.  Specify the manufacturer's machine list chart to be placed on the crane and used in operation.
4.  Specify the location of the crane on the barge and the initial conditions of the list and trim.

Cranes on barges shall be secured to the barge in the operating position.  Never walk with a load on a barge.

## 8. Emergency Planning (Weather or manmade event)

Every site shall incorporate crane specific emergency response procedures specific to the equipment on that site in accordance with the manufacturer's notes and instructions.  These procedures shall include provisions for:

- Cold and Freezing Temperatures
- Wind
- Water, drainage, and wet conditions
- Power lines and whether
- Electrical storms
- Flooding

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

**SKANSKA**

- Rescue and evacuation procedures

# Section 500 – Management Systems

**1. Documentation Control**

Every crane operating on a Skanska USA project must have the following documentation in the cab of the crane available for review.

- The last 3rd party annual inspection
- The last monthly inspection
- Exception reports, if any
- Manufacturer's operating manual
- Manufacturer's lift charts

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

## Demolition

Prior to the start of any demolition work, the subcontractor must ensure a competent person has performed an engineering survey of the building or area to be demolished to determine the condition and location of utilities, whether hazardous materials (such as asbestos, lead, and mercury) exist, means and methods of performing the work, sequencing, etc.  No work will commence until a written engineering survey has been completed and has been submitted to and reviewed by Skanska.

Debris and material shall not be dropped through walls, floor holes, windows or other elevated work areas without the area below being barricaded and properly signed.  Under no circumstances shall materials be dropped more than 20 feet without using a chute.

Debris chutes shall have a substantial gate at all elevated openings.

If demolition of a building will involve implosions, the demolition contractor shall submit to Skanska a detailed safety plan to specifically address site preparation, installation of explosives, debris/dust control, and blaster qualifications.

See Non Mandatory Appendix X or its equivalent for Pre-demolition guidelines.

## Electrical

*No work will be performed on any energized electrical circuit, bussbars, equipment, or panels* unless an approved written work plan is developed in accordance with Chapter 1 of NFPA 70E and submitted to Skanska for review prior to performance of work.

Electrical equipment and tools used on this project shall be inspected by a competent person to prevent any worker from receiving an accidental electrical shock.  This rule will apply to all cord sets, portable electrical equipment, tools and appliances not part of any permanent building or structural electrical systems.

All temporary cords will be three wire, 14 gauge or heavier, with a hard or extra hard duty rating.

Ground Fault Circuit Interrupters (GFCI)

All cord sets and cord-plug electrical equipment, tools or appliances that are 120 volts will be connected to a ground fault circuit interrupter (GFCI).  No cord set or cord-plug electrical equipment, tool or appliance will be plugged directly into any permanent building or structural electrical system not equipped with a GFCI.  Office equipment and appliances in site offices do not require GFCI devices.

When the source of electricity is from a two-wire, single-phase portable or vehicle mounted generator rated not more than 5KW, a GFCI is not required, as long as the generator is insulated from the frame and all other grounded surfaces.

Each worker, after plugging in his/her tool and/or extension cord, shall test and reset the GFCI device being used to ensure it is working properly with each use.  If the GFCI device is not functioning properly he/she will repeat the process until a properly working GFCI device is found.  He/She will report the defective GFCI device to his/her supervisor.

Double-Insulated Tools

Double-insulated tools are allowable if the case bears the Underwriter Laboratories "double-insulated" label.  Tools where this label has been removed, painted over or is otherwise not readable must be removed from service.

Inspection Form

An inspection program must be established to inspect all cord sets, portable electrical equipment, tools and appliances as described below and before first use, before returned to service following any repair, and after an incident that could have caused damage.

**Daily Inspection:**

Each cord set, attachment cap, plug, and receptacle of cord sets, portable electrical equipment, tools or appliances connected by a cord and plug, will be visually inspected daily by workers for external damage, such

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

as deformed or missing ground pins, insulation damage, frayed wires or indications of possible internal damage. Cord sets and receptacles that are fixed to the permanent electrical system and are not exposed or damaged are exempt from daily inspections.

Any electrical equipment, tool, appliance or cord set that is damaged or defective will be immediately removed from service and tagged out as defective equipment for repair.  A qualified electrician will repair tagged electrical items.

**Quarterly Inspection:**

All cord sets, receptacles and cord-plug connected electrical equipment, tools or appliances not part of the building or structure's permanent wiring, will have the following performed each quarter:

- Visually inspect for damage or missing ground pin
- Inspect insulation for damage
- Inspect for frayed or exposed wires
- Inspect for signs of internal damage

Temporary Lighting

Provide all material and labor necessary to furnish, install and maintain proper illumination of construction work areas as specified herein.

All lighting shall meet or exceed OSHA guidelines (1926.56 and 1926.405), the National Electrical Code, the authority having jurisdiction and the Skanska Guidelines to Temporary Lighting.

A phased plan for temporary power distribution and lighting systems shall be submitted to Skanska for coordination and record before temporary work is installed.  The sketch shall indicate the location (exterior and interior), voltages, means of protection and hours of operation of all circuits, fixture and lamp type, cable / wire type, supports and protection.

Temporary Lighting circuits shall be separate from electric tool circuits.  Receptacle circuits shall be dedicated to either temporary lighting or electric tools and shall be labeled "Lights Only" or "Tools Only", as applicable.

Fixtures shall be moved or modified as necessary during the construction process to limit the lighting being blocked by installed materials and systems.

The system shall be installed at the earliest opportunity and coordinated with other construction activities.

All temporary lighting, including all wiring and supports, shall be removed as permanent lighting is installed.  Patching and fire stopping must be completed as well.

All fixtures and lamps shall be protected from physical damage.

Each area of the building larger than 10 square feet shall be provided with temporary lighting.

The minimum light level shall be five foot-candles measured at 30 inches above the floor.

Emergency lighting backup units (where applicable) shall have self-contained emergency lighting battery packs complete with inverter/charger and pilot light and test switch.

Skanska and the subcontractor shall take weekly light level readings to ensure the temporary lighting system is installed and maintained as specified herein.  The subcontractor shall report of the minimum foot-candle level in each area and record in an appropriate log.

Broken or burned out fixtures in stairways shall be fixed or replaced immediately.  Broken or burned out fixtures in work areas which are not a safety hazard shall be fixed or replaced within 24 hours.

For energy conservation, use timers, photocells and florescent bulbs whenever possible.  Properly dispose of florescent bulbs.

Each fixture shall bear the label of Underwriters Laboratories and shall be produced by reputable manufacturers.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

Non-metallic sheathed cable may be used as allowed by the NEC and as follows:

- Along studs, joists, or similar supports closely following the finish or running boards when 8-0 feet or more above the floor.

- When firmly attached to each cabinet, box fitting, or fixture by means of a cable clamp. **Non-metallic sheathed cable may not be used where precluded by the NEC nor as portable extension cords, lying on the ground subject to any type of traffic, where subject to frequent flexing, or as service entrance cable**

Fixture and Lamp Types

- Incandescent lamps shall be inside frosted

- Mercury vapor lamps shall be deluxe white

- Metal halide lamps **SHALL NOT** be used for temporary lighting

- Low pressure or High pressure sodium lamps **SHALL NOT** be used for temporary lighting

- Mercury vapor lamps shall be equipped with self-extinguishing mechanisms to extinguish the arc if the outer globe is broken.

General Electrical Rules

All cord sets will be elevated above the work surface when practical.

Wire, nails, or other conductive material will not be used to hang or attach cord sets or welding leads.

Cord sets that cross roadways will be protected from damage by vehicle and equipment traffic by devices such as hose bridges.

Light stringers and halogen lamps will have the lamps protected from accidental contact or breakage and will be hung per manufacturer specifications.

UL approved covers are required on all panels, load centers, pull boxes, etc. prior to energizing.  Necessary steps will be taken to prevent unauthorized or unqualified workers access to energized electrical parts or equipment.

## Equipment and Vehicles

**Motor vehicles that may access any airport area will be equipped with a two-way radio on the FAA Ground Traffic Control frequency.**

Heavy equipment (cranes, forklifts, dump trucks, excavators/back hoes, man-lifts, etc.) used on this project will be inspected prior to use and comply with applicable OSHA and ANSI standards, which will be documented.

Equipment that is equipped with a windshield will be free of cracks or other visible damage.

All equipment will be equipped with rollover protective structures (ROPS).

Seatbelts are required to be worn at all times when provided in moving equipment.

Only company and/or delivery vehicles used for the sole purpose of conducting work tasks on-site are permitted in construction areas.  Vehicles one ton or greater and equipment used on-site must have an audible backup alarm.  The driver and all passengers in any vehicle will wear seat belts.

No equipment or vehicle will be used to transport personnel unless it is specifically designed to do so, including beds of pick-up trucks.

Equipment Operators are responsible to check their equipment daily to verify it is working properly.  Forklifts require the use of Skanska or equivalent forklift checklist (Appendix AA)

# SKANSKA

As a minimum, each operator will check:

- Backup alarm and horn
- Hydraulic systems
- Steering mechanism
- Operating controls
- Mirrors
- Fire extinguisher
- Limit switches
- Brakes
- Lights
- Leaks

Equipment operators will possess the required training, certification, and licenses as required by law for the equipment that they are operating.

## Excavation and Trenching

**Florida soil shall be considered Type C**

Prior to any disruption of ground, excavation, or trenching on this project, the following will be performed:

- Skanska shall request locations for existing underground private utilities from the owner.
- Subcontractors shall notify public utility locating authorities.
- The subcontractor will identify the competent person and submit qualifications for review and approval by Skanska.
- The competent person will analyze the soil of the work area to determine the condition and type of soil to ascertain proper sloping or shoring requirements.
- An excavation permit (Appendix J or equivalent) must be completed and approved by a Skanska representative prior to breaking ground.

During excavation or trenching operations on this project, the following requirements will be followed:

- All trenches and excavations will be barricaded and signage posted at the work area.
- Fall protection shall be provided for excavations six feet or more in depth.
- Trenches or excavations will be sloped or benched in accordance with local rules and regulations, and as determined by the competent person.
- Supporting systems (i.e. shoring, piling, trench boxes, etc.) will be utilized for all trenches and excavations where sloping or benching could not be performed.  Manufacturer's tabulated data shall be available on project for all protective systems.
- Spoil piles and all other material will be placed a minimum of two feet from the edges of all trenches or excavations.
- When underground utilities are suspected, they will be located first by hand digging.
- Adequate access must be maintained at all times during trenching or excavating activities.  Access points will be placed such that no worker travels more than 25 feet in any direction.
- The competent person will inspect excavations and trenches at the beginning of each day before work begins and when conditions change.
- Excavations in Type C soil will not be benched.
- Excavations and trenches four feet or greater in depth will be evaluated for atmospheric hazards to determine whether permit required confined space requirements apply.
- A Professional Registered Engineer must design sloping, benching, and all protective systems in excavations over 20-feet in depth.

## Fall Prevention/Protection

**This project is committed to the philosophy of** 100% **continuous fall protection whenever workers are exposed to fall hazards of six feet (6') or greater.  A monitor system is not an acceptable form of fall prevention/protection on any Skanska project.  In the event any deviation from this fall protection procedure is required, the activity must be approved by the Environmental, Health and Safety Director and Account Executive.**

Skanska, subcontractors, vendors, or other third party individuals will take all practical measures to eliminate, prevent, and control fall hazards.  All work will be planned with the intent to eliminate identified fall hazards.

# SKANSKA

When a fall hazard has been identified and cannot be eliminated, then effective means of fall protection will be implemented.

Acceptable fall protection systems include the following:

- Guardrail systems
- Safety netting
- Covers for floor, roof and wall openings
- Positioning device systems
- Protection from falling objects
- Personal fall arrest systems

Workers exposed to fall hazards that cannot be eliminated will be equipped, trained and given periodic refresher training in fall protection to minimize the adverse effects of accidental falls. Fall protection training records shall be maintained on the project and available for review by Skanska.

**On this project,** 100% **Fall Protection means Protected from falls at all times when working at or above six feet. This is mandatory for all trades.**

Workers may work from ladders without personal fall protection when the following criteria are met with no exception:

- Working height does not exceed 6 feet
- Work can be performed without reaching (worker remains inside the area between the vertical side rails)
- Work does not involve working within 15 feet or above an open side, leading edge, or shaft, even if the edge has a proper guardrail.

Personal Fall Arrest Systems will consist of a full-body harness, double lanyard with shock absorbing device or retractable lifeline, locking snap hook and anchorage points meeting OSHA regulations and ANSI requirements.

Workers will not tie off to a perimeter cable or wire rope handrail.
When wire rope is used to construct guardrail systems, at least 3/8" diameter cable shall be used with cable clamps as required by wire rope manufacturers. Wire rope clips and turnbuckles manufactured in China will not be acceptable.

Cable handrail shall not have greater than of 3" of deflection and flagged every 6'

Subcontractors will submit all engineered documentation on horizontal lifelines and anchor points to Skanska for review and approval prior to use. All horizontal lifelines will be installed under the direct supervision of a qualified person.

The use of personal fall arrest systems requires the submission of a Rescue Plan for each condition.

Lanyards will not be tied back to themselves unless the lanyard is specifically manufactured to tie back to itself.

The use of knot(s) at the anchorage point of a vertical life line is prohibited. A knot anywhere in a fall protection system (vertical/horizontal lifeline or lanyard) is prohibited.

If any component of a guardrail system must be removed, a Skanska Guardrail Removal Permit must be issued (Appendix E or equivalent). Any contractor that must remove a fall protection system in the course of their work will be responsible for immediately replacing and restoring the protective system.

Floor openings two inches or greater in the least dimension and all wall openings will be guarded or covered with an appropriate cover or guardrail. Floor covers will be secured to the floor to prevent easy removal. The floor or wall cover will be properly marked with a Danger sign stating, "**Cover-Do Not Remove**."

Elevated work must have protection from falling objects if work is permitted below.

## Fire Protection/Prevention

<u>Fire Protection</u>

Temporary fire protection measures such as fire extinguishers, temporary hose lines, and temporary standpipes are required during construction.

The Project Team shall develop a Fire Protection Plan in accordance with OSHA 29 CFR 1926 Subpart F.

# SKANSKA

Fire extinguishers will be:

- Conspicuously located
- Certified annually and inspected monthly
- Protected from freezing
- Placed within the immediate area of any welding/cutting operation or flammable liquid storage area
- Placed within five feet whenever gasoline operated equipment is used

If a fire extinguisher is discharged for any purpose, it should be reported to Skanska.

Each temporary building and trailer (shops, field offices, storage boxes, etc.) will have its own appropriately sized and located class ABC fire extinguisher.

Access to fire hydrants and extinguishers will be maintained at all times.  Clear access to buildings and other structures will be maintained at all times.

<u>Fire Prevention</u>

Temporary buildings located within another building or structure shall be constructed of non-combustible material or have a fire resistance rating of one (1) hour.  Plastic tarps or covers (polyethylene) used for any purpose inside an occupied building or where welding, cutting, or open flame is present will be made of fire retardant material.

Combustible refuse from construction operations will not be burned or dumped anywhere on the construction site. Such refuse will be removed at frequent intervals, as needed.  Storage of large quantities of construction debris will be placed in metal dumpsters.

Storage of compressed gases will include:

- Valves, regulators and hoses removed with valve caps securely on.
- Secured upright at all times, including when transported in vehicles.
- Combustible materials and oxygen cylinders separated by a minimum of 20 feet.  Oxygen cylinders in storage shall be separated from fuel-gas cylinders or combustible materials (especially oil or grease), a minimum distance of 20 feet (6.1 m) or by a noncombustible barrier at least 5 feet (1.5 m) high having a fire-resistance rating of at least one-half hour.
- Empty cylinders stored separate from full cylinders.

Only approved high flash point solvents are to be used for cleaning purposes.

Oily rags and waste are to be stored separately in metal containers fitted with self-closing lids.  Trash and refuse must be placed in trash containers provided for this purpose.

<u>Fire and Flammable Liquid Storage and Dispensing</u>

**Methylene chloride** is a known carcinogen and solvents containing it are prohibited.

Flammable and combustible liquids will be stored, dispensed, and used in accordance with OSHA and NFPA requirements, and the following:

- When stored outside they cannot be within 20 feet of any structure or must be in a properly constructed storage locker whenever possible (no more than a total of 25 gallons flammable and combustible liquids can be stored outside of an approved locker).
- Stored in approved portable containers marked as to contents and ownership.
- Posted with "NO SMOKING" signs.
- Outside storage areas kept free of weeds and other combustible material.
- Storage of flammables will be in an enclosure away from open flame, heat, direct sun or other sources of ignition.

All storage tanks/drums will be placed in a berm or other secondary containment.  Berms will be lined with minimum 6-mil plastic sheeting that is fuel resistant.  PVC linings are not allowed.

# SKANSKA

Skanska will designate vehicle refueling locations and procedures.

Fuel and flammable liquid tanks, drums, or barrels will have the proper DOT placard and contents label.

All fuel storage tanks and compressed gas cylinders will be protected from vehicle traffic.

All fuel dispensing points shall be located away from storm drains and wetlands. The following is required:

- Portable 20 lb ABC fire extinguisher no closer than 25 feet or further than 75 feet from the fueling point
- No Smoking signs posted.
- The dispensing nozzle shall be an approved automatic closing type without a latch opening device.
- Spill kit stored nearby
- Tanks will be grounded and when dispensing flammable liquids, the containers will be bonded

## Hot Work

Hot work is defined as the use of open flames, other heat sources, and/or spark producing devices in areas where combustible or flammable materials are present and/or where there is potential for explosion or fire. Hot work activities include burning, welding, cutting, grinding or other operations that produce a flame, heat, or sparks.

When burning or welding using compressed gases, flame arrestors will be installed on both the torch side and regulator side of the oxygen and gas hoses.

Prior to performing "Hot Work" operations, workers will obtain a Hot Work Permit (Appendix H or equivalent) from Skanska.

A Hot Work Permit is valid only for the date and shift that is stated on the permit.

All precautionary measures listed on the Hot Work Permit must be followed.

Prior to performing any hot work, workers will be trained in the following:

- A review of the work to be performed
- Precautions to be taken
- Emergency procedure in case of fire
- How to use the fire extinguisher correctly

## Housekeeping

The Skanska policy on housekeeping is that all equipment, tools, and materials will be stored, stacked, or set up to prevent an incident or injury. The area will be a clean and orderly work place.

Project management, supervision, workers, vendors and third party persons will maintain all work locations in an orderly and clean manner at all times.

**Debris and loose material capable of causing damage to aircraft will not be placed or blown into any area where there are aircraft operations.**

Mud and dirt tracked onto public streets or alleyways will be removed continuously during the workday.

The following are the minimum housekeeping requirements for this project:

- Access walkways, roadways, and fire lanes will not be blocked.
- Electrical extension cords, light stringers, air hoses, and welding leads will be elevated above walkways a minimum of seven feet or the area marked with signage stating: **"Trip Hazard"**
- Welding rods, nuts, bolts, and washers will be kept in proper containers.
- Shackles, slings, chokers, ladders, and safety equipment will be removed from the work area when not needed and properly stored.
- Trash containers will be placed at appropriate locations.
- All nails will be removed from scrap and form lumber and swept up daily.
- Rubbish, trash, and debris will be removed from the work area daily.

# SKANSKA

---

Subcontractor shall provide continuous/progressive cleanup necessitated by its operations including daily sweeping of all work areas.

Skanska may require the subcontractor to provide one employee for every ten workers, to be dedicated to housekeeping tasks.

Subcontractor shall provide adequate brooms, shovels, mobile trash containers, carts, buggies, and other cleaning equipment to support the quantity of trash and waste generated by the Work.  All trash and debris shall be deposited in the designated dumpsters on a daily basis

## Infection Control

It is important to control the risk of infection and disease when performing construction, demolition and/or renovation in a health care environment.

The client Infection Control procedure will be followed.  The client is responsible for assigning the Risk Group for the designated work area and developing the work procedure and restrictions.

Work procedures and restrictions may include structure height, temporary partitions, debris and material routing, use of negative or positive air pressure, tack and walk-out mats, covered trash bins, etc.

Skanska is responsible to monitor all work in the designated work area to ensure work procedures are followed and maintain inspection and negative pressure logs.

The following matrix can be used as an example of how hospitals determine risk level of work:

| Type of Construction Activity | |
|---|---|
| Type A | Inspection and Non-Invasive Work<br><br>Includes but not limited to:<br>• Temporary removal of no more than six ceiling tiles for inspection or minor repair<br>• Painting (but not sanding)<br>• Wall covering, electrical, trim work, minor plumbing, and activities which do not generate dust or require cutting of walls or access to ceilings other than for visual inspection |
| Type B | Small-scale short duration activities (minimum dust)<br><br>Includes but not limited to:<br>• Installation of telephone and computer cabling<br>• Access to chase spaces<br>• Cutting of walls or ceiling where dust migration can be controlled |
| Type C | Work that generates a moderate to high level of dust or requires demolition or removal of any fixed building component or assemblies<br><br>Includes but not limited to:<br>• Sanding walls for painting or wall covering<br>• Removal of floor coverings, ceiling tiles and casework<br>• New wall construction<br>• Minor duct work or electrical work above ceilings<br>• Major cabling activities<br>• Any activity that cannot be completed within a single work shift |
| Type D | Major demolition and construction projects<br><br>Includes but not limited to:<br>• Activities which require consecutive work shifts<br>• Requires heavy demolition or removal of a complete cabling system<br>• New construction/renovation |

# SKANSKA

| Patient Risk Group | | | |
|---|---|---|---|
| Non-Patient Care Areas | Patient Care Areas | | |
| Offices<br>Public hallways | Cardiopulmonary<br>Echocardiography<br>Outpatient Services<br>Nuclear Medicine<br>Rehabilitation<br>Radiology/MRI<br>IMC<br>Emergency Department | Labor & Delivery<br>Laboratories<br>Newborn Nursery<br>Pediatrics<br>Pharmacy<br>Orthopedics<br>Neurosurgery<br>CCU<br>Burn unit<br>Any area caring for immuno-compromised | ICU<br>CVICU<br>Surgery<br>Cardiac Cath Lab<br>Oncology<br>Dialysis<br>Negative Pressure Rooms<br>PACU<br>CVOR |

| Class of Precaution | | | | |
|---|---|---|---|---|
| Patient Risk Group | Type Of Construction Activity | | | |
| | Type A | Type B | Type C | Type D |
| Non-Patient Area | Class I | Class II | Class III | Class III |
| Patient Care Area | Class II | Class III | Class IV | |

Once the Class of Precaution has been determined, the following precautions shall be taken to ensure adequate infection control:

| Precautions for Infection Control | | |
|---|---|---|
| Type Class | During Work | Upon Completion of Work |
| Class I | Minimize dust<br>Immediately replace all ceiling tiles displaced for visual inspection | Clean work area |
| Class II | All Class I requirements<br>Prevent airborne dust from dispersing into atmosphere<br>Water mist working surface to control dust<br>Seal unused doors with tape<br>Block off and seal air vents<br>Dust mat at entrance and exit of work area<br>Remove or isolate HVAC system in area where work is being performed | All Class I requirements<br>Wipe work surface with disinfectant<br>Contain construction waste and transport in tightly covered container<br>Wet mop/vacuum with HEPA filter<br>Remove isolation of HVAC |
| Class III | All Class I and II requirements<br>Complete critical barriers (sheetrock, plywood, plastic) to seal area from non-work area<br>Maintain negative air pressure with work area using HEPA filtration<br>Contain construction waste in tightly covered container | All Class I and II requirements<br>Remove barriers only upon completion of work<br>Remove barrier carefully to minimize dust<br>Wet mop area with disinfectant |
| Class IV | All Class I, II, and III requirements<br>Seal holes, pipes, conduits, and punctures appropriately<br>Construct decontamination room and require all workers to be decontaminated with HEPA vacuum prior to departing the work area | All Class I, II, and III requirements |

   FL SHMP REV: 16/July/2014

# SKANSKA

---

## Ladders and Stairways

**Ladders Last**

Prior to beginning work, the subcontractor shall evaluate all tasks that require individuals to work at elevated heights. It is the expectation that these tasks will be performed using methods other than a ladder. Use of portable scaffold devices, scissor lifts, scaffold towers, podium/platform ladders (acceptable only with the top rail at least 30" above the platform), liftpods, etc. shall be the preferred method to perform work at heights.

Ladder use will be allowed only when it has been determined by the subcontractor in conjunction with the Skanska Project Superintendent that it is unfeasible to use all other options to complete the task.   If it is determined that a ladder must be used the following shall be followed:

      (1)  The subcontractor shall complete the Skanska Ladder Authorization Permit (LAP) and submit it to the Skanska Project Superintendent and/or Skanska EHS Management for approval.

      (2)  Skanska will enter the LAP request information in the Ladder Authorization Log (LAL).

      (3)  Once the LAP is approved by Skanska the subcontractor must ensure the LAP is attached to the ladder.

      (4)  Workers must maintain three points of contact at all times when working from a ladder.

      (5)  When working at a height greater than twelve (12) feet, 100% fall protection is required.

Upon completion of the task, the LAP must be immediately returned to Skanska.   The date and time of the returned LAP shall be noted on the LAL.

**Fall protection while working from a ladder is addressed in the Fall Prevention/Protection section.**

Stairways having four or more risers or rising 30 inches or more shall have a stair rail system 36 inches high on each unprotected side.

Metal pan stairs shall not be used until the pans are filled to prevent a tripping hazard.

Ladders, stairs, or ramps will be provided where there is a change in elevation of 19 inches or greater.

Workers will be trained on the safe use of ladders.

Ladders are required to ascend or descend truck beds and/or trailers.

Ladders will extend past the bearing point no less than 36 inches.

Ladder landings shall remain clear of all obstacles and obstructions to allow safe access and egress.  Each contractor is required to inspect ladders daily prior to use.  Ladders with broken or bent rungs, steps or side rails will be immediately destroyed and removed from the project.

When ladders are used to access upper levels, they must be secured to prevent displacement and extend a minimum of 36 inches above the upper landing surface to which the ladder is used to gain access.

Aluminum ladders are not allowed.

All ladders will be heavy-duty type with a minimum capacity rating of 250 lbs.

Stepladders

Stepladders will not be used as straight ladders.

Stepladders will only be used with the spreader bars fully extended and locked in place.

Workers will not stand on the top or top step of a stepladder.

Workers will not straddle the top of a stepladder

Workers will not stand on the back of a stepladder unless designed for this use.

Straight/Extension Ladders

Ladders will be set up so the horizontal distance at the bottom is not less than ¼ of the vertical distance to the bearing point.

                    **FL SHMP REV: 16/July/2014**

# SKANSKA

Workers will not stand on the top three rungs of a straight ladder.  No worker will work when his/her knees are above the top of the ladder.

All straight ladders will have non-skid feet at the base.

<u>Job Made Ladders</u>

Job-made ladders shall be constructed for intended use.  If a ladder is to provide the only means of access and egress from an elevated working area for 25 or more employees, or simultaneous two-way traffic is expected, a double cleated ladder shall be installed.

Job-made ladders will be constructed in accordance with OSHA and ANSI standards including the following:

A competent person who has been designated by the job superintendent will build job made ladders.

Single-Cleat Ladder:

- For use by 24 or fewer employees, shall not exceed 30 feet in length;

- Width shall be 15 to 20 inches at the top, side rails shall be parallel or flared top to bottom not more than ¼ inch for each two feet of length; and

- 2 x 4 inch lumber shall be used for side rails up to 16 feet long; 2 x 6 inch lumber shall be used for ladders 16 to 30 feet long.

Double-Cleat Ladder:

- For use by 25 or more employees or for two-way traffic; shall not exceed 24 feet in length; and

- Side and middle rails shall be 2 x 4 inch lumber up to 12 feet in length; 2 x 6 inch lumber from 12 to 24 feet in length.

Cleats:

- Shall be set into the edges of the side rails ½ inch, or have filler blocks placed between them;

- Shall be secured with three (3) 10d common wire nails (or equivalent).  Double headed nails will not be used;

- Shall be spaced 12 inches top to top; and

When using ¾ inch thick cleats, the width shall be determined by the length of the cleat as shown below:

| Length of Cleat (inches) | Width (inches) |
|---|---|
| Up to and including 20" | 3 ½ |
| Over 10" and up to and including 30" | 3 ¾ |
| **Wood Materials Acceptable for ¾" Thick Cleats** | |

| | | | |
|---|---|---|---|
| Oregon Ash | Rock Elm | Western Larch | White Oak |
| Pumpkin Ash | Soft Elm | Locust | Pecan |
| White Ash | Hackberry | Hard Maple | Persimmon |
| Beach | Hickory | Red Maple | Southern Yellow Pine |
| Birch | Holly | Red Oak | Tamarack |

## Lasers

Precautions will be taken to ensure all workers that use lasers are trained in proper use and the hazards associated with lasers.

No worker will install, adjust, or operate any laser equipment without a valid qualification card, which the worker must have on their person.

# SKANSKA

Standard laser warning signs will be placed around the perimeter of the area where the laser is being used.

No laser equipment will be used that does not contain a label indicating make, maximum output, and beam spread.

Whenever a laser is not in use, shutters or caps will be used and the laser turned off.

When performing internal alignment, lasers will only be guided by mechanical or electronic means.

No laser beam will be directed at any worker.

When environmental conditions exist such as rain, fog, snow, or extremely dusty conditions, use of lasers will not be permitted.

Workers using lasers will use appropriate eye protection.

## Lead

When welding, cutting, burning, grinding, chipping, abrasive blasting, rivet busting, or otherwise disturbing painted or coated surfaces, a pre-assessment will be required to determine if the surfaces contain lead-based paint.  If bulk sampling results for paint are positive for lead, OSHA Standard 29 CFR 1926.62 will be followed.

An initial hazard assessment is required and will be performed to determine worker exposure levels.  The assessment will involve personal air sampling of a representative group of workers performing different tasks unless historical data is available.  During the initial exposure assessment, workers will wear protective clothing and the proper respiratory protection until the results of the assessment are known.

Copies of sampling results will be made available to Skanska and all affected employees.  Each worker is to be notified in writing of their blood and/or personal monitoring results within five working days after the results are known.

Area sampling results from a work area will not be used for determining worker exposure levels.

If sampling results indicate the exposure limits are above 30 $\mu g/m^3$ but below 50 $\mu g/m^3$, the following are required:

- Written compliance plan
- Medical surveillance (blood lead)
- Personal air monitoring
- Hazard communication training for lead

If sampling results are above 50 $\mu g/m^3$, the following are required:

- Written compliance plan
- Engineering controls
- Respiratory protection
- Protective clothing
- Medical surveillance
- Clean change rooms and showers
- Clean lunchrooms
- Warning signs
- Training

Barricades, enclosures, wet methods, HEPA vacuums, track mats, ventilation, and good housekeeping protocols shall be provided to ensure the protection of all workers, members of the public, and building occupants, regardless of lead levels.

When installing lead back drywall, a pre-assessment will be required to determine if the installing methods used create excessive lead dust.  If bulk sampling results (must be conducted within the past year) for dust is positive for lead, the following procedures will be used.

If sampling results indicate the exposure limits are above 30 µg/m$^3$ but below 50 µg/m$^3$, the following are required:

- Written compliance plan
- Medical surveillance (blood lead)
- Disposal
- Personal air monitoring

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

- Hazard communication training for lead

## Lockout/Tagout

The Project Team will establish a lockout/tagout procedure to ensure that workers are not exposed to the hazards from moving machinery or equipment and those hazards posed by an energized source (pneumatic, steam, hydraulic, electrical, chemical, etc.).

Safety locks and tags will be applied to all circuits, switches, valves, isolating devices, and any other energy sources to ensure equipment, machinery, or processes that have been considered functioning, charged, or could otherwise be operable have been rendered non-operational or de-energized.

Pay particular attention to the last step in locking out equipment – verify that the residual and stored energy has been released. Remember – Lock Out, Tag Out, and then Try Out.  Be aware of residual energy.

No person will remove another worker's safety lock or attempt to energize any piece of equipment, machinery or process that has been locked out and tagged.

Appendix O or its equivalent shall be completed prior to beginning any work activity involving lockout/tagout procedures.

# SKANSKA

---

<u>De-Energizing Equipment and Processes</u>

A Skanska representative will coordinate with the operating facility representative and/or construction start-up group when any energized equipment or process must be de-energized.

The Skanska representative and operating facility representative and/or construction start-up group will identify all circuits and sources of energy that require locking and tagging to make the equipment or process inoperable. The operating facility representative/construction start-up group will notify their personnel that may be affected by the de-energizing. The first-line supervisor overseeing the work will sign out sufficient safety locks to lockout the piece of equipment or process.

The following procedures shall be followed:

1. The operating facility representative and/or construction start-up group and first-line supervisor(s) will make certain the operating controls to the equipment, machinery or process are in the "off" or "neutral" position.
2. Once the operating controls are in the "off" or "neutral" position, the operating facility representative will place a safety lock and tag on the energy isolating device(s) first.
3. The first-line supervisor(s) will apply their safety lock to each of the isolating devices that provides power or other energy to the machinery, equipment or process. The first-line supervisor(s) will also apply a visible warning tag, which will contain the name of the first-line supervisor(s), company, date and phone number.
4. Once the first-line supervisor(s) have placed their safety lock(s) and tag(s) on the energy-isolating device, all affected workers will then apply a safety lock and tag to the energy-isolating device. Alternatively, the first-line supervisor may place the key(s) to their equipment safety lock(s) in a safety lock box, place their individual safety lock and tag on the safety lock box, and then have each affected worker place their safety lock and tag on the lock box.
5. Prior to any work being performed on the piece of equipment, machinery, or process, the operating facility representative/construction start-up group and first-line supervisor will verify that it is inoperable. The operating facility representative/construction start-up group will attempt to operate the piece of equipment machinery, or process. After verifying it is inoperable, the switch will be returned to the "off" or "neutral" position.

Stored or residual energy will be dissipated by whatever means are necessary. Capacitors will be discharged and high capacitance elements short-circuited and grounded by a qualified electrician.

<u>Re-Energizing Equipment and Processes</u>

When the required work is completed and the machinery, equipment or process can be returned to service, the first-line supervisor will contact the operating facility representative/construction start-up group to notify of completed work operations.

The first-line supervisor will make a visual inspection of the equipment, machinery, or process to insure all workers have completed their work and equipment, tools and other material is removed from the area.

After confirming all workers, materials, tools and other equipment are out of the area, the operating controls are still in the "off" or "neutral" position, and each worker has removed their safety lock and tag, the first-line supervisor will remove their safety lock and tag from each of the isolating devices.

If a worker fails to remove his or her safety lock at the completion of the job or assigned duties, their immediate supervisor will immediately notify management and the Skanska Environmental Health and Safety Department. **Every attempt should be made to contact the worker and require them to return to the project to remove their lock.** If the worker is unwilling or cannot return to the project, it must be verified that he/she is not physically at the project site before the safety lock can be removed. All safety lock removal incidents will be investigated following the incident investigation process and disciplinary action will occur.

The management representative will notify the operating facility representative/construction start-up group that the equipment, machinery or process is clear to be energized.

**SKANSKA**

---

De-Energizing Fluid Processes

Any vessel, pipe, hose or process that contains a hazardous liquid or gas will be purged with nitrogen or flushed before work begins as described in the pre/post-task plan for the activity.

A management representative will coordinate with operating facility representative/construction start-up group when any fluid process requires de-energizing.

The management representative and operating facility representative/construction start-up group will identify all valves or gates and where blanks are required to be installed to isolate the work area. The operating facility representative/construction start-up group will notify their personnel that may be affected by the de-energizing.

The first-line supervisor overseeing the work will sign out sufficient safety locks and tags to completely isolate the system.

The operating facility representative/construction start-up group and first-line supervisor will verify that each valve or gate is in the "off", "neutral," or closed position.

Once the valve or gate is in the "off", "neutral," or closed position, the operating facility representative will place a safety lock on the valve or gate first. Then the first-line supervisor will apply a safety lock to each valve or gate. The first-line supervisor will also apply a visible warning tag with the name of the first-line supervisor, company, date and phone number.

Once the first-line supervisor has placed their safety lock(s) and tag(s) on the energy-isolating device, all affected workers will then apply a safety lock and tag to the energy-isolating device. Alternatively, the first-line supervisor may place the key(s) to their equipment safety lock(s) in a safety lock box, place their individual safety lock and tag on the safety lock box and then have each affected worker place their safety lock and tag on the lock box. The required blanks will be placed at this time.

Prior to commencing work, the operating facility representative and first-line supervisor will verify the system and all piping, hoses, valves and processes are de-energized and that any stored energy is dissipated or restrained.

Welded valve connections should have the valve handles removed and the stem tagged "**Do Not Operate**." All other valves and isolating devices must be physically prohibited from being operated.

Hydraulic and pneumatic equipment or machinery will be blocked to prevent movement.

Re-Energizing Fluid Processes

When the required work is completed and the system can be returned to service, the first-line supervisor will contact the operating facility representative/construction start-up group to notify them of completed work operations.

The first-line supervisor will make a visual inspection of the area to ensure all workers; equipment, tools, and materials are removed from the area.

After confirming all workers, equipment, tools and materials are removed from the area, the valves and gates are in the "off", "neutral," or "closed" position, and each worker has removed their safety lock and tag, the first-line supervisor will remove their safety lock and tag from each of the isolating devices.

The management representative will notify the operating facility representative/construction start-up group that the system is ready to be energized.

## Masonry Construction

**Control measures for concrete dust are addressed in the Silica section**

A limited access zone is required to be in place prior to the construction of any masonry wall.

Masonry walls over eight feet in height shall be adequately braced to prevent collapse and bracing shall remain in place until permanent support is in place.

Masonry saw cutting requires wet cutting to eliminate silica exposure (no electric saws for portable saw cutting).

# SKANSKA

## Mold Control

All work areas must be maintained to prevent the formation of mold, which grows when there is water and a nutrient source (i.e. wallboard, wood, and/or other building material).

Work will be planned to:

**Prevent moisture accumulation**

Double check points where moisture may enter:

- Doors
- Windows
- Flashings and caulking

- Waterproof membranes (proper lapping at joints and corners)
- Roofing systems and penetrations

**Properly store material**
- Dry location
- Off the ground

- Loose tarps or sheets to allow air flow

**Have drying equipment readily available**
- Fans
- Dehumidifiers

- Wet-dry vacuum

If mold is observed, notify Skanska so that an evaluation of the exposure can be done and an abatement plan developed.

## Personal Protective Equipment (PPE)

All Skanska, subcontractors, vendors, and third party individuals will at a minimum wear the following personal protective equipment while on this project (except in office and lunch areas).

Head Protection

Hard hats will be worn at all times on this project, in accordance with the following:

- Hard hats will be worn according to manufacturer requirements.

- Employee and Company name displayed on hardhat

- Hardhats that have a manufacturer date of five years or greater will not be worn

- Meets ANSI Z89.1 requirements

Eye and Face Protection

Eye and face protection safety glasses with side-shields that meet ANSI Z87 criteria are to be worn at all times. Prescription glasses must meet ANSI Z87 requirements or employees will be required to wear "over the glasses" (OTG) safety eyewear.  Dark lenses are prohibited indoors.  ANSI indoor/outdoor lenses are approved for indoors.

In addition, the following eye/face protective equipment must be used when performing the following work activities:

| Activity | Safety Equipment |
|----------|------------------|
| Welding | Welding Hood and safety glasses |
| Burning | Burning Goggles with Shield |
| Abrasive grinding or cutting | Face Shield and safety glasses |
| Drilling | Goggles or Face Shield and safety glasses |
| Reaming | Face Shield and safety glasses |
| Chemical Handling | Goggles and Face Shield |
| Molten Materials | Goggles and Face Shield |
| Corrosive Liquids | Goggles and Face Shield |
| Concrete Pouring | Safety glasses with side shields |

# SKANSKA

## Foot Protection

Sturdy work boots that are in good condition must be worn (heel and sole will not show excessive wear). Tennis shoes, sandals, or other street-type shoes are not allowed, even if they have steel toes.

## High Visibility Attire

Every worker, visitor, and vendor will wear high-visibility attire, as determined by the Skanska Project Team at all times.  ANSI reflectivity requirements must be met when working in traffic and/or at night.

## Work Attire

Shirts will have a minimum sleeve length of three (3) inches.  Tank tops and cut-off shirts are not permitted.

Long trousers that fit properly around the waist and ankles are required.  Trousers that are worn low on the hips or thigh are not allowed.  The length of the trouser will be such as to not present a tripping hazard.  Shorts are not permitted.

## Respiratory Protection

A competent person will determine if a hazard exists that requires respiratory protection prior to start of work. Written documentation supporting this hazard assessment will be made available to Skanska upon request.

Whenever respiratory protection is deemed required or requested by a worker on this project, the requirements outlined in OSHA 29 CFR 1926.103 will be followed, which include:

1. Have workers complete a Medical Questionnaire for Respirator Use.
2. Submit questionnaires to a physician or Licensed Health Care Professional (PLHCP) for review and further testing.
3. Once medical approval to wear a respirator is received from the PLHCP, select the appropriate type of respirator to protect workers from the hazard(s).
4. For air purifying respirators, choose the appropriate filter/cartridge.
5. For supplied air respirators, ensure breathing air source provides "Grade D" breathing air.
6. Train workers about the specific type of respirator being used.
7. Fit-test the workers with the specific type of respirator being used.

If a worker decides to voluntarily wear a filtering face piece (dust mask) and a respirator is not required, the first-line supervisor must inform the worker about the limitations of the selected respirator.  The worker must complete, sign, date, and submit the "Voluntary Use of a Disposable Respirator" form (Appendix N) or its equivalent.

## Hearing Protection

Approved hearing protection will be worn as specified in posted areas and while working with or around high-noise level producing machines, tools, or equipment.  A good rule to follow is: When you must raise your voice to be heard, you need hearing protection.  Exposure to impulsive or impact noise will not exceed 140dB noise level.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

The following permissible noise levels, per OSHA 29 CFR 1926.52, should not be exceeded:

| Hours per day | Sound Level DBA Slow Response |
|---------------|------------------------------|
| 8 | 90 |
| 6 | 92 |
| 4 | 95 |
| 3 | 97 |
| 2 | 100 |
| 1 ½ | 102 |
| 1 | 105 |
| ½ | 110 |
| ¼ or less | 115 |

| Impulsive Or Impact Noise | |
|---------------------------|----------------------|
| Equipment or tools | Sound Level Created* |
| Pneumatic chip hammer | 103-113 |
| Jack hammer | 102-111 |
| Concrete joint cutter | 99-102 |
| Chop saw | 88-102 |
| Stud welder | 101 |
| Bulldozer | 93-95 |
| Crane | 90-96 |
| Hammer | 87-95 |
| Backhoe | 84-93 |
| * based on an 8 hour exposure | |

Hand Protection

All personnel on the project shall wear gloves at all times.  Each task shall be analyzed to determine the appropriate cut level of glove that is required.  Specialty gloves may be required for handling sharp materials, chemicals, electrical work, etc.

Specific tasks requiring high dexterity may be exempt from the requirement if agreed upon in advance by Skanska Supervision in conjunction with Skanska EHS.  These exempt employees shall have gloves on their person at all times.

This policy applies to all craft workers, supervisors, managers, visitors, vendors or any other individual onsite.

Additional Protections

Skanska may require workers to wear additional personal protective equipment to reduce the likelihood of a work related injury or illness.

## Pile Driving

No pile driving work will occur until it is verified that no underground utilities exist where piles will be driven or existing underground utility locations have been verified by hand or vacuum excavation.

Fall protection will be required when personnel climb leads over six feet.

Hose connections will be secured by at least ¼ inch diameter chain or equivalent wire rope to prevent whipping.

Stirrups will be provided on sheet piling to aid in guiding the pile in place.

For pile other than sheet piles, a driving head or bonnet is required to bell the head.

Stop blocks are required for the leads to prevent the hammer from striking the head block.

A designated signal person will be assigned to give direction to the winch-men.

Equipment will meet the OSHA Construction standards on cranes and derricks.

Pits or excavations that piles are being driven into shall be properly braced, sheet-piled, or sloped and barricades shall be provided.

When pile tops are cut, operations will stop for a distance not less than the longest pile that is to be cut.

When driving jacked piles, the pits will be provided with ladders and curbs to prevent material from falling into the pit.

# SKANSKA

---

## Precast Concrete

A competent person will be responsible for the inspection of all rigging and hardware and the supervision of the rigging of precast concrete members.

Unloading of Precast Concrete Members

Prior to precast concrete members being unloaded, the following will occur:

- Inspect all rigging and hardware
- Ensure load is stable before releasing binders
- Ensure precast member is properly rigged
- Prohibit use of shakeout hooks

Placement of Precast Concrete Members

Precast members are not to be moved over other workers

Workers involved in the setting or connecting of precast members will strictly adhere to the 100% fall protection policy with no exception.

No worker will use their hands to reach under a precast member to adjust a shim or bearing pad.

Post-tensioning Operations

No worker, except those essential to the post-tensioning operation, will be permitted behind the jack.  Warning signs and barriers will be erected to limit access to the post-tensioning area during post-tensioning operations.

## Rigging

Riggers must be qualified to rig material or equipment lifted by a crane.

Hooks will be equipped with safety latches.  Safety latches on hooks that are disabled and/or shakeout ("pelican") hooks will not be used unless in compliance with 29 CFR 1926 Subpart R.

All rigging equipment and spreader bars shall have a manufacturer's tag or otherwise professionally engineered mark noting its safe working load.  Rigging equipment and spreader bars not tagged or marked will be immediately removed from the project.

All rigging will be inspected daily before each shift by the qualified rigger and documented in writing. Inspection reports will be made available to Skanska upon request.

## Scaffolding

All scaffolding used on this project will meet the requirements established in Subpart L of OSHA 29 CFR 1926.

Each contractor using scaffolds must designate a competent person to direct and supervise the erection and dismantling of all scaffolding on this project.  The competent person will sign and attach one of the following color-coded scaffold tags to each scaffold (Tagging applies to all types of scaffolds):

- **Green Tag: Scaffolding complete and ready for use.**
- **Red Tag: Scaffolding incomplete and not for use.**
- **Yellow Tag: Scaffolding usable but personal fall protection required**

The competent person will inspect the scaffolding daily prior to use and sign the tag at the time of inspection. Deviations from Skanska's scaffold safety requirements require approval of a Skanska representative.  The Daily Scaffold Safety Inspection Report (Appendix L) will be used to document these inspections.

Workers required to work from scaffolding will receive training on the following:

- Nature of any known hazards, such as electrical, fall, or falling objects.
- Correct method of erecting, maintaining, and disassembling fall protection systems.
- Falling object protection system.
- Proper handling of equipment or material on the scaffold.

# SKANSKA

- Maximum load-carrying capacity of the scaffold.
- Any other pertinent requirements about the scaffold.

During erection and dismantling of scaffolding, if deviation from the fall protection procedure is required, the Environmental Health and Safety Director and Account Manager will be required to approve.

Documentation of scaffolding training shall be submitted to Skanska prior to commencing work **prior** to erection, all scaffolding components shall be inspected for defects and any damaged components will not be used.

Scaffolding will be erected on a firm foundation/footing.  Scaffold poles, legs, posts, frames, and uprights will bear on metal base plates, and mud sills

Scaffold legs, poles, posts, frames and uprights will be pinned or locked to prevent uplift.

No scaffold will be enclosed unless a qualified engineer designs and approves the attachment to the adjacent structure

Scaffold platforms will be constructed with no space between the platform components.  The space between the platform components and the scaffold uprights will not exceed one inch.

Because of special circumstances such as building a scaffold around a pipe, the space opening between the scaffold and the object/structure cannot exceed 9½ inches.

Scaffold planks shall extend past the horizontal support a minimum of six inches and not more than 12 inches unless cleared or restrained by hooks.

Scaffold plank will not be overlapped unless:

- Overlap occurs at a horizontal support
- The minimum planking overlap is 12 inches

Only scaffolding-grade planking shall be used.

Ladders or stairs must be used to access any scaffold platform that is more than two feet above or below the point of access.  End frames of tubular welded scaffold can be used as a ladder if the following criteria are used:

Specifically designed and constructed as ladder rungs

- Spacing between rungs not to exceed 16 ¾ inches
- A walk through frame or gate is provided for access at each landing
- No worker will climb up or down a scaffold using the cross bracing.

Workers working below scaffolding will also be protected from falling objects. Scaffold will be equipped with toe plates, screening, debris netting, catch platforms, or a canopy structure.

Aerial Lifts

The gates of aerial lifts will be properly engaged whenever the lift is in use.

Travel in aerial lifts is prohibited while platform is elevated

Aerial lifts shall not be used as material hoists unless the load is contained within the basket and meets the lift's rated capacity.  The lift shall not be modified for hoisting material unless the manufacturer approves it in writing.

Use proper fall prevention/protection in accordance with manufacturer's requirements in all boom supported elevating work platforms.

Personal fall arrest system shall be used in scissor lifts.  Scissor lifts must be equipped with manufacturer approved fall arrest anchorage points.  Consideration shall be given to prevent workers in the event of a fall from coming in contact with the ground or objects below the lift.  Examples of equipment that meet this requirement would be a 3 foot – 4 foot positioning device or a retractable lifeline.

- All scissor lifts will be included with manufacturer installed tie off points independent of the guardrail and be fully compliant with federal and state OSHA requirements.
- Specific documented pre/post-task plans must insure any person using a personal arrest system must fully understand the difference between fall arrest and fall restraint.

# SKANSKA

- No scissor lifts without an approved tie off point will be allowed on the project.
- Lanyard lengths must be put in place that ensures it is a restraint device.  Meaning, that it must prevent the individual from being able to stand on the mid rail.
- The best location for the anchor point is the floor of the scissor lift, any deviation from a floor location, requires the manufacturer's written verification that the tie off point provided meets or exceeds any statutory requirement.

Suspended Scaffolds

A competent person will evaluate suspended scaffolding, anchorages, and suspension lines before each use.

Workers working from suspended scaffolding will wear a full body harness attached to an independent vertical lifeline.

When welding is required from swing stage scaffolding, the scaffold will be grounded and suspension ropes protected.

The use of knot(s) at the anchorage point of a vertical life line is prohibited.  A knot anywhere in a fall protection system (vertical/horizontal lifeline or lanyard) is prohibited.

Mobile Scaffolds

Interior or dry wall scaffolding (Perry or Baker type scaffolding) greater than one section high will be equipped with outriggers and guardrail systems. All other built-up scaffolding will follow the four to one rule.

Folding/"Handy Roll Scaffolding"/paper hanger type scaffolding is prohibited unless authorized by a Skanska representative.

Wheels on mobile scaffolding will be locked in place when workers are working from it (self propelling is prohibited).

Scissor lifts shall be used in accordance with 29 CFR 1926.452 (w). The procedures outlined in the manufacture's operations manual must be followed when using a scissors lift.  If non-typical situation arises where work must take place on or outside the basket then variance must be applied for through OSHA or proper state authority.

Mast-Climbing Work Platforms (ANSI A92.9-1993)

An erection and dismantling plan shall be provided by the manufacturer and submitted to Skanska prior to mobilization.

Fall protection shall be provided when wall openings exist on the façade of the building in front of the work platform, the distance to the façade exceeds that permitted, the platform passes an in-set in the façade or it extends past the façade.

In accordance with ANSI requirements, unless the scaffold is equipped with an emergency decent device an evacuation plan from the platform must be developed.

Building access is prohibited underneath scaffold platforms unless protective walkway is provided.

System specific training must be provided to all workers who will be on the work platform.

Stilts

Use of stilts requires the use of a Daily Stilt Permit (Appendix AB)

# Silica

Workers that perform any of the following work tasks must be protected from exposure to silica dust unless historical data or real time air monitoring indicates it isn't necessary:

- Chipping, hammering, or mixing of refractory
- Abrasive blasting using silica sand as a blasting medium
- Abrasive blasting of concrete regardless of the type of medium

# SKANSKA

- Sawing, hammering, drilling, grinding, or chipping of concrete or masonry products
- Chipping, hammering, or mixing of concrete grout
- Demolition of concrete or masonry structures
- Concrete mixing activities
- Dry sweeping or compressed air blowing of concrete, masonry, rock, or sand dust

Workers performing any of the above tasks who could be exposed to silica dust shall receive training regarding health hazards associated with silica.

Acceptable engineering controls, such as those listed below, will be used when exposure to silica is likely.

- Substitute blasting medium for less hazardous material with less than 1% silica
- Maintain an effective dust control program
- Use internal blast-cleaning machines
- Wet Saw
- Use water through the drill stem

When acceptable engineering controls cannot be used, workers will wear respiratory protection, protective coveralls, and gloves.  At a minimum, respirators must be half-face piece negative pressure respirators with N95 filters, per NIOSH recommendations.

Workers will also comply with these hygiene requirements when exposed to silica:

- No eating, drinking, or using tobacco products in areas where silica dust is present.
- Always wash hands and face before eating, drinking, or using tobacco products after working around silica dust.

## Steel Erection

No steel erection will begin without a written Notice to Commence Steel Erection (Appendix K) from Skanska.

Workers engaged in steel erection activities including but not limited to connecting, decking, and bolt up are _not exempt_ from Skanska's 100% fall protection requirements when working from six feet or greater.

Perimeter safety cable installed by steel erector will remain in place unless otherwise instructed by Skanska.

Training records indicating workers have received required steel erection and fall protection training will be maintained at the project and available for review by Skanska.

All steel deliveries will be coordinated with the Skanska Project Team to ensure traffic around the project is controlled.  No deliveries shall be unbound until inspected and deemed secure by a qualified person.

Design criteria for any multi-lift device must be available for review by the Skanska.

Work will be planned that no load will be swung over the public, other workers, or occupied structures. Exceptions must be reviewed and approved by Skanska.

During bolt-up activities all steps will be taken to protect workers below from falling objects.

## Temporary Barricades

Temporary barricades will be erected to warn or protect workers whenever hazards or processes, such as those listed below, are encountered on this project.

- Floor or wall openings
- Working above other workers
- Open excavations/trenches
- Unguarded equipment
- Overhead loads
- Closed stairwells
- Exposure to vehicular traffic
- Low light work areas
- Startup operations and testing of equipment/systems
- Process hazards such as discharges, open systems, etc.

# SKANSKA

When barricading is required, the following guidelines should be followed:

- **Yellow "Caution" tape** is used to limit the passage of workers through the barricaded area. This barricading should only be used to protect workers from hazards that are not severe or the potential for severe injury or death is unlikely.
- **Red "Danger" tape** is used to prohibit the passage of unauthorized workers through the barricaded area. This barricading should be used to protect workers from hazards that have the potential to cause serious injury or death. Danger tape is not to be used if the hazards cannot be eliminated or removed during a single work shift.
- **Rigid barricades** are used when protection is required beyond a single work shift. They will be used to protect workers from unguarded moving machinery/equipment, vehicular or heavy equipment traffic, and low light conditions. Rigid barricading will consist of standard guardrail, temporary chain link fencing, tube and coupler scaffold members with blue construction fencing attached and concrete barriers.
- **Radiation "Danger" Tape** is used to identify x-raying operations and warn of a radiation hazard in the area.

When using "Caution" or "Danger" tape barricading:

- Install at least six feet from excavations, trenches.
- Reinforced "Danger" tape or ¼ in high visibility rope at least six feet back from edge shall be used for holes, leading edges, and floor or wall openings. A hard barricade is preferred.
- Install a standard "Caution" or "Danger" sign that identifies the hazard at regular intervals around the barricaded area and the name and contact information for the individual who erected the barricade
- Do not impede stairs, walkways, driveways, or aisles without notifying Skanska and identifying alternative passageways

When using rigid barricading:

- Support construction fencing to prevent tipping or sagging.
- Install pins in concrete barriers whenever there is a danger of vehicles or heavy equipment striking them
- Provide adequate access to the work area

When work is complete and the hazard is eliminated, remove the barricading immediately.

Workers who enter a "Danger" or "Radiation" barricaded work area without authorization will be subject to disciplinary action up to and including termination.

## Tools, Hand and Power

All hand and power tools will be kept in good condition with regular maintenance. Hand and power tools are to be operated according to manufacturers' instructions and guidelines and the personal protective equipment appropriate for the hand or power tool will be worn.

Hand Tools

- Impact tools such as chisels, wedges, etc. are not to have mushroomed heads
- Wooden handles will not be splintered or cracked
- Pocketknives will not be used for stripping wire

Electric Tools

- Never lift or carry a power tool by its cord
- Guards and safety switches will not be removed or made inoperative
- Electric tools must have a three-wire cord unless they are double insulated

Portable Abrasive Wheel Tools

- Guards will not be removed
- Grinding disks and wheels will be checked to verify they are the correct one for the grinder and speed.

**SKANSKA**

---

Pneumatic Tools

- Air hoses ½ inch in diameter or greater will have a safety excess valve installed at the source of air.
- Clips, whips or retainers are required at each air hose coupling and to prevent attachments from being ejected from the tool.
- Only pneumatic nail guns requiring the muzzle to be pressed against the work surface to fire are allowed.
- Hose couplings will be secured to prevent displacement.
- Pneumatic nail guns shall be disconnected from the air supply when unattended.

Powder/Automatic Gas-Actuated Tools

- Workers will be trained to operate a powder actuated tool and required to carry their training card at all times.
- Fired cartridges shall be placed in a container or bucket and properly disposed.
- The powder-actuated tool must not be able to fire until it is placed against the surface with a force of five pounds or greater.
- Misfires should be stored in a closed container until disposal or as otherwise required by local, state, and federal safety, health and environmental regulations.  Water will not de-activate/neutralize the boosters.

## Traffic Maintenance and Protection

There will be no temporary blocking or occupying of any street or alleyway without prior approval of Skanska and local authorities.

When it becomes necessary to temporarily close a public street or alley, a written traffic control plan is required showing how the closure will occur.  The plan must be submitted to Skanska for review.  Refer to the Manual of Uniform Traffic Control Devices (MUTCD) Part VI when developing a traffic control plan.

At a minimum, the written Traffic Control Plan will contain:

- Time the street(s) will be required to be closed.
- Detail drawing showing temporary signage, tapers, etc.
- Detail plan illustrating detour routes for traffic impacted by the closed streets.

All workers and supervision will wear high visibility attire in accordance with the ANSI requirements.

Workers assigned as flaggers will be trained as recommended in the Manual of Uniform Traffic Control Devices and state DOT.  Trained flaggers are required to direct all construction traffic entering and leaving the project site.

Work that fails to follow the traffic control plan or occupies a city street or sidewalk without authorization will not be allowed.

## Welding and Cutting

When burning or welding using compressed gases, flame arrestors will be installed on both the torch side and regulator side of the oxygen and gas hoses.  All compressed gas cylinders shall be tagged or labeled with the name of the subcontractor responsible for them.

Arc Welding and Cutting

Welding current return circuits or grounds must carry their current without hot or sparking contacts and without passage of current through equipment or structures.  Specifically, welding current must not be allowed to pass through any of the following materials:

- Acetylene, fuel gas, oxygen, or other compressed gas cylinders.
- Tanks or containers used for gasoline, oil, or other flammable or combustible material.
- Pipes carrying compressed air, steam, gases, or flammable or combustible liquids.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

- Conduits carrying electrical conductors.
- Chains, wire ropes, metal hand railings or ladders, machines, shafts, bearings, or weighing scales.

Whenever practical, all arc welding and cutting operations shall be shielded by non-combustible or flame-proof screens.

The ground for the welding circuit shall be mechanically strong and electrically adequate for the service required and should be attached directly to the work piece.

When possible, electrode and ground cables shall be supported to prevent obstructions interfering with the safe passage of workers.

Cables with worn insulation may not be used.

<u>Gas Welding, Cutting, and Soldering</u>

A suitable cylinder cart, chain or other secure non-flammable fastening shall be used to keep cylinders from being knocked over while in use.

Cylinders of oxygen shall not be stored next to cylinders of acetylene or other fuel gas.  They shall be separated by 20 feet or by a non-combustible barrier with a half-hour fire rating.

Oxygen cylinders, cylinder valves, couplings, regulators, hose, and apparatus shall be kept free of and away from oil and grease.  Oil or grease in the presence of oxygen under pressure may ignite violently.

Empty cylinders shall have their valves closed.  Valve protection caps shall always be in place except when cylinders are in use or connected for use.

When moving cylinders by a crane or derrick, a cradle, boat or suitable platform shall be used.  Slings, hooks or electric magnets shall not be used.  Valve protection caps shall always be in place.

Compressed gas cylinders, empty or full, shall be secured in an upright position at all times except, if necessary, for short periods of time while cylinders are actually being moved.  Empty cylinders should be marked **Empty or MT** for identification.

Regulators and hoses shall be frequently inspected for leaks, worn places, and loose connections.  Regulators shall also be checked for operable gauges.

Approved flash arresters shall be provided on the oxygen and acetylene hoses at the regulator connection and the torch connections.

# SKANSKA

# Quality of Life Requirements

## Smoking Policy

Skanska encourages a Smoke-Free Workplace.  No worker will smoke any tobacco product within any building or structure on this project designated as Smoke-Free.  In Smoke-Free workplaces, smoking is only authorized in designated areas or inside your personal vehicle, if permitted while on the owner's property.  Workers that violate this rule will be subject to immediate termination.

## Warm up and Stretching Exercises

Skanska believes the most recurring and disabling injuries that plague the construction worker are soft tissue injuries.  Warm up and stretching exercises before work have proven to reduce these soft tissue injuries.  These exercises can reduce the chance of heart attack and increase the life expectancy of our workers.  Skanska believes the benefits of reducing injuries and improving the life of every worker on this project is significant.

Workers associated with this project will participate in warm up and stretching exercises at the beginning of each workday within their crew or subcontractor company.

## Sanitation

Toilet Facilities

Adequate chemical toilets are available on the jobsite for the use of workers.

Chemical toilets shall be serviced often enough to prevent overflowing and the creation of an unsanitary condition or nuisance.  Toilets shall be maintained in good repair so as to prevent leakage of the contents to the surrounding ground, floor, or other portions of the structure.

Drinking Water

Every day contractors will provide fresh clean drinking water to their employees.  Drinking water will be dispensed in containers with a tight sealing lid and labeled as "Drinking Water."  Drinking water containers are to be cleaned daily.

Adequate cups will be made available at each drinking water container.  Cups will be stored in a durable, clean dispenser.  A trash can or other type receptacle will be provided to collect used cups.  Contractors are responsible for cleaning up around the water container area.

The dipping of cups into the container, storing soda cans and bottles, drinking directly from the spout, or placing of hands or material into drinking water are prohibited.

## Emergency Procedures

Each project team shall develop an Emergency Action Plan; each project team shall develop the following:

- Owner requirements and procedures
- Skanska Crisis Management and site logistics protocols
- Coordination with local emergency response personnel

The Emergency Action Plan will be posted throughout the jobsite and communicated to workers during the environmental, health & safety orientation and weekly safety meetings.

## Building Evacuation

Exit signs shall be conspicuously posted along evacuation routes.

A signal or alarm shall be designated to initiate evacuation.  Temporary pull stations should be considered.

Personnel should de-energize tools and equipment and observe their work area for fellow workers in need of assistance.

Workers should observe stairs for safe passage before accessing.

Report any hazardous conditions that are known to exist within the building to your supervisor

# SKANSKA

A plan view drawing will be developed for each project's evacuation plan.  This drawing will clearly identify the following:

- Building footprint
- Primary and secondary assembly areas
- Exits
- Fire alarm pull stations or air horn locations
- Site telephones

- Stairs
- Fire extinguishers
- Skanska's project office
- First aid kit locations
- Emergency numbers

## Medical Emergency

During the environmental, health & safety orientation, workers will be given information on how to summon medical assistance in case of a medical emergency.  Workers should know the following information:

**Emergency Phone Number:**      911

**Project Address:**

**City:**                                    Gainesville

When reporting a medical emergency, the worker will state their name, the nature of the emergency, the severity of the emergency and where assistance is needed.  A worker may be required to meet medical personnel and guide them to where the emergency is located.

Do not move an injured worker before medical assistance arrives unless further injury is possible.

# SKANSKA

## Emergency Medical Map

The following medical facilities have been selected for treatment of work related injuries/illnesses on this project



DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

## Fire

In case of a fire, workers will evacuate their work area immediately and report to the pre-determined assembly area.

After reporting the fire, workers will evacuate the work area and report to the pre-determined assembly area that was stated during the environmental, health & safety orientation.

## Severe Weather

Should weather conditions, such as severe thunderstorms or tornadoes, develop around or near this project; workers will follow the direction of their immediate supervisor.  Work in areas where severe weather events are possible will have a contingency plan in place.

## Emergency Action Planning

Project Management will ensure the Emergency Action Plan is communicated to all workers during orientation. Specific emergency procedures and emergency phone numbers will be posted in lunch areas, near all telephones and on project bulletin boards.

The plan shall be reviewed periodically by Skanska to ensure continued accuracy and applicability.  Daily Pre/Post -Task Plans shall also address emergency egress from each work area.

The emergency action plan shall be reviewed by all workers and posted with a site plan in prominent locations accessible to all workers.

Template on next page.

**SKANSKA**

## Emergency Action Plan

| | |
|---|---|
| **Project Name:** | UF-323 Chemistry/Chemical Biology Building |
| **Work Location:** | Corner of Buckman and W. University Ave. Gainesville, Florida |

1. This is a project specific Emergency Action Plan communicating evacuation procedures, specific alarms, and assembly points, should an emergency evacuation become necessary because of severe weather, fire, hazardous chemical release, explosion or other emergencies that could cause worker harm.

2. It is each worker's responsibility to familiarize themselves with evacuation routes, alarms and assembly points in case an emergency evacuation of the work area is required.

3. **Caution:** Evacuation routes, alarms or assembly points for one emergency may differ from another emergency.

4. **In case of fire or medical emergency:**

| | |
|---|---|
| Emergency Phone Number: | 911 |
| Alarm or Notification: | Radio, voice commands, 3 short blows of air horn |
| Evacuation Route: | Walk north east towards Skanska Field Offices or NW on Buckman to access gates |
| Primary Assembly Point: | East of Skanska Field Offices |
| Secondary Assembly Point: | West side by access gates |

5. **In case of severe weather:**

| | |
|---|---|
| Alarm or Notification: | Radio, voice commands, 3 continuous blows of air horn |
| Evacuation Route: | Follow your supervisors directions, move towards the closest enclosed space or stair case |
| Assembly Point: | Assembly point after the event is east of Skanska's field offices |

6. **In case of chemical release or explosion:**

| | |
|---|---|
| Alarm or Notification: | Voice commands and radio |
| Evacuation Route: | Walk north east towards Skanska Field Offices or NW on Buckman to access gates |
| Primary Assembly Point: | East of Skanska field offices |
| Secondary Assembly Point: | NW corner of the project by access gates |
| Spill Kit Location: | Skanska field offices |
| Remediation Contact: | Safetykleen Orange Park, FL 904.264.2607 |

7. Workers will immediately evacuate their work area upon hearing the alarm or being notified of the emergency and ordered to evacuate. No worker is exempt from evacuation even if the evacuation is a drill.

8. Workers are required to report immediately to their designated assembly point and be accounted for. Failure to report may cause another to risk danger in an effort to search for you. Do not leave the project without prior authorization from first-line supervision.

9. A designated Skanska employee will call the identified Remediation Company to respond to chemical spills that require outside attention. An agreement must be made with the Remediation Company prior to identifying them as the remediation contact.

**FL SHMP REV: 16/July/2014**

# SKANSKA

## Hurricane Preparedness Plan

General Information

Hurricane season generally lasts from June 1 to November 30.

Coordinate your plan with your owner and train our employees and subcontractors to the plan.

Take in consideration and site specific issues not covered in this plan.

Obtain a hurricane tracking and information guide at a local store or internet.  Share the information with your employees so they are aware if their homes are in an evacuation zone and how to take care of their families and homes.

According to experts, forecasters only have a 10% chance of accurately predicting where a storm will hit 72 hours in advance.  They have a 74% chance within 24 hours.  Just because your project is not in the storms projected path does not mean that it could change course, therefore projects near but outside of the storm's predicted path that need to take precautions regardless.

During Hurricane Season

Skanska will develop a call-in team, including the owner, Skanska project team members, subcontractors, major utilities and Skanska Senior VP, EHS Dept, Insurance Coordinator and Risk Manager for post storm assistance.  Project teams should have their supervisor's home phone # as well of those of their project team to facilitate communication and to ensure it is safe to return to the project after the storm.  Home phone #'s are important in case cell phone towers are damaged.  Make a hard copy or this plan and your call in team in case of a loss of power.

All contractors/subcontractors shall keep the project free from any accumulation of debris and scrap material that can become windblown hazards.  This will reduce the amount of time necessary to sure the project site in the event of a hurricane emergency.  As part of standard operating procedures, ensure that diesel dewatering pumps, portable pumps, and generators are procured or in operational condition at all times and that an adequate supply of duct tape, banding strap, banding tools, generators, fuel, oil, grease, plastic bags and tarps to cover the dumpsters are on hand.

Skanska will monitor local radio, internet and television weather updates and report information to all subs for proper action.

Skanska will be alert to job conditions that require advance attention so as to reduce emergency preparation time.

Do not wait until your project is in the footprint of the approaching storm to contract with several temporary labor companies.  You should already have at least one labor company that you have contracted for your project for your day to day operations.  It is a good idea to have at least two companies under unit price subcontracts for emergency situations.  In 2004, it was difficult to find any available temporary laborers, as the need exceeded the number of workers.

Take pictures.  The old adage of a picture being worth a thousand words is especially true with insurance claims.  If your project is in the path of an approaching storm, take pictures of the structure, all onsite stored materials, all equipment, and the jobsite trailers and offices before the storm arrives to document the "before" as proof  for an insurance claim.

When a hurricane approaches

Preparations need to underway before evacuation orders are issued and tropical force winds affect the area (vehicles should not be on the road, crossing bridges etc while tropical force (or higher) winds are occurring). **ENSURE YOU TAKE ACTION PRIOR TO 24-48 HOURS OF AN APPROACHING STORM TO SECURE YOUR PROJECT SO THAT EMPLOYEES AND SUBCONTACTORS ARE GIVEN ENOUGH TIME TO TAKE CARE OF THEIR OWN HOMES AND FAMILIES**.

Project superintendents and project managers should have their supervisor's home phone # as well of those of their project team to facilitate communication if needed.

# SKANSKA

---

Hurricane approaching – action items

Recheck all anchors on all temporary buildings and trailers, including subcontractors.

Welding machines, air compressors, etc., are to be grouped together and secured to stable objects.  All leads, hoses and torches on trailers are to be secured together and trailers anchored.

Wooden pallets, forms and wooden decks are to be secured and anchored.

Ensure that all vehicles and heavy equipment, including track cranes are set upon high ground and secured with brakes set on high ground.  Lay crane booms on the ground if possible.

Top off fuel tanks on all equipment.

Anchor all tanks, drums and vessels that may be moved by high winds and water.

All booms are to be lowered to a safe position.

All paint hoppers are to be tied down.

All mats are to be tied together and anchored.

Remove any unused scaffolding/shoring in all areas initially and then as storm gets closer group, secure and anchor down all scaffolding to the scaffold storage area.

Ensure that all loose forming materials are neatly stacked.  If time permits band strap all stacks.  If time is short, heavy objects can be used to secure materials.

Ensure that the spoil piles around all excavations are continuous and in good repair.

Secure essential barricades, with anchors, tie downs, or sand bags.

Ensure that incomplete underground process piping and storm drain systems are protected against flotation and the infiltration of sand and silt.

Water cans full of portable water are to be placed inside gang boxes.

Icehouse is to be secured with a full supply of ice on hand.

All trash barrels and portable toilets are to be grouped together and secured to stable objects.

Security coverage may need to be included in planning or considered after the storm.

When possible, construction drawings and records shall be protected from water damage in case of roof, window damage or rising water.  Ensure that critical project documents are put into fireproof files and that the safes are securely closed and locked.  If necessary remove the critical documents offsite to a safe location.

Turn off all temporary construction power to power company source including office trailers.

Board up or use hurricane film on the windows of offices.

Ensure that all loose scrap material is gathered up and disposed of in the dumpsters.

Ensure that the dumpsters are emptied.  If the waste hauler is unable to pull the dumpsters, they should be covered with tarps to prevent debris in them from becoming windblown hazards.

Make final clean up of construction and plant areas.

IT Related issues

Data is more important than hardware, back up desktop/laptop hard drives and digital photos.

Disconnect all computers and network equipment from electrical outlets and phone and data lines before evacuating the site.  If left on site, cover (trash bags work well) the equipment to protect from potential water damage.  Please contact Customer Service to coordinate server shut down or powering down of network equipment prior to unplugging servers or routers.

# SKANSKA

Desktops, laptops, and possible network printers may be removed from the site to a safe location.  If they are removed from the site, please make sure they receive proper storage inside a building.  Do not leave equipment in automobile trunks during the storm.

Server removal or other computer questions should be coordinated through IT.  Please contact Customer Service.

Most jobsite servers have remote backups.  Any sites that do not have verified remote backups or have local media backups should contact IT to address data backup and storage.

<u>After The Storm</u>

The project call-in team:

Will stay tuned to local radio/TV to find out when it is advisable to venture back out onto the public roadways.

Will evaluate the damage and initiate corrective action to ensure a safe site before employees are called back to work.

Move cautiously about the project, being on alert for unsafe conditions left by the storm.

Survey the project for damage, especially concerning the structural integrity of structures and work platforms. Inspect cranes and other heavy equipment/vehicles before placing them back in service.

Do not touch loose or dangling wires, but report them to a supervisor.

In the event of a loss, take pictures of the damage.  Report all losses immediately.  Water damage is not covered by our insurance if seepage occurs for more than five days.  You must take immediate action to report the damage and stop water intrusion.

Remaining project team members:  If phones are working, call job site for information on when they are to return to work.

## Project Hazard Communication Program

All workers on this project are entitled to know the properties and potential safety and health hazards of chemicals or substances that they may come in contact with on this project.

Each project will develop a written project specific Hazard Communication Plan.  This plan will be posted in a location where workers can easily access and review the plan.

Each subcontractor will submit to Skanska a Master Chemical and Substance Inventory List and a copy of the Safety Data Sheet (SDS) of all known hazardous chemicals that are in their work area.  Prime subcontractors will be responsible for obtaining all sub-tier subcontractors' Master Chemical and Substance Inventory Lists/SDS and forwarding to Skanska.

The Master Chemical and Substance Inventory List (Appendix G) or equal will be maintained, even if they do not have or will not use any hazardous chemicals or substances.  ***This is an OSHA requirement.***

Subcontractors will maintain a project specific SDS on location for each hazardous chemical or substance listed on the Master Chemical and Substance Inventory List.  Prime subcontractors will be responsible to ensure all sub-tier subcontractors have their project specific SDS sheets at the project.

It will be the responsibility of each worker's supervision or project manager to assure Safety Data Sheets are received prior to, or at the time of delivery of, a hazardous chemical.

Project management and first-line supervision will ensure all hazardous chemicals are properly labeled in accordance with the SDS.   Containers that hazardous chemicals have been transferred into for use during a single work shift will be labeled as to contents.

Every worker on this project shall receive instruction from their employer on their Hazard Communication Program, the location of the Master Hazardous Chemical and Substance Inventory list, the location of the Safety Data Sheets, labeling requirements and specific environmental, safety & health instructions about the hazardous chemical or substance.

**SKANSKA**

Recommended minimum Hazard Communication Training will consist of:

1. The contents of the program
2. Prior to use of or the potential exposure to any hazardous chemical or substance, workers are to be instructed in:

- Physical and health hazards
- Procedures to protect against the hazards
- Engineering and administrative controls
- Personal protective equipment
- Emergency procedures in case of exposure or accidental spill

3. Labeling requirements
4. Whenever a new chemical or substance is introduced into the workplace, workers will be briefed of its hazards

The client, vendors, and subcontractors that may have business in or near a work area will be notified that hazardous chemicals are being used and the hazards they may encounter.

If a worker believes they have encountered a hazardous chemical or substance unfamiliar to them, they will immediately notify their supervisor.  Project management or supervision will attempt to identify the hazardous chemical or substance and initiate all precautions to handle and dispose of this material, if required, and to properly protect workers.

# SKANSKA

## Hazard Communication Program

**This plan will be reviewed by all Skanska workers and posted in a prominent location accessible by all workers.  This plan is a supplement to the project-specific health and safety program.**

**Project Number:** 239012

**Project Name:** UF-323 Chemistry/Chemical Biology Building

**Project Location:** Corner of Buckman and West University Ave. Gainesville, FL

This is a project specific Hazard Communication Plan ensuring that information on hazardous chemicals and substances is communicated to workers in accordance with OSHA 29 CFR 1926.59 and the Skanska Hazard Communication Safety Program.

1.  An inventory of known hazardous chemicals and substances used on this project has been conducted and listed on the Master Chemical and Substance Inventory which is located and can be reviewed at: Skanska Field Offices

2.  A copy of the Safety Data Sheets (SDS) for known hazardous chemicals and substances used on this project are located and can be reviewed at: Skanska Field Offices

3.  If a copy of a SDS cannot be located, contact your Project Manager, Superintendent, Foreman or Skanska Environmental Health and Safety Department at: 954.448.9235

4.  Project management and first line supervision are responsible for obtaining SDS and ensuring they are received prior to, or at the time of delivery of, a hazardous chemical.

5.  Hazardous chemicals will be properly labeled in accordance with the SDS.  Containers that hazardous chemicals have been transferred into for use during a single work shift require secondary labeling.

6.  Workers who work with, or may be potentially exposed to, a hazardous chemical or substance will be informed of the physical and health hazards and procedures to protect against those hazards. Included in the procedures are engineering and administrative controls, personal protective equipment, and emergency instructions for accidental exposure, emergency evacuations, or spill containment of the hazardous chemical or substance.

7.  When new hazardous chemicals or substances are introduced into the work environment, workers will be informed of the physical and health hazards.

8.  Employers, who may be working in a Skanska work area where workers could be exposed to a hazardous chemical or substance, will be informed of where that hazardous chemical or substance is in use.

9.  Workers performing non-routine tasks will be informed of chemical hazards associated with the work activity and the appropriate protection measures.

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

## Subcontractor Requirements

### Designated Subcontractor Safety Representative

Each subcontractor expected to have less than thirty workers on-site will designate a safety representative prior to mobilization.  This on-site safety representative will be a competent worker who has completed at least 30 hours of OSHA awareness training and who may have other on site duties.

Subcontractors that plan to have thirty (30) or more workers (including tiered subcontractors) will provide a full time on-site EHS professional (s) upon mobilization of the first employee according to the following staffing guidelines.

- 30-99 workers = 1 full time EHS professional
- 100-149 workers = 2 full time EHS professionals
- 150-199 workers =3 full time EHS professionals
- 200-249- workers = 4 full time EHS professionals
- 250-299 workers = 5 full time EHS professionals

Subcontractors will submit the resume of their proposed safety professional or representative to be reviewed by Skanska.  Skanska will determine if the proposed safety professional or representative has the training and experience required for this project.  This person will have the authority and responsibility to ensure the proper implementation of this Safety & Health Management Program.

Subcontractor safety professionals and representatives will have the full authority to implement safety corrections and recommendations.  Subcontractor safety professionals and representatives will have authority to stop any work they deem unsafe.

Subcontractor full time on-site safety professionals shall have the following minimum qualifications:

- Five years construction experience, one year of which includes on-site construction safety responsibilities.
- Specialized training relevant to scope of work.
- OSHA 30 hour construction safety awareness course.
- Working knowledge of safety regulations and hazard control methods.
- Demonstrated ability to conduct safety training.

The minimum duties of the designated safety professional and/or representative will be:

- Investigate any incident or near miss and report the findings to Skanska.
- Attend safety meetings as required by Skanska.
- Conduct regular safety meetings with workers to instruct them on project environmental, safety & health practices and requirements.
- Conduct written daily safety inspections of their work activities and make available to Skanska for review to ensure compliance with safe work practices and this Safety & Health Management Program.
- Take direction from Skanska related to timely abatement and control of hazards.

### Subcontractor Safety Orientation

In addition to the Skanska project orientation, each subcontractor will conduct an additional safety orientation for their employees to ensure they understand the project environmental, health & safety requirements as well as their company's requirements.

### Monthly Man-hour Report

At the end of each month subcontractors must submit total man-hours worked, including hours for tiered subcontractors using Appendix A or its equivalent.

# SKANSKA

## Subcontractor Safety Submittals

Prior to beginning work, each subcontractor shall submit to Skanska the following:

- Subcontractor written project specific safety plan.
- Work plan for work on energized electrical circuits, buss bars, equipment or panels in compliance with Chapter 1 of NFPA 70E (2012)
- Commencement for steel erection executed by Skanska and subcontractor
- Engineered documentation on horizontal lifelines/anchor points
- NCCCO crane operator certification card, qualified rigger(s) and signal person(s) name(s) & training documentation
- Name(s) of designated safety representative or professional and qualifications.
- Name(s) and training verification of designated competent persons as required by the scope of work for trenching, scaffolding, rigging, etc.
- A list of activities the contractor has identified that will be made available in the event light duty has been directed by a physician.
- Name(s) and training verification of trained and qualified equipment operators as required by the scope of work for forklifts, aerial lifts, etc.
- Name(s) and training verification of employees trained in first aid and CPR.
- Current annual crane inspections by a third party crane inspection firm for all cranes brought onto the project.
- Project specific Master Chemical and Substance Inventory Sheet and Safety Data Sheets for all hazardous chemicals and materials to be used or stored on the project.
- Training verification of OSHA or project required training as necessary. Verification shall include training rosters. Examples of OSHA or project required training may be:

| | | | |
|---|---|---|---|
| Fall Protection | Confined Space | Respiratory Protection | Excavations and Trenches |
| Scaffolding | Crane Signals | Hazard Communications | Ladders |

### On-Going Submittals

Each subcontractor will be required to submit various on-going safety documents to Skanska as required by the scope of work. These submittals may include the following:

- Subcontractor Monthly Man-hour Report (Appendix A).
- Incident Notification and Investigation Report (Appendix C) (Within 24-hours of any incident or near miss).
- Weekly "Tool Box" safety meeting minutes.
- Daily Pre/Post-Task Safety Plan (Appendix F).

### Maintain While Working on the Project

Throughout the course of the project, each subcontractor will maintain the following records or documents on site and make available for inspection by Skanska:

- Subcontractor Work Site Safety Inspection
- Scaffold, Trench, Crane, and Forklift Inspections

Skanska permits or forms, or their approved equivalent, shall be used.

### Permits or Safety Plans as Required

Subcontractors will submit to Skanska work permits or plans for review by Skanska prior to start of work as required. Work permits or plans that are required include:

- Confined Space Entry
- Hot Work
- Excavation and Trenching
- Crane Lift Permit
- Fall Protection Plan
- Lockout/Tagout Checklist

**FL SHMP REV: 16/July/2014**

**SKANSKA**

- Other work plans as deemed necessary

# SKANSKA

## Forms Appendix

**Appendix A**    Subcontractor Monthly Incident Summary Report

**Appendix B**    General Safe Work Practices Poster

**Appendix C**    Incident Notification & Investigation Form

**Appendix D**    Safety Training Roster

**Appendix E**    Guard Rail Removal Permit

**Appendix F**    Daily Pre/Post-task Safety Plan

**Appendix G**    Master Chemical & Substance Inventory List

**Appendix H**    Hot Work Permit

**Appendix I**    Confined Space Entry Permit

**Appendix J**    Excavation Permit

**Appendix K**    Notice to Commence Steel Erection

**Appendix L**    Daily Scaffold Safety Inspection Report

**Appendix M**    Work Site Safety Inspection Form

**Appendix N**    Voluntary Use of a Disposable Respirator

**Appendix O**    Lockout/Tagout Checklist

**Appendix P**    Annual Inspection – Lattice and Telescoping Boom Crane

**Appendix Q**    Monthly Inspection – Lattice and Telescoping Boom Crane

**Appendix R**    Daily Inspection – Lattice and Telescoping Boom Crane

**Appendix S**    Crane Maintenance Checklist

**Appendix T**    Critical Lift Checklist

**Appendix U**    Tower Crane Checklist

**Appendix V**    Lift Plan – Example

**Appendix W**    Soil Bearing Chart

**Appendix X**    Pre-Demolition Survey

**Appendix Y**    Safety Deviation Ticket

**Appendix Z**    Daily Forklift Inspection

**Appendix AA**    Daily Stilt Inspection

**Appendix BB**    Ladder Authorization Permit

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

**SKANSKA**

**Appendix CC**        Ladder Authorization Log

# SKANSKA

## Appendix A: Subcontractor Monthly Incident Summary Report

Project:   UF-323 Chemistry/Chemical Biology Building

Subcontractor Name:

Sub-Tier Subcontractor To:

Reporting Period:                          Month:                        Year:

At the end of each month subcontractors must submit total man-hours worked, including hours for tiered subcontractors

Note: Subcontractors that fail to submit this report may not receive payment.

**Directions:** *Report all injuries, no matter how minor as indicated below!*  When reporting number of OSHA recordable medical cases that had lost work days, enter number of calendar days away from work (do not count first day of injury, but the weekends must be counted).  Carry over days from a previously reported lost time case where the worker is still off work in this reporting period.  Report the number of OSHA recordable medical cases that had restricted or light duty work and the total number of calendar days or restricted or light duty (do not count the first day of injury, but the weekend must be counted).  Carry over days from a previously reported restricted or light duty case where the worker is still on restricted or light duty.  Report number of first aid only cases for period as well.

|       | Man-hours Worked | First Aid Injuries | Medical Treatment Only | Lost Time Injuries | Days Lost | Restricted Work Injuries | Days of Restricted Work |
|-------|------------------|--------------------|------------------------|--------------------|-----------|--------------------------|-------------------------|
| Month |                  |                    |                        |                    |           |                          |                         |
| YTD   |                  |                    |                        |                    |           |                          |                         |

**Person Making Report:**                          **Phone Number:**

FL SHMP REV: 16/July/2014

# SKANSKA

---

## Appendix B: General Safety Work Practices Poster

Clean and safe working conditions are absolutely essential for achieving an Injury Free Environment, as well as for the promotion of construction efficiency and progress. Each worker on this project is valued not only for what they do, but for who they are. Everyone must maintain a strong personal desire to think and act safely, in an effort to create an Injury Free Environment. The following general safe work rules are a partial list of the general rules that apply to each worker on this project. There will be no tolerance for any worker who carelessly or callously disregards these rules or other applicable environmental, health and safety rules.

1. It is the responsibility of each worker to perform his/her assigned duties so as to provide:
   a. Safety for themselves and their fellow worker
   b. Protection of the general public and all other workers
   c. Protection of equipment, materials and tools
2. Report all unsafe acts and conditions to supervision.
3. Report work related injuries or illnesses immediately to supervision.
4. Work only in conditions that appear to be safe.
5. Use proper fall protection when working six (6') feet or greater above the surface.
6. Wear the minimum personal protective equipment (hardhat, safety glasses, shirt, trousers, high visibility attire and work boots).
7. Use tools and equipment properly. Remove damaged or defective tools and equipment from service. Field modified tools are not permitted.
8. Lock out and tag equipment, machinery, and/or systems prior to working on them.
9. Maintain clean and orderly work areas at all times.
10. Operate tools and equipment with proper guards and safety devices in place.
11. Request instruction from supervision when unsure as to the safe performance or procedures.
12. Obtain authorization and training prior to entering a confined space.
13. Operate equipment, machinery or any specialty tool (e.g. powder-actuated tools) only with proper training and authorization.
14. Wear eye and face protection when cutting, welding, grinding, chipping, or performing other tasks where the danger of flying debris exists.
15. Use safe lifting techniques when required to lift material or other loads.
16. Wear respiratory protection when the task or work area requires it.
17. Wear hearing protection when the task or work area requires it.
18. Ride vehicles only in the cab with proper restraining devices. Riding in the bed of pick-up truck is prohibited.
19. No worker will be under the influence of drugs/alcohol or engage in any horseplay, fighting or gambling of any form.
20. Observe and comply with covered, barricaded, taped, or flagged areas. Do not remove, cross, or enter without proper authorization and protection.
21. No worker will intentionally discharge or remove fire-fighting equipment.
22. Radios and other audio distractions are not allowed in any work area.

# SKANSKA

## Appendix C: Incident Notification Form

**Project Num:** 239012          **Project Name:** UF-323 Chemistry/Chemical Biology Building

| All Sections |
|---|
| **A-  General Information* (Required Section)** |

| *Date of Incident: | * Date Incident was Reported: |
|---|---|
| | |

*Required Fields*

| Employer Type (Check One) | | | |
|---|---|---|---|
| Skanska ☐ | Subcontractor ☐ | Vendor/Supplier ☐ | General Public ☐ |

| Type of Incident (Check One) | | |
|---|---|---|
| Injury/Illness ☐ | Near Miss ☐ | Fatality ☐ |

| B – Project Information *(Required Section) | |
|---|---|
| * Incident Location | |

*Required Fields*

| C - Employee Information *(Required Section) | | |
|---|---|---|
| *Last Name: | *First Name: | *Middle Initial: |
| *Date of Birth: | *Gender: | Marital Status: |
| Primary Language: | Position: | Title: |
| Shift: | Supervisor Name: | Hire Date: |
| Badge ID Number: | Main Phone Number: | Additional Number: |
| *Company: | *Company Phone Number: | |
| Address: | | |
| Address 2: | | |
| City: | State: | Zip Code |

*Required Fields*

| D – Investigation Information |
|---|
| Describe Incident: |
| |
| |
| |
| |
| |
| |
| |

# SKANSKA

| Time of Incident | Exact Location: | | Equipment/Tools Involved (Check  One): YES ☐ NO☐ |
|---|---|---|---|
| Task Being Performed: | | Describe Equipment Defects: | |
| Root Cause of Incident: | | | |
| | | | |
| | | | |
| | | | |
| Corrective Action(s)/Preventative Actions: | | | |
| | | | |

*Required Fields

| E – Injury Information*(Required Section) | | |
|---|---|---|
| OSHA Recordable: | | Physicians Name: |
| Body Part Injured: | | Side of Body Injured: |
| Diagnosis: | | |
| Prescriptions Given (Check One): YES ☐   NO ☐ | Work Restrictions (Check  One): YES ☐ NO ☐ | Work Days Lost (Check One): YES☐  NO☐ |
| Diagnosis: | | |
| Describe Restrictions: | | |
| How Many Work Days Restricted: | How Many Work Days Lost: | Wage: |
| Hospital/Clinic: | | |
| Phone Number: | | Address: |
| City: | State: | Zip Code: |
| Other Notes: | | |
| | | |

| F – Investigator Contact Information*(Required Section) | | |
|---|---|---|
| Last Name: | First Name: | Contact Number: |

*Required Fields

| G – Witness Information | |
|---|---|
| Last Name: | First Name: |
| Company: | Position/Title: |
| Contact Number: | |

_____          _____

**Subcontractor's Representative Signature and Date**                    **Print Name**

**FL SHMP REV: 16/July/2014**

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68E48D0DEDD6

**SKANSKA**

## Appendix D: Safety Training Roster

| Project Name: UF-323 Chemistry/Chemical Biology Building | | Project Location: Gainesville, FL | |
|---|---|---|---|
| Course: | | | |
| Date: | | Presented by: | |
| **Name** | | **Company Name** | **Signature** |
| This is to certify that I, the undersigned, have attended this Skanska Safety Training course and understand the contents presented during the program. | | | |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |

FL SHMP REV: 16/July/2014

**SKANSKA**

## Appendix E: Guard Rail Removal Permit
## Work will not be performed until form is approved by a Skanska representative!

**Contact Information:**

Contractor: _____   Date: _____

Foreman's Name: _____   Foreman Phone #: _____

Write out specific **Location** N, S, E, W, NW, SW, etc.)  Include Guardrail location with column lines or gridlines (if known),
**Level** (Level 1, Level 2, Suite A, Concourse 1 etc.)

| | Location | | Level |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Employee(s) Performing Work:**

| Name _____ | Signature _____ |
|---|---|
| _____ | _____ |

**Considerations:**

- Reason for Guardrail removal?
- Number of Spans being affected?
- Total Length of Guardrail affected?
- Amount of time Guardrail will be down?
- What other contractors are working in the area?
- How will you continually notify other contractors?

**Fall Protection Plan:**                                                      **yes    no**

- Does your company have a written fall protection Program?    ☐    ☐
- Have involved workers been trained in the Fall Protection Systems in use?    ☐    ☐
- Has Fall Protection Plan been put in place?    ☐    ☐
- Will workers be tied off inside the area of the guardrail removal?    ☐    ☐
- Describe how workers will be tied off: _____
- Describe how the other trades will be protected from the fall hazard: _____

**If <u>No</u> is answered to any of the above questions then the Skanska EHS Department must be contacted for review
prior to guardrail removal.**

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBF-68E48D0D5DD6

# SKANSKA

| Fire/Explosion Assembly Point: East of Skanska Offices | Severe Weather Assembly Point: Closest enclosed area |
|---|---|
| Emergency Alarm  Air horn/voice/radio | Spill Kit Location: Skanska Field Offices |
| Skanska Project Ph#/Address | Spill Clean-up Vendor-Safety Kleen: 888-375-5336 |

**Appendix F: Daily Pre/Post Task Planning**

| Contractor: | | Job Name: | **UF-323 Chemistry/Chemical Biology Building** | |
|---|---|---|---|---|
| Meeting Lead: | | Task Description: | | |
| Date: | | | | |

| How are you going to do the job? List All the Steps of the Job | | Potential Hazards From Our or Other Trades Work? | | How Will You Control the Hazards? | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | **List Craft Identified Hazards** | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**FALL PROTECTION:  Do fall hazards exist in the work area that need to be corrected before starting work?**

| What means of fall prevention/protection will be utilized? |
|---|
| Indentify adequate anchorage points if utilized: |
| Are fall arrest systems being utilized to prevent the worker from striking the lower level?  6' lanyard = 18.5' of fall clearance ☐Yes  ☐No |
| If required to remove handrails, has a guardrail removal permit been completed?  ☐Yes     ☐No |
| Has the proper ladder (height/capacity)for the task been selected?  ☐Yes     ☐No |
| Regardless of height, have handrails and outriggers been installed on Baker-type scaffolds?  ☐Yes   ☐No |
| Working outside of a roof warning line or inside a control access zone requires 100% fall arrest.  Snap keeper to Snap keeper  connections prohibited |

**SKANSKA**

| HAZARD CONTROL TIPS |
|---|

What permits are required for this task? ☐Confined Space ☐Hot Work ☐Lockout/Tryout ☐ Excavation ☐ Other:

Are all tools and equipment available to complete the task safely?  ☐Yes  ☐No

Are there any SDS's that need reviewed for hazardous substances present in the work area?  ☐Yes  ☐No

| Environmental Exposures/Hazards From Today's Activities | | Potential Hazards Example: Skin Irritant/Hazardous Fumes or Dust/ Equipment Leak | How Will You Control The Hazard? Example: Gloves/Respirator/Ventilation |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Pre Task Meeting | Post Task Meeting |
|---|---|
| Are Crew Members Fit for Duty ☐Yes  ☐No | All Crew members accounted for? ☐Yes ☐No |

| Signature | Signature | Reported Injury Today | Near Miss Today | Tools/Equipment Needed for Tomorrow |
|---|---|---|---|---|
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |
| | | ☐Yes ☐No | ☐Yes ☐No | |

**SKANSKA**

## Appendix G: Master Chemical and Substance Inventory List

Subcontractor:                                                      Date of Update:

| Date | Brand Name | Manufacturer | Chemical Name |
|------|-----------|-------------|---------------|
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |
|      |           |             |               |

FL SHMP REV: 16/July/2014

# SKANSKA

## Appendix H: Hot Work Permit

| Permit # | Date |
|---|---|
|  |  |

Location: _____

Company Name: _____   Shift: ☐1st ☐2nd ☐3rd

Location of Work: _____

Floor/Level/Elevation: _____

Description of Work: _____

Any Special Precautions: _____

### Employees Performing Work:

Name: _____   Signature: _____

_____   _____

_____   _____

_____   _____

### Fire Watch:

Name: _____   Signature: _____

### Hot Work Requirements

**Hot Work Activities:**
1. Hot work activities include any spark-producing activity that includes welding, burning, and grinding.

**Requirements:**
1. Each foreman will complete permit and have authorized prior to performing any hot work activities.
2. Foreman will instruct employees as to work being performed, precautions to be taken, how to use a fire extinguisher correctly, emergency procedures in case of fire, and the duties of a fire watch.
3. Work area must be clear of combustible and/or flammable material within a 35' radius.  If these materials are immovable, then fire blankets or other fire-resistive material must protect them.
4. A 20 (twenty-pound), or larger, dry-chemical fire extinguisher must be in immediate vicinity of work area.
5. Sparks and slag shall be confined to the work area.  When working in elevated areas, protect areas below from sparks and slag.

**Fire Watch Duties:**
1. Continually check work area and all adjacent areas (above, below, around) to ensure free of fire during work activities, during breaks and for ½ hour after completed activities.
2. Trained in the proper use of a fire extinguisher and how to summon fire department or brigade.

**Fire Extinguisher Use -** Follow the P.A.S.S. method:
1. **P**ull the pin on the extinguisher.
2. **A**im the extinguisher nozzle at the base of the fire.
3. **S**queeze the handle.
4. **S**weep the base of the fire.

### Approval

Skanska Project
Manager/Superintendent                                        Date:
Or EHS Representative:   _____   _____

# SKANSKA

## Appendix I: Confined Space Entry Permit

| Description – Required for all entries |
|---|

Permit #: _____        Subcontractor: _____
Supervisor: _____       Location: _____
Type:  ☐ Non-Permit      ☐ Permit       Date and Time of Entry:      /   /          AM/PM
Location of Confined Space:
Type of Confined Space:   ☐ Tank   ☐ Pipe   ☐ Manhole   ☐ Tunnel   ☐ Vault   ☐ Other: _____
Work Description/Purpose of Entry: _____

Hazards: _____

| Verifications – required for all entries |
|---|

|  | Date | Entry Supervisor's Initials |
|---|---|---|
| Lockout/Tagout (electrical, mechanical, hydraulic, etc.) | _____ | _____ |
| Purged, Cleaned, Drained, and Ventilated | _____ | _____ |
| Employee Training | _____ | _____ |

| Required for all entries | | | Additional Permit Required Controls | | |
|---|---|---|---|---|---|
|  | Required | Verified |  | Required | Verified |
| EHS Department Notified | X | ☐ | Authorized Entry Log at Access | ☐ | ☐ |
| Adequate Access | X | ☐ | Fire Extinguisher Available | ☐ | ☐ |
| Adequate Lighting (low voltage) | X | ☐ | Attendant | ☐ | ☐ |
| Harness / Lifelines | X | ☐ | Warning Signs Posted at Access | ☐ | ☐ |
| Training | X | ☐ | Respirators Required?  If required, what type? _____ | ☐ | ☐ |
| Ventilation Adequacy | X | ☐ |  |  |  |
| Communications Equipment | X | ☐ | Protective Clothing Required (describe) | ☐ | ☐ |
| Continuous Air Monitoring | X | ☐ | Rescue Equipment/Service Available (Tri-pod/winch or emergency services, SCBA) | ☐ | ☐ |
|  |  |  | Hot Work Permit Required | ☐ | ☐ |

| Attendant(s) Name(s): | Entrant(s) Name(s): |
|---|---|
|  |  |

* Attach a separate log if more entrants are involved in permit required confined space activity than allowed for on this form.

| Air Monitoring – required for all entries |
|---|

Make: _____   Model: _____        ID# _____
Field Calibration Date: _____   Calibrated By: _____
*Atmosphere Checked By:*

| Contaminants | Permissible Levels | 1st Check* | Time | 2nd Check* | Time | 3rd Check* | Time |
|---|---|---|---|---|---|---|---|
| % Oxygen (O2) | 19.5% to 23.5% |  |  |  |  |  |  |
| LEL | Less than 10% |  |  |  |  |  |  |
| Carbon Monoxide (CO) | Less than 35 ppm |  |  |  |  |  |  |
| Hydrogen Sulfide (H2S) | Less than 10 ppm |  |  |  |  |  |  |
| Other: |  |  |  |  |  |  |  |
| * 1ST CHECK TO BE COMPLETED PRIOR TO ENTRY | | | | | | | |

**IN CASE OF EMERGENCY, CALL:** _____   *OR*   _____

| Authorization |
|---|

**Entry Supervisor:** _____        **Date:** _____

FL SHMP REV: 16/July/2014

# SKANSKA

## Appendix J: Excavation Permit

Location: _____

Permit #: _____  Date: _____

Company Name: _____  Shift: _____

Excavation Location: _____

Excavation Length
Width & Depth: _____

| | |
|---|---|
| Soil Classification: | Florida soil shall be considered type C<br>☐ Type A ☐ Type B<br>☐ Type C |

**NOTE: Trenches over 4 feet deep will use a protective system.**

🛑 STOP

Protective System Used:  ☐ Yes  ☐ No    Type:  ☐ Shielding (Box)  ☐ Sloping
☐ Shoring  ☐ Benching
☐ Other: _____

Weather: _____
Competent Person: _____  Person Completing Report  _____

| Excavation Requirements |
|---|

| Yes | No | N/A | General |
|---|---|---|---|
| ☐ | ☐ | ☐ | Protective system used in any trench/excavation greater than 4 feet deep |
| ☐ | ☐ | ☐ | Spoils, materials & equipment set back ≥ 2 feet from the edges of the excavation |
| ☐ | ☐ | ☐ | Engineering designs for sheeting and/or manufacturer's data on trench box capabilities on site |
| ☐ | ☐ | ☐ | Adequate signs posted and barricades provided |
| ☐ | ☐ | ☐ | Employee training conducted prior to beginning work |

| Yes | No | N/A | Utilities |
|---|---|---|---|
| ☐ | ☐ | ☐ | Utility company contacted & given 24 hours notice &/or utilities already located & marked |
| ☐ | ☐ | ☐ | Utility locations (overhead & underground) reviewed with operator & employees |
| ☐ | ☐ | ☐ | Utilities protected, supported or removed when excavation opened |

| Yes | No | N/A | Wet Conditions |
|---|---|---|---|
| ☐ | ☐ | ☐ | Employees protected from water accumulations (continuous dewatering) |
| ☐ | ☐ | ☐ | Inspection made after every rainstorm |

| Yes | No | N/A | Hazardous Atmospheres |
|---|---|---|---|
| ☐ | ☐ | ☐ | Air monitored for methane gas prior to entering trench/excavation |
| ☐ | ☐ | ☐ | Air monitoring & ventilation provided for potentially hazardous atmospheres |
| ☐ | ☐ | ☐ | Emergency equipment available where hazardous atmospheres could or do exist |

| Yes | No | N/A | Entry & Exit |
|---|---|---|---|
| ☐ | ☐ | ☐ | Ladders no further than 25 feet from ANY employee in ANY direction |
| ☐ | ☐ | ☐ | Ladders extend 3 feet above excavation edge and secured |
| ☐ | ☐ | ☐ | Wood ramps constructed of uniform material thickness and cleated together at bottom |
| ☐ | ☐ | ☐ | Employees protected from cave-ins where entering/exiting the excavation |

**Note: Items marked *No* below must be corrected prior to any employee entering the excavation.**

| Approval |
|---|

Skanska Project Manager/Superintendent: _____  Date: _____

**FL SHMP REV: 16/July/2014**

# SKANSKA

## Appendix K: Notice to Commence Steel Erection

| Project Name: UF-323 Chemistry/Chemical Biology Building |
|---|
| Steel Erector Subcontractor: |
| Contact Name: |
| Address: |

**Skanska is hereby authorizing you to commence steel erection activities with the following notifications:**

| Concrete in footings, piers, and walls, and mortar in masonry piers and walls has attained, based on the appropriate ASTM standard test for field cured samples either 75% of the intended minimum compressive strength or sufficient strength to support the loads imposed during steel erection. | Name of testing agency:<br><br>Attached testing reports: |
|---|---|
| Repairs or modifications were made to anchor rods/bolts: ☐ Yes ☐ No<br><br>Locations of repairs/modifications: | Approval by: (Structural Engineer of Record):<br>Approval in writing? ☐ Yes ☐ No (attach)<br>Date approved:<br>As built drawings available? ☐ Yes ☐ No |

**You are notified of your responsibility to: (initial each)**

| | Initials: |
|---|---|
| Indicate to Skanska what material laydown areas are needed, and intended routes of transferring materials. Only those designated laydown areas will be utilized, and Skanska responsibility to maintain laydown areas will be limited to those that are designated. | |
| Preplan all overhead hoisting operations to prevent traveling loads over other contractor personnel, and to coordinate hoisting activities with Skanska and other contractors to minimize impacts on other operations. | |
| Provide a written site specific erection plan if any part of your operations will deviate from the published OSHA Standard 29 CFR 1926.752(e). | |
| Conduct documented daily inspections of all cranes, forklifts, and other hoisting equipment utilized in steel erection activities. | |
| Designate a qualified trained rigger(s) to inspect all rigging equipment (Submit record of training)<br>Name of qualified rigger: | |
| Maintain on the project written proof of training for all employees engaged in connecting, bolt-up, multiple lift rigging procedures, exposure to falls, equipment operation, and as required by any other specific standard. | |
| Assure that all columns are properly anchored by a minimum of 4 anchor bolts. | |
| Maintain and require the use of fall protection equipment for all employees exposed to fall elevations of 6 feet or greater as directed in the project Incident Prevention Program. | |
| Properly install perimeter guardrail systems on all exterior and interior leading edges consisting of a top rail and mid rail meeting the requirements of 29 CFR1926.502 (b)(1-15) | |
| Maintain required fire protection/prevention equipment appropriate to the type of work operation and hazards involved. | |
| Meet all other requirements of the Skanska Incident Prevention Program, Published OSHA Standards, and the requirements of local regulations. | |

_____          _____
**Skanska Project Manager/Superintendent**          **Steel Erector Subcontractor**

# SKANSKA

## Appendix L: Daily Scaffold Safety Inspection Report

**Inspection by:** _____  **Date:** _____
(Must Be a Competent Person)

**Company Name:** _____  **Time:** _____
**Project Name:** UF-323 Chemistry/Chemical Biology Building  **Project #:** 239012
**Scaffold Location:** _____

### Inspection Criteria

| | Yes | No | N/A | Action Taken |
|---|---|---|---|---|
| 1. Are 2"x10" mud sills and base plates used? | ☐ | ☐ | ☐ | _____ |
| 2. If CMU piers are used for footings are they poured solid? | ☐ | ☐ | ☐ | _____ |
| 3. Are all components free of damage? | ☐ | ☐ | ☐ | _____ |
| 4. Are scaffold frames plumb and level? | ☐ | ☐ | ☐ | _____ |
| 5. Are scaffold frames pinned together to prevent displacement? | ☐ | ☐ | ☐ | _____ |
| 6. Are cross braces used at all locations? | ☐ | ☐ | ☐ | _____ |
| 7. Are frames and braces compatible? | ☐ | ☐ | ☐ | _____ |
| 8. Are all working levels fully planked (Max. 1" gap between planks)? | ☐ | ☐ | ☐ | _____ |
| 9. Are all platforms at least 18" wide? | ☐ | ☐ | ☐ | _____ |
| 10. Is the work platform not more than 14" from the wall? | ☐ | ☐ | ☐ | _____ |
| 11. Do all planks overlap their end supports 6"-12"? | ☐ | ☐ | ☐ | _____ |
| 12. Are scaffold planks free of damage, splits, etc.? | ☐ | ☐ | ☐ | _____ |
| 13. Are scaffolds secured to the structure once the scaffold is 4 times as high as it is wide including guardrails? | ☐ | ☐ | ☐ | _____ |
| 14. Are scaffold ties repeated every 26' vertically after the first set of ties? | ☐ | ☐ | ☐ | _____ |
| 15. Where scaffold ties are required are they installed at both ends of the scaffold and at 30' max. intervals between ends? | ☐ | ☐ | ☐ | _____ |
| 16. Is a safe means of access provided to all scaffold platforms more than 2' high? (Extension ladders, attachable ladders, stairs or integral ladder access frames must be used.) | ☐ | ☐ | ☐ | _____ |
| 17. Does the ladder extend 3' above the platform? | ☐ | ☐ | ☐ | _____ |
| 18. Are ladders secured to prevent displacement? | ☐ | ☐ | ☐ | _____ |
| 19. Are ladders installed as scaffold is erected to provide access for erectors? | ☐ | ☐ | ☐ | _____ |
| 20. Are scaffolds at safe distances from power lines? | ☐ | ☐ | ☐ | _____ |
| 21. Are tag lines used when hoisting loads onto scaffolds with cranes? | ☐ | ☐ | ☐ | _____ |
| 22. Are guardrails installed on all platforms over 6' high? | ☐ | ☐ | ☐ | _____ |
| 23. Is the top rail between 38"–45" high and capable of supporting 200 lbs? | ☐ | ☐ | ☐ | _____ |
| 24. Are midrails capable of supporting 150 lbs.? | ☐ | ☐ | ☐ | _____ |
| 25. Where cross bracing is used as a midrail is the crossing point of the brace between 20" –30" above the work platform? | ☐ | ☐ | ☐ | _____ |
| 26. Where cross bracing is used as a top rail is the crossing point of the brace between 38" –48" above the work platform? (cross bracing cannot serve as both top rail and midrail) | ☐ | ☐ | ☐ | _____ |
| 27. Are platforms kept clear of unnecessary material and debris? | ☐ | ☐ | ☐ | _____ |
| 28. Are all material platforms equipped w/ toeboards? | ☐ | ☐ | ☐ | _____ |
| 29. Are all areas below and around scaffolds barricaded to prevent workers from walking under scaffolds? | ☐ | ☐ | ☐ | _____ |
| 30. Are canopies erected when workers must pass under scaffolds? | ☐ | ☐ | ☐ | _____ |
| 31. Are all scaffolds that are incomplete tagged "Danger Do Not Use"? | ☐ | ☐ | ☐ | _____ |
| 32. Are all damaged components removed from service and tagged "Danger Do Not Use"? | ☐ | ☐ | ☐ | _____ |
| 33. Are there legible scaffold tags at each access point? | ☐ | ☐ | ☐ | _____ |
| 34. Is the tag proper for the scaffold condition? (red, yellow, or green) | ☐ | ☐ | ☐ | _____ |

### Signatures

Competent Person's Signature _____ Date: _____
Superintendent's Signature: _____ Date: _____

  FL SHMP REV: 16/July/2014

# SKANSKA

## Appendix M: Work Site Safety Inspection Form

**PROJECT:** UF-323        **PROJECT #:**239012        **AREA INSPECTED:**
Chemistry Bldg.

**DATE:**                   **INSPECTED BY:**          **TITLE/POSITION:**

Indicate in space if <u>NEED IMPROVEMENT (NI), NOT APPLICABLE (NA), OR SATISFACTORY (S)</u>

**Note: All NI's must be documented in space below with date of corrective action completed.**

|  | NI | NA | S | Date Corrected |
|---|---|---|---|---|
| 1. Fall protection addressed properly, i.e. guardrails, personal fall arrest, nets, CAZ, warning line, 100% =double lanyard | ☐ | ☐ | ☐ | |
| Floor openings - guardrails used or covers secured and properly marked | ☐ | ☐ | ☐ | |
| Condition of harnesses, lanyards, retractables and lifelines – proper use | ☐ | ☐ | ☐ | |
| Impalement protection as needed - troughs or approved covers | ☐ | ☐ | ☐ | |
| 2. Scaffolding - proper foundation, fully decked with top rails, mid rails, toeboards and proper access.  Tied in when necessary | ☐ | ☐ | ☐ | |
| Documented inspection of scaffolding before use and a tagging system in place | ☐ | ☐ | ☐ | |
| Aerial and scissor lifts - personnel trained in proper use, 100% fall arrest in use | ☐ | ☐ | ☐ | |
| 3. Ladders being used properly, tied off, extend 3' above landing and in good condition. | ☐ | ☐ | ☐ | |
| 4. Trenches 5' deep or more properly sloped, shored, or trench box in use | ☐ | ☐ | ☐ | |
| Trench access within 25' of workers inside trenches 4' or deeper | ☐ | ☐ | ☐ | |
| Trench spoils at least 2' from trench edge and water accumulation controlled | ☐ | ☐ | ☐ | |
| Documented inspections of excavations before entering | ☐ | ☐ | ☐ | |
| 5. All tools properly guarded and GFCI'S tested, overhead high voltage signs posted | ☐ | ☐ | ☐ | |
| All extension cords/welding leads in good condition | ☐ | ☐ | ☐ | |
| 6. Compliance with hard hats, eye/hearing protection, high viz wear and respirators when  necessary | ☐ | ☐ | ☐ | |
| 7. Housekeeping including trip/slip & puncture hazards, clear aisles/stairways | ☐ | ☐ | ☐ | |
| 8. Charged fire extinguishers throughout | ☐ | ☐ | ☐ | |
| 9. Cranes - proper cribbing under outriggers, swing radius barricaded, CCO Opr | ☐ | ☐ | ☐ | |
| 3rd party annual certification and documented daily/monthly inspections | ☐ | ☐ | ☐ | |
| 10. Mobile Equipment – seat belt use and back-up alarm/spotter when required | ☐ | ☐ | ☐ | |
| **Engine oil, hydraulic/brake fluid, coolant and fuel storage leaks | ☐ | ☐ | ☐ | |
| 11. _____ | ☐ | ☐ | ☐ | |

**COMMENTS:**


Date last documented safety warning/citation issued


** - Observations/corrections involving leaks of any kind must be copied to the project EMS Coordinator

# SKANSKA

## Appendix N: Voluntary Use of a Disposable Respirator

I _____ am requesting to use a disposable paper filter respirator, also known as a Dust Mask for my personal comfort.

I will be performing the following work task: (Example Sweeping Floor, etc.)

_____

_____

I clearly described the task I am to perform to my supervisor or EHS coordinator and upon evaluating the task they determined I should not be exposed to a hazardous chemical or substance.

I have been supplied the following Dust Mask:
Brand:                                    Model:

I understand that the disposable dust mask is for personal comfort and not intended to protect me from a hazardous chemical or substance.  I further understand the voluntary use is limited to the task described above. Please read the following:

---

Appendix D to Sec. 1910.134 (Mandatory) Information for Employees Using Respirators When Not Required Under the Standard

Respirators are an effective method of protection against designated hazards when properly selected and worn.  Respirators use is encouraged, even when exposures are below the exposure limit, to provide an additional level of comfort and protection for workers. However, if a respirator is used improperly or not kept clean, the respirator itself can become a hazard to the worker.  Sometimes, workers may wear respirators to avoid exposures to hazards, even if the amount of hazardous substances does not exceed the limits set by OSHA standards.  If your employer provides respirators for your voluntary use, or if you provide your own respirator, you need to take certain precautions to be sure that the respirator itself does not present a hazard.

<u>You should do the following:</u>

1.  Read and heed all instructions provided by the manufacturer on use, maintenance, cleaning and care, and warnings regarding the respirators limitations.
2.  Choose respirators certified for use to protect against the contaminant of concern, NIOSH, the National Institute for Occupational Safety and Health of the U.S. Department of Health and Human Services certifies respirators.  A label or statement of certification should appear on the respirator or respirator packaging.  It will tell you what the respirator is designed for and how much it will protect you.
3.  Do not wear your respirator into atmospheres containing contaminants for which your respirator is not designed to protect against.  For example, a respirator designed to filter dust particles will not protect you against gases, vapors, or very small solid particles of fumes or smoke.
4.  Keep track of your respirator so that you do not mistakenly use someone else's respirator.

---

**I have read the above section from the OSHA standard for respiratory protection and understand its content.  I further understand that I am responsible for the care, maintenance/upkeep, and proper storage of this respirator.  Instructions on the proper wear were made available to me.**

_____

Signature:                                    Date:

# SKANSKA

## Appendix O: Lockout/Tagout Checklist

| Name of Contractor(s): | Scope of Work: |
|---|---|
| | ☐ Temporary Electrical Service<br>☐ Permanent Electrical Service<br>☐ Mechanical Work<br>☐ Other _____ |
| Name of Contractor's On Site Supervisor : | |
| Date of Coordination Meeting: | Date(s) LO/TO Will Be In Affect: |

Electrical hazards and many forms of stored energy are unique in that there are very few properties that warn of their presence. **The goal of this Checklist is to minimize the circumstances where electrical workers and others are exposed to the deadly hazards associated with stored energy.**
This Checklist shall be used to identify and/or review the following:
✓   Scope of work that requires LO/TO,
✓   Identify circumstances and/or locations where electrical hot work or other 'hot taps' <u>cannot be avoided</u>, and
✓   Identify the procedures and safety precautions that will be followed in the event hot work or a hot tap must proceed.
<u>The contents of this Checklist shall be reviewed with all affected contractor employees and Skanska personnel.</u>

| Name of Meeting Attendees: | Title/Responsibility: |
|---|---|
| | |
| | |
| | |
| | |

1. Does the Owner or host employer have a LO/TO Permit or LO/TO requirements?    **Yes   No**

2. Has a project specific safety plan or Job Hazard Analysis (JHA) been developed by the contractor(s) doing the work?    **Yes   No**

3. What type of energy sources or systems will be worked on and/or need to be isolated and locked out? (Check all that apply)

| Type of System | LO/TO Required? (Check One) | | |
|---|---|---|---|
| | Yes | No | N/A |
| ▪   Electrical | | | |
| ▪   High volt ($\geq$ 480 v) | | | |
| ▪   Low volt  (< 480 v) | | | |
| ▪   Mechanical | | | |
| ▪   Hydraulic/Steam | | | |
| ▪   Pneumatic | | | |
| ▪   Chemical | | | |
| ▪   Other | | | |

4. Are other contractors or entities affected by this lockout?    **YES   NO**

   If yes please Identify:

<u>**FL SHMP REV: 16/July/2014**</u>

# SKANSKA

5. Identify the companies and individuals who will responsible for leading the Lockout-Tagout program for their employer. These individuals must be on site for the duration of the lockout-tagout in most circumstances.

| Name of Contractor | Name of Individual |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

❑ Check here if Skanska will be participating in locking out the affected system(s).

**Safety Equipment and Procedures Checklist**

A. Will the work proceed in a flammable or Class I atmosphere? **YES   NO**
If no, continue to item B. If Yes, check all safety equipment that will be used.

❑ Non sparking tools
❑ Intrinsically safe lights, tools, radios, etc.
❑ Non static charging clothing or shoes
❑ LEL Monitor

B. Will other trades be working in the immediate vicinity of live circuits or otherwise be **YES   NO**
affected or exposed to the hazards of the activity?

If yes, describe safety precautions that must be taken to protect affected workers:
_____
_____

C. Check the safety equipment or procedures that will be followed to protect the safety of the workers conducting live work (hot taps, working on energized circuits, etc):

| | | |
|---|---|---|
| ❑ Safety glasses with side shields and/or face shield | ❑ Electrical blankets | ❑ Gloves (electrical, hot work, or chemical resistant?) |
| ❑ Hard hat (regular or high volt?) | ❑ Blankets for hot work | ❑ Insulating mats |
| ❑ Leathers or heat resistant clothing | ❑ Chemical resistant clothing | ❑ Barricades around the work area |
| ❑ Insulating tools | ❑ Air monitor | ❑ Retrieval equipment |
| ❑ Low volt lighting | ❑ Harness and lanyard | ❑ Locks and Tags |
| ❑ | ❑ | ❑ |
| ❑ | ❑ | ❑ |

D. To be completed by the employer(s) completing the work: **If work is to proceed on live, energized, charged, or otherwise operating systems, describe why work _cannot_ proceed in a locked-out or de-energized state.**

85                                                    FL SHMP REV: 16/July/2014

# SKANSKA

## Appendix P: Annual Inspection Forms – Lattice & Telescoping Boom

**Lattice Boom Crane – Periodic (Annual) Inspection**

| Date: | | Location: | | Service Status: | |
|---|---|---|---|---|---|
| Make: | | Model: | | Serial Number: | |
| Unit ID Number: | | Max. Capacity: | | Date of Manufacturer: | |
| Inspector: | | Title: | | Inspector Certification Number: | |

☒　　Before inspection crane, lockout/tagout power source
☒　　Consult Operator / Service Manual for additional inspection items, service bulletins, and other service information
☒　　Before inspection and operating, crane, crane must be set up away from power lines and leveled.
References:　　O – OSHA 1926.Subpart CC, ANSI B30.5 (1968)
　　　　　　　　A – ANSI / ASME B30.5 (1995)
　　　　　　　　C – New York City Cranes & Derricks (1996)
Status　　　　　S – Satisfactory　　　– Recommendation
　　　　　　　　D – Deficiency　　　　– Not Applicable

| Item | | Status | Item | | Status |
|---|---|---|---|---|---|
| **1.** | **Historical Data** | | **5.** | **Operator's Cab & Station (cont)** | |
| 1.1 | Monthly Inspection Records | | 5.7 | Fire Extinguisher | |
| 1.2 | Maintenance Records | | 5.8 | Mirrors | |
| 1.3 | Repair/Modification Records | | 5.9 | Seat Restraint | |
| 1.4 | Load Test Reports | | 5.10 | Seat Belt | |
| 1.5 | NYC Cranes & Derricks Certificate | | 5.11 | Operator's Manual | |
| 1.6 | Other | | 5.12 | Operating Instructions / Decals | |
| | | | 5.13 | Electrocution Warning Sign(inside) | |
| **2.** | **General** | | 5.14 | Hand Signal Chart | |
| 2.1 | Sheet Metal | | 5.15 | Swing Brake | |
| 2.2 | Guards / Covers | | 5.16 | Positive Swing Lock | |
| 2.3 | External Lights | | 5.17 | Controls-Forces / Movements | |
| 2.4 | Housekeeping | | 5.18 | Air Pressure | |
| 2.5 | Safety / Warning Decals & Labels | | 5.19 | Foot Brakes – Latches / Linkage | |
| 2.6 | Hand Signal Chart (outside) | | 5.20 | Power Controlled Lowering | |
| 2.7 | Paint Condition / Corrosion Control | | 5.21 | Engine Clutch | |
| 2.8 | Other | | 5.22 | Accelerator / Throttle Control | |
| 2.9 | Other | | 5.23 | Other | |
| | | | 5.24 | Other | |
| **3.** | **Power Plant** | | | | |
| 3.1 | Performance | | **6.** | **Load Chart** | |
| 3.2 | Exhaust System/Guards & Insulators | | 6.1 | Per Configuration | |
| 3.3 | Belts / Hoses – Condition | | 6.2 | Durable | |
| 3.4 | Guards/Covers–Rotate & Recip Parts | | 6.3 | Legible | |
| 3.5 | Other | | 6.4 | Visible from Operator's Station | |
| | | | 6.5 | Secured | |
| **4.** | **Crawler Assembly** | | 6.6 | Other | |
| 4.1 | Car Body / Side Frames | | | | |
| 4.2 | Chain – Condition / Adjustment | | **7** | **Safety Devices/ Operational Aids** | |
| 4.3 | Sprockets / Idlers / Rollers | | 7.1 | Warning Devices | |
| 4.4 | Track Pads / Pins | | 7.2 | Boom Angle Indicator | |
| 4.5 | Travel Locks | | 7.3 | Boom Length Indicator | |
| 4.6 | Steering Clutches | | 7.4 | Main Drum Rotation Indicator | |
| 4.7 | Other | | 7.5 | Aux. Drum Rotation Indicator | |
| 4.8 | Other | | 7.6 | Load Moment Indicator | |
| | | | 7.7 | Load Weight Indicator | |
| **5.** | **Operator's Cab and Station** | | 7.8 | Radius Indicator | |
| 5.1 | Grab Rails / Steps / Platforms | | 7.9 | Crane Level Indicator | |
| 5.2 | Anti-Skid Surface | | 7.10 | Anti-Two Block Device | |
| 5.3 | Protection from Weather | | 7.11 | Two Block Warning Device | |
| 5.4 | Window Glass | | 7.12 | Boom Hoist Shut Off | |

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**FL SHMP REV: 16/July/2014**

# SKANSKA

| 5.5 | Windshield Wiper(s) | | | | | |
|-----|---------------------|---|---|---|---|---|
| 5.6 | Door Restraint | | | | | |

| 8. | **Rotating Upper Structure** | |
|------|------------------------------|---|
| 8.1 | Turntable / Bearing | |
| 8.2 | Turntable – Rollers / Roller Path | |
| 8.3 | Ring Gear / Pinion Gear | |
| 8.4 | Hydraulic Pump(s) | |
| 8.5 | Hydraulic Hoses / Tubes / Fittings | |
| 8.6 | Hydraulic Pressure | |
| 8.7 | Electrical Wiring | |
| 8.8 | Main Hoist – Motor / Valves / Lines | |
| 8.9 | Main Hoist – Clutches / Brakes | |
| 8.10 | Main Hoist – Wrapping on Drum | |
| 8.11 | Main Hoist – Min. 2 Rope Wraps | |
| 8.12 | Aux. Hoist – Motor / Valves & Lines | |
| 8.13 | Aux. Hoist – Clutches / Brakes | |
| 8.14 | Aux. Hoist – Wrapping on Drum | |
| 8.15 | Aux. Hoist – Min. 2 Rope Wraps | |
| 8.16 | Boom Hoist – Motor / Valves & Lines | |
| 8.17 | Boom Hoist – Clutches / Brakes | |
| 8.18 | Boom Hoist – Wrapping on Drum | |
| 8.19 | Boom Hoist – Minimum 2 Rope Wraps | |
| 8.20 | Boom Hoist – Gears / Shafts / Etc | |
| 8.21 | Swing System / Assembly | |
| 8.22 | Hydraulic Motors / Valves / Lines | |
| 8.23 | Drums / Flanges | |
| 8.24 | Clutch / Brake Protection | |
| 8.25 | Torque Converter | |
| 8.26 | Anti-Skid Surface | |
| 8.27 | Steps / Hand Holds / Platforms | |
| 8.28 | Access to Cab and Roof | |
| 8.29 | Air System – Compressor / Lines etc | |
| 8.30 | Counterweight & Mounting | |
| 8.31 | Counterweight Warning Sign | |
| 8.32 | Electrocution Warning Sign (outside) | |
| 8.33 | House Lock | |
| 8.34 | Frame | |
| 8.35 | Swing Gear Box | |

| 9. | **Boom Support System** | |
|------|--------------------------|---|
| 9.1 | Gantry / Mast | |
| 9.2 | Boom Stops | |
| 9.3 | Inner Ball | |
| 9.4 | Outer Ball / Equalizer | |
| 9.5 | Sheaves | |
| 9.6 | Boom Hoist Reeving | |
| 9.7 | Other | |

| 10. | **Boom** | |
|-------|----------|---|
| 10.1 | Boom Selection Identification | |
| 10.2 | Boom Section Sequence | |
| 10.3 | Boom Section Alignment | |
| 10.4 | Warning Decals | |
| 10.5 | Spreader Bar | |
| 10.6 | Sheaves | |
| 10.7 | Hoist Line Dead End | |
| 10.8 | Wire Rope Retainer(s) | |
| 10.9 | Boom Foot Pins / Keepers | |
| 10.10 | Boom Head Section | |
| 10.11 | Auxiliary Boom Head | |
| 10.12 | Lattice Members | |
| 10.13 | Cord Members | |
| 10.14 | End Connections / Pins | |
| 10.15 | Lift Cylinder(s) | |
| 10.16 | Telescoping Cylinder(s) | |
| 10.17 | Hydraulic Hoses/Tubing & Fittings | |
| 10.18 | Holding Device (check valve) | |
| 10.19 | Wear Pads | |
| 10.20 | Equal Extension | |
| 10.21 | Boom Hinge Pin | |
| 10.22 | Structure | |
| 10.23 | Other | |
| 10.24 | Other | |

| 11. | **Jib** | |
|-------|---------|---|
| 11.1 | Positive Stops | |
| 11.2 | Sheave(s) | |
| 11.3 | Wire Rope Retainer(s) | |
| 11.4 | Lattice Members | |
| 11.5 | Cord Members | |
| 11.6 | End Containers / Pins | |
| 11.7 | Other | |

| 12. Wire Rope | | | | | | | | | | | |
|---------------|------|------|--------------|-------|------|----------------|------------------|-----------------|------------|--------------------|--------|
| Rope Application | Type | Size | Construction | Grade | Core | Rope Damage | Measured Wear | Broken Wires | Lubrication | End Connections | Status |
| Main Hoist Drum | | | | | | | | | | | |
| Aux. Hoist Drum | | | | | | | | | | | |
| Boom Hoist Drum | | | | | | | | | | | |
| Boom Pendants | | | | | | | | | | | |
| Jib Pendants | | | | | | | | | | | |

**SKANSKA**

| 13. | **Main Load Block & Hook** | |
|---|---|---|
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 13.1 | Capacity Marking | |
| 13.2 | Weight Marking | |
| 13.3 | Sheaves | |
| 13.4 | Safety Latches | |
| 13.5 | 10 Degree Hook Twist | |
| 13.6 | 15% Hook Throat Opening | |
| 13.7 | 10% Hook Wear | |
| 13.8 | Swivel | |
| 13.9 | Bearing | |
| 13.10 | Wedge Socket / End Fitting | |
| 13.11 | Reeving | |
| 13.12 | NDT – Results | |
| 13.13 | Other | |

| 14. | **Overhaul Ball & Hook** | |
|---|---|---|
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 14.1 | Capacity Marking | |
| 14.2 | Weight Marking | |
| 14.3 | Safety Latches | |
| 14.4 | 10 Degree Hook Twist | |
| 14.5 | 15% Hook Throat Opening | |
| 14.6 | 10% Hook Wear | |
| 14.7 | Swivel | |
| 14.8 | Bearing | |
| 14.9 | Wedge Socket / End Fitting | |
| 14.10 | NDT – Results | |
| 14.11 | Other | |
| 14.12 | Other | |
| 14.13 | Other | |

| **15. No-Load Operational Test** | | | |
|---|---|---|---|
| ITEM | | Status | Caution:  Operation of cranes by EHS Department inspectors shall be limited to those crane functions necessary to accomplish the inspection. |
| 15.1 | No-Load Operational Test | | Inspectors must be qualified as outlined in ANSI/ASME B30.5 |

| **16. Load Test** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hoisting From: | Boom / Ext. / Jib Length | Load Radius | Boom Angle | Parts of Line | Rated Capacity | Test Weight | % of Rated Capacity |
| Main Boom | | | | | | | |
| Jib | | | | | | | |

| Item | Status |
|---|---|
| Load Test Results | Passed    Failed    N/A |
| Explanation: | |
| | |
| | |
| | |
| | |

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

**Deficiency/Recommendation Report**

The following corrective action(s) (repairs, adjustments and replacement parts, etc.) are to be performed by a qualified person in accordance with all manufacturer's instructions, specifications and requirements. OSHA requires that "any deficiency (d) be repaired or defective parts replaced before continued use".

Recommendation(s) (R) should be considered for corrective action. The advisability of a particular recommendation depends on the facts of each situation. Any corrective action(s) is to be performed by a qualified person in accordance with all manufacturer's recommendations, specifications and requirements.

D = Deficiency R = Recommendation

| D / R | Item # | Explanation/Corrective Action | Date Corrected |
|-------|--------|------------------------------|----------------|
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |
|       |        |                              |                |

_____          _____
             Crane Inspector                                   Project / Equipment Manager

**Project Name:** UF-323 Chemistry/Chemical Biology Building     **Project No.** 239012     **Date**_____

# SKANSKA

---

**Telescoping Boom Crane – Periodic (Annual) Inspection**

| Date: | | Location: | | Service Status: | |
|---|---|---|---|---|---|
| Make: | | Model: | | Serial Number: | |
| Unit ID Number: | | Max. Capacity: | | Date of Manufacturer: | |
| Inspector: | | Operator: | | Inspection Interval: | Annual/ monthly |

☒ Before inspection crane, lockout/tagout power source
☒ Consult Operator / Service Manual for additional inspection items, service bulletins, and other service information
☒ Before inspection and operating, crane, crane must be set up away from power lines and leveled.

References:    O – OSHA 1926 Subpart CC, PCSA#2, ANSI B30.5(1968)
            A – ANSI / ASME B30.5 (1998), PCSA#4
            C – NYC RS 19-2 (1996)
Status    S – Satisfactory        D – Deficiency
            R – Recommendation    N – Not Applicable

| Item | | Status | | Item | | Status |
|---|---|---|---|---|---|---|
| **1.** | **Historical Data** | | | **5.** | **Outriggers** | |
| 1.1 | Monthly Inspection Records | | | 5.1 | Boxes | |
| 1.2 | Maintenance Records | | | 5.2 | Beams | |
| 1.3 | Repair/Modification Records | | | 5.3 | Cylinders | |
| 1.4 | Load Test Reports | | | 5.4 | Floats / Pads | |
| 1.5 | NYC Cranes & Derricks Certificate | | | 5.5 | Hydraulic Hoses / Tubing / Fittings | |
| 1.6 | Other | | | 5.6 | Holding Valves | |
| | | | | 5.7 | Position Locks | |
| **2.** | **General** | | | 5.8 | Warning Signs | |
| 2.1 | Sheet Metal | | | 5.9 | Other | |
| 2.2 | Guards / Covers | | | | | |
| 2.3 | External Lights | | | **6** | **Operator's Cab & Station** | |
| 2.4 | Housekeeping | | | 6.1 | Grab Rails / Steps / Platforms | |
| 2.5 | Safety / Warning Decals & Labels | | | 6.2 | Anti-Skid Surface | |
| 2.6 | Electrocution Warning Chart (outside) | | | 6.3 | Protection from Weather | |
| 2.7 | Hand Signal Chart (outside) | | | 6.4 | Window Glass | |
| 2.7 | Paint Condition / Corrosion Control | | | 6.5 | Windshield Wiper(s) | |
| 2.8 | License Plates | | | 6.6 | Door Restraint | |
| 2.9 | Other | | | 6.7 | Fire Extinguisher | |
| | | | | 6.8 | Mirrors | |
| **3.** | **Power Plant** | | | 6.9 | Seat Restraint | |
| 3.1 | Performance | | | 6.10 | Seat Belt | |
| 3.2 | Exhaust System/Guards & Insulators | | | 6.11 | Operator's Manual | |
| 3.3 | Belts / Hoses – Condition | | | 6.12 | Controls Clearly Identified | |
| 3.4 | Guards/Covers–Rotate & Recip Parts | | | 6.13 | Operating Instructions / Decals | |
| 3.5 | Other | | | 6.14 | Electrocution Warning Sign (inside) | |
| | | | | 6.15 | Hand Signal Chart | |
| **4.** | **Carrier** | | | 6.16 | Parking Brake | |
| 4.1 | Transmission Function | | | 6.17 | Swing Brake | |
| 4.2 | Drive Line Function | | | 6.18 | Positive Swing Lock | |
| 4.3 | Main Frame Members | | | 6.19 | Controls – Forces / Movements | |
| 4.4 | Hydraulic Hoses / Tubing / Fittings | | | 6.20 | Accelerator / Throttle Control | |
| 4.5 | Hydraulic Fluid Level | | | 6.21 | Air Pressure | |
| 4.6 | Anti-Skid Surface | | | 6.22 | Hydraulic Leaks | |
| 4.7 | Backup Alarm | | | 6.23 | Horn / Warning Device | |
| 4.8 | Tires / Wheels Condition | | | 6.24 | Electrical Access Panels Covered | |
| Front Left: | Size-      Press- | | | 6.25 | Other | |
| Front Rt: | Size-      Press- | | | | | |
| Back Left: | Size-      Press- | | | **7.** | **Load Chart** | |
| Back Rt: | Size-      Press- | | | 7.1 | Per Configuration | |
| 4.9 | Tire Size & Pressure per Load Chart | | | 7.2 | Durable & Legible | |
| | | | | 7.3 | Visible from Operator's Station | |
| | | | | 7.4 | Secured | |
| | | | | 7.5 | 75% of Tipping | |

# SKANSKA

| 8. | Safety Devices/ Operational Aids | |
|---|---|---|
| 8.1 | Boom Angle Indicator | |
| 8.2 | Boom Length Indicator | |
| 8.3 | Main Drum Rotation Indicator | |
| 8.4 | Aux. Drum Rotation Indicator | |
| 8.5 | Load Moment Indicator | |
| 8.6 | Load Weight Indicator | |
| 8.7 | Radius Indicator | |
| 8.8 | Crane Level Indicator | |
| 8.9 | Anti-Two Block Device | |
| 8.10 | Overload Indicator | |
| | | |
| 9. | Rotating Upper Structure | |
| 9.1 | Turntable | |
| 9.2 | House Lock | |
| 9.3 | Frame | |
| 9.4 | Hydraulic Pump(s) | |
| 9.5 | Hydraulic Hoses / Tubes / Fittings | |
| 9.6 | Hydraulic Pressure | |
| 9.7 | Electrical Wiring | |
| 9.8 | Main Hoist – Motor / Valves / Lines | |
| 9.9 | Main Hoist – Wrapping on Drum | |
| 9.10 | Main Hoist – Minimum 2 Rope Wraps | |
| 9.11 | Aux. Hoist – Motor / Valves & Lines | |
| 9.12 | Aux. Hoist – Wrapping on Drum | |
| 9.13 | Aux. Hoist – Minimum 2 Rope Wraps | |
| 9.14 | Counterweight / Mounting | |
| 9.15 | Swing Gear Box | |
| 9.16 | Electrocution Warning Sign (Outside) | |
| 9.17 | Counterweight Warning Sign | |
| 9.18 | Other | |
| 9.19 | Other | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| 10. | Main Boom | |
|---|---|---|
| 10.1 | Lift Cylinder(s) | |
| 10.2 | Telescoping Cylinder(s) | |
| 10.3 | Hydraulic Hoses/Tubing & Fittings | |
| 10.4 | Holding Device (check Valve) | |
| 10.5 | Boom Sections Alignment | |
| 10.6 | Wear Pads | |
| 10.7 | Equal Extension | |
| 10.8 | Sheaves | |
| 10.9 | Hoist Line Dead End | |
| 10.10 | Wire Rope Retainer | |
| 10.11 | Boom Hinge Pins | |
| 10.12 | Boom Head Section | |
| 10.13 | Auxiliary Boom Head | |
| 10.14 | Structure | |
| 10.15 | Other | |
| | | |
| 11. | Manual / Pinned Section | |
| 11.1 | Alignment | |
| 11.12 | Locking Device | |
| 11.13 | Structure | |
| 11.14 | Other | |
| | | |
| 12. | Lattice Boom Extension | |
| 12.1 | Boom Extension Alignment | |
| 12.2 | Cords | |
| 12.3 | Lattices | |
| 12.4 | End Connections | |
| 12.5 | Storage Device | |
| 12.6 | Sheave(s) | |
| 12.7 | Wire Rope Retainer | |
| 12.8 | Structure | |
| 12.9 | Other | |
| | | |
| 13. | Jib | |
| 13.1 | Positive Stops | |
| 13.2 | Sheave(s) | |
| 13.3 | Wire Rope Retainer(s) | |
| 13.4 | Structure | |
| 13.5 | Other | |

| 15.. Wire Rope | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rope Application | Type | OrigSize | Construction | Grade | Core | Rope Damage | Measured Wear | Broken Wires | Lubrication | End Connections | Status |
| Main Hoist | | | | | | | | | | | |
| Aux. Hoist | | | | | | | | | | | |

FL SHMP REV: 16/July/2014

**SKANSKA**

| 13. | **Main Load Block & Hook** | |
|---|---|---|
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 13.1 | Capacity Marking | |
| 13.2 | Weight Marking | |
| 13.3 | Sheaves | |
| 13.4 | Safety Latches | |
| 13.5 | 10 Degree Hook Twist | |
| 13.6 | 15% Hook Throat Opening | |
| 13.7 | 10% Hook Wear | |
| 13.8 | Swivel | |
| 13.9 | Bearing | |
| 13.10 | Wedge Socket / End Fitting | |
| 13.11 | Reeving | |
| 13.12 | NDT – Results | |
| 13.13 | Other | |

| 14. | **Overhaul Ball & Hook** | |
|---|---|---|
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 14.1 | Capacity Marking | |
| 14.2 | Weight Marking | |
| 14.3 | Safety Latches | |
| 14.4 | 10 Degree Hook Twist | |
| 14.5 | 15% Hook Throat Opening | |
| 14.6 | 10% Hook Wear | |
| 14.7 | Swivel | |
| 14.8 | Bearing | |
| 14.9 | Wedge Socket / End Fitting | |
| 14.10 | NDT – Results | |
| 14.11 | Other | |

| 15. No-Load Operational Test | | |
|---|---|---|
| ITEM | Status | Caution:  Operation of cranes by EHS Department inspectors shall be limited to those crane functions necessary to accomplish the inspection. Inspectors must be qualified as outlined in ANSI/ASME B30.5 |
| 15.1 | No-Load Operational Test | |

| 16. Load Test | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hoisting From: | Boom / Ext. / Jib Length | Load Radius | Boom Angle | Parts of Line | Rated Capacity | Test Weight | % of Rated Capacity |
| Main Boom | | | | | | | |
| Jib | | | | | | | |
| Boom Extension | | | | | | | |
| Jib | | | | | | | |

| ITEM | STATUS |
|---|---|
| Load Test Results | PASSED    FAILED    N/A |
| Explanation: | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# SKANSKA

**Deficiency/Recommendation Report**

> The following corrective action(s) (repairs, adjustments and replacement parts, etc.) are to be performed by a qualified person in accordance with all manufacturer's instructions, specifications and requirements. OSHA requires that "any deficiency (d) be repaired or defective parts replaced before continued use".

> Recommendation(s) (R) should be considered for corrective action. The advisability of a particular recommendation depends on the facts of each situation. Any corrective action(s) is to be performed by a qualified person in accordance with all manufacturer's recommendations, specifications and requirements.

D = Deficiency R = Recommendation

| D / R | Item # | Explanation/Corrective Action | Date Corrected |
|-------|--------|-------------------------------|----------------|
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |

_____          _____
       Crane Inspector                    Project / Equipment Manager

**Project Name:** UF-323 Chemistry/Chemical Biology Building   **Project Number:** 239012   **Date:** _____

# SKANSKA

## Appendix Q: Monthly Inspection Forms – Lattice & Telescoping Boom

**Lattice Boom Crane – Frequent (Monthly) Inspection Checklist**

| Date: | | Location: | | Service Status: | |
|---|---|---|---|---|---|
| Make: | | Model: | | Serial Number: | |
| Unit ID Number: | | Max. Capacity: | | Date of Manufacturer: | |
| Inspector: | | Operator: | | Superintendent: | |

☒   Before inspection crane, lockout/tagout power source
☒   Consult Operator / Service Manual for additional inspection items, service bulletins, and other service information
☒   Before inspection and operating, crane, crane must be set up away from power lines and leveled.

References:          O – OSHA 1926Subpart CC, ANSI B30.5 (1968)
                     A – ANSI / ASME B30.5 (1995)
                     C – New York City Cranes & Derricks (1996)
Status          S – Satisfactory          R – Recommendation
                D – Deficiency            N – Not Applicable

| Item | | Status | Item | | Status |
|---|---|---|---|---|---|
| **1.** | **Historical Data** | | **5.** | **Operator's Cab & Station (cont)** | |
| 1.1 | Daily Inspection Records | | 5.7 | Fire Extinguisher | |
| 1.2 | Maintenance Records | | 5.8 | Mirrors | |
| 1.3 | Repair/Modification Records | | 5.9 | Seat Restraint | |
| 1.4 | Load Test Reports | | 5.10 | Seat Belt | |
| 1.5 | NYC Cranes & Derricks Certificate | | 5.11 | Operator's Manual | |
| 1.6 | Other | | 5.12 | Operating Instructions / Decals | |
| | | | 5.13 | Electrocution Warning Sign(inside) | |
| **2.** | **General** | | 5.14 | Swing Brake | |
| 2.1 | Sheet Metal | | 5.15 | Positive Swing Lock | |
| 2.2 | Guards / Covers | | 5.16 | Controls-Forces / Movements | |
| 2.3 | External Lights | | 5.17 | Air Pressure | |
| 2.4 | Housekeeping | | 5.18 | Foot Brakes – Latches / Linkage | |
| 2.5 | Safety / Warning Decals & Labels | | 5.19 | Power Controlled Lowering | |
| 2.6 | Hand Signal Chart (outside) | | 5.20 | Engine Clutch | |
| 2.7 | Paint Condition / Corrosion Control | | 5.21 | Accelerator / Throttle Control | |
| 2.8 | Other | | 5.22 | Other | |
| 2.9 | Other | | 5.23 | Other | |
| | | | | | |
| **3.** | **Power Plant** | | **6.** | **Load Chart** | |
| 3.1 | Performance | | 6.1 | Per Configuration | |
| 3.2 | Exhaust System/Guards & Insulators | | 6.2 | Durable | |
| 3.3 | Belts / Hoses – Condition | | 6.3 | Legible | |
| 3.4 | Guards/Covers–Rotate & Recip Parts | | 6.4 | Visible from Operator's Station | |
| 3.5 | Other | | 6.5 | Secured | |
| | | | 6.6 | Other | |
| **4.** | **Crawler Assembly** | | | | |
| 4.1 | Car Body / Side Frames | | **7** | **Safety Devices/Operational Aids** | |
| 4.2 | Chain – Condition / Adjustment | | 7.1 | Warning Devices | |
| 4.3 | Sprockets / Idlers / Rollers | | 7.2 | Boom Angle Indicator | |
| 4.4 | Track Pads / Pins | | 7.3 | Boom Length Indicator | |
| 4.5 | Travel Locks | | 7.4 | Main Drum Rotation Indicator | |
| 4.6 | Steering Clutches | | 7.5 | Aux. Drum Rotation Indicator | |
| 4.7 | Other | | 7.6 | Load Moment Indicator | |
| | Other | | 7.7 | Load Weight Indicator | |
| | | | 7.8 | Radius Indicator | |
| **5.** | **Operator's Cab and Station** | | 7.9 | Crane Level Indicator | |
| 5.1 | Grab Rails / Steps / Platforms | | 7.10 | Anti-Two Block Device | |
| 5.2 | Anti-Skid Surface | | 7.11 | Two Block Warning Device | |
| 5.3 | Protection from Weather | | 7.12 | Boom Hoist Shut Off | |
| 5.4 | Window Glass | | 7.13 | Boom Hoist Ratchet and Pawl | |
| 5.5 | Windshield Wiper(s) | | 7.14 | Other | |

**FL SHMP REV: 16/July/2014**

**SKANSKA**

| | | |
|---|---|---|
| 5.6 | Door Restraint | |
| **8.** | **Rotating Upper Structure** | |
| 8.1 | Hydraulic Hoses/Tubes/Fittings | |
| 8.2 | Electrical Wiring | |
| 8.3 | Main Hoist – Clutches / Brakes | |
| 8.4 | Main Hoist – Wrapping On Drum | |
| 8.5 | Main Hoist – Min. 2 Rope Wraps | |
| 8.6 | Aux. Hoist – Motor, Valves & Lines | |
| 8.7 | Aux. Hoist – Clutches / Drums | |
| 8.8 | Aux. Hoist – Wrapping on Drum | |
| 8.9 | Aux. Hoist – Min. 2 Rope Wraps | |
| 8.10 | Boom Hoist – Motor, Valves & Lines | |
| 8.11 | Boom Hoist – Clutches / Brakes | |
| 8.12 | Boom Hoist – Wrapping on Drum | |
| 8.13 | Boom Hoist – Minimum 2 Rope Wraps | |
| 8.14 | Swing System / Assembly | |
| 8.15 | Anti-Skid Surface | |
| 8.16 | Steps / Hand Holds / Platforms | |
| 8.17 | Access to Cab and Roof | |
| 8.18 | Air System – Compressor / Lines etc | |
| 8.19 | Counterweight and Mounting | |
| 8.20 | Counterweight Warning Sign | |
| 8.21 | Electrocution Warning Sign (outside) | |
| | | |
| **9.** | **Boom & Support System** | |
| 9.1 | Boom Hoist Reeving | |
| 9.2 | Hoist Line Dead End | |
| 9.3 | Wire Rope Retainer(s) | |
| 9.4 | Boom Head Section | |
| 9.5 | Auxiliary Boom Head | |
| 9.6 | Hydraulic Hoses / Tubing & Fittings | |
| 9.7 | Holding Device (check valve) | |
| 9.8 | Other | |
| | Visual (Unable to lay boom down) | |
| | Physical (Able to lay boom down) | |
| | | |
| | | |
| | | |
| | | |
| | | |

| | | |
|---|---|---|
| **10.** | **Jib** | |
| 10.1 | Positive Stops | |
| 10.2 | Sheave(s) | |
| 10.3 | Wire Rope Retainer(s) | |
| 10.4 | Lattice Members | |
| 10.5 | Cord Members | |
| 10.6 | End Containers / Pins | |
| 10.7 | Other | |
| | Visual (Unable to lay boom down) | |
| | Physical (Able to lay boom down) | |
| **11.** | **Main Load Block & Hook** | |
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| 11.1 | Capacity Marking | |
| 11.2 | Weight Marking | |
| 11.3 | Sheaves | |
| 11.4 | Safety Latches | |
| 11.5 | 10 Degree Hook Twist | |
| 11.6 | 15% Hook Throat Opening | |
| 11.7 | 10% Hook Wear | |
| 11.8 | Swivel | |
| 11.9 | Bearing | |
| 11.10 | Wedge Socket / End Fitting | |
| 11.11 | Reeving | |
| | | |
| **12.** | **Overhaul Ball & Hook** | |
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| 12.1 | Capacity Marking | |
| 12.2 | Weight Marking | |
| 12.3 | Safety Latches | |
| 12.4 | 10 Degree Hook Twist | |
| 12.5 | Swivel | |
| 12.6 | Bearing | |
| 12.7 | Wedge Socket / End Fitting | |

**13. Wire Rope**

| Rope Application | Type | Size | Construction | Grade | Core | Rope Damage | Measured Wear | Broken Wires | Lubrication | End Connections | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Main Hoist Drum | | | | | | | | | | | |
| Aux. Hoist Drum | | | | | | | | | | | |
| Boom Hoist Drum | | | | | | | | | | | |
| Boom Pendants | | | | | | | | | | | |
| Jib Pendants | | | | | | | | | | | |

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

**Deficiency/Recommendation Report**

The following corrective action(s) (repairs, adjustments and replacement parts, etc.) are to be performed by a qualified person in accordance with all manufacturer's instructions, specifications and requirements.  OSHA requires that "any deficiency (d) be repaired or defective parts replaced before continued use".

Recommendation(s) (R) should be considered for corrective action.  The advisability of a particular recommendation depends on the facts of each situation.  Any corrective action(s) is to be performed by a qualified person in accordance with all manufacturer's recommendations, specifications and requirements.

D = Deficiency R = Recommendation

| D / R | Item# | Explanation/Corrective Action | Date Corrected |
|-------|-------|-------------------------------|----------------|
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |
|       |       |                               |                |

| Crane Inspector | Project / Equipment Manager |
|-----------------|-----------------------------|

**FL SHMP REV: 16/July/2014**

# SKANSKA

**Telescoping Boom Crane – Frequent (Monthly) Inspection**

| Date: | | Location: | | Service Status: | |
|---|---|---|---|---|---|
| Make: | | Model: | | Serial Number: | |
| Unit ID Number: | | Max. Capacity: | | Date of Manufacturer: | |
| Inspector: | | Operator: | | Superintendent: | |

☒   Before inspection crane, lockout/tagout power source
☒   Consult Operator / Service Manual for additional inspection items, service bulletins, and other service information
☒   Before inspection and operating, crane, crane must be set up away from power lines and leveled.

References:      O – OSHA 1926 Subpart CC, PCSA#2, ANSI B30.5 (1968)
                 A – ANSI / ASME B30.5 (1998)
                 C – New York City RS 19-2 (1996)
Status           S – Satisfactory          D – Deficiency
                 R – Recommendation        N – Not Applicable

| Item | | Status | Item | | Status |
|---|---|---|---|---|---|
| **1.** | **Historical Data** | | **5.** | **Outriggers** | |
| 1.1 | Daily Inspection Records | | 5.1 | Boxes | |
| 1.2 | Maintenance Records | | 5.2 | Beams | |
| 1.3 | Repair/Modification Records | | 5.3 | Cylinders | |
| 1.4 | Load Test Reports | | 5.4 | Floats / Pads | |
| 1.5 | NYC Cranes & Derricks Certificate | | 5.5 | Hydraulic Hoses / Tubing / Fittings | |
| 1.6 | Other | | 5.6 | Holding Valves | |
| | | | 5.7 | Position Locks | |
| **2.** | **General** | | 5.8 | Warning Signs | |
| 2.1 | Sheet Metal | | 5.9 | Other | |
| 2.2 | Guards / Covers | | | | |
| 2.3 | External Lights | | **6** | **Operator's Cab & Station** | |
| 2.4 | Housekeeping | | 6.1 | Grab Rails / Steps / Platforms | |
| 2.5 | Safety / Warning Decals & Labels | | 6.2 | Anti-Skid Surface | |
| 2.6 | Electrocution Warning Chart (outside) | | 6.3 | Protection from Weather | |
| 2.7 | Hand Signal Chart (outside) | | 6.4 | Window Glass | |
| 2.7 | Paint Condition / Corrosion Control | | 6.5 | Windshield Wiper(s) | |
| 2.8 | License Plates | | 6.6 | Door Restraint | |
| 2.9 | Other | | 6.7 | Fire Extinguisher | |
| | | | 6.8 | Mirrors | |
| **3.** | **Power Plant** | | 6.9 | Seat Restraint | |
| 3.1 | Startup and Performance | | 6.10 | Seat Belt | |
| 3.2 | Exhaust System/Guards & Insulators | | 6.11 | Operator's Manual | |
| 3.3 | Belts / Hoses – Condition | | 6.12 | Controls Clearly Identified | |
| 3.4 | Guards/Covers–Rotate & Recip Parts | | 6.13 | Operating Instructions / Decals | |
| 3.5 | Other | | 6.14 | Electrocution Warning Sign (inside) | |
| | | | 6.15 | Hand Signal Chart | |
| **4.** | Carrier | | 6.16 | Parking Brake | |
| 4.1 | Transmission Function | | 6.17 | Swing Brake | |
| 4.2 | Drive Line Function | | 6.18 | Positive Swing Lock | |
| 4.3 | Main Frame Members | | 6.19 | Controls – Forces / Movements | |
| 4.4 | Hydraulic Hoses / Tubing / Fittings | | 6.20 | Accelerator / Throttle Control | |
| 4.5 | Hydraulic Fluid Level | | 6.21 | Hydraulic Leaks | |
| 4.6 | Anti-Skid Surface | | 6.22 | Horn / Warning Device | |
| 4.7 | Backup Alarm | | 6.23 | Electrical Access Panels Covered | |
| 4.8 | Tires / Wheels Condition | | 6.24 | Other | |
| Front Left: Size-  Press-     Front Rt: Size-     Press- | | | | | |
| Back Left: Size-  Press-     Back Rt: Size-     Press- | | | **7.** | **Load Chart** | |
| 4.9 | Tire Size & Pressure per Load Chart | | | Per Configuration | |
| | | | | Durable & Legible | |
| | | | | Visible from Operator's Station | |
| | | | | Secured | |

**FL SHMP REV: 16/July/2014**

# SKANSKA

| | | |
|---|---|---|
| **8.** | **Safety Devices/ Operational Aids** | |
| 8.1 | Boom Angle Indicator | |
| 8.2 | Boom Length Indicator | |
| 8.3 | Main Drum Rotation Indicator | |
| 8.4 | Aux. Drum Rotation Indicator | |
| 8.5 | Load Moment Indicator | |
| 8.6 | Load Weight Indicator | |
| 8.7 | Radius Indicator | |
| 8.8 | Crane Level Indicator | |
| 8.9 | Anti-Two Block Device | |
| 8.10 | Overload Indicator | |
| | | |
| **9.** | **Rotating Upper Structure & Boom** | |
| 9.1 | Hoist Line Dead End | |
| 9.2 | Main Boom Head Section | |
| 9.3 | Auxiliary Boom Head | |
| 9.4 | Main Hoist – Wrapping on Drum | |
| 9.5 | Main Hoist – Minimum 2 Rope Wraps | |
| 9.6 | Aux. Hoist – Wrapping on Drum | |
| 9.7 | Aux. Hoist – Minimum 2 Rope Wraps | |
| 9.8 | Counterweight Warning Sign | |
| | | |
| **10.** | **Manual / Pinned Section** | |
| 10.1 | Alignment | |
| 10.2 | Locking Device | |
| 10.3 | Structure | |
| 10.4 | Other | |
| | | |
| **11.** | **Lattice Boom Extension** | |
| 11.1 | Boom Extension Alignment | |
| 11.2 | Sheave(s) | |
| 11.3 | Wire Rope Retainer | |
| 11.4 | Structure | |
| | Visual (Unable to lay boom down) | |
| | Physical (Able to lay boom down) | |
| | | |
| | | |
| | | |
| | | |
| | | |

| | | |
|---|---|---|
| | 75% of Tipping | |
| **12.** | **Jib** | |
| 12.1 | Positive Stops | |
| 12.2 | Sheave(s) | |
| 12.3 | Wire Rope Retainer(s) | |
| 12.4 | Structure | |
| 12.5 | Other | |
| | Visual  (Unable to lay boom down) | |
| | Physical (Able to lay boom down) | |
| | | |
| **13.** | **Main Load Block & Hook** | |
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 13.1 | Capacity Marking | |
| 13.2 | Weight Marking | |
| 13.3 | Sheaves | |
| 13.4 | Safety Latches | |
| 13.5 | 10 Degree Hook Twist | |
| 13.6 | 15% Hook Throat Opening | |
| 13.7 | 10% Hook Wear | |
| 13.8 | Swivel | |
| 13.9 | Bearing | |
| 13.10 | Wedge Socket / End Fitting | |
| 13.11 | Reeving | |
| | | |
| **14.** | **Overhaul Ball & Hook** | |
| Manufacturer: | | |
| Rated Capacity: | | |
| Block Weight: | | |
| Original Hook Throat Opening: | | |
| | | |
| 14.1 | Capacity Marking | |
| 14.2 | Weight Marking | |
| 14.3 | Safety Latches | |
| 14.4 | 10 Degree Hook Twist | |
| 14.5 | 15% Hook Throat Opening | |
| 14.6 | 10% Hook Wear | |
| 14.7 | Swivel | |
| 14.8 | Bearing | |
| 14.9 | Wedge Socket / End Fitting | |

**15.. Wire Rope**

| Rope Application | Type | Size | Construction | Grade | Core | Rope Damage | Measured Wear | Broken Wires | Lubrication | End Connections | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Main Hoist | | | | | | | | | | | |
| Aux. Hoist | | | | | | | | | | | |

98

**SKANSKA**

**Deficiency/Recommendation Report**

The following corrective action(s) (repairs, adjustments and replacement parts, etc.) are to be performed by a qualified person in accordance with all manufacturer's instructions, specifications and requirements. OSHA requires that "any deficiency (d) be repaired or defective parts replaced before continued use".

Recommendation(s) (R) should be considered for corrective action. The advisability of a particular recommendation depends on the facts of each situation. Any corrective action(s) is to be performed by a qualified person in accordance with all manufacturer's recommendations, specifications and requirements.

D = Deficiency R = Recommendation

| D / R | Item # | Explanation/Corrective Action | Date Corrected |
|-------|--------|-------------------------------|----------------|
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |
|       |        |                               |                |

_____          _____
Crane Inspector                           Project / Equipment Manager

**FL SHMP REV: 16/July/2014**

# SKANSKA

## Appendix R: Daily Inspection Forms – Lattice & Telescoping Boom

**Lattice Boom Crane – Daily Inspection Checklist**

Make/Model: _____     Serial #: _____

Unit ID: _____     Jobsite: UF-323 Chemistry/Chemical Biology Building

Inspector: _____     Date: _____

| S = Satisfactory | | D = Deficiency | | | N/A = Not Applicable | | | |
|---|---|---|---|---|---|---|---|---|
| **Condition** | | **MON** | **TUE** | **WED** | **THU** | **FRI** | **SAT** | **SUN** |
| Fluid Level | 1. Crankcase Oil | | | | | | | |
| | 2. Coolant | | | | | | | |
| | 3. Hydraulic Oil | | | | | | | |
| CAB(S) | 4. Electrical System | | | | | | | |
| | 5. House Lock | | | | | | | |
| | 6. Service / Parking Brake | | | | | | | |
| | 7. Swing Brake / House Lock | | | | | | | |
| | 8. Gauges | | | | | | | |
| | 9. Housekeeping | | | | | | | |
| | 10. Fire extinguisher(s) | | | | | | | |
| | 11. Load Chart | | | | | | | |
| | 12. Windows / Mirrors | | | | | | | |
| Functions | 13. Travel | | | | | | | |
| | 14. Steering | | | | | | | |
| | 15. Outriggers | | | | | | | |
| | 16. Boom Up / Down | | | | | | | |
| | 17. Hoist Up / Down | | | | | | | |
| | 18. Swing | | | | | | | |
| Safety Devices | 19. Anti Two-Block | | | | | | | |
| | 20. LMI / Load Weight Indicator | | | | | | | |
| | 21. Boom Angle Indicator | | | | | | | |
| | 22. Lights / Locks / Buzzers | | | | | | | |
| | 23. Back Up Alarm / Horn | | | | | | | |
| | 24. Boom Kick Out | | | | | | | |
| Boom, Jib & Accessories | 25. Load Block / Ball / Hooks | | | | | | | |
| | 26. Safety Latches | | | | | | | |
| | 27. Wedge Sockets | | | | | | | |
| | 28. Sheaves | | | | | | | |
| | 29. Wire Rope Retainers | | | | | | | |
| | 30. Main Boom | | | | | | | |
| | 31. Jib / Extension | | | | | | | |
| Lower Works | 32. Tires / Inflation | | | | | | | |
| | 33. Carrier / Car Body | | | | | | | |
| | 34. Shoes / Tracks / Chain | | | | | | | |
| | 35. Outriggers | | | | | | | |
| | 36. Machine Guards | | | | | | | |
| | 37. Hoist Brakes / Clutches | | | | | | | |
| Upper Works | 38. Hoses / Tubing | | | | | | | |
| | 39. Hoist(s) | | | | | | | |
| | 40. Wrapping on Drum | | | | | | | |
| | 41. Rope Reeving | | | | | | | |
| | 42. Wire Rope | | | | | | | |
| | 43. Gantries / Bridles | | | | | | | |
| | Operator's Initials | | | | | | | |

**Superintendant Signature:** _____

**Telescoping Boom Crane – Daily Inspection Checklist**

# SKANSKA

Make/Model: _____    Serial #: _____

Unit ID: _____    Jobsite:  UF-323 Chemistry/Chemical Biology Building

Inspector: _____    Date: _____

| S = Satisfactory | | D = Deficiency | | | | N/A = Not Applicable | | |
|---|---|---|---|---|---|---|---|---|
| **Condition** | | MON | TUE | WED | THU | FRI | SAT | SUN |
| **Fluid Level** | 1. Crankcase Oil | | | | | | | |
| | 2. Coolant | | | | | | | |
| | 3. Hydraulic Oil | | | | | | | |
| **CAB(S)** | 4. Electrical System | | | | | | | |
| | 5. Service / Parking Brake | | | | | | | |
| | 6. Swing Brake / House Lock | | | | | | | |
| | 7. Gauges | | | | | | | |
| | 8. Housekeeping | | | | | | | |
| | 9. Fire Extinguisher(s) | | | | | | | |
| | 10. Load Chart | | | | | | | |
| | 11. Windows / Mirrors | | | | | | | |
| | 12. Travel | | | | | | | |
| **Functions** | 13. Steering | | | | | | | |
| | 14. Outriggers | | | | | | | |
| | 15. Boom Up/Down | | | | | | | |
| | 16. Boom In / Out | | | | | | | |
| | 17. Hoist Up/Down | | | | | | | |
| | 18. Swing | | | | | | | |
| **Safety Devices** | 19. Anti Two-Block | | | | | | | |
| | 20. LMI / Load Weight Indicator | | | | | | | |
| | 21. Boom Length Indicator | | | | | | | |
| | 22. Boom Angle Indicator | | | | | | | |
| | 23. Radius Indicator | | | | | | | |
| | 24. Warning Lights / Alarms | | | | | | | |
| **Boom, Jib & Accessories** | 25. Back Up Alarm & Horn | | | | | | | |
| | 26. Load Block / Ball / Hook(s) | | | | | | | |
| | 27. Safety Latches | | | | | | | |
| | 28. Wedge Socket(s) | | | | | | | |
| | 29. Sheaves | | | | | | | |
| | 30. Wire Rope Retainers | | | | | | | |
| | 31. Main Boom | | | | | | | |
| **Lower Works** | 32. Jib / Extension | | | | | | | |
| | 33. Lift Cylinder(s) | | | | | | | |
| | 34. Tires / Inflation | | | | | | | |
| | 35. Carrier | | | | | | | |
| | 36 Outriggers | | | | | | | |
| | 37. Machine Guards | | | | | | | |
| **Upper Works** | 38. Hoist Break(s) | | | | | | | |
| | 39. Hoses / Tubing | | | | | | | |
| | 40. Hoist(s) | | | | | | | |
| | 41. Wrapping on Drum(s) | | | | | | | |
| | 42. Rope Reeving | | | | | | | |
| | 43. Wire Rope | | | | | | | |
| | Operator's Initials | | | | | | | |

**Superintendant Signature:** _____

# SKANSKA

## Appendix S: Crane Maintenance Checklist

| | |
|---|---|
| Rig # : | |
| Rig Model: | |
| Rig Hours: | |
| CD #: | |
| Date of Check List | |
| Month of Check List | |
| *Recommended* — Operator | |
| *Monthly Maintenance Check List* — Maintenance Person | |
| Super/PM on Jobsite | |
| Job# | 239012 |
| Jobsite Name | |

| *Description of Service* | *Action* | Action Recorded | | |
|---|---|---|---|---|
| | | *Good* | *N/G* | *Needs Mechanic* |
| Air Cleaner Restriction | Check | | | |
| Charge Air Piping | Check | | | |
| Charge Air Cooler | Check | | | |
| Fuel Injection Pump Mounting | Check | | | |
| Air Compressor Mounting | Check | | | |
| Filter or Change the Hydraulic Oil | Check/Change If Needed | | | |
| Replace the Hydraulic Oil Filter Elements | Check/Change If Needed | | | |
| Clean the Hydraulic Oil Tank | If Needed | | | |
| Pressure Settings of the Hydraulic System | Check | | | |
| Hydraulic Valve System Functions Properly | Check | | | |
| Hydraulic Hose and Pipe Connections | Check | | | |
| Mountings of the Hydraulic Pumps | Check | | | |
| Torque up the Slewing Ring and the Swing Drive Bolts | Check/Tighten If Needed | | | |
| Winch Brakes | Check | | | |
| Winch Transmission Oil Level | Check/Refill If Needed | | | |
| Track Drive Transmission Oil Level | Check/Refill If Needed | | | |
| Swing Drive Transmission Oil Level | Check/Refill If Needed | | | |
| Tighten the Track Shoe Bolts | Check / Tighten If Needed | | | |
| Hydraulic Cooler | Check/Clean If Needed | | | |

A copy of this Report must be left in the rig at all times.
Please note that all actions shall be done the first of every month.
If a Mechanic is needed please notify your Superintendent or Project Manager

FL SHMP REV: 16/July/2014

# SKANSKA

## Appendix T: Critical Lift Checklist

|  | Go | No Go |
|---|---|---|
| Date | | |
| Work Description | | |
| Work Duration | | |
| Associated Working Drawings | | |
| Crane Model | | |
| Location Pick | | |
| Capacity of Crane at Pick Radius | | |
| Weight of Pick | | |
| Ground Conditions | | |
| Overhead Wires Present | | |
| Proximity to Traffic | | |
| Outrigger Placement | | |
| Outrigger Blocking as per Drawing | | |
| Rigging in good working order | | |
| Delivery Location | | |
| Wind Speed and Approximate Direction | | |
| Weather | | |
| Operator | | |
| IW Foreman | | |
| Supervisor | | |
| Design Engineer | | |

Prepared by _____

Approved by _____

**SKANSKA**

## Appendix U: Tower Crane Checklist

| 1 | **Tower Crane Requirement** | |
|---|---|---|
| A | Mobile Vs. Tower | Superintendent |
| | | |
| 2 | **Tower Crane Selection** | |
| A | Load Requirements. | Superintendent |
| B | Reach Requirements | Superintendent |
| C | Location | Superintendent |
| D | When Required | Superintendent |
| E | Lead Time | Superintendent |
| F | Place Order (Define Final commitment Date) | Superintendent / PM |
| | | |
| 3 | **Geotechnical Considerations** | |
| A | Sub grade - Evaluation & Test Report | Geo Technical Engineers |
| B | Rat Slab Installation Prior to Tower Crane Foundation Pour | Skanska |
| | | |
| 4 | **Foundation Considerations** | |
| A | Structural Design by Structural Engineer | Structural Engineer |
| B | Tower Crane Loads Transmitted to Structural Engineer Provided by Crane Supplier | Crane Supplier |
| C | Reinforcing Steel Submittal (Blow-up of Footing Detail and Rebar Schedule) | Skanska |
| D | Special Inspection Report of Footing Reinforcing and Concrete | Special Inspector |
| E | Structural Engineer Inspection of Footing Prior to Concrete Pour | Structural Engineer |
| F | Concrete Strength Required for Plinths and Footing from Structural Engineer | Structural Engineer |
| G | Concrete Break Reports of Plinth and Footing | Special Inspector |
| | | |
| 5 | **Electrical Considerations** | |
| A | Electrical Permit for Crane Temporary Power | Electrical Contractor |
| B | Electrical Inspection Report | Electrical Contractor |
| C | Miscellaneous Crane Specific Electrical Information | Crane Supplier |
| | | |
| 6 | **Tower Crane Erection Considerations** | |
| A | Set Tower Crane Base | |
| | 1  Critical Pick Plan to Set Base Provided by Erector | Crane Erector |
| | 2  Plumb Tolerance of Base | |
| |   a  Crane Supplier Provide Base Plumb Tolerance | Crane Supplier |
| |   b  Pre-erection Base Plumb Survey Transmitted to Crane Supplier | Skanska |
| |   c  Post-erection Base Plumb Survey Transmitted to Crane Supplier | Skanska |
| | 3  Traffic Control Plan | Crane Erector |
| B | Pre-Inspection of Tower Crane | 3rd Party Crane Inspector |
| | 1  Pre-erection Inspection Report from Skanska 3rd Party Consultant | Skanska |
| | 2  Skanska Superintendent Daily Log as witness to Pre-erection Inspection | Skanska |
| | 3  Documentation of Skanska Request for Repairs Noted in 3rd Party Pre-erection Inspection Report | Skanska |
| | 4  Documentation from Crane Supplier that Skanska 3rd Party Consultant Requested Repairs are Complete | Crane Supplier |
| | 5  Crane Suppliers 3rd Party Consultant Pre-Inspection Report | Crane Supplier |
| | 6  Documentation from Crane Supplier that their 3rd Party Consultant Requested Repairs are Complete | Crane Supplier |

**SKANSKA**

| | | | |
|---|---|---|---|
| C | Set Tower Crane | | |
| | 1 | JHA in Place | Skanska |
| | 2 | Traffic Control Plan | Crane Erector |
| | 3 | Critical Pick Plan to Set Tower Provided by Erector | Crane Erector |
| | 4 | Documentation of Where and How Erection Equipment can sit on Site Relative to Shoring Wall | Skanska |
| | 5 | Copies of Crane Certificate for Assist Cranes | Crane Erector |
| | 6 | Confirmation of Skanska Operator being Nationally Certified | Skanska |
| | 7 | Confirmation of Erector Operators being Nationally Certified | Crane Erector |
| | 8 | Erector Safety Plan | |
| | | a    Project Specific Safety Plan for Erector | Crane Erector |
| | | b    Pre/post-task Safety Plan - Including day of erection crew signatures | Crane Erector |
| | | c    Fall Protection Plan Specific to Erection Day Operation - Including day of erection crew signatures | Crane Erector |
| | 9 | Copies of Insurance Certificates | |
| | | a    Erector | Crane Erector |
| | | b    Crane Supplier - for their Technician | Crane Supplier |
| | 10 | Drug Testing | |
| | | a    Copy of Erector's Company Drug Test Policy - w/employees names if possible | Crane Erector |
| | 11 | Site Environmental, Health & Safety Orientation | Skanska |
| | | | |
| **7** | **Post-Erection Inspections** | | |
| A | Crane Suppliers Post Inspection Reports | | |
| | 1 | Certification & Acceptance Report | Crane Supplier |
| | 2 | 2nd Re-torque Tower & Turntable Inspection & Field Service Report (30 days or 80 hours) | Crane Supplies |
| B | Skanska 3rd Party Consultant Inspection Report | | 3rd Party Crane Inspector |
| | | | |
| **8** | **Jump Considerations** | | |
| A | JHA in Place | | Skanska |
| B | Pre/Post-Task Safety Plan | | Crane Erector |
| C | Post Jump 3rd Party Consultant Inspection Report | | 3rd Party Crane Inspector |
| | | | |
| **9** | **Appendix** | | |
| A | Yearly Inspection Report - Crane Supplier | | Crane Supplier |
| B | Miscellaneous Field Service Reports - Crane Supplier | | Crane Supplier |
| C | Quarterly Inspection Reports | | 3rd Party Inspector |
| D | Daily Inspections - Operator | | Skanska |

# SKANSKA

## Appendix V: Lift Plan Example



DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA



# SKANSKA

## GENERAL NOTES FOR MOBILE CRANES

1. Contractor to verify all dimensions and site conditions prior to commencing work. Any errors, omissions, or unusual conditions to be reported to the Office of Neil Greenblatt immediately.

2. That the crane to be used is a Liebherr LTM 1100/2 Hydraulic crane with 17' boom + 62' Jib @ 0° offset and 25.4 kip counterweight on 19'-7 1/2" outrigger spacing (CD#3244). Refer to drawing ER-1 for pick-radii limits.

3. The operational notes herein are offered for information and guidance and are not to be taken to infer that the Engineer is any way involved in or is responsible for the actual placement, installation, or operation of the crane in site field.

4. Reduce crane load ratings to account for wind on load. Consult operator's manual for requirements when wind exceeds 20 m.p.h. Do not operate in winds over 30 m.p.h.

5. If winds exceed 50 m.p.h. lower boom to ground unless manufacturer's instructions indicate otherwise.

6. Crane operations are to be conducted in accordance with ANSI/ASME B30.5a-1984, appropriate OSHA rules and R.5 19-2 of the New York City Building Code.

7. Crane is to be operated only by New York City Licensed Operator.

8. All trucks shall be located within the barricaded area and no lifting shall be done over pedestrians, vehicles or adjacent buildings.

OUTRIGGER DUNNAGE
4 # #'x 9' x 14' MIN. TIMBERS OR 2# A.T. 3" x 4'-6" x 14" MIN. STEEL PLATE CENTERED UNDER OUTRIGGER (TYP.)

FRONT
CRANE
TAIL SW. RD.
12'-7"
22" SQ. OUT PAD (TYP.)
REAR

LIEBHERR LTM 1100 CRANE PART PLAN
(SCALE 1" = 10')

GRAPHICAL SCALE 1" = 10'
0    5'    10'    15'    20'

LIEBHERR LTM 1100 HYDRAULIC CRANE - PART PLAN & NOTES

| JV CORPORATION | MLA ENGINEERING NO, P.C. | 1095 AVENUE OF THE AMERICAS | JOB #: 09-033 |
|---|---|---|---|
| 2 GALASSO PLACE | 600 HEMPSTEAD TPKE. | NEW YORK, NY | DWG. 3/23/09 |
| MASPETH, NY 11578 | W. HEMPSTEAD, NY 11552 | | DWN. BY: M.B. |
| (718) 456-1800 | (516) 292-1000 | | SHEET No. ER-3 of 3 |

# SKANSKA

**NYC TRANSIT GENERAL NOTES**

**LIEBHERR LTM 1100 HYDRAULIC CRANE - NYCTA GENERAL NOTES**

| | | | |
|---|---|---|---|
| JV CORPORATION<br>2 GALASSO PLACE<br>MASPETH, NY 1378<br>(718) 456-1800 | MRA ENGINEERING, P.C.<br>6100 HEMPSTEAD TPKE<br>W. HEMPSTEAD, NY 1552<br>(516) 292-1000 | 1095 AVENUE OF THE AMERICAS<br>NEW YORK, NY | JOB #: 08-278<br>DATE: 8/28/08<br>DRWN BY: M.G<br><br>SHEET No.<br>TA-1 of 2 |

**FL SHMP REV: 16/July/2014**

**SKANSKA**

## Appendix W: Soil Bearing Chart

Mobile Crane
Outrigger Loads
100,000 lbs. on 2′ x 2′ Float-Ram 4″ Diameter

### Soil Bearing Capacities

| Soils | | Approximate Bearing Capacities |
|---|---|---|
| Hardpan-Cemented Sand & Gravel | | 135 PSI |
| Gravel-Sand & Gravel - | Compact | 110 PSI |
| | Firm | 81 PSI |
| | Loose | 54 PSI |
| Sand-Coarse to Medium - | Compact | 81 PSI |
| | Firm | 60 PSI |
| | Loose | 40 PSI |
| Sand-Fine, Silty, or with trace of Clay - | Compact | 54 PSI |
| | Firm | 40 PSI |
| | Loose | 27 PSI |
| Silt | Compact | 40 PSI |
| | Firm | 33 PSI |
| | Loose | 27 PSI |
| Clay | Compact | 54 PSI |
| | Firm | 33 PSI |
| | Loose | 13 PSI |

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68F48D0DEDD6

# SKANSKA

## Appendix X: Pre-Demolition Survey

**Please Print Clearly**

Project Name: ___UF-323 Chemistry/Chemical Biology___    Project No: ___239012___

Location: ___Gainesville, Florida___    Survey Date: _____

Name: _____

Major Cross Streets: ___W. University Ave. and Buckman Drive___    Title: _____

## Structure Information

**Structure Type:** _____

| | | | | | | |
|---|---|---|---|---|---|---|
| **Basement:** | Yes | No | **Type:** | Block | Concrete | Other: _____ |

**Building Height:** _____    **No: of Stories:** _____

**Shoring Required:**    Yes    No
*If Yes complete the following:*
  Type of Shoring    **Describe:** _____
  Location of Shoring    **Describe:** _____

**Adjacent Properties:**    Yes    No    **Describe:** _____
*If Yes complete the following:*
  Protection Required:    Yes    No    **Describe:** _____
  Underground Tanks    Yes    No    **Describe:** _____
    Location of Tanks    **Describe:** _____
    Previous Use:    **Describe:** _____
  Tanks Drained    Yes    No    **Date:** _____
  Tanks Purged:    Yes    No    **Date:** _____
  Tested:    Yes    No    Performed By: _____

**Public Prot. Required:**    Yes    No    **Describe:** _____
*If Yes complete the following:*
  Signage:    Yes    No    **Describe:** _____
  Barricades:    Yes    No    **Describe:** _____
  Fencing:    Yes    No    **Describe:** _____

**Demo Methods:** _____

# SKANSKA

**Disconnects**

Reference No: _____

| Utility Disconnect | | | Disconnect Date | Utility Contact Name & Phone |
|---|---|---|---|---|
| Electric | Yes | No | | |
| Gas | Yes | No | _____ | _____ |
| Water | Yes | No | _____ | _____ |
| Sewer | Yes | No | _____ | _____ |
| Phone | Yes | No | _____ | _____ |
| Security | Yes | No | _____ | _____ |
| PC Network | Yes | No | _____ | _____ |

**Location of Energized Power / Communication Lines / Gas:**

_____

[ ] Original –Superintendent                    Signature

[ ] Copy-General Superintendent

[ ] Copy-Main Office Safety File via EHS Director

**SKANSKA**

Permit #_____

## Appendix Y: Safety Deviation Ticket

**Subcontractor:** _____  **Date Observed:** _____

**Job Site:** UF-323
Chemistry

**Type of Deviation:**  ☐ Safety/Health   ☐ Housekeeping
☐ Environmental

**Location:** _____

**Description of Deviation:** _____

_____

_____

_____

**Remedial Work Required:** _____

_____

_____

_____

**The subcontractor is hereby directed to perform the noted remedial work by no later than _____.   Until the remedial work is completed by the subcontractor and acknowledged by Skanska, $_____ will be withheld from any payment due to the subcontractor prior to the specified date, this document will serve as written notice the Skanska, at it's sole discretion and without any further notice, may elect to perform the remedial work and all associated costs will be deducted from the subcontractor's price.**

Skanska Initiator: _____

**Remedial Work Acknowledgement**

Remedial Work Performed by: _____  Back charge: $ _____

Remedial Work Observed: _____  Date Observed: _____

Additional Copies: _____  Project Accounting  _____
Regional EHS Director  _____

# SKANSKA

Permit #_____

## Appendix Z: Daily Forklift Inspection

| | | | |
|---|---|---|---|
| **Inspection by:** | _____ | **Date:** | _____ |
| | (Licensed Forklift Operator) | | |
| **Company Name:** | _____ | **Time:** | _____ |
| **Project Name:** | UF-323 Chemistry/Chemical Biology Building | **Project #:** | 239012 |
| **Forklift Make & Model:** | _____ | | |

### INSPECTION CRITERIA

| | M | T | W | TH | F | S | Comments |
|---|---|---|---|---|---|---|---|
| 1. Forks free of damage. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 2. Forks of appropriate capacity and match. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 3. Engine oil. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 4. Hydraulic fluid. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 5. Fuel, engine coolant and brake fluid. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 6. Hydraulic leaks. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 7. Condition of hydraulic hoses. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 8. Tire pressure. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 9. Tire condition. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 10. Tire ballast. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 11. Lugs tight. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 12. Seat belt. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 13. Back-up alarm. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 14. Horn. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 15. Lights and signals. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 16. Load chart visible to operator. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 17. Fire extinguisher. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 18. Mirrors. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 19. Roll Over Protective Structure. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 20. Frame level indicator. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 21. Boom angle indicator. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 22. Operator's Manual available. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 23. Evidence of structural damage. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 24. Floorboard free of debris. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 25. Gauges working properly. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 26. Service brake. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 27. Parking brake. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 28. Steering (All modes). | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 29. Transmission. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| 30. Hydraulic controls (Function test and cycle): | | | | | | | |
| Boom/Mast – Up & Down. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Boom – Extend & Retract. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Fork Tilt – Forward & Backward. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Frame Level – Left & Right. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Carriage Tilt – Left & Right. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Traverse – Forward & Backward. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Fork Side Shift – Left & Right. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |
| Outriggers – Up & Down. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | _____ |

### Signatures

| | | |
|---|---|---|
| Inspector's Signature:_____ | Date:_____ |
| Superintendent's Signature:_____ | Date:_____ |

FL SHMP REV: 16/July/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

**SKANSKA**

Permit #_____

## Appendix AA: Daily Stilt Permit

Date: _____

Project: UF-323 Chemistry/Chemical Biology Building    Foreman: _____

Type of work:
_____

Stilt Height: _____

| Condition | Yes | No |
|---|---|---|
| Has the floor be swept clean daily and have all trip and slip hazards, including extension cords, conduit, threaded rod, Hilti® loads, caution tape, studs, track, drywall, etc. be picked up daily before starting any stilt work? | | |
| Will the floor always be dry? | | |
| Would a ladder or Perry type scaffold be a safer alternative? | | |
| Have all open floor holes in work area been covered? | | |

| Employee's names using stilts ||
|---|---|
| | |
| | |
| | |
| | |

To use stilts you must comply with the following before starting work.

1. Permit must be reviewed/signed by a Skanska Supervisor prior to starting work and posted on site.
2. All employees using stilts must have their name on the permit at time of review.
3. Employee(s) must be trained in proper stilt use.
4. Stilts must be inspected daily before use.
5. Stilts are prohibited in areas where guardrails are in use unless the guardrail height is adjusted.

_____
Subcontractor's Supervisor Signature

_____
Skanska Supervisor Signature

**SKANSKA**

Permit #_____

# DO NOT EXCEED LOAD LIMIT = 225 LBS.

## IMPORTANT GUIDELINES TO FOLLOW BEFORE ASSEMBLY OR USE

DO…

- Inspect stilts thoroughly before use, making sure that construction is free from damage and hazards, that there is no excessive wear at the connection points, and that all bolts are tight. Special attention should be given to the entire strut tube assemblies and wing bolts in this respect.
- Walk only on suitable hard surface which is level.
- Be cautious when working around low profile furniture, fixtures, pipes, etc.
- Fasten the upper leg strap first when putting on stilts.
- Disconnect upper leg straps last when removing stilts.
- Replace any damaged or excessively worn stilt components before use.
- Remove stilts to adjust them unless assisted by another person.
- Remove stilts when moving up and down stairs.
- Cover any floor openings.
- Get help when retrieving objects from the floor.  If no one is around remove them completely.
- Keep all straps tightly fastened and secured.
- Take short steps, making sure that the stilts are raised well clear of the floor with each step.
- Walk forward only, making a "U" turn to change direction.
- Adjust Stilts whenever necessary to ensure it is safe.
- Always watch where you are walking.

DON'T…

- Wear stilts without having the proper instruction.
- Wear stilts that are uncomfortable or not adjusted properly.
- Wear stilts without having first inspected them for obvious hazards.
- Wear stilts that have clearly been misused damaged or modified.
- Walk on slippery surfaces.
- Work around uncovered floor openings, stairwells, etc.
- Work in or around loose items e.g. wires, cords, material etc.
- Carry heavy loads while walking on stilts.  The Stilts have a load limit!
- Run or walk fast on stilts.
- Pick up objects which are lower than foot level.
- Wear stilts that are taller than necessary.
- Lean over desks, files, boxes, or other objects while on stilts.
- Be irresponsible on stilts.
- Take steps so large that the action springs fall out.  This can cause serious Injury.
- Modify this product in anyway.
- Wear stilts while under the influence of drugs or alcohol.
- Walk on secondary scaffolding, benches, planks etc.

<u>**FL SHMP REV: 16/July/2014**</u>

**SKANSKA**

Permit #_____

## Appendix BB: Ladder Authorization Permit

| Ladder Use Requested By: | | Date: |
|---|---|---|
| Company: | Duration of Ladder Use: | |
| Forman's Name: | Foreman's contact #: | |
| Work Level/Area: | | |
| Task Description: | | |
| Name of Employee(s) Performing Task: | | |

**PORTABLE LADDER USE JUSTIFICATION**

Describe why other means of access are not feasible:

**LADDER USE CHECKLIST**

Have users been trained on proper/safe ladder use?　☐Yes　☐No

The height of the task is_____ The working height of the ladder is _____

Is the capacity of the ladder appropriate for its user?　☐Yes　☐No

Is the bottom of the ladder free of tripping hazards?　☐Yes　☐No

Are rungs, rails, cleats or intact and free from damage?　☐Yes　☐No

If applicable, is the extension ladder properly secured?　☐Yes　☐No

Is the locking device intact and functional?　☐Yes　☐No

Is the ladder free from any other defects?　☐Yes　☐No

Skanska Authorization _____Date_____

Rev 5/2014

**SKANSKA**

## Appendix CC: Ladder Authorization Log

| Company | Issued to | Issued by | Date/Time Issued | Date/Time Returned | Permit # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Rev 5/2014

DocuSign Envelope ID: 6E090B92-AA5B-43B4-9EBE-68E48D0DEDD6

# SKANSKA

This Page Left Intentionally Blank

ISO·14001 / OHSAS·18001

SKANSKA

**FL SHMP REV: 16/July/2014**



## Certificate of Completion

Envelope Number: 6E090B92AA5B43B49EBF68E48D0DEDD6                          Status: Completed
Subject: 239012-201-017  CCMS
Project Name: UF-323A, Chemistry/Chemical Biology Building
Project Number: 239012
Sub/Vendor Name: Climate Control Mechanical Services, Inc.
Source Envelope:
Document Pages: 311                    Signatures: 3                    Envelope Originator:
Certificate Pages: 5                   Initials: 0                     Linda Miller
AutoNav: Enabled                                                       389 Interpace Parkway
EnvelopeId Stamping: Enabled                                           Parsippany, NJ  07054
                                                                       linda.miller@skanska.com
                                                                       IP Address: 216.52.207.121

## Record Tracking

Status: Original                       Holder: Linda Miller            Location: DocuSign
          5/15/2015 11:08:16 AM PT               linda.miller@skanska.com

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Louie Wise III<br>lw3@climatecontrolflorida.com<br>President<br>Security Level: Email, Account Authentication<br>(None)<br><br>Electronic Record and Signature Disclosure:<br>  Accepted: 5/19/2015 12:05:49 PM PT<br>  ID: c05c7024-d495-4444-af6d-036dc630afcd | *Louie Wise III*<br>DocuSigned by:<br>FD714C8B5B8B4B0...<br><br>Using IP Address: 216.255.242.61 | Sent: 5/15/2015 11:15:31 AM PT<br>Viewed: 5/17/2015 7:35:59 AM PT<br>Signed: 5/19/2015 12:10:07 PM PT |
| Matt Gilbert<br>matt.gilbert@skanska.com<br>Sr. Vice President<br>Security Level: Email, Account Authentication<br>(None)<br><br>Electronic Record and Signature Disclosure:<br>  Accepted: 5/19/2015 12:11:56 PM PT<br>  ID: a352f61e-3d60-41fc-b41c-24fdc1f03f72 | *Matt Gilbert*<br>DocuSigned by:<br>F755CB4A6F404CF...<br><br>Using IP Address: 216.52.207.123 | Sent: 5/19/2015 12:10:18 PM PT<br>Viewed: 5/19/2015 12:11:56 PM PT<br>Signed: 5/19/2015 12:13:48 PM PT |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| Dave Anderson<br>david.anderson@skanska.com<br>Proj Exec<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 5/19/2015 12:13:55 PM PT |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Electronic Record and Signature Disclosure: <br> Accepted: 5/26/2015 3:27:37 PM PT <br> ID: fc6cc0db-4174-407c-9958-813c4ab22d56 | | |

| | | |
|---|---|---|
| Joe Ettershank <br> Joe.ettershank@skanska.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Not Offered <br> ID: | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT <br> Viewed: 5/20/2015 4:47:44 AM PT |
| John Easterwood <br> john.easterwood@skanska.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Accepted: 10/13/2014 7:49:54 AM PT <br> ID: 96c4bfbc-091f-4519-8b59-c2aa79732ab8 | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT |
| Joshua Bowden <br> joshua.bowden@skanska.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Not Offered <br> ID: | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT <br> Viewed: 5/19/2015 12:14:48 PM PT |
| Kevin Barry <br> kbarry@climatecontrolflorida.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Not Offered <br> ID: | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT <br> Viewed: 5/26/2015 1:58:28 PM PT |
| Matthew Cleary <br> matthew.cleary@skanska.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Accepted: 2/10/2015 10:12:46 AM PT <br> ID: 2aceb8e9-4c1d-4167-b9cf-6625aaa06377 | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT |
| Pamela Ysidron <br> Pamela.ysidron@skanska.com <br> Security Level: Email, Account Authentication (None) <br><br> Electronic Record and Signature Disclosure: <br> Not Offered <br> ID: | **COPIED** | Sent: 5/19/2015 12:13:55 PM PT <br> Viewed: 5/27/2015 2:38:29 PM PT |

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/19/2015 12:13:55 PM PT |
| Certified Delivered | Security Checked | 5/19/2015 12:13:55 PM PT |
| Signing Complete | Security Checked | 5/19/2015 12:13:55 PM PT |
| Completed | Security Checked | 5/19/2015 12:13:55 PM PT |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 6/10/2014 5:24:29 PM
Parties agreed to: Louie Wise III, Matt Gilbert, Dave Anderson, John Easterwood, Matthew Cleary

Case 3:16-ap-00100-JAF    Doc 26    Filed 03/07/17    Page 336 of 427

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Skanska USA Building Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Skanska USA Building Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

 To contact us by email send messages to: erin.devaughn@skanska.com


**To advise Skanska USA Building Inc. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at erin.devaughn@skanska.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Skanska USA Building Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to erin.devaughn@skanska.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Skanska USA Building Inc.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to erin.devaughn@skanska.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| --- | --- |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

\*\* These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Skanska USA Building Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Skanska USA Building Inc. during the course of my relationship with you.

# EXHIBIT "B"
# -COMPOSITE EXHIBIT-

# PAYMENT BONDS,
# PERFORMANCE BONDS
# AND, BOND RIDERS



*Zurich/F&D 09131570
**Liberty 015044653
***Federal 81929911
****Continental 929590085
Bond # _____

## PERFORMANCE BOND

THIS BOND IS ISSUED SIMULTANEOUSLY WITH PAYMENT BOND (FOR LABOR & MATERIALS) IN FAVOR OF THE OWNER CONDITIONED ON THE FULL AND FAITHFUL PERFORMANCE OF THE CONTRACT AS PROVIDED BY SECTION 255.05, F.S.

KNOW ALL MEN BY THESE PRESENTS: that **Skanska USA Building, Inc., 4030 Boy Scout Boulevard, Suite 200, Tampa FL 33607  (407) 839-2925**, as Principal, hereinafter called Principal, and ***Zurich American Insurance / Fidelity and Deposit Company of Maryland, 1400 American Lane, Schaumburg IL 60196-1056; **Liberty Mutual Insurance Company, 175 Berkeley Street, Boston MA 02116; ***Federal Insurance Company 15 Mountain View Road, Warren NJ 07059; ****The Continental Insurance Company, CNA Center, 333 South Wabash, Chicago IL 60685**, as Surety, hereinafter called Surety, are held and firmly bound unto the University of Florida Board of Trustees, hereinafter called Owner, for the use and benefit of claimants as herein below defined, in the amount of **One Hundred Seventy Five Thousand Three Hundred Seven and 00/100 dollars ($175,307.00)**, for the payment whereof Principal and Surety bind themselves, their heirs, personal representatives, executors, administrators, successors and assigns, jointly and severally.

WHEREAS,

Principal has by written agreement dated **June 23, 2009**, entered into a contract with Owner for construction of **Chemistry/Chemical Biology Building and Renovation of Existing Facilities** at the University of Florida, Project No. **UF-323**, in accordance with Drawings and Specifications prepared by **Stantec Architecture, 400 Morgan Center, 101 East Diamond Street, Butler PA 16001**, which agreement is incorporated herein by reference, and is hereinafter referred to as the Agreement. Project consists of **4 story concrete and masonry laboratory building in Gainesville FL at orner of University Ave and Buckman Dr on main campus University of Florida      .**

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly and faithfully perform said Agreement, then this obligation shall be null and void; otherwise, it shall remain in full force and effect.

The Surety hereby waives notice of any change, including changes of time, in the Agreement or related subcontracts, purchase orders or other obligations.

Whenever the Principal is in default under the Agreement, and the Owner has performed its obligations thereunder, the Surety shall within thirty (30) days after receipt of Owner's notice of default, and at Surety's expense: (1) arrange for the Principal, with the Owner's consent, to perform and complete the Agreement; or (2) undertake to perform and complete the Agreement itself through agents or other independent contractors; or (3) obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Agreement; arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued for the Agreement; and pay to the Owner the amount of damages described in this Bond in excess of the Balance of the Contract Price that the Owner incurs because of Principal's default; or (4) waive its right to perform and complete, arrange for completion or obtain a new contractor and, within thirty (30) days after Principal is declared in default: (a) determine the amount for which the Surety is liable to the Owner and tender payment therefor to the Owner within sixty (60) days after Surety sends notice to Owner of its intent; or (b) deny liability in whole or in part and notify the Owner citing reasons for the denial.

If the Surety fails to proceed within the times provided in the paragraph above, the Surety shall be deemed in default under this Bond.

If Surety elects to act as provided above, the Surety's responsibilities to the Owner shall not be greater than those of the Principal under the Agreement and the Owner's responsibilities to the Surety shall not be greater than those of the Owner under the Agreement.  To the limit of the penal sum of this Bond, but subject to Owner's payment of the Balance of the Contract Price under the Agreement, the Surety is obligated without duplication for:

(1). The Principal's  responsibilities for correcting defective work and completion of the Agreement;
(2). Additional legal, design professional and delay costs resulting from the Principal's default and resulting from the Surety's actions or failure to act;
(3). Liquidated damages, or if no liquidated damages are specified in the Agreement, the Owner's actual damages cause by the Principal's delayed performance or non-performance.

*The Foundation for The Gator Nation*

AN EQUAL OPPORTUNITY INSTITUTION

For purposes hereof, the term "Balance of the Contract Price" means the total amount payable by Owner to Principal under the Agreement and any amendments thereto, less amounts already paid by Owner to Principal.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**

SIGNED AND SEALED THIS 4ᵗʰ DAY OF September, 2014.

FOR THE **PRINCIPAL:**

AS WITNESSED BY:

NAME OF FIRM:

Skanska USA Building, Inc.

By:

TITLE: **Fred Hames**
Executive Vice President/GM

DATE: 9/8/14

(Seal)

FOR THE **SURETY:**

AS WITNESSED BY:

NAME OF SURETY:                    (SEAL)

*Zurich American Insurance Company and

Fidelity and Deposit Company of Maryland

**Liberty Mutual Insurance Company

***Federal Insurance Company

****The Continental Insurance Company

BY:

Camille M. Cruz, Surety Witness

RESIDENT AGENT AS ATTORNEY-IN-FACT

AGENT NAME AND ADDRESS:

Claudette Alexander Hunt

Aon Risk Solutions

(POWER OF ATTORNEY ATTACHED HERETO)

1001 Brickell Bay Dr., Suite 1100, Miami FL 33131

FILE:    PerformanceBond.doc,    , File Note



BUSINESS AFFAIRS

FACILITIES PLANNING AND CONSTRUCTION

## PAYMENT BOND
### (FOR LABOR AND MATERIALS)

THIS BOND IS ISSUED SIMULTANEOUSLY WITH PERFORMANCE BOND IN FAVOR OF THE OWNER CONDITIONED ON THE FULL AND FAITHFUL PERFORMANCE OF THE CONTRACT AS PROVIDED BY SECTION 255.05, F.S.

KNOW ALL MEN BY THESE PRESENTS: that **Skanska USA Building, Inc., 4030 Boy Scout Boulevard, Suite 200, Tampa FL 33607  (407) 839-2925**, as Principal, hereinafter called Principal, and **\*Zurich American Insurance / Fidelity and Deposit Company of Maryland, 1400 American Lane, Schaumburg IL 60196-1056; \*\*Liberty Mutual Insurance Company, 175 Berkeley Street, Boston MA 02116; \*\*\*Federal Insurance Company 15 Mountain View Road, Warren NJ 07059; \*\*\*\*The Continental Insurance Company, CNA Center, 333 South Wabash, Chicago IL 60685**, as Surety, hereinafter called Surety, are held and firmly bound unto the University of Florida Board of Trustees, hereinafter called Owner, for the use and benefit of claimants as herein below defined, in the penal sum of **One Hundred Seventy Five Thousand Three Hundred Seven and 00/100 dollars ($175,307.00)**, for the payment whereof Principal and Surety bind themselves, their heirs, personal representatives, executors, administrators, successors and assigns, jointly and severally.

WHEREAS:

Principal has by written agreement dated **June 23, 2009**, entered into a contract with Owner for construction of **Chemistry / Chemical Biology Building and Renovations of Existing Facilities** at the University of Florida, Project No. **UF-323A**, in accordance with Drawings and Specifications prepared by **Stantec Architecture, 400 Morgan Center, 101 East Diamond Street, Butler PA 16001**, which agreement is incorporated herein by reference and is hereinafter referred to as the Agreement. Project consists of **4 story concrete and masonry laboratory building in Gainesville FL at orner of University Ave and Buckman Dr on main campus University of Florida        .**

THE CONDITIONS OF THIS BOND are such that:

1.  If Principal shall promptly make all payments owing when due to all claimants defined in Section 255.05(1), Florida Statutes, who furnish labor, materials or supplies, used directly or indirectly by Principal in the prosecution of the Work provided for in the Agreement, then this bond is void; otherwise, it remains in full force and effect.

2.  Each said claimant shall have a right of action against the Principal and Surety for the amount due the claimant.  No such action shall subject the Owner to any cost, expense, loss or damage, and Principal shall promptly pay Owner for the full measure of all cost, expense, loss, damage, and attorney's fees sustained by Owner as a result of any default by Principal under the Agreement.

3.  A claimant, except a laborer, who is not in privity with the Principal shall, before commencing or not later than forty five (45) days after commencing to furnish labor, materials, equipment or supplies for the prosecution of the Work, furnish the Principal with a notice that the claimant intends to look to the bond for protection.  A claimant who is not in privity with the Principal and who has not received payment for labor, materials, equipment or supplies shall deliver to the Principal and to the Surety written notice of the performance of the labor or delivery of the materials, equipment or supplies and of the nonpayment.  The notice of nonpayment may be served at any time during the progress of the work or thereafter but not before 45 days after the first furnishing of labor, services or materials and not later than 90 days after the final furnishing of the labor, services, or materials by the claimant or, with respect to rental equipment, not later than 90 days after the date that the rental equipment was last on the jobsite available for use.  No action for the labor, materials, equipment or supplies may be instituted against the Principal or the Surety unless both notices have been given.

4.  An action, except for an action exclusively for the recovery of retainage, must be instituted against the Principal or Surety within one(1) year after the performance of the labor or completion of delivery of the materials or supplies.  An action exclusively for recovery of retainage must be instituted against the Principal or the Surety within one (1) year after the performance of the labor or completion of delivery of the materials or supplies, or within ninety (90) days after receipt of final payment by the Principal or Surety, whichever comes last.

5.  An action against the Surety or the Principal, or both, may be brought in the county in which the public building or public work is being constructed or repaired or in any other place authorized by the provisions of Chapter 47, Florida Statutes.

6.  The amount of this bond shall be changed only to the extent that the Construction Contract Price is changed in accord with applicable provisions of the Agreement.

*The Foundation for The Gator Nation*

AN EQUAL OPPORTUNITY INSTITUTION

7. Neither any change in or under the Agreement, nor any compliance or noncompliance with any formalities provided in the Agreement or the change shall relieve the Surety of its obligations under this Bond.

8. All capitalized terms used herein by not expressly defined herein shall have the meaning ascribed thereto in the Agreement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**

SIGNED AND SEALED THIS 4th DAY OF September, 2014.

FOR THE **PRINCIPAL:**

AS WITNESSED BY:

NAME OF FIRM:

Skanska USA Building, Inc.

By:

TITLE: **Fred Hames**
**Executive Vice President/GM**

DATE:

(Seal)

FOR THE **SURETY:**

AS WITNESSED BY:

NAME OF SURETY:                    (SEAL)

*Zurich American Insurance Company and

Fidelity and Deposit Company of Maryland

**Liberty Mutual Insurance Company

***Federal Insurance Company

****The Continental Insurance Company

Camille M. Cruz, Surety Witness

By:

RESIDENT AGENT AS ATTORNEY-IN-FACT

AGENT NAME AND ADDRESS:

Claudette Alexander Hunt

Aon Risk Solutions

(POWER OF ATTORNEY ATTACHED HERETO)

1001 Brickell Bay Dr., Suite 1100, Miami FL 33131

FILE:    PaymentBond.doc,        , File Note

## EXTRACT FROM BY-LAWS OF THE COMPANIES

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

## CERTIFICATE

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this 4th day of September, 2014 .

  

Geoffrey Delisio, Vice President

**ZURICH AMERICAN INSURANCE COMPANY**
**COMPARATIVE BALANCE SHEET**
ONE LIBERTY PLAZA, 165 BROADWAY, 32nd FLOOR, NEW YORK, NY 10006
As of December 31, 2013 and December 31, 2012

|  | 12/31/2013 | 12/31/2012 |
|---|---|---|
| **Assets** | | |
| Bonds | $ 18,990,565,123 | $ 18,907,466,866 |
| Preferred Stock | - | - |
| Common Stock | 2,411,755,638 | 2,123,025,432 |
| Other Invested Assets | 2,505,133,631 | 2,035,077,824 |
| Short-term Investments | 327,019,081 | 126,053,209 |
| Receivable for securities | 123,767,865 | 134,410,839 |
| Cash and cash equivalents | (65,045,469) | 728,298,115 |
| Securities lending reinvested collateral assets | 208,060,537 | 225,335,750 |
| Employee Trust for Deferred Compensation Plan | 142,420,097 | 130,493,778 |
| Total Cash and Invested Assets | $ 24,643,676,503 | $ 24,410,161,814 |
| | | |
| Premiums Receivable | $ 3,358,946,105 | $ 3,649,247,239 |
| Funds Held with Reinsurers | 2,383,155 | 3,681,443 |
| Reinsurance Recoverable | 391,812,478 | 215,451,507 |
| Accrued Investment Income | 113,886,701 | 121,729,727 |
| Federal Income Tax Recoverable | 940,033,456 | 930,267,731 |
| Due from Affiliates | 183,852,738 | 187,274,289 |
| Other Assets | 549,410,052 | 493,265,075 |
| Total Assets | $ 30,184,001,188 | $ 30,011,078,824 |
| | | |
| **Liabilities and Policyholders' Surplus** | | |
| **Liabilities:** | | |
| Loss and LAE Reserves | $ 13,894,112,327 | $ 14,244,436,264 |
| Unearned Premium Reserve | 4,321,146,577 | 4,159,670,241 |
| Funds Held with Reinsurers | 185,460,548 | 212,412,675 |
| Loss in Course of Payment | 357,922,606 | 408,170,112 |
| Commission Reserve | 68,132,284 | 64,038,359 |
| Federal Income Tax Payable | 290,773,995 | 16,190,044 |
| Remittances and Items Unallocated | 111,710,550 | 196,410,982 |
| Payable to parent, subs and affiliates | 154,428,297 | 57,540,814 |
| Provision for Reinsurance | 43,942,761 | 66,649,220 |
| Ceded Reinsurance Premiums Payable | 807,651,125 | 551,510,878 |
| Securities Lending Collateral Liability | 208,060,537 | 225,335,750 |
| Other Liabilities | 1,942,241,242 | 2,166,453,164 |
| Total Liabilities | $ 22,385,582,849 | $ 22,368,818,502 |
| | | |
| **Policyholders' Surplus:** | | |
| Common Capital Stock | $ 5,000,000 | $ 5,000,000 |
| Paid-In and Contributed Surplus | 4,394,131,321 | 4,394,131,321 |
| Surplus Notes | - | 430,000,000 |
| Special Surplus Funds | 34,865,000 | 43,259,000 |
| Cumulative Unrealized Gain | 505,136,565 | 331,857,594 |
| Unassigned Surplus | 2,859,285,454 | 2,438,012,408 |
| Total Policyholders' Surplus | $ 7,798,418,339 | $ 7,642,260,323 |
| | | |
| Total Liabilities and Policyholders' Surplus | $ 30,184,001,188 | $ 30,011,078,824 |

I, Dennis F. Kerrigan, Corporate Secretary of ZURICH AMERICAN INSURANCE COMPANY do hereby certify
that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company, on the
31st day of December, 2013, according to the best of my information, knowledge and belief.

_____
Corporate Secretary

State of Illinois
County of Cook } SS:

Subscribed and sworn to, before me, a Notary Public of the State of Illinois, in the City of Schaumburg,
this 15th day of March, 2014.

_____
Notary public

OFFICIAL SEAL
DARRYL JOINER
Notary Public - State of Illinois
My Commission Expires May 3, 2014

# FIDELITY AND DEPOSIT COMPANY

OF MARYLAND

600 Red Brook Blvd., Suite 600, Owings Mills, MD 21117

**Statement of Financial Condition**
As Of December 31, 2013

### ASSETS

| | |
|---|---:|
| Bonds | $ 139,272,722 |
| Stocks | 22,258,887 |
| Cash and Short Term Investments | 6,595,113 |
| Reinsurance Recoverable | 17,970,134 |
| Other Accounts Receivable | 33,409,916 |
| TOTAL ADMITTED ASSETS | $ 219,506,772 |

### LIABILITIES, SURPLUS AND OTHER FUNDS

| | | |
|---|---:|---:|
| Reserve for Taxes and Expenses | | $ 1,787,480 |
| Ceded Reinsurance Premiums Payable | | 42,146,005 |
| Securities Lending Collateral Liability | | 6,613,750 |
| TOTAL LIABILITIES | | $ 50,547,235 |
| Capital Stock, Paid Up | $ 5,000,000 | |
| Surplus | 163,959,537 | |
| Surplus as regards Policyholders | | 168,959,537 |
| TOTAL | | $ 219,506,772 |

Securities carried at $58,378,690 in the above statement are deposited with various states as required by law.

Securities carried on the basis prescribed by the National Association of Insurance Commissioners. On the basis of market quotations for all bonds and stocks owned, the Company's total admitted assets at December 31, 2013 would be $223,222,696 and surplus as regards policyholders $172,675,461.

I, DENNIS F. KERRIGAN, Corporate Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company on the 31st day of December, 2013.

*Corporate Secretary*

State of Illinois
City of Schaumburg } SS:

Subscribed and sworn to, before me, a Notary Public of the State of Illinois, in the City of Schaumburg, this 15th day of March, 2014.

*Notary Public*

OFFICIAL SEAL
DARRYL JOINER
Notary Public - State of Illinois
My Commission Expires May 3, 2014

THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.
This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 5953253

American Fire and Casualty Company     Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company     West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS:  That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint,     Caroline K. Larnarre; Claudette Alexander Hunt; Joseph M. Pietrangelo

all of the city of _Miami_____, state of _FL_____ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this _16th_ day of _January_____, _2013____.



American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

By: _____
Gregory W. Davenport, Assistant Secretary

STATE OF WASHINGTON          ss
COUNTY OF KING

On this _16th_ day of _January_____, _2013_, before me personally appeared Gregory W. Davenport, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Seattle, Washington, on the day and year first above written.



By: _KD Riley_____
KD Riley , Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

ARTICLE IV – OFFICERS – Section 12. Power of Attorney. Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.  Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation.  When so executed, such instruments shall be as binding as if signed by the President and attested by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

ARTICLE XIII – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings. Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.  Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company.  When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

Certificate of Designation – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes Gregory W. Davenport, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

Authorization – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, David M. Carey, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this _4th_ day of _September_, 20_14_.



By: _____
David M. Carey, Assistant Secretary

*Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.*

*To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day.*

LMS_12873_092012

376 of 500



**LIBERTY MUTUAL INSURANCE COMPANY**

**FINANCIAL STATEMENT — DECEMBER 31, 2013**

| Assets | | Liabilities | |
|---|---|---|---|
| Cash and Bank Deposits | $1,118,180,550 | Unearned Premiums | $5,940,431,054 |
| *Bonds — U.S Government | 1,888,225,943 | Reserve for Claims and Claims Expense | 17,305,063,560 |
| *Other Bonds | 12,039,490,815 | Funds Held Under Reinsurance Treaties | 212,659,311 |
| *Stocks | 9,030,962,112 | Reserve for Dividends to Policyholders | 1,226,236 |
| Real Estate | 251,301,907 | Additional Statutory Reserve | 63,348,980 |
| Agents' Balances or Uncollected Premiums | 4,781,042,931 | Reserve for Commissions, Taxes and | |
| Accrued Interest and Rents | 149,855,386 | Other Liabilities | 5,826,683,629 |
| Other Admitted Assets | 15,216,749,451 | **Total** | $29,349,412,770 |
| | | Special Surplus Funds $55,686,852 | |
| | | Capital Stock 11,250,000 | |
| | | Paid in Surplus 7,898,288,167 | |
| | | Unassigned Surplus 7,161,171,306 | |
| **Total Admitted Assets** | **$44,475,809,095** | **Surplus to Policyholders** | **15,126,396,325** |
| | | **Total Liabilities and Surplus** | **$44,475,809,095** |



\* Bonds are stated at amortized or investment value; Stocks at Association Market Values. The foregoing financial information is taken from Liberty Mutual Insurance Company's financial statement filed with the state of Massachusetts Department of Insurance.

I, TIM MIKOLAJEWSKI, Assistant Secretary of Liberty Mutual Insurance Company, do hereby certify that the foregoing is a true, and correct statement of the Assets and Liabilities of said Corporation, as of December 31, 2013, to the best of my knowledge and belief.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Corporation at Seattle, Washington, this 20th day of March, 2014.

*T A Mikolajewski*

Assistant Secretary



| Chubb Surety | POWER OF ATTORNEY | Federal Insurance Company<br>Vigilant Insurance Company<br>Pacific Indemnity Company | Attn: Surety Department<br>15 Mountain View Road<br>Warren, NJ 07059 |
| --- | --- | --- | --- |

**Know All by These Presents, That FEDERAL INSURANCE COMPANY**, an Indiana corporation, **VIGILANT INSURANCE COMPANY**, a New York corporation, and **PACIFIC INDEMNITY COMPANY**, a Wisconsin corporation, do each hereby constitute and appoint  **Claudette Alexander Hunt, Caroline K. Lamarre, Michael A. Marino, Joseph M. Pietrangelo and Paul Rodriguez** of Miami, Florida ————————————————————————————————————————————————

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

In Witness Whereof, said FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY have each executed and attested these presents and affixed their corporate seals on this     **15th**  day of **March, 2012.**

Kenneth C. Wendel, Assistant Secretary

David B. Norris, Jr., Vice President

STATE OF NEW JERSEY

County of Somerset              ss.

On this    **15th**  day of **March, 2012**      before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By- Laws of said Companies; and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with David B. Norris, Jr., and knows him to be Vice President of said Companies; and that the signature of David B. Norris, Jr., subscribed to said Power of Attorney is in the genuine handwriting of David B. Norris, Jr., and was thereto subscribed by authority of said By-Laws and in deponent's presence.

Notarial Seal



KATHERINE J. ADELAAR
NOTARY PUBLIC OF NEW JERSEY
No. 2316685
Commission Expires July 16, 2014

Notary Public

## CERTIFICATION

Extract from the By- Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys- in- Fact  for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY

(the "Companies") do hereby certify that

(i)     the foregoing extract of the By- Laws of the Companies is true and correct,

(ii)    the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and

(iii)   the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this    4th    day of  September, 2014

  

Kenneth C. Wendel, Assistant Secretary

---

IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY   Telephone (908) 903- 3493  Fax (908) 903- 3656
e-mail:  surety@chubb.com

---

Form 15-10- 0225B- U   (Ed. 5- 03)  CONSENT

# FEDERAL INSURANCE COMPANY

### STATEMENT OF ASSETS, LIABILITIES AND SURPLUS TO POLICYHOLDERS

Statutory Basis

### DECEMBER 31, 2013

(in thousands of dollars)

## ASSETS

|  |  |
|---|---:|
| Cash and Short Term Investments............... $ | 352,393 |
| United States Government, State and | |
|   Municipal Bonds .......................................... | 9,295,185 |
| Other Bonds.................................................. | 5,535,360 |
| Stocks.......................................................... | 1,000,938 |
| Other Invested Assets.................................... | 1,452,598 |
| | |
| **TOTAL INVESTMENTS** ............................... | **17,636,474** |

Investments in Affiliates:

|  |  |
|---|---:|
|   Chubb Investment Holdings, Inc. ............... | 3,364,996 |
|   Pacific Indemnity Company........................ | 2,771,422 |
|   Executive Risk Indemnity Inc...................... | 1,218,625 |
|   Chubb Insurance Investment Holdings Ltd.... | 1,111,941 |
|   CC Canada Holdings Ltd............................ | 629,592 |
|   Great Northern Insurance Company .......... | 478,838 |
|   Chubb Insurance Company of Australia Ltd. | 449,419 |
|   Chubb European Investment Holdings SLP .. | 281,312 |
|   Vigilant Insurance Company....................... | 264,883 |
|   Other Affiliates .......................................... | 472,259 |
| Premiums Receivable .................................... | 1,586,676 |
| Other Assets ................................................ | 1,494,913 |
| | |
| **TOTAL ADMITTED ASSETS** ..................... | **$ 31,761,350** |

## LIABILITIES AND SURPLUS TO POLICYHOLDERS

|  |  |
|---|---:|
| Outstanding Losses and Loss Expenses ..... $ | 12,129,450 |
| Unearned Premiums...................................... | 3,504,583 |
| Ceded Reinsurance Premiums Payable....... | 338,026 |
| Provision for Reinsurance ............................ | 61,351 |
| Other Liabilities............................................ | 986,628 |
| | |
| **TOTAL LIABILITIES** .................................... | **17,020,038** |
| | |
| Capital Stock................................................ | 20,980 |
| Paid-In Surplus............................................. | 3,106,809 |
| Unassigned Funds ....................................... | 11,613,523 |
| | |
| **SURPLUS TO POLICYHOLDERS** ............. | **14,741,312** |
| | |
| **TOTAL LIABILITIES AND SURPLUS** | |
|   **TO POLICYHOLDERS**............................ | **$ 31,761,350** |

Investments are valued in accordance with requirements of the National Association of Insurance Commissioners.
At December 31, 2013, investments with a carrying value of $452,687,680 were deposited with government authorities
as required by law.

State, County & City of New York, —  ss:

Yvonne Baker, Assistant Secretary       of the Federal Insurance Company

being duly sworn, deposes and says that the foregoing Statement of Assets, Liabilities and Surplus to Policyholders of said
Federal Insurance Company on December 31, 2013 is true and correct and is a true abstract of the Annual Statement of said
Company as filed with the Secretary of the Treasury of the United States for the 12 months ending December 31, 2013.
    Subscribed and sworn to before me
this March 11, 2014.

*Yvonne Baker*

Assistant Secretary

*Jeanette Shipsey*

Notary Public

JEANETTE SHIPSEY
Notary Public, State of New York
No. 02SH5074142
Qualified in Nassau County
Commission Expires March 10, 2015

Form 15-10-0313A (Rev. 3/14)

**POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT**

**Know All Men By These Presents,** That The Continental Insurance Company, a Pennsylvania insurance company, is a duly organized and existing insurance company having its principal office in the City of Chicago, and State of Illinois, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**Claudette Alexander Hunt, Joseph M Pietrangelo, Individually**

of Miami, FL, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

### - In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the insurance company and all the acts of said Attorney, pursuant to the authority hereby given is hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Board of Directors of the insurance company.

**In Witness Whereof,** The Continental Insurance Company has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 18th day of July, 2014.



The Continental Insurance Company

_____

Paul T. Bruflat                    Vice President

State of South Dakota, County of Minnehaha, ss:

On this 18th day of July, 2014, before me personally came Paul T. Bruflat to me known, who, being by me duly sworn, did depose and say:  that he resides in the City of Sioux Falls, State of South Dakota; that he is a Vice President of The Continental Insurance Company, a Pennsylvania insurance company, described in and which executed the above instrument; that he knows the seal of said insurance company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said insurance company and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said insurance company.

**J. MOHR**
NOTARY PUBLIC
SOUTH DAKOTA

My Commission Expires June 23, 2015

_____

J. Mohr                    Notary Public

### CERTIFICATE

I, D. Bult, Assistant Secretary of The Continental Insurance Company, a Pennsylvania insurance company, do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of the insurance company printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said insurance company this _____4th_____ day of _____September_____, _2014_.

The Continental Insurance Company

_____

D. Bult                    Assistant Secretary

Form F6850-4/2012

## THE CONTINENTAL INSURANCE COMPANY
### Radnor, Pennsylvania
### Statement of Net Admitted Assets and Liabilities
### December 31, 2013

### ASSETS

| | | |
|---|---|---:|
| Bonds | $ | 1,684,328,034 |
| Stocks | | 158,773,278 |
| Cash and short-term investments | | 187,796,353 |
| Amounts recoverable from reinsurers | | 193,598,356 |
| Net deferred tax asset | | 73,211,237 |
| Other assets | | 47,825,939 |
| **Total Assets** | **$** | **2,345,533,197** |

### LIABILITIES AND SURPLUS

| | | |
|---|---|---:|
| Losses | $ | 908,894,332 |
| Loss adjustment expense | | 34,732,682 |
| Unearned premiums | | - |
| Ceded reinsurance premiums payable (net of ceding commissions) | | 26,174,058 |
| Funds held by company under reinsurance treaties | | 719,991,228 |
| Provision for reinsurance | | 76,000,000 |
| Other liabilities | | (787,119,094) |
| **Total Liabilities** | | **978,673,206** |

| | | |
|---|---|---:|
| Surplus Account: | | |
|     Capital paid up | 53,566,360 | |
|     Gross paid in and contributed surplus | 1,423,436,994 | |
|     Special Surplus | 105,639,025 | |
|     Unassigned funds | (215,782,388) | |
|     Surplus as regards policyholders | | 1,366,859,991 |
| **Total Liabilities and Capital** | $ | **2,345,533,197** |

I, OJ B. Magana, Assistant Vice President of The Continental Insurance Company hereby certify that the above is an accurate representation of the financial statement of the Company dated December 31, 2013, as filed with the various Insurance Departments and is a true and correct statement of the condition of The Continental Insurance Company as of that date.

The Continental Insurance Company

By _____
Assistant Vice President

Subscribed and sworn to me this ___12th___ day of ___March___ , 2014.

My commission expires:

_____
Notary Public

"OFFICIAL SEAL"
KATHLEEN M SCHROEDER
Notary Public  State of Illinois
My Commission Expires 08/16/15

## RIDER 1

To be attached to and form part of:

| | |
|---|---|
| Bond Number | 015044653,81929911,929590085,09131570 |
| dated | 9/4/2014 |

issued by the     Zurich American Insurance Company/Fidelity and Deposit Company of Maryland; Liberty Mutual Insurance Company; Federal Insurance Company; The Continental Insurance Company (Surety)

in the amount of     $ 175,307.00

on behalf of     Skanska USA Building, Inc. (Principal)

and in favor of     UNIVERSITY OF FLORIDA BOARD OF TRUSTEES (Obligee)

Now therefore, it is agreed that in consideration of the premium charged, the attached bond shall be amended as follows:

**The Bond Amount shall be amended to include Authorization-2 increasing the bond amount by $5,065,921.00**

**FROM:**     **One Hundred Seventy Five Thousand Three Hundred Seven and 00/100 dollars ($175,307.00**

**TO:**     **Five Million Two Hundred Forty One Thousand Two Hundred Twenty Eight and 00/100 dollars ($5,241,228.00)**

It is further understood and agreed that all other terms and conditions of this bond shall remain unchanged.

This Rider is to be Effective this 8th day of October, 2014.

Signed, Sealed & Dated this 8th day of October, 2014

Skanska USA Building, Inc.

By: _____ (Principal)
    **Fred Hames**
    **Executive Vice President/GM**

Zurich American Insurance Company/Fidelity and Deposit Company of Maryland; Liberty Mutual Insurance Company; Federal Insurance Company; The Continental Insurance Company

By: _____ (Surety)
Maria Signorile, Attorney-in-Fact

### ZURICH AMERICAN INSURANCE COMPANY
### COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
### FIDELITY AND DEPOSIT COMPANY OF MARYLAND
### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **GEOFFREY DELISIO, Vice President**, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Wesley P. WILLIAMS, Maria SIGNORILE, Beth KITCHENS-HARMON and James F. DUNN, all of Atlanta, Georgia, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills, Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, this 13th day of August, A.D. 2012.

**ATTEST:**

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By: _____

*Assistant Secretary*
*Gregory E. Murray*

_____
*Vice President*
*Geoffrey Delisio*

**State of** Maryland
**City of** Baltimore

On this 13th day of August, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **GEOFFREY DELISIO, Vice President, and GREGORY E. MURRAY, Assistant Secretary**, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____
Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2015

POA-F 032-0008C

## EXTRACT FROM BY-LAWS OF THE COMPANIES

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

## CERTIFICATE

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this _8th_ day of _October_, 20_14_.

  

James M. Carroll, Vice President

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.**
This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 6674903

American Fire and Casualty Company     Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company     West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS: That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, __Beth Marian Kitchens-Harmon; James F. Dunn; Maria Signorile; Wesley P. Williams__

all of the city of _Atlanta_ , state of _GA_ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this _6th_ day of _August_ , _2014_ .

American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

STATE OF PENNSYLVANIA    ss
COUNTY OF MONTGOMERY

On this _6th_ day of _August_ , _2014_ , before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Teresa Pastella, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires March 28, 2017
Member, Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella , Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS** – Section 12. Power of Attorney. Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested to by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII** – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings. Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation** – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization** – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Gregory W. Davenport, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this _8th_ day of _October_ , _20 14_ .

By: _Gregory W. Davenport_
Gregory W. Davenport, Assistant Secretary

   

*Sidebar (left margin):* Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees.

*Sidebar (right margin):* To confirm the validity of this Power of Attorney call



| Chubb Surety | POWER OF ATTORNEY | Federal Insurance Company Vigilant Insurance Company Pacific Indemnity Company | Attn: Surety Department 15 Mountain View Road Warren, NJ 07059 |
|---|---|---|---|

**Know All by These Presents,** That FEDERAL INSURANCE COMPANY, an Indiana corporation, VIGILANT INSURANCE COMPANY, a New York corporation, and PACIFIC INDEMNITY COMPANY, a Wisconsin corporation, do each hereby constitute and appoint James F. Dunn, Beth Marian Kitchens-Harmon, Maria Signorile and Wesley P. Williams of Atlanta, Georgia ————————————————————————————————————————————

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

**In Witness Whereof,** said FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY have each executed and attested these presents and affixed their corporate seals on this **1st** day of **August, 2012.**

Kenneth C. Wendel, Assistant Secretary                          David B. Norris, Jr., Vice President

**STATE OF NEW JERSEY**
                                        ss.
**County of Somerset**

On this **1st** day of **August, 2012** before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By- Laws of said Companies, and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with David B. Norris, Jr., and knows him to be Vice President of said Companies; and that the signature of David B. Norris, Jr., subscribed to said Power of Attorney is in the genuine handwriting of David B. Norris, Jr., and was thereto subscribed by authority of said By- Laws and in deponent's presence.

Notarial Seal



KATHERINE J. ADELAAR
NOTARY PUBLIC OF NEW JERSEY
No. 2316685
Commission Expires July 16, 2014

                                                                            Notary Public

## CERTIFICATION

Extract from the By- Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys- in- Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY

(the "Companies") do hereby certify that

(i)     the foregoing extract of the By- Laws of the Companies is true and correct,
(ii)    the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and
(iii)   the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this **8th** day of **October, 2014**

  

Kenneth C. Wendel, Assistant Secretary

---

**IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY Telephone (908) 903- 3493 Fax (908) 903- 3656 e-mail: surety@chubb.com**

---

Form 15-10- 0225B- U   (Ed. 5- 03) CONSENT

## POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

**Know All Men By These Presents,** That The Continental Insurance Company, a Pennsylvania insurance company, is a duly organized and existing insurance company having its principal office in the City of Chicago, and State of Illinois, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**Beth Kitchens-Harmon, Maria S Signorile, Wesley P Williams, Individually**

of Atlanta, GA, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

### - In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the insurance company and all the acts of said Attorney, pursuant to the authority hereby given is hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Board of Directors of the insurance company.

**In Witness Whereof,** The Continental Insurance Company has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 13th day of January, 2014.



The Continental Insurance Company

Paul T. Bruflat                                    Vice President

State of South Dakota, County of Minnehaha, ss:

On this 13th day of January, 2014, before me personally came Paul T. Bruflat to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Sioux Falls, State of South Dakota; that he is a Vice President of The Continental Insurance Company, a Pennsylvania insurance company, described in and which executed the above instrument; that he knows the seal of said insurance company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said insurance company and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said insurance company.

**J. MOHR**
NOTARY PUBLIC
SOUTH DAKOTA

My Commission Expires June 23, 2015          J. Mohr                          Notary Public

### CERTIFICATE

I, D. Bult, Assistant Secretary of The Continental Insurance Company, a Pennsylvania insurance company, do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of the insurance company printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said insurance company this _8th_ day of _October_ _2014_.

The Continental Insurance Company

D. Bult                                    Assistant Secretary

Form F6850-4/2012

## Authorizing Resolutions

ADOPTED BY THE BOARD OF DIRECTORS OF THE CONTINENTAL INSURANCE COMPANY:

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company at a meeting held on May 10, 1995.

"RESOLVED: That any Group Vice President may authorize an officer to sign specific documents, agreements and instruments on behalf of the Company provided that the name of such authorized officer and a description of the documents, agreements or instruments that such officer may sign will be provided in writing by the Group Vice President to the Secretary of the Company prior to such execution becoming effective."

This Power of Attorney is signed by Paul T. Bruflat, Vice President, who has been authorized pursuant to the above resolution to execution power of attorneys on behalf of The Continental Insurance Company.

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company by unanimous written consent dated the 25th day of April, 2012:

"Whereas, the bylaws of the Company or specific resolution of the Board of Directors has authorized various officers (the "Authorized Officers") to execute various policies, bonds, undertakings and other obligatory instruments of like nature; and

Whereas, from time to time, the signature of the Authorized Officers in addition to being provided in original, hard copy format, may be provided via facsimile or otherwise in an electronic format (collectively, "Electronic Signatures"); Now therefore be it resolved: that the Electronic Signature of any Authorized Officer shall be valid and binding on the Company."

## RIDER 1

To be attached to and form part of:

Bond Number        015044653,81929911,929590085,09131570
dated              9/4/2014

issued by the      Zurich American Insurance Company/Fidelity and Deposit Company of
                   Maryland; Liberty Mutual Insurance Company; Federal Insurance
                   Company; The Continental Insurance Company (Surety)

in the amount of   $ 175,307.00

on behalf of       Skanska USA Building, Inc. (Principal)

and in favor of    UNIVERSITY OF FLORIDA BOARD OF TRUSTEES  (Obligee)

Now therefore, it is agreed that in consideration of the premium charged, the attached bond shall
be amended as follows:

**The Bond Amount shall be amended to include Authorization-2 increasing the bond
amount by $5,065,921.00**

**FROM:**      **One Hundred Seventy Five Thousand Three Hundred Seven and 00/100
               dollars ($175,307.00**

**TO:**        **Five Million Two Hundred Forty One Thousand Two Hundred Twenty
               Eight and 00/100 dollars ($5,241,228.00)**

It is further understood and agreed that all other terms and conditions of this bond shall remain
unchanged.

This Rider is to be Effective this 8th day of October, 2014.

Signed, Sealed & Dated this 8th day of October, 2014.

Skanska USA Building, Inc.

By: _____  (Principal)
         Fred Hames
         Executive Vice President/GM

Zurich American Insurance Company/Fidelity and Deposit Company of Maryland; Liberty
Mutual Insurance Company; Federal Insurance Company; The Continental Insurance Company

By: _____  (Surety)
Maria Signorile, Attorney-in-Fact

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **GEOFFREY DELISIO, Vice President,** in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Wesley P. WILLIAMS, Maria SIGNORILE, Beth KITCHENS-HARMON and James F. DUNN, all of Atlanta, Georgia, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings,** and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills, Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND,** this 13th day of August, A.D. 2012.

ATTEST:

ZURICH AMERICAN INSURANCE COMPANY<br>COLONIAL AMERICAN CASUALTY AND SURETY COMPANY<br>FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By: _____

*Assistant Secretary*
*Gregory E. Murray*

_____

*Vice President*
*Geoffrey Delisio*

**State of** Maryland
City of Baltimore

On this 13th day of August, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **GEOFFREY DELISIO, Vice President, and GREGORY E. MURRAY, Assistant Secretary,** of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____
Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2015

POA-F 032-0008C

### EXTRACT FROM BY-LAWS OF THE COMPANIES

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

### CERTIFICATE

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this _8th_ day of _October_, 20_14_.

  

James M. Carroll, Vice President

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.**
This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 6674905

American Fire and Casualty Company
The Ohio Casualty Insurance Company

Liberty Mutual Insurance Company
West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS: That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, __Beth Marian Kitchens-Harmon; James F. Dunn; Maria Signorile; Wesley P. Williams__

all of the city of _Atlanta_____, state of _GA_____ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this _6th___ day of _August_____ _2014___.



American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

STATE OF PENNSYLVANIA        ss
COUNTY OF MONTGOMERY

On this _6th___ day of _August_____, _2014_, before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Teresa Pastella, Notary Public
Plymouth Twp, Montgomery County
My Commission Expires March 28, 2017
Member, Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella , Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS – Section 12. Power of Attorney.** Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings.** Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation –** The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization –** By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Gregory W. Davenport, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this _8th_ day of _October_, 20_14_.

By: _Gregory W. Davenport_
Gregory W. Davenport, Assistant Secretary

LMS_12873_122013

52 of 400

*(Left margin, vertical text)* Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees.

*(Right margin, vertical text)* To confirm the validity of this Power of Attorney call



| **Chubb** **Surety** | **POWER** **OF** **ATTORNEY** | **Federal Insurance Company** **Vigilant Insurance Company** **Pacific Indemnity Company** | **Attn: Surety Department** **15 Mountain View Road** **Warren, NJ 07059** |

**Know All by These Presents,** That FEDERAL INSURANCE COMPANY, an Indiana corporation, VIGILANT INSURANCE COMPANY, a New York corporation, and PACIFIC INDEMNITY COMPANY, a Wisconsin corporation, do each hereby constitute and appoint **James F. Dunn, Beth Marian Kitchens-Harmon, Maria Signorile and Wesley P. Williams of Atlanta, Georgia** --------------------------------------------------------------------------------------

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

**In Witness Whereof,** said FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY have each executed and attested these presents and affixed their corporate seals on this    **1st**    day of    **August, 2012.**

Kenneth C. Wendel, Assistant Secretary

David B. Norris, Jr., Vice President

STATE OF NEW JERSEY
County of Somerset            ss.

On this  **1st**    day of    **August, 2012**    before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By- Laws of said Companies; and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with David B. Norris, Jr., and knows him to be Vice President of said Companies; and that the signature of David B. Norris, Jr., subscribed to said Power of Attorney is in the genuine handwriting of David B. Norris, Jr., and was thereto subscribed by authority of said By- Laws and in deponent's presence.

Notarial Seal



KATHERINE J. ADELAAR
NOTARY PUBLIC OF NEW JERSEY
No. 2316685
Commission Expires July 16, 2014

Notary Public

## CERTIFICATION

Extract from the By- Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys- in- Fact  for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY (the "Companies") do hereby certify that

    (i)    the foregoing extract of the By- Laws of the Companies is true and correct,
    (ii)   the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and
    (iii)  the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this **8th** day of **October, 2014**

  

Kenneth C. Wendel, Assistant Secretary

IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY  Telephone (908) 903- 3493  Fax (908) 903- 3656
e-mail:  surety@chubb.com

Form 15-10- 0225B- U  (Ed. 5- 03)  CONSENT

## POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

**Know All Men By These Presents,** That The Continental Insurance Company, a Pennsylvania insurance company, is a duly organized and existing insurance company having its principal office in the City of Chicago, and State of Illinois, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**Beth Kitchens-Harmon, Maria S Signorile, Wesley P Williams, Individually**

of Atlanta, GA, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

### - In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the insurance company and all the acts of said Attorney, pursuant to the authority hereby given is hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Board of Directors of the insurance company.

**In Witness Whereof,** The Continental Insurance Company has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 13th day of January, 2014.



The Continental Insurance Company

_____
Paul T. Bruflat                                Vice President

State of South Dakota, County of Minnehaha, ss:

On this 13th day of January, 2014, before me personally came Paul T. Bruflat to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Sioux Falls, State of South Dakota; that he is a Vice President of The Continental Insurance Company, a Pennsylvania insurance company, described in and which executed the above instrument; that he knows the seal of said insurance company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said insurance company and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said insurance company.

**J. MOHR**
SEAL  NOTARY PUBLIC  SEAL
SOUTH DAKOTA

My Commission Expires June 23, 2015

_____
J. Mohr                                        Notary Public

### CERTIFICATE

I, D. Bult, Assistant Secretary of The Continental Insurance Company, a Pennsylvania insurance company, do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of the insurance company printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said insurance company this ___8th___ day of ___October___ ___2014___.

The Continental Insurance Company

_____
D. Bult                                    Assistant Secretary

Form F6850-4/2012

## Authorizing Resolutions

ADOPTED BY THE BOARD OF DIRECTORS OF THE CONTINENTAL INSURANCE COMPANY:

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company at a meeting held on May 10, 1995.

"RESOLVED: That any Group Vice President may authorize an officer to sign specific documents, agreements and instruments on behalf of the Company provided that the name of such authorized officer and a description of the documents, agreements or instruments that such officer may sign will be provided in writing by the Group Vice President to the Secretary of the Company prior to such execution becoming effective."

This Power of Attorney is signed by Paul T. Bruflat, Vice President, who has been authorized pursuant to the above resolution to execution power of attorneys on behalf of The Continental Insurance Company.

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company by unanimous written consent dated the 25th day of April, 2012:

"Whereas, the bylaws of the Company or specific resolution of the Board of Directors has authorized various officers (the "Authorized Officers") to execute various policies, bonds, undertakings and other obligatory instruments of like nature; and

Whereas, from time to time, the signature of the Authorized Officers in addition to being provided in original, hard copy format, may be provided via facsimile or otherwise in an electronic format (collectively, "Electronic Signatures"); Now therefore be it resolved: that the Electronic Signature of any Authorized Officer shall be valid and binding on the Company."

## RIDER 2

To be attached to and form part of:

| | |
|---|---|
| Bond Number | 09131570; 015044653; 81929911; 929590085 |
| dated | 9/4/2014 |
| issued by the | FIDELITY AND DEPOSIT COMPANY OF MARYLAND AND ZURICH AMERICAN INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; THE CONTINENTAL INSURANCE COMPANY (Surety) |
| in the amount of | $ 175,307.00 |
| on behalf of | SKANSKA USA BUILDING INC (Principal) |
| and in favor of | UNIVERSITY OF FLORIDA BOARD OF TRUSTEES (Obligee) |

Now therefore, it is agreed that in consideration of the premium charged, the attached bond shall be amended as follows:

**The Bond Amount shall be amended to include Structural Frame and Foundations Phase 2 GMP#3, increasing the bond amount**

**FROM:** **Five Million Four Hundred Sixteen Thousand Five Hundred Thirty Five and 00/100 dollars ($5,416,535.00)**

**TO:** **Fourteen Million Thirty Three Thousand Nine Hundred Eighty Five and 00/100 dollars ($14,033,985.00)**

It is further understood and agreed that all other terms and conditions of this bond shall remain unchanged.

This Rider is to be Effective  this 1st day of December, 2014.

Signed, Sealed & Dated this  1st  day of  December, 2014.

SKANSKA USA BUILDING INC (Principal)

By: _____

Fred Hames
Executive Vice President/GM

FIDELITY AND DEPOSIT COMPANY OF MARYLAND AND ZURICH AMERICAN INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; THE CONTINENTAL INSURANCE COMPANY _____ (Surety)

By: _____
Maria Signorile, Attorney-in-Fact

### ZURICH AMERICAN INSURANCE COMPANY
### COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
### FIDELITY AND DEPOSIT COMPANY OF MARYLAND
### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **GEOFFREY DELISIO, Vice President**, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Wesley P. WILLIAMS, Maria SIGNORILE, Beth KITCHENS-HARMON and James F. DUNN, all of Atlanta, Georgia, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills,  Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, this 13th day of August, A.D. 2012.

**ATTEST:**

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By:

*Assistant Secretary*
*Gregory E. Murray*

*Vice President*
*Geoffrey Delisio*

**State of** Maryland
**City of** Baltimore

On this 13th day of August, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **GEOFFREY DELISIO, Vice President, and GREGORY E. MURRAY, Assistant Secretary**, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2015

POA-F  032-0008C

## EXTRACT FROM BY-LAWS OF THE COMPANIES

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

## CERTIFICATE

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this _1st_ day of _December_, 20_14_.

  

_James M. Carroll_

—————————————————

James M. Carroll, Vice President

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.**

This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 6674994

American Fire and Casualty Company
The Ohio Casualty Insurance Company

Liberty Mutual Insurance Company
West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS: That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint,  __Beth Marian Kitchens-Harmon; James F. Dunn; Maria Signorile; Wesley P. Williams__

all of the city of __Atlanta__ , state of __GA__ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this __6th__ day of __August__ , __2014__ .

American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

STATE OF PENNSYLVANIA      ss
COUNTY OF MONTGOMERY

On this __6th__ day of __August__ , __2014__ , before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Teresa Pastella, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires March 28, 2017
Member, Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella , Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS** – Section 12. Power of Attorney. Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII** – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings. Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation** – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization** – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Gregory W. Davenport, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this __1st__ day of __December__ , 20 __14__ .

By: _Gregory W. Davenport_
Gregory W. Davenport, Assistant Secretary

_Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees._

_To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day._



| Chubb<br>Surety | POWER<br>OF<br>ATTORNEY | Federal Insurance Company<br>Vigilant Insurance Company<br>Pacific Indemnity Company | Attn: Surety Department<br>15 Mountain View Road<br>Warren, NJ 07059 |

**Know All by These Presents,** That **FEDERAL INSURANCE COMPANY,** an Indiana corporation, **VIGILANT INSURANCE COMPANY,** a New York corporation, and **PACIFIC INDEMNITY COMPANY,** a Wisconsin corporation, do each hereby constitute and appoint **James F. Dunn, Beth Marian Kitchens-Harmon, Maria Signorile and Wesley P. Williams** of Atlanta, Georgia ------------------------------------------------------------------------------------------------------------------------------------

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

**In Witness Whereof,** said **FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY,** and **PACIFIC INDEMNITY COMPANY** have each executed and attested these presents and affixed their corporate seals on this **1st** day of **August, 2012.**

_____          _____
Kenneth C. Wendel, Assistant Secretary                     David B. Norris, Jr., Vice President

STATE OF NEW JERSEY
                                        ss.
County of Somerset

On this **1st** day of **August, 2012** before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By- Laws of said Companies; and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with David B. Norris, Jr., and knows him to be Vice President of said Companies; and that the signature of David B. Norris, Jr., subscribed to said Power of Attorney is in the genuine handwriting of David B. Norris, Jr., and was thereto subscribed by authority of said By-Laws and in deponent's presence.

Notarial Seal



KATHERINE J. ADELAAR
NOTARY PUBLIC OF NEW JERSEY
No. 2316685
Commission Expires July 16, 2014

_____
                                                Notary Public

## CERTIFICATION

Extract from the By- Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys- in- Fact  for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY (the "Companies") do hereby certify that

(i)     the foregoing extract of the By- Laws of the Companies is true and correct,
(ii)    the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and
(iii)   the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this 1st day of December, 2014

    

_____
Kenneth C. Wendel, Assistant Secretary

| IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY  Telephone (908) 903- 3493  Fax (908) 903- 3656<br>e-mail:  surety@chubb.com |

Form 15-10- 0225B- U   (Ed. 5- 03)  CONSENT

## POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

**Know All Men By These Presents,** That The Continental Insurance Company, a Pennsylvania insurance company, is a duly organized and existing insurance company having its principal office in the City of Chicago, and State of Illinois, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**Beth Kitchens-Harmon, Maria S Signorile, Wesley P Williams, Individually**

of Atlanta, GA, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

### - In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the insurance company and all the acts of said Attorney, pursuant to the authority hereby given is hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Board of Directors of the insurance company.

**In Witness Whereof,** The Continental Insurance Company has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 8th day of September, 2014.



The Continental Insurance Company

_Paul T. Bruflat_

Paul T. Bruflat        Vice President

State of South Dakota, County of Minnehaha, ss:

On this 8th day of September, 2014, before me personally came Paul T. Bruflat to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Sioux Falls, State of South Dakota; that he is a Vice President of The Continental Insurance Company, a Pennsylvania insurance company, described in and which executed the above instrument; that he knows the seal of said insurance company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said insurance company and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said insurance company.

**J. MOHR**
NOTARY PUBLIC
SEAL   SOUTH DAKOTA   SEAL

My Commission Expires June 23, 2015

_J. Mohr_

J. Mohr        Notary Public

### CERTIFICATE

I, D. Bult, Assistant Secretary of The Continental Insurance Company, a Pennsylvania insurance company, do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of the insurance company printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said insurance company this _1st_ day of _December 2014_.

The Continental Insurance Company

_D. Bult_

D. Bult        Assistant Secretary

Form F6850-4/2012

## Authorizing Resolutions

ADOPTED BY THE BOARD OF DIRECTORS OF THE CONTINENTAL INSURANCE COMPANY:

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company at a meeting held on May 10, 1995.

"RESOLVED:  That any Group Vice President may authorize an officer to sign specific documents, agreements and instruments on behalf of the Company provided that the name of such authorized officer and a description of the documents, agreements or instruments that such officer may sign will be provided in writing by the Group Vice President to the Secretary of the Company prior to such execution becoming effective."

This Power of Attorney is signed by Paul T. Bruflat, Vice President, who has been authorized pursuant to the above resolution to execution power of attorneys on behalf of The Continental Insurance Company.

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company by unanimous written consent dated the 25th day of April, 2012:

"Whereas, the bylaws of the Company or specific resolution of the Board of Directors has authorized various officers (the "Authorized Officers") to execute various policies, bonds, undertakings and other obligatory instruments of like nature; and

Whereas, from time to time, the signature of the Authorized Officers in addition to being provided in original, hard copy format, may be provided via facsimile or otherwise in an electronic format (collectively, "Electronic Signatures"); Now therefore be it resolved:  that the Electronic Signature of any Authorized Officer shall be valid and binding on the Company."

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2915660 6 PG(S)
March 23, 2015 10:54:59 AM
Book 4338 Page 588
J K IRBY Clerk Of Circuit Court
ALACHUA COUNTY, Florida

**RIDER 3**

To be attached to and form part of:

Bond Number     09131570; 015044653; 81929911; 929590085

dated     9/4/2014

issued by the     FIDELITY AND DEPOSIT COMPANY OF MARYLAND AND ZURICH
AMERICAN INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE
COMPANY; FEDERAL INSURANCE COMPANY; THE CONTINENTAL
INSURANCE COMPANY (Surety)

in the amount of     $ 175,307.00

on behalf of     SKANSKA USA BUILDING INC (Principal)

and in favor of     UNIVERSITY OF FLORIDA BOARD OF TRUSTEES (Obligee)

Now therefore, it is agreed that in consideration of the premium charged, the attached bond shall be amended as follows:

**The Bond Amount shall be amended to include Authorization-4 (FINAL) for Phase-III UF-323A, Chemistry / Chemical Biology Building, increasing the bond amount**

**FROM:**     **Fourteen Million Thirty Three Thousand Nine Hundred Eighty Five and 00/100 dollars ($14,033,985.00)**

**TO:**     **Fifty One Million Five Hundred Thousand and 00/100 dollars ($51,500,000.00)**

It is further understood and agreed that all other terms and conditions of this bond shall remain unchanged.

This Rider is to be Effective this 18th day of February, 2015.

Signed, Sealed & Dated this 18th day of February, 2015.

SKANSKA USA BUILDING INC (Principal)

By: _____
     Fred Hames
     Executive Vice President/GM

FIDELITY AND DEPOSIT COMPANY OF MARYLAND AND ZURICH AMERICAN INSURANCE
COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; FEDERAL INSURANCE COMPANY;
THE CONTINENTAL INSURANCE COMPANY _____ (Surety)

By: _____
Maria Signorile, Attorney-In-Fact

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **GEOFFREY DELISIO, Vice President,** in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Wesley P. WILLIAMS, Maria SIGNORILE, Beth KITCHENS-HARMON and James F. DUNN, all of Atlanta, Georgia, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings,** and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills, Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND,** this 13th day of August, A.D. 2012.

ATTEST:

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

  

By: _____

*Assistant Secretary*
*Gregory E. Murray*

_____

*Vice President*
*Geoffrey Delisio*

**State of** Maryland
**City of** Baltimore

On this 13th day of August, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **GEOFFREY DELISIO,** Vice President, and **GREGORY E. MURRAY,** Assistant Secretary, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of the said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____

Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2015

POA-F 032-0008C

## EXTRACT FROM BY-LAWS OF THE COMPANIES

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

## CERTIFICATE

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this _18th_ day of _February_, 20 _15_.



James M. Carroll, Vice President

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.**

This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Certificate No. 6675065

American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

# POWER OF ATTORNEY

KNOWN ALL PERSONS BY THESE PRESENTS: That American Fire & Casualty Company and The Ohio Casualty Insurance Company are corporations duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, ___Beth Marian Kitchens-Harmon; James F. Dunn; Maria Signorile; Wesley P. Williams___

all of the city of ___Atlanta___, state of ___GA___ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this __6th__ day of __August__, __2014__.

American Fire and Casualty Company
The Ohio Casualty Insurance Company
Liberty Mutual Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

STATE OF PENNSYLVANIA ss
COUNTY OF MONTGOMERY

On this __6th__ day of __August__, __2014__, before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of American Fire and Casualty Company, Liberty Mutual Insurance Company, The Ohio Casualty Insurance Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Teresa Pastella, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires March 28, 2017
Member, Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella, Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of American Fire and Casualty Insurance Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS** – Section 12. Power of Attorney. Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested to by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII** – Execution of Contracts – SECTION 5. Surety Bonds and Undertakings. Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation** – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization** – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Gregory W. Davenport, the undersigned, Assistant Secretary, of American Fire and Casualty Company, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this __18th__ day of __February__, 20 __15__.

By: _Gregory W. Davenport_
Gregory W. Davenport, Assistant Secretary






*Left margin (rotated):* Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees.

*Right margin (rotated):* To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day.



| **Chubb Surety** | **POWER OF ATTORNEY** | **Federal Insurance Company Vigilant Insurance Company Pacific Indemnity Company** | **Attn: Surety Department 15 Mountain View Road Warren, NJ 07059** |
|---|---|---|---|

**Know All by These Presents,** That **FEDERAL INSURANCE COMPANY,** an Indiana corporation, **VIGILANT INSURANCE COMPANY,** a New York corporation, and **PACIFIC INDEMNITY COMPANY,** a Wisconsin corporation, do each hereby constitute and appoint **James F. Dunn, Beth Marian Kitchens-Harmon, Maria Signorile and Wesley P. Williams** of Atlanta, Georgia ————————————————————————————————————————

each as their true and lawful Attorney- in- Fact to execute under such designation in their names and to affix their corporate seals to and deliver for and on their behalf as surety thereon or otherwise, bonds and undertakings and other writings obligatory in the nature thereof (other than bail bonds) given or executed in the course of business, and any instruments amending or altering the same, and consents to the modification or alteration of any instrument referred to in said bonds or obligations.

In Witness Whereof, said **FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY,** and **PACIFIC INDEMNITY COMPANY** have each executed and attested these presents and affixed their corporate seals on this **1st** day of **August, 2012.**

_Kenneth C. Wendel_
Kenneth C. Wendel, Assistant Secretary

_David B. Norris_
David B. Norris, Jr., Vice President

STATE OF NEW JERSEY
County of Somerset **ss.**

On this **1st** day of **August, 2012** before me, a Notary Public of New Jersey, personally came Kenneth C. Wendel, to me known to be Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY, the companies which executed the foregoing Power of Attorney, and the said Kenneth C. Wendel, being by me duly sworn, did depose and say that he is Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY and knows the corporate seals thereof, that the seals affixed to the foregoing Power of Attorney are such corporate seals and were thereto affixed by authority of the By- Laws of said Companies; and that he signed said Power of Attorney as Assistant Secretary of said Companies by like authority; and that he is acquainted with David B. Norris, Jr., and knows him to be Vice President of said Companies; and that the signature of David B. Norris, Jr., subscribed to said Power of Attorney is in the genuine handwriting of David B. Norris, Jr., and was thereto subscribed by authority of said By- Laws and in deponent's presence.

Notarial Seal



KATHERINE J. ADELAAR
NOTARY PUBLIC OF NEW JERSEY
No. 2316685
Commission Expires July 14, 2014

_Katherine J. Adelaar_
Notary Public

## CERTIFICATION

Extract from the By- Laws of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY:

"All powers of attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman or the President or a Vice President or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the following officers: Chairman, President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Assistant Secretaries or Attorneys- in- Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached."

I, Kenneth C. Wendel, Assistant Secretary of FEDERAL INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, and PACIFIC INDEMNITY COMPANY (the "Companies") do hereby certify that

  (i)   the foregoing extract of the By- Laws of the Companies is true and correct,
  (ii)  the Companies are duly licensed and authorized to transact surety business in all 50 of the United States of America and the District of Columbia and are authorized by the U.S. Treasury Department; further, Federal and Vigilant are licensed in Puerto Rico and the U.S. Virgin Islands, and Federal is licensed in American Samoa, Guam, and each of the Provinces of Canada except Prince Edward Island; and
  (iii) the foregoing Power of Attorney is true, correct and in full force and effect.

Given under my hand and seals of said Companies at Warren, NJ this _18th_ day of _February, 2015_




_Kenneth C. Wendel_
Kenneth C. Wendel, Assistant Secretary

---

**IN THE EVENT YOU WISH TO NOTIFY US OF A CLAIM, VERIFY THE AUTHENTICITY OF THIS BOND OR NOTIFY US OF ANY OTHER MATTER, PLEASE CONTACT US AT ADDRESS LISTED ABOVE, OR BY   Telephone (908) 903- 3493  Fax (908) 903- 3656**
**e-mail:  surety@chubb.com**

Form 15-10- 0225B- U  (Ed. 5- 03)  CONSENT

# POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

**Know All Men By These Presents,** That The Continental Insurance Company, a Pennsylvania insurance company, is a duly organized and existing insurance company having its principal office in the City of Chicago, and State of Illinois, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**Beth Kitchens-Harmon, Maria S Signorile, Wesley P Williams, Individually**

of Atlanta, GA, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

## - In Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the insurance company and all the acts of said Attorney, pursuant to the authority hereby given is hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Board of Directors of the insurance company.

**In Witness Whereof,** The Continental Insurance Company has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 8th day of September, 2014.



The Continental Insurance Company

Paul T. Bruflat      Vice President

State of South Dakota, County of Minnehaha, ss:

On this 8th day of September, 2014, before me personally came Paul T. Bruflat to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Sioux Falls, State of South Dakota; that he is a Vice President of The Continental Insurance Company, a Pennsylvania insurance company, described in and which executed the above instrument; that he knows the seal of said insurance company; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said insurance company and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said insurance company.

**J. MOHR**
NOTARY PUBLIC
SOUTH DAKOTA

My Commission Expires June 23, 2015

J. Mohr      Notary Public

## CERTIFICATE

I, D. Bult, Assistant Secretary of The Continental Insurance Company, a Pennsylvania insurance company, do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of the insurance company printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said insurance company this _18th_ day of _February_ _2015_.

The Continental Insurance Company

D. Bult      Assistant Secretary

Form F6850-4/2012

## Authorizing Resolutions

ADOPTED BY THE BOARD OF DIRECTORS OF THE CONTINENTAL INSURANCE COMPANY:

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company at a meeting held on May 10, 1995.

"RESOLVED: That any Group Vice President may authorize an officer to sign specific documents, agreements and instruments on behalf of the Company provided that the name of such authorized officer and a description of the documents, agreements or instruments that such officer may sign will be provided in writing by the Group Vice President to the Secretary of the Company prior to such execution becoming effective."

This Power of Attorney is signed by Paul T. Bruflat, Vice President, who has been authorized pursuant to the above resolution to execution power of attorneys on behalf of The Continental Insurance Company.

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company by unanimous written consent dated the 25th day of April, 2012:

"Whereas, the bylaws of the Company or specific resolution of the Board of Directors has authorized various officers (the "Authorized Officers") to execute various policies, bonds, undertakings and other obligatory instruments of like nature; and

Whereas, from time to time, the signature of the Authorized Officers in addition to being provided in original, hard copy format, may be provided via facsimile or otherwise in an electronic format (collectively, "Electronic Signatures"); Now therefore be it resolved: that the Electronic Signature of any Authorized Officer shall be valid and binding on the Company."

# EXHIBIT "C"

# 48 HOUR DEFAULT NOTICE

**SKANSKA**

Date:   March 10, 2016

*Via Facsimile to # 352-351-0219 and Email*

To:   Louie Wise
      Climate Control Mechanical Services
      2695 NW 4th Street
      Ocala, FL 34475

RE:   UF-323A, Chemistry/Chemical Biology Project Subcontract No.: 239012-201-01744
      48-Hour Default Notice

Please be advised that Climate Control Mechanical Services (CCMS) is in default of the terms and conditions of its Subcontract for the following reasons:

1. CCMS failed to comply with the original Project Schedule from March 2, 2015.
2. Skanska and CCMS met on the on November 18, 2015, January 27, 2016, February 1, 2016, February 16, 2016 and March 3, 2016 to develop mutually agreeable recovery schedules, but CCMS failed to meet the requirements of the recovery schedules.
3. Any re-sequencing the original Project Schedule does not relieve CCMS of its obligation to meet the Project Schedule.  The Subcontract Agreement allows Skanska to adjust and re-sequence the Project Schedule based upon the actual progress of work in the field during construction.  This includes re-sequencing required as a result of CCMS's failure to perform timely.   If your company was impacted by any re-sequencing it was required to provide notice to Skanska of the alleged impact within 2 days.  CCMS never provided any notice of alleged resulting from re-sequencing and failed to meet the Project Schedule.
4. CCMS failed to provide adequate and / or qualified labor to complete its work timely and continually failed to meet the quality standards for the Project.  Skanska was forced to assign specific QA/QC personnel to supervise schedule repairs to be performed by CCMS to mitigate issues of impacting other trades.  As per our discussions and meetings over the last several weeks, Skanska has had to provide supplemental manpower to correct deficient work and provide additional supervision to help manage and direct these resources.
5. CCMS has had insufficient manpower to maintain original schedule durations or revised schedule durations provided by CCMS to Skanska for schedule revisions.
6. To this date, CCMS has not been able to complete the work based on the revised schedule to provide conditioned air to allow for finishes to start that are dependent on these elements.  Therefore, other trades are impacted for completing their work.
7. The substantial completion date is impacted by the progress to date by CCMS for rough-in, mechanical systems start up, and installation of work that is required to meet the move-in dates for the Owner to allow classes to start in the fall.  With the Substantial Completion date being late and behind schedule, Skanska is exposed to liquidated damages resulting from the mechanical systems impact to the schedule.  During the course of the re-sequencing and updates, Skanska and CCMS had a plan to complete the work to meet the Substantial

Completion dates for the Project, but the delays to the mechanical system have caused un-recoverable tie delays to meet the required completion date.

8. CCMS failed to comply with the safety requirements which resulted in stop work orders issued by Skanska and an eventual OSHA complaint as discussed more fully in the attached summary of the air quality issue. This is further impacting the schedule.

Pursuant to Section 12.1 of Exhibit E of your Subcontract, if the above deficiencies are not cured within forty-eight (48) hours of your receipt of this notice, your right to proceed with the Work will be terminated for default. In such event, Skanska will suspend all payments to you and hold you responsible for all additional costs and damages Skanska may incur as a result of your default.

Please call me if you have any questions.

Very truly yours,

Sincerely,

*Susan N. Williams*

Susan N. Williams, Sr. PM

Skanska USA Building Inc.

Cc:     Rob Boyer – CCMS
        Kevin Barry - CCMS
        Bob Lanier – Skanska USA Inc.
        Matt Gilbert – Skanska USA Inc.

# EXHIBIT "D"

# NOTICE OF PAYMENT WITHOLDING

**SKANSKA**

Date:    March 10, 2016

*Via Facsimile to # 352-351-0219 and Email*

To:    Louie Wise
       **Climate Control Mechanical Services**
       2695 NW 4th Street
       Ocala, FL 34475

RE:    UF-323A, Chemistry/Chemical Biology Project Subcontract No.: 239012-201-01744
       Notice of Payment Withholding

Your company failed to complete its work timely and the delays are likely to result in backcharges and/or claims from other subcontracts.  Accordingly, Skanska is withholding all future payments to your company pursuant to Section 4.7 of the Subcontract Terms and Conditions.

Very truly yours,

Sincerely,

Susan N. Williams, Sr. PM

Skanska USA Building Inc.

Cc:    Rob Boyer – CCMS
       Kevin Barry - CCMS
       Bob Lanier – Skanska USA Inc.
       Matt Gilbert – Skanska USA Inc.

# EXHIBIT "E"

# CCMS WRITTEN REPLY

 **Climate**Control
MECHANICAL SERVICES

March 14, 2016

Ms. Susan Williams
1430 SW 13th Street
Gainesville, FL  32608

Re:    Response to your March 10th Letter

Dear Ms. Williams,

Climate Control Mechanical Service, Inc. (CCMS) received your letter this morning requiring a response to your 48 hour notice of default.  Please find our responses to your letter below.

1. Your statement about schedule is indicative of the overall schedule since we began on this project. All subcontractors working on this project have failed to meet schedule obligations. Since the structure, site, and roofing on this project all completed behind schedule, our work has been pushed back throughout all our activities.  Skanska failed to maintain the schedule which has unduly punished CCMS.
2. CCMS has been adversely affected by Skanska's inability to meet their scheduled obligations under the terms of the contract.  To be brief, below are some examples for reference.
   a. BIM Coordination
      i. scheduled completion April 22, 2015
      ii. Contract was not executed until May 19, 2015
      iii. BIM was completed in September 2015
      iv. Adequate time for coordination was not provided by Skanska
   b. Roof Dry In
      i. Original Scheduled completion October 12, 2015
      ii. Actual completion of early January 2016
      iii. Delay of almost 90 days
      iv. This delay prevented us from installing materials due to the IAQ and LEED requirements of this building, among other things.
   c. Shaft walls
      i. Although critical to the completion of the project, shaft walls were not shown on the original contract schedule.
      ii. This lack of showing on the project scheduled appears to show a gap in the planning on this project.
      iii. The shafts were delayed until November 2015 because of structural design issues and fireproofing.  Our daily reports documented this and were provided to Skanska each day.
   d. Permanent Power
      i. Our ability to flush piping and provide conditioned air has been delayed by delays in permanent power.
      ii. Original scheduled for completion on December 8, 2015.
      iii. Actual permanent power completed March 7, 2016
   e. Pipe sizing for chilled water connections to the AHUs.  The response to our RFI about pipe sizing took 35 days to be answered on a critical activity.

f. CCMS provided notice of delays caused by the roof dry in on November 12, 2015 prior to any of the meeting dates you referenced. We provided notice that the dry-in of the building was affecting our ability to meet your schedule completion dates, that it would affect the substantial completion date, and how much overtime we had worked to date trying to correct this deficiency. This notice also provided notice that materials were installed out of sequence which could result in damaged materials due to the water intrusion. I provided notice in my letters dated January 26, 2016 and March 8, 2016.

3. See item # 2 above, notice was provided in writing by email, in writing in our daily reports, and in subsequent jobsite meetings to discuss the schedule and progress.

4. CCMS has welcomed the help of the 3 welders Skanska told us they would provide. Their assistance with QC issues was greatly appreciated. Skanska told us they would assign supervisors to assist with MEP above ceiling coordination due to the fact that other trades had not installed their work according to the BIM drawings and therefore we were being delayed from installing our work. Skanska provided the additional supervision to help mitigate the 40+ items installed by other subcontractors, which were in conflict with our work being installed per the BIM drawings. The welding help from Skanska was necessary until CCMS provided 26 additional men to assist with schedule and all welded systems. When we provided these additional crews, adequate supervision was provide for these additional forces as well.

5. When we met for our scope review, CCMS detailed that we needed 45 men as an average work force to meet the project schedule. At a peak, CCMS would need 60 men to meet the schedule. Since the roof dry-in was completed and the chase steel/fireproofing was done, CCMS has provided 65 to 94 men on this project each day. Additionally we are working each Saturday with some crews working 68 hours a week to correct the schedule deficiencies caused by other subcontractors. This has impacted our ability to be productive due to the late start of all of our activities caused by Skanska and other subcontractors.

6. CCMS has been unable to fill the water systems for the HVAC due to insufficient water being provided on site. Makeup water for the HVAC system was not included on the contract documents. An RFI addressing this has been out there since November 2015. This also should have been documented in your weekly jobsite meetings with all subcontractors. The RFI was answered last week which has impacted our ability to fill and flush the systems to provide cooling to the building. Without adequate water, it is very difficult to properly clean and flush the system for our customer.

7. CCMS has made significant progress in the last 8 weeks to help Skanska recover the schedule which was significantly delayed by other contractors and design outside CCMS control. Skanska has even stated so in the numerous meetings between us to review progress. Nothing has changed from that drive to complete this project by CCMS. Except that Skanska has engaged another mechanical contractor who contacted our subcontractors, vendors, and even our employees creating significant interference with our ability to perform our work effectively, to the point it has become distracting and torturous.

8. CCMS has made every effort to comply with the changing requirements from Skanska to address off gasses from welding. In our meeting on March 3, 2016, Skanska was going to have an industrial hygienist provide air sampling on March 7, 2016 to ensure that the air quality in the project was safe for all occupants. That test was perform the day after the OSHA complaint on March 8, 2016 and now has shown that air quality levels are not being adversely affected by our work, but much more by the dust caused by other trades and possibly by housekeeping of the jobsite in general. The complaints are nothing to do with our work, but housekeeping issues

and dust caused by other subcontractors has affected our ability to consistently weld on this project. This again, has adversely affected our ability to complete this project in a timely manner. Under section Exhibit E, section 2.9 of our subcontract, Skanska should direct the offending subcontractor to meet their obligations to provide a safe, clean work environment free from the dust causing our employees to become sick. Please provide confirmation by the same testing agency once remediation of the unsafe work environment is completed by those subcontractors that our employees and subcontractors are not being subject to a hazardous work environment.

Your letter did not provided details on which activities are impacting the scheduled completion. Which activities were on the critical path in the original schedule and which activities are now on the critical path. Skanska has not responded to my letter dated January 26, 2016 addressing the impacts which are affecting CCMS on this project.

All 8 points of your letter are addressed above, and as detailed, Skanska bears responsibility in each. We continue to look for a cooperative solution to complete this project with Skanska. However, the actions by Skanska continue to diminish the project schedule and adversely impact the substantial completion date.

Regards,

Louie F. Wise III
President

Cc:     Rob Boyer – CCMS
        Matt Gilbert – Skanska USA Building Inc.
        Frank Javaheri – University of Florida
        Kent Fuchs – University of Florida

2695 NW 4th Street · Ocala, FL 34475 · www.ClimateControlFlorida.com

888.711.4822    O: 352.291.0185    F: 352.351.0219 · CMC056921 · An InTec Company

# EXHIBIT "F"

# NOTICE OF TERMINATION

# SKANSKA

Date:    March 14, 2016

*Via Facsimile to # 352-351-0219 and Email*

To:    Louie Wise
       Climate Control Mechanical Services
       2695 NW 4th Street
       Ocala, FL 34475

RE:    UF-323A, Chemistry/Chemical Biology Project Subcontract No.: 239012-201-01744
       Notice of Termination

Skanska delivered a notice of default to your company on Saturday March 12, 2016 providing your company with 48 hours to cure its default.  Your company failed to cure its default within 48 hours and informed Skanska this morning that it was demobilizing from the job in light of the pending termination of your company.  As a result, Skanska is providing this 24 hour notice of termination.

Skanska will move forward with completing your company's remaining work by the method Skanska deems most expedient and will issue a backcharge or backcharges to your company for the Damages resulting from your company's failure to perform.

Very truly yours,

Sincerely,

*Susan N. Williams*

Susan N. Williams, Sr. PM

Skanska USA Inc.

Cc:    Rob Boyer – CCMS
       Kevin Barry - CCMS
       Bob Lanier – Skanska USA Inc.
       Matt Gilbert – Skanska USA Inc.

# EXHIBIT "G"

# REPLY TO NOTICE OF TERMINATION


**Climate**Control
MECHANICAL SERVICES

March 15, 2016

Ms. Susan Williams
1430 SW 13th Street
Gainesville, FL 32608

Re:    Response to your March 14th Termination Letter

Dear Ms. Williams,

Climate Control Mechanical Service, Inc. (CCMS) received your Termination Notice letter this morning. Being that your letter requiring a response to your 48 hour notice of default was delivered to our shop foreman on Saturday, who coincidentally was working to fabricate ductwork for the UF Chemistry Building.  CCMS provided our response to Skanska 5:00 pm last night, within our 48 hour window, to address your points of default and our questions unanswered by Skanska.  Because you have not provided a true 48 hours for our response, it appears that Skanska has breached their own subcontract with CCMS.

Additionally, our project manager wrote you an email at 9:13 am yesterday morning stating we were demobilizing based on a conversation with Skanska supervision.  He then followed it at 9:17 am with an email stating that was an error once we got your written 48 hour notice, not a termination notice, and we would be manning the project and continuing on with our work.  This was acknowledged by you almost immediately, so your assertion that we demobilized from the project is patently false and misleading.

Regards,

Louie F. Wise III
President

Cc:    Rob Boyer – CCMS
       Matt Gilbert – Skanska USA Building Inc.
       Frank Javaheri – University of Florida
       Kent Fuchs – University of Florida

# EXHIBIT "H"

# LETTER FROM CCMS TO SKANSKA



June 14, 2016

Mr. Fred Hames, Executive Vice President
Skanska USA Building, Inc.
4030 W. Boy Scout Boulevard
Suite 200
Tampa, FL 33607
VIA US CERTIFIED MAIL, RETURN RECEIPT REQUESTED – 7014 2870 0000 8928 2783

Dear Mr. Hames:

Please be advised Climate Control Mechanical Services, Inc. (CCMS) has incurred $2,848,710.88 in damages on the UF-323A Chemistry/Chemical Biology Building.  The damages have been calculated based on the industry standard MCAA factors for productivity on construction projects.

Additionally, per ARTICLE 4.2 Progress Payments; ARTICLE 10 Changes and Disputes Skanska USA Building, Inc. (Skanska) is in breach of contract with respect to payment to CCMS.  CCMS should have been paid within fourteen (14) days of Skanska receipt of payment from University of Florida.  CCMS' last payment was received on 2 MARCH 2016 for Project Timeline Acceleration cost (additional staffing) in the amount of $261,267.80.

Please review the above; and schedule a meeting to resolve by 30 JUNE 2016.


Regards,

Louie F. Wise, III
President


cc:    Zurich American Insurance Company
       Federal Insurance Company
       Liberty Mutual Insurance Company
       The Continental Insurance Company
       University of Florida Board of Trustees
       Richard A. Perry, Attorney at Law


LFW/ljs


Enclosures

UNDER FLORIDA LAW, YOUR FAILUR_  _O MAKE SURE THAT WE ARE PAID M/  _RESULT IN A LIEN AGAINST YOUR PROPERTY AND YOU PAYING TWICE.  TO AVOID YOUR PAYING TWICE, YOU MUST OBTAIN A WRITTEN RELEASE FROM US EVERY TIME YOU PAY YOUR CONTRACTOR.

# NOTICE TO OWNER/NOTICE TO CONTRACTOR
And PRELIMINARY NOTICE TO OWNER, CONTRACTOR, SUBCONTRACTOR AND SURETY (if applicable)
FLORIDA STATUTES 713.06, 713.23 AND 255.05

Date:  **April 28, 2015**

**OWNER**

University of Florida
PO Box 115050
Gainesville, FL 32611

**GENERAL CONTRACTOR**

Skanska USA Building, Inc.
4030 Boy Scout Boulevard
Tampa, FL 33607

**CERTIFIED MAIL # 7013 1090 0000 5589 6019**       **CERTIFIED MAIL # 7013 1090 0000 5589 6002**

The undersigned hereby informs you that he or she has furnished or is furnishing services or material as follows:

HVAC

For the improvement of real property identified as: UF-323A Chemistry/Chemical Biology Building, University of Florida, Gainesville, FL

Under and order given by: **Skanska USA Building, Inc.**

Florida Law prescribes the serving of this notice and restricts your right to make payments under your contract in accordance with Section 713.06 and 255.05 Florida Statutes.  The undersigned requests a copy of the direct contract(s) and any payment bond for this project and agrees to pay reasonable copy costs for such copy.  If there is a PAYMENT BOND, then this notice will advise you that we intend to look to the applicable payment bond for payment of the foregoing items.  Within ten (10) days of receipt for this notice, you are required by Florida Statutes Section 713.23 and 255.05 to furnish notice of the existence of such payment bond and a copy of said bond.  PLEASE NOTE:  THIS NOTICE IS NOT A LIEN, CLOUD, NOR ENCUMBRANCE UPON TITLE TO YOUR PROPERTY, NOR IS IT A MATTER OF PUBLIC RECORD.  This notice is a standard business procedure of the undersigned firm and does not adversely reflect upon the credit worthiness or other reputation of any person names herein.

Request for Sworn Statement of Account must be addressed to: Climate Control Mechanical Services, Inc.

## IMPORTANT INFORMATION FOR YOUR PROTECTION
*Under Florida's laws, those who work on your property or provide materials and are not paid have a right to enforce their claim for payment against your property.  This claim is known as a construction lien.  If your contractor fails to pay subcontractors or material suppliers or neglects to make other legally required payments, the people who are owned money may look to your property for payment.  EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL.*

## PROTECT YOURSELF
*Recognize that this Notice to Owner may result in a lien against your property unless all those supplying a Notice to Owner have been paid.  LEARN more about Construction Lien Law, Chapter 713, Part 1, Florida Statues, and the meaning of this notice by contacting an attorney or the Florida Department of Business and Professional Regulation.*

By:

Agent for:

*Trish Wilson*
**Climate Control Mechanical Services, Inc.**

COPIES TO:

CERTIFIED MAIL #

**Prepared by: Climate Control Mechanical Services, Inc., 2695 NW 4th Street Ocala, FL 34475**

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Skansfa USA Bldg.
4030 Boy Scout Blvd
Tampa, Fl. 33607

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail®  ☐ Priority Mail Express™
   ☐ Registered  ☐ Return Receipt for Merchandise
   ☐ Insured Mail  ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
   (Transfer from service label)   7013 1090 0000 5589 6002

PS Form 3811, July 2013   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

University of Florida
PO Box 115050
Gainesville, Fl. 32611

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail®  ☐ Priority Mail Express™
   ☐ Registered  ☐ Return Receipt for Merchandise
   ☐ Insured Mail  ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
   (Transfer from service label)   7013 1090 0000 5589 6019

PS Form 3811, July 2013   Domestic Return Receipt

English          Customer Service          USPS Mobile                                    Register / Sign In



# USPS Tracking®



 **Customer Service ›**
Have questions? We're here to help.

 **Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number:** 70142870000089282745

**Updated Delivery Day:** Monday, June 20, 2016

## Product & Tracking Information

Postal Product:              Features:
                             Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 20, 2016 , 6:36 am** | **Delivered** | **CHICAGO, IL 60685** |
| Your item was delivered at 6:36 am on June 20, 2016 in CHICAGO, IL 60685. | | |
| June 20, 2016 , 5:49 am | Available for Pickup | CHICAGO, IL 60685 |
| June 20, 2016 , 5:33 am | Arrived at Unit | CHICAGO, IL 60680 |
| June 17, 2016 , 4:51 am | Arrived at USPS Facility | CHICAGO, IL 60607 |
| June 15, 2016 , 10:43 pm | Departed USPS Facility | JACKSONVILLE, FL 32203 |
| June 15, 2016 , 10:11 pm | Arrived at USPS Facility | JACKSONVILLE, FL 32203 |

## Available Actions

Text Updates

Email Updates

## Track Another Package

**Tracking (or receipt) number**

[                    ]          **Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



**HELPFUL LINKS**
Contact Us
Site Index
FAQs

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2016 USPS. All Rights Reserved.



# USPS Tracking®

Search or Enter a Tracking Number



**Customer Service ›**
Have questions? We're here to help.



**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number:** 70142870000089282769

**Updated Delivery Day:** Monday, June 20, 2016

## Product & Tracking Information

Postal Product:                     Features:
                                    Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 18, 2016 , 11:01 am** | **Arrived at Unit** | **WARREN, NJ 07059** |

Your item arrived at the Post Office at 11:01 am on June 18, 2016 in WARREN, NJ 07059.

| | | |
|---|---|---|
| June 17, 2016 , 11:51 pm | Departed USPS Facility | JERSEY CITY, NJ 07097 |
| June 17, 2016 , 9:07 am | Arrived at USPS Facility | JERSEY CITY, NJ 07097 |
| June 15, 2016 , 10:43 pm | Departed USPS Facility | JACKSONVILLE, FL 32203 |
| June 15, 2016 , 10:11 pm | Arrived at USPS Facility | JACKSONVILLE, FL 32203 |

## Available Actions

Text Updates

Email Updates

## Track Another Package

Tracking (or receipt) number

Track It

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



**HELPFUL LINKS**
Contact Us
Site Index
FAQs

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2016 USPS. All Rights Reserved.



**USPS.COM**®

# USPS Tracking®

Still Have Questions? Browse our FAQs >



**Customer Service ›**
Have questions? We're here to help.



**Get Easy Tracking Updates ›**
Sign up for My USPS.

---

**Tracking Number:** 70142870000089282752

**Updated Delivery Day:** Friday, June 24, 2016

## Product & Tracking Information

**Postal Product:**

**Features:**
Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 24, 2016 , 9:50 am** | **Delivered** | **BOSTON, MA 02116** |
| Your item was delivered at 9:50 am on June 24, 2016 in BOSTON, MA 02116. | | |
| June 24, 2016 , 8:22 am | Arrived at Unit | BOSTON, MA 02116 |
| June 23, 2016 , 1:04 pm | Departed USPS Facility | BOSTON, MA 02205 |
| June 17, 2016 , 1:08 pm | Arrived at USPS Facility | BOSTON, MA 02205 |
| June 15, 2016 , 10:43 pm | Departed USPS Facility | JACKSONVILLE, FL 32203 |
| June 15, 2016 , 10:11 pm | Arrived at USPS Facility | JACKSONVILLE, FL 32203 |

## Available Actions

Text Updates

Email Updates

---

## Track Another Package

**Tracking (or receipt) number**

Track It

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



---

**HELPFUL LINKS**
Contact Us
Site Index
FAQs

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2016 USPS. All Rights Reserved.

English     Customer Service     USPS Mobile        Register / Sign In



# USPS Tracking®

 **Customer Service ›**
Have questions? We're here to help.

 **Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number:** 70142870000089282776

## Product & Tracking Information

**Postal Product:**      **Features:**
     Certified Mail™

## Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 21, 2016 , 4:40 am** | **Delivered, Individual Picked Up at Postal Facility** | **SCHAUMBURG, IL 60194** |

Your item was picked up at a postal facility at 4:40 am on June 21, 2016 in SCHAUMBURG, IL 60194.

| | | |
|---|---|---|
| June 18, 2016 , 5:32 am | Departed USPS Facility | CAROL STREAM, IL 60199 |
| June 17, 2016 , 8:46 am | Arrived at USPS Facility | CAROL STREAM, IL 60199 |
| June 15, 2016 , 10:43 pm | Departed USPS Facility | JACKSONVILLE, FL 32203 |
| June 15, 2016 , 10:11 pm | Arrived at USPS Facility | JACKSONVILLE, FL 32203 |

## Track Another Package

**Tracking (or receipt) number**

[                                    ]    **Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



**HELPFUL LINKS**
Contact Us
Site Index
FAQs

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2016 USPS. All Rights Reserved.

English     Customer Service     USPS Mobile        Register / Sign In



# USPS Tracking®

Search or Enter a Tracking Number


**Customer Service ›**
Have questions? We're here to help.


**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number:** 70142870000089282783

## Product & Tracking Information

| Postal Product: | Features: |
|---|---|
| | Certified Mail™ |

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 17, 2016 , 12:01 pm** | **Delivered, Front Desk/Reception** | **TAMPA, FL 33607** |
| | Your item was delivered to the front desk or reception area at 12:01 pm on June 17, 2016 in TAMPA, FL 33607. | |
| June 17, 2016 , 1:01 am | Departed USPS Facility | TAMPA, FL 33630 |
| June 16, 2016 , 2:59 pm | Arrived at USPS Facility | TAMPA, FL 33630 |
| June 15, 2016 , 10:43 pm | Departed USPS Facility | JACKSONVILLE, FL 32203 |
| June 15, 2016 , 10:11 pm | Arrived at USPS Facility | JACKSONVILLE, FL 32203 |

## Available Actions

Text Updates

Email Updates

## Track Another Package

**Tracking (or receipt) number**

Track It

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



**HELPFUL LINKS**
Contact Us
Site Index
FAQs

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2016 USPS. All Rights Reserved.

# EXHIBIT "I"

# LETTER FROM ZURICH TO CCMS

RECEIVED

JUL 2 2 2016



**ZURICH**

Zurich Surety & Financial Claims
P. O. Box 968032
Schaumburg, IL 60196

July 19, 2016

Climate Control Mechanical Services
Attn: Louie F. Wise, III
2695 NW 4th Street
Ocala, FL 34475

RE:  Principal:        Skanska USA Building, Inc.
     Obligee:          University of Florida Board of Trustees
     Claim #           638 0068885
     Bond #            PRF 9131570
     Project:          Chemistry/Chemical Biology Building and Renovations of
                       Existing Facilities
     Claimant:         Climate Control Mechanical Services
     Claimed Amount:   $2,848,710.88

**Please send all responses or replies to this letter to the attention of Teresa
Schoenhaar via e-mail to teresa.schoenhaar@zurichna.com or via fax to 877-
812-5754, if possible.**

Dear Mr. Wise:

This letter acknowledges receipt of a Notice of Claim against the above-referenced Bond
in the amount of $2,848,710.88. Our records show that this Notice was received by the
Surety on July 8, 2016.

The Surety's investigation requires information and documentation sufficient to evaluate
and demonstrate your claim. In order for the Surety to timely respond to your claim,
please send supporting information and documentation to the Surety **within 10 days of
the date of this letter**, including but not limited to the following:

1. An itemization of your claim, in the following format:

| | |
|---|---|
| Original Subcontract/Purchase Order/ Agreement amount | $ 6,410,705.00 |
| Changes/ additions/ deductions (+/-) | -2,359,693.25 |
| Revised Subcontract/Purchase Order/ Agreement amount | 4,051,011.75 |
| Less amounts paid to date | 2,361,787.24 |
| Current Subcontract/Purchase Order/ Agreement balance | 1,689,214.51 |
| Portion of balance which is Retainage (if any) | $ 405,101.18 |
| Amount claimed against the Payment Bond | 2,848,710.88 |

2. Copies of your subcontract, purchase order(s), rental agreement(s) or other
   contractual agreements;
3. Change orders(s) or other written agreements modifying the original Agreement,
   all submitted change order requests, extra work tickets, or other written
   documentation of claimed changes, with supporting documentation;

4. Your Notice to Owner/ Preliminary Notice (if required), with proof of delivery to the Owner (the "Obligee") and to the Contractor (our "Principal");
5. Any other Notices required by law and/or by your Agreement;
6. Proof of delivery of your Notice of Nonpayment/ Notice of Claim to Obligee and to Surety, showing the date of delivery;
7. Your first and last application for payment/ invoice/ other billing;
8. All unpaid applications for payment/ invoices/ other billings, with supporting documentation;
9. An account history reflecting all billings and payments on this project, or an accounts receivable ledger;
10. All licenses required by law, including professional licenses or certifications;
11. All correspondence to or from the Principal, the Obligee, or anyone else related to your claim;
12. If you provided labor and materials to the project:
    a. Current punch lists and all warranty requests regarding your work;
    b. All schedules;
    c. All project close-out documentation required by your Agreement;
    d. Copies of your Performance Bond and/or Payment Bond; and
    e. A listing of all your direct subcontractors and suppliers, and the amounts due (if any) to each, with supporting documentation.
13. If you supplied labor only to the project, all timesheets supporting claimed labor charges
14. If you supplied materials and/or equipment only:
    a. Signed delivery tickets, bills of lading, and/or shipping receipts showing delivery of materials and/or equipment to the Project; and
    b. Signed pick-up tickets for rental equipment.
15. Any other information and documentation supporting or demonstrating the value of your claim under the Bond.

**The Surety requires such information and documentation to determine with substantial accuracy the value of your claim and the compliance of your claim with the terms of the bond, subcontract or other requirements. Your failure to timely provide the requested information and documentation will impact the Surety's ability to investigate and evaluate your claim and therefore may result in the dispute and/or denial of your claim.**

This letter also encloses a Proof of Claim form, which will assist the Surety's review of your claim. We request that you complete the Proof of Claim form, sign it before a notary, and return the completed and signed form with your response.

Please direct your response and any future correspondence to my attention at the address, fax number and/or e-mail address on this letter. E-mail or fax is preferred, if possible. Please include the claim number above on all correspondence.

Without passing on the merits of your claim, we are taking this matter up with our bond Principal.

Our actions are taken for the purposes of investigation only, and the Surety reserves all rights and defenses that the Surety and/ or its Principal may have or obtain concerning this matter. Nothing stated or unstated in this or any other correspondence is intended

● Page 3                                                                 July 19, 2016

or should be construed as an acknowledgement of liability regarding this matter or as a waiver of any right or defense, known or unknown, at law or in equity.

Thank you for your assistance in the Surety's investigation.  If you have any questions, please contact me at the phone or fax numbers listed below.

Sincerely,
Fidelity and Deposit Company of Maryland

*Teresa Schoenhaur / JR*

Teresa Schoenhaar
Claims Counsel
Phone: 800-379-9916 ext. 5

cc:     Stacey Sturrock, Skanska USA Building via email
        Nancy Schnee, AON CSG via email
        Nancy Matozzo, Liberty Mutual Surety (015044653)
        Mark Torp, CNA Surety Claims (929590085)
        ecsc.claims@chubb.com, Chubb Group (8192-99-11)
        Patrick Evans, Zurich Surety via email

# EXHIBIT "J"

# LETTER FROM ZURICH
# TO CCMS DENYING CLAIM



**Zurich**
Fidelity and Crime Claims
P.O. Box 968032
Schaumburg, IL  60196

Phone:  800-379-9916 x 5
Fax:  877-812-5754
Email:  teresa.schoenhaar@zurichna.com

October 20, 2016

By Email: lw3@intec360.com
Louie F. Wise, III, CEO
InTec
2695 NW 4th Street
Ocala, FL 34475

RE:     Claim No:           6380068885
          Principal:           Skanska USA Building, Inc.
          Bond No:           PRF 9131570
          Obligee:           University of Florida Board of Trustees
          Project:            Chemistry/Chemical Biology Building
          Claimant:          Climate Control Mechanical Services
          Claim Amount:    $2,848,710.88

Dear Mr. Wise:

Fidelity and Deposit Company of Maryland has reviewed your claim on behalf of all sureties shown on the bond.  I understand that Climate Control Mechanical Services (CCMS) provided labor and materials under contract with Skanska USA Building, Inc. on the referenced project.  Please be advised that this project and the bond provided by the sureties are governed by the terms of the contract and Florida public works law.

Skanska advises that due to numerous deficiencies in the work performed by CCMS, Skanska terminated the CCMS contract.  The claim submitted by CCMS consists of backcharges assessed by Skanska, as well as unsubstantiated and unapproved change order requests, and no amount is due CCMS.  Therefore, we must decline coverage for this claim.

If you have any further information that would indicate the possibility of coverage under the bond please provide this information and we will consider it.  Please contact me if you have any questions or would like to discuss this matter further.  Please be advised that we continue to reserve all rights and defenses available under the bond, contract documents and applicable law.

Sincerely,

Fidelity & Deposit Company of Maryland


*Teresa N. Schoenhaar*
By:  Teresa N. Schoenhaar

● Page 2                                                    October 20, 2016

Claim Counsel

cc:     Stacey Sturrock, Skanska USA Building
        Nancy Matozzo, Liberty Mutual Surety
        Mark Torp, CNA Surety Claims
        Diana Dobosiewicz, Chubb Group
        Patrick Evans, Zurich Surety